## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA,

    v.                             CASE NO. 8:21-cr-355-WFJ-CPT

GREGORY ALLEN WILLIAMSON,

    Defendant.

_____/

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND
## CONCLUSIONS OF LAW IN SUPPORT OF MOTION TO SUPPRESS

Defendant, Gregory Allen Williamson, by and through undersigned counsel, and pursuant to the Court's October 12, 2022 Order, Doc. 97, hereby submits these Proposed Findings of Fact and Conclusions of Law in Support of Defendant's pending Motion to Suppress. Doc. 45. For the reasons set forth below, the Motion to Suppress should be granted.

## INTRODUCTION

As detailed below, the results of two search warrants should be suppressed. Yahoo and NCMEC were state actors that conducted a warrantless search. And even if they were not state actors, Detective Keller exceeded the scope of the private search.

Further, under *Franks*, the warrant applications contained material omissions and misrepresentations, without which the applications lack probable cause. No good-faith exception applies here.

<u>**PROPOSED FINDINGS OF FACT**</u>

Defendant submits the following Proposed Findings of Fact, supported by citations to the testimony taken at the October 11, 2022 evidentiary hearing. A copy of the transcript from that hearing is attached hereto as **Exhibit A**.[1]

**I.     Facts Relevant to the Private Search Issue.**

**A.     Actions taken by Yahoo relevant to the private search issue.**

1.     Yahoo is an internet service provider ("ISP") and scans emails that are sent by its users for "hash" matches against a list of known "hashes." Ex. A 77:1-4.

2.     "Hash matches" are a digital method of comparing the computer code of an electronic image with the code of another. Ex. A 45: 1-11. This is not based on the visual image depicted by the code. *Id*. at 7-11.

3.     In September 2020, Yahoo submitted a CyberTipline Report to the National Center for Missing and Exploited Children ("NCMEC"). Ex. A 83:21-23; Defense Ex. A.

4.     That CyberTipline report alleged that seven computer files contained child pornography. Ex. A 86: 23-25; Defense Ex. A. Those files were from a Yahoo email account caled <u>vladlover50@gmail.com</u>. Defense Ex. A.

---

[1] Citations to the Transcript while be reflected first by page number then by line number, e.g. a citation to Ex. A 45:1-7 would refer to page 45 of the transcript: 1 through 7.

5. At the evidentiary hearing, no one from Yahoo who actually performed the review of the materials was present to testify about what they did or did not do.

6. The Yahoo representative, Ashley Guizzotti, testified that Yahoo has a policy that requires human review of images that are reported by Yahoo to the NCMEC CyberTipline. Ex. A 78:5-10.

7. However, when asked how she knew such policies were followed here, she only referred to the training of the agents. Ex. A p100-01:22-25, 1. When pressed about the specific policies, she admitted that she had no knowledge whether all the relevant Yahoo policies were actually followed in this instance. Ex. A 101:10-13.

8. No written Yahoo policies were entered into evidence during the evidentiary hearing.

9. The Yahoo representative did not know whether any Yahoo employees had ever been disciplined for failure to abide by Yahoo policies. Ex. A 101:19-23.

10. The Yahoo representative did not know whether an agent actually viewed the images at issue in this case. Ex. A 102:8-10.

11. When an ISP submits a CyberTipline Report to NCMEC, it contains a questions ""Did reporting ESP view entire contents of uploaded file?" to be answered by the ISP. Defense Ex. A.

12.     Yahoo receives no guidance from NCMEC regarding the definition of the phrase "Did reporting ESP view entire contents of uploaded file?"  Ex. A 102: 15-20.

13.     Yahoo has no internal definition of the phrase "Did reporting ESP view entire contents of uploaded file?" that it applies in submitting CyberTipline Reports.  Ex. A 103: 6-13.  There was no testimony from the Yahoo employee who submitted the CyberTipline report regarding how that phrase was interpreted here.

14.     Apart from the CyberTipline Report itself, the only documentation Yahoo maintains regarding its actions in response to alleged child pornography, except for an Excel spreadsheet it calls the "Tracker."  Defense Ex. I; Ex. A 104: 12-16.  The Tracker is a "running document" that can be edited and, if edited, information previously contained in the Tracker would no longer be present.  Ex. A 126: 2-6.  The Tracker only documents what Yahoo's trust and safety moderators are working on "at the time."  Ex. A 104: 16, 22; Defense Ex. I.

15.     The Tracker spreadsheet contains several columns of information, including the Yahoo email address at issue and the IP address of the Yahoo user, along with other information.  Ex. A 112: 12-13.

16.     The Yahoo representative testified that the column for "Archiving Agent" in the Tracker means the person who allegedly performed the human review in this case.  Ex. A 116-17: 19-5.

17.     However, when pressed, she admitted that she did not know whether in this case, the person identified as the Archiving Agent on the Tracker ("Jessie" or Jessica Hines) is actually the person who performed the alleged human review. Ex. A 117: 11-16.

18.     With respect to the seven images reported to NCMEC in this case, the Yahoo representative did not know who reviewed those images, and did not know who would know.  Ex. A 120: 13-19.

19.     Ms. Hines testified that, based on the Tracker spreadsheet, she did not review the images that were submitted to NCMEC in the CyberTipline Report.  Ex. A 144-45: 23-8.

20.     Ms. Hines believed it would have been a person named Chris Wayne who reviewed the images reported via the CyberTipline.  Ex. A 144-45: 23-25, 1. Chris Wayne did not testify or otherwise provide any testimony about what he did or did not do.

21.     Yahoo itself maintains no documentation as to who would have performed the review.  Ex. A 120-121: 25-2.

22.     Ms. Hines testified that she had no personal recollection regarding the CyberTipline Report at issue in this case.  Ex. A 139: 12-16.

23.     Ms. Hines had no recollection of reviewing the images at issue in this case.  Ex. A 139: 17-19.

24.     Ms. Guizzotti testified that if an image was in a "gray area" where it could not be determined whether the image should be reported to NCMEC, the image would be subject to a discussion with Yahoo's legal department.  Ex. A 80: 1-5.  Ms. Hines had no recollection whether such a legal call took place here.  Ex. A 143: 1-3.

**B.     Actions taken by NCMEC relevant to the private search issue.**

25.     NCMEC labels alleged child pornography it receives through the CyberTipline.  Those labels categorize the images.  Ex. A 23: 16-24.

26.     Relevant here, the label of "Apparent Child Pornography" means "the activity depicted in the image or video meets the federal definition of child pornography and that it is overtly clear that it is a child that's involved in that activity."  Ex. A 66: 10-18.

27.     The label "CP (Unconfirmed)" means "the activity depicted in that image or video appears to meet the federal definition of child pornography. However, there may be question of the age of the individual seen in that particular image or video."  This is also called "age difficult" or "age indeterminate."  Ex. A 35: 5-10.

28.     NCMEC will cross-reference images reported through the CyberTipline against a database using "hash matches." Ex. A 21: 5-8.

29.     If a hash match of one image is the same as an image that is already contained in NCMEC's database, NCMEC would categorize it the same way.  Ex. A 47: 12-15.

30.     This occurs automatically without a person ever physically looking at the image.  Ex. A 47: 16-19.

31.     When submitting a CyberTipline Report, Section A of that report contains information provided by the ISP.  Defense Ex. A.

32.     Included in Section A of a CyberTipline Report is a summary of information regarding the images that are being reported by the ISP.  Here, Section A of the CyberTipline (Def. Ex. A) contains information regarding the seven images reported by the Yahoo and includes a question "Did reporting ESP view entire contents of uploaded file?"  Def. Ex. A, Ex. A 48: 15-25.

