# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


```
* * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA      *
                              *    Case No. 8:21-cr-355
vs.                           *
                              *    October 11, 2022
GREGORY WILLIAMSON            *
* * * * * * * * * * * * * * * *
```


EVIDENTIARY HEARING

Heard in Courtroom 12B
Sam M. Gibbons United States Courthouse
801 N. Florida Avenue
Tampa, FL
October 11, 2022


BEFORE THE HONORABLE CHRISTOPHER P. TUITE

UNITED STATES MAGISTRATE JUDGE




Official Court Reporter:    Tana J. Hess, CRR, FCRR, RMR
                            U.S. District Court Reporter
                            Middle District of Florida
                            Tampa Division
                            801 N. Florida Avenue
                            Tampa, FL  33602
                            813.301.5207
                            tana_hess@flmd.uscourts.gov


Proceedings recorded by mechanical stenography using
computer-aided transcription software.

APPEARANCES:


FOR THE GOVERNMENT:

          Erin Claire Favorit
          Abigail King
          DOJ-USAO
          400 N. Tampa Ave.
          Suite 3200
          Tampa, FL  33602
          813.274.6259
          erin.favorit@usdoj.gov
          abigail.king@usdoj.gov


FOR THE DEFENDANT:

          Gus M. Centrone
          Kynes, Markman & Felman, PA
          PO Box 3396
          Tampa, FL  33601
          813.229.1118
          gcentrone@kmf-law.com

<u>INDEX</u>

<u>NAME</u>                                                          <u>PAGE</u>

Jennifer Newman

    Direct Examination by Ms. Favorit            9

    Cross-Examination by Mr. Centrone           38

    Redirect Examination by Ms. Favorit         64

    Recross-Examination by Mr. Centrone         65

    Recross-Examination by Mr. Centrone         67

Ashley Guizzotti

    Direct Examination by Ms. Favorit           71

    Cross-Examination by Mr. Centrone           91

    Redirect Examination by Ms. Favorit        129

    Recross-Examination by Mr. Centrone        129

Jessica Hines

    Direct Examination by Ms. Favorit          131

    Cross-Examination by Mr. Centrone          139

James Keller

    Direct Examination by Ms. King             151

    Cross-Examination by Mr. Centrone          169

    Redirect Examination by Ms. King           192

### EXHIBITS

| NUMBER | IDENTIFIED | ADMITTED |
|--------|:----------:|:--------:|
| Government Exhibit 1 | 26 | 6 |
| Government Exhibit 2 | 161 | 6 |
| Government Exhibit 3 | 75 | 6 |
| Government Exhibit 4 | 38 | 6 |
| Government Exhibit 5 | 74 | 6 |
| Government Exhibit 6 | | 6 |
| | | |
| Defendant Exhibit A | 48 | 7 |
| Defendant Exhibit B | 180 | 7 |
| Defendant Exhibit C | 188 | 7 |
| Defendant Exhibit D | 127 | 7 |
| Defendant Exhibit E | 99 | 7 |
| Defendant Exhibit F | 43 | 7 |
| Defendant Exhibit G | 97 | 7 |
| Defendant Exhibit H | 94 | 7 |
| Defendant Exhibit I | 111 | 111 |

1    (Call to order of the Court.)

2    **THE COURT:**  Good morning everyone.  Madam clerk, if

3    you could please call the case.

4    **COURTROOM DEPUTY:**  United States of America versus

5    Gregory Allen Williamson, criminal case number 8:21-CR-355.

6    **THE COURT:**  If I could please have the appearances of

7    counsel for the record, beginning with the Government.

8    **MS. FAVORIT:**  Good morning, Your Honor.  Erin Favorit

9    on behalf of the United States.

10    **MS. KING:**  And Abigail King on behalf of the United

11    States.

12    **THE COURT:**  Good afternoon -- or good morning to you

13    both.  And for the defense?

14    **MR. CENTRONE:**  Good morning, Judge.  Gus Centrone for

15    Gregory Allen Williamson, who is present with me in the

16    courtroom.

17    **THE COURT:**  Good morning to you as well.

18    Are the parties prepared to proceed?

19    **MS. FAVORIT:**  Yes, Your Honor.

20    **THE COURT:**  Ms. Favorit, are you generally taking the

21    lead here today?

22    **MS. FAVORIT:**  Yes, Your Honor.

23    **THE COURT:**  Okay.  Ms. Favorit, if you could call

24    your first witness.

25    **MS. FAVORIT:**  United States calls Jennifer Newman.

10:11AM  1          And actually before we get started, I had spoken

10:11AM  2    with defense about stipulating our -- both of our exhibits, so

10:12AM  3    at this time the Government would move the exhibits from the

10:12AM  4    exhibit list into evidence.  That's numbers 1 through 6.

10:12AM  5          THE COURT:  I have a judge's copy black binder.  Is

10:12AM  6    this, Mr. Centrone, your binder?

10:12AM  7          MR. CENTRONE:  Correct, and I'd also move to enter

10:12AM  8    our exhibits into evidence as well.  I believe it's A through

10:12AM  9    H.

10:12AM  10         MS. FAVORIT:  And may I approach with the judge's

10:12AM  11   copies of the exhibit list?

10:12AM  12         THE COURT:  Give me just one moment to get to your

10:12AM  13   exhibit list.  I have before me the Government's list.  You

10:12AM  14   mentioned 1 through 6?

10:12AM  15         MS. FAVORIT:  Yes, Your Honor.

10:12AM  16         THE COURT:  Okay.  Mr. Centrone, just out of an

10:12AM  17   abundance of caution, I take it from Ms. Favorit that the --

10:12AM  18   these are stipulated, but any objection to the admission of

10:12AM  19   Government's 1 through 6 found on document 92, which is the

10:13AM  20   Government's exhibit list?

10:13AM  21         MR. CENTRONE:  No, Your Honor.

10:13AM  22         THE COURT:  Okay.  Those exhibits are admitted.  Now,

10:13AM  23   Mr. Centrone had moved to admit his exhibits.  Do I understand

10:13AM  24   those to be A through H?

10:13AM  25         MR. CENTRONE:  Yes, sir.

10:13AM 1          THE COURT:  Okay.  Ms. Favorit, any objection?

10:13AM 2          MS. FAVORIT:  No objection, Your Honor.

10:13AM 3          THE COURT:  Okay.  Defendant's A through H are

10:13AM 4   admitted.

10:13AM 5                And then Ms. Favorit, you had a copy of 1

10:13AM 6   through 6 to tender to the Court?

10:13AM 7          MS. FAVORIT:  Yes, Your Honor.

10:13AM 8          THE COURT:  Okay.  You may approach.

10:13AM 9          MS. FAVORIT:  Thank you.

10:13AM 10         THE COURT:  Mr. Centrone, while Ms. Favorit is doing

10:13AM 11  that, I take it in your binder you've got your exhibits

10:13AM 12  contained therein?

10:13AM 13         MR. CENTRONE:  Yes, sir, and I've also placed a

10:13AM 14  witness copy on the stand for the witnesses today.

10:13AM 15         THE COURT:  Okay.  Thank you to you both.

10:13AM 16             Ms. Favorit, again your first witness?

10:13AM 17         MS. FAVORIT:  Jennifer Newman, Your Honor.

10:13AM 18         MR. CENTRONE:  And, Judge, I would like to invoke the

10:13AM 19  rule, please?

10:14AM 20         THE COURT:  Certainly.  Any objection?

10:14AM 21         MS. FAVORIT:  No objection.

10:14AM 22         THE COURT:  Are you invoking the rule as well,

10:14AM 23  Ms. Favorit?

10:14AM 24         MS. FAVORIT:  Yes, Your Honor.

10:14AM 25         THE COURT:  To be clear, any witness testifying in

| | | |
|---|---|---|
| 10:14 AM | 1 | this case who is not currently testifying must excuse |
| 10:14 AM | 2 | themselves from the courtroom. |
| 10:14 AM | 3 | MS. FAVORIT:  And, Your Honor, we have Detective |
| 10:14 AM | 4 | Keller present.  As he is the lead case agent, he is exempt |
| 10:14 AM | 5 | from that sequestration rule. |
| 10:14 AM | 6 | THE COURT:  That's certainly the practice in this |
| 10:14 AM | 7 | courthouse.  Mr. Centrone? |
| 10:14 AM | 8 | MR. CENTRONE:  I'm going to go ahead and object for |
| 10:14 AM | 9 | the record, but it is my understanding that is the practice as |
| 10:14 AM | 10 | well. |
| 10:14 AM | 11 | THE COURT:  I'm going to allow Detective Keller to |
| 10:14 AM | 12 | remain.  And is it Ms. Newman who's the first witness? |
| 10:14 AM | 13 | MS. FAVORIT:  Yes.  May I retrieve the witnesses, |
| 10:14 AM | 14 | Your Honor? |
| 10:14 AM | 15 | THE COURT:  Absolutely. |
| 10:15 AM | 16 | Ms. Newman, if you'd kindly come forward to my |
| 10:15 AM | 17 | courtroom deputy.  She's going to swear you in. |
| 10:15 AM | 18 | COURTROOM DEPUTY:  Please raise your right hand. |
| 10:15 AM | 19 | (Witness sworn.) |
| 10:15 AM | 20 | COURTROOM DEPUTY:  Thank you.  Please state your name |
| 10:15 AM | 21 | for the record. |
| 10:15 AM | 22 | THE WITNESS:  Jennifer Newman. |
| 10:15 AM | 23 | COURTROOM DEPUTY:  Thank you.  You may be seated over |
| 10:15 AM | 24 | there. |
| 10:15 AM | 25 | THE COURT:  Ms. Favorit, before you get started, the |

NEWMAN - DIRECT EXAMINATION

10:15AM  1    exhibits which you tendered to the Court, are those my copy

10:15AM  2    that I can make notations on, or are those intended to be the

10:15AM  3    ones to be admitted?

10:15AM  4        MS. FAVORIT:  Those are your copy, Your Honor.  You

10:15AM  5    may make your notations, and I will not retrieve them from you.

10:15AM  6        THE COURT:  Thank you.  Ms. Newman, you'll see that

10:15AM  7    there's a microphone in front of you.  It seems to be situated

10:15AM  8    where it needs to be, but if at any time you need to adjust it,

10:15AM  9    just so that we can hear you, I'd appreciate you doing so.

10:16AM  10        With that, Ms. Favorit, you may proceed.

10:16AM  11        MS. FAVORIT:  Thank you, Your Honor.

10:16AM  12                    JENNIFER NEWMAN,

10:16AM  13    a witness called on behalf of the Government, being first duly

10:16AM  14    sworn, was examined and testified as follows:

10:16AM  15                    DIRECT EXAMINATION

10:16AM  16                    BY MS. FAVORIT:

10:16AM  17    Q.   Did you already state your name for the record?

10:16AM  18    A.   I did.

10:16AM  19    Q.   Okay.  I missed that.  I'm sorry.  What is it that you do

10:16AM  20    for a living?

10:16AM  21    A.   I am an Executive Director at the National Center for

10:16AM  22    Missing and Exploited Children.

10:16AM  23    Q.   How long have you been doing that?

10:16AM  24    A.   I've worked at the National Center for 21 years.  This

10:16AM  25    particular role I've been doing since November of 2020.

NEWMAN - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:16AM | 1 | Q.   What is your educational background? |
| 10:16AM | 2 | A.   I have a bachelor of science from James Madison |
| 10:16AM | 3 | University. |
| 10:16AM | 4 | Q.   What roles have you held within the -- we're going to call |
| 10:16AM | 5 | it NCMEC from now on? |
| 10:16AM | 6 | A.   Yes.  As I mentioned, I started in November of 2001 as an |
| 10:16AM | 7 | analyst in the CyberTipline.  Over the past 20 years, I've held |
| 10:16AM | 8 | various roles all within the Exploited Children Division. |
| 10:16AM | 9 | Currently I also have an added responsibility of leading our |
| 10:16AM | 10 | office down in Austin, Texas. |
| 10:17AM | 11 | Q.   What, other than leading the Texas office, are your |
| 10:17AM | 12 | current responsibilities? |
| 10:17AM | 13 | A.   As the Executive Director in the Exploited Children |
| 10:17AM | 14 | Division, I oversee our strategies, our special projects, |
| 10:17AM | 15 | assist ECD management and leadership with workflow improvements |
| 10:17AM | 16 | and processes.  Really, anything that helps our operations. |
| 10:17AM | 17 | Q.   Can you tell me what NCMEC is? |
| 10:17AM | 18 | A.   The National Center for Missing and Exploited Children is |
| 10:17AM | 19 | a private non-profit.  We were founded in 1984 after the |
| 10:17AM | 20 | kidnapping and murder of Adam Walsh in 1981.  Our cofounders |
| 10:17AM | 21 | John and Revé started the National Center in 1984, and we serve |
| 10:17AM | 22 | three main missions:  To find missing children, reduce child |
| 10:17AM | 23 | sexual exploitation, and prevent future victimization. |
| 10:17AM | 24 | Q.   I've heard it referred to as a clearinghouse previously. |
| 10:18AM | 25 | Can you explain what that means? |

**NEWMAN - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 10:18 AM | 1 | **A.** Sure. Basically because of the work that we do at a |
| 10:18 AM | 2 | national level, you know, we kind of serve in that |
| 10:18 AM | 3 | clearinghouse role. For example, we have the CyberTipline, |
| 10:18 AM | 4 | which is the nation's recording mechanism for online child |
| 10:18 AM | 5 | exploitation. We have 1-800-THE-LOST, which is a 24/7 call |
| 10:18 AM | 6 | center for reporting any sort of incidents of missing children, |
| 10:18 AM | 7 | sightings of missing children, requests for information, really |
| 10:18 AM | 8 | serving at all times for those who are invested in child safety |
| 10:18 AM | 9 | and protection. |
| 10:18 AM | 10 | **Q.** You mentioned it being a non-profit organization. To the |
| 10:18 AM | 11 | best of your knowledge, can you explain what that means? |
| 10:18 AM | 12 | **A.** I don't have an exact definition of a non-profit, but we |
| 10:18 AM | 13 | certainly don't operate for profit or income. |
| 10:18 AM | 14 | **THE COURT:** Ms. Newman, forgive me. I couldn't quite |
| 10:18 AM | 15 | hear that last part. |
| 10:18 AM | 16 | **THE WITNESS:** Sure. So I don't have the exact |
| 10:19 AM | 17 | definition of a non-profit, but we don't operate for profit or |
| 10:19 AM | 18 | income. |
| 10:19 AM | 19 | **BY MS. FAVORIT:** |
| 10:19 AM | 20 | **Q.** Are you an employee of the federal government? |
| 10:19 AM | 21 | **A.** No. |
| 10:19 AM | 22 | **Q.** How many people does NCMEC employ? |
| 10:19 AM | 23 | **A.** Right now I believe we're around 420. |
| 10:19 AM | 24 | **Q.** And because of your role as the Executive Director, are |
| 10:19 AM | 25 | you generally familiar with NCMEC's practices and employees and |

**NEWMAN - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 10:19AM | 1 | that type of thing? |
| 10:19AM | 2 | A.    Generally, yes. |
| 10:19AM | 3 | Q.    Does NCMEC receive any grant money? |
| 10:19AM | 4 | A.    We do. |
| 10:19AM | 5 | Q.    Can you tell me from what sources grant money comes from? |
| 10:19AM | 6 | A.    I don't know all of them, but I know Department of |
| 10:19AM | 7 | Justice, Secret Service, Immigrations and Customs Enforcement, |
| 10:19AM | 8 | and then we certainly also have private donations as well, |
| 10:19AM | 9 | foundational grants. |
| 10:20AM | 10 | Q.    Are you aware of a percentage of funds to NCMEC that come |
| 10:20AM | 11 | from federal money versus private grants? |
| 10:20AM | 12 | A.    When you consider our corporate donations, our in-kind |
| 10:20AM | 13 | private donors, and the foundational grants, as well as the |
| 10:20AM | 14 | government funding, it's roughly 70/30 government to private. |
| 10:20AM | 15 | Q.    Does NCMEC have a board of directors? |
| 10:20AM | 16 | A.    We do. |
| 10:20AM | 17 | Q.    Are you aware of who sits on that board? |
| 10:20AM | 18 | A.    I don't have those specifics.  I know it's listed on our |
| 10:20AM | 19 | website though. |
| 10:20AM | 20 | Q.    You mentioned having programs that NCMEC is in charge of. |
| 10:20AM | 21 | Could you tell me what those programs are? |
| 10:20AM | 22 | A.    Sure.  We have maybe five core -- what you would call five |
| 10:20AM | 23 | core areas of focus.  As I mentioned, our missing children, |
| 10:20AM | 24 | exploited children.  We have our prevention of future |
| 10:21AM | 25 | victimization.  We also have our family advocacy division, |

NEWMAN - DIRECT EXAMINATION

10:21 AM  1    which is focused on the victims, survivors, and families of

10:21 AM  2    missing and sexual exploitation issues, and then we also have

10:21 AM  3    training and outreach, which is working with child-serving

10:21 AM  4    professionals to educate them on the resources of the National

10:21 AM  5    Center and other issues related to child protection.

10:21 AM  6    Q.    Is there a specific program that you are involved with?

10:21 AM  7    A.    As Executive Director in the Exploited Children Division,

10:21 AM  8    I do have a hand in all three programs of work that we have in

10:21 AM  9    this division.

10:21 AM  10   Q.    So we talked about the Exploited Children's Division; is

10:21 AM  11   that correct?

10:21 AM  12   A.    Correct.

10:21 AM  13   Q.    Also known as ECD.  Can you tell me what programs are

10:21 AM  14   within that department?

10:21 AM  15   A.    Sure.  We have three.  We have the CyberTipline, we have

10:21 AM  16   the child victim identification program, and we have our

10:21 AM  17   survivor services.

10:21 AM  18   Q.    What is the child victim identification program?

10:21 AM  19   A.    That is where we serve, again in that clearinghouse role,

10:22 AM  20   in regards to children that have been identified that have been

10:22 AM  21   seen in child sexual abuse material, also known as child

10:22 AM  22   pornography.  We assist law enforcement with identifying those

10:22 AM  23   children.  We also serve with the federal government in terms

10:22 AM  24   of -- in part of the federal notification and restitution

10:22 AM  25   process, and we also just basically focus on helping identify

NEWMAN - DIRECT EXAMINATION

10:22AM 1    those children that are still at risk so that we can assist law

10:22AM 2    enforcement in identifying them.

10:22AM 3    Q.   And what about survivor services?

10:22AM 4    A.   This really goes back to our grassroots, which is to serve

10:22AM 5    families and survivors, and the survivor services program

10:22AM 6    provides resources and assistance to, again, those survivors

10:22AM 7    and families that have been impacted by child sexual abuse

10:22AM 8    material, whether that's helping to connect them to mental

10:23AM 9    health therapists that could help them, connecting them to an

10:23AM 10   attorney who might be of assistance to them, providing peer

10:23AM 11   counseling and support.  We really try to help them

10:23AM 12   post-identification as they work towards recovery.

10:23AM 13   Q.   And what is the CyberTipline program?

10:23AM 14   A.   The CyberTipline started in 1998, and that, as I

10:23AM 15   mentioned, is the nation's recording mechanism for child sexual

10:23AM 16   exploitation.  It can be online or offline, but really serving

10:23AM 17   as that conduit to receive tips from the public or from

10:23AM 18   electronic service providers and, if deemed appropriate, make

10:23AM 19   those reports available to law enforcement.

10:23AM 20   Q.   What is the ultimate goal of the program?

10:23AM 21   A.   The ultimate goal is to surface any files or reports that

10:23AM 22   come in to us where there could be a child in danger and get

10:23AM 23   those reports to law enforcement for them to -- to review on

10:23AM 24   their own, do their own analysis, and if they do investigate,

10:24AM 25   hopefully safeguard a child.

NEWMAN - DIRECT EXAMINATION

10:24AM  1  Q.    About how many tips does the CyberTipline receive per

10:24AM  2  year?

10:24AM  3  A.    So last year in 2021, we received over 29 million reports.

10:24AM  4  That averaged between 70 to 80,000 reports a day that we

10:24AM  5  received.  Many of those reports resolve internationally as

10:24AM  6  well.

10:24AM  7  Q.    Talk about the international aspect.  How are there

10:24AM  8  international reports coming to NCMEC?

10:24AM  9  A.    The majority of those are going to be from the electronic

10:24AM 10  service providers pursuant to 2258A.  If they are made aware of

10:24AM 11  child pornography on their servers or platforms, they are

10:24AM 12  mandated to make reports to the CyberTipline.  As such, they

10:24AM 13  have user bases throughout the world, so we -- we by extension

10:24AM 14  almost become a global tipline.  Because they follow U.S. law,

10:25AM 15  they make those reports to us with, you know, users worldwide.

10:25AM 16  So we refer those on to international law enforcement.

10:25AM 17  Q.    Do you know a percentage of tips international versus

10:25AM 18  domestic?

10:25AM 19  A.    On average each year about 94 percent of our reports

10:25AM 20  resolve internationally.

10:25AM 21  Q.    Are they treated any differently than the reports that

10:25AM 22  come in domestically?

10:25AM 23  A.    They are just because of that volume.  Only the

10:25AM 24  high-priority cases receive human review.  Otherwise, they are

10:25AM 25  automatically sent to law enforcement at a 15-minute cadence to

**NEWMAN - DIRECT EXAMINATION**

10:25AM  1  those countries where we have connections through either the

10:25AM  2  National Police Service or through federal liaisons who are

10:25AM  3  serving as that conduit.

10:26AM  4  Q.    We talked a little bit about electronic service providers.

10:26AM  5  I'm not asking for an official definition, but what is your

10:26AM  6  understanding of what that might be?

10:26AM  7  A.    My understanding is it's really any service that provides,

10:26AM  8  say, social media interface, gaming, any sort of

10:26AM  9  connection-type service.  You know, we generally leave it up to

10:26AM  10  companies to self-identify if they're an electronic service

10:26AM  11  provider, but that's my understanding of what an ESP or

10:26AM  12  electronic service provider is.

10:26AM  13  Q.    Do all of the CyberTip reports come from electronic

10:26AM  14  service providers?

10:26AM  15  A.    No.  We do get reports from the public.  Again, that's

10:26AM  16  originally how we started to be a resource for the general

10:26AM  17  public, but we do receive about 98 to 99 percent of the volume

10:26AM  18  each year from the companies.

10:26AM  19  Q.    And we keep talking about these CyberTip reports.  Could

10:27AM  20  you tell me what exactly that is?

10:27AM  21  A.    Sure.  So it's basically information that's reported to us

10:27AM  22  by the public or company.  The reporting person or entity

10:27AM  23  chooses one of the eight categories of type of report that

10:27AM  24  they're making to us.  The information is intaked to us at

10:27AM  25  NCMEC, and we generate a CyberTip report, which our analysts

**NEWMAN - DIRECT EXAMINATION**

10:27AM    1    will then, you know, review the files, possibly do some sort of

10:27AM    2    deconfliction or open-source search if it's a priority report,

10:27AM    3    and then, again, make that report available to law enforcement.

10:27AM    4    Q.    You mentioned eight categories.  Could you explain what

10:27AM    5    that means?

10:27AM    6    A.    Sure.  So when you make a report to us, certainly we want

10:27AM    7    to know from the reporting person or entity what kind of report

10:27AM    8    is coming in to us, so those categories include child

10:27AM    9    pornography, which is the possession, distribution or

10:27AM    10   production of online enticement; sex tourisms; sexual

10:28AM    11   molestation, that sort of thing.

10:28AM    12   Q.    Are there any members of law enforcement on the

10:28AM    13   CyberTipline team?

10:28AM    14   A.    No.

10:28AM    15   Q.    So we talked about the CyberTips that could come from the

10:28AM    16   public or what we'll call from now on ESPs.  What happens when

10:28AM    17   a report is received by NCMEC?

10:28AM    18   A.    When the report is received by us, again we have certain

10:28AM    19   indicators to let us know if that is a high priority report to

10:28AM    20   us.  If it is, it's triaged to be handled first and foremost.

10:28AM    21   Our analysts will look at the information provided in that

10:28AM    22   report, see if there's any open source searches that we can do.

10:28AM    23   Ideally, the goal is to identify if there's a child at risk and

10:28AM    24   get that report to law enforcement to safeguard that child

10:29AM    25   and/or if there's an offender, identify where that offender is.

NEWMAN - DIRECT EXAMINATION

10:29AM  1              That report is then made available to law enforcement

10:29AM  2      for their independent review and investigation.

10:29AM  3      Q.   You mentioned the categories.  Is that how a report might

10:29AM  4      become prioritized?

10:29AM  5      A.   It could, yes.  It could also be based on the information

10:29AM  6      that's provided in that report.  Whether it comes from the

10:29AM  7      public or from the electronic service providers, there's

10:29AM  8      certain indicators that will flag to us that it is a high

10:29AM  9      priority report, either based on the information in that report

10:29AM  10     or based on the files associated with it.

10:29AM  11     Q.   Are reports from ESPs and the public treated differently?

10:29AM  12     A.   Unless it's a priority report.  So reports that come in

10:29AM  13     from the public receive one of three designations.  They're

10:30AM  14     priority 1, 2 or 3.  Priority 1 would mean that that child's in

10:30AM  15     imminent danger.  Priority 2 would be that there's concern for

10:30AM  16     that child's welfare in the future, and Priority 3 would be

10:30AM  17     just any report from a member of the public where we don't

10:30AM  18     believe that there's an imminent threat to a child.  So all of

10:30AM  19     the reports that come in from the public would be 3 unless

10:30AM  20     they're prioritized.

10:30AM  21              On the company side, on the ESP side, generally those

10:30AM  22     all come in as what we call priority E for electronic service

10:30AM  23     provider.  That is automated, and those are not reviewed by

10:30AM  24     humans.  If there are indicators surrounding that, such as an

10:30AM  25     electronic service provider chooses to escalate a report or

**NEWMAN - DIRECT EXAMINATION**

10:30AM  1    provide other information that may make us think this needs to

10:30AM  2    be prioritized, we will go ahead and do that and make it a

10:30AM  3    higher priority report.

10:30AM  4    Q.    Is that reliant upon the ESP providing that type of

10:31AM  5    emphasis on the report?

10:31AM  6    A.    Yes.  We work solely off what is provided to us by the

10:31AM  7    public or the company.

10:31AM  8    Q.    Does NCMEC generate any of these CyberTip reports full of

10:31AM  9    information?

10:31AM 10    A.    So we're not the origin of the report, but we do generate

10:31AM 11    a CyberTip report based on information that's coming in to us

10:31AM 12    from members of the public or the companies, but we are not the

10:31AM 13    origin of the report.

10:31AM 14    Q.    Is law enforcement involved in generating that report?

10:31AM 15    A.    No.

10:31AM 16    Q.    Why not?

10:31AM 17    A.    Just as our business process and based on our purview, we

10:31AM 18    just generate those reports as our national clearinghouse role.

10:31AM 19    Q.    As what point does a human review the ESP reports that are

10:31AM 20    category E?

10:32AM 21    A.    We'll go ahead and review those.  The files are handled

10:32AM 22    through a separate workflow based on the findings in that --

10:32AM 23    from the files or what is provided in that report.  Companies

10:32AM 24    may provide all sorts of different information at their own

10:32AM 25    voluntary election to those reports.  So depending on what is

NEWMAN - DIRECT EXAMINATION

10:32AM  1    reported to us kind of depends on when and who sees that

10:32AM  2    report.

10:32AM  3    Q.    What information is typically provided in a CyberTip

10:32AM  4    report that comes from an ESP?

10:32AM  5    A.    There is really no typical.  Whether it's a report from

10:32AM  6    the public or a report from the electronic service provider,

10:32AM  7    there's only two mandatory fields, which is to select one of

10:32AM  8    those eight categories and to select the date and time of the

10:32AM  9    incident.  Outside of that, both for public and company

10:32AM  10   reports, everything else is voluntarily and electively provided

10:33AM  11   to us.

10:33AM  12           So there is no real typical.  Generally, companies do

10:33AM  13   provide some sort of identifier or information about the

10:33AM  14   subject or the child victim or the incident for just

10:33AM  15   informational purposes.

10:33AM  16   Q.    Do they have an opportunity -- and when I say "they," I

10:33AM  17   mean the ESPs.  Do they have the opportunity to attach anything

10:33AM  18   to their report?

10:33AM  19   A.    Companies do.  Members of the public are not able to

10:33AM  20   submit anything to us because of our NGO non-profit status.

10:33AM  21   Companies are able to not attach, but they do designate images

10:33AM  22   that we are then also able to access so that we can review the

10:33AM  23   files in question.

10:33AM  24   Q.    And before we get further into that, does NCMEC catalog

10:33AM  25   child sexual abuse material at all?

NEWMAN - DIRECT EXAMINATION

10:34AM  1    A.    In terms of the labeling the content?  Is that the
10:34AM  2    question?
10:34AM  3    Q.    Yes.
10:34AM  4    A.    Yes, we do.
10:34AM  5    Q.    Is there some type of database that maintains child
10:34AM  6    sexually abusive material?
10:34AM  7    A.    So we do have a list of the files, the hash values, and
10:34AM  8    the associated labels once they've been labeled as such.
10:34AM  9    Q.    So can you tell us what the hash value is?
10:34AM  10   A.    My understanding of it is that it is basically a digital
10:34AM  11   fingerprint.  It is -- we traditionally use MD5 at NCMEC, which
10:34AM  12   is an alphanumeric designation for that file.
10:34AM  13   Q.    So it's not the actual images?  It's a numeric code that
10:34AM  14   identifies an image?
10:34AM  15   A.    Exactly, as I understand it, and videos as well.
10:34AM  16   Q.    And videos, yes.  Is that -- what do you call that at
10:34AM  17   NCMEC?  Is it a catalog or something else?
10:35AM  18   A.    I don't know that I understand the question.
10:35AM  19   Q.    Is there a name for that kind of catalog of images of hash
10:35AM  20   values?
10:35AM  21   A.    We just call it our files.
10:35AM  22   Q.    Are those files reviewed before the hash value is entered
10:35AM  23   into that file database?
10:35AM  24   A.    They are -- they are reviewed before a label is given to
10:35AM  25   them.  In terms of the MD5, that's an automated process that

**NEWMAN - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 10:35AM | 1 | happens when those files, images, and videos are associated |
| 10:35AM | 2 | with that CyberTipline report, but there is a human review |
| 10:35AM | 3 | before the label is given to that file. |
| 10:35AM | 4 | Q.  Do you know how many images that NCMEC has filed? |
| 10:35AM | 5 | A.  I do not. |
| 10:35AM | 6 | Q.  Do you know if those hash values are shared with ESPs? |
| 10:36AM | 7 | A.  The National Center makes available the MD5s and the files |
| 10:36AM | 8 | that are submitted by companies basically those that are kind |
| 10:36AM | 9 | of what we call our worst of the worst, and that's what we call |
| 10:36AM | 10 | our hash sharing initiative, which is those images and videos |
| 10:36AM | 11 | that are received by us which appear to be the worst of the |
| 10:36AM | 12 | worst content.  We just offer that and make that available then |
| 10:36AM | 13 | to companies who would like to use those for voluntary |
| 10:36AM | 14 | initiatives to detect and report CSAM, child sexual abuse |
| 10:36AM | 15 | material, that's on their servers and platforms. |
| 10:36AM | 16 | Q.  Do you know how a company can obtain that information? |
| 10:36AM | 17 | A.  They just need to reach out to us, and I believe that |
| 10:36AM | 18 | there's a legal agreement, but I'm not certain. |
| 10:37AM | 19 | Q.  Why is it significant to have the hash value or the MD5 of |
| 10:37AM | 20 | a potential child sexual abuse image or video? |
| 10:37AM | 21 | A.  It can be helpful in many ways.  You know, as we talked |
| 10:37AM | 22 | about volume, I said we received over 29 million reports last |
| 10:37AM | 23 | year.  Within those reports, there were over 85 million images |
| 10:37AM | 24 | and videos that were received by us.  So you can understand the |
| 10:37AM | 25 | volume that we're dealing with.  So using the files and the |

NEWMAN - DIRECT EXAMINATION

10:37AM 1   MD5s is helpful for many reasons.  It helps us identify those

10:37AM 2   files that NCMEC has already seen and already classified so we

10:37AM 3   don't need to look at those again.  That also helps with our

10:37AM 4   staff welfare so that they're not looking at additional child

10:37AM 5   pornography that they don't need to be looking at.  When there

10:37AM 6   is not a match on an MD5, we believe that could be new content,

10:37AM 7   a child who's in danger right now, so we want to prioritize

10:37AM 8   those reports.  So really using that matching is able to serve

10:38AM 9   many purposes.

10:38AM 10  Q.   Can you tell me the process of when NCMEC receives a

10:38AM 11  CyberTip from an ESP, where is the life of that report going to

10:38AM 12  go through NCMEC?

10:38AM 13  A.   I'm sorry, I don't understand the question.

10:38AM 14  Q.   Who is going to see it?  What's going to happen to that

10:38AM 15  report?  What are the steps that are going to be taken?

10:38AM 16  A.   Okay.  So right now, the way that the process works is

10:38AM 17  that the files are reviewed separately from the report.  So

10:38AM 18  they are carved out, and they are reviewed ahead of the report

10:38AM 19  being processed.  They are labeled as such.  Again, if those --

10:38AM 20  if those files are viewable and need to be reviewed, we will do

10:38AM 21  that.  We then associate those labels and any information from

10:38AM 22  the files to the report, and then another analyst will process

10:39AM 23  that report and make available to law enforcement if deemed

10:39AM 24  necessary.

10:39AM 25  Q.   You mentioned labeling images.  What does that mean?

NEWMAN - DIRECT EXAMINATION

10:39AM  1   A.    We have categorization at the National Center for our
10:39AM  2   files.  It's really meant to provide context and kind of an
10:39AM  3   impression of that file and of that report.  You know, it's
10:39AM  4   meant to inform what we're looking at in that report and
10:39AM  5   provide context to law enforcement when we make it available.
10:39AM  6   It certainly helps us in our advocacy role.  Again, as a
10:39AM  7   non-profit, we want to serve as child advocates, so it lets us
10:39AM  8   use that information for data that we can -- we can use
10:39AM  9   proactively.  So that's really the purpose:  Triage,
10:39AM  10  prioritization, and really just kind of informing that report.
10:39AM  11  Q.    Once an image or video receives a label, is it ever
10:39AM  12  reviewed again?
10:40AM  13  A.    It may be, but to receive that label, it is reviewed at
10:40AM  14  least twice by two different people.  But it may be reviewed
10:40AM  15  again.
10:40AM  16  Q.    Once it receives a label, is it now part of the file
10:40AM  17  database?
10:40AM  18  A.    It is.
10:40AM  19  Q.    Can you tell me what type of labels images or videos may
10:40AM  20  receive?
10:40AM  21  A.    Sure.  I don't have the exhaustive list in my head, but I
10:40AM  22  know we have apparent CP, we have CP unconfirmed, we have child
10:40AM  23  clothed, we have child unclothed, anime, things like that.
10:40AM  24  Q.    Does the reviewer receive any training in order to be a
10:40AM  25  reviewer of those images or videos?

NEWMAN - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:40AM | 1 | **A.**  Yes. |
| 10:40AM | 2 | **Q.**  What type of training do they receive, if you know? |
| 10:40AM | 3 | **A.**  My understanding is that it's basically just, you know, |
| 10:40AM | 4 | understanding what that definition is and applying labels over |
| 10:41AM | 5 | and over, and then working with management to fine-tune their |
| 10:41AM | 6 | assessment of those files. |
| 10:41AM | 7 | **Q.**  Are they associated with law enforcement at all? |
| 10:41AM | 8 | **A.**  No. |
| 10:41AM | 9 | **Q.**  Does law enforcement have access to the labeling in the |
| 10:41AM | 10 | database? |
| 10:41AM | 11 | **A.**  No. |
| 10:41AM | 12 | **Q.**  When NCMEC labels an image, is that an expert opinion? |
| 10:41AM | 13 | **A.**  I -- I would say it's an educated and informed impression |
| 10:41AM | 14 | of what is being depicted.  We certainly, you know, rely on law |
| 10:41AM | 15 | enforcement to do their independent review and investigation |
| 10:41AM | 16 | and assessment of those files.  We are certainly just serving, |
| 10:41AM | 17 | again, more as an impression, but we are not the determiners of |
| 10:41AM | 18 | what is illegal or legal content. |
| 10:41AM | 19 | **Q.**  What then is the purpose of giving a label to an image or |
| 10:41AM | 20 | video? |
| 10:41AM | 21 | **A.**  Again, really just to assist with that -- that |
| 10:41AM | 22 | prioritization or that triage, again, just to give that |
| 10:42AM | 23 | impression of what that report is coming in, what those files |
| 10:42AM | 24 | are.  Again, internally we can use it for staff welfare as well |
| 10:42AM | 25 | so they understand what's being depicted in those images, and |

**NEWMAN - DIRECT EXAMINATION**

10:42AM   1   really it serves as context.  So understanding what the files

10:42AM   2   are labeled associated with a report.  When that analyst goes

10:42AM   3   to look at that report, they can kind of have a sense of what

10:42AM   4   was exchanged or part of that as they do their other analytical

10:42AM   5   work.

10:42AM   6   Q.   You mentioned at the end of the CyberTipline report that's

10:42AM   7   maybe generated, is that then sent to law enforcement?

10:42AM   8   A.   We make them available to law enforcement.

10:42AM   9   Q.   What does that mean?

10:42AM  10   A.   Essentially, there's a secure connection where we

10:42AM  11   basically open a portal to the receiving law enforcement so

10:43AM  12   that they can come in and access that CyberTipline report.  We

10:43AM  13   do send them emails to let them know there is a CyberTipline

10:43AM  14   report waiting for them, and if it is a priority report, we

10:43AM  15   will call ahead of time just to make sure we make a

10:43AM  16   human-to-human contact that a priority report is available to

10:43AM  17   them.

10:43AM  18   Q.   I want to talk about this case in particular.  I'm going

10:43AM  19   to show you what's been identified as Government Exhibit 1.

10:43AM  20        Do you recognize the exhibit that I've shown you?

10:43AM  21   A.   I do.

10:43AM  22   Q.   I'm showing you a CyberTipline report 79384716.  Is this a

10:44AM  23   report that was generated by NCMEC?

10:44AM  24   A.   It is.

10:44AM  25   Q.   Can you tell me when that was generated?

NEWMAN - DIRECT EXAMINATION

10:44AM    1    A.    I would need to --

10:44AM    2    Q.    You can go ahead and flip through.

10:44AM    3    A.    Okay.  As you can see here, it was received by us on

10:44AM    4    September 10th, 2020 at 18:02:08 universal time.  Our analyst

10:44AM    5    processed this report on October 22nd.

10:44AM    6    Q.    Now, we talked about priority levels, and I see on the

10:44AM    7    first page this says, "priority level E", and what does that

10:44AM    8    mean to NCMEC?

10:44AM    9    A.    That this is a report that was submitted to us by an

10:44AM    10   electronic service provider, and there were no extenuating

10:45AM    11   circumstances that were indicated by the company when they made

10:45AM    12   the report to us to make it a priority or escalation.

10:45AM    13   Q.    And there's an executive summary.  Where does that

10:45AM    14   information come from?