33.     NCMEC maintains no official definition for the phrase "Did reporting ESP view entire contents of uploaded file."  Ex. A 49: 16-19.

34.     NCMEC does not provide training to ISPs as to the definition of that phrase and instead leaves it up to the companies to answer the question.  Ex. A 49-50: 25-4.

35.     ISPs have the ability to automatically complete CyberTipline Reports without a human ever looking at the report.  Ex. A 52: 16-20.

36.     NCMEC has no ability to verify whether an ISP reporting through the CyberTipline has actually viewed an image that it reports as child pornography.

Ex. A 53: 11-16.  NCMEC performs no investigation to determine what an ISP has or has not done in making a CyberTipline Report.  *Id*. at 53:19-20.

38.     Originally, the NCMEC CyberTipline Report claimed that NCMEC did not view any of the images associated with that report.  However, at the evidentiary hearing, NCMEC testified that NCMEC viewed six of the seven images included in the CyberTipline Report here.  Ex. A 28: 24-25.

39.     NCMEC did not view the image relating to the "image.4-1.gif" file.  Ex. A 55: 1-5.  That image had been previously viewed and labelled by NCMEC prior to the CyberTipline Report in this case.  Ex. A 57: 20-24.

40.     The NCMEC witness also testified that she did not know whether the "hash matches" corresponding to the other six images in the CyberTipline report had been previously categorized by NCMEC.  Ex. A 56: 2-6.  She also did not know whether the previous labels of "CP (Unconfirmed)" or "Child Clothed" had been created during the course of this particular CyberTipline Report, or had been previously made by NCMEC prior to receiving the CyberTipline in this case.  Ex. A 56: 6-18; 58: 2-8.

41.     NCMEC does not know when it viewed six of the seven images, except that it occurred between the making of the CyberTipline Report on September 10, 2020, and September 14, 2020.  Ex. A 59: 16-20.

42.     NCMEC does not know who reviewed six of the seven images reported.  Ex. A 59-60: 24-6.

43.     NCMEC did not forward the September 10, 2022 CyberTipline Report to law enforcement until October 22, 2010, due to the volume of reports it received from other sources.  Ex. A 60-61: 19-4.

**C.     Actions taken by Detective Keller relevant to the private search issue.**

44.     Detective Keller personally reviewed the images that were included in the CyberTipline Report.  Defense Ex. B.

45.     Detective Keller testified that, at the time the relevant warrant applications were made here, it was his policy and practice to review all images related to every NCMEC CyberTipline Report, regardless of whether those images had been previously viewed by any private entity.  Ex. A 155: 6-10; p. 190: 3-7.

46.     Indeed, that policy did not change until 2022.  Ex. A 190: 8-10.

47.     Two or three months before the evidentiary hearing in this case, legal counsel from the State Attorney's Office had to direct Detective Keller to stop reviewing all images in every CyberTipline Report.  Ex. A 190: 12-20.

48.     Detective Keller never spoke to anyone at Yahoo who allegedly reviewed the images.  Ex. A 190: 21-23.

49.     Detective Keller does not know when anyone at Yahoo allegedly viewed the images involved in this case.  Ex. A 191: 1-5.

50. Detective Keller never spoke to anyone at NCMEC regarding the CyberTipline Report prior to the warrant application. Ex. A 191: 5-9.

51. Detective Keller did no independent investigation of his own regarding what images were viewed before he viewed them. Ex. A 191: 10-13.

52. Detective Keller has no knowledge of any alleged criminal activity occurring in this case between September 8, 2020, and the execution of the search warrant on January 27, 2021. Ex. A 191-92: 23-1.

## II. Facts relevant to the right to privacy.

53. Users of Yahoo's email service must agree to certain "terms of service." Ex. A 74: 2-4.

54. The terms of service in effect by Yahoo in September 2020 stated that "users agreed in pertinent part to not use the Yahoo services to upload, post, email, transmit, or otherwise make available any content that is unlawful, harmful, threatening, abusive, harassing, tortious, defamatory, vulgar, obscene, libelous, invasive of another's privacy, hateful, or racially, ethnically or otherwise objectionable or harm to minors in any way." Ex. A 75: 19-25; Gov. Ex. E.

55. The Yahoo terms of service for its users do not indicate that any information will be disclosed to law enforcement or any third party. Ex. A 126: 20-24; Gov. Ex. 5.

56. Instead, if Yahoo believes a user has violated its terms of service, the account will simply be disabled. Ex. A 126-27: 25-2.

57.     Indeed, even after a CyberTipline is reported to NCMEC based on a user account, Yahoo only disables the account.  Ex. A 86: 17-19.

### III.     Facts relevant to the State Actor issue.

#### A.     Yahoo

58.     Yahoo is obligated by federal law to report child pornography to NCMEC.  Ex. A 92: 6-11; Ex. A 98: 23-25.

59.     Yahoo would be subject to a criminal fine if such material was not reported to NCMEC.  Ex. A 99: 1-5.  18 U.S.C.  2258A(a)(1), (e).

60.     Yahoo maintains a "close partnership" with NCMEC.   Defense Ex. E.

61.     Yahoo has donated more than $2 million to NCMEC.  *Id.*

62.     Yahoo is granted immunity to possess child pornography under federal law.  Ex. A 100: 15-18; 18 U.S.C.  2258B(a).

63.     Yahoo does not make any money from reviewing its platform for child pornography.  Ex. A 93: 3-7.  Instead, it spends money to hire the "Trust and Safety Moderators" employees to review content on its platform, and on software it uses to conduct that review.  *Id.* at 93:8-16.

64.     Yahoo's purpose as a corporation is to make money.  Ex. A 93: 17-19.

65.     Yahoo has not calculated how much money it would lose if it failed to actively search for child pornography.  Ex. A 93: 20-22.

66.     When NCMEC receives a report of child sexual exploitation from an ISP, it confirms that report with the ISP and the ISP must treat the confirmation as

a request to preserve evidence for 90 days as if issued by the federal government itself . Ex. A 42: 21-25; 18 U.S.C. § 2258A(h)(1).

67.    The failure of an ISP, such as Yahoo, to comply with that preservation request exposes the ISP to criminal and civil liability. Ex. A 43:1-3; 18 U.S.C. § 2258B; Ex. A 98: 23-25.

68.    In 2019, Yahoo reported 5,359 accounts to NCMEC for possible child pornography allegations. Ex. A 97: 15-20; Defense Ex. G.

69.    In 2021, Yahoo reported 5,498 accounts to NCMEC for possible child pornography allegations. Ex. A 97: 21-25.

70.    Yahoo will continue investigating child pornography after its initial report to NCMEC in certain instances. In doing so, Yahoo will investigate and identify the actual individuals who commits these acts. Ex. A 98:5-9. Yahoo is not obligated by law to perform such investigations. *Id*. at 98:10-12.

71.    Yahoo reports its additional investigation results to NCMEC. Ex. A 146: 1-7.

72.    Yahoo maintains a "Law Enforcement Compliance Guide" that "is designed to assist law enforcement in understanding Yahoo!'s policies and practices with regard to retention and disclosure of electronic information." Def. Ex. H, p. 6. The Law Enforcement Compliance Guide "**is not meant to be distributed to individuals or organizations that are not law enforcement entities**, including Yahoo! customers, consumers, or civil litigants." *Id*. (emphasis

in original).   The Compliance Guide includes sample forms for law enforcement to use when requesting information from Yahoo.  *Id*. pp. 14-17.

**B.**     **NCMEC**

73.     NCMEC is obligated by federal statute to operate the CyberTipline. Ex. A 40: 3-9; p. 42: 7-10; 18 U.S.C. § 2258A.