10:45AM    15   A.    That information is a template that's autofilled at the

10:45AM    16   completion of the processing of the report.

10:45AM    17   Q.    Can you tell me the incident type on this CyberTipline

10:45AM    18   report?

10:45AM    19   A.    The incident type reads "Apparent child pornography."

10:45AM    20   Q.    Is that one of those labels that we talked about

10:45AM    21   previously?

10:45AM    22   A.    That is -- the labels apply to the files.  This is what we

10:45AM    23   would call our incident type for the report itself.  So in

10:45AM    24   regards to those eight categories that are selected by the

10:45AM    25   reporting person or company at the time the report is made,

NEWMAN - DIRECT EXAMINATION

10:45AM   1   after analysis, we can recategorize that report to be more

10:45AM   2   accurate.  So in this case our analyst selected "Apparent child

10:46AM   3   pornography."

10:46AM   4   Q.   What does that mean to NCMEC?

10:46AM   5   A.   This means that at least one of the files that was

10:46AM   6   submitted to us as part of this report was labeled as apparent

10:46AM   7   CP.

10:46AM   8   Q.   Now, it says, "Files not reviewed by NCMEC hash match."

10:46AM   9   Could you explain what that means in this report?

10:46AM  10   A.   Traditionally when we have that verbiage, that basically

10:46AM  11   means that we did not review the files in this report, but that

10:46AM  12   the labels were applied based on hash matches to previously

10:46AM  13   seen iterations of the files.

10:46AM  14   Q.   If there is a hash match, what's the significance of that?

10:46AM  15   A.   It just means that we've seen that file before and so

10:46AM  16   that's where the label is coming from and that we did not

10:46AM  17   review it in this particular report.  That's what the template

10:46AM  18   means.

10:46AM  19   Q.   And we talked about your familiarity with this particular

10:47AM  20   CyberTipline report.  Is that an accurate statement, "Files not

10:47AM  21   reviewed by NCMEC?"

10:47AM  22   A.   It is not.

10:47AM  23   Q.   Could you explain why that's not an accurate statement?

10:47AM  24   A.   So in this particular case, six of the seven files were

10:47AM  25   actually reviewed by us.  The one file that was not was the GIF

NEWMAN - DIRECT EXAMINATION

10:47AM  1   file.  This was processed during our transition in workflow as

10:47AM  2   a result of COVID and different processing guidelines and

10:47AM  3   workflows.  So at the time that this report was sent out, the

10:47AM  4   system did not know, is the way to say it, did not know that

10:47AM  5   the humans have reviewed it -- humans had reviewed it.  So, in

10:47AM  6   fact, they had.  So there was inaccuracy there.

10:47AM  7   Q.   How were you able to discover that the human did review

10:47AM  8   those files?

10:47AM  9   A.   It was really only as a result of this case that we looked

10:47AM  10  at that in preparation for court, and in looking on the back

10:47AM  11  end, I'm able to see that humans did review six of the seven

10:48AM  12  files that were submitted.

10:48AM  13  Q.   Have the CyberTipline report procedures changed

10:48AM  14  post-COVID-19?

10:48AM  15  A.   They did change once COVID hit, and there was the pandemic

10:48AM  16  and mandatory work from home.  Certainly working with child

10:48AM  17  pornography, we're unable to do that work at home, so we did

10:48AM  18  have a group of volunteers who went into the office during the

10:48AM  19  pandemic and that began kind of the new workflow where the

10:48AM  20  files are reviewed separately than the reports, and at this

10:48AM  21  time we were still working on that system, and so these hadn't

10:48AM  22  received the label yet that the humans had reviewed them.

10:48AM  23  Q.   I want to scooch down to the bottom of this first page.

10:48AM  24  There's a lot of text here that talks about the National Center

10:48AM  25  for Missing and Exploited Children, but I want to focus on the

NEWMAN - DIRECT EXAMINATION

10:49AM 1   last sentence.  Could you read that to us, please?

10:49AM 2   A.    Sure.  "NCMEC does not investigate and cannot verify the

10:49AM 3   accuracy of the information submitted by reporting parties."

10:49AM 4   Q.    Why is that in the CyberTipline report?

10:49AM 5   A.    Mainly for two reasons.  Everything that is submitted to

10:49AM 6   us, whether by the public or a company that's listed in

10:49AM 7   Section A, is untouchable by NCMEC.  We're not able in any way

10:49AM 8   to access that information, change, or edit that information.

10:49AM 9   So any information that is submitted to us is essentially

10:49AM 10  locked down and part of Section A.  In addition, we are not a

10:49AM 11  law enforcement agency, so we cannot do investigative work.  We

10:49AM 12  are certainly a non-profit, and we serve in that clearinghouse

10:49AM 13  role to provide information to law enforcement for their

10:49AM 14  independent review and assessment.

10:49AM 15  Q.    Let me go to the next page on this exhibit.  I'm showing

10:49AM 16  you the contents page.  It has Section A, B, and C.  Could you

10:50AM 17  tell me what Section A represents?

10:50AM 18  A.    Section A represents everything that was reported to us by

10:50AM 19  the company in this report.

10:50AM 20  Q.    The information provided in Section A, does NCMEC

10:50AM 21  contribute to that at all?

10:50AM 22  A.    No.

10:50AM 23  Q.    And what about Section B?

10:50AM 24  A.    Section B is where any information that is received

10:50AM 25  through automated services would be listed there.

NEWMAN - DIRECT EXAMINATION

10:50AM  1   Q.   And what about Section C?

10:50AM  2   A.   Section C is where any work done by our analysts would be

10:50AM  3   listed there.

10:50AM  4   Q.   And what about Section D?

10:50AM  5   A.   Section D indicates which law enforcement, if any, the

10:50AM  6   report was made available to.

10:50AM  7   Q.   And in this particular case, was it made available to law

10:50AM  8   enforcement agency?

10:50AM  9   A.   It was, to the Central Florida ICAC, Internet Crimes

10:50AM 10   Against Children task force.

10:51AM 11   Q.   Let me go to the next page where Section A is actually

10:51AM 12   represented.  Could you tell me the reporting electronic

10:51AM 13   service provider for this particular report?

10:51AM 14   A.   Yahoo.

10:51AM 15   Q.   And does it provide any company information about maybe

10:51AM 16   who owns Yahoo?

10:51AM 17   A.   It does.  It appears that they provide a company

10:51AM 18   information section.

10:51AM 19   Q.   Okay.  And what company is listed under the reporting

10:51AM 20   electronic service provider?

10:51AM 21   A.   Oath Holdings.

10:51AM 22   Q.   I'm going to go to the next page and get to incident

10:51AM 23   information.  Is there suspect information provided in this

10:51AM 24   report?

10:51AM 25   A.   There is.

NEWMAN - DIRECT EXAMINATION

10:51AM 1    Q.    Can you tell me the name of the suspect?

10:51AM 2    A.    As listed, it's vlad vlad.

10:52AM 3            THE COURT:  If you could just pause, Ms. Favorit.

10:52AM 4    You said going to the next page.  It appears that you've moved

10:52AM 5    two pages from the last page.  So just for the record if you

10:52AM 6    could describe the page that you're looking at.

10:52AM 7    BY MS. FAVORIT:

10:52AM 8    Q.    Yes, I'm showing you page 5 of the CyberTipline report in

10:52AM 9    Government's Exhibit 1, and at the top of the page it starts

10:52AM 10   with the incident type and then leads to suspect, and then it

10:52AM 11   has page 3 listed for the actual CyberTip.

10:52AM 12           And what is the email address provided as the

10:52AM 13   suspect's?

10:52AM 14   A.    It appears to be vladlover50@yahoo.com.

10:52AM 15   Q.    And, again, is any of this provided by NCMEC?

10:52AM 16   A.    No.

10:52AM 17   Q.    How many files were up loaded by Yahoo?

10:52AM 18   A.    Seven.

10:53AM 19   Q.    And I want to talk about the first uploaded file

10:53AM 20   information.  What type of information is provided in reference

10:53AM 21   to each file uploaded?

10:53AM 22   A.    Well, that can vary depending on what's completed by the

10:53AM 23   electronic service provider, but as a standard template, you

10:53AM 24   can see the fields that are available.  So that's file name,

10:53AM 25   MD5, the original file name, three questions from the

NEWMAN - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:53AM | 1 | electronic service provider, and then two additional |
| 10:53AM | 2 | information fields. |
| 10:53AM | 3 | Q.   And is there significance about the MD5 number that was |
| 10:53AM | 4 | provided by Yahoo in this case? |
| 10:53AM | 5 | A.   The -- just the significance of that is that digital |
| 10:53AM | 6 | fingerprint and being able to find those automated services to |
| 10:53AM | 7 | see if those files have been through the NCMEC system before. |
| 10:53AM | 8 | Q.   What is Yahoo's response to, "Did reporting ESP view |
| 10:54AM | 9 | entire contents of uploaded file?" |
| 10:54AM | 10 | A.   They responded in the affirmative, "Yes." |
| 10:54AM | 11 | Q.   And what about view entire contents -- or, "Were entire |
| 10:54AM | 12 | contents of uploaded file publicly available?" |
| 10:54AM | 13 | A.   They did not answer that question. |
| 10:54AM | 14 | Q.   Okay.  Does NCMEC rely on the self-reporting of Yahoo in |
| 10:54AM | 15 | this case? |
| 10:54AM | 16 | A.   We do. |
| 10:54AM | 17 | Q.   Why would NCMEC rely upon that "yes" answer? |
| 10:54AM | 18 | A.   Because we trust their submission and reporting to us. |
| 10:54AM | 19 | Q.   Is that something that NCMEC will investigate? |
| 10:54AM | 20 | A.   No, that's outside of our purview. |
| 10:54AM | 21 | Q.   Would NCMEC contact Yahoo to confirm that they did open or |
| 10:54AM | 22 | receive these files? |
| 10:54AM | 23 | A.   Not to my knowledge. |
| 10:54AM | 24 | Q.   You mentioned the number of uploaded files.  Could you |
| 10:55AM | 25 | tell us how many were viewed by NCMEC? |

NEWMAN - DIRECT EXAMINATION

10:55AM  1    A.    Six of the seven were viewed before it was made available

10:55AM  2    to law enforcement.

10:55AM  3    Q.    Why wasn't the seventh reviewed?

10:55AM  4    A.    Because that one based on that MD5 had already been seen

10:55AM  5    by NCMEC, and so it identified as being a seen-before file, and

10:55AM  6    that label was already applied.

10:55AM  7    Q.    What does NCMEC in this case do with the information

10:55AM  8    that's provided by Yahoo?

10:55AM  9    A.    In this particular case, we -- as mentioned, we reviewed

10:55AM  10   six of the seven files, ensured that they all had those

10:55AM  11   categorizations labeled for them, and then just processed the

10:55AM  12   rest of the report.

10:55AM  13   Q.    Let me move on from looking at the CyberTip briefly.  Does

10:55AM  14   NCMEC have any authority to subpoena information from Yahoo?

10:56AM  15   A.    No.

10:56AM  16   Q.    Does NCMEC regularly receive reports from Yahoo?

10:56AM  17   A.    Regularly, uh-huh.

10:56AM  18   Q.    Were there any hash matches in this case?

10:56AM  19   A.    There was at least one, that GIF file that I mentioned.

10:56AM  20   Q.    Was it given a label by NCMEC?

10:56AM  21   A.    It was.

10:56AM  22   Q.    Do you remember what that label was?

10:56AM  23   A.    Can I flip --

10:56AM  24   Q.    Yes, you can review the exhibit.

10:56AM  25   A.    So I'm looking at page 6 of the CyberTipline report,

NEWMAN - DIRECT EXAMINATION

10:56AM  1    Section B.

10:56AM  2    Q.   I'm also showing that for the courtroom.

10:56AM  3    A.   The GIF file was labeled, "CP unconfirmed."

10:57AM  4    Q.   What does that mean to NCMEC?

10:57AM  5    A.   Traditionally, what that means is that the activity

10:57AM  6    depicted in that image or video appears to meet the federal

10:57AM  7    definition of child pornography.  However, there may be

10:57AM  8    question of the age of the individual seen in that particular

10:57AM  9    image or video.  So we would call that "Age indeterminate" or

10:57AM  10   "Age difficult."

10:57AM  11   Q.   Does NCMEC make the final determination of the labeling of

10:57AM  12   the image for court purposes?

10:57AM  13   A.   No, that is left to law enforcement.

10:57AM  14   Q.   I see that all the file names are listed here.  Could you

10:57AM  15   tell me the categorization for each of the files?

10:57AM  16   A.   Sure.  So the first one, as mentioned, the GIF, is "CP

10:57AM  17   unconfirmed."  Image.125-1 is "CP unconfirmed."  Image.1-1 is

10:58AM  18   "Apparent CP."  Image.120 hash -- or, I'm sorry, -1 is "Child

10:58AM  19   clothed."  Image.97-1 is "CP unconfirmed."  Image.5-1 is "CP

10:58AM  20   unconfirmed," and image.118-1 is "Apparent child pornography."

10:58AM  21   Q.   If these images were not previously in NCMEC's database,

10:58AM  22   the files that we spoke about, would they be later included now

10:58AM  23   that NCMEC had received these images?

10:58AM  24   A.   Yes.  With the submission of this, if they are not already

10:58AM  25   in our system, they would be now.

**NEWMAN - DIRECT EXAMINATION**

10:58AM  1  Q.  Does NCMEC reach out to the suspect at all?

10:58AM  2  A.  No.

10:58AM  3  Q.  In this particular case, was Central Florida ICAC

10:59AM  4  contacted?

10:59AM  5  A.  They received notification that there was a CyberTipline

10:59AM  6  report available to them.

10:59AM  7  Q.  Were any phone calls made to law enforcement in this case?

10:59AM  8  A.  Not that I'm aware of.

10:59AM  9  Q.  Is there like an age cutoff at all for labeling of images

10:59AM  10  of children?

10:59AM  11  A.  We use the federal estimation of 18, 18 years old.

10:59AM  12  Q.  And how else are images categorized?  Is the federal law

10:59AM  13  of child pornography utilized?

10:59AM  14  A.  It is.

10:59AM  15  Q.  Does NCMEC pay electronic service providers to provide

10:59AM  16  these CyberTips?

10:59AM  17  A.  No.

10:59AM  18  Q.  Does NCMEC provide any money to ESPs?

10:59AM  19  A.  No.

10:59AM  20  Q.  Does the Government participate in the CyberTipline

11:00AM  21  reporting?

11:00AM  22  A.  No.

11:00AM  23  Q.  Is the Government in charge of supervising the

11:00AM  24  CyberTipline report within NCMEC?

11:00AM  25  A.  No.

NEWMAN - DIRECT EXAMINATION

11:00AM 1    Q.    Does the Government have any role in the operation of the

11:00AM 2    CyberTipline program?

11:00AM 3    A.    Not to my knowledge.

11:00AM 4    Q.    Is NCMEC controlled by the federal government in any way?

11:00AM 5    A.    No.

11:00AM 6    Q.    Did Yahoo get any special treatment in this particular

11:00AM 7    case?

11:00AM 8    A.    Not to my knowledge.

11:00AM 9    Q.    Does NCMEC have pediatricians on staff that can review

11:00AM 10   images to determine age of children?

11:00AM 11   A.    No.

11:00AM 12   Q.    Was this CyberTip done in the regular course of business?

11:00AM 13   A.    It was.

11:00AM 14   Q.    I'm sorry.  Was there anything different about this

11:01AM 15   CyberTipline report compared to other CyberTipline reports?

11:01AM 16   A.    No.

11:01AM 17   Q.    Is that the totality of NCMEC's involvement?

11:01AM 18   A.    Yes, what is listed here in the report.

11:01AM 19   Q.    Does NCMEC obtain IP addresses from suspects?

11:01AM 20   A.    We only obtain what's submitted to us by the member of the

11:01AM 21   public or the company.

11:01AM 22          MS. FAVORIT:  May I have a moment, Your Honor?

11:01AM 23          THE COURT:  Sure.

11:01AM 24                      (Pause.)

11:02AM 25          MS. FAVORIT:  May I proceed, Your Honor?

**NEWMAN - CROSS-EXAMINATION**

| | | |
|---|---|---|
| 11:02AM | 1 | THE COURT:  You may. |
| 11:02AM | 2 | BY MS. FAVORIT: |
| 11:02AM | 3 | Q.   I just want to show you briefly Government's Exhibit 4. |
| 11:02AM | 4 | Do you recognize this exhibit? |
| 11:02AM | 5 | A.   I do. |
| 11:02AM | 6 | Q.   What do you recognize it to be? |
| 11:02AM | 7 | A.   An affidavit. |
| 11:02AM | 8 | Q.   And where did this affidavit come from? |
| 11:02AM | 9 | A.   I believe from you. |
| 11:02AM | 10 | Q.   Is this affidavit something that you've read previously? |
| 11:02AM | 11 | A.   It is. |
| 11:02AM | 12 | Q.   And was it drafted by NCMEC? |
| 11:02AM | 13 | A.   It was. |
| 11:03AM | 14 | Q.   Did you have the opportunity to review this affidavit |
| 11:03AM | 15 | previously? |
| 11:03AM | 16 | A.   I have. |
| 11:03AM | 17 | Q.   And do you support everything that it says in the |
| 11:03AM | 18 | affidavit? |
| 11:03AM | 19 | A.   I do. |
| 11:03AM | 20 | MS. FAVORIT:  I don't have any further questions, |
| 11:03AM | 21 | Your Honor. |
| 11:03AM | 22 | THE COURT:  Okay.  Mr. Centrone, any cross? |
| 11:03AM | 23 | MR. CENTRONE:  Yes, Your Honor. |
| 11:03AM | 24 | CROSS-EXAMINATION |
| 11:03AM | 25 | BY MR. CENTRONE: |

NEWMAN - CROSS-EXAMINATION

```
11:03AM   1   Q.   Good morning, Ms. Newman.
11:03AM   2   A.   Good morning.
11:03AM   3   Q.   Just to clarify, we talked a little bit about ago -- a
11:03AM   4   little while ago about the definition of "CP unconfirmed."  So
11:03AM   5   it's fair to call that "Age difficult;" is that -- is that
11:03AM   6   correct?
11:03AM   7   A.   That's fair.
11:03AM   8   Q.   And based on your testimony, that means, to put it in
11:03AM   9   plain English, you can't tell if the person in the image is 18
11:03AM  10   or not?
11:03AM  11   A.   Correct.
11:03AM  12   Q.   Those -- we'll call them labels, as the Government did.
11:03AM  13   The people who review images and apply those levels, what
11:04AM  14   standards are employed to help them make those determinations?
11:04AM  15   A.   Really, just exposure and training.  So reviewing file
11:04AM  16   after file and then working with their manager to help kind of
11:04AM  17   fine-tune their assessment of the file.
11:04AM  18   Q.   So because part of that review involves attempting to
11:04AM  19   determine the age of the participants in the photos, is it fair
11:04AM  20   to say that the reviewers are trained to determine whether
11:04AM  21   someone is 18 or not from an image?
11:04AM  22   A.   You know, for that, we really focus on those where it's,
11:04AM  23   you know, pretty clear that it's a child.  If there's any
11:04AM  24   question about that, you know, we'll lean towards the CP
11:04AM  25   unconfirmed just because we are not pediatricians.  We are not
```

NEWMAN - CROSS-EXAMINATION

| | | |
|---|---|---|
| 11:04AM | 1 | trained to do biological assessments, physiological |
| 11:04AM | 2 | assessments. |
| 11:04AM | 3 | Q.   Okay.  Thank you.  Under -- under federal law, NCMEC must |
| 11:05AM | 4 | operate the CyberTipline, correct? |
| 11:05AM | 5 | A.   We're authorized to operate the CyberTipline. |
| 11:05AM | 6 | Q.   You're obligated to operate the CyberTipline under federal |
| 11:05AM | 7 | law, correct? |
| 11:05AM | 8 | A.   Yes, pursuant to 2258A, which requires electronic service |
| 11:05AM | 9 | providers to make reports to us. |
| 11:05AM | 10 | Q.   And there's no other non-profit that takes that same role |
| 11:05AM | 11 | apart from NCMEC, correct? |
| 11:05AM | 12 | A.   Not to my knowledge. |
| 11:05AM | 13 | Q.   And under that same statute, NCMEC must make its reports |
| 11:05AM | 14 | available to law enforcement agencies, correct? |
| 11:05AM | 15 | A.   I -- I can't confirm the "must."  I know that, when |
| 11:05AM | 16 | appropriate, we can make them available to law enforcement. |
| 11:05AM | 17 | Q.   And that includes state, federal, and foreign agencies, |
| 11:05AM | 18 | correct? |
| 11:05AM | 19 | A.   Correct. |
| 11:05AM | 20 | Q.   And NCMEC, likewise, is legally required to operate the |
| 11:05AM | 21 | national clearinghouse for information about missing and |
| 11:05AM | 22 | exploited children, correct, under 34 USC 11293(b)? |
| 11:06AM | 23 | A.   I'm not sure of the source, but, yes, that's my |
| 11:06AM | 24 | understanding. |
| 11:06AM | 25 | Q.   And NCMEC is also legally required to help law enforcement |

NEWMAN - CROSS-EXAMINATION

| | | |
|---|---|---|
| 11:06AM | 1 | locate and recover missing and exploited children under that |
| 11:06AM | 2 | same statute; is that correct? |
| 11:06AM | 3 | A.   I'm not familiar with that statute, so I'll defer to you. |
| 11:06AM | 4 | Q.   And NCMEC is also required to provide forensic technical |
| 11:06AM | 5 | assistance to law enforcement to help identify victims of child |
| 11:06AM | 6 | exploitation, correct? |
| 11:06AM | 7 | A.   I know we do; that we're required component I can't speak |
| 11:06AM | 8 | to, but I know that is what we do. |
| 11:06AM | 9 | Q.   And, likewise, NCMEC's obligated by federal law to track |
| 11:06AM | 10 | and identify patterns of attempted child abductions for law |
| 11:06AM | 11 | enforcement purposes? |
| 11:06AM | 12 | A.   Again, we do do that.  The requirement is -- I'll defer to |
| 11:06AM | 13 | you. |
| 11:06AM | 14 | Q.   And NCMEC is legally obligated to provide training to law |
| 11:07AM | 15 | enforcement agencies in identifying and locating non-compliant |
| 11:07AM | 16 | sex offenders, correct? |
| 11:07AM | 17 | A.   We do that.  Again, the requirement, I'll defer to you. |
| 11:07AM | 18 | Q.   And you're not aware of any other entity under federal law |
| 11:07AM | 19 | that's obligated to perform these activities, correct? |
| 11:07AM | 20 | A.   Correct. |
| 11:07AM | 21 | Q.   And the purpose of those activities is to assist or |
| 11:07AM | 22 | support law enforcement, correct? |
| 11:07AM | 23 | A.   Yes, and to also serve families, other NGOs, other |
| 11:07AM | 24 | stakeholders, child-serving professionals, all who are working |
| 11:07AM | 25 | on missing and exploited children issues and cases. |

NEWMAN - CROSS-EXAMINATION

11:07AM  1    Q.    And NCMEC is also empowered to call on other federal

11:07AM  2    agencies for assistance, such as the Secret Service, correct?

11:07AM  3    A.    Yes, we can.

11:07AM  4    Q.    Again, are you aware of any other entity that has those

11:07AM  5    rights under federal law?

11:07AM  6    A.    Not that I know of.

11:08AM  7    Q.    And NCMEC alone is statutorily obligated to maintain the

11:08AM  8    CyberTipline for ISPs to use to report possible internet child

11:08AM  9    sexual exploitation violations to the Government, correct?

11:08AM 10    A.    That's my understanding.

11:08AM 11    Q.    And NCMEC is obligated to forward every report it receives

11:08AM 12    to federal law enforcement agencies and make its reports

11:08AM 13    available to state and local law enforcement as well?

11:08AM 14    A.    All of our reports are available to law enforcement.

11:08AM 15    Q.    And ISPs, internet service providers, must report any

11:08AM 16    known child pornography violations to NCMEC alone, correct?

11:08AM 17    A.    That's my understanding.

11:08AM 18    Q.    In other words, they're not obligated to report it to any

11:08AM 19    other entity under the law?

11:08AM 20    A.    That's my understanding.

11:08AM 21    Q.    And when NCMEC confirms it's received a report, confirms

11:08AM 22    to the ISP that they've received a report, the ISP must treat

11:09AM 23    that confirmation as a request to preserve evidence issued by

11:09AM 24    the Government itself, correct?

11:09AM 25    A.    That's correct, for 90 days.

NEWMAN - CROSS-EXAMINATION

| | | |
|---|---|---|
| 11:09AM | 1 | Q.   And the failure of ISPs to comply with those obligations |
| 11:09AM | 2 | opens them to civil and criminal liability, correct? |
| 11:09AM | 3 | A.   That's my understanding. |
| 11:09AM | 4 | Q.   And NCMEC is statutorily authorized to receive contraband, |
| 11:09AM | 5 | including child pornography, knowingly and to review its |
| 11:09AM | 6 | contents intentionally, correct? |
| 11:09AM | 7 | A.   My understanding. |
| 11:09AM | 8 | Q.   In other words, NCMEC can possess child pornography, |
| 11:09AM | 9 | whereas an average citizen obviously would not have such a |
| 11:09AM | 10 | right, correct? |
| 11:09AM | 11 | A.   Correct.  I would say we access it, yes, uh-huh. |
| 11:09AM | 12 | Q.   Okay.  You spoke a little earlier about the grants |
| 11:09AM | 13 | received by NCMEC.  I'd like to direct your attention in that |
| 11:09AM | 14 | binder in front of you to Exhibit F. |
| 11:10AM | 15 | THE COURT:  This is Defendant's F, Mr. Centrone? |
| 11:10AM | 16 | MR. CENTRONE:  Yes, Your Honor. |
| 11:10AM | 17 | THE COURT:  Okay. |
| 11:10AM | 18 | BY MR. CENTRONE: |
| 11:10AM | 19 | Q.   And this is the NCMEC 2021 annual report. |
| 11:10AM | 20 | A.   Uh-huh. |
| 11:10AM | 21 | Q.   Reviewing that report, does it refresh your memory that |
| 11:10AM | 22 | Government grants and contracts make up about $42 million of |
| 11:10AM | 23 | NCMEC's revenue in 2021? |
| 11:10AM | 24 | A.   I'm sorry, I'm not familiar with the exact numbers. |
| 11:10AM | 25 | Q.   Sure.  If you look on page 4 of the report, there's a -- |

**NEWMAN - CROSS-EXAMINATION**

11:10AM  1    there's a section entitled "Financials" and the top line

11:11AM  2    reflects Government contracts and grants.

11:11AM  3    A.    Uh-huh.

11:11AM  4    Q.    Do you see that?

11:11AM  5    A.    I do.

11:11AM  6    Q.    It's a total of $41,863,909?

11:11AM  7    A.    I do see that.

11:11AM  8    Q.    Okay.  And that's out of approximately $61 million of a

11:11AM  9    total budget, correct, if you look at the bottom line of the

11:11AM  10   same financial page?

11:11AM  11   A.    Yes.

11:11AM  12   Q.    The work NCMEC does to aid the enforcement and prosecution

11:11AM  13   of sex offenders serves a public function, correct?

11:11AM  14   A.    In what regard?

11:11AM  15   Q.    It's contributing to enforcement of laws and prosecution

11:11AM  16   of violators of law?

11:11AM  17   A.    The sex offender team, I am not familiar with that.  I

11:11AM  18   don't work on that team.  My understanding is that they assist

11:12AM  19   the marshals with absconded sex offenders.

11:12AM  20   Q.    At least one federal appellate court has found that NCMEC

11:12AM  21   is a state actor for Fourth Amendment purposes, correct?

11:12AM  22           MS. FAVORIT:  Objection.  Requesting legal

11:12AM  23   conclusion.

11:12AM  24           THE COURT:  Mr. Centrone, why would the witness be

11:12AM  25   qualified to render such an opinion about a matter that's a

NEWMAN - CROSS-EXAMINATION

| | | |
|---|---|---|
| 11:12AM | 1 | published opinion? |
| 11:12AM | 2 | MR. CENTRONE:  I don't believe it is asking for a |
| 11:12AM | 3 | legal opinion or a legal conclusion. |
| 11:12AM | 4 | THE COURT:  You'll have to establish a foundation why |
| 11:12AM | 5 | this witness would know that. |
| 11:12AM | 6 | BY MR. CENTRONE: |
| 11:12AM | 7 | Q.   Has NCMEC ever been called to testify in a hearing such as |
| 11:12AM | 8 | today where it's had to establish whether or not it is a state |
| 11:12AM | 9 | actor, to your knowledge? |
| 11:12AM | 10 | A.   I -- I believe that that has happened. |
| 11:13AM | 11 | Q.   How often has that happened, to your knowledge? |
| 11:13AM | 12 | MS. FAVORIT:  Objection.  Relevance to this hearing. |
| 11:13AM | 13 | MR. CENTRONE:  This is -- |
| 11:13AM | 14 | THE COURT:  Overruled. |
| 11:13AM | 15 | BY MR. CENTRONE: |
| 11:13AM | 16 | Q.   You can answer. |
| 11:13AM | 17 | A.   I'm sorry, can you repeat the question? |
| 11:13AM | 18 | Q.   Sure.  How often has that happened, to your knowledge? |
| 11:13AM | 19 | A.   I don't know. |
| 11:13AM | 20 | Q.   Okay.  Are you aware of any -- the results of any such |
| 11:13AM | 21 | hearings? |
| 11:13AM | 22 | A.   All I know is the role of NCMEC was an issue in those |
| 11:13AM | 23 | cases.  That's all I know. |
| 11:13AM | 24 | Q.   You're not aware of how those cases resolved with respect |
| 11:13AM | 25 | to that particular issue? |

NEWMAN - CROSS-EXAMINATION

| | | |
|---|---|---|
| 11:13AM | 1 | MS. FAVORIT: Objection. Relevance. |
| 11:13AM | 2 | THE COURT: Overruled. |
| 11:13AM | 3 | THE WITNESS: I don't know the exact details of it. |
| 11:13AM | 4 | BY MR. CENTRONE: |
| 11:13AM | 5 | Q. What do you know? |
| 11:13AM | 6 | A. I just know that the role of NCMEC was -- was raised to |
| 11:13AM | 7 | understand what our specific role was versus what the |
| 11:13AM | 8 | Government's role was, and so I know, you know, obviously as a |
| 11:13AM | 9 | consequence to that, we had already been making changes to our |
| 11:14AM | 10 | CyberTipline reports. We do change the format and some of the |
| 11:14AM | 11 | information just to make it crystal clear and improve |
| 11:14AM | 12 | transparency about what our role is and isn't and what is done |
| 11:14AM | 13 | before we receive information. So as a result, we improved the |
| 11:14AM | 14 | information we provide in CyberTipline reports to make sure |
| 11:14AM | 15 | that it is incredibly clear. |
| 11:14AM | 16 | Q. Was the NCMEC board of directors changed as a result of |
| 11:14AM | 17 | those hearings? |
| 11:14AM | 18 | A. I don't know that. |
| 11:14AM | 19 | Q. I want to -- I want to put a little bit of a finer point |
| 11:14AM | 20 | on some of your testimony about the hash matches. The way I |
| 11:14AM | 21 | understand it is that a hash match is -- you called it a |
| 11:14AM | 22 | digital fingerprint. It's effectively a way to compare one |
| 11:14AM | 23 | image with another image without ever actually looking at the |
| 11:15AM | 24 | picture in that image; is that correct? |
| 11:15AM | 25 | A. My understanding -- again, I'm not a digital forensic |

NEWMAN - CROSS-EXAMINATION

11:15AM   1   examiner.  My understanding with MD5, it is a true match.  So
11:15AM   2   that would mean that that image seen on one computer is exactly
11:15AM   3   the same image on another computer.
11:15AM   4   Q.   But that's based on the computer code, correct, the MD5
11:15AM   5   is --
11:15AM   6   A.   On the algorithm, uh-huh.
11:15AM   7   Q.   Correct.  So it's based on the -- and I'm not a technology
11:15AM   8   expert either, but it's based on the computer code that
11:15AM   9   comprises the image, not the contents of a photo itself, for
11:15AM  10   instance; is that fair?
11:15AM  11   A.   That's fair.
11:15AM  12   Q.   So if a hash code of one image is the same as an image
11:15AM  13   already in NCMEC's database, it would be categorized the same
11:15AM  14   way?
11:15AM  15   A.   Correct.
11:15AM  16   Q.   Without -- again, without ever looking at the photo.  I
11:15AM  17   believe you testified earlier that it happens automatically; is
11:15AM  18   that correct?
11:15AM  19   A.   Correct.  That doesn't necessarily mean that we won't look
11:16AM  20   at the image again, though, but yes, it's applied.  As
11:16AM  21   mentioned, we have a high volume of images and videos that come
11:16AM  22   into us so we do use that to help with previously-seen files.
11:16AM  23   Q.   And you looked earlier at the CyberTipline report and the
11:16AM  24   use of the phase, "Did the reporting ESP view entire contents
11:16AM  25   of uploaded file," correct?

NEWMAN - CROSS-EXAMINATION

11:16AM  1    A.    Correct.

11:16AM  2    Q.    And I believe that's located on what is identified at the

11:16AM  3    top of the CyberTipline as page 3.  You can refer to the

11:16AM  4    Government's copy or in the binder there Exhibit A of the --

11:16AM  5    it's the same thing, which you could see the Bates stamps at

11:16AM  6    the bottom match up to the Government's copy.

11:16AM  7          THE COURT:  Just to be clear, Mr. Centrone, are you

11:16AM  8    referring to Government's 1?

11:16AM  9          MR. CENTRONE:  Government's 1, correct, Your Honor,

11:16AM 10    and Defendant's A are identical copies of the same document, as

11:16AM 11    identified by the Bates stamp at the bottom.

11:17AM 12          THE COURT:  Are you directing the witness to

11:17AM 13    Government's 1 or Defendant's A?

11:17AM 14    BY MR. CENTRONE:

11:17AM 15    Q.    I'll go ahead and just for clarity direct you to

11:17AM 16    Defendant's A since I'm the one doing the questioning.  And

11:17AM 17    just to go back to what we were talking about, this report

11:17AM 18    contains summary information about the seven images that are at

11:17AM 19    issue in this case and broken down by image file name, and also

11:17AM 20    in each summary includes the question, "Did reporting ESP view

11:17AM 21    entire contents of uploaded file," correct?

11:17AM 22    A.    Correct.  This is all information provided to us by Yahoo.

11:17AM 23    Q.    Okay.  So that's a question that the ISP answers when

11:17AM 24    submitting the CyberTipline report?

11:17AM 25    A.    Correct.

NEWMAN - CROSS-EXAMINATION

| | | |
|---|---|---|
| 11:17AM | 1 | Q.   And is that question worded the exact same way when it's |
| 11:18AM | 2 | answered by the ISP? |
| 11:18AM | 3 | A.   That is the question that they're answering on their end |
| 11:18AM | 4 | and as displayed here.  Is that the question? |
| 11:18AM | 5 | Q.   Yes.  I suppose to put a finer point on it, I'm asking is |
| 11:18AM | 6 | it verbatim the same question? |
| 11:18AM | 7 | A.   I believe that it is. |
| 11:18AM | 8 | Q.   Okay. |
| 11:18AM | 9 |         THE COURT:  When you say, Ms. Newman, is that |
| 11:18AM | 10 | information reflected here, are you referring to a particular |
| 11:18AM | 11 | page on Defendant's Exhibit A? |
| 11:18AM | 12 |         THE WITNESS:  Yes, what is provided in Exhibit A in |
| 11:18AM | 13 | the Section A pages.  So that's page -- CyberTipline page 1 |
| 11:18AM | 14 | through 5. |
| 11:18AM | 15 | BY MR. CENTRONE: |
| 11:18AM | 16 | Q.   Is there an official definition written down somewhere |
| 11:18AM | 17 | that's used by NCMEC that defines the phrase, "Did reporting |
| 11:19AM | 18 | ESP view entire contents of uploaded file?" |
| 11:19AM | 19 | A.   There is not a definition. |
| 11:19AM | 20 | Q.   So NCMEC does not have an official definition of that |
| 11:19AM | 21 | term? |
| 11:19AM | 22 | A.   I mean, we just have the implied definition of what that |
| 11:19AM | 23 | question is, which is that they viewed the entire content of |
| 11:19AM | 24 | the uploaded image or video. |
| 11:19AM | 25 | Q.   So because NCMEC doesn't have an official definition, |

**NEWMAN - CROSS-EXAMINATION**

11:19 AM  1   NCMEC, I assume, does not train ISPs as to what the definition

11:19 AM  2   of that phrase means?

11:19 AM  3   A.    Again, we leave that up to the companies to be truthful in

11:19 AM  4   their responses to what that question is.

11:19 AM  5   Q.    But the company could misinterpret the meaning of that

11:19 AM  6   question if they're not provided official guidance; is that

11:19 AM  7   fair?

11:19 AM  8   A.    I believe during the onboarding when electronic service

11:19 AM  9   providers onboard to make reports to us, that is reviewed with

11:20 AM  10  them.

11:20 AM  11  Q.    Can you elaborate on that?  I'm not sure what that means.

11:20 AM  12  A.    I'm not part of the process so I don't know the exact

11:20 AM  13  protocol, but certainly for an electronic service provider to

11:20 AM  14  make a report to us, upload those files through a secure

11:20 AM  15  server, you know, we reach out, and we onboard them to the ways

11:20 AM  16  of making a CyberTipline report.  Completing that field is

11:20 AM  17  covered as part of that, so they understand what that field

11:20 AM  18  means should they choose to use it.

11:20 AM  19  Q.    How can they understand what that field means if NCMEC

11:20 AM  20  doesn't have an official definition of that field?

11:20 AM  21  A.    It's possible that we do.  I'm not part of the onboarding.

11:20 AM  22  I have just never seen a written document of that, but I

11:20 AM  23  believe that there is direction that's provided for that.

11:20 AM  24  Q.    But you don't know sitting here what that direction is?

11:20 AM  25  A.    I personally don't know.