74.     No other entity takes the same role other than NCMEC with respect to reporting of child pornography.  *Id*. at 40: 10-12.

75.     Federal law requires NCMEC to make such reports available to state, federal, and foreign law enforcement agencies.  *Id*. at 40:13-19; 18 U.S.C. § 2258A(c).

76.     NCMEC is required by federal law to operate the national clearinghouse for information about missing and exploited children.  Ex. A 40-41: 20-24; 1-3; 34 U.S.C. § 11293(b).

77.     NCMEC is required by federal law to assist law enforcement locate and recover missing and exploited children.  34 U.S.C. § 11293(b)(1)(K)(2).

78.     NCMEC is required by law to provide forensic technical assistance to law enforcement to help identity victims of child exploitation.  Ex. A 41: 3-8; 34 U.S.C. § 11293(b)(1)(H).

79.     NCMEC is required by federal law to track and identify patterns of attempted child abductions for law enforcement purposes.  Ex. A 41: 9-13.

80.     NCMEC is legally obligated to provide training to law enforcement agencies in identifying and locating non-compliant sex offenders.  *Id*. at 41: 14-17; 34 U.S.C. § 11293(b)(1)(I).

81.     NCMEC is empowered to call on other federal agencies for assistance, such as the Secret Service.  *Id*. at 42:1-3; 18 U.S.C. § 3056(f).

82.     No other entity federal law is obligated to perform these activities. Ex. A 41: 18-22.

83.     The purpose of these activities is to assist and support law enforcement.  *Id*. at 41: 21-25.

84.     NCMEC alone is statutorily obligated to maintain the CyberTipline for Internet Service Providers ("ISPs") to use to report possible internet child sexual exploitation violations to the Government.  Ex. A 42: 7-10.

85.     ISPs must report any child sexual exploitation it discovers to NCMEC alone.  Ex. A 42: 15-17.  ISPs are not required to report such acitivty to any other entity under the law.  *Id*. at 42:18-20.

86.     NCMEC is statutorily obligated to forward every report of such exploitation to federal law enforcement agencies and also make its reports available to state and local law enforcement.  Ex. A 42: 11-14; 18 U.S.C. § 2258A.

87.     NCMEC is authorized by federal law to receive and possess child pornography, where as an average citizen has no such rights.  Ex. A 43: 4-11; 18 U.S.C. § 2258A(a), (b)(4); 18 U.S.C. § 2252A(a)(2).

88.     The federal government provides approximately $42 million of NCMEC's $62 million budget.  Defense Ex. F, p 4; Ex. A 43-44: 25-11.

89.     NCMEC assists the U.S. Marshals regarding absconded sex offenders.  Ex. A 44: 15-19.

## IV.    Facts relevant to the *Franks* issue.

90.     Detective Keller has not received any training from NCMEC regarding CyberTipline Reports.  Ex. A 169: 6-10.

91.     At the time of submitting the affidavit in support of the search warrants at issue in this case, Detective Keller was unaware of what NCMEC's phrase "CP (Unconfirmed)" meant.  Ex. A 170: 14-17.

92.     At the time of that warrant application, Detective Keller did not know the meaning of the phrase "CP (Unconfirmed)" as used by NCMEC.  Ex. A 170: 18-22.

93.     Indeed, despite the CyberTipline Report in this case occurring in 2020, Detective Keller was completely unaware of the actual definition of "CP (Unconfirmed)" until the evidentiary hearing in this very case.  Ex. A 171: 5-11.

94.     Detective Keller admits that the phrase "CP (Unconfirmed)" (as used by NCMEC) means the same things as the phrase "age difficult," as used in his warrant applications.  Ex. A 172: 3-7.

95.     Detective Keller also admitted that an image that is "age difficult" or "CP (Unconfirmed)" would not be sufficient to establish probable cause in a warrant application.  Ex. A 173: 7-17.

96.     Detective Keller also testified that if an image is "age difficult, then I don't include it in probable cause."  Ex. A 179: 6-7.  However, here he included several images he himself determined to be "age difficult" images as probable cause for the warrants at issue.  Defense Ex. B; Ex. A 179: 18-22.

97.     He testified that whether an image is "age difficult" is material to a finding of probable cause in a warrant application.  Ex. A 179: 18-24.

98.     Detective Keller admitted that his statements in the warrant application that NCMEC had previously determined several images to be child pornography were false.  Ex. A 180-81: 20-10.

99.     That false statement by Detective Keller applies to images titled "image.4-1.gif", "image.125-1.jpg," and "image.97-1.jpg" Ex. A 181: 10-12: 13-18, 19-24.

100.    Detective Keller admitted that the warrant application omits that NCMEC found those images to be "age difficult" or "CP (Unconfirmed)".  Ex. A 182: 10-18.

101.    Detective Keller found another three images to be "age difficult" or not child pornography at all, yet included them in the warrant application.  That characterization applies to "image.120-1.jpg", "image.5-1.jpg", and

"image.118.jpg." Ex. A 182: 19-22; Ex. A 183: 7-11. He admitted that those images do not support a finding of probable cause. Ex. A 183: 15-18.

102. Thus, six of the seven images that were included as a basis for a search warrant were found by either NCMEC or Detective Keller to have been "age difficult," and therefore could not have contributed to a finding of probable cause.

103. Of the three images determined to be "age difficult" by NCMEC, Detective Keller omitted that classification in the warrant application. Defense Ex. B.

104. The seventh image, "image.1-1.jpg" was allegedly uploaded through Yahoo on September 8, 2020. Ex. A 183-84: 19-3.

105. Detective Keller submitted a search warrant to Yahoo, and had received the results of that warrant, prior to submitting a search warrant application on Mr. Williamson's residence. Ex. A 185: 2-9.

106. Included with that search warrant response from Yahoo was an item describing the log-in dates to the Yahoo account, vladlover50@gmail.com. Defense Ex. D.

107. Yahoo maintains a list of the dates and times one of its account is logged into by a user, as well as the IP address from where it is logged in. Ex. A 127: 3-14; Defense Ex. D.

108. In this case, the Yahoo testified that the account at issue had a final login date of September 5, 2020, with daily logins on the preceding days of August

31, September 1, September 2, September 3, and September 4, 2020.  Ex. A 127: 15-23; Defense Ex. D; Ex. A 185: 21-24.

109.    When a user logs out of his or her account, Yahoo does not track whether an account was logged out manually or automatically.  Ex. A 128: 7-12.

110.    Thus, while the Yahoo representative testified that accounts are automatically logged out after two weeks, Ex. A 89: 17-21, the Yahoo representative testified that Yahoo did not know whether the account at issue was automatically logged out after a period of inactivity of two weeks.  Ex. A 128: 13-18.

111.    Indeed, Yahoo does not know when the account at issue was logged out.  *Id.*  Indeed, the Yahoo representative did not even know how long a log-in session will last before it expires.  Ex. A 89: 4-6.

112.    Detective Keller has no training on when accounts are automatically logged out by Yahoo or other ISPs.  Ex. A 187: 4-8.  His experience with this issue is likewise not based on Yahoo specifically.  Ex. A 186: 6-11.  His only insight was that "some people stay logged in for some period of time."  *Id.*

113.    He had no direct information from Yahoo or any other source regarding the topic of how or when Yahoo accounts or logged out.  Ex. A 187: 14-17.

114.    Detective Keller performed no investigation in this case regarding how or when Yahoo logs out accounts.  Ex. A 187: 18-20.