NEWMAN - CROSS-EXAMINATION

| | | |
|---|---|---|
| 11:20AM | 1 | Q.   Who would know? |
| 11:20AM | 2 | A.   The person who's responsible for onboarding our electronic |
| 11:21AM | 3 | service providers. |
| 11:21AM | 4 | Q.   Do you know who that is? |
| 11:21AM | 5 | A.   We have a team who does that, so it would be one of three |
| 11:21AM | 6 | people. |
| 11:21AM | 7 | Q.   Which -- can you identify those three people, just for my |
| 11:21AM | 8 | own edification? |
| 11:21AM | 9 | A.   Fallon McNulty, Aaron Hunter (phonetic).  Those would |
| 11:21AM | 10 | probably be your best two. |
| 11:21AM | 11 | Q.   Gotcha.  But sitting here today, you don't know if ISPs |
| 11:21AM | 12 | are made aware of any official definition when they are |
| 11:21AM | 13 | completing that form? |
| 11:21AM | 14 | A.   As I mentioned, they're given instruction and direction on |
| 11:21AM | 15 | what all of the fields are that they can fill out.  I |
| 11:21AM | 16 | personally have not seen if there is a definition there, but I |
| 11:21AM | 17 | know we do provide definitions for all of our fields, so I am |
| 11:21AM | 18 | just making the assumption that there is a definition for that |
| 11:22AM | 19 | one, but I have personally not seen it, and I can't quote it |
| 11:22AM | 20 | back to you.  But we do provide guidance for them on how to |
| 11:22AM | 21 | complete a CyberTipline report with the fields, should they |
| 11:22AM | 22 | choose to use them. |
| 11:22AM | 23 | Q.   Okay.  Is there a separate CyberTipline report for ISPs |
| 11:22AM | 24 | that's different than the one for reports from the public? |
| 11:22AM | 25 | A.   Yes, they can -- I mean, they can make reports through the |

**NEWMAN - CROSS-EXAMINATION**

| | | |
|---|---|---|
| 11:22AM | 1 | public mechanism, but they can access an API, which allows them |
| 11:22AM | 2 | to make automated reporting on their end. |
| 11:22AM | 3 | Q.   In other words, the ISP, similar to the way NCMEC can |
| 11:22AM | 4 | auto-populate portions of the CyberTipline report, can |
| 11:22AM | 5 | auto-populate portions of its own report? |
| 11:22AM | 6 | A.   I'm sorry, can you ask that -- |
| 11:22AM | 7 | Q.   Sure.  So you said NCMEC provides an API that allows the |
| 11:23AM | 8 | ISPs to automate portions of their reporting to NCMEC, correct? |
| 11:23AM | 9 | A.   Correct. |
| 11:23AM | 10 | Q.   So NCMEC auto-populates portions of its report, correct, |
| 11:23AM | 11 | as we saw earlier? |
| 11:23AM | 12 | A.   In Section B, once that information is received by us. |
| 11:23AM | 13 | Q.   Well, we also talked about the first page, for instance, |
| 11:23AM | 14 | being automated? |
| 11:23AM | 15 | A.   Right. |
| 11:23AM | 16 | Q.   So ISPs can do the same?  They can auto-populate their |
| 11:23AM | 17 | CyberTipline reports? |
| 11:23AM | 18 | A.   They can. |
| 11:23AM | 19 | Q.   Potentially without a human ever looking at it? |
| 11:23AM | 20 | A.   They can. |
| 11:23AM | 21 |         MS. FAVORIT:  Objection.  Speculation. |
| 11:23AM | 22 |         MR. CENTRONE:  This is within the witness's |
| 11:23AM | 23 | knowledge, Your Honor. |
| 11:23AM | 24 |         THE COURT:  If the witness knows. |
| 11:23AM | 25 |         MR. CENTRONE:  If the witness knows. |

**NEWMAN - CROSS-EXAMINATION**

| | | |
|---|---|---|
| 11:23AM | 1 | **THE COURT:** So, Ms. Newman, the question that has |
| 11:23AM | 2 | been propounded here, like all of these questions, you may |
| 11:23AM | 3 | answer it if you know. |
| 11:23AM | 4 | **THE WITNESS:** They can. That's up to the companies |
| 11:23AM | 5 | to decide how they want to report to us, and that's where that |
| 11:24AM | 6 | documentation of what those fields means is relevant with the |
| 11:24AM | 7 | API so they understand what each of those fields means. |
| 11:24AM | 8 | BY MR. CENTRONE: |
| 11:24AM | 9 | Q.  But they can?  They can do that? |
| 11:24AM | 10 | A.  Uh-huh. |
| 11:24AM | 11 | Q.  And NCMEC has no way to verify whether an ISP reporting |
| 11:24AM | 12 | through the CyberTipline has -- such as Yahoo here -- has |
| 11:24AM | 13 | actually viewed an image, correct? |
| 11:24AM | 14 | A.  Like can we verify that they did view the entire contents? |
| 11:24AM | 15 | Q.  Or viewed the image, yes. |
| 11:24AM | 16 | A.  We can't verify that. |
| 11:24AM | 17 | Q.  And you -- |
| 11:24AM | 18 | A.  We rely on the accuracy of that statement. |
| 11:24AM | 19 | Q.  And you don't do any investigation? |
| 11:24AM | 20 | A.  We do not, investigations. |
| 11:24AM | 21 | Q.  And NCMEC has no way to know how Yahoo interpreted the |
| 11:24AM | 22 | phase, "Did reporting ESP view entire contents of uploaded |
| 11:24AM | 23 | files?" |
| 11:24AM | 24 | A.  No.  As I mentioned, we provide guidance in that |
| 11:24AM | 25 | documentation for the API, but that is up to them to determine. |

**NEWMAN - CROSS-EXAMINATION**

11:25AM   1    Q.   But, again, sitting here today, you do not know what that

11:25AM   2    guidance is?

11:25AM   3    A.   I do not know what the definition is.  I know it's

11:25AM   4    provided.  I just don't know what it is.

11:25AM   5    Q.   So NCMEC has no way to know whether if Yahoo answered yes

11:25AM   6    to that question, it was accurate or a mistake, correct?

11:25AM   7    A.   You'd have to ask Yahoo.

11:25AM   8    Q.   We talked earlier about how the CyberTipline report

11:25AM   9    incorrectly stated that NCMEC did not view the images when it

11:25AM   10   had; is that right?

11:25AM   11   A.   Correct.  It listed that it was a hash match, but we had

11:25AM   12   actually viewed six of the seven files before making it

11:25AM   13   available to law enforcement.

11:25AM   14   Q.   Which images did NCMEC view, and which one did it not?

11:25AM   15   A.   Could I reference?

11:25AM   16   Q.   Yes, please.

11:25AM   17   A.   On page 6 of the CyberTipline report.

11:25AM   18             THE COURT:  Is that 6 as identified at the top of the

11:25AM   19   page?

11:26AM   20             THE WITNESS:  Yes, uh-huh.

11:26AM   21             THE COURT:  That's, again, Defendant's Exhibit A,

11:26AM   22   Mr. Centrone?

11:26AM   23             MR. CENTRONE:  Yes, Your Honor.

11:26AM   24             THE COURT:  Okay.

11:26AM   25             THE WITNESS:  You'll see in the middle there's an

NEWMAN - CROSS-EXAMINATION

11:26AM 1  uploaded file information section.  You'll see those file names

11:26AM 2  there which correspond back to the previous section that we

11:26AM 3  were looking at.  Those were provided by Yahoo.  The one that

11:26AM 4  was not viewed ahead of this being made available to law

11:26AM 5  enforcement was image.4-1.gif.

11:26AM 6  BY MR. CENTRONE:

11:26AM 7  Q.   Sorry.  Just to clarify, that was the one that was not

11:26AM 8  viewed by NCMEC, correct?

11:26AM 9  A.   As part of this report.

11:26AM 10 Q.   Correct.  Okay.

11:26AM 11 A.   It had previously been reviewed, but not as part of this

11:26AM 12 report.

11:26AM 13 Q.   And do I understand from your earlier testimony that

11:26AM 14 that's because that image had already been categorized by

11:27AM 15 NCMEC, and the other six had not?

11:27AM 16 A.   Correct.  That one had not been -- that one had already

11:27AM 17 been labeled, so it was not reviewed as part of this report.

11:27AM 18 The other six were viewed as part of this report.  It's

11:27AM 19 possible others had been labeled ahead of time.  Regardless,

11:27AM 20 they were viewed as part of this report.

11:27AM 21 Q.   And do I understand correctly then that that would be the

11:27AM 22 first time NCMEC has reviewed those specific images?

11:27AM 23 A.   Not necessarily.

11:27AM 24 Q.   So NCMEC may have already reviewed the images but had not

11:27AM 25 categorized them previously; is that correct?

**NEWMAN - CROSS-EXAMINATION**

11:27AM  1   A.   That's correct.

11:27AM  2   Q.   I'm a little bit confused.  So in other words, the hash

11:27AM  3   matches could have been in NCMEC's database, and I believe they

11:27AM  4   were, correct?

11:27AM  5   A.   That I don't know.

11:27AM  6   Q.   Okay.  But the -- as we referred to them earlier, the

11:28AM  7   labels such as "CP unconfirmed" or "Child clothed" had not been

11:28AM  8   previously made?

11:28AM  9   A.   I'm not able to determine that from this report, so we

11:28AM  10  would be able to find that through a manual process, but at the

11:28AM  11  time, again, we were transitioning our workflows so the

11:28AM  12  automated service and the information did not marry up, but

11:28AM  13  it's possible that we had seen that hash value before, but it

11:28AM  14  was before we were labeling files, so it would flag that we

11:28AM  15  needed to look at it again to apply that label.

11:28AM  16  Q.   But you're speculating about that in this particular

11:28AM  17  instance, correct?

11:28AM  18  A.   I am.

11:28AM  19  Q.   Okay.  So do I understand correctly then that sitting here

11:28AM  20  right now, you don't know whether the image had been previously

11:28AM  21  labeled prior to a type of relabeling that NCMEC did again when

11:28AM  22  reviewing those six images?

11:29AM  23          THE COURT:  Mr. Centrone, not to interject too

11:29AM  24  heavily here, but I've lost -- since I've got to make a

11:29AM  25  decision on this matter, when you say "that image," to what

11:29AM  1    specific image of the seven, I would assume, are you referring?

11:29AM  2         MR. CENTRONE:  I'm referring to the six of the seven

11:29AM  3    that NCMEC is now correcting its previous report to say that

11:29AM  4    when they previously said they did not view them, that now

11:29AM  5    they're saying they have.

11:29AM  6         THE COURT:  So you said "that image," singular.

11:29AM  7    You're referring to images?

11:29AM  8         MR. CENTRONE:  I apologize.  That's correct.

11:29AM  9         THE COURT:  That's okay.  I just want to make sure

11:29AM 10    that when the time comes for me to review this important

11:29AM 11    testimony, like all of it, that I understand to what precisely

11:29AM 12    you and the witness are referring.  So maybe it would be best

11:29AM 13    if you could just rephrase.

11:29AM 14         MR. CENTRONE:  Sure.  And I apologize, Your Honor,

11:29AM 15    because I thought I understood the earlier testimony, but I

11:29AM 16    guess I didn't, so I'm just -- I'm literally just asking for

11:29AM 17    clarity.

11:29AM 18         THE COURT:  That's okay.

11:29AM 19    BY MR. CENTRONE:

11:29AM 20    Q.   So let's back up a little bit.  So of the seven images, we

11:30AM 21    know image 4-1.gif had not been previously viewed -- excuse me,

11:30AM 22    had been -- now I'm confusing things -- had been previously

11:30AM 23    viewed by NCMEC.

11:30AM 24    A.   Correct, and labeled.

11:30AM 25    Q.   And labeled?

**NEWMAN - CROSS-EXAMINATION**

11:30AM  1    A.   Uh-huh.

11:30AM  2    Q.   The other six images of the seven that are set forth in

11:30AM  3    the CyberTipline report, sitting here right now, we do not know

11:30AM  4    whether those images had been previously viewed?

11:30AM  5    A.   Correct.

11:30AM  6    Q.   And we do not know whether they had been previously

11:30AM  7    labeled?

11:30AM  8    A.   Correct.

11:30AM  9    Q.   All of those six other images --

11:30AM  10   A.   It's possible that they were all labeled as part of this

11:30AM  11   report.  I just don't have that information.  I would need to

11:30AM  12   do -- we would need to do a manual service to find that.

11:30AM  13        I do know that six of the seven, though, were viewed

11:30AM  14   as part of this report.

11:30AM  15   Q.   But, again, we don't know if that was the first time they

11:31AM  16   were viewed by NCMEC?

11:31AM  17   A.   Correct.

11:31AM  18   Q.   And we don't know whether it was the first time they were

11:31AM  19   labeled by NCMEC?

11:31AM  20   A.   Correct.

11:31AM  21   Q.   Okay.  How was it discovered after-the-fact that NCMEC

11:31AM  22   actually did view those images when the CyberTipline report

11:31AM  23   says they were not viewed?

11:31AM  24   A.   Really just as part of our protocol once we receive the --

11:31AM  25   the notification that there would be a case surrounding this

**NEWMAN - CROSS-EXAMINATION**

| | | |
|---|---|---|
| 11:31AM | 1 | CyberTipline report, we looked further into it.  We realized |
| 11:31AM | 2 | that we had actually viewed those files. |
| 11:31AM | 3 | Q.   But how was that discovered?  Was it written down |
| 11:31AM | 4 | somewhere? |
| 11:31AM | 5 | A.   It's visible to us on the back end of the system. |
| 11:31AM | 6 | Q.   Okay.  Is that -- is that a standard procedure when a case |
| 11:31AM | 7 | is developing such as the matter we're here for today? |
| 11:31AM | 8 | A.   Yes.  I mean, we'll look through the system and just make |
| 11:31AM | 9 | sure that we understand everything surrounding the files and |
| 11:32AM | 10 | the report. |
| 11:32AM | 11 | Q.   Does that back end part of that process that you just |
| 11:32AM | 12 | described, does that tell you when the images were viewed? |
| 11:32AM | 13 | A.   It does not.  It gives a time frame.  Because the files |
| 11:32AM | 14 | are reviewed in a separate system, we -- outside the |
| 11:32AM | 15 | CyberTipline, we just know when that that has been updated into |
| 11:32AM | 16 | the CyberTipline.  So I do know on September 14th is when the |
| 11:32AM | 17 | CyberTipline system learned that those files had been viewed. |
| 11:32AM | 18 | So it would have been sometime from the time that the CyberTip |
| 11:32AM | 19 | was made to NCMEC and September 14th that those files were |
| 11:32AM | 20 | reviewed. |
| 11:32AM | 21 | Now, we can find that.  Again, it's a manual process, |
| 11:32AM | 22 | so that is something that could be done.  It's just not easily |
| 11:32AM | 23 | findable right now. |
| 11:32AM | 24 | Q.   Okay.  Does that same back end part of the software tell |
| 11:32AM | 25 | you who viewed the images at NCMEC? |

NEWMAN - CROSS-EXAMINATION

11:32AM  1    A.   It doesn't.  That would be part of the manual process, but
11:32AM  2    we do have that.
11:33AM  3    Q.   And I take it from your testimony that that manual
11:33AM  4    process, despite this case being -- going on, was not
11:33AM  5    performed, correct?
11:33AM  6    A.   It was not.
11:33AM  7    Q.   Has any additional information as part of the review that
11:33AM  8    you just described as part of -- part of the review that was
11:33AM  9    done in this case, has any additional information been provided
11:33AM  10   to the Government here?
11:33AM  11   A.   Not to my knowledge.
11:33AM  12   Q.   The CyberTip at issue here identified as Defendant's
11:34AM  13   Exhibit A was received on September 10th, 2020, correct?
11:34AM  14   A.   Correct.
11:34AM  15   Q.   And it was not forwarded to the North Port Police
11:34AM  16   Department until I believe November 10th, 2020; is that -- is
11:34AM  17   that correct?
11:34AM  18   A.   It was made available to law enforcement on October 22nd.
11:34AM  19   Q.   Okay.  So in between November 10th -- excuse me,
11:34AM  20   September 10th and October 22nd, what was the -- what was the
11:34AM  21   reason for the delay between the CyberTip initial report and
11:34AM  22   the making available to law enforcement?  What was done in that
11:34AM  23   interim period?
11:34AM  24   A.   Volume of reports that we're receiving.  As mentioned, we
11:35AM  25   have an increasing volume of CyberTip reports that are received

NEWMAN - CROSS-EXAMINATION

11:35AM 1   each year and subsequently each day.  Because there were no
11:35AM 2   escalating factors in this case as reported to us and because
11:35AM 3   there was no urgent prioritization, it remained in the queue
11:35AM 4   until October 22nd.
11:35AM 5   Q.   Okay.  Section C of the CyberTipline report which is --
11:35AM 6   which can be found on page 7 of Defendant's Exhibit A, what
11:35AM 7   is -- what is that information under NCMEC note number 1?
11:35AM 8   A.   This indicates where our analyst now is intervening with
11:36AM 9   this report.  So the information provided in NCMEC notes
11:36AM 10  indicate the work done by our staff.
11:36AM 11  Q.   And what is that work?
11:36AM 12  A.   You can see here she -- she lists a CTTA query for the
11:36AM 13  reported identifiers return negative results.  And then
11:36AM 14  subsequently you see information here on page 7, page 8, and
11:36AM 15  into page 9 regarding the IP address that was received by Yahoo
11:36AM 16  and doing a lookup for that.
11:36AM 17  Q.   So, in other words, a human found the IP address connected
11:36AM 18  to the images discussed in the previous part of the report and
11:36AM 19  found where -- where that IP address originated?
11:36AM 20  A.   I believe that this IP address is associated with the
11:36AM 21  suspect information provided by Yahoo, and so you can see we
11:37AM 22  use MaxMind, which is just an open source IP lookup company,
11:37AM 23  and it geolocated back to North Port, Florida.  Therefore, we
11:37AM 24  made this report available to the Central Florida ICAC.
11:37AM 25  Q.   So do I understand correctly then that Yahoo provides the

**NEWMAN - CROSS-EXAMINATION**

| | | |
|---|---|---|
| 11:37AM | 1 | IP address associated with the images, and then NCMEC |
| 11:37AM | 2 | effectively investigated who that IP address belonged to or at |
| 11:37AM | 3 | least what service provider it belonged to? |
| 11:37AM | 4 | A.   So Yahoo provided an IP address affiliated with this |
| 11:37AM | 5 | report.  We ran, yes, a geo lookup for that.  To clarify, we |
| 11:37AM | 6 | did not find an individual per se.  We just found that it |
| 11:37AM | 7 | resolved back to North Port, Florida. |
| 11:37AM | 8 | Q.   And then that information was also forwarded with this |
| 11:38AM | 9 | report to law enforcement, correct? |
| 11:38AM | 10 | A.   Correct. |
| 11:38AM | 11 | Q.   You referred earlier to the CTTA query on the same page. |
| 11:38AM | 12 | What is that? |
| 11:38AM | 13 | A.   As regular course of business, when we received |
| 11:38AM | 14 | identifiers such as an email, screen name, IP address, we run |
| 11:38AM | 15 | that through the whole entire CyberTipline system, so over |
| 11:38AM | 16 | 100 million CyberTip reports that we've received, as well as |
| 11:38AM | 17 | TA, which is our technical assistance, which is requests from |
| 11:38AM | 18 | law enforcement.  We run those identifiers through that |
| 11:38AM | 19 | database just to see if there are any related reports. |
| 11:38AM | 20 | Q.   And the answer here to that is no, correct? |
| 11:38AM | 21 | A.   Correct.  She reported return negative or relevant |
| 11:38AM | 22 | results. |
| 11:38AM | 23 | MR. CENTRONE:  Just one moment, Your Honor. |
| 11:38AM | 24 | THE COURT:  Sure. |
| | 25 | |

**NEWMAN - CROSS-EXAMINATION**

11:39AM  1   BY MR. CENTRONE:

11:39AM  2   Q.   Thank you for your patience, Ms. Newman.  I just have a

11:39AM  3   couple of questions to -- frankly, for my own edification, to

11:39AM  4   learn a little bit more about the CyberTipline reports.

11:39AM  5           Under -- on page 3 of the CyberTipline report,

11:39AM  6   Defendant's Exhibit A, under the section that says, "Additional

11:39AM  7   information submitted by the reporting ESP" --

11:39AM  8   A.   Uh-huh.

11:39AM  9   Q.   Do you see that?

11:39AM  10  A.   I do.

11:39AM  11  Q.   There's a reference to "Message ID" followed by a long

11:39AM  12  stream of letters?

11:39AM  13  A.   Uh-huh.

11:39AM  14  Q.   What is that referring to?

11:39AM  15  A.   I don't know.  You'd need to ask Yahoo.

11:39AM  16  Q.   So that information comes from Yahoo?

11:39AM  17  A.   Yes, all information in Section A is from Yahoo.

11:39AM  18  Q.   But it would be populating a field on NCMEC's report?  In

11:40AM  19  other words, correct?  Do I understand that correctly, that

11:40AM  20  NCMEC provides the opportunity for a message ID in their fields

11:40AM  21  that -- that the ISPs populate by themselves?

11:40AM  22  A.   Yes, we have many, many fields that are available for them

11:40AM  23  to populate.  This is just displaying what was populated by

11:40AM  24  them.

11:40AM  25  Q.   I understand.  Okay.  On the same page and then the

NEWMAN - REDIRECT EXAMINATION

11:40AM  1   following couple of pages, each image summary includes a

11:40AM  2   question, "Did reporting ESP view the EXIF of uploaded file?"

11:40AM  3   A.   Uh-huh.

11:40AM  4   Q.   What's an EXIF?

11:40AM  5   A.   Again, I'm not a digital forensic examiner.  EXIF

11:40AM  6   information, as I understand it, is what's called metadata

11:40AM  7   which can be associated with a digital file.  So it could be

11:40AM  8   information surrounding when that picture was taken, which kind

11:41AM  9   of camera was taken with it, you know, information about the

11:41AM  10  camera at the time the picture was taken, that sort of thing.

11:41AM  11  Q.   And do I understand correctly from this -- from these

11:41AM  12  summaries for each image, whatever information that it's

11:41AM  13  referring to was not provided by Yahoo?

11:41AM  14  A.   Correct.

11:41AM  15       MR. CENTRONE:  Okay.  All right.  I have no further

11:41AM  16  questions.  Thank you very much.

11:41AM  17       THE WITNESS:  Thank you.

11:41AM  18       THE COURT:  Thank you, Mr. Centrone.  Any redirect,

11:41AM  19  Ms. Favorit?

11:41AM  20       MS. FAVORIT:  Yes, Your Honor.

11:41AM  21                    REDIRECT EXAMINATION

11:41AM  22                    BY MS. FAVORIT:

11:41AM  23  Q.   Why does NCMEC run the IP address provided by Yahoo in

11:41AM  24  this case?

11:41AM  25  A.   IP address helps us geolocate a potential jurisdiction for

NEWMAN - RECROSS-EXAMINATION

11:41AM  1  the -- again, the independent review and assessment by law
11:41AM  2  enforcement, but provides an impression or starting point for a
11:42AM  3  potential case related to the CyberTipline report.
11:42AM  4  Q.   Were any changes made at NCMEC whether or not the
11:42AM  5  CyberTipline team opens these attached images or not?
11:42AM  6  A.   Yes.  So we are only permitted to view these files if one
11:42AM  7  or two -- one or both of these two questions are answered in
11:42AM  8  the affirmative, and those two questions are:  "Did reporting
11:42AM  9  ESP view entire contents of uploaded file," and/or "Did
11:42AM 10  reporting ESP view the" -- or I'm sorry.  "Were entire contents
11:42AM 11  of uploaded file publicly available?"  One of those two has to
11:42AM 12  be yes for us to view the file.
11:42AM 13  Q.   If the answer had been no, would NCMEC view the file?
11:42AM 14  A.   No.
11:42AM 15          MS. FAVORIT:  I don't have any further questions.
11:42AM 16          THE COURT:  Okay.  Any recross, Mr. Centrone?
11:43AM 17          MR. CENTRONE:  Very, very briefly.
11:43AM 18                      RECROSS-EXAMINATION
11:43AM 19                      BY MR. CENTRONE:
11:43AM 20  Q.   Following up on the Government's last question, if either
11:43AM 21  answer had been no, why wouldn't NCMEC view them?
11:43AM 22  A.   Based on just -- again, trying to be very transparent
11:43AM 23  about what role we play in that.  So if the answer to both had
11:43AM 24  been no, we don't view those files.  We still do send them on
11:43AM 25  to law enforcement, but we do indicate that we have not

NEWMAN - RECROSS-EXAMINATION

11:43AM  1    reviewed the files.

11:43AM  2                MR. CENTRONE:  Okay.  No further questions.  Thank

11:43AM  3    you.

11:43AM  4                THE COURT:  Ms. Newman, a question or two.  One of

11:43AM  5    these designations is, as I understand it, "Apparent child

11:43AM  6    pornography."

11:44AM  7                THE WITNESS:  Yes.

11:44AM  8                THE COURT:  Is that correct?

11:44AM  9                THE WITNESS:  Yes.

11:44AM  10               THE COURT:  Referring in particular -- I'll stay with

11:44AM  11   Defendant's Exhibit A, page 6 of the exhibit.  It's got a Bates

11:44AM  12   stamped DISC-01131.  What is the definition or your

11:44AM  13   understanding at least of what is "Apparent child pornography"?

11:44AM  14               THE WITNESS:  As NCMEC uses that label, we define

11:44AM  15   that to mean that the activity depicted in the image or video

11:44AM  16   meets the federal definition of child pornography and that it

11:44AM  17   is overtly clear that it is a child that's involved in that

11:44AM  18   activity.

11:44AM  19               THE COURT:  Why is the term "Apparent" used then?

11:44AM  20               THE WITNESS:  We reserve that because to use child

11:44AM  21   pornography is truly the federal definition and because we are

11:44AM  22   not the final determiners of what is legal or illegal, we just

11:45AM  23   add that context to ensure that that's just NCMEC vernacular.

11:45AM  24               THE COURT:  There's also been discussion or testimony

11:45AM  25   about a hash match, and as I understand your testimony --

NEWMAN - RECROSS-EXAMINATION

11:45AM  1    correct me if I don't understand it properly -- is the hash

11:45AM  2    match here solely to the GIF image found on page 6 as the first

11:45AM  3    image.4-1. --

11:45AM  4              THE WITNESS:  In this case, the hash match was used

11:45AM  5    by the system to say that we already knew that image and it

11:45AM  6    already had a label, so that is why that image was not reviewed

11:45AM  7    as part of this report.

11:45AM  8              THE COURT:  And to be clear, the hash match pertained

11:45AM  9    only to the GIF file or image?

11:45AM  10             THE WITNESS:  In terms of it already recognizing that

11:45AM  11   and not needing human review.

11:46AM  12             THE COURT:  That's overall a "yes?"

11:46AM  13             THE WITNESS:  Overall a "yes."

11:46AM  14             THE COURT:  Okay.  Based on my questions,

11:46AM  15   Ms. Favorit, anything further for Ms. Newman?

11:46AM  16             MS. FAVORIT:  No, Your Honor.

11:46AM  17             THE COURT:  Thank you.  Mr. Centrone?

11:46AM  18             MR. CENTRONE:  Just very briefly just to make sure I

11:46AM  19   understand, Your Honor.

11:46AM  20                        RECROSS-EXAMINATION

11:46AM  21                        BY MR. CENTRONE:

11:46AM  22   Q.  So the Judge's question about image.4-1.gif, the way I

11:46AM  23   understand it, there was a hash match as to that image.  With

11:46AM  24   respect to the other six, was there a hash match, or do we not

11:46AM  25   know?

NEWMAN - RECROSS-EXAMINATION

11:46AM  1   A.   We don't know.  All we do know is that we then did -- we

11:47AM  2   did review it as part of this report.  So if there was a prior

11:47AM  3   hash match, we still looked at it as part of this report.

11:47AM  4   Q.   So similar to how you testified earlier that with respect

11:47AM  5   to those other six images we don't know if they had been

11:47AM  6   previously labeled and we don't know if they had been

11:47AM  7   previously reviewed by a human, we don't know if they had a

11:47AM  8   prior hash match either; is that correct?

11:47AM  9   A.   Correct.

11:47AM  10          MR. CENTRONE:  Okay.  Thank you.  No further

11:47AM  11   questions.  Thank you, Your Honor.

11:47AM  12          THE COURT:  Thank you.  That brings me then to the

11:47AM  13   question going back to Defendant's Exhibit A, which is the same

11:47AM  14   and so represented as Government's 1.

11:47AM  15          Looking at the Tipline report, can you discern

11:47AM  16   from the Tipline report which image or images in particular the

11:47AM  17   term "hash match" as used on the report refers to?

11:48AM  18          THE WITNESS:  The one file that is a hash match is

11:48AM  19   image.4-1.gif.  The other six, I'm uncertain if they were hash

11:48AM  20   matches and have been seen before.  Regardless, we did view

11:48AM  21   those, a human did view those, as part of this report.

11:48AM  22          THE COURT:  And what in the report leads you to the

11:48AM  23   conclusion that the hash match at least refers to the 4-1.gif

11:48AM  24   image?

11:48AM  25          THE WITNESS:  There's nothing in this report per se.

NEWMAN - RECROSS-EXAMINATION

| | | |
|---|---|---|
| 11:48AM | 1 | It's more something that we found as a course of processing the |
| 11:48AM | 2 | preparations for this case that we learned that the other six |
| 11:48AM | 3 | had, in fact, been viewed by us.  We had inaccurately listed |
| 11:49AM | 4 | that they all were hash matches and, in fact, only one was, and |
| 11:49AM | 5 | the other six were viewed as part of our processing of this |
| 11:49AM | 6 | report. |
| 11:49AM | 7 | THE COURT:  Okay.  Thank you, Ms. Newman.  Again, |
| 11:49AM | 8 | Ms. Favorit, anything further? |
| 11:49AM | 9 | MS. FAVORIT:  No, Your Honor. |
| 11:49AM | 10 | THE COURT:  Thank you.  Mr. Centrone? |
| 11:49AM | 11 | MR. CENTRONE:  No, Your Honor, thank you. |
| 11:49AM | 12 | THE COURT:  Okay.  Ms. Newman, thank you.  You may |
| 11:49AM | 13 | step down. |
| 11:49AM | 14 | (Witness excused.) |
| 11:49AM | 15 | THE COURT:  Ms. Favorit, it's ten to 12:00.  I'm |
| 11:49AM | 16 | happy to continue, although I would ordinarily take a short |
| 11:49AM | 17 | recess.  How long is your next witness? |
| 11:49AM | 18 | MS. FAVORIT:  Your Honor, before this witness leaves, |
| 11:49AM | 19 | may she be excused? |
| 11:49AM | 20 | THE COURT:  Mr. Centrone, any reason Ms. Newman needs |
| 11:49AM | 21 | to remain? |
| 11:49AM | 22 | MR. CENTRONE:  No.  I don't think so, Your Honor. |
| 11:49AM | 23 | THE COURT:  Okay.  Ms. Newman, you're free to go. |
| 11:49AM | 24 | MS. FAVORIT:  I believe the next witness will be just |
| 11:49AM | 25 | as lengthy as Ms. Newman.  So if you were interested in taking |

11:49AM   1   a lunch break at all, I don't mind stopping in the middle of
11:49AM   2   testimony either.  I'll defer to the Court.
11:49AM   3               THE COURT:  I have a 2:00 hearing which I expect,
11:49AM   4   counsel, to be short -- in other words five or ten minutes --
11:50AM   5   so why don't we take a lunch break now, and we'll resume at
11:50AM   6   1:00 by the courtroom clock, okay?  We'll be in recess.
          7               (Recess from 11:50 a.m. to 1:05 p.m.)
12:57PM   8               THE COURT:  Good afternoon, everyone.  Madam clerk,
1:05PM    9   if you could again call the case, please.
1:05PM   10               COURTROOM DEPUTY:  United States versus Gregory Allen
1:05PM   11   Williamson, 8:21-CR-355.
1:05PM   12               THE COURT:  If I could again have appearances of
1:05PM   13   counsel, beginning with the Government?
1:05PM   14               MS. FAVORIT:  Good afternoon again, Your Honor.  Erin
1:05PM   15   Favorit on behalf of the United States.
1:05PM   16               MS. KING:  And Abigail King on behalf of the United
1:05PM   17   States.
1:05PM   18               THE COURT:  Good afternoon, again, to you both.  And
1:05PM   19   for the defense?
1:05PM   20               MR. CENTRONE:  Good afternoon, Judge.  Gus Centrone
1:05PM   21   for Gregory Allen Williamson who is present with me in court.
1:06PM   22               THE COURT:  Good afternoon, again, to you both.  As a
1:06PM   23   housekeeping matter, counsel, my hearing is scheduled for 3:00.
1:06PM   24   I had hoped that we would be done by then.  Let's see how we
1:06PM   25   do.

| | | |
|---|---|---|
| 1:06 PM | 1 | Ms. Favorit, you can call your next witness. |
| 1:06 PM | 2 | **MS. FAVORIT:**  United States calls Ashley Guizzotti. |
| 1:06 PM | 3 | **COURTROOM DEPUTY:**  Please raise your right hand. |
| 1:06 PM | 4 | (Witness sworn.) |
| 1:06 PM | 5 | **COURTROOM DEPUTY:**  Thank you.  And if you'll please |
| 1:06 PM | 6 | state your name for the record and spell your last name. |
| 1:07 PM | 7 | **THE WITNESS:**  Ashley Guizzotti, G-u-i-z-z-o-t-t-i. |
| 1:07 PM | 8 | **COURTROOM DEPUTY:**  Thank you.  You may be seated. |
| 1:07 PM | 9 | **THE COURT:**  Ms. Guizzotti, you'll see that there's a |
| 1:07 PM | 10 | microphone when you find yourself seated on the stand.  If you |
| 1:07 PM | 11 | just orient or position that microphone so that we can clearly |
| 1:07 PM | 12 | hear you. |
| 1:07 PM | 13 | Thank you.  And with that, Ms. Favorit, you may |
| 1:07 PM | 14 | proceed. |
| 1:07 PM | 15 | **MS. FAVORIT:**  Thank you, Your Honor. |
| 1:07 PM | 16 | **ASHLEY GUIZZOTTI,** |
| 1:07 PM | 17 | a witness called on behalf of the Government, being first duly |
| 1:07 PM | 18 | sworn, was examined and testified as follows: |
| 1:07 PM | 19 | **DIRECT EXAMINATION** |
| 1:07 PM | 20 | **BY MS. FAVORIT:** |
| 1:07 PM | 21 | Q.   Ms. Guizzotti, what do you do for a living? |
| 1:07 PM | 22 | A.   I work at Yahoo currently as the legal services manager |
| 1:07 PM | 23 | for the trust and safety team. |
| 1:07 PM | 24 | Q.   What is your educational background? |
| 1:07 PM | 25 | A.   I have an undergrad at Buffalo State College for poli-sci. |

GUIZZOTTI - DIRECT EXAMINATION

1:07 PM   1    Q.    Do you have any related experience prior to working at

1:07 PM   2    Yahoo?

1:07 PM   3    A.    Not prior to working at Yahoo, but prior to the position

1:07 PM   4    I'm in now, I was a contact moderator since 2016 for Yahoo.

1:08 PM   5    Q.    What does a legal service manager do?

1:08 PM   6    A.    Currently I manage a lot of the project work for trust and

1:08 PM   7    safety, which includes the process and the tooling for

1:08 PM   8    reviewing CSAM and detecting CSAM.

1:08 PM   9    Q.    You said "CSAM".  Can you tell me what that stands for?

1:08 PM  10    A.    It's Child Sexual Abuse Material.

1:08 PM  11    Q.    And what are your day-to-day responsibilities?

1:08 PM  12    A.    Currently it's understanding our internal tool that we --

1:08 PM  13    our content moderators review the imagery on and its

1:08 PM  14    capabilities.  I mean, if it breaks, like, I will contact

1:08 PM  15    engineers, so and so like that.  Just like daily maintenance of

1:08 PM  16    maintaining the tool to review CSAM and report it.

1:09 PM  17    Q.    Can you tell me what Yahoo is?

1:09 PM  18    A.    Yahoo is an email service provider primarily for email.

1:09 PM  19    We also host products like Yahoo Finance and Yahoo Sports.

1:09 PM  20    Q.    What is the mission of Yahoo?

1:09 PM  21    A.    Yahoo -- the mission is to inspire and entertain users on

1:09 PM  22    a personal level.  An example would be if you're -- if you play

1:09 PM  23    fantasy sports, we like to give you a personal experience for

1:09 PM  24    fantasy sports.

1:09 PM  25    Q.    Why was Yahoo established?

GUIZZOTTI - DIRECT EXAMINATION

1:09PM  1   A.   My understanding is to be an internet search provider.  It

1:09PM  2   has since, like, came to be an email provider.

1:09PM  3   Q.   Do you know when it was established?

1:09PM  4   A.   Not offhand.

1:09PM  5   Q.   Is it a non-profit organization?

1:09PM  6   A.   No.  We are a private company.

1:10PM  7   Q.   Is it a government organization?

1:10PM  8   A.   No.

1:10PM  9   Q.   What makes it a private company?

1:10PM  10  A.   We are owned by a private equity firm named Apollo.

1:10PM  11  Q.   Does Yahoo make money off of its users?

1:10PM  12  A.   No.  Yahoo makes money based on ad revenue,

1:10PM  13  advertisements.

1:10PM  14  Q.   Approximately how many people does Yahoo employ?

1:10PM  15  A.   The last I had heard, it was around 6,000 people.

1:10PM  16  Q.   You mentioned that currently Yahoo is owned by Apollo.

1:10PM  17  A.   Uh-huh.

1:10PM  18  Q.   In September of 2020, do you know who owned Yahoo?

1:10PM  19  A.   Yes, Verizon.

1:11PM  20  Q.   Have there been any significant changes in your department

1:11PM  21  from Verizon to Apollo ownership?

1:11PM  22  A.   No.

1:11PM  23  Q.   I want to go specifically focusing on email users.  How

1:11PM  24  does an individual sign up for email with Yahoo?

1:11PM  25  A.   Really all you need is -- I mean, you state your name and

GUIZZOTTI - DIRECT EXAMINATION

1:11PM    1    what email you would like and a phone number, I believe.

1:11PM    2    Q.   Does a user interested in obtaining a Yahoo email, are

1:11PM    3    they required to agree to a terms of service?

1:12PM    4    A.   Yes.

1:12PM    5    Q.   Can you tell me what a terms of service is?

1:12PM    6    A.   It's the terms that Yahoo as a company creates to abide

1:12PM    7    by, basically rules to use our services.

1:12PM    8    Q.   Does a user have to agree to that in order to obtain

1:12PM    9    email?

1:12PM   10    A.   Yes.

1:12PM   11    Q.   What happens if a user does not agree to those terms and

1:12PM   12    service?

1:12PM   13    A.   They are not able to use our services.

1:12PM   14    Q.   I'm going to show you what's been identified as Government

1:12PM   15    Exhibit 5 which we've labeled "Yahoo Terms of Service."  Do you

1:12PM   16    recognize that exhibit?

1:12PM   17    A.   I do.

1:12PM   18    Q.   What do you recognize it to be?

1:12PM   19    A.   What the Yahoo terms of service was -- I believe was in

1:12PM   20    2020.

1:13PM   21    Q.   Have you had an opportunity to review this prior to the

1:13PM   22    hearing today?

1:13PM   23    A.   I did.

1:13PM   24    Q.   And is it your understanding that this terms of service

1:13PM   25    was in effect in September of 2020?

GUIZZOTTI - DIRECT EXAMINATION

1:13PM  1    A.    It is.

1:13PM  2    Q.    What significance does a terms of service have for a user

1:13PM  3    who might be using Yahoo's email service?

1:13PM  4    A.    I mean, in the way that it's significant to my

1:13PM  5    responsibilities is the -- the piece of the member conduct.  It

1:13PM  6    is to not use our services abusively.

1:13PM  7    Q.    I'm now going to show you Government Exhibit Number 3,

1:13PM  8    which is the declaration that you prepared on behalf of Yahoo.

1:14PM  9    Do you recognize this document?

1:14PM  10   A.    I do.

1:14PM  11   Q.    What do you recognize it to be?

1:14PM  12   A.    A declaration of what I do at Yahoo and my understanding

1:14PM  13   of reviewing CSAM.