115.    Despite receiving from Yahoo a list of log-ins to the vladlover email account, Detective Keller's search warrant to Yahoo did not include a request for any log-outs.  Def. Ex. C; Ex. A 187: 21-24; Ex. A 188: 11-20.

116.    The warrant applications here do not provide any information regarding when the account may have been logged out.  Ex. A 189: 9-11.

## PROPOSED CONCLUSIONS OF LAW

### A.    The Fourth Amendment and the expectation of privacy.

The United States Supreme Court has "settled the proposition that the Fourth Amendment requires agents of the Government to obtain prior judicial approval of all searches and seizures."  Williams v. United States, 401 U.S. 646, 661 (1971) (collecting cases).

"A person has an expectation of privacy protected by the Fourth Amendment if he has a subjective expectation of privacy, and if society is prepared to recognize that expectation as objectively reasonable."  *United States v. Miravalles*, 280 F.3d 1328, 1331 (11th Cir. 2002).  Courts have not reached a general consensus regarding the expectation of privacy related to e-mail as it relates to the terms of service of an ISP.  The Eleventh Circuit has not weighed in with a thorough or definitive answer to this question.

As detailed in Defendant's Supplemental Brief on the Motion to Suppress, Doc. 64, this Court should follow the ruling of *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010).   For purposes of brevity, Defendant herein incorporates that

filing by reference.  To summarize that holding, the Sixth Circuit found a subjective right to privacy exists in emails because of "sensitive and sometimes damning substance" of emails.  *Id*. at 284.  That Court also found that society was prepared to find that expectation of privacy reasonable, likening e-mails to telephone calls and letters.  *Id*. at 285 (citing *Katz v. United States,* 389 U.S. 347, 352 (1967), *United States v. Jacobsen*, 466 U.S. 109 (1984)).  Given the protections granted to other forms of communications and their similarities to emails, *Warshak* held that "it would defy common sense to afford emails lesser Fourth Amendment protection."  *Id*. 285-86.

The government in *Warshak* argued that, under that user's terms of service, the ISP "contractually reserved the right to access Warshak's emails for certain purposes."  *Id*. at 286.  The Court rejected that argument, holding that the mere ability or right of a third-party intermediary to access the contents of a communication "cannot be sufficient to extinguish a reasonable expectation of privacy."  *Id*.

The Eleventh Circuit Court of Appeals has cited *Warshak* with approval.  In *United States v. Davis*, 785 F.3d 498, 528–29 (11th Cir. 2015) (Rosenbaum, J. concurring) (*abrogated on other grounds by Carpenter v. United States*, 138 S.Ct. 2206 (2018)), the Eleventh Circuit Court stated that:

"If our expectation of privacy in our personal communications has not changed from what it was when we only wrote letters to what it is now that we use telephones to conduct our personal interactions, it has not changed just because we now happen to use email to personally communicate. **Just as the need to entrust third parties with our personal conversations when we communicate by written letter or by telephone does not affect the analysis, the need to rely on third parties to provide Internet service when we communicate by email cannot do so, either**." *Id.* (citing *Warshak,* 631 F.3d at 288) (emphasis added).

In the instant case, under the Yahoo "Terms of Service" at issue, there was no evidence introduced that those terms permitted Yahoo to disclose information to law enforcement or anyone else. The relevant term cited in the testimony of Ms. Guizzotti is that "users agreed in pertinent part to not use the Yahoo services to upload, post, email, transmit, or otherwise make available any content that is unlawful, harmful, threatening, abusive, harassing, tortious, defamatory, vulgar, obscene, libelous, invasive of another's privacy, hateful, or racially, ethnically or otherwise objectionable or harm to minors in any way." Ex. A 75:19-25; Gov. Ex. E. If Yahoo believes a user has violated its terms of service, the account will simply be disabled. Ex. A 126-27:25-2. The Terms of Service do not provide for any other action to be taken and certainly do not make clear that information will be disclosed to any other party or law enforcement. Ex. A 126:20-24; Gov. Ex. 5.

This was a central issue in *Warshak* because that Court was "unwilling to hold that a subscriber agreement will *never* be broad enough to snuff out a reasonable expectation of privacy." *Warshark*, 631 F.3d at 287. Instead, that Court

found that the terms of service in that particular case – which only stated the ISP "may access and use individual Subscriber information in the operation of the Service and as necessary to protect the Service" – did not rise to the level of terminating an individual's right to privacy. Instead, it found that, had the terms put the user on notice of potential disclosure, it may have found a lack of an expectation of privacy.

Here, as in *Warshak*, Yahoo's Terms of Service do not put a user on notice of a potential disclosure to third-parties. Therefore, as in *Warshak*, a user maintains a reasonable expectation of privacy in those emails. Thus, the Yahoo e-mails are subject to Fourth Amendment protection.

**B.      Both NCMEC and Yahoo were state actors for Fourth Amendment purposes at the time of the search of the Yahoo e-mail account.**

As established at the evidentiary hearing in this matter, the actions taken of both Yahoo and NCMEC were taken as state actors and therefore their actions constituted an illegal search under the Fourth Amendment.

The Fourth Amendment only curtails governmental action, and thus, "[a] search by a private person does not implicate the Fourth Amendment unless he acts as an instrument or agent of the government." *United States v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003). To determine whether a private person was acting as the government's agent, district courts "look to two critical factors: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether

the private actor's purpose was to assist law enforcement efforts rather than to further his own ends." *United States v. Allen*, 854 Fed. Appx. 329, 333 (11th Cir. 2021). Beyond those somewhat ambiguous standards, neither the Eleventh Circuit nor the Supreme Court has provided much guidance applicable to the instant case.[2]

Here, for the reasons set forth below, both Yahoo and NCMEC were state actors for Fourth Amendment purposes.

### 1. Yahoo is a state actor for Fourth Amendment purposes.

In searching the "vladlover" e-mail account at issue in this case, Yahoo acted as a state actor and therefore its warrantless search was illegal.

#### A. The Government knows of Yahoo's reporting activities and federal law designs its statutory scheme around such activities.

Yahoo receives special protections for its actions, and penalties for failing to act, with respect to child pornography. Yahoo is obligated by federal law to report child pornography to NCMEC. Ex. A 92: 6-11; Ex. A 98: 23-25. If Yahoo does not report child pornography to NCMEC, it is subject to a criminal fine. Ex. A 99: 1-5.

---

[2] Other circuits apply different standards to determine whether a party is acting on behalf of the Government. For instance, the Sixth Circuit has held that "Private action might still be attributed to the government if 'a sufficiently close nexus' exists between a private party and government actors." *United States v. Miller*, 982 F.3d 412, 425 (6th Cir. 2020) (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)), and that "Private action might still be attributed to the government if 'a sufficiently close nexus' exists between a private party and government actors." *United States v. Miller*, 982 F.3d 412, 425 (6th Cir. 2020) (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)); *United States v. Soward*, CR 20-03-DLB-CJS, 2021 WL 3027024, at *5 (E.D. Ky. Apr. 26, 2021), *report and recommendation adopted*, CR 20-3-DLB-CJS, 2021 WL 2383007 (E.D. Ky. June 10, 2021).

18 U.S.C. 2258A(a)(1), (e). Moreover, unlike a normal citizen, Yahoo is granted special immunity to possess child pornography under federal law. Ex. A 100: 15-18; 18 U.S.C. 2258B(a). When Yahoo makes a report of child sexual exploitation to NCMEC, Yahoo must treat the confirmation as a request to preserve evidence for 90 days as if issued by the federal government itself. Ex. A 42: 21-25; 18 U.S.C. § 2258A(h)(1).