1:14PM  14   Q.    Does this document reference the terms of service

1:14PM  15   agreement at all?

1:14PM  16   A.    It does.

1:14PM  17   Q.    And would you please read item number 4 to the Court?

1:14PM  18   A.    "Under the Yahoo terms of service in effect at the time

1:14PM  19   Yahoo filed CyberTip number 79384716 with NCMEC, users agreed

1:14PM  20   in pertinent part to not use the Yahoo services to upload,

1:14PM  21   post, email, transmit, or otherwise make available any content

1:14PM  22   that is unlawful, harmful, threatening, abusive, harassing,

1:15PM  23   tortious, defamatory, vulgar, obscene, libelous, invasive of

1:15PM  24   another's privacy, hateful, or racially, ethnically or

1:15PM  25   otherwise objectionable or harm to minors in any way."

GUIZZOTTI - DIRECT EXAMINATION

1:15PM  1   Q.   Do you know why Yahoo has included that section in its

1:15PM  2   terms of service?

1:15PM  3   A.   My understanding is because we need to protect our users,

1:15PM  4   we need to protect our reputation as a company.  We can't host

1:15PM  5   abusive material, especially a harm to minor.

1:15PM  6   Q.   And in bullet number 5 of this declaration, is that kind

1:15PM  7   of outlining the Yahoo's interests in enforcing these terms of

1:15PM  8   service?

1:15PM  9   A.   Absolutely.

1:15PM  10  Q.   Does Yahoo enforce that terms of service?

1:16PM  11  A.   We do.

1:16PM  12  Q.   How do they go about enforcing it?

1:16PM  13  A.   If my team finds illegal content, specifically abuse to

1:16PM  14  minors, we disable their account.

1:16PM  15  Q.   I want to focus on the "harm to minors in any way".  What

1:16PM  16  does that mean to Yahoo?

1:16PM  17  A.   That could be solicitation, sharing or distributing

1:16PM  18  typically imagery or videos of a minor in an abusive way or a

1:16PM  19  sexual way.

1:16PM  20  Q.   Does Yahoo actively search users' emails for that

1:16PM  21  material?

1:16PM  22  A.   No.

1:16PM  23  Q.   How does Yahoo find that type of material?

1:17PM  24  A.   We cross-reference with a hash list that is maintained by

1:17PM  25  NCMEC.  If we come across the same hash, we scan, and it could

GUIZZOTTI - DIRECT EXAMINATION

1:17PM    1    be a hit on our servers, like in our email.  We only do that

1:17PM    2    for emails that are sent.  It is not upon upload.  It is when a

1:17PM    3    user explicitly sends an email, that sent email will be scanned

1:17PM    4    against a known hash list.

1:17PM    5    Q.   I'm going to break that down.  Let's start with the hash

1:17PM    6    list.

1:17PM    7    A.   Sure.

1:17PM    8    Q.   What is your understanding of the contents of the hash

1:17PM    9    list?

1:17PM   10    A.   So the contents is a lot of known already -- they've

1:17PM   11    already been known as a positive identification of CSAM.  We

1:17PM   12    use technologies from Microsoft, Google, our own known

1:17PM   13    proprietary lists, and like I said, NCMEC can maintain the --

1:18PM   14    the -- like, the appropriateness of the images.

1:18PM   15    Q.   I'm going to go through a few hypotheticals to understand

1:18PM   16    what you've testified to.

1:18PM   17    A.   Sure.

1:18PM   18    Q.   So an email user has uploaded an image as an attachment to

1:18PM   19    an email but never sends that email.  Is that something Yahoo

1:18PM   20    will search and find?

1:18PM   21    A.   No, we would never find it.

1:18PM   22    Q.   Why not?

1:18PM   23    A.   Because we only scan on a sent event.  You have to send

1:18PM   24    out that email.  That's where the scanning takes place.

1:18PM   25    Q.   So same hypothetical.  The user has uploaded an image as

GUIZZOTTI - DIRECT EXAMINATION

1:18PM   1   an email attachment and emails it, and it is now sent.

1:18PM   2   A.   Yes.

1:18PM   3   Q.   Is that now something that Yahoo will scan?

1:19PM   4   A.   Right, yes.

1:19PM   5   Q.   Is that a human person scanning the email attachments?

1:19PM   6   A.   So at that level, it is still just cross-referencing the

1:19PM   7   known hash list, and once -- say it, you know, sets off that it

1:19PM   8   had a match, that then gets sent for human review.  So in

1:19PM   9   theory, I mean, at that point a human will review if it was hit

1:19PM  10   as a match.

1:19PM  11   Q.   Okay.  We'll move on to that in a minute.

1:19PM  12   A.   Okay.

1:19PM  13   Q.   In the same hypothetical scenario, the image uploaded to

1:19PM  14   that email, it's sent out.  Yahoo has now scanned that image,

1:19PM  15   comparing to this hash list.  What if there is no hash list

1:19PM  16   match?  What happens?

1:19PM  17   A.   Nothing.  We move on.  That case is essentially closed,

1:19PM  18   and we are not -- as moderators, we are not able to retrieve

1:20PM  19   it.  It's essentially deleted.

1:20PM  20   Q.   Now, if -- same hypothetical, the email has that photo

1:20PM  21   attachment and that attachment does match something from the

1:20PM  22   hash list.  What happens now?

1:20PM  23   A.   It gets sent to a queue for a human moderator to review.

1:20PM  24   Q.   So at that point it kind of moves to your team?

1:20PM  25   A.   Right.

GUIZZOTTI - DIRECT EXAMINATION

1:20PM  1  Q.   Okay.  Is it a computer or software system that does the
1:20PM  2  scanning of those images at that level?
1:20PM  3  A.   It is an internal tool we call Radar.
1:20PM  4  Q.   You talked a little bit about PhotoDNA.  Can you explain
1:20PM  5  what that is?
1:20PM  6  A.   The way I explain PhotoDNA is every image on the internet
1:21PM  7  quite literally has like a fingerprint.  It's -- it's only that
1:21PM  8  image.  So it's what we would have to match is that identical
1:21PM  9  fingerprint again to make sure that it is a match.
1:21PM 10  Q.   Now, we called it a hash list.
1:21PM 11  A.   Uh-huh.
1:21PM 12  Q.   Is it actually a database of photos and videos?
1:21PM 13  A.   No.
1:21PM 14  Q.   Is it quite literally a list of image and file names?
1:21PM 15  A.   No, it's not even file names.  It's those hash -- which is
1:21PM 16  a bunch of 1s, 0s.  It's a string of letters or numbers.
1:21PM 17  Q.   If you were to read those strings of letters and numbers,
1:21PM 18  it's not going to be an image or a video?
1:21PM 19  A.   No.
1:22PM 20  Q.   I want to move on to same hypothetical.  Now your team is
1:22PM 21  involved because there is a hash match.  What happens next?
1:22PM 22  A.   So it gets into a queue, as I said, and an agent will
1:22PM 23  review if the hit was, in fact, CSAM.  If it is, we will
1:22PM 24  archive the rest of the images in that email to view more than
1:22PM 25  just the original hash.  The videos and images will then all be

GUIZZOTTI - DIRECT EXAMINATION

1:22PM  1    queued to go into like a stage 2 review.

1:22PM  2    Q.    Where are these images stored at this point?

1:22PM  3    A.    In our internal Radar tool.

1:22PM  4    Q.    Does anybody at your company have access to that?

1:22PM  5    A.    Just the trust and safety agents.

1:23PM  6    Q.    Do all images and videos get added to this hash list?

1:23PM  7    A.    No.

1:23PM  8    Q.    Why not?

1:23PM  9    A.    All videos and images might not be true CSAM.

1:23PM 10    Q.    Have you called law enforcement at this point when a hash

1:23PM 11    match takes place?

1:23PM 12    A.    No.

1:23PM 13    Q.    Do you ever call law enforcement at this point?

1:23PM 14    A.    No.

1:23PM 15    Q.    Those human moderators, do they receive any training?

1:23PM 16    A.    Yes.  Our moderators are housed in the legal department,

1:23PM 17    so we get a lot of legal counsel on what we can and cannot

1:23PM 18    consider CSAM as well as we do monthly calibrations with our

1:24PM 19    lawyer and managers, and then onboarding is a lot of shadowing

1:24PM 20    of images and detection of images, and then explanations and

1:24PM 21    just onboarding training, understanding what to submit and what

1:24PM 22    not to submit.

1:24PM 23    Q.    What is a calibration?

1:24PM 24    A.    So we meet with our manager and our lawyer with the

1:24PM 25    definition of what CSAM is, and we go over like gray area

GUIZZOTTI - DIRECT EXAMINATION

1:24 PM 1   images, anything that could be borderline, say within age or

1:24 PM 2   borderline sexual versus modeling, like just little nuances of

1:24 PM 3   if our agents aren't a hundred percent positive that it would

1:24 PM 4   be considered CSAM, we kind of table it until we can get a

1:24 PM 5   legal call, and we do that monthly.

1:25 PM 6   Q.   If your team determines that something is not a hundred

1:25 PM 7   percent certain that it's CSAM, what happens?

1:25 PM 8   A.   We ask our lawyer, and then aside from that, we do not

1:25 PM 9   submit it.

1:25 PM 10  Q.   Is that process part of how you decide whether or not to

1:25 PM 11  report these images?

1:25 PM 12  A.   Typically only on gray area content.

1:25 PM 13  Q.   I want to talk a little bit about the reporting process.

1:25 PM 14  Are you familiar with CyberTipline?

1:25 PM 15  A.   I'm familiar to submit a CyberTip.

1:25 PM 16  Q.   Do you submit CyberTips?

1:25 PM 17  A.   Yes.

1:25 PM 18  Q.   Who do you submit CyberTips to?

1:25 PM 19  A.   NCMEC.

1:26 PM 20  Q.   At what point does Yahoo generate a report to NCMEC?

1:26 PM 21  A.   After reviewing the contents or the images and videos of

1:26 PM 22  an account, and then we submit to NCMEC.

1:26 PM 23  Q.   What type of information is required to send to NCMEC?

1:26 PM 24  A.   We include the user's name, their email address, I believe

1:26 PM 25  their IP address, and the files.

### GUIZZOTTI - DIRECT EXAMINATION

1:26PM  1    Q.    When you say "the files," are those like the images or

1:26PM  2    videos?

1:26PM  3    A.    Not the images, but their hash values and typically their

1:26PM  4    file names.

1:26PM  5    Q.    Do you send contents of emails?

1:26PM  6    A.    No.

1:26PM  7    Q.    Under any circumstances?

1:26PM  8    A.    No.

1:26PM  9    Q.    Is submitting a tip an automatic computer process?

1:27PM  10   A.    It is pretty automatic.  The only non-automatic thing

1:27PM  11   would be the moderator selecting which images to include.

1:27PM  12   Q.    Can you tell us a little bit about what that might look

1:27PM  13   like at your end when you're submitting a CyberTip?

1:27PM  14   A.    Sure.  So after going through the contents and you select

1:27PM  15   the images, there is like a review page, and it will kind of

1:27PM  16   tell you the images that are going to be reported.  We have to

1:27PM  17   confirm that I have identified CSAM and I personally reviewed

1:27PM  18   them, and then we click a button that literally says, "Submit

1:27PM  19   to NCMEC."  It's a pretty automatic process, automative

1:27PM  20   process.

1:27PM  21   Q.    And I know we refer to email contents.  I want to be a

1:27PM  22   little more specific.  Does it sometimes include the subject

1:28PM  23   line of the email?

1:28PM  24   A.    It can if there is one.

1:28PM  25   Q.    But not the body of the email?

GUIZZOTTI - DIRECT EXAMINATION

1:28PM  1    A.    Not at all.

1:28PM  2    Q.    Does that remain even if the body of the email seems

1:28PM  3    emergent?

1:28PM  4    A.    Yes, we don't include the body.

1:28PM  5    Q.    I'm going to show you Government Exhibit 1.  Do you

1:28PM  6    recognize this exhibit?

1:28PM  7    A.    I do.

1:28PM  8    Q.    What do you recognize it to be?

1:28PM  9    A.    The CyberTip report sent to NCMEC.

1:28PM  10   Q.    Okay.  Does it look the same as the report that you submit

1:28PM  11   to NCMEC from Yahoo?

1:29PM  12   A.    Yes.

1:29PM  13   Q.    Okay.  Do you ever see it in this format after you submit

1:29PM  14   it?

1:29PM  15   A.    No.

1:29PM  16   Q.    I'm going to go to page -- page 4 of Government Exhibit 1,

1:29PM  17   which is also page 3 of the CyberTipline report.  Listed on

1:29PM  18   this page we have, "Suspect information."  Is that provided by

1:29PM  19   Yahoo?

1:29PM  20   A.    It is.

1:29PM  21   Q.    Okay.  And I think I need to lay a little more foundation.

1:29PM  22   This a CyberTip that came from Yahoo in September of 2020?

1:29PM  23   A.    Yes.

1:29PM  24   Q.    Okay.  And just for record purposes, it says,

1:30PM  25   "CyberTipline report 79384716."

GUIZZOTTI - DIRECT EXAMINATION

1:30 PM     1     A.     Yes.

1:30 PM     2     Q.     And is it your understanding that this is the CyberTipline

1:30 PM     3     report in question today?

1:30 PM     4     A.     Yes.

1:30 PM     5     Q.     Okay.  Going back to that page, we also see, "Uploaded

1:30 PM     6     file information," including the number of uploaded files and

1:30 PM     7     some descriptions.  Does that come from Yahoo?

1:30 PM     8     A.     It does.

1:30 PM     9     Q.     We'll start with the first one.  It says, "File name," and

1:30 PM    10     it's image.4-1.gif.  Can you tell me where that file name would

1:30 PM    11     have come from?

1:30 PM    12     A.     The user.

1:30 PM    13     Q.     What about the MD5?  Do you know what that is?

1:30 PM    14     A.     That is the hash.  I had spoke earlier of hashes.  That's

1:31 PM    15     what that would look like.

1:31 PM    16     Q.     Do you manually type that in?

1:31 PM    17     A.     No.

1:31 PM    18     Q.     Where does it come from?

1:31 PM    19     A.     The image itself.

1:31 PM    20     Q.     Now, I see a question, "Did recording ESP review the

1:31 PM    21     entire contents of uploaded file," and the response is, "Yes."

1:31 PM    22     Can you explain what that means?

1:31 PM    23     A.     That is the check box after reviewing the images and

1:31 PM    24     videos and before submitting to NCMEC that we need to sign off

1:31 PM    25     on that we had reviewed the content, the images and videos that

GUIZZOTTI - DIRECT EXAMINATION

1:31PM  1    we are submitting.

1:31PM  2    Q.    How do you know a human person reviewed these images?

1:31PM  3    A.    That is the process and really the only way to submit a

1:31PM  4    CyberTip.

1:31PM  5    Q.    Does Yahoo ever submit a CyberTip without viewing the

1:31PM  6    images or videos?

1:31PM  7    A.    Never.

1:31PM  8    Q.    Why not?

1:31PM  9    A.    A human literally needs to check the images.  Say like in

1:32PM  10   a gallery view, we check box the images as well as checking the

1:32PM  11   button that says, "Submit to NCMEC."  I don't see that

1:32PM  12   happening without somebody to click buttons.

1:32PM  13   Q.    As you click those buttons, can you visually see the file

1:32PM  14   attachments at that point?

1:32PM  15   A.    Yes, in a gallery view.

1:32PM  16   Q.    Okay.  And were you working in the same position in

1:32PM  17   September of 2020?

1:32PM  18   A.    Currently, no.  I was a content moderator in September of

1:32PM  19   2020.

1:32PM  20   Q.    Is that the role that we've been speaking about today?

1:32PM  21   A.    Yes.

1:32PM  22   Q.    Were you actually the one who submitted this particular

1:32PM  23   CyberTip report?

1:32PM  24   A.    I was not.

1:32PM  25   Q.    Do you know who did?

GUIZZOTTI - DIRECT EXAMINATION

1:32PM   1   A.   I do.

1:32PM   2   Q.   And who is that person?

1:32PM   3   A.   Jessica Hines.

1:32PM   4   Q.   Was she a member of the same team that you were?

1:33PM   5   A.   She was.  She was my senior manager of trust and safety at

1:33PM   6   the time.

1:33PM   7   Q.   Do you have the same process now as in 2020?

1:33PM   8   A.   We do.

1:33PM   9   Q.   Did you ever report the suspect from this CyberTip to law

1:33PM  10   enforcement?

1:33PM  11   A.   No.

1:33PM  12   Q.   Why not?

1:33PM  13   A.   We don't have any contact with law enforcement.

1:33PM  14   Q.   Why do you report it to NCMEC?

1:33PM  15   A.   To my understanding, we are only privileged to report to

1:33PM  16   NCMEC.

1:33PM  17   Q.   What happens to the user after the report is submitted to

1:33PM  18   NCMEC?

1:33PM  19   A.   We disable their account.

1:33PM  20   Q.   Is there any other reason that Yahoo might search or scan

1:34PM  21   a user's content?

1:34PM  22   A.   No.

1:34PM  23   Q.   I just want to ask you a couple more specifics about this

1:34PM  24   case.  Do you know how many images were reported to NCMEC?

1:34PM  25   A.   Seven.

GUIZZOTTI - DIRECT EXAMINATION

1:34 PM 1    Q.    Were all seven reviewed by a human?

1:34 PM 2    A.    Yes.

1:34 PM 3    Q.    I want to move on to IP addresses.

1:34 PM 4    A.    Okay.

1:34 PM 5    Q.    What is your understanding of what an IP address is?

1:34 PM 6    A.    An IP is short for internet protocol, and it's an address

1:34 PM 7    given to any device.  My understanding how we use it as an IP

1:35 PM 8    address is if you send an email, for an example, it needs to go

1:35 PM 9    somewhere; i.e., an address.

1:35 PM 10    Q.    Is an IP address required to send an email message?

1:35 PM 11    A.    Yes.

1:35 PM 12    Q.    Does Yahoo maintain IP address information?

1:35 PM 13    A.    We do.

1:35 PM 14    Q.    Was there any IP address information in this particular

1:35 PM 15    case?

1:35 PM 16    A.    Yes.

1:35 PM 17    Q.    Was that information put into the CyberTipline report?

1:35 PM 18    A.    It was.

1:35 PM 19    Q.    Why would that be included?

1:35 PM 20    A.    I'm not sure.

1:35 PM 21    Q.    Does an email user need to be logged in to Yahoo in order

1:35 PM 22    to send an email?

1:35 PM 23    A.    Yes.

1:35 PM 24    Q.    Does Yahoo maintain time stamps from when emails are sent?

1:35 PM 25    A.    Yes.

GUIZZOTTI - DIRECT EXAMINATION

1:36 PM 1  Q.   When a user logs in to their email account with Yahoo,

1:36 PM 2  there a record of that?

1:36 PM 3  A.   Yes.

1:36 PM 4  Q.   How long can a user stay logged into Yahoo?

1:36 PM 5  A.   A couple of weeks.

1:36 PM 6  Q.   Does a Yahoo email user need to be re-logged in to submit

1:36 PM 7  an email?  I'm going to make that a little more clear.

1:36 PM 8        You said that they stay logged in for a few weeks.

1:36 PM 9  If a user is still logged in, but they're going to send an

1:36 PM 10 email, do they have to re-log in to do that?

1:36 PM 11 A.   No.

1:36 PM 12 Q.   Does Yahoo maintain information every time somebody opens

1:36 PM 13 their own Yahoo email account?

1:36 PM 14 A.   No, I believe just registration and log in.

1:37 PM 15 Q.   Can you tell me what a persistent log-in session is?

1:37 PM 16 A.   Sure.  So you typically have multiple devices, whether

1:37 PM 17 it's your computer or your cellphone, and you are logged in to

1:37 PM 18 Yahoo.  You can be logged in to Yahoo without re-logging for

1:37 PM 19 weeks at a time between different devices.  For an example, I

1:37 PM 20 could be logged out of my computer but still logged in by my

1:37 PM 21 cellphone pretty much at any given time.

1:37 PM 22 Q.   Would there be a new log in when an email is sent?

1:37 PM 23 A.   No.

1:37 PM 24 Q.   If a user actively logs out, will they have to re-log in

1:37 PM 25 to access their email?

GUIZZOTTI - DIRECT EXAMINATION

1:37PM   1   **A.**   It depends.  On the same device, yes.  If I log out of my

1:37PM   2   computer, I would have to log back in.  However, if I log out

1:37PM   3   on my computer, I could still be logged in on my cellphone.

1:38PM   4   **Q.**   Referencing the persistent log-in session, does that

1:38PM   5   expire at some point?

1:38PM   6   **A.**   I don't know.

1:38PM   7   **Q.**   I want to reference again Government Exhibit Number 3,

1:38PM   8   which is your declaration, and I want to go to page 3 of that.

1:38PM   9   Specifically I want to focus on bullet 14.  In reference to

1:38PM  10   this particular CyberTipline report, could you read for us

1:38PM  11   bullet 14?

1:38PM  12   **A.**   "Yahoo's records also reflect a time stamp for the last

1:38PM  13   active session for the account reported in CyberTip report

1:38PM  14   number 79384716 as beginning on September 5th, 2022 (verbatim),

1:39PM  15   at 9:29:59.  This time stamp value in Yahoo's records

1:39PM  16   corresponds to the date and time when the user either logged in

1:39PM  17   the reported account or extended a previous log-in session.  By

1:39PM  18   logging in or by extending a log in session, the user would

1:39PM  19   remain logged into the Yahoo account on the same device for a

1:39PM  20   period of two weeks.  Yahoo mail users must be logged into an

1:39PM  21   account to send email messages."

1:39PM  22           **THE DEFENDANT:**  Thank you.

1:39PM  23           **THE COURT:**  Ms. Favorit, when you say "bullet 14,"

1:39PM  24   it's the same as paragraph 14?

1:39PM  25           **MS. FAVORIT:**  It is.  That's the better way to put

GUIZZOTTI - DIRECT EXAMINATION

1:39PM  1    it, Your Honor.

1:39PM  2              THE COURT:  I understood.  I just wanted to make

1:39PM  3    sure.  Thank you.

1:39PM  4    BY MS. FAVORIT:

1:39PM  5    Q.  I want to ask if there are any labels given to CSAM images

1:40PM  6    or videos by Yahoo.

1:40PM  7    A.  Sometimes.

1:40PM  8    Q.  Would that be something that ends up in a CyberTipline

1:40PM  9    report?

1:40PM  10   A.  Yes.

1:40PM  11   Q.  Can you explain how that might end up in there?

1:40PM  12   A.  So the label that we would use is like A1 is a -- it's

1:40PM  13   considered like worst of the worst.  A is prepubescent minor.

1:40PM  14   1 is sexual encounter.  So I would label like a

1:40PM  15   worst-of-the-worst image as an A1.  If I choose to submit it as

1:40PM  16   an A1, which is another click, that would be relevant on the

1:40PM  17   CyberTip.

1:40PM  18   Q.  Did this particular CyberTip have a label?

1:40PM  19   A.  I don't think so, no.

1:41PM  20   Q.  To your knowledge, does Yahoo receive any benefit from

1:41PM  21   NCMEC to participate in the CyberTipline reports?

1:41PM  22   A.  No.

1:41PM  23   Q.  You mentioned never calling law enforcement in these

1:41PM  24   particular instances.  Post-sending a report, does Yahoo talk

1:41PM  25   to law enforcement?

GUIZZOTTI - CROSS-EXAMINATION

1:41PM  1   A.   Another team can intake a search warrant or a subpoena,

1:41PM  2   but that would not be my responsibility or my organization.

1:41PM  3   Q.   If you know the answer, would law enforcement need a

1:41PM  4   search warrant or subpoena to receive information from Yahoo?

1:41PM  5   A.   Yes.

1:41PM  6   Q.   Is Yahoo required to scan for child sexual abuse material?

1:42PM  7   A.   No.

1:42PM  8   Q.   But they choose to do that?

1:42PM  9   A.   Voluntarily.

1:42PM  10  Q.   What benefit does Yahoo receive by implementing this

1:42PM  11  system?

1:42PM  12  A.   We want to keep our users safe, first and foremost, as

1:42PM  13  well as our business responsibility to create a safe

1:42PM  14  environment.

1:42PM  15          MS. FAVORIT:  May I have a moment, Your Honor?

1:42PM  16          THE COURT:  Absolutely.

1:42PM  17          MS. FAVORIT:  I don't have any further questions,

1:42PM  18  Your Honor.

1:42PM  19          THE COURT:  Thank you, Ms. Favorit.

1:43PM  20              Defense have any cross?

1:43PM  21          MR. CENTRONE:  I do.  Thank you, Your Honor.

1:43PM  22                  CROSS-EXAMINATION

1:43PM  23                  BY MR. CENTRONE:

1:43PM  24  Q.   Good afternoon.

1:43PM  25  A.   Hi.  How are you?

GUIZZOTTI - CROSS-EXAMINATION

1:43 PM  1   Q.   Good.  Can you pronounce your last name again for me?

1:43 PM  2   A.   Guizzotti.

1:43 PM  3   Q.   Thank you.

1:43 PM  4   A.   It's less fancy than it looks.

1:43 PM  5   Q.   As a fellow Italian, I know the feeling.

1:43 PM  6        Yahoo has a policy of reporting child pornography to

1:43 PM  7   law enforcement, correct -- excuse me, to NCMEC, correct?

1:43 PM  8   A.   To NCMEC.

1:43 PM  9   Q.   And, in fact, is obligated under federal law to do -- to

1:43 PM  10  do just that if it finds child pornography?

1:43 PM  11  A.   Only when we are made aware, yes.

1:43 PM  12  Q.   Do you know how much money Yahoo spends on its searching,

1:43 PM  13  analysis, and reporting of child pornography?

1:43 PM  14  A.   I have no idea.

1:43 PM  15  Q.   Ballpark?

1:43 PM  16  A.   I don't know.

1:43 PM  17  Q.   I mean, we are -- is it fair to say we're probably talking

1:44 PM  18  at least a million dollars?

1:44 PM  19       MS. FAVORIT:  Objection, Your Honor.  This witness

1:44 PM  20  says she does not know.

1:44 PM  21       THE COURT:  Mr. Centrone, foundation?

1:44 PM  22       MR. CENTRONE:  There was a discussion in direct about

1:44 PM  23  the --

1:44 PM  24       THE COURT:  Are you withdrawing that question?

1:44 PM  25       MR. CENTRONE:  I'll rephrase, Your Honor.

GUIZZOTTI - CROSS-EXAMINATION

1:44PM  1        THE COURT:  Okay.

1:44PM  2   BY MR. CENTRONE:

1:44PM  3   Q.   Does Yahoo make any money from reviewing the reported

1:44PM  4   child pornography?

1:44PM  5   A.   No.

1:44PM  6   Q.   Nobody pays Yahoo to do it, correct?

1:44PM  7   A.   Correct.

1:44PM  8   Q.   Yahoo hires trust and safety moderators, correct?

1:44PM  9   A.   Yes --

1:44PM  10  Q.   Presumably they get paid a salary --

1:44PM  11  A.   Yes.

1:44PM  12  Q.   H- correct?  It employs software that we discussed such as

1:44PM  13  PhotoDNA and Radar, correct?

1:44PM  14  A.   Correct.

1:44PM  15  Q.   Presumably that costs money, correct?

1:44PM  16  A.   Yes.

1:44PM  17  Q.   Yahoo is a corporation that's purpose is to make money,

1:45PM  18  correct?

1:45PM  19  A.   Right.

1:45PM  20  Q.   Has Yahoo ever calculated how much money it would lose if

1:45PM  21  it failed to actively search for CSAM material?

1:45PM  22  A.   Not to my knowledge.

1:45PM  23  Q.   You've never seen any data regarding the financial benefit

1:45PM  24  to Yahoo by actively searching for CSAM, correct?

1:45PM  25  A.   No.

GUIZZOTTI - CROSS-EXAMINATION

1:45 PM  1    Q.   Ms. Guizzotti, there's a -- that binder in front of you,

1:45 PM  2    I'd like to direct you to tab H of that binder.  This is a

1:46 PM  3    document entitled, "Yahoo Compliance Guide for Law

1:46 PM  4    Enforcement."  Have you ever seen this before?

1:46 PM  5    A.   No.  This would not be my team of trust and safety.

1:46 PM  6    Q.   Who would maintain that?

1:46 PM  7    A.   I'm not sure.

1:46 PM  8    Q.   I'm going to direct you to page six of that compliance

1:46 PM  9    guide.  Do you see a header number 2, "General information?"

1:46 PM  10   A.   I do.

1:46 PM  11   Q.   Can you read that first sentence of that -- of that

1:46 PM  12   section?

1:47 PM  13   A.   "This compliance guide is designed to assist law

1:47 PM  14   enforcement in understanding Yahoo's policies and practices

1:47 PM  15   with regard to retention and disclosure of electronic

1:47 PM  16   information and to provide answers to frequently asked

1:47 PM  17   questions related to subpoenas and other legal process."

1:47 PM  18   Q.   Okay.  Can you go ahead and read the rest of that

1:47 PM  19   paragraph for me?

1:47 PM  20   A.   Absolutely, sure.  "The policies and procedures in this

1:47 PM  21   guide are subject to change without notice, and this document

1:47 PM  22   is not meant to be distributed to individuals or organizations

1:47 PM  23   that are not law enforcement entities, including Yahoo

1:47 PM  24   customers, consumers, or civil litigants.  Nothing in this

1:47 PM  25   guide is intended to create any enforceable rights against

GUIZZOTTI - CROSS-EXAMINATION

| | | |
|---|---|---|
| 1:47PM | 1 | Yahoo.  Yahoo will make reasonable efforts to advise law |
| 1:47PM | 2 | enforcement of significant changes in policies or procedures |
| 1:47PM | 3 | through updates to this guide." |
| 1:48PM | 4 | **Q.**   Okay.  I want to ask you to turn to page 12 of the same |
| 1:48PM | 5 | document. |
| 1:48PM | 6 |         THE COURT:  It's Defendant's Exhibit H? |
| 1:48PM | 7 |         MR. CENTRONE:  Correct, same exhibit, Your Honor. |
| 1:48PM | 8 | BY MR. CENTRONE: |
| 1:48PM | 9 | **Q.**   Do you see a section there entitled, "VI. NCMEC reporting |
| 1:48PM | 10 | procedures?" |
| 1:48PM | 11 | **A.**   I do. |
| 1:48PM | 12 | **Q.**   Can you go ahead and read that section for me? |
| 1:48PM | 13 | **A.**   "Yahoo has worked with law enforcement and the National |
| 1:48PM | 14 | Center for Missing and Exploited Children, NCMEC, to develop |
| 1:48PM | 15 | practices for reporting instances of apparent child |
| 1:48PM | 16 | pornography, CP, as required by 18 USC 2258A."  Keep going? |
| 1:48PM | 17 | **Q.**   Yes, please. |
| 1:48PM | 18 | **A.**   "Yahoo -- |
| 1:48PM | 19 |         THE COURT:  Mr. Centrone, if you could just pause for |
| 1:48PM | 20 | a moment. |
| 1:48PM | 21 |         MR. CENTRONE:  Yes, sir. |
| 1:48PM | 22 |         THE COURT:  Is there a reason why this witness, who's |
| 1:48PM | 23 | not familiar with this document, is being asked to read it? |
| 1:48PM | 24 | It's in evidence. |
| 1:49PM | 25 |         MR. CENTRONE:  I'm trying to include it in the |

GUIZZOTTI - CROSS-EXAMINATION

1:49PM    1    transcript as well, Your Honor, for ease of reference later on.

1:49PM    2            THE COURT:  I think the Court is anticipating having

1:49PM    3    post-hearing submissions.

1:49PM    4            MR. CENTRONE:  Sure.

1:49PM    5            THE COURT:  So just in the interests of time.

1:49PM    6            MR. CENTRONE:  Okay.  There's -- I do have a couple

1:49PM    7    of questions about this section that I believe the witness

1:49PM    8    would have information on based on her --

1:49PM    9            THE COURT:  Okay.  It's fine for you to ask her

1:49PM   10    questions about an area about which she has -- a property

1:49PM   11    foundation has been laid, but just to simply read documents

1:49PM   12    into the record which are already in evidence, I think we can

1:49PM   13    use our time a little better.

1:49PM   14    BY MR. CENTRONE:

1:49PM   15    Q.   Ms. Guizzotti, do you see in the second paragraph of that

1:49PM   16    same section, the NCMEC reporting procedures section, that it

1:49PM   17    says, "Yahoo may learn about possible CP on its networks from a

1:49PM   18    variety of sources, including abuse reports from users, tips

1:49PM   19    from NCMEC and law enforcement, and internal proactive

1:49PM   20    efforts"?

1:50PM   21            With respect to this particular case, the portions of

1:50PM   22    this statement that relate to abuse report from users, tips

1:50PM   23    from NCMEC and law enforcement do not apply here, correct?

1:50PM   24    This was an internal discovery by Yahoo?

1:50PM   25    A.   Correct.

GUIZZOTTI - CROSS-EXAMINATION

1:50PM    1    Q.    Okay.    In the next paragraph, and I believe you testified

1:50PM    2    to this earlier, it says, "Yahoo will disable public access to

1:50PM    3    materials and escalate material to Yahoo's legal department

1:50PM    4    upon the discovery."   I assume that's also in addition to, as

1:50PM    5    you testified, disabling of the account, correct?

1:50PM    6    A.    Right.

1:50PM    7    Q.    And nothing in here relates to disclosure to law

1:50PM    8    enforcement, correct?

1:50PM    9    A.    Correct.

1:50PM   10    Q.    Ms. Guizzotti, I'd like to turn your attention to

1:51PM   11    Defendant's Exhibit G in the same binder, and this is a public

1:51PM   12    report by Yahoo titled, "Yahoo's Efforts to Combat Sexual Abuse

1:51PM   13    Material."   Have you seen this before?

1:51PM   14    A.    I have.

1:51PM   15    Q.    And this report states that in 2019, and I'm specifically

1:51PM   16    referring -- I believe it carries over to the second page of

1:51PM   17    two of this same exhibit, that Yahoo reported 5,359 accounts to

1:51PM   18    NCMEC for trafficking in CSAM in 2019.   Is that -- does that

1:51PM   19    comport with your understanding of Yahoo's --

1:51PM   20    A.    It does, yes.

1:51PM   21    Q.    And then on the first page, it says, "In 2021, Yahoo

1:51PM   22    reported 5,498 accounts to NCMEC for trafficking and CSAM."

1:51PM   23    Does that also comport with your understanding of Yahoo's

1:51PM   24    reporting?

1:51PM   25    A.    It does.

GUIZZOTTI - CROSS-EXAMINATION

1:51PM  1    Q.   And this report states that Yahoo not only reports to

1:52PM  2    NCMEC, but after such reports, will continue investigating CSAM

1:52PM  3    in some certain instances; is that correct?

1:52PM  4    A.   It is.

1:52PM  5    Q.   Including the filing of supplemental reports to NCMEC

1:52PM  6    which involve Yahoo taking it on itself to investigate and

1:52PM  7    identify the actual individuals who commit these acts; is that

1:52PM  8    correct?

1:52PM  9    A.   Yes.

1:52PM  10   Q.   And it's under no -- Yahoo is under no legal obligation to

1:52PM  11   do that, correct?

1:52PM  12   A.   Correct.

1:52PM  13   Q.   Was -- was such a report -- was such a supplemental report

1:52PM  14   filed in this case?

1:52PM  15   A.   No.

1:52PM  16   Q.   Thank you.  I'm going to turn to some different questions.

1:52PM  17          We talked before that Yahoo is compelled by federal

1:52PM  18   law to report any CP it finds on its network, correct?

1:53PM  19   A.   Once it finds it, yes.

1:53PM  20   Q.   And it's compelled to report it specifically to NCMEC,

1:53PM  21   correct?

1:53PM  22   A.   Correct, yes.

1:53PM  23   Q.   And, in fact, it's illegal for Yahoo not to report child

1:53PM  24   pornography, correct?

1:53PM  25   A.   Correct.

GUIZZOTTI - CROSS-EXAMINATION

1:53PM  1    Q.   And Yahoo would be subject to a fine if such material was

1:53PM  2    not reported, correct?

1:53PM  3    A.   Yes.

1:53PM  4    Q.   Has Yahoo ever received such a fine to your knowledge?

1:53PM  5    A.   I don't know.

1:53PM  6    Q.   Just one moment, please.

1:53PM  7         I'd like to draw your attention to Exhibit E in that

1:53PM  8    same binder, which is a digital -- a Verizon digital safety

1:53PM  9    policy.

1:54PM  10        THE COURT:   E as in echo?

1:54PM  11        MR. CENTRONE:  Yes, sir.

1:54PM  12        THE COURT:   Thank you.

1:54PM  13   BY MR. CENTRONE:

1:54PM  14   Q.   There should be a letter tab for E.  I believe you're

1:54PM  15   looking at a --

1:54PM  16   A.   I think I got it.  Oh, there we go.

1:54PM  17        THE COURT:   Ms. Guizzotti, have you found Exhibit E?

1:54PM  18        THE WITNESS:  I did.  Thanks.

1:54PM  19        THE COURT:   Okay.

1:54PM  20   BY MR. CENTRONE:

1:54PM  21   Q.   Have you -- are you familiar with this document?  Have you

1:54PM  22   seen this before?

1:54PM  23   A.   I have.

1:54PM  24   Q.   Okay.  And this is a Verizon document.  I understand

1:54PM  25   Verizon no longer owns Yahoo, but was -- or I believe they're

100

GUIZZOTTI - CROSS-EXAMINATION

| | | |
|---|---|---|
| 1:54 PM | 1 | actually a minority owner now, but are -- was this digital |
| 1:55 PM | 2 | safety policy in place in 2020? |
| 1:55 PM | 3 | A.   I'm not sure. |
| 1:55 PM | 4 | Q.   Okay.  This -- this document refers to a close partnership |
| 1:55 PM | 5 | between Verizon and NCMEC.  Given your role at the company, is |
| 1:55 PM | 6 | that your experience?  Would you also identify the relationship |
| 1:55 PM | 7 | as close between Verizon and NCMEC? |
| 1:55 PM | 8 | A.   I don't know. |
| 1:55 PM | 9 | Q.   And this document also identifies a $2 million donation |
| 1:55 PM | 10 | from Verizon to NCMEC.  Were you aware of that donation? |
| 1:55 PM | 11 | A.   No. |
| 1:55 PM | 12 | Q.   Okay.  It's illegal for the general public to possess |
| 1:55 PM | 13 | child pornography, of course, correct? |
| 1:55 PM | 14 | A.   Of course, yes. |
| 1:55 PM | 15 | Q.   And, in fact, it's a very serious crime.  But Yahoo is |
| 1:56 PM | 16 | allowed to possess federal -- well, is allowed by federal law |
| 1:56 PM | 17 | to possess child pornography, correct? |
| 1:56 PM | 18 | A.   Yes. |
| 1:56 PM | 19 | Q.   And it's granted an exemption from liability under federal |
| 1:56 PM | 20 | law to do so, correct? |
| 1:56 PM | 21 | A.   Correct. |
| 1:56 PM | 22 | Q.   With respect to your testimony earlier about Yahoo's |
| 1:56 PM | 23 | policies regarding the review of alleged CSAM materials, how do |
| 1:56 PM | 24 | you know those policies were followed here? |
| 1:56 PM | 25 | A.   Our agents are trained under our legal guidance, and we |

GUIZZOTTI - CROSS-EXAMINATION

1:56 PM   1    follow certain guidelines and factors determining what CSAM is.
1:56 PM   2    Q.   I understand.  That's essentially another policy though;
1:57 PM   3    isn't it?  You have a policy to train people.  You have a
1:57 PM   4    policy to train -- to provide guidance about CSAM, but how do
1:57 PM   5    you know those policies were actually followed in this
1:57 PM   6    particular instance?
1:57 PM   7    A.   I've never had any complaints with a senior manager
1:57 PM   8    maintaining and doing this process.  She was a very good agent
1:57 PM   9    at the time, and that would be my best --
1:57 PM  10    Q.   So is it fair to say you don't have any personal knowledge
1:57 PM  11    whether in this particular instance all the policies were
1:57 PM  12    followed?
1:57 PM  13    A.   That's correct.
1:57 PM  14    Q.   Okay.  Have you ever heard of someone at Yahoo being
1:57 PM  15    disciplined for not viewing images --
1:57 PM  16    A.   No.
1:57 PM  17    Q.   -- that are part of a CyberTip report?
1:57 PM  18    A.   No.
1:57 PM  19    Q.   No one has ever been disciplined for not doing their job?
1:57 PM  20    A.   I wouldn't be privy to that.
1:58 PM  21    Q.   Okay.  So, is it a -- okay.  So is it correct that you
1:58 PM  22    don't know whether --
1:58 PM  23    A.   I don't know.
1:58 PM  24    Q.   Okay.  You referred earlier to a gallery when images are
1:58 PM  25    attached to a CyberTipline report; is that correct?