Yahoo does not limit its activities to merely making a report to NCMEC. It continues to actively investigate allegations of child pornography and provide further information to NCMEC. Yahoo will actively seek to identify the specific individuals who have allegedly committed such acts. Ex. A 98:5-9. Yahoo is not obligated by law to perform such investigations. *Id*. at 98:10-12.

The Government is well aware of Yahoo's activities. Indeed, the entire statutory scheme devised by Congress relies on ISP's like Yahoo in order to combat child pornography. *See* Legislative History of PROTECT Act of 2008, 154 Cong. Rec. H10241-02, 154 Cong. Rec. H10241-02, H10250, 2008 WL 4373171 ("Internet companies will need to do their part too. When we begin to hold Web sites accountable for the images that they host, we've taken the first step towards supporting parents in their efforts to protect children. Our combined efforts will help make the Internet a safer place."). In 2019, Yahoo reported 5,359 accounts to NCMEC for possible child pornography allegations. Ex. A 97: 15-20; Defense Ex. G. In 2021, Yahoo reported 5,498 accounts to NCMEC for possible child

pornography allegations. Ex. A 97: 21-25. That averages to nearly fifteen CyberTipline Reports from Yahoo alone each and every day of the year.

By way of analogy, one can imagine a national company's employees going around peeking into its customers' windows and reporting to law enforcement anything it believed to be illegal, and doing this more than a dozen times a day, every day, resulting in many thousands of such reports each year. After thousands of such reports, a rational person would be hard-pressed to claim that law enforcement has no knowledge of the company's conduct just because it doesn't know about one specific instance in advance.

That is why this case is similar to *United States v. Burgos Montes*, No. Crim. 06-009 JAG, 2011 WL 1743420, at *1 (D.P.R. May 2, 2011), *aff'd*, 786 F.3d 92 (1st Cir. 2015), cited in Defendant's Supplemental Brief on the Motion to Suppress. Doc. 64. There, as detailed in the Supplemental Brief, the DEA knew and encouraged an informant to live in a suspect's home. The DEA asked her not to obtain physical evidence, but the informant did so anyway, and the DEA logged it as evidence.

In opposing a motion to suppress, the Government argued that law enforcement "did not know of, instigate, direct, nor participate in any of the disputed searches." Nevertheless, the Court found that the DEA knew the informant would have "constant and ample opportunity to obtain physical evidence." *Id*. at *11.

Like the informant in that case, ISP's like Yahoo routinely and systematically go into people's digital homes and automatically hand the contents over to law enforcement. They have "constant and ample opportunity to obtain physical evidence," and the government knows that they are doing exactly that. 2011 WL 1743420, at *11. Just because the government did not ask them to in each specific instance (and instead has passed federal legislation encouraging it through immunity and fines) does not somehow lessen the Constitutional violation, but rather systemizes it.

Cases that have found ISPs like Yahoo are not state actors in similar circumstances have focused on the fact that the federal statutory scheme does not compel the ISP to proactively search for child pornography. *See e.g. United States v. DiTomasso*, 81 F. Supp. 3d 304 (S.D.N.Y. 2015). But while a compulsion to act is sufficient to be found a state actor, it is not necessary. Where a person volunteers to undertake a police function on behalf of law enforcement, and law enforcement has knowledge of such action, that person is a state actor. For instance, in *United States v. Henry*, 447 U.S. 264 (1980), a confidential informant, Nichols, in custody with several federal prisoners (including the defendant Henry) was told by law enforcement to "be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question Henry regarding the bank robbery," for which Henry had been indicted. *Id*. at 266. The Supreme Court found that Nichols was an agent of the Government for Sixth Amendment purposes and the

statements made by Henry to Nichols should have been excluded at trial, despite Nichols having been informed not to extract such statements. *Id*. at 274-75.

Like the informants in *Burgos Montes* and *Henry*, the Government is well aware that Yahoo has "ample opportunity" and "access" to scan its customers emails for the purpose of reporting them to law enforcement, and in fact does so every day. *Burgos Montes*, 2011 WL 1743420, at *11; *Henry*, 447 U.S. at 270. Not only does Yahoo volunteer to act to assist law enforcement (which is well aware of Yahoo's actions), but the entire federal enforcement scheme relies on such action, effectively deputizing ISPs like Yahoo to enforce child pornography laws. Thus, the Government "knew of and acquiesced in the intrusive conduct," undertaken by Yahoo.

### B. The purpose of Yahoo's activities was to assist law enforcement.

The purpose of Yahoo's actions was here to assist law enforcement. Yahoo is a private corporation that exists to make money. Ex. A 93:17-19. The Government's argument that Yahoo was motivated by financial interest is not supported by the record. There was no testimony that Yahoo has ever calculated how much money it would lose if it did not search for and eliminate child pornography. Instead, Yahoo makes no money from reviewing its platform, Ex. A 93:3-7, and instead spends significant amounts to perform the searches it does. *Id*.:8-16. Thus, there was no evidence presented to support Yahoo's declaration that it has "a strong business interest in enforcing [its] terms of service and

ensuring that [its] products are free of illegal content, especially [child sexual abuse material." Gov. Ex. 3. Without such a business interest, the only basis is to comply with federal laws and to assist law enforcement. Indeed, Yahoo publishes a "Yahoo Compliance Guide for Law Enforcement." That Guide is expressly intended to "assist law enforcement," provides law enforcement with forms to obtain information, and is meant to kept from the public and even Yahoo's own users. Def. Ex. H, p. 6.

Thus, because the Government knows of and acquiesces to Yahoo's activities (indeed, the federal system of enforcement of child pornography laws depends on it), and because Yahoo acted with the intent to assist law enforcement. Yahoo is a state actor and its review of the images here was a warrantless search, the results of which must be suppressed.

## 2. NCMEC is a state actor for Fourth Amendment purposes.

NCMEC is also a state actor for Fourth Amendment purposes. NCMEC may not be an official government agency, but it operates and is funded like one. NCMEC, and NCMEC alone, is required under federal law to operate the CyberTipline. Ex. A 40: 3-9; 42:7-10; 18 U.S.C. § 2258A. There is no other private entity that fills the same role with respect to reporting of child pornography. *Id.* at 40:10-12.

NCMEC is statutorily obligated to forward every report of such exploitation to federal law enforcement agencies, and also make its reports available to state

and local law enforcement.  Ex. A 42:11-14; 18 U.S.C. § 2258A(c).  It is also required by federal law to operate the national clearinghouse for information about missing and exploited children, and to assist federal law enforcement recover missing and exploited children.  Ex. A 40:20-24; 34 U.S.C. § 11293(b).

NCMEC is required by law to provide forensic technical assistance to law enforcement to help identity victims of child exploitation.  Ex. A 41:3-8; 34 U.S.C. § 11293(b)(1)(H).  It is also statutorily-obligated to track and identify patterns of attempted child abductions for law enforcement purposes.  Ex. A 41:9-13.

NCMEC is legally mandated to provide training to law enforcement agencies in identifying and locating non-compliant sex offenders.  *Id*. at 41:14-17; 34 U.S.C. § 11293(b)(1)(I).  NCMEC can also call upon other federal agencies for assistance.  *Id*. at 42:1-3; 18 U.S.C. § 3056(f).  As NCMEC testified, the purpose of these activities is to assist and support law enforcement.  *Id*. at 41:21-25.

Unlike private citizens, NCMEC (like Yahoo) is authorized by federal law to receive and possess child pornography, where as an average citizen has no such rights.  Ex. A 43: 4-11; 18 U.S.C. § 2258A(a), (b)(4); 18 U.S.C. § 2252A(a)(2).  Moreover, the federal government provides approximately $42 million of NCMEC's $62 million budget.  Defense Ex. F, p 4; Ex. A 43-44: 25-11.