GUIZZOTTI - CROSS-EXAMINATION

1:58PM    1    A.    Right.

1:58PM    2    Q.    Are those full screen images or thumbnails?

1:58PM    3    A.    They can be either, depending on the agent's preference.

1:58PM    4    Q.    Could it also just be a title of the file?

1:58PM    5    A.    No.

1:58PM    6    Q.    It would be an image?

1:58PM    7    A.    It would be an image.

1:58PM    8    Q.    But, again, you don't have any personal knowledge in this

1:58PM    9    particular instance of what happened here, correct?

1:58PM    10   A.    Correct.

1:59PM    11   Q.    With respect to the language in the CyberTip report that

1:59PM    12   you testified earlier regarding the uploaded file

1:59PM    13   information -- and if you need to refresh your memory, I'd

1:59PM    14   direct you to Exhibit A in the binder.  It's the same -- it's

1:59PM    15   the same as Government's Exhibit 1.  For instance, we were

1:59PM    16   looking at page 3 earlier.  And there's a line in there, "Did

1:59PM    17   reporting ESP view entire contents of uploaded file?"  Does

1:59PM    18   NCMEC provide any guidance to Yahoo about what that phrase

1:59PM    19   means?

1:59PM    20   A.    No.

1:59PM    21   Q.    Does Yahoo have its own internal definition of what that

1:59PM    22   phrase means and what's required to meet it?

1:59PM    23   A.    It's pretty self-explanatory.  We review the entirety of

1:59PM    24   the account.

1:59PM    25   Q.    So is that a no?

GUIZZOTTI - CROSS-EXAMINATION

2:00PM 1    A.    No to -- I'm sorry.  Can you repeat the question?

2:00PM 2    Q.    Whether Yahoo has any internal guidance regarding that

2:00PM 3    statement, that question.

2:00PM 4    A.    That would be our internal guidance is to review the

2:00PM 5    account.

2:00PM 6    Q.    I understand, but I'm talking about the definition of that

2:00PM 7    phrase in particular.

2:00PM 8    A.    Oh, right.  No.

2:00PM 9    Q.    Internal definition that Yahoo uses --

2:00PM 10   A.    No.

2:00PM 11   Q.    -- in order to maintain consistent application of that.

2:00PM 12   Somewhere it's written down, and trust and safety moderators

2:00PM 13   are trained on it.

2:00PM 14   A.    It is our training.  It is in -- yes, it's our training

2:00PM 15   that we review the entire account and check that we had done

2:00PM 16   so.

2:00PM 17   Q.    When you say entire account, what does that refer to?

2:00PM 18   A.    The images and videos that were archived to review upon

2:01PM 19   the initial hit, detection of positive CSAM.

2:01PM 20   Q.    But it's not written down anywhere to your knowledge?

2:01PM 21   A.    No.

2:01PM 22   Q.    Okay.  When do trust and safety moderators receive that

2:01PM 23   training?

2:01PM 24   A.    Upon onboarding when they're hired as well as monthly

2:01PM 25   calibrations.  We review our best practices and policies.

GUIZZOTTI - CROSS-EXAMINATION

2:01PM  1   Q.   Would those monthly calibrations refer to new policies or

2:01PM  2   going over the exact same policies every month?

2:01PM  3   A.   If there any updates, any new policy on the addendums,

2:01PM  4   then yes.

2:01PM  5   Q.   Okay.  But not -- not necessarily rehashing the same

2:01PM  6   onboarding training every month --

2:01PM  7   A.   Correct.

2:01PM  8   Q.   -- if I understand that correctly?

2:01PM  9   A.   Correct.

2:01PM  10  Q.   Okay.

2:01PM  11  A.   Yes.

2:01PM  12  Q.   Does Yahoo maintain any internal documentation about a

2:02PM  13  CyberTip report it makes besides the CyberTip itself?

2:02PM  14  A.   Besides the CyberTip itself, the only thing we use is

2:02PM  15  called our tracker.  It's an internal Excel sheet maintained by

2:02PM  16  the agents of what they're working on at the time.

2:02PM  17  Q.   And when you say the agents, you mean the trust and safety

2:02PM  18  moderators?

2:02PM  19  A.   The trust and safety moderators, yes.

2:02PM  20  Q.   And of what they're working on at the time, does that mean

2:02PM  21  that previous cases are no longer tracked?

2:02PM  22  A.   It's a running document.

2:02PM  23  Q.   Okay.  So it would have a historical --

2:02PM  24  A.   Yes.

2:02PM  25  Q.   What is in that tracker spreadsheet?

GUIZZOTTI - CROSS-EXAMINATION

| | | |
|---|---|---|
| 2:02 PM | 1 | **A.**   The -- so we call it a GUID, which is an internal jargon |
| 2:02 PM | 2 | for the Yahoo address; the date that we found the initial hit; |
| 2:02 PM | 3 | the date that we archived the rest of the videos and the |
| 2:03 PM | 4 | images; and then if we reviewed it or not. |
| 2:03 PM | 5 | **Q.**   When you say Yahoo address, what kind of address is that |
| 2:03 PM | 6 | referring to?  Is that -- |
| 2:03 PM | 7 | **A.**   Like the email address. |
| 2:03 PM | 8 | **Q.**   And who -- so that would be of the trust and safety |
| 2:03 PM | 9 | moderator who was assigned that -- that report; is that |
| 2:03 PM | 10 | correct? |
| 2:03 PM | 11 | **A.**   Right. |
| 2:03 PM | 12 | **Q.**   Do you know if that tracker document has been turned over |
| 2:03 PM | 13 | to the Government here as a result of a search warrant or |
| 2:03 PM | 14 | subpoena? |
| 2:03 PM | 15 | **A.**   I provided it. |
| 2:03 PM | 16 | **Q.**   When did you provide it? |
| 2:03 PM | 17 | **A.**   Today. |
| 2:03 PM | 18 | **Q.**   Okay. |
| 2:04 PM | 19 |         **MS. FAVORIT:**  Your Honor, may I make a quick |
| 2:04 PM | 20 | clarification from what the witness just testified to about |
| 2:04 PM | 21 | that tracker document? |
| 2:04 PM | 22 |         **THE COURT:**  Isn't that more appropriately handled on |
| 2:04 PM | 23 | redirect? |
| 2:04 PM | 24 |         **MS. FAVORIT:**  That's fine. |
| 2:04 PM | 25 |         **THE COURT:**  It hasn't been raised here by |

GUIZZOTTI - CROSS-EXAMINATION

2:04PM  1    Mr. Centrone.  I don't know if there's an issue, but --

2:04PM  2              MR. CENTRONE:  Well, Your Honor, I was not aware of

2:04PM  3    this document, and my question was sincere because I didn't

2:04PM  4    know the answer to it.  If the Government has a copy, I'd like

2:04PM  5    to see a copy of it and see if I have any questions to follow

2:04PM  6    up.  I have not been provided a copy.

2:04PM  7              THE COURT:  All right.  With that, Ms. Favorit,

2:04PM  8    what's your response?

2:04PM  9              MS. FAVORIT:  I don't have a copy of that, Your

2:04PM 10    Honor.  Yahoo provided legal counsel today, and I think that it

2:04PM 11    was prepared for defense -- a subpoena request and didn't

2:04PM 12    really involve the Government, but I was just made aware that

2:04PM 13    she does have that document --

2:04PM 14              THE COURT:  When you say "she," to whom are you

2:04PM 15    referring?

2:04PM 16              MS. FAVORIT:  I'm sorry, counsel for Yahoo.

2:04PM 17              THE COURT:  Okay.  So do I understand the

2:04PM 18    Government's position, Ms. Favorit, that the Government is not

2:05PM 19    in possession, in custody, and control of the document that's

2:05PM 20    at issue?

2:05PM 21              MS. FAVORIT:  That's correct, Your Honor.

2:05PM 22              THE COURT:  Mr. Centrone?

2:05PM 23              MR. CENTRONE:  I -- when this hearing was previously

2:05PM 24    scheduled, Your Honor, my subpoena to Yahoo included a request

2:05PM 25    for any such documents if -- to the deponent, if there was a

GUIZZOTTI - CROSS-EXAMINATION

2:05PM   1    document that they had that I'd like to see a copy.  I assume

2:05PM   2    the Government isn't planning on calling the legal counsel as

2:05PM   3    well.  I think I'd like to go ahead see if we can just

2:05PM   4    streamline this, and I can just get a copy of it real quick

2:05PM   5    from counsel.

2:05PM   6              THE COURT:  Ms. Favorit, we have an attorney here

2:05PM   7    from what you're reporting, and the record should reflect that

2:05PM   8    there's somebody standing in the gallery.  So that person is

2:05PM   9    not on record.  So for this hearing, I look to you at least

2:05PM  10    initially.  When you say a document is not in the possession,

2:06PM  11    custody, or control of the Government, do you have the ability

2:06PM  12    to acquire it, exercise control over it at all?

2:06PM  13              MS. FAVORIT:  I could do that right now by accepting

2:06PM  14    that document from that counsel and handing it to defense.  I

2:06PM  15    suppose I would be in custody and control at that time, but I

2:06PM  16    have not been.

2:06PM  17              THE COURT:  I don't know if custody, control --

2:06PM  18    possession, custody, and control is defined merely by physical

2:06PM  19    possession.  It's defined typically, at least in a number of

2:06PM  20    discovery contexts, more broadly.  So it sounds to me like you

2:06PM  21    have the ability to acquire it, which without going back and

2:06PM  22    looking at case law, would seem to me to indicate that the

2:06PM  23    Government does have the document in its possession, custody,

2:06PM  24    and control, and therefore if you have the ability to acquire

2:06PM  25    the document and you can do that in open court here, it seems

2:07PM    1    like that would be the appropriate next step.

2:07PM    2             MS. FAVORIT:  Yes, Your Honor.  I just want to make

2:07PM    3    it very clear, I have not never been in possession as the

2:07PM    4    Government of this document.  I didn't request for possession

2:07PM    5    of it.  I became aware because defense listed it in his

2:07PM    6    subpoena, but the Government never, ever has received or even

2:07PM    7    viewed a copy of this document.  I just happened to know about

2:07PM    8    it from the subpoena and later counsel as of -- in the middle

2:07PM    9    of the hearing that she had that document.  So I was just

2:07PM   10    assisting and facilitating that since it seemed like the

2:07PM   11    witness maybe was confused and thought the Government was in

2:07PM   12    possession of it, and I just want to make it very clear that we

2:07PM   13    were not.

2:07PM   14             THE COURT:  Okay.  Mr. Centrone, any objection to the

2:07PM   15    document being provided to you now?

2:07PM   16             MR. CENTRONE:  No, Your Honor.  I'd just like a

2:07PM   17    moment to review it and see if I have --

2:07PM   18             THE COURT:  Absolutely.  Why don't we take a

2:07PM   19    five-minute recess --

2:07PM   20             MR. CENTRONE:  Sure.

2:07PM   21             THE COURT:  -- for you to acquire the document.  If

2:07PM   22    you need additional time, if you'd so advise my courtroom

2:07PM   23    deputy.

2:07PM   24             MR. CENTRONE:  Yes, sir.

2:07PM   25             THE COURT:  Unless we hear from you otherwise, we'll

GUIZZOTTI - CROSS-EXAMINATION

2:08PM  1    assume five minutes is enough.  We'll be in recess.

2:08PM  2              MR. CENTRONE:  Thank you, Judge.

        3              (Recess from 2:08 p.m. to 2:18 p.m.)

2:18PM  4              THE COURT:  The record should reflect we've taken

2:18PM  5    roughly a ten-minute recess.  Mr. Centrone, have you acquired

2:18PM  6    the document in question?

2:18PM  7              MR. CENTRONE:  I have, Your Honor.

2:19PM  8              THE COURT:  Have you had sufficient opportunity to

2:19PM  9    review the document?

2:19PM  10             MR. CENTRONE:  I have, Your Honor.

2:19PM  11             THE COURT:  And, again, any objection to receiving

2:19PM  12   the document here this afternoon?

2:19PM  13             MR. CENTRONE:  No, Your Honor.

2:19PM  14             THE COURT:  What is the document?  Can you identify

2:19PM  15   it for the record?

2:19PM  16             MR. CENTRONE:  Sure.  It is a three-page document

2:19PM  17   that looks like a printout of effectively an Excel spreadsheet.

2:19PM  18   So I spoke to Yahoo's counsel, and she informed me that if one

2:19PM  19   were to view this on a computer screen, you would be seeing

2:19PM  20   these columns with information underneath all across the

2:19PM  21   screen.  Since it's printed, they're spread out over a few

2:19PM  22   pages.

2:19PM  23             THE COURT:  Any objection to that description,

2:19PM  24   Ms. Favorit?

2:19PM  25             MS. FAVORIT:  No, Your Honor.

GUIZZOTTI - CROSS-EXAMINATION

2:19PM 1      THE COURT:  Are you seeking to admit this document?

2:19PM 2      MR. CENTRONE:  I am, Your Honor, and I've discussed

2:19PM 3  with the Government, and the Government will stipulate to its

2:19PM 4  admission.

2:19PM 5      THE COURT:  Okay.  I have you at H as in --

2:20PM 6      MR. CENTRONE:  I believe it would be I, Your Honor.

2:20PM 7      THE COURT:  Right.  The last exhibit was H, so I

2:20PM 8  would be the next one.

2:20PM 9      MR. CENTRONE:  Yes, sir.

2:20PM 10     THE COURT:  Do you have an exhibit tab there or

2:20PM 11 sticker?

2:20PM 12     MR. CENTRONE:  I do have an extra.  One moment,

2:20PM 13 Judge.

2:20PM 14     THE COURT:  Thank you, Ms. Favorit, for helping out.

2:20PM 15     MR. CENTRONE:  Paralegal gave me an envelope full of

2:20PM 16 them, and now I can't find it.

2:20PM 17     THE COURT:  Are you going to present this document,

2:20PM 18 which is now Defendant's I, to this witness?

2:20PM 19     MR. CENTRONE:  I am, Your Honor.

2:20PM 20     THE COURT:  Okay.  And do you formally move for its

2:20PM 21 admission?

2:20PM 22     MR. CENTRONE:  I do, Your Honor.

2:20PM 23     THE COURT:  Any objection, Ms. Favorit, just to be

2:20PM 24 clear?

2:20PM 25     MS. FAVORIT:  There's no objection, Your Honor.

GUIZZOTTI - CROSS-EXAMINATION

2:20PM  1         THE COURT:  All right.  Defendant's I is admitted.

2:20PM  2         MR. CENTRONE:  Thank you.

2:20PM  3         THE COURT:  You may proceed, Mr. Centrone.

2:20PM  4         MR. CENTRONE:  Thank you, sir.

2:20PM  5         THE WITNESS:  Thank you.

2:20PM  6  BY MR. CENTRONE:

2:20PM  7  Q.   Ms. Guizzotti, I just handed you a copy of the document I

2:21PM  8  just obtained that has now been entered as evidence as

2:21PM  9  Exhibit I for the Defendant.  Is this the tracker spreadsheet

2:21PM 10  that you were describing earlier?

2:21PM 11  A.   It is, yes.

2:21PM 12  Q.   If you don't mind, I'd like to take you through each

2:21PM 13  column just so I can have a full understanding of what it means

2:21PM 14  because some of it is not necessarily in layman's terms.

2:21PM 15         For instance, the first column on the first page is

2:21PM 16  labeled GUID.  What does that stand for?

2:21PM 17  A.   It's a GUID ID.  That's what we call it, and it's the

2:21PM 18  user's internal reference.

2:21PM 19         THE COURT:  If you could just pause for a moment.

2:21PM 20  Mr. Centrone, do you have a copy for the Court?

2:21PM 21         MR. CENTRONE:  Do we have an extra copy?  Yes, Your

2:21PM 22  Honor.

2:21PM 23         THE COURT:  Thank you.  It's easier to follow along.

2:21PM 24         MR. CENTRONE:  Of course.

2:21PM 25         THE COURT:  The other alternative or option, since

GUIZZOTTI - CROSS-EXAMINATION

2:21PM 1    it's in evidence, you could put it on the Elmo, if you'd like,

2:21PM 2    or not.

2:21PM 3              MR. CENTRONE:  I prefer to not do it, Your Honor, but

2:22PM 4    if Your Honor has a copy and is satisfied with that copy, then

2:22PM 5    I'll try and be as plain as possible about following along.

2:22PM 6              THE COURT:  You can proceed as you wish.

2:22PM 7              MR. CENTRONE:  Thank you.

2:22PM 8    BY MR. CENTRONE:

2:22PM 9    Q.   So, Ms. Guizzotti, you testified this is an -- effectively

2:22PM 10   a user ID; is that correct?

2:22PM 11   A.   Right, an internal.

2:22PM 12   Q.   So this would be how Yahoo refers to a specific user --

2:22PM 13   A.   A Yahoo email address, yes.

2:22PM 14   Q.   Okay.  The next column looks like it's blank, but it's

2:22PM 15   titled YID.  What does that refer to?

2:22PM 16   A.   It's Yahoo ID.  Which is would be typically instead of the

2:22PM 17   GUID.

2:22PM 18   Q.   So would that be like an email address?

2:22PM 19   A.   It would be the email address.

2:22PM 20   Q.   Okay.  Any idea why it's not filled in here?

2:22PM 21   A.   It's -- it happens on an automatic system, like what

2:22PM 22   pulls, and it's usually just one or the other.

2:22PM 23   Q.   Okay.  So is this entire document generated automatically

2:22PM 24   without human intervention?

2:22PM 25   A.   No.  We pop -- the agents populate it from our Radar tool,

GUIZZOTTI - CROSS-EXAMINATION

2:23 PM  1    which is the CSAM review tool, and then we populate the

2:23 PM  2    information into this -- into these boxes.

2:23 PM  3    Q.   Okay.  You just described information being kind of

2:23 PM  4    auto-populated?

2:23 PM  5    A.   Right.

2:23 PM  6    Q.   What information --

2:23 PM  7    A.   My apologies.  So the automatic piece of that would be on

2:23 PM  8    the Radar tool side, and I would copy either the GUID or the

2:23 PM  9    YID.

2:23 PM  10   Q.   I understand.  Okay.  The next column is author IP.  What

2:23 PM  11   does that refer to?

2:23 PM  12   A.   It is the IP address that the image was located at.

2:23 PM  13   Q.   Okay.  In other words, that's associated with the user as

2:23 PM  14   well?

2:23 PM  15   A.   Right.

2:23 PM  16   Q.   Okay.  The next is platform AOL mail or Yahoo mail.  It

2:23 PM  17   says Yahoo.  Is that because this is a Yahoo email account?

2:24 PM  18   A.   Yes.

2:24 PM  19   Q.   Does Yahoo also own AOL?

2:24 PM  20   A.   We do.

2:24 PM  21   Q.   And it uses the same trust and safety moderators to

2:24 PM  22   moderate the email content?

2:24 PM  23   A.   Yes, same team, yep.

2:24 PM  24   Q.   The next is column is "Creation time," and a parenthetical

2:24 PM  25   "Radar."  It's a number that does not look like a time of day.

GUIZZOTTI - CROSS-EXAMINATION

2:24 PM 1    What does that refer to?

2:24 PM 2    A.    It is a unix time stamp.  You can -- and it populates

2:24 PM 3    actually to a time and date.

2:24 PM 4    Q.    Okay.  Can you kind of decipher this particular --

2:24 PM 5    A.    Without say, like, the calculator, I cannot.

2:24 PM 6    Q.    When you say calculator, what are you referring to?

2:24 PM 7    A.    A unix time, it's kind of -- it's -- again, it's like an

2:24 PM 8    engineering term, like an IP address.  It's a bunch of numbers,

2:24 PM 9    right?  Like, this is a string of numbers, and this unix time

2:24 PM 10   when say submitted or populated into, like, a unix calculator,

2:24 PM 11   it can be displayed in the time and date stamp as like you and

2:24 PM 12   I would know it.

2:25 PM 13   Q.    Okay.  Is -- do Yahoo's trust and safety moderators speak

2:25 PM 14   unix time or is that something that's done automatically?

2:25 PM 15   A.    It's done automatically.

2:25 PM 16   Q.    So sitting here right now, you cannot tell us what date

2:25 PM 17   and time this information was --

2:25 PM 18   A.    I cannot.

2:25 PM 19   Q.    Okay.  But is this referring to creation of -- of what

2:25 PM 20   exactly?

2:25 PM 21   A.    The creation of the archive.  So upon detection of that --

2:25 PM 22   of an initial CSAM hit, we archive the rest of the contents,

2:25 PM 23   and we essentially create a case.  This would be the creation

2:25 PM 24   of that case.

2:25 PM 25   Q.    The rest of the contents of what?

GUIZZOTTI - CROSS-EXAMINATION

2:25PM    1    A.    The email that was originally --

2:25PM    2    Q.    Okay.  So not, for instance, the entire contents of a

2:25PM    3    user's account?

2:25PM    4    A.    The images and videos.

2:25PM    5    Q.    For all the emails or the emails that are tagged --

2:25PM    6    A.    The email that was with the initial hit of the initial

2:26PM    7    scanning.

2:26PM    8    Q.    Would that be one email or -- for instance, in this

2:26PM    9    instance, the images identified in the CyberTip report take

2:26PM    10   place over several months.  Is this referring only to one of

2:26PM    11   those?

2:26PM    12   A.    No, we do archive all images and videos of the email

2:26PM    13   account.

2:26PM    14   Q.    At the same time?

2:26PM    15   A.    Correct.

2:26PM    16   Q.    Okay.  Turn to the next page.  The next column if we were

2:26PM    17   reading this kind of left to right is mail message ID.  What

2:26PM    18   does that refer to?

2:26PM    19   A.    It is the -- like the email ID.

2:26PM    20   Q.    Can you elaborate please, like the ID of a specific email?

2:26PM    21   A.    Correct, that the initial hit was in.

2:26PM    22   Q.    So, again, this is referring only to one email?

2:26PM    23   A.    Only one email would this message ID be, yes.

2:27PM    24   Q.    And each email has a different message ID?

2:27PM    25   A.    To my understanding, yes.

GUIZZOTTI - CROSS-EXAMINATION

2:27 PM  1   Q.   Is that something that's automatically done by Yahoo?

2:27 PM  2   A.   Yes.

2:27 PM  3   Q.   And is each email assigned such an ID whether it's

2:27 PM  4   something that's going through the CyberTip process or not, or

2:27 PM  5   is this only reserved for those emails in the CSAM reporting

2:27 PM  6   process?

2:27 PM  7   A.   So this is referred to the initial -- the image that was

2:27 PM  8   the initial hit of why we scanned in the first place, so that

2:27 PM  9   initial hit.

2:27 PM  10  Q.   No, I understand.  My question is more -- is more general.

2:27 PM  11  Do all -- does every single email that is sent by a Yahoo email

2:27 PM  12  user get assigned such a message ID, or is this limited to

2:27 PM  13  emails that are in the CSAM reporting process internally in

2:27 PM  14  Yahoo?

2:27 PM  15  A.   All emails have a message ID.

2:27 PM  16  Q.   Okay.  And that's something that's automatically created

2:28 PM  17  by Yahoo?

2:28 PM  18  A.   Correct.

2:28 PM  19  Q.   Okay.  The next column is archiving agent.  What does that

2:28 PM  20  refer to?

2:28 PM  21  A.   It is the agent that took the initial hit and then

2:28 PM  22  archived the -- all of the images and videos of the entire

2:28 PM  23  account.

2:28 PM  24  Q.   Would that be the same as the person who did the -- a

2:28 PM  25  human review to the account?

GUIZZOTTI - CROSS-EXAMINATION

| | | |
|---|---|---|
| 2:28PM | 1 | A. Yes. |
| 2:28PM | 2 | Q. Always? |
| 2:28PM | 3 | A. Not always. |
| 2:28PM | 4 | Q. How do you know that's the same here, if you do know |
| 2:28PM | 5 | that's the case? |
| 2:28PM | 6 | A. I know that the same agent did submit this CyberTip, and |
| 2:28PM | 7 | that is who reviewed the images. |
| 2:28PM | 8 | Q. How do you know that? |
| 2:28PM | 9 | A. Because you have to submit -- you have to check the images |
| 2:28PM | 10 | at the same -- on the same screen that you submit to NCMEC. |
| 2:28PM | 11 | Q. No, I understand. I'm asking how do you know from this or |
| 2:28PM | 12 | from some other document that the same person is the same |
| 2:29PM | 13 | archiving agent identified in this column? |
| 2:29PM | 14 | A. I don't. |
| 2:29PM | 15 | Q. You don't know? Okay. |
| 2:29PM | 16 | A. I don't. |
| 2:29PM | 17 | Q. The next column is date, time archival started, and it |
| 2:29PM | 18 | reads September 8th, 2020. Is that a normal date, or is that a |
| 2:29PM | 19 | unix date? |
| 2:29PM | 20 | A. Nope, that's a normal date. |
| 2:29PM | 21 | Q. Is that auto-populated, or is that put in by a human? |
| 2:29PM | 22 | A. That would be inputted by Jessie in this. |
| 2:29PM | 23 | Q. And next column is number of images, and this says 167 it |
| 2:29PM | 24 | looks like to me; is that correct? |
| 2:29PM | 25 | A. Correct. |

GUIZZOTTI - CROSS-EXAMINATION

2:29 PM  1    Q.   As we've discussed before, that the CyberTip report

2:29 PM  2    relates to seven images.  Where does this 167 number come from?

2:29 PM  3    A.   So as I understand it, we would have reviewed 167 in

2:29 PM  4    total, and the difference would be we only submitted seven to

2:29 PM  5    NCMEC.

2:30 PM  6    Q.   Okay.  Let me unpack that a little bit.  So the account is

2:30 PM  7    flagged as potentially containing CSAM, and then 167 what,

2:30 PM  8    separate emails were reviewed?

2:30 PM  9    A.   It doesn't need to be separate emails, but images and

2:30 PM  10   videos of the account were archived to be reviewed.  So it can

2:30 PM  11   be across a series of emails.

2:30 PM  12   Q.   And how is it determined which get that review?  And I

2:30 PM  13   apologize because this is the first I'm hearing about this, so

2:30 PM  14   I'm trying to feel my way through it a little bit, but what --

2:30 PM  15   what -- how do you know what to look at to go say, "Okay.

2:30 PM  16   We're going to review 167 images"?

2:30 PM  17   A.   To my understanding, that would be all of his images and

2:31 PM  18   videos in his email account.

2:31 PM  19   Q.   Every -- every email ever sent from that account; is that

2:31 PM  20   what you're saying?

2:31 PM  21   A.   Yes.

2:31 PM  22   Q.   You would -- is that normal that you would look at every

2:31 PM  23   single email -- I assume you're talking about email

2:31 PM  24   attachments, correct?

2:31 PM  25   A.   Right.

GUIZZOTTI - CROSS-EXAMINATION

2:31PM   1   Q.   That are images or videos?

2:31PM   2   A.   Yes.

2:31PM   3   Q.   Something similar would get -- would then get reviewed?

2:31PM   4   A.   Correct.

2:31PM   5   Q.   Is that -- does that happen in each and every instance of

2:31PM   6   CyberTip reporting?

2:31PM   7   A.   Every time we get a hit on a positive CSAM image, we

2:31PM   8   archive the entire account of all videos and images and human

2:31PM   9   review them.

2:31PM  10   Q.   Going back to the beginning of time, the beginning of when

2:31PM  11   the account was created?

2:31PM  12   A.   Correct.

2:31PM  13   Q.   Okay.  So do I understand correctly then that 167 images

2:31PM  14   were viewed, and seven were -- were determined worthy of

2:32PM  15   reporting to NCMEC?

2:32PM  16   A.   Yeah.

2:32PM  17   Q.   Okay.  The next column is agent reviewing archive, and

2:32PM  18   it's the name Chris.  What is that referring to?

2:32PM  19   A.   That is another agent, and how I read this is he could

2:32PM  20   have been a secondary reviewer given the amount of images.  So

2:32PM  21   Jessie and Chris could have both reviewed this account and

2:32PM  22   because this is our tracker, it's more for like bandwidth of

2:32PM  23   where our agents are working, he would have submitted his name

2:32PM  24   in this column.

2:32PM  25   Q.   Are you -- are you speculating about that, that that's

GUIZZOTTI - CROSS-EXAMINATION

2:32PM  1  what this could be, or do you know?

2:32PM  2  A.   In my experience, that's the only reason why another agent

2:32PM  3  would be listed, yes.

2:32PM  4  Q.   Okay.  Do you know what Chris this is referring to, who

2:32PM  5  that could be?

2:32PM  6  A.   I do know who that would be.

2:32PM  7  Q.   Who is that?

2:33PM  8  A.   Chris Wayne.

2:33PM  9  Q.   Wayne?

2:33PM  10  A.   Wayne.

2:33PM  11  Q.   W-a-y-n-e?

2:33PM  12  A.   Yes, sir.

2:33PM  13  Q.   With respect to the seven images in particular that are

2:33PM  14  the subject of the CyberTip report, do you know whether Jessie

2:33PM  15  or Chris or some combination thereof reviewed those particular

2:33PM  16  images?

2:33PM  17  A.   I would not know.

2:33PM  18  Q.   Do you know who would know?

2:33PM  19  A.   No.

2:33PM  20  Q.   And as we talked about before, this -- I believe you said

2:33PM  21  this is the only other documentation besides the CyberTip

2:33PM  22  report itself, and I don't see anything here that breaks down

2:33PM  23  kind of who did what.

2:33PM  24  A.   Right.

2:33PM  25  Q.   So is it fair to say there is no such documentation that

GUIZZOTTI - CROSS-EXAMINATION

2:33PM 1    identifies who did which review?

2:33PM 2    A.    Correct.

2:33PM 3    Q.    Okay.  Okay.  The next column says full archive,

2:33PM 4    parenthetical, all chapters, reviewed and submitted, and in

2:34PM 5    parenthetical, including pending, yes, no.  What is that

2:34PM 6    referring to?

2:34PM 7    A.    So that is if all -- all of the archives, so 167 images

2:34PM 8    would have been the archive in total.  We break that down by

2:34PM 9    chapters.  In 167 images, there wouldn't be chapters.  Say if

2:34PM 10   there were 10,000 images, we break our chapters down by a

2:34PM 11   thousand.  In this case, there would only be one chapter, and

2:34PM 12   all of them were reviewed.

2:34PM 13   Q.    But as we just discussed, we don't know which agent

2:34PM 14   reviewed which images?

2:34PM 15   A.    Correct.

2:34PM 16   Q.    The next column is YID deactivated and legal notes added

2:34PM 17   in AMT.  What does that refer to?

2:34PM 18   A.    So we deactivated the account upon -- following the CP,

2:35PM 19   and then we added the legal notes, and that is to preserve the

2:35PM 20   account.  Since a deactivated account for Yahoo could

2:35PM 21   essentially be purged within 30 days, we want to preserve the

2:35PM 22   information longer on these accounts.

2:35PM 23   Q.    Okay.  So YID refers to Yahoo ID?

2:35PM 24   A.    Yes.

2:35PM 25   Q.    What is does AMT refer to?

GUIZZOTTI - CROSS-EXAMINATION

2:35PM  1    A.    It's our internal account tool.

2:35PM  2    Q.    And what does that mean?  Can you elaborate on that?

2:35PM  3    A.    It's where the person's email would be say -- their

2:35PM  4    account email would be, their name would be, and maybe like

2:35PM  5    their registration IP would be, just like very basic details of

2:35PM  6    their account.  It's an internal tool.

2:35PM  7    Q.    But it allows for the adding of legal notes?

2:35PM  8    A.    Correct.

2:35PM  9    Q.    Who adds those legal notes?

2:35PM  10   A.    The trust and safety agent.

2:35PM  11   Q.    So is it fair to say there is another piece of Yahoo

2:36PM  12   software that has additional information about it?  If this

2:36PM  13   says legal notes were added to AMT, it would have additional

2:36PM  14   information about, for instance, the CyberTip reporting?

2:36PM  15   A.    It would not have the CyberTip or even the basis of why.

2:36PM  16   The only legal note would be a preservation note, like, "Don't

2:36PM  17   purge in 30 days."

2:36PM  18   Q.    Is that because that is the only note that the system

2:36PM  19   allows for, the AMT system allows for?

2:36PM  20   A.    I don't know.

2:36PM  21   Q.    I guess I'm asking can somebody go into the AMT system and

2:36PM  22   type a narrative of findings or information or work done or

2:36PM  23   anything about this particular investigation?

2:36PM  24   A.    I don't know.

2:36PM  25   Q.    Have you ever seen legal notes in AMT, what it looks like?

GUIZZOTTI - CROSS-EXAMINATION

2:36PM    1    **A.**    I have.

2:36PM    2    **Q.**    Okay.  What does it look like?

2:36PM    3    **A.**    It's a box that we -- I mean, yes.  I guess it's text box

2:37PM    4    that we write, like, the date and time and preservation.

2:37PM    5    **Q.**    When you say "we," do you mean trust and safety --

2:37PM    6    **A.**    Trust and safety agents, yes.

2:37PM    7    **Q.**    Legal notes, for instance, would not include notes from

2:37PM    8    Yahoo's counsel?

2:37PM    9    **A.**    Right.  It would only be the agent that deactivated the

2:37PM   10    account.

2:37PM   11        **THE COURT:**  Mr. Centrone, just in the interests of

2:37PM   12    making sure that we stay on a course that leads us to a -- in

2:37PM   13    the end conclusion or evidence and testimony dealing with

2:37PM   14    pertinent matters, I've allowed you a lot of latitude here to

2:37PM   15    inquire about a number ancillary matters having to do with

2:37PM   16    Defense Exhibit I.  With respect to any further questions,

2:37PM   17    you'll have to establish some relevancy here.

2:37PM   18        **MR. CENTRONE:**  I appreciate the latitude, Your Honor,

2:37PM   19    and, again, because I have only seen this document for the

2:38PM   20    first time, I am asking some questions just to familiarize

2:38PM   21    myself.  Now it appears there may be additional notes

2:38PM   22    somewhere, but unless I'm mistaken, the Government doesn't have

2:38PM   23    those.  I don't know if Yahoo's counsel brought them.  So at

2:38PM   24    this point I think I've gotten everything I need on that

2:38PM   25    particular question.  There's one more column that is blank,

GUIZZOTTI - CROSS-EXAMINATION

2:38PM   1   and that's my last question about this document.

2:38PM   2           THE COURT:  Okay.  Ms. Favorit, as to any other

2:38PM   3   documents, are you aware of any other documents --

2:38PM   4           MS. FAVORIT:  I am not aware, Your Honor.

2:38PM   5           THE COURT:  -- from your discussions or interactions

2:38PM   6   with Yahoo?

2:38PM   7           MS. FAVORIT:  No, Your Honor.  We didn't discuss

2:38PM   8   outside of this one document being provided this morning that I

2:38PM   9   already explained to Your Honor.

2:38PM  10           THE COURT:  Okay.  Mr. Centrone, at some point the

2:38PM  11   Court will have to take another recess, roughly in 20 minutes.

2:38PM  12   You can confer with Yahoo's counsel or the attorney with Yahoo

2:38PM  13   who's here today, as I understand it, and remains in the

2:39PM  14   gallery about whether there are any other documents, but even

2:39PM  15   if you're to be given the documents, I just want to make sure

2:39PM  16   that there's a reason to inquire in such great detail about

2:39PM  17   each item in the document.

2:39PM  18           MR. CENTRONE:  I appreciate that, Your Honor, and I

2:39PM  19   will do that.  Again, given that I haven't been provided these

2:39PM  20   documents before and Yahoo is represented by outside counsel so

2:39PM  21   I can't pick up the phone and ask somebody at Yahoo these

2:39PM  22   questions, this is the best opportunity to not have to reinvent

2:39PM  23   the wheel down the road and hopefully save us time down the

2:39PM  24   road as well.

2:39PM  25           But, again, with respect to this document and

Tana J. Hess, CRR, RMR, FCRR
U.S. District Court Reporter
Middle District of Florida

GUIZZOTTI - CROSS-EXAMINATION

| | | |
|---|---|---|
| 2:39PM | 1 | I'm not aware of any other documents -- |
| 2:39PM | 2 | THE COURT:  Which is Defense Exhibit I? |
| 2:39PM | 3 | MR. CENTRONE:  Correct, sir.  There's only one column |
| 2:39PM | 4 | left, and it appears to be blank. |
| 2:39PM | 5 | THE COURT:  Okay.  If you could proceed with some |
| 2:39PM | 6 | reasonable dispatch here. |
| 2:39PM | 7 | MR. CENTRONE:  Thank you, sir.  I should be able to |
| 2:39PM | 8 | finish by 3:00 for your hearing, Your Honor. |
| 2:39PM | 9 | THE COURT:  I would hope so. |
| 2:39PM | 10 | BY MR. CENTRONE: |
| 2:40PM | 11 | Q.  Ms. Guizzotti, on the last page of Defense Exhibit I, |
| 2:40PM | 12 | there's a column that says additional notes, correct? |
| 2:40PM | 13 | A.  Correct. |
| 2:40PM | 14 | Q.  And it appears to be blank -- |
| 2:40PM | 15 | A.  Correct. |
| 2:40PM | 16 | Q.  -- is that correct?  What would normally go in additional |
| 2:40PM | 17 | notes column? |
| 2:40PM | 18 | A.  I really can't think of an example.  Typically it is |
| 2:40PM | 19 | empty. |
| 2:40PM | 20 | Q.  Okay.  This is a -- this is a spreadsheet.  My layman's |
| 2:40PM | 21 | understanding of how a spreadsheet works is they can be changed |
| 2:40PM | 22 | over time and not necessarily capture prior information that |
| 2:40PM | 23 | may have been in some of these columns.  Is that the case here |
| 2:40PM | 24 | as well? |
| 2:40PM | 25 | A.  I don't think it's been altered if that's what you're |

GUIZZOTTI - CROSS-EXAMINATION

2:40PM  1    asking.