These facts are precisely what the Tenth Circuit Court of Appeals relied on in holding that NCMEC is a state actor in *United States v. Ackerman*, 831 F.3d 1292, 1296-1300 (10th Cir. 2016) (Gorsuch, J.).  Here, as in *Ackerman*, "in the face of so

much law and evidence suggesting NCMEC qualifies as a governmental entity, the government offers almost no reply." *Id.* at 1298. The NCMEC witness's testimony that NCMEC is not "controlled by the federal government in any way" rings hollow in the light of so many federal statutory mandates controlling NCMEC's mission and conduct. Ex. A 37:4-5.

As the Court held in *Ackerman*, NCMEC is a governmental entity for Fourth Amendment purposes.[3] Therefore, its search here, and the review of the images from Yahoo, constitute an improper warrantless search, the results of which must be suppressed.

**C.    Even if Yahoo and NCMEC were not state actors, Detective Keller exceeded the scope of the private search.**

As discussed above, Yahoo and NCMEC acted as agents of the Government here. However, even if they were not state actors, Detective Keller exceeded the scope of the private search that Yahoo conducted. Therefore, the results of the warrant must be suppressed.

---

[3] The Government cites *United States v. Coyne*, 387 F. Supp. 3d 387 (D. Vt. 2018) for the proposition that NCMEC "was not a governmental entity for Fourth Amendment purposes." Doc. 105 at 11. This citation is misleading.

While *Coyne* did find NCMEC was not a governmental "entity," it found that NCMEC acted as an "agent" of the government "in the manner of a police agency," and therefore "its review of electronic communications is subject to the same Fourth Amendment requirements that apply to its partners in law enforcement." 387 F. Supp. 3d at 399-400.

Courts generally prohibit the government from introducing at trial evidence gathered as a result of a search or seizure that violated the Fourth Amendment. *See e.g. Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 362 (1998). The Fourth Amendment is inapplicable to the actions of private individuals that are not acting as an agent of the Government. The Government may replicate such a private search, "as long as government officials constrain their search to the parameters of the search conducted by the private individual." *United States v. Harling*, 705 Fed. Appx. 911, 916 (11th Cir. 2017) (citing *United States v. Young*, 350 F.3d 1302, 1306–07 (11th Cir. 2003); *see also Jacobsen*, 466 U.S. at 115; *Walter v. United States,* 447 U.S. 649, (1980). Thus, a private search that is broader than the scope of the previously occurring private search violates the Fourth Amendment. *Id.*

"As with all factual matters involving a warrantless search, the government bears the burden of proof by a preponderance of the evidence as to both the scope of the subsequent searches by law enforcement." *United States v. Johnson*, 2:12-CR-92-FTM-29DNF, 2013 WL 3992254, at *7 (M.D. Fla. Aug. 2, 2013), *aff'd on other grounds sub nom. United States v. Sparks*, 806 F.3d 1323 (11th Cir. 2015). To the extent a law enforcement officer views allegedly illegal images that were not reviewed by a private citizen, the viewing exceeds the scope of the private search. *Id.*

Here, the Government has not met its burden of proving the scope of the private search at issue. In other words, the Government has not proven that Yahoo

or NCMEC viewed the allegedly illegal images that were reported through the CyberTipline prior to Detective Keller viewing those images.

No one from Yahoo who viewed the images testified at the evidentiary hearing in this matter. Indeed, the Yahoo representative, Ashley Guizzotti, initially testified that former Yahoo employee Jessica Hines personally reviewed the images at issue, before she admitted that she did not know whether an employee of Yahoo actually even viewed the images at issue in this case. Ex. A 102:8-10.

When Ms. Hines testified, she initially claimed she reviewed the images – despite admitting to having no personal recollection of reviewing the images or making the CyberTipline Report. Ex. A 139:12-19. Indeed, when confronted with the Tracker spreadsheet, Def. Ex. I, Ms. Hines admitted that she was not actually the person who reviewed the images. Instead, she believed it was another Yahoo employee, Chris Wayne. Ex. A 144-45:23-25, 1. Chris Wayne did not testify.

That Tracker spreadsheet itself is unreliable. It is clearly subject to multiple interpretations because two different Yahoo employees reviewed it and testified that they reached different conclusions about what it says. Moreover, it is not a historical record, but rather a "running document," Ex. A 104:20-22, that can be edited. *Id*. at 126:2-5. Information it once contained can be later altered without retaining the earlier information. Thus, that Tracker spreadsheet has little evidentiary value here. Apart from the CyberTipline Report itself and the Tracker,

Yahoo has no other documentation related to this case. *Id*. at 104:12-16. Yahoo itself maintains no documentation as to who would have performed the review. *Id*. at 120-121:25, 1-2.

Further, while Yahoo claims to have policies requiring a human review of images reported to the CyberTipline, Ex. A 78:5-10, there was no testimony that any such policies were followed here. Indeed, the Yahoo representative had no knowledge whether all Yahoo's policies were actually followed. Ex. A 101:10-13. No such written policies were even entered into evidence. Further, while there was testimony that images must be viewed before submitting them to the CyberTipline, there was no evidence from any person with actual knowledge that that actually happened here.

With respect to the CyberTipline Report question "Did reporting ESP view entire contents of uploaded file?" to be answered by the reporting ISP, Defense Ex. A., Yahoo receives no guidance from NCMEC regarding the definition of that phrase. Ex. A 102:15-20. Moreover, neither NCMNEC nor Yahoo maintain any internal definition of that phrase and therefore cannot instruct its employees what it means. *Id*. at 103:6-13. NCMEC maintains no official definition for that phrase, Id. at 49:16-19, and it does not train ISPs like Yahoo what it means. Id. at 49-50:25, 1-4. There was no testimony from any witness about how that phrase was applied in this particular instance. ISPs like Yahoo have the ability to automatically

complete CyberTipline Reports without a human ever looking at the report. Ex. A 52:16-20.

Likewise, there was no reliable testimony that NCMEC actually viewed the images here. NCMEC originally claimed it did not view the images, only to change that position later. NCMEC does not who allegedly viewed the images, or when they were allegedly viewed. Ex. A 59:16-24, p. 60:1-6. NCMEC is unable to verify, and performs no investigation into, whether an ISP reporting through the CyberTipline has actually viewed an image that it reports as child pornography. *Id*. at 53:11-16, 19-20.

NCMEC did not know wheter the "hash matches" corresponding to six of the images in the CyberTipline Report had been previously categorized by NCMEC. Ex. A 56:2-6. This is significant because, if they had been previously categorized, they would not have been viewed again by NCMEC. Ex. A 47: 16-19. Thus, as with Yahoo, there was no evidence of what *actually* occurred with respect to this case from anyone with any knowledge of those facts.

Moreover, Detective Keller testified that, at the time he received the CyberTipline Report, it was his policy to review every image submitted as part of such a report, regardless of whether those images had previously been viewed by a private party. Ex. A 191:10-13. He did no investigation to determine what images had been viewed. Detective Keller never communicated with anyone at Yahoo who allegedly reviewed the images, nor did he ever communicate with

anyone at NCMEC. *Id*. at 191:5-9, 190:21-23. Detective Keller does not know who viewed the images or when they were allegedly viewed. *Id*. at 191:2-4.

In sum, there was no testimony that Yahoo actually viewed the images in this case, no witnesses with any personal knowledge about what occurred at Yahoo, no documentation reflecting Yahoo's policies and no testimony that Yahoo's policies were followed here. And Detective Keller testified that it was his policy that he would have viewed the images regardless of what Yahoo or NCMEC did.