2:40PM  2    Q.    And I don't mean anything nefarious.  I just mean updated

2:40PM  3    and information that may have been blank or different or may

2:40PM  4    have changed.

2:40PM  5    A.    But you're right.  It is editable.  It can be edited, yes.

2:40PM  6    Q.    Okay.  I'm going to move on to ask some questions about

2:41PM  7    the Terms of Service, which you should still have up there as

2:41PM  8    Government Exhibit 5.  I think you're looking at the defense

2:41PM  9    exhibits.

2:41PM  10   A.    Oh, my apologies.  I don't have 5 here.

2:41PM  11   Q.    Okay.  I'm going to go ahead and hand you another copy

2:41PM  12   then.

2:41PM  13   A.    Okay.  Thank you.

2:41PM  14        MR. CENTRONE:  If the record can reflect I've handed

2:41PM  15   the witness a copy of Government's Exhibit 5, which is the

2:41PM  16   Yahoo Terms of Service that were discussed earlier.  I would

2:41PM  17   note that I marked on that particular copy, but no words, just

2:41PM  18   some symbols.

2:41PM  19   BY MR. CENTRONE:

2:41PM  20   Q.    With respect to the Terms of Service that you discussed

2:41PM  21   earlier about the uploading of material that violates Yahoo's

2:42PM  22   terms of service, nothing in that term indicates that the

2:42PM  23   information will be disclosed to law enforcement, correct?

2:42PM  24   A.    Correct.

2:42PM  25   Q.    Okay.  And Yahoo's internal procedure is simply to disable

GUIZZOTTI - CROSS-EXAMINATION

| | | |
|---|---|---|
| 2:42PM | 1 | the account, correct? |
| 2:42PM | 2 | A.   Correct. |
| 2:42PM | 3 | Q.   Okay.  All right.  My last area of questioning is about |
| 2:42PM | 4 | the -- the discussion had earlier about the log-in, which |
| 2:42PM | 5 | there's a copy of the relevant log-in that was provided here as |
| 2:42PM | 6 | Defense Exhibit D in that binder.  Do you have that in front of |
| 2:42PM | 7 | you? |
| 2:42PM | 8 | A.   I do. |
| 2:42PM | 9 | Q.   So this is a list of the log-ins related to the vladlover |
| 2:43PM | 10 | Yahoo account that's at issue in this case, correct? |
| 2:43PM | 11 | A.   Correct. |
| 2:43PM | 12 | Q.   And this reflects the date and time that the |
| 2:43PM | 13 | information -- that the account was logged into? |
| 2:43PM | 14 | A.   Yes. |
| 2:43PM | 15 | Q.   And this shows a final log-in of September 5th, correct, |
| 2:43PM | 16 | at the top of that page? |
| 2:43PM | 17 | A.   That's correct. |
| 2:43PM | 18 | Q.   And just to clarify, September 5th, 2020, correct? |
| 2:43PM | 19 | A.   Yes. |
| 2:43PM | 20 | Q.   And that's preceded by daily log-ins in the few days |
| 2:43PM | 21 | leading up to September 5th, such as a log-in on August 31st, |
| 2:43PM | 22 | September 1st, September 2nd, September 3rd, and September 4th. |
| 2:43PM | 23 | Do I understand that correctly? |
| 2:43PM | 24 | A.   Yes. |
| 2:43PM | 25 | Q.   So on each of those days, it would have been logged into, |

GUIZZOTTI - CROSS-EXAMINATION

2:43PM  1    that account, correct?

2:43PM  2    A.    Yes.

2:43PM  3    Q.    Does that mean that the owner of the account must have

2:43PM  4    logged out manually on those other dates if it reflects that he

2:43PM  5    or she is logging back in on September 5th?

2:43PM  6    A.    Yes.

2:43PM  7    Q.    Is Yahoo able to track when an account is either manually

2:44PM  8    or automatically logged out the way it is -- the same way it's

2:44PM  9    able to track log-ins?

2:44PM  10   A.    No.

2:44PM  11   Q.    No, that information does not exist?

2:44PM  12   A.    No.

2:44PM  13   Q.    Okay.  So when you testified earlier about the -- that an

2:44PM  14   account is logged out automatically after two weeks, we don't

2:44PM  15   know that that's what actually happened here, correct?

2:44PM  16   A.    Correct.

2:44PM  17   Q.    We don't know when the account was logged out, correct?

2:44PM  18   A.    No.

2:44PM  19        MR. CENTRONE:  Okay.  Just one moment, Your Honor.

2:44PM  20        THE COURT:  Sure.

2:44PM  21                    (Pause.)

2:45PM  22        MR. CENTRONE:  I have no further questions.  Thank

2:45PM  23   you so much.

2:45PM  24        THE COURT:  Thank you, Mr. Centrone.

2:45PM  25        MR. CENTRONE:  Thank you, Judge.

GUIZZOTTI - RECROSS-EXAMINATION

2:45PM   1    **THE COURT:**  Any redirect, Ms. Favorit?

2:45PM   2    **MS. FAVORIT:**  Briefly, Your Honor.

2:45PM   3    **REDIRECT EXAMINATION**

2:45PM   4    **BY MS. FAVORIT:**

2:45PM   5    **Q.**   On cross-examination, you were told about a donation from

2:45PM   6    Verizon to NCMEC.  Were any special privileges granted to Yahoo

2:45PM   7    because of this donation?

2:45PM   8    **A.**   No.

2:45PM   9    **Q.**   And on these CyberTipline report information submitted by

2:45PM   10   Yahoo to NCMEC, when it says, "Did ESP review entire contents

2:45PM   11   of files uploaded," what does that mean to you?

2:46PM   12   **A.**   That means that we reviewed every image that we are

2:46PM   13   submitting to NCMEC.

2:46PM   14   **Q.**   Is there any evidence in this particular case that the

2:46PM   15   policies were not followed for viewing those images?

2:46PM   16   **A.**   No.

2:46PM   17        **MS. FAVORIT:**  I have no further questions.

2:46PM   18        **THE COURT:**  Thank you.  Any brief recross,

2:46PM   19   Mr. Centrone?

2:46PM   20        **MR. CENTRONE:**  Very briefly, Your Honor.

2:46PM   21   **RECROSS-EXAMINATION**

2:46PM   22   **BY MR. CENTRONE:**

2:46PM   23   **Q.**   My recollection of your testimony was that you were not

2:46PM   24   aware of that $2 million donation?

2:46PM   25   **A.**   That's correct.

Tana J. Hess, CRR, RMR, FCRR
U.S. District Court Reporter
Middle District of Florida

GUIZZOTTI - RECROSS-EXAMINATION

2:46PM  1    Q.   So you don't know whether any special privileges were

2:46PM  2    conveyed or not?

2:46PM  3    A.   I would not have received any.

2:46PM  4    Q.   Okay.  Well, I believe the question was about Yahoo in

2:46PM  5    general, not about --

2:46PM  6    A.   Yahoo in general, that's correct.  I wouldn't know.

2:46PM  7           MR. CENTRONE:  Okay.  Okay.  No further questions.

2:46PM  8    Thank you.

2:46PM  9           THE WITNESS:  Thank you.

2:46PM  10          THE COURT:  If you'll give me a moment.

        11                        (Pause.)

2:47PM  12          THE COURT:  Ms. Guizzotti?

2:47PM  13          THE WITNESS:  Guizzotti, yes.

2:47PM  14          THE COURT:  If you could kindly step down.

2:47PM  15   Mr. Centrone, any reason for Ms. Guizzotti to remain --

2:47PM  16          MR. CENTRONE:  No, Your Honor.  Thank you.

2:47PM  17          THE COURT:  You're excused.  You may head back to

2:47PM  18   Buff State.

2:47PM  19          THE WITNESS:  Thank you.  Go Bills.

        20                        (Witness excused.)

2:47PM  21          THE COURT:  Ms. Favorit, any way we can squeeze in

2:47PM  22   another witness here, at least on direct?

2:47PM  23          MS. FAVORIT:  Your Honor, may I just briefly ask

2:47PM  24   defense his intentions on calling a certain witness or not?

2:47PM  25          THE COURT:  Absolutely.

| | | |
|---|---|---|
| 2:47PM | 1 | MS. FAVORIT:  Thank you. |
| 2:47PM | 2 | (Pause.) |
| 2:48PM | 3 | MS. FAVORIT:  Your Honor, the United States calls |
| 2:48PM | 4 | Jessica Hines. |
| 2:48PM | 5 | THE COURT:  Okay.  Ms. Hines, if you could kindly |
| 2:48PM | 6 | come forward here to my courtroom deputy, who sits to my right, |
| 2:48PM | 7 | your left, she is going to swear you in. |
| 2:48PM | 8 | COURTROOM DEPUTY:  Would you raise your right hand? |
| 2:48PM | 9 | (Witness sworn.) |
| 2:48PM | 10 | COURTROOM DEPUTY:  Would you please state your name |
| 2:48PM | 11 | for the record and spell your last name? |
| 2:48PM | 12 | THE WITNESS:  Jessica Hines, H-i-n-e-s. |
| 2:48PM | 13 | COURTROOM DEPUTY:  Thank you.  You may be seated. |
| 2:49PM | 14 | THE COURT:  Ms. Hines, you'll see when you get on the |
| 2:49PM | 15 | witness stand there that there's a microphone.  If you could |
| 2:49PM | 16 | situate that microphone such that we can clearly hear you. |
| 2:49PM | 17 | THE WITNESS:  Okay. |
| 2:49PM | 18 | THE COURT:  With that, Ms. Favorit, you may proceed. |
| 2:49PM | 19 | MS. FAVORIT:  Thank you, Your Honor. |
| 2:49PM | 20 | JESSICA HINES, |
| 2:49PM | 21 | a witness called on behalf of the Government, being first duly |
| 2:49PM | 22 | sworn, was examined and testified as follows: |
| 2:49PM | 23 | DIRECT EXAMINATION |
| 2:49PM | 24 | BY MS. FAVORIT: |
| 2:49PM | 25 | Q.   Ms. Hines, at some point did you work for Yahoo? |

**HINES - DIRECT EXAMINATION**

2:49PM 1    A.    Yes, I did.

2:49PM 2    Q.    When was that?

2:49PM 3    A.    I believe -- let me think about it real quick.  I've job

2:49PM 4    hopped a little bit, but I believe I started in 2019.

2:49PM 5    Q.    What did you do at Yahoo?

2:49PM 6    A.    In terms -- I had two roles at Yahoo.  First I was an

2:49PM 7    E-crimes investigator, and then I was the senior manager for

2:49PM 8    trust and safety.

2:49PM 9    Q.    What is your educational background?

2:49PM 10    A.    I studied psychology and sociology at Virginia Tech.

2:50PM 11    Q.    And prior to working at Yahoo, did you have any relevant

2:50PM 12    work experience?

2:50PM 13    A.    I believe so, yes.

2:50PM 14    Q.    Could you explain what that might be?

2:50PM 15    A.    Sure.  Prior to working at Yahoo, I worked for the

2:50PM 16    National Center for Missing and Exploited Children within

2:50PM 17    NCMEC's CyberTipline, and then I worked for YouTube as a policy

2:50PM 18    enforcement manager focusing on child safety, and then was an

2:50PM 19    E-crimes investigator at Yahoo.

2:50PM 20    Q.    What was your job description or role at Yahoo as -- was

2:50PM 21    it investigator?

2:50PM 22    A.    Yeah, E-crimes investigator.  I would investigate possible

2:50PM 23    crimes on the platform, generally child safety cases or other

2:51PM 24    types of harmful activity.

2:51PM 25    Q.    What about as a senior manager for trust and safety?

**HINES - DIRECT EXAMINATION**

2:51PM  1    A.    Yes.  For trust and safety, I oversaw the trust and safety

2:51PM  2    team, so I oversaw a group of individuals that reviewed child

2:51PM  3    exploitation material, and that was reported to NCMEC

2:51PM  4    CyberTipline, and also other types of user-generated content,

2:51PM  5    such as maybe comments, that could be abusive to Yahoo's

2:51PM  6    platform.

2:51PM  7    Q.    I'm going to do my best to streamline your testimony

2:51PM  8    because this Court's heard from previous witnesses, but was one

2:51PM  9    of your responsibilities reporting CyberTips to NCMEC?

2:51PM  10   A.    Yes.

2:51PM  11   Q.    Did you work in this capacity in September of 2020?

2:51PM  12   A.    Yes.

2:52PM  13   Q.    What was your role at that time?

2:52PM  14   A.    I believe it was a policy manager-- or sorry, the senior

2:52PM  15   manager for trust and safety.

2:52PM  16   Q.    Does that mean you were generating reports for NCMEC?

2:52PM  17   A.    Yes.

2:52PM  18   Q.    I want to show you Government Exhibit Number 1.  I'm going

2:52PM  19   to walk up and see if you have that in front of you.  Do you

2:52PM  20   recognize this document?

2:52PM  21   A.    I recognize it as a CyberTip, but to the specific one, not

2:52PM  22   necessarily.

2:52PM  23   Q.    About how many CyberTips while working at Yahoo would you

2:52PM  24   have submitted to NCMEC approximately?

2:52PM  25   A.    I would estimate in the hundreds, possibly over a thousand

**HINES - DIRECT EXAMINATION**

2:53 PM 1    CyberTips.

2:53 PM 2    Q.    Because we are here today and you are testifying, are you

2:53 PM 3    aware if you were the individual who submitted the CyberTip

2:53 PM 4    79384716?

2:53 PM 5    A.    For the reason why I'm here, yes.

2:53 PM 6    Q.    Do you have any independent recollection of submitting

2:53 PM 7    that CyberTip?

2:53 PM 8    A.    I do not.

2:53 PM 9    Q.    If you were to review this CyberTip, would that refresh

2:53 PM 10   your recollection?

2:53 PM 11   A.    No.

2:53 PM 12   Q.    Based on Yahoo records, were you listed as the individual

2:53 PM 13   who submitted this CyberTip report?

2:53 PM 14   A.    If Yahoo indicated that I did, then I probably did.

2:54 PM 15   Q.    Speaking specifically to this CyberTipline, I'm going to

2:54 PM 16   be a little bit more general since you don't have that

2:54 PM 17   independent recollection.  Did you help your team submit

2:54 PM 18   reports to NCMEC?

2:54 PM 19   A.    Yes.

2:54 PM 20   Q.    If you were submitting that report, what information would

2:54 PM 21   you have from Yahoo to give to NCMEC?

2:54 PM 22   A.    NCMEC would receive images from an account that was

2:54 PM 23   flagged and reviewed for child exploitation material as well as

2:54 PM 24   certain account information and possible -- the transmission

2:54 PM 25   information, the transmission details.

HINES - DIRECT EXAMINATION

2:54PM  1    Q.    Were the images or attachments to this report reviewed by

2:54PM  2    you before submitting to NCMEC?

2:54PM  3    A.    Yes.

2:54PM  4    Q.    Did you ever not review the images or videos that are

2:55PM  5    attached to the CyberTip reports?

2:55PM  6    A.    No.

2:55PM  7    Q.    Would that have been in violation of your policy as a

2:55PM  8    trust and safety moderator at Yahoo?

2:55PM  9    A.    Yes.

2:55PM  10   Q.    Does only one person review the information before

2:55PM  11   submitting reports to NCMEC?

2:55PM  12   A.    Not necessarily.

2:55PM  13   Q.    Is there any system of checks and balances before

2:55PM  14   submitting a report?

2:55PM  15   A.    Yes.

2:55PM  16   Q.    Would that involve another individual looking at these

2:55PM  17   images or the report?

2:55PM  18   A.    Yes.

2:55PM  19   Q.    I want to reference again Government Exhibit 1, and I'm

2:55PM  20   going to go to the fifth page of the exhibit.

2:55PM  21   A.    Is that the CyberTipline fifth page, or is it the actual

2:55PM  22   fifth page?

2:55PM  23   Q.    It's the third line of the CyberTipline and the fifth page

2:56PM  24   of the document.

2:56PM  25   A.    Okay.

**HINES - DIRECT EXAMINATION**

2:56PM  1   Q.   Okay.  Not specifically this CyberTip, but do you

2:56PM  2   recognize the contents where it says "uploaded file" and what

2:56PM  3   that might contain?

2:56PM  4   A.   Yes.

2:56PM  5   Q.   There's a question here.  "Did reporting ESP view entire

2:56PM  6   contents of uploaded file?"  Do you recognize that question?

2:56PM  7   A.   Yes.

2:56PM  8   Q.   Is that something that you working at Yahoo would have

2:56PM  9   entered as part of the report?

2:56PM  10  A.   Yes.

2:56PM  11  Q.   The response here is, "Yes."  What does that mean to you

2:56PM  12  as a previous trust and safety moderator at Yahoo?

2:56PM  13  A.   That I reviewed the files that were submitted in this

2:56PM  14  report.

2:56PM  15  Q.   Is it possible that the "yes" was an accident?

2:56PM  16  A.   No.

2:56PM  17  Q.   Why not?

2:57PM  18          MR. CENTRONE:  Objection.  She's asking questions

2:57PM  19  about a document this witness already says she has no

2:57PM  20  recollection of.

2:57PM  21          THE COURT:  Overruled.  She's testified --

2:57PM  22          MR. CENTRONE:  These are --

2:57PM  23          THE COURT:  If I could just address the objection.

2:57PM  24  She's testified generally that she's aware of the reports and

2:57PM  25  the system or processes in place, so on that grounds, I'm going

**HINES - DIRECT EXAMINATION**

2:57PM  1    to allow the question and the answer.  I'll take it for what

2:57PM  2    it's worth, and you can explore the matter on cross if you

2:57PM  3    wish, Mr. Centrone.

2:57PM  4                    You may proceed Ms. Favorit.

2:57PM  5                    MS. FAVORIT:  Thank you, Your Honor.

2:57PM  6    BY MS. FAVORIT:

2:57PM  7    Q.   You can answer the question, which I believe was what does

2:57PM  8    that mean to you, that the answer is "yes" here?

2:57PM  9    A.   That I had reviewed the images in this report.

2:57PM  10   Q.   And if you had generated a report and not answer as yes,

2:57PM  11   what does that mean to you?

2:57PM  12   A.   That I reviewed the files in this report.

2:58PM  13   Q.   Did you as a trust and safety moderator call law

2:58PM  14   enforcement when child sexual abuse material was discovered?

2:58PM  15   A.   No.

2:58PM  16   Q.   Did you ever call NCMEC in that same role before

2:58PM  17   submitting these reports?

2:58PM  18   A.   No.

2:58PM  19   Q.   In your role as Yahoo trust and safety moderator, did you

2:58PM  20   ever determine the actionability of these images?

2:58PM  21   A.   Can you rephrase?

2:58PM  22   Q.   Did you determine what to do with these images apart from

2:58PM  23   submitting a report?

2:58PM  24   A.   Just reporting the files.

2:58PM  25   Q.   Would you have any other role after a NCMEC report was

**HINES - DIRECT EXAMINATION**

2:59PM  1    submitted?

2:59PM  2    **A.**    No.

2:59PM  3            **MS. FAVORIT:**  I don't have any further questions.

2:59PM  4            **THE COURT:**  Thank you.  Any cross-examination,

2:59PM  5    Mr. Centrone?

2:59PM  6            **MR. CENTRONE:**  I do, Judge, but it's now 3:00.  Did

2:59PM  7    you want to have your 3:00 hearing or --

2:59PM  8            **THE COURT:**  How much cross do you have?

2:59PM  9            **MR. CENTRONE:**  Probably about 10 or 15 minutes.

2:59PM  10           **THE COURT:**  Okay.  We'll take a recess.  I can't tell

2:59PM  11   you that -- exactly how long it'll take.  If you could move

2:59PM  12   your materials to the side to allow counsel for the next case

2:59PM  13   to come forward.  Mr. Centrone, you've got plenty of room to

2:59PM  14   your right, my left.  Ms. Favorit and Ms. King, it will be a

2:59PM  15   little more challenging on your end, but I'm sure you can

2:59PM  16   accommodate counsel.  If counsel would stay close by.

2:59PM  17           Ms. Hines, you may step down.  You're still

2:59PM  18   under oath.  Ms. Favorit since you concluded your direct

2:59PM  19   examination, the ordinary practice would be that the witness is

3:00PM  20   now Mr. Centrone's, and you're not allowed to speak to the

3:00PM  21   witness.  Any reason to think that wouldn't be the appropriate

3:00PM  22   course here?

3:00PM  23           **MS. FAVORIT:**  No, Your Honor.  I have no reason to

3:00PM  24   speak to the witness.

3:00PM  25           **THE COURT:**  Okay.  We'll be in recess on that case.

HINES - CROSS-EXAMINATION

| | |
|---|---|
| | 1 |  (Recess from 3:00 p.m. to 3:43 p.m.) |

3:43 PM  2    THE COURT:  Good afternoon, everyone.  I believe we

3:43 PM  3  finished -- or no, we didn't.  Mr. Centrone, you're

3:44 PM  4  cross-examining Ms. Hines?

3:44 PM  5    MR. CENTRONE:  Correct, Your Honor.  Thank you.

3:44 PM  6    THE COURT:  Okay.  You may proceed, Mr. Centrone.

3:44 PM  7    MR. CENTRONE:  Thank you.

3:44 PM  8    THE COURT:  Ms. Hines, I'll remind you, you're still

3:44 PM  9  under oath.

3:44 PM  10    CROSS-EXAMINATION

3:44 PM  11    BY MR. CENTRONE:

3:44 PM  12  Q.  Good afternoon, Ms. Hines.  I know you've got a flight to

3:44 PM  13  catch, so I'm going to be as quick as I possibly can.  I just

3:44 PM  14  want to reiterate for the record, you have no personal

3:44 PM  15  recollection of CyberTip report number 79384716, correct?

3:44 PM  16  A.  Correct.

3:44 PM  17  Q.  And no personal recollection of reviewing the images

3:44 PM  18  associated with that CyberTip, correct?

3:44 PM  19  A.  Correct.

3:44 PM  20  Q.  Your testimony on direct was effectively you -- and please

3:44 PM  21  correct me if I'm misstating it, but I understood your

3:44 PM  22  testimony to be on direct that effectively you believe you

3:45 PM  23  reviewed the images because you always viewed the images with

3:45 PM  24  respect to a CyberTip report.  Is that a fair characterization?

3:45 PM  25  A.  Yes.

**HINES - CROSS-EXAMINATION**

3:45 PM   1   Q.   What policies or procedures does Yahoo have in place to

3:45 PM   2   ensure that such images are viewed before a CyberTipline is

3:45 PM   3   submitted?

3:45 PM   4   A.   I think in terms of physically submitting the report, you

3:45 PM   5   cannot go to the submission stage without selecting files.

3:45 PM   6   Q.   And when you say select files, what does that mean?

3:45 PM   7   A.   Individually clicking each image that I viewed and

3:45 PM   8   selecting them to be sent to NCMEC.

3:45 PM   9   Q.   So you're attaching files to the CyberTip report to

3:46 PM   10  those -- what does that look like on your screen?  Are they

3:46 PM   11  file names?  Are they thumbnails?  Are they -- you know, I've

3:46 PM   12  seen icons of an image instead of the image itself on computer

3:46 PM   13  screens.  What does that actually look like?

3:46 PM   14  A.   It's a gallery view of all of the images that were

3:46 PM   15  archived for that account.  So it is image thumbnails in files

3:46 PM   16  that are visually on the screen, kind of like in a gallery-type

3:46 PM   17  viewer.

3:46 PM   18  Q.   How big are those images?

3:46 PM   19  A.   I mean, it depends on how you have your screen formatted,

3:46 PM   20  but there is the ability to get the files, like, larger and

3:46 PM   21  enhance them to full screen, but generally it depends on how

3:47 PM   22  the computer screen is formatted.

3:47 PM   23  Q.   And you said that archive contains all of the images from

3:47 PM   24  that account, correct?

3:47 PM   25  A.   The archive contains all of the images, but there's, like,

HINES - CROSS-EXAMINATION

3:47PM   1   file limits on each page so you can, like, scroll through.

3:47PM   2   Q.   So X number of files per page; is that what you're saying?

3:47PM   3   A.   (Witness nodding head affirmatively.)

3:47PM   4   Q.   Does it also list the file names?

3:47PM   5   A.   I believe -- yes, the tool does allow at the time a view

3:47PM   6   of the file names.

3:47PM   7   Q.   To ask it another way, are you looking at the file names

3:47PM   8   to choose which images to attach, or are you looking at the

3:47PM   9   pictures and going by the content of the pictures?

3:47PM  10   A.   The pictures.

3:47PM  11   Q.   Not the file names?

3:47PM  12   A.   Correct.

3:47PM  13   Q.   Okay.  My understanding from some earlier testimony is

3:48PM  14   that if a photo is quote-unquote, you know, in a "gray area",

3:48PM  15   there would be a legal call regarding whether to attach that

3:48PM  16   image to a CyberTip report from Yahoo.  Is that your

3:48PM  17   recollection as well from having worked there?

3:48PM  18   A.   Can you just ask one more time?  I'm sorry.

3:48PM  19   Q.   Sure.  My understanding from earlier testimony was that if

3:48PM  20   an image is quote-unquote "gray area" -- in other words, if a

3:48PM  21   trust and safety moderator is not sure whether an image is

3:48PM  22   CSAM, it should be -- it would be subject to a legal call and

3:48PM  23   discussed, I take it, with somebody from the legal department

3:48PM  24   to review that image prior to submitting it to NCMEC.  Did you

3:48PM  25   ever participate in those kind of meetings?

HINES - CROSS-EXAMINATION

3:48PM   1   A.   Yes, the calibrations, yes.

3:48PM   2   Q.   If you -- if you go to the binder in front of you, Defense

3:49PM   3   Exhibit A is another copy of the same CyberTip report.  It's an

3:49PM   4   identical copy to the Government's Exhibit 1 that you looked at

3:49PM   5   earlier.

3:49PM   6          And I'm going to draw your attention to what's

3:49PM   7   identified at the top as page six, Section B of the CyberTip

3:49PM   8   report.  Let me know when you have that in front of you.

3:49PM   9   A.   Yep, I have Section B in front of me.

3:49PM   10  Q.   At the bottom, the section that says "Files and

3:49PM   11  Categorization," there's one of the files, image.120-jpeg.  Do

3:49PM   12  you see that?

3:49PM   13  A.   Yes.

3:49PM   14  Q.   And that's categorized as child clothed, and I'll

3:49PM   15  represent to you that it was not identified as child

3:50PM   16  pornography.  Why would that have been included in the

3:50PM   17  submission to -- on the CyberTip report if it was not child

3:50PM   18  pornography?

3:50PM   19  A.   There are instances in which there could be files that

3:50PM   20  still are of child sexual exploitation that may not have a

3:50PM   21  minor that is nude, so based on my evaluation of that file, I

3:50PM   22  included it in the CyberTip report.

3:50PM   23  Q.   But you have no personal memory of that or what is -- what

3:50PM   24  the contents of that photo are, correct?

3:50PM   25  A.   I do not, no.

**HINES - CROSS-EXAMINATION**

3:50 PM  1    Q.    All right.  Do you remember having a legal call about this

3:50 PM  2    case?

3:50 PM  3    A.    I do not, no.

3:50 PM  4    Q.    Okay.  In the front pocket of that binder is what's been

3:51 PM  5    marked as Defense Exhibit I, which is a -- what's been

3:51 PM  6    described to us as a tracker report from Yahoo.  Are you

3:51 PM  7    familiar with this kind of document generally from your time at

3:51 PM  8    Yahoo?

3:51 PM  9    A.    Yes.

3:51 PM  10   Q.    Okay.  If you flip to page 2, there's a column that says

3:51 PM  11   "Archiving Agent, Jessie."  Is that how you were referred to in

3:51 PM  12   the Yahoo system, Jessie?

3:51 PM  13   A.    Yes.

3:51 PM  14   Q.    Okay.  And there's another column that says "Agent

3:51 PM  15   Reviewing Archive, Chris."  Do you know who that's referring

3:51 PM  16   to?

3:51 PM  17   A.    Yes.

3:51 PM  18   Q.    Who was that referring to?

3:51 PM  19   A.    It was a former Yahoo employee on the trust and safety

3:51 PM  20   team.

3:51 PM  21   Q.    And what was his name?

3:51 PM  22   A.    I forgot his last name, but his name was Chris.  I'm

3:51 PM  23   sorry.

3:51 PM  24   Q.    In between those columns, there's a column that says

3:51 PM  25   "Number of Images, 167," and we heard testimony earlier that

HINES - CROSS-EXAMINATION

3:52 PM  1    that would have been the total number of images associated with

3:52 PM  2    the email account at issue; is that your understanding as well?

3:52 PM  3    A.    Yes.

3:52 PM  4    Q.    Okay.  And not all of those images would have been

3:52 PM  5    submitted as part of the CyberTipline report; just that that

3:52 PM  6    would be the total number of images at all connected with the

3:52 PM  7    account.  Is that your understanding as well?

3:52 PM  8    A.    Correct.

3:52 PM  9    Q.    And then presumably seven of those images were the images

3:52 PM  10   that were associated with the CyberTipline report; would that

3:52 PM  11   be correct?

3:52 PM  12   A.    Yes.

3:52 PM  13   Q.    Okay.  Between yourself and Chris -- which, by the way,

3:52 PM  14   does the name Chris Wayne ring a bell for you?

3:52 PM  15   A.    Yes.

3:52 PM  16   Q.    Would that be the Chris that this is referring to?

3:52 PM  17   A.    Correct.

3:52 PM  18   Q.    Okay.  Between yourself and Chris, who would have reviewed

3:52 PM  19   which images?  Do you have any way of knowing that?

3:53 PM  20   A.    For the archiving agent, I would have -- or so -- let me

3:53 PM  21   go back.  Chris and I would have had the -- both have the

3:53 PM  22   opportunity to review the images that were reported.

3:53 PM  23   Q.    It's your testimony that both of you would have reviewed

3:53 PM  24   all of the 167 images identified in this report?

3:53 PM  25   A.    As I interpret this, that Chris would have been the one

HINES - CROSS-EXAMINATION

| | | |
|---|---|---|
| 3:53 PM | 1 | reviewing the images in this report. |
| 3:53 PM | 2 | Q.   Chris would have reviewed the images in the CyberTipline |
| 3:53 PM | 3 | report, not yourself? |
| 3:53 PM | 4 | A.   I would have been -- like, as I see this document, I would |
| 3:53 PM | 5 | have been the one to have archived -- to review the email that |
| 3:53 PM | 6 | was transmitted and flagged for images, and then Chris Wayne |
| 3:54 PM | 7 | would have been the individual that would have reviewed and |
| 3:54 PM | 8 | submitted the CyberTipline report. |
| 3:54 PM | 9 | Q.   So looking at the document now, you don't believe you were |
| 3:54 PM | 10 | the one who submitted this CyberTipline report? |
| 3:54 PM | 11 | A.   Based on this document, it would have been Chris that |
| 3:54 PM | 12 | would submit the CyberTipline report. |
| 3:54 PM | 13 | Q.   Okay.  You're no longer working for Yahoo, correct? |
| 3:54 PM | 14 | A.   Correct. |
| 3:54 PM | 15 | Q.   And were you terminated, or did you leave freely? |
| 3:54 PM | 16 | A.   I left freely. |
| 3:54 PM | 17 | Q.   Okay.  Did you ever receive any disciplinary action while |
| 3:54 PM | 18 | you were there? |
| 3:54 PM | 19 |         MS. FAVORIT:  Objection.  Relevance. |
| 3:54 PM | 20 |         THE COURT:  Overruled. |
| 3:54 PM | 21 |         THE WITNESS:  No. |
| 3:54 PM | 22 | BY MR. CENTRONE: |
| 3:54 PM | 23 | Q.   Did you testify earlier that you were an E-crimes |
| 3:54 PM | 24 | investigator?  Was that with Yahoo as well? |
| 3:54 PM | 25 | A.   Yes. |

**HINES - CROSS-EXAMINATION**

3:54PM 1    Q.   Okay.  Would that be someone who investigates information

3:54PM 2    that came from CyberTips?  What does an E-crimes investigator

3:55PM 3    do?

3:55PM 4    A.   Yes, they provide additional analysis on CyberTipline

3:55PM 5    reports for the more egregious cases.

3:55PM 6    Q.   And is that information transmitted to law enforcement?

3:55PM 7    A.   No.  That information is sent to NCMEC.

3:55PM 8    Q.   To NCMEC.  Okay.  Would this be referring to supplemental

3:55PM 9    reports, so-called supplemental reports from -- from Yahoo that

3:55PM 10   come after a CyberTipline report?

3:55PM 11   A.   Yes.

3:55PM 12   Q.   And the information comes -- goes to NCMEC.  Yahoo is

3:55PM 13   under no obligation to do that, correct?

3:55PM 14   A.   No, it's voluntary.

3:55PM 15   Q.   Okay.  And you previously worked for NCMEC.  Can you

3:55PM 16   refresh my memory of when that was?

3:55PM 17   A.   So long ago.  I believe I started in 2012 and left in

3:55PM 18   2019.

3:55PM 19   Q.   And what did you do when you were there?

3:56PM 20   A.   I was an analyst within the CyberTipline, and then I

3:56PM 21   was -- when I left, I was in -- the supervisor for electronic

3:56PM 22   service provider relations.

3:56PM 23   Q.   And why -- just briefly, why did you leave NCMEC?

3:56PM 24   A.   I had a really nice offer from Google.

3:56PM 25   Q.   Oh, it was from Google?  So you didn't leave to join

**HINES - CROSS-EXAMINATION**

| | | |
|---|---|---|
| 3:56PM | 1 | Yahoo?  You left to join Google? |
| 3:56PM | 2 | **A.**   Yes.  Google owns YouTube. |
| 3:56PM | 3 | **Q.**   Okay.  Do I understand correctly you're now working with |
| 3:56PM | 4 | Amazon? |
| 3:56PM | 5 | **A.**   Yes. |
| 3:56PM | 6 | **Q.**   Okay.  What is your current work? |
| 3:56PM | 7 | **A.**   I am a policy -- a senior policy manager focusing on child |
| 3:56PM | 8 | safety. |
| 3:56PM | 9 | **MR. CENTRONE:**  Okay.  Just one moment, Your Honor. |
| 3:56PM | 10 | **THE COURT:**  Sure. |
| 3:56PM | 11 | (Pause.) |
| 3:57PM | 12 | **MR. CENTRONE:**  No further questions.  Thank you so |
| 3:57PM | 13 | much. |
| 3:57PM | 14 | **THE COURT:**  Thank you.  Any redirect, Ms. Favorit? |
| 3:57PM | 15 | **MS. FAVORIT:**  No, Your Honor. |
| 3:57PM | 16 | **THE COURT:**  Thank you.  Ms. Hines, you may step down. |
| 3:57PM | 17 | Any reason for Ms. Hines to remain, Mr. Centrone? |
| 3:57PM | 18 | **MR. CENTRONE:**  Not for me, Your Honor. |
| 3:57PM | 19 | **THE COURT:**  Ms. Favorit? |
| 3:57PM | 20 | **MS. FAVORIT:**  No, Your Honor. |
| 3:57PM | 21 | **THE COURT:**  Thank you.  Ms. Hines, you may step down, |
| 3:57PM | 22 | and you're excused. |
| 3:57PM | 23 | **THE WITNESS:**  Thank you. |
| 3:57PM | 24 | **THE COURT:**  Thank you. |
| 3:57PM | 25 | (Witness excused.) |

3:57 PM  1    THE COURT:  Ms. Favorit, if you want to call your

3:57 PM  2  next witness?

3:57 PM  3    MS. FAVORIT:  Your Honor, the next witness would be

3:57 PM  4  Detective Keller, which AUSA King is going to do.  I know we

3:57 PM  5  consulted with defense.  I wasn't sure how long Your Honor

3:57 PM  6  intended on remaining in court today.  I don't know that we

3:58 PM  7  would finish him in an hour with those questions, and I do

3:58 PM  8  believe Ms. King is going to discuss <u>Franks</u> prior to his

3:58 PM  9  testimony being presented.

3:58 PM  10    THE COURT:  I'm going to hear from Mr. Keller today.

3:58 PM  11  We'll see how far we go.  We'll probably go to 5:00, so we can

3:58 PM  12  begin.

3:58 PM  13    MS. KING:  And then, Your Honor, just a matter of

3:58 PM  14  housekeeping.  The United States is ready to call Detective

3:58 PM  15  Keller.  However, there has not been a ruling by this Court as

3:58 PM  16  to whether the <u>Franks</u> hearing -- whether the predicate has been

3:58 PM  17  met by defense and the Government is expected to move forward

3:58 PM  18  with the <u>Franks</u> hearing.  I am prepared to go forward with that

3:58 PM  19  testimony as well if the Court does make that ruling today.

3:58 PM  20    THE COURT:  I've explained, I think, to the parties,

3:58 PM  21  it's a situation when the matter is before the Court on -- in

3:58 PM  22  this case, myself, on a Report and Recommendation.  So I think

3:58 PM  23  what I indicated to the parties previously and I'll just

3:59 PM  24  reiterate today is just to move forward on all aspects of the

3:59 PM  25  <u>Franks</u> hearing.  I don't think it's that complicated.  I can't

| | |
|---|---|
| 3:59 PM | 1 |

3:59 PM 1 make a definitive ruling because it's a Report and

3:59 PM 2 Recommendation, and what I want to avoid is having the matter

3:59 PM 3 to go up to Judge Jung and for whatever reason, for it to come

3:59 PM 4 back down, and then we would be here all over again.

3:59 PM 5 So I understand the parameters of the Franks

3:59 PM 6 hearing.  I've conducted them before.  I just think in the

3:59 PM 7 interests of judicial economy and scarce judicial resources

3:59 PM 8 that we just move forward.

3:59 PM 9 You can make your arguments at the end of the

3:59 PM 10 hearing about where the cutoff should be and whether it's

3:59 PM 11 pertinent that that testimony has been elicited, but I just

3:59 PM 12 think if -- looking at the big picture here, it just makes the

3:59 PM 13 most sense to do it that way so that we're not sending the

4:00 PM 14 matter up to the Judge and having it come back down.

4:00 PM 15 I've looked at a number of cases that you'll

4:00 PM 16 find if you look online.  Many courts have proceeded that way.

4:00 PM 17 I think that just makes the most sense here.  I'm not

4:00 PM 18 intimating that in every case I would do it, but Mr. Keller is

4:00 PM 19 going to be on the stand.  I suspect there's going to be areas

4:00 PM 20 of cross-examination which may cut into Franks-related matters

4:00 PM 21 which arguably would come in anyway, and rather than parse this

4:00 PM 22 with a fine scalpel on each of those matters, we could be here

4:00 PM 23 much longer just doing that alone.  So why don't we just

4:00 PM 24 proceed on the full ambit of a Franks hearing?