This case is similar to *United States v. Wilson*, 13 F.4th 961, 971 (9th Cir. 2021), where the Ninth Circuit held that the "government's actions here exceed the limits of the private search exception as delineated in *Walter* and *Jacobsen* and their progeny." There, the Ninth Circuit reversed the district court's denial of a motion to suppress. Google reported alleged child pornography in a CyberTipline Report to NCMEC, which passed them on to law enforcement. Like Detective Keller here, that law enforcement officer policy at the time "called for inspecting the images without a warrant whether or not a Google employee had reviewed them." *Id*. At 965.

In *Wilson*, Google set forth in a declaration that it did not view the images prior to submitting them to NCMEC. *Id*. At 965. Here, for the reasons discussed above, the Government presented no evidence that Yahoo or NCMEC actually viewed the images prior to Detective Keller viewing them. This creates the same

scenario as *Wilson* where the Court found that the "government has not met its burden" to prove that law enforcement warrantless search of the images was constitutionally valid. *Id.* at 971.

Further, as in *Wilson*, by viewing the images at issue here, Detective Keller's warrantless search "substantively expanded the information available to law enforcement far beyond" what was contained in the NCMEC report. While the NCMEC report contains only labels, such as "CP (Unconfirmed)" or "Child Clothed," in his warrant applications Detective Keller described the contents of the images, including sexual positions. *Id.* at 973. By viewing the images, Detective Keller "learned exactly what the image showed, and learned that at least one of the images was child pornography. *Id.* "Only by viewing the images did the government confirm, and convey to the fact finder . . . that they depicted child pornography under the applicable federal standard." *Id.*

Further, in *Jacobsen*, the Supreme Court has, at minimum, heavily implied that the knowledge of law enforcement regarding the scope of a private search is relevant to a determination of whether a Fourth Amendment violation has occurred. There, the majority agreed with a portion of Justice White's concurrence that a case in which "the police simply learn from a private party that a container contains contraband, seize it from its owner, and conduct a warrantless search . . . would be unconstitutional." *Jacobsen*, 466 U.S. at 120 n.17. Thus, the Supreme Court has held that if a party merely tells law enforcement that a container

contains contraband, that would be insufficient to conduct a warrantless search. Therefore, the knowledge of law enforcement regarding what actually transpired during a private search is required for a search to be constitutionally valid.

Here, as discussed above, Detective Keller had no knowledge regarding what actually happened during the alleged private search, including who conducted it or when. Indeed, Yahoo and NCMEC do not even know. And Detective Keller testified that it would not have mattered to him anyway as he would have viewed the images regardless of what was done. Therefore, under *Jacobsen*, Detective Keller's lack of knowledge regarding the scope of a private search renders his warrantless search constitutionally invalid.

Thus, the Government has failed to establish the scope of any private search here and Detective Keller's review of the images without a warrant was improper.

**D.    Under *Franks*, the reckless omission of crucial facts warrants suppression of evidence.**

While affidavits supporting search warrants are presumed valid, *Franks v. Delaware*, 438 U.S. 154 (1978), criminal defendants have a right to challenge the veracity of that affidavit. *See United States v. Schwinn*, 376 Fed. Appx. 974, 978 (11th Cir. 2010).

Under *Franks*, if a defendant "makes a threshold showing that the affiant deliberately or recklessly made a false statement," then he is entitled to a *Franks*

hearing.[4]  "[W]hen the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself."  *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997).

1. **Detective Keller made reckless omission and misrepresentations in the warrant application and thus the threshold test for Franks is met.**

If a "defendant makes a threshold showing that the affiant deliberately or recklessly made a false statement, then the defendant is entitled to a *Franks* hearing."  *United States v. Schulz*, 486 Fed. Appx. 838, 841 (11th Cir. 2012). *Franks* also applies "when the 'misinformation' involves omissions from the affidavit "'made intentionally or with a reckless disregard for the accuracy of the affidavit.'" *Madiwale v. Savaaiko,* 117 F.3d 1321, 1326-27 (11th Cir.1997) (quoting *United States v. Martin,* 615 F.2d 318, 329 (5th Cir.1980)).  "The distinction among such categories as 'negligence,' 'reckless or callous indifference,' and 'intentional' conduct can be elusive."  *United States v. Rauda-Constantino*, 1:18-CR-00203-AT-JSA, 2019 WL 7838968, at *10 (N.D. Ga. Aug. 6, 2019), *report and recommendation adopted,* CV118CR0203AT13, 2020 WL 469675 (N.D. Ga. Jan. 28, 2020).  "Reckless" conduct is "a gross deviation from what a reasonable person would do."  *Black's Law Dictionary* 1298–99 (8th ed. 2004).

---

[4] As the Court noted at the evidentiary hearing in this matter, it was the Court's prerogative to have a hearing both as to the *Franks* threshold question and the ultimate question simultaneously. Ex. A 148:20-25.

Here, Detective Keller made reckless omissions and also misrepresentations in the warrant application to search Mr. Williamson's residence. With respect to three of the seven images, Detective Keller stated that "NCMEC had categorized this image previously as Child Pornography." Def. Ex. B. This is a false statement – it both affirmatively misrepresents that NCMEC categorized the images as child pornography (which is not true), and omits that NCMEC categorized the images as "CP (Unconfirmed)," which means the age could not be determined.

As Detective Keller testified, the fact of whether an image depicts a person whose age cannot be determined is "material" to include in a warrant application. Ex. A 179: 18-24. Further, Detective Keller testified that images that are "age difficult" do not support a finding of probable cause. Ex. A 183: 15-18. At least he is correct on that point.

Yet Detective Keller had no knowledge of the meaning of "CP (Unconfirmed)," as NCMEC uses that term, before misrepresenting it to say that NCMEC affirmatively found those three images to be child pornography when it did not. Despite working on sex crimes since 2019, being a member of the Internet Crimes Against Children ("ICAC") Task Force, and attending a 40-hour course on sex crimes investigations, Def. Ex. B, Detective Keller had no idea that "CP (Unconfirmed)" means "age difficult." He was unaware of that definition until attending the evidentiary hearing in this very case. Ex. A 171: 5-11. Thus, Detective Keller admitted that his statements in the warrant application that

NCMEC had previously determined several images to be child pornography were false. Ex. A 180-81: 20-10. That false statement applies to the three images titled "image.4-1.gif", "image.125-1.jpg," and "image.97-1.jpg" Ex. A 181: 10-12: 13-18, 19-24.

In addition to the misrepresentations and omissions about three of the images, Detective Keller also omitted from the warrant applications that there was no information whether the Yahoo account was logged-in or logged-out at the time that "image.1-1.jpg" was allegedly sent on September 8, 2020. Def. Ex. B. If the Yahoo account was not logged in on September 8, 2020, then it would call the probable cause into question regarding the sending of the allegedly pornographic image on that date.

At the time of the warrant application for Mr. Williamson's residence, Detective Keller had already submitted a search warrant to Yahoo that included a list of log-in dates for the "vladlover" account. Def. Ex. D. That list showed daily logins on the preceding days of August 31, September 1, September 2, September 3, and September 4, 2020. Ex. A 127: 15-23; Defense Ex. D; Ex. A 185: 21-24.