4:00 PM 25 Mr. Centrone, you're well aware that you have

| | | |
|---|---|---|
| 4:00PM | 1 | some obligations under <u>Franks</u> to make a showing, and just to |
| 4:00PM | 2 | reiterate something that I mentioned to the parties previously, |
| 4:00PM | 3 | is that the Court anticipates having the parties submit |
| 4:00PM | 4 | post-hearing submissions, which includes the <u>Franks</u>.  So, |
| 4:01PM | 5 | Mr. Centrone, you'll have to address certain matters that are |
| 4:01PM | 6 | with respect to the <u>Franks</u> hearing, including materiality as I |
| 4:01PM | 7 | recall, but the weight to that. |
| 4:01PM | 8 | Ms. King, when you're ready. |
| 4:01PM | 9 | MS. KING:  Thank you, Your Honor.  If I could have |
| 4:01PM | 10 | just one more moment. |
| 4:01PM | 11 | THE COURT:  Sure. |
| 4:01PM | 12 | (Pause.) |
| 4:02PM | 13 | MS. KING:  Your Honor, at this time -- |
| 4:02PM | 14 | THE COURT:  Are you prepared to proceed? |
| 4:02PM | 15 | MS. KING:  Yes.  Thank you, Your Honor.  At this time |
| 4:02PM | 16 | the United States would called Detective James Keller. |
| 4:02PM | 17 | THE COURT:  Okay, Mr. Keller, Detective, if you could |
| 4:02PM | 18 | kindly come forward as with the other witnesses, take the oath |
| 4:02PM | 19 | with my courtroom deputy. |
| 4:02PM | 20 | COURTROOM DEPUTY:  Please raise your right hand. |
| 4:02PM | 21 | (Witness sworn.) |
| 4:02PM | 22 | COURTROOM DEPUTY:  And if you could please state your |
| 4:02PM | 23 | full name for the record. |
| 4:02PM | 24 | THE WITNESS:  James Keller. |
| 4:02PM | 25 | COURTROOM DEPUTY:  Thank you.  You may be seated. |

**KELLER - DIRECT EXAMINATION**

4:02PM   1        THE COURT:  Detective, as I've indicated to the other

4:02PM   2   witnesses, if you'll arrange the microphone at an appropriate

4:02PM   3   level so that you can speak well into it and we can clearly

4:02PM   4   hear you.

4:02PM   5        Counsel, there are a number of matters on the

4:02PM   6   witness stand that may or may not have particular significance

4:03PM   7   to Detective Keller.  Do those need to remain, Ms. King?

4:03PM   8        MS. KING:  I do not believe so.  If I may approach

4:03PM   9   the witness stand, I will absolutely investigate it.

4:03PM  10        THE COURT:  Absolutely.

4:03PM  11        MS. KING:  Your Honor, if I may inquire?

4:03PM  12        THE COURT:  You may.

4:03PM  13        MS. KING:  Thank you.

4:03PM  14                    JAMES KELLER,

4:03PM  15   a witness called on behalf of the Government, being first duly

4:03PM  16   sworn, was examined and testified as follows:

4:03PM  17                  DIRECT EXAMINATION

4:03PM  18                   BY MS. KING:

4:03PM  19   Q.   Detective Keller, good afternoon.  Where do you work?

4:03PM  20   A.   I work with the North Port Police Department.

4:03PM  21   Q.   How long have you worked there?

4:03PM  22   A.   I've worked there for nine years and about nine months.

4:03PM  23   Q.   What kind of training did you have to become a North Port

4:03PM  24   Police Department officer?

4:03PM  25   A.   So I attended the Police Academy in Sarasota County,

**KELLER - DIRECT EXAMINATION**

4:04 PM 1   Florida.

4:04 PM 2   Q.  And then are you currently an officer, or do you hold

4:04 PM 3   another role?

4:04 PM 4   A.  I am a detective, and then I am also a task force officer

4:04 PM 5   with the FBI.

4:04 PM 6   Q.  What kind of detective are you?

4:04 PM 7   A.  Currently I'm assigned as Internet Crimes Against Children

4:04 PM 8   or also known as ICAC.

4:04 PM 9   Q.  What kind of training did you have to become a detective

4:04 PM 10   of that capacity?

4:04 PM 11   A.  So I attended multiple trainings through ICAC, which is

4:04 PM 12   put on through DOJ, to include training such as online

4:04 PM 13   undercover chat and concepts for investigations, and then I

4:04 PM 14   also do -- or I have done training on NCMEC CyberTips and the

4:04 PM 15   intake of those called investigative techniques, and I've also

4:04 PM 16   attended other webinars on the matter, and on-the-job training.

4:04 PM 17   Q.  You also are a task force officer --

4:04 PM 18   A.  Correct.

4:04 PM 19   Q.  -- with the FBI?

4:04 PM 20   A.  Correct.

4:04 PM 21   Q.  What does that job entail?

4:05 PM 22   A.  So being a task force officer with the FBI and then also

4:05 PM 23   being a state -- certified state police officer, I can work

4:05 PM 24   investigations on a state level or transition to a federal

4:05 PM 25   level, and what that means is I work hand in hand with other

**KELLER - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 4:05PM | 1 | special agents with the FBI, and I receive guidance and |
| 4:05PM | 2 | on-the-job training through them. |
| 4:05PM | 3 | Q.   Are you an employee of the National Center for Missing and |
| 4:05PM | 4 | Exploited Children, also known as NCMEC? |
| 4:05PM | 5 | A.   No. |
| 4:05PM | 6 | Q.   Are you an employee of Yahoo? |
| 4:05PM | 7 | A.   No. |
| 4:05PM | 8 | Q.   Are you familiar with CyberTip reports? |
| 4:05PM | 9 | A.   Yes. |
| 4:05PM | 10 | Q.   I know you indicated you had some training in that.  How |
| 4:05PM | 11 | else are you familiar with that? |
| 4:05PM | 12 | A.   Just from the training.  It was a 40-hour course that I |
| 4:05PM | 13 | took with the training, and then also just from learning from |
| 4:05PM | 14 | other ICAC investigators and through working multiple cases |
| 4:05PM | 15 | since 2019. |
| 4:05PM | 16 | Q.   What is your understanding of what an electronic service |
| 4:06PM | 17 | provider is? |
| 4:06PM | 18 | A.   Electronic service provider is -- it's a type of business, |
| 4:06PM | 19 | such as -- in this case is Yahoo.  Other examples would be |
| 4:06PM | 20 | Google, YouTube, Discord.  They are just businesses that do |
| 4:06PM | 21 | business electronically. |
| 4:06PM | 22 | Q.   Now, moving back to a CyberTip, what is your involvement |
| 4:06PM | 23 | in the creation of those reports? |
| 4:06PM | 24 | A.   I'm not involved in the creation of CyberTips. |
| 4:06PM | 25 | Q.   How do you receive a CyberTip?  How do you get involved or |

**KELLER - DIRECT EXAMINATION**

4:06 PM   1   start looking at a CyberTip?

4:06 PM   2   A.   So specifically I'm involved in the Central Florida ICAC

4:06 PM   3   Task Force where -- my department has an MOU with, and what

4:06 PM   4   that does is it basically designates me at my department as the

4:06 PM   5   receiver of CyberTips that NCMEC assigns to the Central Florida

4:06 PM   6   Task Force which geolocates to the city of North Port.

4:07 PM   7   Q.   You said MOU.  What does that mean?

4:07 PM   8   A.   It's a memo of understanding, which means there's an

4:07 PM   9   agreement between two agencies on how they work together.

4:07 PM  10   Q.   What do you do once you receive a CyberTip?

4:07 PM  11   A.   So through an online portal, I receive a CyberTip through

4:07 PM  12   ICAC, and what I do when I receive it is I open up the

4:07 PM  13   document, and I review the PDF document, and then I -- I look

4:07 PM  14   at -- I read the CyberTip, see what it entails, see who it's

4:07 PM  15   from, see if they viewed any of the images on it, and then we

4:07 PM  16   look at the images that they provided us.

4:07 PM  17   Q.   Do you contact the electronic service provider once you

4:07 PM  18   receive the CyberTip?

4:07 PM  19   A.   No.

4:07 PM  20   Q.   Do you contact NCMEC once you receive the CyberTip?

4:07 PM  21   A.   No.

4:08 PM  22   Q.   Do you receive any additional information from the ESP or

4:08 PM  23   NCMEC outside of the CyberTip?

4:08 PM  24   A.   No.

4:08 PM  25   Q.   Is the CyberTip the only report that you're looking at at

**KELLER - DIRECT EXAMINATION**

4:08 PM   1    the start of that investigation?

4:08 PM   2    A.    Yes.

4:08 PM   3    Q.    Now, you indicated that you look at images or attachments

4:08 PM   4    that come with that CyberTip; is that correct?

4:08 PM   5    A.    Correct.

4:08 PM   6    Q.    Do you always view those attachments?

4:08 PM   7    A.    So our policy, how we conduct these investigations, have

4:08 PM   8    changed over time.  At the time of receiving this CyberTip,

4:08 PM   9    yes, I would review and look at all of the images that were

4:08 PM   10   provided to me.

4:08 PM   11   Q.    And that was back in September of 2020?

4:08 PM   12   A.    I believe when I received the tip, it was the end of

4:08 PM   13   November of 2020.

4:08 PM   14   Q.    Okay.  And what is the policy now?

4:08 PM   15   A.    Now we look at -- so when I open up a CyberTip in the

4:09 PM   16   online portal, I only look at the PDF.  I examine the PDF, and

4:09 PM   17   if the ESP has reviewed the image or if the image was made

4:09 PM   18   publicly available, then I will review it.  If it has -- if

4:09 PM   19   those two criterias or one of the two have not been met, then a

4:09 PM   20   search warrant is sought.

4:09 PM   21   Q.    Now, when you receive a CyberTip report, what information

4:09 PM   22   are you specifically looking for in order to open an

4:09 PM   23   investigation?

4:09 PM   24   A.    So there's a couple things that we look at, so the -- I

4:09 PM   25   look at specifically the IP addresses associated with the

**KELLER - DIRECT EXAMINATION**

4:09 PM  1  CyberTip, so whether or not it either shows up as an upload IP

4:09 PM  2  or a last log-in IP or just an incident date IP, and then I

4:09 PM  3  take those IPs, and I search those to a publicly available site

4:10 PM  4  called MaxMind, and it gives us an approximate geolocation.

4:10 PM  5          And then what I do off that is I do a subpoena to who

4:10 PM  6  that ISP is -- which is an internet service provider such as

4:10 PM  7  Comcast, it could be Verizon, Frontier, CenturyLink, any of

4:10 PM  8  those -- and then I find out exactly where the incident

4:10 PM  9  occurred in order to determine whether I have jurisdiction or

4:10 PM  10  not.

4:10 PM  11          The other thing I do is I look at the images, and I

4:10 PM  12  reviewed images to see if they are child pornography images or

4:10 PM  13  CSAM, sexually abusive material, as it relates to Florida state

4:10 PM  14  statute, and part of my criteria for that is looking at it to

4:10 PM  15  see hey, does that image or video contain a minor?  Is that

4:10 PM  16  minor somehow engaged in a sexual act or displaying, like,

4:10 PM  17  sexual organs in a way to cause sexual stimulation to the

4:11 PM  18  viewer?  Once all those criterias are met, then I determine

4:11 PM  19  that it is CSAM at that point.

4:11 PM  20  Q.  How can you tell if someone is a minor?

4:11 PM  21  A.  So through my training and experience -- I have kids

4:11 PM  22  myself.  I've been around kids my whole life.  What I like to

4:11 PM  23  do is with these images, such as the residential search

4:11 PM  24  warrant, I give approximate ages.  I don't know the exact ages

4:11 PM  25  on the minors I'm looking at in these videos or images, but I

**KELLER - DIRECT EXAMINATION**

4:11PM    1    gave an approximate based upon my own life experiences and

4:11PM    2    training and experience.

4:11PM    3    Q.    Now, is there a scenario in which you receive a CyberTip

4:11PM    4    from NCMEC through the portal and you decide not to open an

4:11PM    5    investigation?

4:11PM    6    A.    Yes.

4:11PM    7    Q.    Could you please elaborate on that for the Court?

4:11PM    8    A.    Sometimes we're given CyberTips, and we look at the image

4:11PM    9    or the video, and it just doesn't seem like we can determine

4:12PM   10    that it's a minor in that material, and I'm -- the way that I

4:12PM   11    run my investigations is I'm very conservative, so if I have

4:12PM   12    the chance to go lower on the age range or higher on the age

4:12PM   13    range, I almost always go higher.  That way I don't want to --

4:12PM   14    you know, I don't want to have any issues or -- with the

4:12PM   15    approximation of ages.  I'd just rather kind of play it safe

4:12PM   16    than sorry, be conservative on it.  And so specifically for

4:12PM   17    those cases that we decide not to investigate, I just determine

4:12PM   18    that it's just too much age difficult, so we just won't open an

4:12PM   19    investigation.

4:12PM   20    Q.    So based on that, there are scenarios in which your

4:12PM   21    determination based on your training and experience in viewing

4:12PM   22    whatever image has been submitted to you may be a different

4:12PM   23    classification or categorization than what NCMEC provided?

4:13PM   24    A.    Yes, and that is very -- that happens often.

4:13PM   25    Q.    Now, do you ever contact an electronic service provider to

KELLER - DIRECT EXAMINATION

4:13PM  1    request that an investigation be initiated?

4:13PM  2    A.    No.

4:13PM  3    Q.    Do you ever contact an electronic service provider to

4:13PM  4    request for them to search a user's account without a warrant?

4:13PM  5    A.    No.

4:13PM  6    Q.    Do you have any relationship with an electronic service

4:13PM  7    provider in which you're instructing them on how to maintain

4:13PM  8    their platform or user accounts?

4:13PM  9    A.    No.

4:13PM 10    Q.    Did you review a CyberTip in this case?

4:13PM 11    A.    Yes.

4:13PM 12    Q.    Now, I'm showing you what has already been stipulated and

4:13PM 13    entered into evidence as Government Exhibit 1.

4:13PM 14          MS. KING:  Your Honor, may I approach the witness?

4:13PM 15          THE COURT:  You may.

4:14PM 16          THE WITNESS:  Thank you.

4:14PM 17    BY MS. KING:

4:14PM 18    Q.    So I am showing you Government's Exhibit 1, which is

4:14PM 19    CyberTipline report 79384716.  Do you recognize this

4:14PM 20    CyberTipline report?

4:14PM 21    A.    Yes.

4:14PM 22    Q.    Can you please explain to the Court where you look -- or

4:14PM 23    what you looked for in the CyberTipline report to determine how

4:14PM 24    to start?

4:14PM 25    A.    Yes.  So I start on the first page.  I look at -- start

**KELLER - DIRECT EXAMINATION**

4:14 PM  1    from the top, when it was received by NCMEC, and then I go down

4:14 PM  2    to the incident type, about the middle of page 1 where it says

4:14 PM  3    "Apparent Child Pornography.  Files not reviewed by NCMEC, but

4:14 PM  4    Hash Match," and then about how many uploaded files total.

4:14 PM  5              Then the second page is table of contents.  Proceed

4:15 PM  6    to the third page, which is the ESP submitter, which in this

4:15 PM  7    case is Yahoo.

4:15 PM  8    Q.   Now, does the ESP submitting agency have any significance

4:15 PM  9    to you?

4:15 PM  10   A.   They have no bearing on my investigation other than they

4:15 PM  11   are the ones that submitted these images.

4:15 PM  12   Q.   So in reviewing this CyberTip, did you view any other

4:15 PM  13   files than the seven files there were the subject of the upload

4:15 PM  14   for this NCMEC CyberTip?

4:15 PM  15   A.   No.

4:15 PM  16   Q.   Did you view these seven files?

4:15 PM  17   A.   Yes.

4:15 PM  18   Q.   And did you eventually submit for a Yahoo account search

4:16 PM  19   warrant and a residential search warrant based on your view of

4:16 PM  20   those files?

4:16 PM  21   A.   Yes, based upon the view of the files and the response

4:16 PM  22   from Comcast.

4:16 PM  23   Q.   And what do you mean by the response from Comcast?

4:16 PM  24   A.   The IP address that was in this CyberTip, I submitted a

4:16 PM  25   subpoena to Comcast to try to find out the address that it

**KELLER - DIRECT EXAMINATION**

4:16 PM  1    resulted to, and it did come back to a residence within the

4:16 PM  2    city of North Port.

4:16 PM  3    Q.   Why did you obtain a search warrant for the Yahoo account

4:16 PM  4    in this case?

4:16 PM  5    A.   So there's a couple of reasons why I submit -- I apply and

4:16 PM  6    try to obtain a search warrant to the ESP in ICAC

4:16 PM  7    investigations.  It's for a number of reasons.  First, I want

4:16 PM  8    to confirm that the images that they provided I can obtain

4:16 PM  9    through a search warrant, or at least try to.  And then another

4:17 PM  10   one is other information that can be found surrounding those

4:17 PM  11   images such as -- through my training and experience through

4:17 PM  12   ESPs, I've also obtained much more child pornography from doing

4:17 PM  13   a search warrant to an ESP.  And then also if these are with

4:17 PM  14   emails, then I can -- I can evaluate to see if there's any

4:17 PM  15   exculpatory evidence or if there's something that would

4:17 PM  16   exonerate the owner of that account, such as someone else

4:17 PM  17   accessing it or something.

4:17 PM  18   Q.   So in this case you viewed the seven files that were

4:17 PM  19   uploaded?

4:17 PM  20   A.   Yes.

4:17 PM  21   Q.   And did you make a determination as to whether each file

4:17 PM  22   was child sexual abuse material or CSAM?

4:17 PM  23   A.   Yes.

4:17 PM  24   Q.   How did you make that determination?

4:17 PM  25   A.   By visually looking at them in their -- in its entirety

**KELLER - DIRECT EXAMINATION**

4:18 PM    1    and describing them.

4:18 PM    2    Q.    And you said that you described them.  Where did you

4:18 PM    3    describe them?

4:18 PM    4    A.    So I described them in first the Yahoo search warrant and

4:18 PM    5    application for that, and then also in the residential search

4:18 PM    6    warrant, which is even more detailed in my descriptions.

4:18 PM    7    Q.    And the residential search warrant is Government

4:18 PM    8    Exhibit 2.  Your Honor, may I approach the witness?

4:18 PM    9            THE COURT:  You may.

4:18 PM    10    BY MS. KING:

4:18 PM    11    Q.    Are those the detailed explanations of each photo that you

4:18 PM    12    viewed as subject of this NCMEC CyberTip?

4:18 PM    13    A.    Yes.

4:19 PM    14            MS. KING:  Your Honor, may I have a quick moment to

4:19 PM    15    confer?

4:19 PM    16            THE COURT:  Sure.

4:19 PM    17                    (Pause.)

4:19 PM    18    BY MS. KING:

4:19 PM    19    Q.    Now, do you typically include a description of the images

4:20 PM    20    that you view when you're applying for a warrant?

4:20 PM    21    A.    I do include a description of the images.  Sometimes not

4:20 PM    22    all the images though.

4:20 PM    23    Q.    Okay.  And what's the minimum amount of images that you

4:20 PM    24    need in order to submit a case to get a judge to sign a

4:20 PM    25    warrant?

**KELLER - DIRECT EXAMINATION**

4:20PM   1    A.   Well, the possession of even one image of CSAM is in

4:20PM   2    violation, so I've done search warrants from just one image all

4:20PM   3    the way up to a couple of images or more.

4:20PM   4    Q.   Now, at any point in your application for a search warrant

4:20PM   5    of the Yahoo account of vladlover50@yahoo.com, did you

4:20PM   6    misrepresent the contents of the photos that you viewed?

4:20PM   7    A.   No.

4:20PM   8    Q.   At any point when you were applying for the residential

4:20PM   9    search warrant in this case, did you misrepresent the contents

4:21PM  10    of the photos that you viewed?

4:21PM  11    A.   No.

4:21PM  12    Q.   Now, as we view the CyberTip, at some point in your -- in

4:21PM  13    the Exhibit 2 in your residential search warrant, you indicate

4:21PM  14    a NCMEC categorization?

4:21PM  15    A.   Correct.

4:21PM  16    Q.   Could you please explain to the Court what this NCMEC

4:21PM  17    categorization is?

4:21PM  18    A.   Yeah.  So the NCMEC categorization, when I receive a

4:21PM  19    CyberTip from NCMEC, just like in law enforcement when we

4:21PM  20    receive a tip from a civilian or private entity, we treat it

4:21PM  21    just as that, a tip, and so we take what they say as a

4:21PM  22    suggestion, but ultimately it comes down to me as the sworn law

4:21PM  23    enforcement officer to view it myself and make a determination,

4:21PM  24    not -- it's not on NCMEC.  It's on me.

4:21PM  25    Q.   So where do you get that information that it had been

**KELLER - DIRECT EXAMINATION**

4:22PM  1    categorized as child pornography previously?

4:22PM  2    A.    From the NCMEC CyberTip.

4:22PM  3    Q.    Okay.  And that would be Government Exhibit 1?

4:22PM  4    A.    That would be page -- it says 6, but --

4:22PM  5          THE COURT:  Ms. King, remind me what exhibit is that?

4:22PM  6          MS. KING:  This is Government Exhibit Number 1, Your

4:22PM  7    Honor.

4:22PM  8          THE COURT:  Page 6?

4:22PM  9          THE WITNESS:  I think it's really page 8, but at the

4:22PM 10    top right it says 6 in red letter.

4:22PM 11    BY MS. KING:

4:22PM 12    Q.    Is that under Section B?

4:22PM 13    A.    Yes.

4:22PM 14    Q.    And could you please explain to the Court where you're

4:22PM 15    getting this previous categorization of child pornography by

4:23PM 16    NCMEC?

4:23PM 17    A.    So there's two areas on this page.  In almost the very

4:23PM 18    center of the page, there's a question that says, "Does listed

4:23PM 19    files match file previously viewed and categorized from a

4:23PM 20    CyberTip report?"  That answer by NCMEC is, "Yes."  And then in

4:23PM 21    the categorization to the right, it says "CP," which stands for

4:23PM 22    child pornography, and then in the parentheses is

4:23PM 23    "Unconfirmed."  However, I'm the one that reviews it in order

4:23PM 24    to confirm it.

4:23PM 25    Q.    So based on your training and experience, you're able to

KELLER - DIRECT EXAMINATION

4:23 PM  1   confirm that these images are meeting the definition of child

4:23 PM  2   pornography?

4:23 PM  3   A.   Yes.

4:23 PM  4   Q.   At any point in your application for a search warrant of

4:23 PM  5   the subject Yahoo account in this case, did you intentionally

4:23 PM  6   misrepresent the NCMEC image categorization of child

4:24 PM  7   pornography?

4:24 PM  8   A.   No.

4:24 PM  9   Q.   At any point in your application for a search warrant of

4:24 PM  10  the residence in this case, did you intentionally misrepresent

4:24 PM  11  the previous NCMEC categorization of child pornography?

4:24 PM  12  A.   No.

4:24 PM  13  Q.   Now, when you submitted your affidavit in support of

4:24 PM  14  probable cause for a search warrant in this case of the

4:24 PM  15  residence, did you know the last log-in date for the

4:24 PM  16  vladlover50@yahoo.com account?

4:24 PM  17  A.   Yes, for the residential search warrant.

4:24 PM  18  Q.   And how did you know that?

4:24 PM  19  A.   Because before I submitted the residential search warrant,

4:24 PM  20  I obtained search warrant results back from Yahoo from the

4:24 PM  21  first search warrant that I completed, and then in those

4:24 PM  22  results, there is a log where it has all the IPs associated

4:24 PM  23  with the account, and I was aware of the last log-in IP from

4:25 PM  24  those results.

4:25 PM  25  Q.   What bearing does that information have on your

**KELLER - DIRECT EXAMINATION**

4:25PM  1    investigation and affidavit of probable cause?

4:25PM  2    A.   Has no bearing.  From my training and experience, from

4:25PM  3    dealing with many CyberTips, this isn't uncommon to see with

4:25PM  4    the last log-in date.  Sometimes in CyberTips, that's all that

4:25PM  5    we're provided is the last log-in IP address, and then that's

4:25PM  6    what we do our legal paperwork off of.  But from what I know is

4:25PM  7    that people can -- from my training and experiences, I know

4:25PM  8    that people can stay logged into accounts for a significant

4:25PM  9    period of time.

4:25PM  10   Q.   So the last log-in date doesn't necessarily mean the last

4:25PM  11   access date?

4:25PM  12   A.   Correct.

4:25PM  13   Q.   In your submission and in your affidavit of probable cause

4:26PM  14   for a residential search warrant in this case, did you

4:26PM  15   intentionally omit the information of the last log-in date of

4:26PM  16   the vladlover50@yahoo.com account?

4:26PM  17   A.   No.  I did not see the relevance of it.

4:26PM  18   Q.   And is that because of the training and experience and

4:26PM  19   knowledge that you just testified to for the Court?

4:26PM  20   A.   Correct.

4:26PM  21   Q.   Now, in your warrant application for the Yahoo account, is

4:26PM  22   there anything that you excluded or omitted that could have

4:26PM  23   potentially exonerated the suspect?

4:26PM  24   A.   No.

4:26PM  25   Q.   And that's the same for both the Yahoo and residential

**KELLER - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 4:26 PM | 1 | search warrants? |
| 4:26 PM | 2 | A.    Correct. |
| 4:26 PM | 3 | Q.    Now, was there anything that you thought could have been |
| 4:26 PM | 4 | detrimental to your case and to your probable cause that you |
| 4:26 PM | 5 | decided to exclude or omit from your probable cause affidavit |
| 4:27 PM | 6 | in the Yahoo account search warrant? |
| 4:27 PM | 7 | A.    No.  In fact, I think I provided even more information. |
| 4:27 PM | 8 | Q.    What do you mean by that? |
| 4:27 PM | 9 | A.    Sometimes -- like, the amount of images that I described |
| 4:27 PM | 10 | and provided is in this case kind of above and beyond what I |
| 4:27 PM | 11 | typically do. |
| 4:27 PM | 12 | Q.    And the same question for the residential search warrant. |
| 4:27 PM | 13 | Is there anything that you -- |
| 4:27 PM | 14 | MR. CENTRONE:  Your Honor, I'm going to go ahead and |
| 4:27 PM | 15 | object.  I was counseled against a deposition style line of |
| 4:27 PM | 16 | questioning, and that appears to be where we're going.  All of |
| 4:27 PM | 17 | this is outside the scope of the issues in the motion. |
| 4:27 PM | 18 | THE COURT:  Ms. King? |
| 4:27 PM | 19 | MS. KING:  Your Honor, this is directly relevant to |
| 4:27 PM | 20 | the Franks issue that defense has brought up in the fact that |
| 4:27 PM | 21 | they're alleging that Detective Keller intentionally omitted |
| 4:27 PM | 22 | information that would have been pertinent to the probable |
| 4:28 PM | 23 | cause finding in this case for these search warrants. |
| 4:28 PM | 24 | THE COURT:  Overruled. |
| 4:28 PM | 25 | BY MS. KING: |

KELLER - DIRECT EXAMINATION

4:28PM    1    Q.   So for the residential search warrant, did you

4:28PM    2    intentionally omit or exclude any information that you thought

4:28PM    3    may be detrimental to your case?

4:28PM    4    A.   No.

4:28PM    5         MS. KING:  Your Honor, may I have a moment to confer?

4:28PM    6         THE COURT:  Absolutely.

4:28PM    7         MS. KING:  Just a few more questions if the Court

4:28PM    8    will allow.

4:28PM    9         THE COURT:  Absolutely.

4:28PM   10         MS. KING:  Thank you, Your Honor.

4:28PM   11    BY MS. KING:

4:28PM   12    Q.   When you wrote the search warrant for the Yahoo account in

4:28PM   13    this case, did you know NCMEC's internal definition of "CP

4:28PM   14    Unconfirmed" as it's viewed on page 6 of Government's

4:29PM   15    Exhibit 1?

4:29PM   16    A.   You're referring to the categorization to the right-hand

4:29PM   17    side?

4:29PM   18    Q.   Yes.  Did you know NCMEC's internal definition of what "CP

4:29PM   19    Unconfirmed" means?

4:29PM   20    A.   No.

4:29PM   21    Q.   And in your search warrants, is there a reason that you

4:29PM   22    provide the categorizations from NCMEC?

4:29PM   23    A.   It was just additional information that I decided to

4:29PM   24    provide in this affidavit, which I don't always provide in

4:29PM   25    affidavits, but for some reason I did in this one.

**KELLER - DIRECT EXAMINATION**

4:29 PM  1    Q.   So it's additional to the detailed descriptions of each

4:29 PM  2    image you gave?

4:29 PM  3    A.   Correct.  I was trying to be as detailed as I could.

4:29 PM  4            MS. KING:  Nothing further at this time, Your Honor.

4:29 PM  5            THE COURT:  Thank you.  Any cross, Mr. Centrone?

4:29 PM  6            MR. CENTRONE:  Yes, Judge.  We're at 4:30.  I

4:29 PM  7    probably have about an hour and a half worth of questions.  I'm

4:30 PM  8    not sure how Your Honor would like to handle that, if Your

4:30 PM  9    Honor would like --

4:30 PM  10           THE COURT:  As I said before, let's go to 5:00.

4:30 PM  11           MR. CENTRONE:  Okay.

4:30 PM  12           THE COURT:  I wasn't intending for this hearing to

4:30 PM  13   continue until tomorrow, so I'm interested in getting as much

4:30 PM  14   done as we can.

4:30 PM  15           MR. CENTRONE:  Sure.

4:30 PM  16           THE COURT:  You may begin your cross.

4:30 PM  17           MR. CENTRONE:  If that's the case, Your Honor, my

4:30 PM  18   preference would be to go all the way through to finish the

4:30 PM  19   testimony so we don't have to come back at all.

4:30 PM  20           THE COURT:  I understand that may be your preference,

4:30 PM  21   but that's not of my staff.  So why don't we get started?

4:30 PM  22   We're going to finish at 5:00 as I've indicated.

4:30 PM  23           MR. CENTRONE:  I'm sorry, I missed that last part.

4:30 PM  24           THE COURT:  We're going to finish at 5:00 as I

4:30 PM  25   previously indicated.

KELLER - CROSS-EXAMINATION

4:30PM  1           MR. CENTRONE:  Yes, sir.

4:30PM  2                    CROSS-EXAMINATION

4:30PM  3                    BY MR. CENTRONE:

4:30PM  4    Q.    Good afternoon, Detective Keller.

4:30PM  5    A.    Good afternoon.

4:30PM  6    Q.    You said you've previously received training on

4:30PM  7    CyberTipline reports.  Who provided that training?

4:30PM  8    A.    That was through ICAC task force funded by DOJ.

4:30PM  9    Q.    So that was not training from NCMEC?

4:30PM  10   A.    Correct.

4:30PM  11   Q.    Did NCMEC in any way participate in that training?

4:31PM  12   A.    I think the particular class I attended, there were some

4:31PM  13   employees who attended the class, but not that facilitated it.

4:31PM  14   Q.    I apologize.  Just to clarify, you said there were

4:31PM  15   employees of NCMEC who attended the class but were not teaching

4:31PM  16   the class; is that fair?

4:31PM  17   A.    Yes.

4:31PM  18   Q.    Okay.  Are you familiar with what a hash match is?

4:31PM  19   A.    Yes.

4:31PM  20   Q.    What is your definition of a hash match?

4:31PM  21   A.    A hash match is if you take a -- it could be a video,

4:31PM  22   image, a document file that you have saved on your computer,

4:31PM  23   and you can basically run it through an algorithm, and it will

4:31PM  24   give you what's called a hash match, which is a unique

4:31PM  25   identifier similar to a fingerprint.

KELLER - CROSS-EXAMINATION

4:32 PM  1    Q.   And that's without viewing the image itself, correct?

4:32 PM  2    A.   Correct.

4:32 PM  3    Q.   It's based on a computer code.  Is that your

4:32 PM  4    understanding?

4:32 PM  5    A.   From the algorithm.

4:32 PM  6    Q.   And by algorithm, what do you mean?

4:32 PM  7    A.   The algorithm that processes the image to provide you the

4:32 PM  8    hash.

4:32 PM  9    Q.   And you're aware that NCMEC maintains a database of such

4:32 PM  10   hash matches?

4:32 PM  11   A.   Yes.

4:32 PM  12   Q.   And how they've previously categorized images?

4:32 PM  13   A.   Yes.

4:32 PM  14   Q.   You testified at the time you submitted the warrant

4:32 PM  15   applications we were just discussing, you did not know the

4:32 PM  16   definition of "CP Unconfirmed;" is that correct?

4:33 PM  17   A.   By NCMEC standards, no.

4:33 PM  18   Q.   Did you -- at the time you made the warrant applications,

4:33 PM  19   did you do any investigation at all into what the meaning of

4:33 PM  20   that phrase is?

4:33 PM  21   A.   No, other than I knew that CP stands for child

4:33 PM  22   pornography.

4:33 PM  23   Q.   What is your understanding now of what "CP Unconfirmed"

4:33 PM  24   means?

4:33 PM  25   A.   Now is that they believe that -- by they, NCMEC, believes

KELLER - CROSS-EXAMINATION

4:33 PM  1   that it meets the federal definition of child pornography, but

4:33 PM  2   it needs to be confirmed.

4:33 PM  3   Q.   What needs to be confirmed?

4:33 PM  4   A.   The age of the minor.

4:33 PM  5   Q.   When did you become aware of NCMEC's definition?

4:33 PM  6   A.   Just recently.

4:33 PM  7   Q.   Well, recently -- you were in the courtroom when we

4:33 PM  8   discussed it earlier.  Is that how recent or before that?

4:33 PM  9   A.   That recent.

4:33 PM  10  Q.   So you first learned about it today in this courtroom?

4:33 PM  11  A.   Right, from NCMEC.

4:33 PM  12  Q.   Okay.  And it's your understanding now that the phrase "CP

4:34 PM  13  Unconfirmed" means the same as your use of the phrase "age

4:34 PM  14  difficult" in the warrant application; is that correct?

4:34 PM  15  A.   I would disagree with that.

4:34 PM  16  Q.   Based on what?

4:34 PM  17  A.   Well, if they're saying that "CP Unconfirmed" means it

4:34 PM  18  could have been age difficult for them, it can be completely

4:34 PM  19  different from what I determine to be age difficult under

4:34 PM  20  Florida state statute.

4:34 PM  21  Q.   Okay.  I understand that, and I wasn't trying to imply

4:34 PM  22  otherwise.  I was just trying to determine that it was

4:34 PM  23  effectively the same definition, understanding that different

4:34 PM  24  people could reach different conclusions about that, what would

4:34 PM  25  be age difficult.  Is that -- does that help elaborate on the

KELLER - CROSS-EXAMINATION

4:34PM   1    question for you?

4:34PM   2    A.   Yes.

4:34PM   3    Q.   Okay.  So given that qualification, do you now understand

4:34PM   4    that age difficult means -- excuse me, that "CP Unconfirmed" is

4:35PM   5    effectively used the same as the phrase you use, "age

4:35PM   6    difficult," in the warrant applications?

4:35PM   7    A.   Yes.

4:35PM   8    Q.   If you can't determine the age of the person in the photo,

4:35PM   9    then it's not probable that it is child pornography; is that

4:35PM  10    correct?

4:35PM  11    A.   Can you say that again?

4:35PM  12    Q.   Sure.  "Probable" means more likely than not; is that a

4:35PM  13    fair definition?

4:35PM  14         MS. KING:  Your Honor, I'm going to object to this

4:35PM  15    line of questioning as calling for a legal conclusion by the

4:35PM  16    witness.

4:35PM  17         THE COURT:  Mr. Centrone?

4:35PM  18         MR. CENTRONE:  It is his job to determine probable

4:35PM  19    cause.  I'm trying to figure out that we're all on the same

4:35PM  20    page as what "probable" means.

4:35PM  21         THE COURT:  And what's your definition of "probable

4:35PM  22    cause?"  In other words, if the detective has a view of

4:36PM  23    probable cause that's different than the legal standard --

4:36PM  24         MR. CENTRONE:  Okay.  Let me ask him.

4:36PM  25    BY MR. CENTRONE:

**KELLER - CROSS-EXAMINATION**

4:36PM  1  Q.   Detective, what is your view of probable cause?  What does
4:36PM  2  that mean?
4:36PM  3  A.   My view of probable cause is when a reasonable officer,
4:36PM  4  based upon the facts and circumstances presented to them at a
4:36PM  5  given time, that they believe that a crime did, has, or was
4:36PM  6  about to be, occurred.
4:36PM  7  Q.   Okay.  So given that, if a photograph is age difficult,
4:36PM  8  how -- meaning you are not -- you, as a trained detective, are
4:36PM  9  unable to determine whether the person in the photo is a minor,
4:36PM 10  how is it probable cause -- how does that lend to probable
4:36PM 11  cause that a crime has or is about to occur based on your
4:37PM 12  definition?
4:37PM 13  A.   You're referring to an age difficult?
4:37PM 14  Q.   Yes, sir.
4:37PM 15  A.   Okay.  Now, is that age difficult on NCMEC standards or my
4:37PM 16  standards?  Because on my standards, no, it would not meet
4:37PM 17  probable cause.
4:37PM 18  Q.   And I am asking about your standards.  So just to clarify,
4:37PM 19  just to put a fine point on it, age difficult does not equal
4:37PM 20  child porn, correct, by your -- by your testimony just now?
4:37PM 21  A.   It means that it needs to be --
4:37PM 22           MS. KING:  Your Honor --
4:37PM 23           THE COURT:  Yes, Ms. King?
4:37PM 24           MS. KING:  Again, objection to legal conclusion being
4:37PM 25  requested of this witness.

KELLER - CROSS-EXAMINATION

4:37PM  1      THE COURT:  Mr. Centrone?

4:37PM  2      MR. CENTRONE:  I'm -- as he just testified, he

4:37PM  3  applies a standard of age difficult that has some meaning to

4:37PM  4  him that lends itself to whether probable cause occurred.

4:37PM  5  Probable cause is the standard for the issuance of a warrant.

4:38PM  6  While Mr. -- while Detective Keller may not be a lawyer, I

4:38PM  7  think he's more than qualified to opine on the nature of

4:38PM  8  probable cause.

4:38PM  9      THE COURT:  So to both counsel, Ms. King, when a

4:38PM  10  detective or an agent, or in this case a task force officer,

4:38PM  11  submits a warrant, said agent or officer makes a representation

4:38PM  12  about probable cause.  So in part, that answers -- it would

4:38PM  13  seem at least, as I mentioned -- in part your objection.  At

4:38PM  14  the same time, Mr. Centrone, hypothetically if Mr. -- or

4:38PM  15  Detective Keller has a different understanding, let's say his

4:38PM  16  probable cause standard is higher than the legal standard, what

4:38PM  17  relevance is that to the Court in the end?  In other words,

4:38PM  18  when the Court has to evaluate it, it has to evaluate it by the

4:39PM  19  legal standard of probable cause, irrespective of what your

4:39PM  20  view or what the detective's view of probable cause may be

4:39PM  21  individually.  Your view, if it was informed by Eleventh

4:39PM  22  Circuit case law or otherwise binding authority, would be

4:39PM  23  different, but --

4:39PM  24      MR. CENTRONE:  Well, if his standard was higher than

4:39PM  25  the legal standard for probable cause, I think that is as

KELLER - CROSS-EXAMINATION

4:39PM 1  relevant as knowing whether his standard is lower than the

4:39PM 2  legal standard for --

4:39PM 3      THE COURT:  How is that relevant to the Court's

4:39PM 4  determination?