But Detective Keller did not know whether the Yahoo account at issue was logged out, or even how or when Yahoo logs out accounts. Ex. A 187: 18-20. He has no training on when accounts are automatically logged out by Yahoo or other ISPs. Ex. A 187: 4-8. He had no direct information from Yahoo or any other source regarding the topic of how or when Yahoo accounts or logged out. Ex. A 187: 14-

17.   Yahoo has no method to track whether an account was logged in manually or automatically.  Ex. A 128:7-12.  The Yahoo witness testified that Yahoo does not know whether the account at issue was logged in or logged out at the time of the alleged transmission.  Ex. A 89:4-6.  Detective Keller did no investigation regarding how or when Yahoo logs out accounts.  Ex. A 187:18-20.

The warrant applications here do not provide any information regarding when the account may have been logged out.  Ex. A 189: 9-11.  Thus, based on the testimony of the Yahoo witness here, it is entirely possible the account was logged out on September 8, 2022, at the time "image.1-1" was allegedly sent from that account.

The failure to know important, objective facts, and instead including in the warrant application material information that is incorrect and omitting crucial information, was reckless.  Whether an image is child pornography and whether an account was actually logged in when messages were allegedly transmitted were "clearly critical" to a finding of probable cause and thus recklessness can be inferred.  *Madiwale*, 117 F.3d at 1327.  Thus, the threshold for a *Franks* hearing has been met.

## 2. Under a new evaluation of probable cause, the warrants here fail.

Because the threshold for *Franks* has been met, the Court may reevaluate the probable cause supporting the warrants at issue. Here, based on the misrepresentations and omissions in the warrant, the warrants lack probable cause.

"[I]f that threshold showing of deliberate or reckless falsity is then proved by a preponderance of the evidence, the defendant is entitled to a new evaluation of probable cause with the affidavit stripped of the false statements." If the falsity of the statement stems from an omission, then inclusion of the omitted material is used to re-evaluate probable cause. *United States v. Murray*, 625 Fed. Appx. 955, 957 (11th Cir. 2015).

Here, if the warrant application for Mr. Williamson's residence was rewritten to address both the omissions and misrepresentations, it would lack probable cause. With respect to the categorization of the images, six of the seven images at issue were "age difficult" and thus lacked probable cause. With respect to images "image.120-1.jpg", "image.5-1.jpg", and "image.118.jpg," Detective Keller admitted those images did not support a finding of probable cause. With respect to images "image.4-1.gif", "image.125-1.jpg," and "image.97-1.jpg," because Detective Keller misrepresented that NCMEC determined these images were child pornography and Ex. A 101:10-13 that they were "age difficult," the judge who signed the warrant did not know that those images had, in fact, *not*

been categorized by NCMEC as child pornography.  Nor did that judge know that NCMEC had in fact categorized those images as "age difficult," which Detective Keller omitted.  Those "age difficult" images would not give rise to probable cause.

The signing judge did not review the images at issue in this case herself. Had she known that six of the seven images had been deemed by NCMEC and Detective Keller to be ***not*** child pornography, she could have found that probable cause did not exist, at minimum, as to those six images.  With respect to the single remaining image, "image.1-1," had the judge who signed the warrant known that there was no evidence that the "vladlover" account was logged in at the time that image was allegedly sent from that account, she could have found there was insufficient probable cause that the images were sent from that account.

Thus, under *Franks*, the warrant lacks probable cause and the results of the search must be suppressed.

## E.     The Exclusionary Rule applies here.

For the reasons discussed above, Yahoo, NCMEC and Detective Keller violated the Fourth Amendment in their warrantless search of the email address at issue.  The evidence from those searches should be suppressed.

The exclusionary rule applies "when it serves to deter otherwise unlawful conduct and the benefit of the deterrence outweighs the cost."  *United States v. Franklin*, 721 F. Supp. 2d 1229, 1242 (M.D. Fla. 2010), *aff'd,* 694 F.3d 1 (11th Cir. 2012).  In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court created the

"good faith" exception, holding that courts should generally find evidence inadmissible if police officers were not acting in reasonable reliance on a search warrant ultimately found to be unsupported by probable cause. Four situations will negate the existence of good faith, but only one applies here: good faith will not be found where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002).

As established above, the warrant contained recklessly false statements and omissions that misled the judge who signed the warrant. Here, there is ample improper conduct that a ruling excluding the evidence obtained in the search of the residence and from Yahoo would serve to deter. Detective Keller apparently had no idea that, as a law enforcement officer, he needed a warrant to view the images here. As he testified, it was his policy that he would have viewed the images regardless of whether Yahoo or NCMEC conducted a private search because he viewed them in every instance. Indeed, he only learned a few months before the evidentiary hearing in this matter that he should not do so, and it took intervention from the State Attorney's Office.

A law enforcement officer tasked with investigating crimes should know the bounds of his powers under the Constitution. And one whose job is to investigate child pornography, nearly all of which is in electronic form, should

know how the Fourth Amendment applies to searching such electronic images. The failure to have such knowledge is not an act of "good faith," it is indifference to the law. An officer sticking his head in the sand about the laws he operates under when submitting a warrant application is not the type of reasonable reliance on the law on which the good-faith exception applies.

Ignorance of the law is no excuse for criminal defendants; there is no reason why that rule should not apply to law enforcement as well. *See Gilker v. Baker*, 576 F.2d 245, 247 (9th Cir. 1978) (reversing dismissal of civil rights claim and holding that, while "law enforcement officials perform functions indispensable to the preservation of public safety and [] they must not be left defenseless, it does not follow that an unreasonable ignorance of the law or an entirely subjective "good faith" belief is always a defense in section 1983 damage actions."). To hold otherwise would only serve to encourage ignorance of the law, or even feigned ignorance of the law, by law enforcement officers. This is especially true here because this case involves not merely a technical violation of the law, such as the failure to serve a copy of the warrant before a search commences under Federal Rule of Criminal Procedure 41. *See e.g. United States v. Williamson*, 439 F.3d 1125, 1134 (9th Cir. 2006). Rather, this issue goes to fundamental rights of privacy and the government's ability to invade those rights without respect to Constitutional boundaries. Mr. Williamson has been unfairly prejudiced by that invasaion.

This argument applies to both the warrant as to Mr. Williamson's residence and the warrant to Yahoo. The probable cause set forth in both warrants suffer from the same taint arising from the warrantless search by state actors, or by Detective Keller's exceeding the scope of the private search, as set forth above.

The Court should exclude the evidence seized pursuant to the warrants here as deterrence to other law enforcement agencies that continue to ignore the bounds of the Constitution.

## V.    Items to be suppressed

Attached to this Brief as **Exhibit B** is an inventory of all items seized during the January 27, 2021 search of Mr. Williamson's residence. This list, including contents of all electronic devices seized during the search, constitutes the items to be suppressed as a result of that illegal search.

With respect to the warrant to Yahoo, all items received from Yahoo are due to be suppressed. This includes, without limitation, the emails and images connected to the"vladlover" account, subscriber details, the login page, and any other information received from Yahoo pursuant to the search warrant. However, because the information received pursuant to this warrant contains contraband, undersigned counsel does not have in his possession all of the information received from Yahoo and therefore cannot fully list every single item Detective Keller received pursuant to that warrant.

Date:  November 25, 2022

Respectfully Submitted,

/s/ Gus M. Centrone
Gus M. Centrone (FBN 0030151)
gcentrone@kmf-law.com
KYNES, MARKMAN & FELMAN, P.A.
Post Office Box 3396
Tampa, Florida 33601-3396
Telephone:  (813) 229-1118
Facsimile:   (813) 221-6750
*Counsel for Defendant Gregory Allen Williamson*

## CERTIFICATE OF SERVICE

I HERBY CERTIFY that on November 25, 2022, I electronically filed the foregoing with the Clerk of Court through the CM/ECF Filing System which will send a notice of electronic filing to all counsel of record.

/s/ Gus M. Centrone
Gus M. Centrone