4:39PM 5      MR. CENTRONE:  Because there's case law, Judge,

4:39PM 6  that -- with respect to the Franks issues, whether a fact

4:39PM 7  submitted in a warrant is clearly critical to a finding of

4:39PM 8  probable cause goes to the materiality issue.

4:39PM 9      THE COURT:  Isn't that a determination that the Court

4:39PM 10  makes?  In other words, how is Detective Keller's view of

4:40PM 11  probable cause going to influence or at least validly influence

4:40PM 12  the Court's consideration?  I'm just asking you the question.

4:40PM 13  It's a curious point.

4:40PM 14      I mention something for Ms. King to consider and

4:40PM 15  something for you to consider, and let's make the hypothetical

4:40PM 16  even broader.  Let's say Mr. -- or Detective Keller's probable

4:40PM 17  cause is less than the legal standard.  Doesn't the Court have

4:40PM 18  to apply the appropriate legal standard on a Franks challenge

4:40PM 19  or on any challenge to a warrant, irrespective of the views of

4:40PM 20  a witness in a particular case?

4:40PM 21      MR. CENTRONE:  Sure, Judge, but it goes -- again,

4:40PM 22  whether a fact represented in a warrant goes to a finding of

4:40PM 23  probable cause, goes to -- it's clearly critical to a finding

4:40PM 24  of probable cause, just like materiality can be -- for

4:40PM 25  recklessness can be inferred as well.

KELLER - CROSS-EXAMINATION

4:41PM 1          Contrary to the Government's representations a
4:41PM 2 few moments ago, my argument is not regarding Detective
4:41PM 3 Keller's intention.  Recklessness is not required in
4:41PM 4 intentional misrepresentation.  It can stem from the failure to
4:41PM 5 investigate things that should have been investigated.
4:41PM 6          So all of these issues go -- speak to the heart
4:41PM 7 of that.
4:41PM 8          THE COURT:  I may have missed it.  I didn't hear you
4:41PM 9 address probable cause.  I understand -- you're talking about a
4:41PM 10 different -- you're talking about a scienter, whether it's an
4:41PM 11 affirmative attempt to misrepresent as opposed to reckless
4:41PM 12 disregard.  I'm talking about probable cause and Detective
4:41PM 13 Keller's view of what -- probable cause.  How is that relevant
4:41PM 14 to the Court's consideration of that issue now?
4:41PM 15          MR. CENTRONE:  And we may be talking past each other
4:41PM 16 a little bit, Judge.
4:41PM 17          The issue of whether the warrant was supported
4:41PM 18 by probable cause in general is certainly a legal finding that
4:42PM 19 the Court can make regardless of Detective Keller's view on
4:42PM 20 that, but that's not the issue we're talking about.  We're
4:42PM 21 talking about -- we are talking about a -- an issue of intent,
4:42PM 22 because one of the Franks issues is one of intent.  One of
4:42PM 23 those threshold questions is one of intent.
4:42PM 24          THE COURT:  Okay.  Then I'll rephrase my question.
4:42PM 25 How does your inquiry about probable cause go to scienter?

KELLER - CROSS-EXAMINATION

4:42 PM  1        MR. CENTRONE:  Because it goes to whether or not
4:42 PM  2   there was probable -- whether or not Detective Keller
4:42 PM  3   understood there was probable cause or not and whether that
4:42 PM  4   probable cause -- and obviously I haven't finished this line of
4:42 PM  5   questioning -- is clearly critical to the warrant application
4:42 PM  6   and, therefore, whether such recklessness or such materiality
4:43 PM  7   can be inferred under the case law.
4:43 PM  8        THE COURT:  I'm going to allow the question in part
4:43 PM  9   because, Ms. King, your questions that you asked on direct
4:43 PM  10  asked about whether items were intentionally or inadvertently
4:43 PM  11  omitted, and in some ways you touched upon these issues.  So
4:43 PM  12  I'm going to allow the inquiry, Mr. Centrone, but I may be
4:43 PM  13  forced to revisit this issue because I still don't see the
4:43 PM  14  connection you're drawing with probable cause.  As I understand
4:43 PM  15  it, subject to further briefing on the matter -- which the
4:43 PM  16  parties will have an opportunity to do -- those are judicial
4:43 PM  17  determinations that are made.  When I say "those," I'm
4:43 PM  18  referring to probable cause to support the warrant itself to
4:43 PM  19  the extent that's implicated here, and to the extent that once
4:43 PM  20  you exclude the challenge portions of the warrant, whether it's
4:44 PM  21  sufficient with those portions excluded, if any, to establish
4:44 PM  22  probable cause.
4:44 PM  23        Detective Keller's view of probable cause
4:44 PM  24  doesn't seem to me to be relevant to how the Court views that
4:44 PM  25  determination, but I'm going to allow you to ask the question.

KELLER - CROSS-EXAMINATION

4:44 PM    1          I will say though that you mentioned probable

4:44 PM    2    cause is being more probable than not.  I'd be curious to see

4:44 PM    3    authority on that.  My understanding of probable cause is it's

4:44 PM    4    less than a preponderance, and your suggestion to Mr. Keller,

4:44 PM    5    Detective Keller that it's more than that would seem not to be

4:44 PM    6    supported by the case law, but I'll wait to see what you have

4:44 PM    7    to offer on the back end.

4:44 PM    8          MR. CENTRONE:  I don't know that that will need to be

4:44 PM    9    addressed because I don't -- I agree with a large portion of

4:44 PM   10    what Your Honor is saying.  Again, we might be more on the same

4:44 PM   11    page on this than we think, but I --

4:44 PM   12          THE COURT:  Let's do this.  Why don't you proceed

4:44 PM   13    with your question, if you could kindly ask it again, and then

4:44 PM   14    we'll go from there.

4:45 PM   15          Ms. King, I understand your objection.  We'll

4:45 PM   16    keep an eye on things as we move forward.

4:45 PM   17          MR. CENTRONE:  And my recollection is I received an

4:45 PM   18    answer to my last question.

4:45 PM   19          THE COURT:  I think Mr. -- Detective Keller was in

4:45 PM   20    the process of answering.  He hadn't finished his answer, so

4:45 PM   21    why don't you ask the question again?

4:45 PM   22          MR. CENTRONE:  Sure.

4:45 PM   23    BY MR. CENTRONE:

4:45 PM   24    Q.   I believe -- I believe we left off, Detective Keller, with

4:45 PM   25    we were talking about age difficult.  We were talking about

**KELLER - CROSS-EXAMINATION**

4:45 PM 1    if -- and I believe your answer to one of my questions was if

4:45 PM 2    the age of a person -- if you could not determine the age of a

4:45 PM 3    person in a photo, that that person was a minor, that that to

4:45 PM 4    you would not raise -- would not raise to the level of probable

4:45 PM 5    cause of a crime being committed; is that correct?

4:45 PM 6    A.    Yes.  If it's age difficult, I don't include it in

4:46 PM 7    probable cause.  However, I don't want to exclude the

4:46 PM 8    possibility with -- if it's later determined that that child is

4:46 PM 9    identified and determined to be a minor, then it would be a

4:46 PM 10   crime.

4:46 PM 11   Q.    Fair enough.  But that would require further

4:46 PM 12   investigation, correct?

4:46 PM 13   A.    Correct.

4:46 PM 14   Q.    And whether a -- a photograph -- the participant in

4:46 PM 15   photograph is age difficult, you would think that would be a

4:46 PM 16   material fact to include in a warrant application; correct?

4:46 PM 17   A.    Sometimes.

4:46 PM 18   Q.    Well, you included it here I believe in your view of

4:46 PM 19   whether these images were age difficult in both of the

4:46 PM 20   residence warrant application and the Yahoo warrant

4:46 PM 21   application; is that correct?

4:46 PM 22   A.    Yes.

4:46 PM 23   Q.    So is it fair to say you viewed it as material to include?

4:47 PM 24   A.    Yes.

4:47 PM 25   Q.    Okay.  I'm going to turn your attention to the binder in

**KELLER - CROSS-EXAMINATION**

4:47 PM    1    front of you.  Tab B is the Defendant's copy -- Exhibit B is

4:47 PM    2    the Defendant's copy of the warrant application related to the

4:47 PM    3    residence at issue.

4:47 PM    4         Do you have that in front of you?

4:47 PM    5    A.   Yes.

4:47 PM    6    Q.   Okay.  In your warrant application to search

4:47 PM    7    Mr. Williamson's residence, you found that four of the seven

4:47 PM    8    images in your opinion were child pornography and the other

4:47 PM    9    three of the seven were either age difficult or not child

4:47 PM   10    pornography.  Is that a fair assessment?

4:47 PM   11    A.   Yes, on page 4?

4:47 PM   12    Q.   Yes, sir.

4:47 PM   13    A.   Yes, four out of the seven I determined to be child

4:47 PM   14    pornography.

4:47 PM   15    Q.   And just for the record, I'm referring to paragraphs that

4:48 PM   16    are numbered in this warrant application, specifically

4:48 PM   17    paragraph number 4 through 9.  Is that -- are we on the same

4:48 PM   18    page as that?

4:48 PM   19    A.   Yes.

4:48 PM   20    Q.   Referring to paragraph 4, the last paragraph says --

4:48 PM   21    excuse me, the last sentence in that paragraph says, "NCMEC

4:48 PM   22    categorized this image previously as child pornography."

4:48 PM   23         Based on your understanding now, do you understand

4:48 PM   24    that to not be correct?

4:48 PM   25    A.   At the time that I wrote the warrant, I did it based upon

KELLER - CROSS-EXAMINATION

4:48 PM 1   the CyberTip that I have.

4:48 PM 2   Q.   Are you referring, as we discussed earlier, to your

4:48 PM 3   previous understanding of the definition of "CP Unconfirmed"

4:48 PM 4   which has now been changed?

4:49 PM 5   A.   Yes.

4:49 PM 6   Q.   So is it fair to say at the time you submitted this

4:49 PM 7   warrant application, you believed that NCMEC had categorized

4:49 PM 8   this image previously as child pornography, but now it is your

4:49 PM 9   understanding that that is not the case?

4:49 PM 10   A.   Yes.

4:49 PM 11   Q.   And, again, for the record, I was discussing just now

4:49 PM 12   image labeled 4-1.gif.

4:49 PM 13        The next paragraph, paragraph 5 in the warrant

4:49 PM 14   application refers to image .125-1.jpeg.  The last sentence of

4:49 PM 15   that paragraph makes the same statement.  "NCMEC had

4:49 PM 16   categorized this image previously as child pornography."  Is it

4:49 PM 17   your understanding now that that is also not correct?

4:49 PM 18   A.   Correct.

4:49 PM 19   Q.   And then skipping to paragraph 8, image.97-1.jpeg, the

4:50 PM 20   last sentence of that paragraph includes the same statement.

4:50 PM 21   "NCMEC had categorized this image previously as child

4:50 PM 22   pornography."  Is it also your understanding now that that is

4:50 PM 23   not correct?

4:50 PM 24   A.   Yes.

4:50 PM 25   Q.   And at the time -- or prior to the warrant application

KELLER - CROSS-EXAMINATION

4:50 PM  1   having been made, did you do any investigation into the

4:50 PM  2   definition of "CP Unconfirmed" as used by NCMEC?

4:50 PM  3   A.    No.

4:50 PM  4   Q.    Okay.  So is it fair to say that this warrant application

4:50 PM  5   omits that NCMEC found those images that we just discussed to

4:50 PM  6   be age difficult instead of child pornography?

4:50 PM  7   A.    Can you --

4:50 PM  8   Q.    Sure.

4:50 PM  9   A.    -- clarify that?

4:50 PM  10  Q.    With respect to the images we just discussed, specifically

4:50 PM  11  identified in paragraph 4, 5, and 8 of your warrant

4:50 PM  12  application, is it fair to say that the application omits that

4:50 PM  13  NCMEC found them to be age difficult or by its classification

4:50 PM  14  CP unconfirmed?

4:51 PM  15  A.    Under the new standards, what you're talking about, yes.

4:51 PM  16  Q.    When you say new standards, do you mean your now -- your

4:51 PM  17  present understanding of that?

4:51 PM  18  A.    Correct.

4:51 PM  19  Q.    Okay.  For another three of these images -- and I'm going

4:51 PM  20  to go through them one by one -- you found that they were

4:51 PM  21  either age difficult or not child pornography; is that correct?

4:51 PM  22  A.    Correct.

4:51 PM  23  Q.    So the fourth image -- and I'm looking at paragraph 7 of

4:51 PM  24  your warrant application, which refers to image.120-1.jpeg, you

4:51 PM  25  concluded that the image is child erotica and not child sexual

**KELLER - CROSS-EXAMINATION**

4:51PM  1    abusive material; is that correct?

4:51PM  2    A.    Correct.

4:51PM  3    Q.    So, therefore, it did not lend to your determination of

4:51PM  4    whether there was probable cause for a warrant application; is

4:51PM  5    that correct?

4:51PM  6    A.    Correct.

4:51PM  7    Q.    Okay.  With respect to paragraph 9 of this warrant

4:52PM  8    application, this paragraph refers to two images in the same

4:52PM  9    paragraph, both image.5-1.jpeg and image.118.jpeg; is that

4:52PM 10    correct?

4:52PM 11    A.    Correct.

4:52PM 12    Q.    And with respect to those images, you found them to be age

4:52PM 13    difficult in your opinion; is that correct?

4:52PM 14    A.    Correct.

4:52PM 15    Q.    Meaning that they also did not contribute to your

4:52PM 16    determination of whether that was probable cause for issuance

4:52PM 17    of a warrant, correct?

4:52PM 18    A.    Correct.

4:52PM 19    Q.    Okay.  With respect to the -- give me just one moment,

4:52PM 20    please.

4:52PM 21          With respect to the image that we have not talked

4:52PM 22    about yet that's in this same page, which is identified at

4:52PM 23    paragraph 6, which is image.1-1.jpeg, that image was allegedly

4:53PM 24    uploaded to Yahoo on September 8th, 2020; is that correct?

4:53PM 25    A.    Let me just verify that through the CyberTip.  It was

**KELLER - CROSS-EXAMINATION**

| | | |
|---|---|---|
| 4:53PM | 1 | paragraph 6?  Image 1 -- image.1-1.jpeg? |
| 4:53PM | 2 | Q.    Yes, sir. |
| 4:53PM | 3 | A.    Yes, September 8th, 2020. |
| 4:53PM | 4 | Q.    Okay.  And in this paragraph, the last sentence says, |
| 4:53PM | 5 | "NCMEC had categorized this image previously as apparent child |
| 4:53PM | 6 | pornography;" is that correct? |
| 4:53PM | 7 | A.    Correct. |
| 4:53PM | 8 | Q.    What was your understanding at the time -- because this |
| 4:53PM | 9 | appears to be the only one of these images that has that NCMEC |
| 4:53PM | 10 | label described in it.  What was your understanding at the time |
| 4:53PM | 11 | of "apparent child pornography" versus "child pornography" as |
| 4:54PM | 12 | it's used by NCMEC and described by you in the other |
| 4:54PM | 13 | paragraphs? |
| 4:54PM | 14 | A.    My interpretation of that apparent -- switch it out with |
| 4:54PM | 15 | obviously -- child pornography, such as it's -- it's clear |
| 4:54PM | 16 | that's child pornography. |
| 4:54PM | 17 | Q.    That was your understanding at the time you made this |
| 4:54PM | 18 | warrant application? |
| 4:54PM | 19 | A.    Yes. |
| 4:54PM | 20 | Q.    How is that distinguished from the other references to |
| 4:54PM | 21 | child pornography and NCMEC's categorization as child |
| 4:54PM | 22 | pornography? |
| 4:54PM | 23 | A.    Well, I knew the CyberTip where it said unconfirmed, but I |
| 4:54PM | 24 | viewed myself as the person to confirm it by viewing and |
| 4:54PM | 25 | describing them. |

**KELLER - CROSS-EXAMINATION**

| | | |
|---|---|---|
| 4:54 PM | 1 | Q. Okay. Now I understand. Thank you. |
| 4:54 PM | 2 | At the time of the warrant application to |
| 4:54 PM | 3 | Mr. Williams' residence, you had already submitted a warrant |
| 4:54 PM | 4 | application and obtained a search warrant for -- from Yahoo, |
| 4:54 PM | 5 | correct? |
| 4:54 PM | 6 | A. Correct. |
| 4:54 PM | 7 | Q. And you had already received the results back from Yahoo; |
| 4:55 PM | 8 | is that correct? |
| 4:55 PM | 9 | A. Correct. |
| 4:55 PM | 10 | Q. Okay. And included with the results from that warrant was |
| 4:55 PM | 11 | the spreadsheet containing the dates of the log-ins; is that |
| 4:55 PM | 12 | correct? |
| 4:55 PM | 13 | A. Yes. |
| 4:55 PM | 14 | Q. And in the same binder in front of you, Tab D, which is |
| 4:55 PM | 15 | Defendant's Exhibit D, is that the document you're referring |
| 4:55 PM | 16 | to? |
| 4:55 PM | 17 | A. Yes. |
| 4:55 PM | 18 | Q. Okay. And I believe you testified earlier that the final |
| 4:55 PM | 19 | log-in was on September 5th, 2020? |
| 4:55 PM | 20 | A. Yes. |
| 4:55 PM | 21 | Q. And is it your understanding from this list that in the |
| 4:55 PM | 22 | days leading up to September 5th, there were daily log-ins from |
| 4:55 PM | 23 | October -- excuse me, from August 31st through September 4th? |
| 4:55 PM | 24 | A. Yes. |
| 4:56 PM | 25 | Q. What is your understanding of Yahoo's procedures -- and |

KELLER - CROSS-EXAMINATION

4:56 PM 1   let me back up a moment.

4:56 PM 2          At the time of the warrant applications here, what

4:56 PM 3   was your understanding of Yahoo's procedures for whether an

4:56 PM 4   account is logged out manually or automatically and how long an

4:56 PM 5   account would be logged in?

4:56 PM 6   A.   So my knowledge is not ESP-specific, but in general my

4:56 PM 7   training and experience with dealing with CyberTips and ICAC

4:56 PM 8   investigations is that -- I see this across multiple

4:56 PM 9   platforms -- is that sometimes people stay logged in for some

4:56 PM 10  period of time.  I don't always have answers on the why, but I

4:56 PM 11  do go off the facts that are presented to me at the time.

4:56 PM 12  Q.   What training did you receive on that?

4:56 PM 13  A.   For --

4:56 PM 14  Q.   For the topic that you just described was based on your

4:57 PM 15  training and experience.

4:57 PM 16  A.   Well, training is IP addresses in general, and then the

4:57 PM 17  experience is actually processing the cases, looking at

4:57 PM 18  results, and doing interviews with people to, like, find out,

4:57 PM 19  "Hey, you know, this is when the incident happened.  It's my

4:57 PM 20  understanding it seems like your account was deactivated.  Can

4:57 PM 21  you talk to me about that?"  And then people can -- defendants

4:57 PM 22  can talk to me about or explain that process with their account

4:57 PM 23  through their ESP, but the training I received is -- it's

4:57 PM 24  actually a couple of different trainings through -- a couple of

4:57 PM 25  different classes from Peer-to-Peer Investigations which I also

KELLER - CROSS-EXAMINATION

4:57PM  1    do, and through the ICAC CyberTip Investigations, which was a
4:57PM  2    40-hour class.  We go in detail about IPv4s and IPv6s and how
4:57PM  3    they kind of operate.
4:57PM  4    Q.   How is that training relevant to the issue we're
4:57PM  5    discussing of how long an account may be logged in
4:57PM  6    automatically before it's logged out?
4:57PM  7    A.   So those have no bearing on the logging in or logging out.
4:58PM  8    It's just how they operate.
4:58PM  9    Q.   Okay.  With respect to your experience, just to clarify,
4:58PM 10    nobody from Yahoo told you, "Hey, this is an account -- this is
4:58PM 11    how long an account is logged in before it's automatically
4:58PM 12    logged out;" is that correct?
4:58PM 13    A.   Correct.
4:58PM 14    Q.   So you had no direct information from Yahoo or some person
4:58PM 15    teaching you about Yahoo or even other internet service
4:58PM 16    providers about the same topic.  Is that fair to say?
4:58PM 17    A.   Correct.
4:58PM 18    Q.   Okay.  As part of the investigation in this case in
4:58PM 19    particular, did you investigate how Yahoo logs out accounts?
4:58PM 20    A.   No.
4:58PM 21    Q.   Did you -- you received this log-in list that we just
4:58PM 22    discussed as part of your subpoena response.  Did you ask for a
4:59PM 23    similar list of log-outs?
4:59PM 24    A.   No.  This was from search warrant results, not subpoena
4:59PM 25    results.

KELLER - CROSS-EXAMINATION

4:59 PM  1   Q.  I apologize.  Correct.  Correct.

4:59 PM  2   A.  No, I -- I don't recall a case off the top of my head that

4:59 PM  3   I ever received sign-outs.

4:59 PM  4   Q.  Whether from Yahoo or any other service provider?

4:59 PM  5   A.  Correct.

4:59 PM  6   Q.  Did you ask for them here or in any other cases?

4:59 PM  7   A.  I would have to refer to evidence sought section of the

4:59 PM  8   Yahoo search warrant for that answer.

4:59 PM  9   Q.  Okay.  If you'd like, a copy is at Exhibit tab C of that

4:59 PM  10  same binder, if you'd like to refresh your memory.

5:00 PM  11  A.  So most of the time, I always ask for any and all captured

5:00 PM  12  IP addresses, so it would be anything that the ESP or ISP

5:00 PM  13  retains.  In this case it was -- I just asked for internet

5:00 PM  14  protocol or IP address, routing information, and then I do

5:00 PM  15  commas to include like sender, receiver, subject line.  I don't

5:00 PM  16  specifically even say log-in on that, but it's just in general

5:00 PM  17  IPs.  So typically in the course of business, I -- for these

5:00 PM  18  ESPs, I haven't seen log-outs, typically just log-ins.

5:00 PM  19  Q.  So you did not ask for one, correct?

5:01 PM  20  A.  Correct, not specifically.

5:01 PM  21  Q.  And you didn't receive one from Yahoo, specifically a list

5:01 PM  22  of log-outs, correct?

5:01 PM  23  A.  Correct.

5:01 PM  24      THE COURT:  Mr. Centrone, how much more do you have?

5:01 PM  25      MR. CENTRONE:  I'm -- I was just looking at my notes,

KELLER - CROSS-EXAMINATION

| | | |
|---|---|---|
| 5:01PM | 1 | Your Honor.  I think if we could power through for maybe 10, 15 |
| 5:01PM | 2 | minutes, I can finish. |
| 5:01PM | 3 | THE COURT:  If I could have a moment. |
| 5:01PM | 4 | (Pause.) |
| 5:01PM | 5 | THE COURT:  Okay.  Mr. Centrone, on your |
| 5:01PM | 6 | representation of 10 or 15 minutes. |
| 5:01PM | 7 | MR. CENTRONE:  Thank you, sir. |
| 5:01PM | 8 | BY MR. CENTRONE: |
| 5:01PM | 9 | Q.   And the warrant application for the residence does not |
| 5:01PM | 10 | discuss any logging out of that account, correct? |
| 5:01PM | 11 | A.   Correct. |
| 5:01PM | 12 | Q.   Okay.  And the Yahoo warrant that we just -- that you just |
| 5:02PM | 13 | looked at, which is at tab C, Defendant's Exhibit C, the |
| 5:02PM | 14 | probable cause in that warrant application was based on the |
| 5:02PM | 15 | same images that we just discussed and went through, correct? |
| 5:02PM | 16 | A.   Correct. |
| 5:02PM | 17 | Q.   But this warrant does not mention NCMEC's classification |
| 5:02PM | 18 | of those images.  Why is that?  And specifically I'll direct |
| 5:02PM | 19 | you to page -- |
| 5:02PM | 20 | THE COURT:  Do you have an exhibit number or letter? |
| 5:02PM | 21 | MR. CENTRONE:  Yes, Judge.  It's Defendant's |
| 5:02PM | 22 | Exhibit C, numbered paragraphs 6 through 12. |
| 5:02PM | 23 | BY MR. CENTRONE: |
| 5:02PM | 24 | Q.   Detective Keller, do you have that page in front of you? |
| 5:03PM | 25 | A.   Yeah.  I was just waiting for everyone to get there.  So I |

KELLER - CROSS-EXAMINATION

5:03PM    1    didn't include it on this warrant application because typically

5:03PM    2    I don't include NCMEC's categorization in my search warrants.

5:03PM    3    Q.    Okay.  You testified earlier, I believe, that at the time

5:03PM    4    of these warrant applications, it was the policy to view the

5:03PM    5    images, all images provided, and then that policy later

5:03PM    6    changed; is that correct?

5:03PM    7    A.    Correct.

5:03PM    8    Q.    Okay.  When did that change occur?

5:03PM    9    A.    It was this year.

5:03PM    10   Q.    This year being sometime in 2022?

5:03PM    11   A.    Correct.

5:03PM    12   Q.    Do you remember approximately what month?

5:03PM    13   A.    It was actually for State of Florida or for Sarasota

5:03PM    14   County.  We were given some legal counsel two, three months

5:03PM    15   ago.

5:03PM    16   Q.    Okay.  And I apologize.  Where did that counsel come from?

5:04PM    17   A.    From the State Attorney's Office.

5:04PM    18   Q.    For --

5:04PM    19   A.    For Sarasota County, the Twelfth Judicial Circuit in

5:04PM    20   Florida.

5:04PM    21   Q.    Okay.  Did you ever speak to the person at Yahoo who

5:04PM    22   allegedly viewed the images?

5:04PM    23   A.    No.

5:04PM    24   Q.    Do you know when they were reviewed?

5:04PM    25   A.    By Yahoo?

KELLER – CROSS-EXAMINATION

5:04 PM  1   Q.   Yeah.

5:04 PM  2   A.   The only date I'm provided is what is on the CyberTip for

5:04 PM  3   the -- between the incident date and the submission date.

5:04 PM  4   That's the only knowledge that I had.

5:04 PM  5   Q.   Did you ever speak to anyone at NCMEC regarding the

5:04 PM  6   CyberTipline report?

5:04 PM  7   A.   No.

5:04 PM  8   Q.   And by that, I mean prior to the warrant application?

5:04 PM  9   A.   Correct.  I have not.

5:05 PM  10   Q.   Did you do any independent investigation of your own of

5:05 PM  11   what was searched prior to you viewing the images, or did you

5:05 PM  12   only rely on the CyberTipline report itself?

5:05 PM  13   A.   I only relied on the CyberTipline report.

5:05 PM  14        MR. CENTRONE:   Just one moment, Judge.

5:05 PM  15        THE COURT:   Sure.

5:05 PM  16                    (Pause.)

5:05 PM  17   BY MR. CENTRONE:

5:06 PM  18   Q.   Detective Keller, the last allegedly illegal activity that

5:06 PM  19   you had knowledge about occurring occurred in September, is

5:06 PM  20   that September 5th, 2020 date; is that correct?  Or excuse me,

5:06 PM  21   September 8th, 2020 date; is that correct?

5:06 PM  22   A.   Correct.

5:06 PM  23   Q.   And you had no evidence of any -- any crime occurring

5:06 PM  24   between that September 8th date and the execution of the search

5:06 PM  25   warrant, correct?

KELLER - REDIRECT EXAMINATION

5:06 PM  1   A.   Correct.

5:06 PM  2           MR. CENTRONE:  Okay.  All right.  No further

5:06 PM  3   questions.

5:06 PM  4           THE COURT:  Thank you.  Any redirect, Ms. King?

5:06 PM  5                        (Pause.)

5:07 PM  6           MS. KING:  Your Honor, if I may redirect?

5:07 PM  7           THE COURT:  Sure.

5:07 PM  8                   REDIRECT EXAMINATION

5:07 PM  9                      BY MS. KING:

5:07 PM  10  Q.   Detective Keller, you submitted an affidavit in support of

5:07 PM  11  probable cause for a Yahoo search warrant?

5:07 PM  12  A.   Yes.

5:07 PM  13  Q.   And received results from that Yahoo search warrant?

5:07 PM  14  A.   Yes.

5:07 PM  15  Q.   Did you eventually go through the totality of those

5:07 PM  16  results?

5:07 PM  17  A.   Yes.

5:07 PM  18  Q.   And in what time frame were you able to get through the

5:07 PM  19  totality of those results?

5:07 PM  20  A.   I believe I received the results the end of September, but

5:07 PM  21  due to, like, remote working and trying to coordinate with my

5:08 PM  22  digital forensic lab in order to get the search warrant

5:08 PM  23  response into a forensic tool to parse out the data, I believe

5:08 PM  24  it was the 26th -- January 26th, 2020 -- or 2021, in order to

5:08 PM  25  go through those results in more detail.

KELLER - REDIRECT EXAMINATION

5:08PM    1    Q.   And in going through those results in more detail

5:08PM    2    throughout that entire time, were you able to review contents

5:08PM    3    of emails?

5:08PM    4    A.   Yes.

5:08PM    5    Q.   And did that lead you to any conclusion of additional

5:08PM    6    illegal activity?

5:08PM    7    A.   Yes.

5:08PM    8              MS. KING:  Nothing further, Your Honor.

5:08PM    9              THE COURT:  Thank you.  Any recross, Mr. Centrone?

5:08PM   10              MR. CENTRONE:  Just one brief moment, Your Honor.

5:08PM   11                          (Pause.)

5:08PM   12              MR. CENTRONE:  No recross, Your Honor.  Thank you.

5:08PM   13              THE COURT:  Okay.  Let's talk quickly about

5:09PM   14    scheduling.  Ms. Favorit and Ms. King --

5:09PM   15              MR. CENTRONE:  Judge, I apologize.  I think as -- and

5:09PM   16    I'm finished with Detective Keller if you'd like to invite him

5:09PM   17    to step down, but I believe I need to call Mr. Williamson to

5:09PM   18    the stand to establish standing so that that is not an issue

5:09PM   19    for me down the road.

5:09PM   20              THE COURT:  Is standing contested, Ms. King?

5:09PM   21              MS. KING:  No, Your Honor.

5:09PM   22              MR. CENTRONE:  Then never mind, if standing is not

5:09PM   23    contested.

5:09PM   24              THE COURT:  I'll put a fine point on closing, but I

5:09PM   25    do want to talk about scheduling.  I notice that Ms. Harris is

5:09PM   1    here, and sometimes these items require upper level approval.

5:09PM   2    What is, Ms. Favorit, the time frame for ordering a transcript?

5:09PM   3    Are you bound by budgetary concerns to order it in a regular

5:09PM   4    time frame?  I don't know what the court reporter is capable of

5:09PM   5    doing here, but we can inquire.

5:10PM   6            MS. FAVORIT:  Your Honor, at my last inquiry, which

5:10PM   7    was several weeks ago now, it was my understanding there was

5:10PM   8    something of a 30-day turnaround maybe on a regular transcript.

5:10PM   9    I don't know if that has to do with the length of the

5:10PM   10   transcript or not, and now at this point I know it is pretty

5:10PM   11   lengthy.  Apart from that, I know a rush could be two weeks,

5:10PM   12   but I wasn't --

5:10PM   13           THE COURT:  Yeah, the question I have for the

5:10PM   14   Government is typically the Government pays for the transcript,

5:10PM   15   and you can tell me what you -- you're able to afford, given

5:10PM   16   whatever the budgetary constraints are.  Is it 30 days, or is

5:10PM   17   it expedited?

5:10PM   18           MS. FAVORIT:  May I have a moment, Your Honor?

5:10PM   19           THE COURT:  That's why I asked.  Absolutely.

5:10PM   20                        (Pause.)

5:11PM   21           MS. FAVORIT:  Your Honor, if I may.

5:11PM   22           THE COURT:  You may.

5:11PM   23           MS. FAVORIT:  The preference is to not do expedited

5:11PM   24   transcripts unless there's an impending trial date that's

5:11PM   25   within that time frame.  It looks like right now we're set for

| | | |
|---|---|---|
| 5:11 PM | 1 | December, so I think unless we really needed to, we would |
| 5:11 PM | 2 | prefer the regular turnaround time of 30 days for the |
| 5:11 PM | 3 | transcript. |
| 5:11 PM | 4 | THE COURT:  Okay.  If I could have a moment. |
| 5:11 PM | 5 | (Pause.) |
| 5:11 PM | 6 | THE COURT:  Okay.  That seems agreeable.  So now that |
| 5:11 PM | 7 | we've taken care of that housekeeping matter, I'll return to |
| 5:11 PM | 8 | the evidentiary portion. |
| 5:11 PM | 9 | Ms. King and Ms. Favorit, any additional |
| 5:11 PM | 10 | witnesses, evidence, or testimony? |
| 5:11 PM | 11 | MS. FAVORIT:  No, Your Honor. |
| 5:11 PM | 12 | THE COURT:  Does the Government rest? |
| 5:12 PM | 13 | MS. FAVORIT:  Yes, Your Honor. |
| 5:12 PM | 14 | THE COURT:  Okay.  Mr. Centrone, any witnesses or |
| 5:12 PM | 15 | evidence that you wish to put forth? |
| 5:12 PM | 16 | MR. CENTRONE:  No, Your Honor. |
| 5:12 PM | 17 | THE COURT:  Do you rest? |
| 5:12 PM | 18 | MR. CENTRONE:  Yes, Your Honor. |
| 5:12 PM | 19 | THE COURT:  All right.  Mr. Keller, thank you for |
| 5:12 PM | 20 | your time this afternoon, you may step down. |
| 5:12 PM | 21 | (Witness excused.) |
| 5:12 PM | 22 | THE COURT:  So the Court will probably enter a |
| 5:12 PM | 23 | scheduling order.  You should talk, Ms. Favorit and Ms. King, |
| 5:12 PM | 24 | with the court reporter about ordering the transcript.  I'll |
| 5:12 PM | 25 | set a briefing scheduling likely that will be two weeks from |

| | | |
|---|---|---|
| 5:12 PM | 1 | the receipt of the transcript no later than 30 days from today, |
| 5:12 PM | 2 | and then Mr. Centrone, two weeks to respond? |
| 5:12 PM | 3 | MR. CENTRONE:  Judge, the only complication on my end |
| 5:12 PM | 4 | is that I've got a two-week trial slated to go in front of |
| 5:12 PM | 5 | Judge Moody that while we were sitting here actually moved from |
| 5:12 PM | 6 | October 31st to November 28th.  So, in other words, I'm going |
| 5:12 PM | 7 | to be -- if it's 30 days from today that we get a transcript, |
| 5:12 PM | 8 | I'm going to be very, very deep in trial prep for a lengthy |
| 5:13 PM | 9 | trial. |
| 5:13 PM | 10 | THE COURT:  How long is the trial? |
| 5:13 PM | 11 | MR. CENTRONE:  I'm sorry? |
| 5:13 PM | 12 | THE COURT:  How long is the trial? |
| 5:13 PM | 13 | MR. CENTRONE:  It's a 10-day trial, Your Honor. |
| 5:13 PM | 14 | THE COURT:  Modest length.  We could have |
| 5:13 PM | 15 | simultaneously briefs, so that would be -- 30 days out would be |
| 5:13 PM | 16 | October -- or November 10th, and then briefs would be due |
| 5:13 PM | 17 | November 24th. |
| 5:13 PM | 18 | MR. CENTRONE:  Which I believe is actually |
| 5:13 PM | 19 | Thanksgiving Day, Your Honor. |
| 5:13 PM | 20 | THE COURT:  I can adjust that date, but when is your |
| 5:13 PM | 21 | trial scheduled to begin? |
| 5:13 PM | 22 | MR. CENTRONE:  The 28th. |
| 5:13 PM | 23 | THE COURT:  Let me just -- if I could find out. |
| 5:13 PM | 24 | (Pause.) |
| 5:14 PM | 25 | THE COURT:  I'll take it under advisement. |

5:14 PM  1          MR. CENTRONE:  Thank you.

5:14 PM  2          THE COURT:  Mr. Centrone, I always try to accommodate

5:14 PM  3   counsel.  I know the difficulties of dealing with a lengthy

5:14 PM  4   trial, but these are all issues that are near and dear to your

5:14 PM  5   heart, as they are to Ms. Favorit and Ms. King's.  You've all

5:14 PM  6   amply researched these matters, so it's just a question of

5:14 PM  7   going through the transcript, I think, in terms of putting

5:14 PM  8   things together.

5:14 PM  9          MR. CENTRONE:  And I think that's fair, Your Honor.

5:14 PM 10   So --

5:14 PM 11          THE COURT:  So if I can set it not for a due date of

5:14 PM 12   Thanksgiving, but some date thereafter -- it may be done in

5:14 PM 13   less than 30 days, we won't know for sure, but I'd like to keep

5:15 PM 14   this moving, if we can.

5:15 PM 15          MR. CENTRONE:  Sure.  Since the trial has now moved

5:15 PM 16   as of today, there may be some preliminary work I can do

5:15 PM 17   without the benefit of a transcript that may -- that may make

5:15 PM 18   it very possible.

5:15 PM 19          THE COURT:  So let me just talk about -- and then we

5:15 PM 20   have to tie this up.  Ms. Favorit and Ms. King, any reason not

5:15 PM 21   to do simultaneous briefing?

5:15 PM 22          MS. FAVORIT:  No, Your Honor.

5:15 PM 23          THE COURT:  Okay.  Mr. Centrone?

5:15 PM 24          MR. CENTRONE:  I don't believe so, Your Honor.

5:15 PM 25          THE COURT:  Okay.  So that's probably what I'll do,

5:15 PM    1    just to get it done before your trial, Mr. Centrone, because

5:15 PM    2    otherwise we're pushing it off then into December.

5:15 PM    3              With that, anything further, Ms. Favorit or

5:15 PM    4    Ms. King?

5:15 PM    5              MS. FAVORIT:  No, Your Honor.

5:15 PM    6              THE COURT:  Thank you.  And Mr. Centrone, anything

5:15 PM    7    further?

5:15 PM    8              MR. CENTRONE:  No, Your Honor.  Thank you.

5:15 PM    9              THE COURT:  We'll be in recess.

5:15 PM    10                   (End of proceedings.)

5:15 PM    11         * * * * * * * * * * * * * * * * * * * *

5:15 PM    12              UNITED STATES DISTRICT COURT

5:15 PM    13              MIDDLE DISTRICT OF FLORIDA

5:15 PM    14

5:15 PM    15              REPORTER TRANSCRIPT CERTIFICATE

5:15 PM    16       I, Tana J. Hess, Official Court Reporter for the United
           States District Court, Middle District of Florida, certify,
5:15 PM    17    pursuant to Section 753, Title 28, United States Code, that the
           foregoing is a true and correct transcription of the
5:15 PM    18    stenographic notes taken by the undersigned in the
           above-entitled matter (Pages 1 through 198 inclusive) and that
5:15 PM    19    the transcript page format is in conformance with the
           regulations of the Judicial Conference of the United States of
5:15 PM    20    America.

5:15 PM    21

5:15 PM    22

5:15 PM    23    _____
                 Tana J. Hess, CRR, RMR, FCRR
5:15 PM          Official Court Reporter
5:15 PM    24    United States District Court
                 Middle District of Florida
5:15 PM    25    Tampa Division
5:15 PM          Date:  October 31, 2022