# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


* * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA      *
                              *      Case No. 8:21-cr-355
vs.                           *
                              *      October 11, 2022
GREGORY WILLIAMSON            *
* * * * * * * * * * * * * * * *



EVIDENTIARY HEARING

Heard in Courtroom 12B
Sam M. Gibbons United States Courthouse
801 N. Florida Avenue
Tampa, FL
October 11, 2022


BEFORE THE HONORABLE CHRISTOPHER P. TUITE

UNITED STATES MAGISTRATE JUDGE




Official Court Reporter:      Tana J. Hess, CRR, FCRR, RMR
                              U.S. District Court Reporter
                              Middle District of Florida
                              Tampa Division
                              801 N. Florida Avenue
                              Tampa, FL  33602
                              813.301.5207
                              tana_hess@flmd.uscourts.gov


Proceedings recorded by mechanical stenography using
computer-aided transcription software.

APPEARANCES:


FOR THE GOVERNMENT:

        Erin Claire Favorit
        Abigail King
        DOJ-USAO
        400 N. Tampa Ave.
        Suite 3200
        Tampa, FL  33602
        813.274.6259
        erin.favorit@usdoj.gov
        abigail.king@usdoj.gov


FOR THE DEFENDANT:

        Gus M. Centrone
        Kynes, Markman & Felman, PA
        PO Box 3396
        Tampa, FL  33601
        813.229.1118
        gcentrone@kmf-law.com

**INDEX**

| NAME | PAGE |
|------|------|
| Jennifer Newman | |
|     Direct Examination by Ms. Favorit | 9 |
|     Cross-Examination by Mr. Centrone | 38 |
|     Redirect Examination by Ms. Favorit | 64 |
|     Recross-Examination by Mr. Centrone | 65 |
|     Recross-Examination by Mr. Centrone | 67 |
| Ashley Guizzotti | |
|     Direct Examination by Ms. Favorit | 71 |
|     Cross-Examination by Mr. Centrone | 91 |
|     Redirect Examination by Ms. Favorit | 129 |
|     Recross-Examination by Mr. Centrone | 129 |
| Jessica Hines | |
|     Direct Examination by Ms. Favorit | 131 |
|     Cross-Examination by Mr. Centrone | 139 |
| James Keller | |
|     Direct Examination by Ms. King | 151 |
|     Cross-Examination by Mr. Centrone | 169 |
|     Redirect Examination by Ms. King | 192 |

## EXHIBITS

| NUMBER | IDENTIFIED | ADMITTED |
|---|---|---|
| Government Exhibit 1 | 26 | 6 |
| Government Exhibit 2 | 161 | 6 |
| Government Exhibit 3 | 75 | 6 |
| Government Exhibit 4 | 38 | 6 |
| Government Exhibit 5 | 74 | 6 |
| Government Exhibit 6 | | 6 |
| | | |
| Defendant Exhibit A | 48 | 7 |
| Defendant Exhibit B | 180 | 7 |
| Defendant Exhibit C | 188 | 7 |
| Defendant Exhibit D | 127 | 7 |
| Defendant Exhibit E | 99 | 7 |
| Defendant Exhibit F | 43 | 7 |
| Defendant Exhibit G | 97 | 7 |
| Defendant Exhibit H | 94 | 7 |
| Defendant Exhibit I | 111 | 111 |

1          (Call to order of the Court.)

10:11AM  2          **THE COURT:**  Good morning everyone.  Madam clerk, if

10:11AM  3  you could please call the case.

10:11AM  4          **COURTROOM DEPUTY:**  United States of America versus

10:11AM  5  Gregory Allen Williamson, criminal case number 8:21-CR-355.

10:11AM  6          **THE COURT:**  If I could please have the appearances of

10:11AM  7  counsel for the record, beginning with the Government.

10:11AM  8          **MS. FAVORIT:**  Good morning, Your Honor.  Erin Favorit

10:11AM  9  on behalf of the United States.

10:11AM  10          **MS. KING:**  And Abigail King on behalf of the United

10:11AM  11  States.

10:11AM  12          **THE COURT:**  Good afternoon -- or good morning to you

10:11AM  13  both.  And for the defense?

10:11AM  14          **MR. CENTRONE:**  Good morning, Judge.  Gus Centrone for

10:11AM  15  Gregory Allen Williamson, who is present with me in the

10:11AM  16  courtroom.

10:11AM  17          **THE COURT:**  Good morning to you as well.

10:11AM  18          Are the parties prepared to proceed?

10:11AM  19          **MS. FAVORIT:**  Yes, Your Honor.

10:11AM  20          **THE COURT:**  Ms. Favorit, are you generally taking the

10:11AM  21  lead here today?

10:11AM  22          **MS. FAVORIT:**  Yes, Your Honor.

10:11AM  23          **THE COURT:**  Okay.  Ms. Favorit, if you could call

10:11AM  24  your first witness.

10:11AM  25          **MS. FAVORIT:**  United States calls Jennifer Newman.

| | | |
|---|---|---|
| 10:11AM | 1 | And actually before we get started, I had spoken |
| 10:11AM | 2 | with defense about stipulating our -- both of our exhibits, so |
| 10:12AM | 3 | at this time the Government would move the exhibits from the |
| 10:12AM | 4 | exhibit list into evidence.  That's numbers 1 through 6. |
| 10:12AM | 5 | THE COURT:  I have a judge's copy black binder.  Is |
| 10:12AM | 6 | this, Mr. Centrone, your binder? |
| 10:12AM | 7 | MR. CENTRONE:  Correct, and I'd also move to enter |
| 10:12AM | 8 | our exhibits into evidence as well.  I believe it's A through |
| 10:12AM | 9 | H. |
| 10:12AM | 10 | MS. FAVORIT:  And may I approach with the judge's |
| 10:12AM | 11 | copies of the exhibit list? |
| 10:12AM | 12 | THE COURT:  Give me just one moment to get to your |
| 10:12AM | 13 | exhibit list.  I have before me the Government's list.  You |
| 10:12AM | 14 | mentioned 1 through 6? |
| 10:12AM | 15 | MS. FAVORIT:  Yes, Your Honor. |
| 10:12AM | 16 | THE COURT:  Okay.  Mr. Centrone, just out of an |
| 10:12AM | 17 | abundance of caution, I take it from Ms. Favorit that the -- |
| 10:12AM | 18 | these are stipulated, but any objection to the admission of |
| 10:12AM | 19 | Government's 1 through 6 found on document 92, which is the |
| 10:13AM | 20 | Government's exhibit list? |
| 10:13AM | 21 | MR. CENTRONE:  No, Your Honor. |
| 10:13AM | 22 | THE COURT:  Okay.  Those exhibits are admitted.  Now, |
| 10:13AM | 23 | Mr. Centrone had moved to admit his exhibits.  Do I understand |
| 10:13AM | 24 | those to be A through H? |
| 10:13AM | 25 | MR. CENTRONE:  Yes, sir. |

| | | |
|---|---|---|
| 10:13AM | 1 | **THE COURT:** Okay. Ms. Favorit, any objection? |
| 10:13AM | 2 | **MS. FAVORIT:** No objection, Your Honor. |
| 10:13AM | 3 | **THE COURT:** Okay. Defendant's A through H are |
| 10:13AM | 4 | admitted. |
| 10:13AM | 5 | And then Ms. Favorit, you had a copy of 1 |
| 10:13AM | 6 | through 6 to tender to the Court? |
| 10:13AM | 7 | **MS. FAVORIT:** Yes, Your Honor. |
| 10:13AM | 8 | **THE COURT:** Okay. You may approach. |
| 10:13AM | 9 | **MS. FAVORIT:** Thank you. |
| 10:13AM | 10 | **THE COURT:** Mr. Centrone, while Ms. Favorit is doing |
| 10:13AM | 11 | that, I take it in your binder you've got your exhibits |
| 10:13AM | 12 | contained therein? |
| 10:13AM | 13 | **MR. CENTRONE:** Yes, sir, and I've also placed a |
| 10:13AM | 14 | witness copy on the stand for the witnesses today. |
| 10:13AM | 15 | **THE COURT:** Okay. Thank you to you both. |
| 10:13AM | 16 | Ms. Favorit, again your first witness? |
| 10:13AM | 17 | **MS. FAVORIT:** Jennifer Newman, Your Honor. |
| 10:13AM | 18 | **MR. CENTRONE:** And, Judge, I would like to invoke the |
| 10:13AM | 19 | rule, please? |
| 10:14AM | 20 | **THE COURT:** Certainly. Any objection? |
| 10:14AM | 21 | **MS. FAVORIT:** No objection. |
| 10:14AM | 22 | **THE COURT:** Are you invoking the rule as well, |
| 10:14AM | 23 | Ms. Favorit? |
| 10:14AM | 24 | **MS. FAVORIT:** Yes, Your Honor. |
| 10:14AM | 25 | **THE COURT:** To be clear, any witness testifying in |

| | | |
|---|---|---|
| 10:14AM | 1 | this case who is not currently testifying must excuse |
| 10:14AM | 2 | themselves from the courtroom. |
| 10:14AM | 3 | MS. FAVORIT:  And, Your Honor, we have Detective |
| 10:14AM | 4 | Keller present.  As he is the lead case agent, he is exempt |
| 10:14AM | 5 | from that sequestration rule. |
| 10:14AM | 6 | THE COURT:  That's certainly the practice in this |
| 10:14AM | 7 | courthouse.  Mr. Centrone? |
| 10:14AM | 8 | MR. CENTRONE:  I'm going to go ahead and object for |
| 10:14AM | 9 | the record, but it is my understanding that is the practice as |
| 10:14AM | 10 | well. |
| 10:14AM | 11 | THE COURT:  I'm going to allow Detective Keller to |
| 10:14AM | 12 | remain.  And is it Ms. Newman who's the first witness? |
| 10:14AM | 13 | MS. FAVORIT:  Yes.  May I retrieve the witnesses, |
| 10:14AM | 14 | Your Honor? |
| 10:14AM | 15 | THE COURT:  Absolutely. |
| 10:15AM | 16 | Ms. Newman, if you'd kindly come forward to my |
| 10:15AM | 17 | courtroom deputy.  She's going to swear you in. |
| 10:15AM | 18 | COURTROOM DEPUTY:  Please raise your right hand. |
| 10:15AM | 19 | (Witness sworn.) |
| 10:15AM | 20 | COURTROOM DEPUTY:  Thank you.  Please state your name |
| 10:15AM | 21 | for the record. |
| 10:15AM | 22 | THE WITNESS:  Jennifer Newman. |
| 10:15AM | 23 | COURTROOM DEPUTY:  Thank you.  You may be seated over |
| 10:15AM | 24 | there. |
| 10:15AM | 25 | THE COURT:  Ms. Favorit, before you get started, the |

NEWMAN - DIRECT EXAMINATION

10:15AM  1   exhibits which you tendered to the Court, are those my copy

10:15AM  2   that I can make notations on, or are those intended to be the

10:15AM  3   ones to be admitted?

10:15AM  4           MS. FAVORIT:  Those are your copy, Your Honor.  You

10:15AM  5   may make your notations, and I will not retrieve them from you.

10:15AM  6           THE COURT:  Thank you.  Ms. Newman, you'll see that

10:15AM  7   there's a microphone in front of you.  It seems to be situated

10:15AM  8   where it needs to be, but if at any time you need to adjust it,

10:15AM  9   just so that we can hear you, I'd appreciate you doing so.

10:16AM 10           With that, Ms. Favorit, you may proceed.

10:16AM 11           MS. FAVORIT:  Thank you, Your Honor.

10:16AM 12                   JENNIFER NEWMAN,

10:16AM 13   a witness called on behalf of the Government, being first duly

10:16AM 14   sworn, was examined and testified as follows:

10:16AM 15                 DIRECT EXAMINATION

10:16AM 16                BY MS. FAVORIT:

10:16AM 17   Q.   Did you already state your name for the record?

10:16AM 18   A.   I did.

10:16AM 19   Q.   Okay.  I missed that.  I'm sorry.  What is it that you do

10:16AM 20   for a living?

10:16AM 21   A.   I am an Executive Director at the National Center for

10:16AM 22   Missing and Exploited Children.

10:16AM 23   Q.   How long have you been doing that?

10:16AM 24   A.   I've worked at the National Center for 21 years.  This

10:16AM 25   particular role I've been doing since November of 2020.

NEWMAN - DIRECT EXAMINATION

10:16AM  1    Q.   What is your educational background?

10:16AM  2    A.   I have a bachelor of science from James Madison

10:16AM  3    University.

10:16AM  4    Q.   What roles have you held within the -- we're going to call

10:16AM  5    it NCMEC from now on?

10:16AM  6    A.   Yes.  As I mentioned, I started in November of 2001 as an

10:16AM  7    analyst in the CyberTipline.  Over the past 20 years, I've held

10:16AM  8    various roles all within the Exploited Children Division.

10:16AM  9    Currently I also have an added responsibility of leading our

10:16AM  10   office down in Austin, Texas.

10:17AM  11   Q.   What, other than leading the Texas office, are your

10:17AM  12   current responsibilities?

10:17AM  13   A.   As the Executive Director in the Exploited Children

10:17AM  14   Division, I oversee our strategies, our special projects,

10:17AM  15   assist ECD management and leadership with workflow improvements

10:17AM  16   and processes.  Really, anything that helps our operations.

10:17AM  17   Q.   Can you tell me what NCMEC is?

10:17AM  18   A.   The National Center for Missing and Exploited Children is

10:17AM  19   a private non-profit.  We were founded in 1984 after the

10:17AM  20   kidnapping and murder of Adam Walsh in 1981.  Our cofounders

10:17AM  21   John and Revé started the National Center in 1984, and we serve

10:17AM  22   three main missions:  To find missing children, reduce child

10:17AM  23   sexual exploitation, and prevent future victimization.

10:17AM  24   Q.   I've heard it referred to as a clearinghouse previously.

10:18AM  25   Can you explain what that means?

NEWMAN - DIRECT EXAMINATION

10:18AM 1    A.    Sure.  Basically because of the work that we do at a

10:18AM 2    national level, you know, we kind of serve in that

10:18AM 3    clearinghouse role.  For example, we have the CyberTipline,

10:18AM 4    which is the nation's recording mechanism for online child

10:18AM 5    exploitation.  We have 1-800-THE-LOST, which is a 24/7 call

10:18AM 6    center for reporting any sort of incidents of missing children,

10:18AM 7    sightings of missing children, requests for information, really

10:18AM 8    serving at all times for those who are invested in child safety

10:18AM 9    and protection.

10:18AM 10   Q.    You mentioned it being a non-profit organization.  To the

10:18AM 11   best of your knowledge, can you explain what that means?

10:18AM 12   A.    I don't have an exact definition of a non-profit, but we

10:18AM 13   certainly don't operate for profit or income.

10:18AM 14          THE COURT:  Ms. Newman, forgive me.  I couldn't quite

10:18AM 15   hear that last part.

10:18AM 16          THE WITNESS:  Sure.  So I don't have the exact

10:19AM 17   definition of a non-profit, but we don't operate for profit or

10:19AM 18   income.

10:19AM 19   BY MS. FAVORIT:

10:19AM 20   Q.    Are you an employee of the federal government?

10:19AM 21   A.    No.

10:19AM 22   Q.    How many people does NCMEC employ?

10:19AM 23   A.    Right now I believe we're around 420.

10:19AM 24   Q.    And because of your role as the Executive Director, are

10:19AM 25   you generally familiar with NCMEC's practices and employees and

NEWMAN - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:19AM | 1 | that type of thing? |
| 10:19AM | 2 | A.   Generally, yes. |
| 10:19AM | 3 | Q.   Does NCMEC receive any grant money? |
| 10:19AM | 4 | A.   We do. |
| 10:19AM | 5 | Q.   Can you tell me from what sources grant money comes from? |
| 10:19AM | 6 | A.   I don't know all of them, but I know Department of |
| 10:19AM | 7 | Justice, Secret Service, Immigrations and Customs Enforcement, |
| 10:19AM | 8 | and then we certainly also have private donations as well, |
| 10:19AM | 9 | foundational grants. |
| 10:20AM | 10 | Q.   Are you aware of a percentage of funds to NCMEC that come |
| 10:20AM | 11 | from federal money versus private grants? |
| 10:20AM | 12 | A.   When you consider our corporate donations, our in-kind |
| 10:20AM | 13 | private donors, and the foundational grants, as well as the |
| 10:20AM | 14 | government funding, it's roughly 70/30 government to private. |
| 10:20AM | 15 | Q.   Does NCMEC have a board of directors? |
| 10:20AM | 16 | A.   We do. |
| 10:20AM | 17 | Q.   Are you aware of who sits on that board? |
| 10:20AM | 18 | A.   I don't have those specifics.  I know it's listed on our |
| 10:20AM | 19 | website though. |
| 10:20AM | 20 | Q.   You mentioned having programs that NCMEC is in charge of. |
| 10:20AM | 21 | Could you tell me what those programs are? |
| 10:20AM | 22 | A.   Sure.  We have maybe five core -- what you would call five |
| 10:20AM | 23 | core areas of focus.  As I mentioned, our missing children, |
| 10:20AM | 24 | exploited children.  We have our prevention of future |
| 10:21AM | 25 | victimization.  We also have our family advocacy division, |

NEWMAN - DIRECT EXAMINATION

10:21AM  1    which is focused on the victims, survivors, and families of

10:21AM  2    missing and sexual exploitation issues, and then we also have

10:21AM  3    training and outreach, which is working with child-serving

10:21AM  4    professionals to educate them on the resources of the National

10:21AM  5    Center and other issues related to child protection.

10:21AM  6    Q.    Is there a specific program that you are involved with?

10:21AM  7    A.    As Executive Director in the Exploited Children Division,

10:21AM  8    I do have a hand in all three programs of work that we have in

10:21AM  9    this division.

10:21AM  10   Q.    So we talked about the Exploited Children's Division; is

10:21AM  11   that correct?

10:21AM  12   A.    Correct.

10:21AM  13   Q.    Also known as ECD.  Can you tell me what programs are

10:21AM  14   within that department?

10:21AM  15   A.    Sure.  We have three.  We have the CyberTipline, we have

10:21AM  16   the child victim identification program, and we have our

10:21AM  17   survivor services.

10:21AM  18   Q.    What is the child victim identification program?

10:21AM  19   A.    That is where we serve, again in that clearinghouse role,

10:22AM  20   in regards to children that have been identified that have been

10:22AM  21   seen in child sexual abuse material, also known as child

10:22AM  22   pornography.  We assist law enforcement with identifying those

10:22AM  23   children.  We also serve with the federal government in terms

10:22AM  24   of -- in part of the federal notification and restitution

10:22AM  25   process, and we also just basically focus on helping identify

NEWMAN - DIRECT EXAMINATION

10:22AM 1    those children that are still at risk so that we can assist law

10:22AM 2    enforcement in identifying them.

10:22AM 3    Q.   And what about survivor services?

10:22AM 4    A.   This really goes back to our grassroots, which is to serve

10:22AM 5    families and survivors, and the survivor services program

10:22AM 6    provides resources and assistance to, again, those survivors

10:22AM 7    and families that have been impacted by child sexual abuse

10:22AM 8    material, whether that's helping to connect them to mental

10:23AM 9    health therapists that could help them, connecting them to an

10:23AM 10   attorney who might be of assistance to them, providing peer

10:23AM 11   counseling and support.  We really try to help them

10:23AM 12   post-identification as they work towards recovery.

10:23AM 13   Q.   And what is the CyberTipline program?

10:23AM 14   A.   The CyberTipline started in 1998, and that, as I

10:23AM 15   mentioned, is the nation's recording mechanism for child sexual

10:23AM 16   exploitation.  It can be online or offline, but really serving

10:23AM 17   as that conduit to receive tips from the public or from

10:23AM 18   electronic service providers and, if deemed appropriate, make

10:23AM 19   those reports available to law enforcement.

10:23AM 20   Q.   What is the ultimate goal of the program?

10:23AM 21   A.   The ultimate goal is to surface any files or reports that

10:23AM 22   come in to us where there could be a child in danger and get

10:23AM 23   those reports to law enforcement for them to -- to review on

10:23AM 24   their own, do their own analysis, and if they do investigate,

10:24AM 25   hopefully safeguard a child.

NEWMAN - DIRECT EXAMINATION

Q.    About how many tips does the CyberTipline receive per
year?

A.    So last year in 2021, we received over 29 million reports.
That averaged between 70 to 80,000 reports a day that we
received.  Many of those reports resolve internationally as
well.

Q.    Talk about the international aspect.  How are there
international reports coming to NCMEC?

A.    The majority of those are going to be from the electronic
service providers pursuant to 2258A.  If they are made aware of
child pornography on their servers or platforms, they are
mandated to make reports to the CyberTipline.  As such, they
have user bases throughout the world, so we -- we by extension
almost become a global tipline.  Because they follow U.S. law,
they make those reports to us with, you know, users worldwide.
So we refer those on to international law enforcement.

Q.    Do you know a percentage of tips international versus
domestic?

A.    On average each year about 94 percent of our reports
resolve internationally.

Q.    Are they treated any differently than the reports that
come in domestically?

A.    They are just because of that volume.  Only the
high-priority cases receive human review.  Otherwise, they are
automatically sent to law enforcement at a 15-minute cadence to

NEWMAN - DIRECT EXAMINATION

10:25 AM 1   those countries where we have connections through either the

10:25 AM 2   National Police Service or through federal liaisons who are

10:25 AM 3   serving as that conduit.

10:26 AM 4   Q.    We talked a little bit about electronic service providers.

10:26 AM 5   I'm not asking for an official definition, but what is your

10:26 AM 6   understanding of what that might be?

10:26 AM 7   A.    My understanding is it's really any service that provides,

10:26 AM 8   say, social media interface, gaming, any sort of

10:26 AM 9   connection-type service.  You know, we generally leave it up to

10:26 AM 10  companies to self-identify if they're an electronic service

10:26 AM 11  provider, but that's my understanding of what an ESP or

10:26 AM 12  electronic service provider is.

10:26 AM 13  Q.    Do all of the CyberTip reports come from electronic

10:26 AM 14  service providers?

10:26 AM 15  A.    No.  We do get reports from the public.  Again, that's

10:26 AM 16  originally how we started to be a resource for the general

10:26 AM 17  public, but we do receive about 98 to 99 percent of the volume

10:26 AM 18  each year from the companies.

10:26 AM 19  Q.    And we keep talking about these CyberTip reports.  Could

10:27 AM 20  you tell me what exactly that is?

10:27 AM 21  A.    Sure.  So it's basically information that's reported to us

10:27 AM 22  by the public or company.  The reporting person or entity

10:27 AM 23  chooses one of the eight categories of type of report that

10:27 AM 24  they're making to us.  The information is intaked to us at

10:27 AM 25  NCMEC, and we generate a CyberTip report, which our analysts

**NEWMAN - DIRECT EXAMINATION**

10:27AM  1   will then, you know, review the files, possibly do some sort of

10:27AM  2   deconfliction or open-source search if it's a priority report,

10:27AM  3   and then, again, make that report available to law enforcement.

10:27AM  4   Q.   You mentioned eight categories.  Could you explain what

10:27AM  5   that means?

10:27AM  6   A.   Sure.  So when you make a report to us, certainly we want

10:27AM  7   to know from the reporting person or entity what kind of report

10:27AM  8   is coming in to us, so those categories include child

10:27AM  9   pornography, which is the possession, distribution or

10:27AM  10  production of online enticement; sex tourisms; sexual

10:28AM  11  molestation, that sort of thing.

10:28AM  12  Q.   Are there any members of law enforcement on the

10:28AM  13  CyberTipline team?

10:28AM  14  A.   No.

10:28AM  15  Q.   So we talked about the CyberTips that could come from the

10:28AM  16  public or what we'll call from now on ESPs.  What happens when

10:28AM  17  a report is received by NCMEC?

10:28AM  18  A.   When the report is received by us, again we have certain

10:28AM  19  indicators to let us know if that is a high priority report to

10:28AM  20  us.  If it is, it's triaged to be handled first and foremost.

10:28AM  21  Our analysts will look at the information provided in that

10:28AM  22  report, see if there's any open source searches that we can do.

10:28AM  23  Ideally, the goal is to identify if there's a child at risk and

10:28AM  24  get that report to law enforcement to safeguard that child

10:29AM  25  and/or if there's an offender, identify where that offender is.

**NEWMAN - DIRECT EXAMINATION**

10:29AM 1        That report is then made available to law enforcement

10:29AM 2    for their independent review and investigation.

10:29AM 3    Q.   You mentioned the categories.  Is that how a report might

10:29AM 4    become prioritized?

10:29AM 5    A.   It could, yes.  It could also be based on the information

10:29AM 6    that's provided in that report.  Whether it comes from the

10:29AM 7    public or from the electronic service providers, there's

10:29AM 8    certain indicators that will flag to us that it is a high

10:29AM 9    priority report, either based on the information in that report

10:29AM 10   or based on the files associated with it.

10:29AM 11   Q.   Are reports from ESPs and the public treated differently?

10:29AM 12   A.   Unless it's a priority report.  So reports that come in

10:29AM 13   from the public receive one of three designations.  They're

10:30AM 14   priority 1, 2 or 3.  Priority 1 would mean that that child's in

10:30AM 15   imminent danger.  Priority 2 would be that there's concern for

10:30AM 16   that child's welfare in the future, and Priority 3 would be

10:30AM 17   just any report from a member of the public where we don't

10:30AM 18   believe that there's an imminent threat to a child.  So all of

10:30AM 19   the reports that come in from the public would be 3 unless

10:30AM 20   they're prioritized.

10:30AM 21        On the company side, on the ESP side, generally those

10:30AM 22   all come in as what we call priority E for electronic service

10:30AM 23   provider.  That is automated, and those are not reviewed by

10:30AM 24   humans.  If there are indicators surrounding that, such as an

10:30AM 25   electronic service provider chooses to escalate a report or

**NEWMAN - DIRECT EXAMINATION**

10:30AM  1    provide other information that may make us think this needs to

10:30AM  2    be prioritized, we will go ahead and do that and make it a

10:30AM  3    higher priority report.

10:30AM  4    Q.   Is that reliant upon the ESP providing that type of

10:31AM  5    emphasis on the report?

10:31AM  6    A.   Yes.  We work solely off what is provided to us by the

10:31AM  7    public or the company.

10:31AM  8    Q.   Does NCMEC generate any of these CyberTip reports full of

10:31AM  9    information?

10:31AM  10   A.   So we're not the origin of the report, but we do generate

10:31AM  11   a CyberTip report based on information that's coming in to us

10:31AM  12   from members of the public or the companies, but we are not the

10:31AM  13   origin of the report.

10:31AM  14   Q.   Is law enforcement involved in generating that report?

10:31AM  15   A.   No.

10:31AM  16   Q.   Why not?

10:31AM  17   A.   Just as our business process and based on our purview, we

10:31AM  18   just generate those reports as our national clearinghouse role.

10:31AM  19   Q.   As what point does a human review the ESP reports that are

10:31AM  20   category E?

10:32AM  21   A.   We'll go ahead and review those.  The files are handled

10:32AM  22   through a separate workflow based on the findings in that --

10:32AM  23   from the files or what is provided in that report.  Companies

10:32AM  24   may provide all sorts of different information at their own

10:32AM  25   voluntary election to those reports.  So depending on what is

NEWMAN - DIRECT EXAMINATION

10:32AM   1    reported to us kind of depends on when and who sees that

10:32AM   2    report.

10:32AM   3    Q.   What information is typically provided in a CyberTip

10:32AM   4    report that comes from an ESP?

10:32AM   5    A.   There is really no typical.  Whether it's a report from

10:32AM   6    the public or a report from the electronic service provider,

10:32AM   7    there's only two mandatory fields, which is to select one of

10:32AM   8    those eight categories and to select the date and time of the

10:32AM   9    incident.  Outside of that, both for public and company

10:32AM  10    reports, everything else is voluntarily and electively provided

10:33AM  11    to us.

10:33AM  12           So there is no real typical.  Generally, companies do

10:33AM  13    provide some sort of identifier or information about the

10:33AM  14    subject or the child victim or the incident for just

10:33AM  15    informational purposes.

10:33AM  16    Q.   Do they have an opportunity -- and when I say "they," I

10:33AM  17    mean the ESPs.  Do they have the opportunity to attach anything

10:33AM  18    to their report?

10:33AM  19    A.   Companies do.  Members of the public are not able to

10:33AM  20    submit anything to us because of our NGO non-profit status.

10:33AM  21    Companies are able to not attach, but they do designate images

10:33AM  22    that we are then also able to access so that we can review the

10:33AM  23    files in question.

10:33AM  24    Q.   And before we get further into that, does NCMEC catalog

10:33AM  25    child sexual abuse material at all?

NEWMAN - DIRECT EXAMINATION

10:34AM  1  A.  In terms of the labeling the content?  Is that the

10:34AM  2  question?

10:34AM  3  Q.  Yes.

10:34AM  4  A.  Yes, we do.

10:34AM  5  Q.  Is there some type of database that maintains child

10:34AM  6  sexually abusive material?

10:34AM  7  A.  So we do have a list of the files, the hash values, and

10:34AM  8  the associated labels once they've been labeled as such.

10:34AM  9  Q.  So can you tell us what the hash value is?

10:34AM  10  A.  My understanding of it is that it is basically a digital

10:34AM  11  fingerprint.  It is -- we traditionally use MD5 at NCMEC, which

10:34AM  12  is an alphanumeric designation for that file.

10:34AM  13  Q.  So it's not the actual images?  It's a numeric code that

10:34AM  14  identifies an image?

10:34AM  15  A.  Exactly, as I understand it, and videos as well.

10:34AM  16  Q.  And videos, yes.  Is that -- what do you call that at

10:34AM  17  NCMEC?  Is it a catalog or something else?

10:35AM  18  A.  I don't know that I understand the question.

10:35AM  19  Q.  Is there a name for that kind of catalog of images of hash

10:35AM  20  values?

10:35AM  21  A.  We just call it our files.

10:35AM  22  Q.  Are those files reviewed before the hash value is entered

10:35AM  23  into that file database?

10:35AM  24  A.  They are -- they are reviewed before a label is given to

10:35AM  25  them.  In terms of the MD5, that's an automated process that

NEWMAN - DIRECT EXAMINATION

10:35AM 1 happens when those files, images, and videos are associated

10:35AM 2 with that CyberTipline report, but there is a human review

10:35AM 3 before the label is given to that file.

10:35AM 4 Q.    Do you know how many images that NCMEC has filed?

10:35AM 5 A.    I do not.

10:35AM 6 Q.    Do you know if those hash values are shared with ESPs?

10:36AM 7 A.    The National Center makes available the MD5s and the files

10:36AM 8 that are submitted by companies basically those that are kind

10:36AM 9 of what we call our worst of the worst, and that's what we call

10:36AM 10 our hash sharing initiative, which is those images and videos

10:36AM 11 that are received by us which appear to be the worst of the

10:36AM 12 worst content.  We just offer that and make that available then

10:36AM 13 to companies who would like to use those for voluntary

10:36AM 14 initiatives to detect and report CSAM, child sexual abuse

10:36AM 15 material, that's on their servers and platforms.

10:36AM 16 Q.    Do you know how a company can obtain that information?

10:36AM 17 A.    They just need to reach out to us, and I believe that

10:36AM 18 there's a legal agreement, but I'm not certain.

10:37AM 19 Q.    Why is it significant to have the hash value or the MD5 of

10:37AM 20 a potential child sexual abuse image or video?

10:37AM 21 A.    It can be helpful in many ways.  You know, as we talked

10:37AM 22 about volume, I said we received over 29 million reports last

10:37AM 23 year.  Within those reports, there were over 85 million images

10:37AM 24 and videos that were received by us.  So you can understand the

10:37AM 25 volume that we're dealing with.  So using the files and the

NEWMAN - DIRECT EXAMINATION

10:37AM  1    MD5s is helpful for many reasons.  It helps us identify those
10:37AM  2    files that NCMEC has already seen and already classified so we
10:37AM  3    don't need to look at those again.  That also helps with our
10:37AM  4    staff welfare so that they're not looking at additional child
10:37AM  5    pornography that they don't need to be looking at.  When there
10:37AM  6    is not a match on an MD5, we believe that could be new content,
10:37AM  7    a child who's in danger right now, so we want to prioritize
10:37AM  8    those reports.  So really using that matching is able to serve
10:38AM  9    many purposes.
10:38AM  10   Q.   Can you tell me the process of when NCMEC receives a
10:38AM  11   CyberTip from an ESP, where is the life of that report going to
10:38AM  12   go through NCMEC?
10:38AM  13   A.   I'm sorry, I don't understand the question.
10:38AM  14   Q.   Who is going to see it?  What's going to happen to that
10:38AM  15   report?  What are the steps that are going to be taken?
10:38AM  16   A.   Okay.  So right now, the way that the process works is
10:38AM  17   that the files are reviewed separately from the report.  So
10:38AM  18   they are carved out, and they are reviewed ahead of the report
10:38AM  19   being processed.  They are labeled as such.  Again, if those --
10:38AM  20   if those files are viewable and need to be reviewed, we will do
10:38AM  21   that.  We then associate those labels and any information from
10:38AM  22   the files to the report, and then another analyst will process
10:39AM  23   that report and make available to law enforcement if deemed
10:39AM  24   necessary.
10:39AM  25   Q.   You mentioned labeling images.  What does that mean?

NEWMAN - DIRECT EXAMINATION

10:39AM  1    A.   We have categorization at the National Center for our

10:39AM  2    files.  It's really meant to provide context and kind of an

10:39AM  3    impression of that file and of that report.  You know, it's

10:39AM  4    meant to inform what we're looking at in that report and

10:39AM  5    provide context to law enforcement when we make it available.

10:39AM  6    It certainly helps us in our advocacy role.  Again, as a

10:39AM  7    non-profit, we want to serve as child advocates, so it lets us

10:39AM  8    use that information for data that we can -- we can use

10:39AM  9    proactively.  So that's really the purpose:  Triage,

10:39AM  10   prioritization, and really just kind of informing that report.

10:39AM  11   Q.   Once an image or video receives a label, is it ever

10:39AM  12   reviewed again?

10:40AM  13   A.   It may be, but to receive that label, it is reviewed at

10:40AM  14   least twice by two different people.  But it may be reviewed

10:40AM  15   again.

10:40AM  16   Q.   Once it receives a label, is it now part of the file

10:40AM  17   database?

10:40AM  18   A.   It is.

10:40AM  19   Q.   Can you tell me what type of labels images or videos may

10:40AM  20   receive?

10:40AM  21   A.   Sure.  I don't have the exhaustive list in my head, but I

10:40AM  22   know we have apparent CP, we have CP unconfirmed, we have child

10:40AM  23   clothed, we have child unclothed, anime, things like that.

10:40AM  24   Q.   Does the reviewer receive any training in order to be a

10:40AM  25   reviewer of those images or videos?

**NEWMAN - DIRECT EXAMINATION**

10:40AM  1    A.   Yes.

10:40AM  2    Q.   What type of training do they receive, if you know?

10:40AM  3    A.   My understanding is that it's basically just, you know,

10:40AM  4    understanding what that definition is and applying labels over

10:41AM  5    and over, and then working with management to fine-tune their

10:41AM  6    assessment of those files.

10:41AM  7    Q.   Are they associated with law enforcement at all?

10:41AM  8    A.   No.

10:41AM  9    Q.   Does law enforcement have access to the labeling in the

10:41AM  10   database?

10:41AM  11   A.   No.

10:41AM  12   Q.   When NCMEC labels an image, is that an expert opinion?

10:41AM  13   A.   I -- I would say it's an educated and informed impression

10:41AM  14   of what is being depicted.  We certainly, you know, rely on law

10:41AM  15   enforcement to do their independent review and investigation

10:41AM  16   and assessment of those files.  We are certainly just serving,

10:41AM  17   again, more as an impression, but we are not the determiners of

10:41AM  18   what is illegal or legal content.

10:41AM  19   Q.   What then is the purpose of giving a label to an image or

10:41AM  20   video?

10:41AM  21   A.   Again, really just to assist with that -- that

10:41AM  22   prioritization or that triage, again, just to give that

10:42AM  23   impression of what that report is coming in, what those files

10:42AM  24   are.  Again, internally we can use it for staff welfare as well

10:42AM  25   so they understand what's being depicted in those images, and

NEWMAN - DIRECT EXAMINATION

10:42AM 1    really it serves as context.  So understanding what the files

10:42AM 2    are labeled associated with a report.  When that analyst goes

10:42AM 3    to look at that report, they can kind of have a sense of what

10:42AM 4    was exchanged or part of that as they do their other analytical

10:42AM 5    work.

10:42AM 6    Q.    You mentioned at the end of the CyberTipline report that's

10:42AM 7    maybe generated, is that then sent to law enforcement?

10:42AM 8    A.    We make them available to law enforcement.

10:42AM 9    Q.    What does that mean?

10:42AM 10   A.    Essentially, there's a secure connection where we

10:42AM 11   basically open a portal to the receiving law enforcement so

10:43AM 12   that they can come in and access that CyberTipline report.  We

10:43AM 13   do send them emails to let them know there is a CyberTipline

10:43AM 14   report waiting for them, and if it is a priority report, we

10:43AM 15   will call ahead of time just to make sure we make a

10:43AM 16   human-to-human contact that a priority report is available to

10:43AM 17   them.

10:43AM 18   Q.    I want to talk about this case in particular.  I'm going

10:43AM 19   to show you what's been identified as Government Exhibit 1.

10:43AM 20          Do you recognize the exhibit that I've shown you?

10:43AM 21   A.    I do.

10:43AM 22   Q.    I'm showing you a CyberTipline report 79384716.  Is this a

10:44AM 23   report that was generated by NCMEC?

10:44AM 24   A.    It is.

10:44AM 25   Q.    Can you tell me when that was generated?

NEWMAN - DIRECT EXAMINATION

10:44AM  1    A.    I would need to --

10:44AM  2    Q.    You can go ahead and flip through.

10:44AM  3    A.    Okay.  As you can see here, it was received by us on

10:44AM  4    September 10th, 2020 at 18:02:08 universal time.  Our analyst

10:44AM  5    processed this report on October 22nd.

10:44AM  6    Q.    Now, we talked about priority levels, and I see on the

10:44AM  7    first page this says, "priority level E", and what does that

10:44AM  8    mean to NCMEC?

10:44AM  9    A.    That this is a report that was submitted to us by an

10:44AM  10   electronic service provider, and there were no extenuating

10:45AM  11   circumstances that were indicated by the company when they made

10:45AM  12   the report to us to make it a priority or escalation.

10:45AM  13   Q.    And there's an executive summary.  Where does that

10:45AM  14   information come from?

10:45AM  15   A.    That information is a template that's autofilled at the

10:45AM  16   completion of the processing of the report.

10:45AM  17   Q.    Can you tell me the incident type on this CyberTipline

10:45AM  18   report?

10:45AM  19   A.    The incident type reads "Apparent child pornography."

10:45AM  20   Q.    Is that one of those labels that we talked about

10:45AM  21   previously?

10:45AM  22   A.    That is -- the labels apply to the files.  This is what we

10:45AM  23   would call our incident type for the report itself.  So in

10:45AM  24   regards to those eight categories that are selected by the

10:45AM  25   reporting person or company at the time the report is made,

NEWMAN - DIRECT EXAMINATION

10:45 AM  1  after analysis, we can recategorize that report to be more

10:45 AM  2  accurate.  So in this case our analyst selected "Apparent child

10:46 AM  3  pornography."

10:46 AM  4  Q.   What does that mean to NCMEC?

10:46 AM  5  A.   This means that at least one of the files that was

10:46 AM  6  submitted to us as part of this report was labeled as apparent

10:46 AM  7  CP.

10:46 AM  8  Q.   Now, it says, "Files not reviewed by NCMEC hash match."

10:46 AM  9  Could you explain what that means in this report?

10:46 AM  10  A.   Traditionally when we have that verbiage, that basically

10:46 AM  11  means that we did not review the files in this report, but that

10:46 AM  12  the labels were applied based on hash matches to previously

10:46 AM  13  seen iterations of the files.

10:46 AM  14  Q.   If there is a hash match, what's the significance of that?

10:46 AM  15  A.   It just means that we've seen that file before and so

10:46 AM  16  that's where the label is coming from and that we did not

10:46 AM  17  review it in this particular report.  That's what the template

10:46 AM  18  means.

10:46 AM  19  Q.   And we talked about your familiarity with this particular

10:47 AM  20  CyberTipline report.  Is that an accurate statement, "Files not

10:47 AM  21  reviewed by NCMEC?"

10:47 AM  22  A.   It is not.

10:47 AM  23  Q.   Could you explain why that's not an accurate statement?

10:47 AM  24  A.   So in this particular case, six of the seven files were

10:47 AM  25  actually reviewed by us.  The one file that was not was the GIF

NEWMAN - DIRECT EXAMINATION

10:47AM  1    file.  This was processed during our transition in workflow as
10:47AM  2    a result of COVID and different processing guidelines and
10:47AM  3    workflows.  So at the time that this report was sent out, the
10:47AM  4    system did not know, is the way to say it, did not know that
10:47AM  5    the humans have reviewed it -- humans had reviewed it.  So, in
10:47AM  6    fact, they had.  So there was inaccuracy there.
10:47AM  7    Q.    How were you able to discover that the human did review
10:47AM  8    those files?
10:47AM  9    A.    It was really only as a result of this case that we looked
10:47AM  10   at that in preparation for court, and in looking on the back
10:47AM  11   end, I'm able to see that humans did review six of the seven
10:48AM  12   files that were submitted.
10:48AM  13   Q.    Have the CyberTipline report procedures changed
10:48AM  14   post-COVID-19?
10:48AM  15   A.    They did change once COVID hit, and there was the pandemic
10:48AM  16   and mandatory work from home.  Certainly working with child
10:48AM  17   pornography, we're unable to do that work at home, so we did
10:48AM  18   have a group of volunteers who went into the office during the
10:48AM  19   pandemic and that began kind of the new workflow where the
10:48AM  20   files are reviewed separately than the reports, and at this
10:48AM  21   time we were still working on that system, and so these hadn't
10:48AM  22   received the label yet that the humans had reviewed them.
10:48AM  23   Q.    I want to scooch down to the bottom of this first page.
10:48AM  24   There's a lot of text here that talks about the National Center
10:48AM  25   for Missing and Exploited Children, but I want to focus on the

NEWMAN - DIRECT EXAMINATION

10:49AM  1    last sentence.  Could you read that to us, please?

10:49AM  2    A.   Sure.  "NCMEC does not investigate and cannot verify the

10:49AM  3    accuracy of the information submitted by reporting parties."

10:49AM  4    Q.   Why is that in the CyberTipline report?

10:49AM  5    A.   Mainly for two reasons.  Everything that is submitted to

10:49AM  6    us, whether by the public or a company that's listed in

10:49AM  7    Section A, is untouchable by NCMEC.  We're not able in any way

10:49AM  8    to access that information, change, or edit that information.

10:49AM  9    So any information that is submitted to us is essentially

10:49AM  10   locked down and part of Section A.  In addition, we are not a

10:49AM  11   law enforcement agency, so we cannot do investigative work.  We

10:49AM  12   are certainly a non-profit, and we serve in that clearinghouse

10:49AM  13   role to provide information to law enforcement for their

10:49AM  14   independent review and assessment.

10:49AM  15   Q.   Let me go to the next page on this exhibit.  I'm showing

10:49AM  16   you the contents page.  It has Section A, B, and C.  Could you

10:50AM  17   tell me what Section A represents?

10:50AM  18   A.   Section A represents everything that was reported to us by

10:50AM  19   the company in this report.

10:50AM  20   Q.   The information provided in Section A, does NCMEC

10:50AM  21   contribute to that at all?

10:50AM  22   A.   No.

10:50AM  23   Q.   And what about Section B?

10:50AM  24   A.   Section B is where any information that is received

10:50AM  25   through automated services would be listed there.

NEWMAN - DIRECT EXAMINATION

| | | |
|---|---|---|
| 10:50AM | 1 | Q.   And what about Section C? |
| 10:50AM | 2 | A.   Section C is where any work done by our analysts would be |
| 10:50AM | 3 | listed there. |
| 10:50AM | 4 | Q.   And what about Section D? |
| 10:50AM | 5 | A.   Section D indicates which law enforcement, if any, the |
| 10:50AM | 6 | report was made available to. |
| 10:50AM | 7 | Q.   And in this particular case, was it made available to law |
| 10:50AM | 8 | enforcement agency? |
| 10:50AM | 9 | A.   It was, to the Central Florida ICAC, Internet Crimes |
| 10:50AM | 10 | Against Children task force. |
| 10:51AM | 11 | Q.   Let me go to the next page where Section A is actually |
| 10:51AM | 12 | represented.  Could you tell me the reporting electronic |
| 10:51AM | 13 | service provider for this particular report? |
| 10:51AM | 14 | A.   Yahoo. |
| 10:51AM | 15 | Q.   And does it provide any company information about maybe |
| 10:51AM | 16 | who owns Yahoo? |
| 10:51AM | 17 | A.   It does.  It appears that they provide a company |
| 10:51AM | 18 | information section. |
| 10:51AM | 19 | Q.   Okay.  And what company is listed under the reporting |
| 10:51AM | 20 | electronic service provider? |
| 10:51AM | 21 | A.   Oath Holdings. |
| 10:51AM | 22 | Q.   I'm going to go to the next page and get to incident |
| 10:51AM | 23 | information.  Is there suspect information provided in this |
| 10:51AM | 24 | report? |
| 10:51AM | 25 | A.   There is. |

NEWMAN - DIRECT EXAMINATION

10:51AM    1    Q.    Can you tell me the name of the suspect?

10:51AM    2    A.    As listed, it's vlad vlad.

10:52AM    3          THE COURT:  If you could just pause, Ms. Favorit.

10:52AM    4    You said going to the next page.  It appears that you've moved

10:52AM    5    two pages from the last page.  So just for the record if you

10:52AM    6    could describe the page that you're looking at.

10:52AM    7    BY MS. FAVORIT:

10:52AM    8    Q.    Yes, I'm showing you page 5 of the CyberTipline report in

10:52AM    9    Government's Exhibit 1, and at the top of the page it starts

10:52AM    10   with the incident type and then leads to suspect, and then it

10:52AM    11   has page 3 listed for the actual CyberTip.

10:52AM    12         And what is the email address provided as the

10:52AM    13   suspect's?

10:52AM    14   A.    It appears to be vladlover50@yahoo.com.

10:52AM    15   Q.    And, again, is any of this provided by NCMEC?

10:52AM    16   A.    No.

10:52AM    17   Q.    How many files were up loaded by Yahoo?

10:52AM    18   A.    Seven.

10:53AM    19   Q.    And I want to talk about the first uploaded file

10:53AM    20   information.  What type of information is provided in reference

10:53AM    21   to each file uploaded?

10:53AM    22   A.    Well, that can vary depending on what's completed by the

10:53AM    23   electronic service provider, but as a standard template, you

10:53AM    24   can see the fields that are available.  So that's file name,

10:53AM    25   MD5, the original file name, three questions from the

NEWMAN - DIRECT EXAMINATION

10:53AM   1   electronic service provider, and then two additional

10:53AM   2   information fields.

10:53AM   3   Q.   And is there significance about the MD5 number that was

10:53AM   4   provided by Yahoo in this case?

10:53AM   5   A.   The -- just the significance of that is that digital

10:53AM   6   fingerprint and being able to find those automated services to

10:53AM   7   see if those files have been through the NCMEC system before.

10:53AM   8   Q.   What is Yahoo's response to, "Did reporting ESP view

10:54AM   9   entire contents of uploaded file?"

10:54AM  10   A.   They responded in the affirmative, "Yes."

10:54AM  11   Q.   And what about view entire contents -- or, "Were entire

10:54AM  12   contents of uploaded file publicly available?"

10:54AM  13   A.   They did not answer that question.

10:54AM  14   Q.   Okay.  Does NCMEC rely on the self-reporting of Yahoo in

10:54AM  15   this case?

10:54AM  16   A.   We do.

10:54AM  17   Q.   Why would NCMEC rely upon that "yes" answer?

10:54AM  18   A.   Because we trust their submission and reporting to us.

10:54AM  19   Q.   Is that something that NCMEC will investigate?

10:54AM  20   A.   No, that's outside of our purview.

10:54AM  21   Q.   Would NCMEC contact Yahoo to confirm that they did open or

10:54AM  22   receive these files?

10:54AM  23   A.   Not to my knowledge.

10:54AM  24   Q.   You mentioned the number of uploaded files.  Could you

10:55AM  25   tell us how many were viewed by NCMEC?

**NEWMAN - DIRECT EXAMINATION**

10:55AM  1    A.   Six of the seven were viewed before it was made available

10:55AM  2    to law enforcement.

10:55AM  3    Q.   Why wasn't the seventh reviewed?

10:55AM  4    A.   Because that one based on that MD5 had already been seen

10:55AM  5    by NCMEC, and so it identified as being a seen-before file, and

10:55AM  6    that label was already applied.

10:55AM  7    Q.   What does NCMEC in this case do with the information

10:55AM  8    that's provided by Yahoo?

10:55AM  9    A.   In this particular case, we -- as mentioned, we reviewed

10:55AM  10   six of the seven files, ensured that they all had those

10:55AM  11   categorizations labeled for them, and then just processed the

10:55AM  12   rest of the report.

10:55AM  13   Q.   Let me move on from looking at the CyberTip briefly.  Does

10:55AM  14   NCMEC have any authority to subpoena information from Yahoo?

10:56AM  15   A.   No.

10:56AM  16   Q.   Does NCMEC regularly receive reports from Yahoo?

10:56AM  17   A.   Regularly, uh-huh.

10:56AM  18   Q.   Were there any hash matches in this case?

10:56AM  19   A.   There was at least one, that GIF file that I mentioned.

10:56AM  20   Q.   Was it given a label by NCMEC?

10:56AM  21   A.   It was.

10:56AM  22   Q.   Do you remember what that label was?

10:56AM  23   A.   Can I flip --

10:56AM  24   Q.   Yes, you can review the exhibit.

10:56AM  25   A.   So I'm looking at page 6 of the CyberTipline report,

**NEWMAN - DIRECT EXAMINATION**

10:56AM  1   Section B.

10:56AM  2   Q.   I'm also showing that for the courtroom.

10:56AM  3   A.   The GIF file was labeled, "CP unconfirmed."

10:57AM  4   Q.   What does that mean to NCMEC?

10:57AM  5   A.   Traditionally, what that means is that the activity

10:57AM  6   depicted in that image or video appears to meet the federal

10:57AM  7   definition of child pornography.  However, there may be

10:57AM  8   question of the age of the individual seen in that particular

10:57AM  9   image or video.  So we would call that "Age indeterminate" or

10:57AM  10  "Age difficult."

10:57AM  11  Q.   Does NCMEC make the final determination of the labeling of

10:57AM  12  the image for court purposes?

10:57AM  13  A.   No, that is left to law enforcement.

10:57AM  14  Q.   I see that all the file names are listed here.  Could you

10:57AM  15  tell me the categorization for each of the files?

10:57AM  16  A.   Sure.  So the first one, as mentioned, the GIF, is "CP

10:57AM  17  unconfirmed."  Image.125-1 is "CP unconfirmed."  Image.1-1 is

10:58AM  18  "Apparent CP."  Image.120 hash -- or, I'm sorry, -1 is "Child

10:58AM  19  clothed."  Image.97-1 is "CP unconfirmed."  Image.5-1 is "CP

10:58AM  20  unconfirmed," and image.118-1 is "Apparent child pornography."

10:58AM  21  Q.   If these images were not previously in NCMEC's database,

10:58AM  22  the files that we spoke about, would they be later included now

10:58AM  23  that NCMEC had received these images?

10:58AM  24  A.   Yes.  With the submission of this, if they are not already

10:58AM  25  in our system, they would be now.

**NEWMAN - DIRECT EXAMINATION**

10:58AM  1   Q.   Does NCMEC reach out to the suspect at all?

10:58AM  2   A.   No.

10:58AM  3   Q.   In this particular case, was Central Florida ICAC

10:59AM  4   contacted?

10:59AM  5   A.   They received notification that there was a CyberTipline

10:59AM  6   report available to them.

10:59AM  7   Q.   Were any phone calls made to law enforcement in this case?

10:59AM  8   A.   Not that I'm aware of.

10:59AM  9   Q.   Is there like an age cutoff at all for labeling of images

10:59AM  10  of children?

10:59AM  11  A.   We use the federal estimation of 18, 18 years old.

10:59AM  12  Q.   And how else are images categorized?  Is the federal law

10:59AM  13  of child pornography utilized?

10:59AM  14  A.   It is.

10:59AM  15  Q.   Does NCMEC pay electronic service providers to provide

10:59AM  16  these CyberTips?

10:59AM  17  A.   No.

10:59AM  18  Q.   Does NCMEC provide any money to ESPs?

10:59AM  19  A.   No.

10:59AM  20  Q.   Does the Government participate in the CyberTipline

11:00AM  21  reporting?

11:00AM  22  A.   No.

11:00AM  23  Q.   Is the Government in charge of supervising the

11:00AM  24  CyberTipline report within NCMEC?

11:00AM  25  A.   No.

NEWMAN - DIRECT EXAMINATION

11:00AM 1    Q.   Does the Government have any role in the operation of the
11:00AM 2    CyberTipline program?
11:00AM 3    A.   Not to my knowledge.
11:00AM 4    Q.   Is NCMEC controlled by the federal government in any way?
11:00AM 5    A.   No.
11:00AM 6    Q.   Did Yahoo get any special treatment in this particular
11:00AM 7    case?
11:00AM 8    A.   Not to my knowledge.
11:00AM 9    Q.   Does NCMEC have pediatricians on staff that can review
11:00AM 10   images to determine age of children?
11:00AM 11   A.   No.
11:00AM 12   Q.   Was this CyberTip done in the regular course of business?
11:00AM 13   A.   It was.
11:00AM 14   Q.   I'm sorry.  Was there anything different about this
11:01AM 15   CyberTipline report compared to other CyberTipline reports?
11:01AM 16   A.   No.
11:01AM 17   Q.   Is that the totality of NCMEC's involvement?
11:01AM 18   A.   Yes, what is listed here in the report.
11:01AM 19   Q.   Does NCMEC obtain IP addresses from suspects?
11:01AM 20   A.   We only obtain what's submitted to us by the member of the
11:01AM 21   public or the company.
11:01AM 22         MS. FAVORIT:  May I have a moment, Your Honor?
11:01AM 23         THE COURT:  Sure.
11:01AM 24                    (Pause.)
11:02AM 25         MS. FAVORIT:  May I proceed, Your Honor?

**NEWMAN - CROSS-EXAMINATION**

| | | |
|---|---|---|
| 11:02AM | 1 | THE COURT:  You may. |
| 11:02AM | 2 | BY MS. FAVORIT: |
| 11:02AM | 3 | Q.   I just want to show you briefly Government's Exhibit 4. |
| 11:02AM | 4 | Do you recognize this exhibit? |
| 11:02AM | 5 | A.   I do. |
| 11:02AM | 6 | Q.   What do you recognize it to be? |
| 11:02AM | 7 | A.   An affidavit. |
| 11:02AM | 8 | Q.   And where did this affidavit come from? |
| 11:02AM | 9 | A.   I believe from you. |
| 11:02AM | 10 | Q.   Is this affidavit something that you've read previously? |
| 11:02AM | 11 | A.   It is. |
| 11:02AM | 12 | Q.   And was it drafted by NCMEC? |
| 11:02AM | 13 | A.   It was. |
| 11:03AM | 14 | Q.   Did you have the opportunity to review this affidavit |
| 11:03AM | 15 | previously? |
| 11:03AM | 16 | A.   I have. |
| 11:03AM | 17 | Q.   And do you support everything that it says in the |
| 11:03AM | 18 | affidavit? |
| 11:03AM | 19 | A.   I do. |
| 11:03AM | 20 | MS. FAVORIT:  I don't have any further questions, |
| 11:03AM | 21 | Your Honor. |
| 11:03AM | 22 | THE COURT:  Okay.  Mr. Centrone, any cross? |
| 11:03AM | 23 | MR. CENTRONE:  Yes, Your Honor. |
| 11:03AM | 24 | CROSS-EXAMINATION |
| 11:03AM | 25 | BY MR. CENTRONE: |

**NEWMAN - CROSS-EXAMINATION**

11:03AM  1    Q.   Good morning, Ms. Newman.

11:03AM  2    A.   Good morning.

11:03AM  3    Q.   Just to clarify, we talked a little bit about ago -- a

11:03AM  4    little while ago about the definition of "CP unconfirmed."  So

11:03AM  5    it's fair to call that "Age difficult;" is that -- is that

11:03AM  6    correct?

11:03AM  7    A.   That's fair.

11:03AM  8    Q.   And based on your testimony, that means, to put it in

11:03AM  9    plain English, you can't tell if the person in the image is 18

11:03AM  10   or not?

11:03AM  11   A.   Correct.

11:03AM  12   Q.   Those -- we'll call them labels, as the Government did.

11:03AM  13   The people who review images and apply those levels, what

11:04AM  14   standards are employed to help them make those determinations?

11:04AM  15   A.   Really, just exposure and training.  So reviewing file

11:04AM  16   after file and then working with their manager to help kind of

11:04AM  17   fine-tune their assessment of the file.

11:04AM  18   Q.   So because part of that review involves attempting to

11:04AM  19   determine the age of the participants in the photos, is it fair

11:04AM  20   to say that the reviewers are trained to determine whether

11:04AM  21   someone is 18 or not from an image?

11:04AM  22   A.   You know, for that, we really focus on those where it's,

11:04AM  23   you know, pretty clear that it's a child.  If there's any

11:04AM  24   question about that, you know, we'll lean towards the CP

11:04AM  25   unconfirmed just because we are not pediatricians.  We are not

NEWMAN - CROSS-EXAMINATION

| | | |
|---|---|---|
| 11:04AM | 1 | trained to do biological assessments, physiological |
| 11:04AM | 2 | assessments. |
| 11:04AM | 3 | Q.   Okay.  Thank you.  Under -- under federal law, NCMEC must |
| 11:05AM | 4 | operate the CyberTipline, correct? |
| 11:05AM | 5 | A.   We're authorized to operate the CyberTipline. |
| 11:05AM | 6 | Q.   You're obligated to operate the CyberTipline under federal |
| 11:05AM | 7 | law, correct? |
| 11:05AM | 8 | A.   Yes, pursuant to 2258A, which requires electronic service |
| 11:05AM | 9 | providers to make reports to us. |
| 11:05AM | 10 | Q.   And there's no other non-profit that takes that same role |
| 11:05AM | 11 | apart from NCMEC, correct? |
| 11:05AM | 12 | A.   Not to my knowledge. |
| 11:05AM | 13 | Q.   And under that same statute, NCMEC must make its reports |
| 11:05AM | 14 | available to law enforcement agencies, correct? |
| 11:05AM | 15 | A.   I -- I can't confirm the "must."  I know that, when |
| 11:05AM | 16 | appropriate, we can make them available to law enforcement. |
| 11:05AM | 17 | Q.   And that includes state, federal, and foreign agencies, |
| 11:05AM | 18 | correct? |
| 11:05AM | 19 | A.   Correct. |
| 11:05AM | 20 | Q.   And NCMEC, likewise, is legally required to operate the |
| 11:05AM | 21 | national clearinghouse for information about missing and |
| 11:05AM | 22 | exploited children, correct, under 34 USC 11293(b)? |
| 11:06AM | 23 | A.   I'm not sure of the source, but, yes, that's my |
| 11:06AM | 24 | understanding. |
| 11:06AM | 25 | Q.   And NCMEC is also legally required to help law enforcement |

**NEWMAN - CROSS-EXAMINATION**

11:06 AM   1   locate and recover missing and exploited children under that

11:06 AM   2   same statute; is that correct?

11:06 AM   3   A.   I'm not familiar with that statute, so I'll defer to you.

11:06 AM   4   Q.   And NCMEC is also required to provide forensic technical

11:06 AM   5   assistance to law enforcement to help identify victims of child

11:06 AM   6   exploitation, correct?

11:06 AM   7   A.   I know we do; that we're required component I can't speak

11:06 AM   8   to, but I know that is what we do.

11:06 AM   9   Q.   And, likewise, NCMEC's obligated by federal law to track

11:06 AM  10   and identify patterns of attempted child abductions for law

11:06 AM  11   enforcement purposes?

11:06 AM  12   A.   Again, we do do that.  The requirement is -- I'll defer to

11:06 AM  13   you.

11:06 AM  14   Q.   And NCMEC is legally obligated to provide training to law

11:07 AM  15   enforcement agencies in identifying and locating non-compliant

11:07 AM  16   sex offenders, correct?

11:07 AM  17   A.   We do that.  Again, the requirement, I'll defer to you.

11:07 AM  18   Q.   And you're not aware of any other entity under federal law

11:07 AM  19   that's obligated to perform these activities, correct?

11:07 AM  20   A.   Correct.

11:07 AM  21   Q.   And the purpose of those activities is to assist or

11:07 AM  22   support law enforcement, correct?

11:07 AM  23   A.   Yes, and to also serve families, other NGOs, other

11:07 AM  24   stakeholders, child-serving professionals, all who are working

11:07 AM  25   on missing and exploited children issues and cases.

**NEWMAN - CROSS-EXAMINATION**

11:07AM 1    Q.    And NCMEC is also empowered to call on other federal

11:07AM 2    agencies for assistance, such as the Secret Service, correct?

11:07AM 3    A.    Yes, we can.

11:07AM 4    Q.    Again, are you aware of any other entity that has those

11:07AM 5    rights under federal law?

11:07AM 6    A.    Not that I know of.

11:08AM 7    Q.    And NCMEC alone is statutorily obligated to maintain the

11:08AM 8    CyberTipline for ISPs to use to report possible internet child

11:08AM 9    sexual exploitation violations to the Government, correct?

11:08AM 10    A.    That's my understanding.

11:08AM 11    Q.    And NCMEC is obligated to forward every report it receives

11:08AM 12    to federal law enforcement agencies and make its reports

11:08AM 13    available to state and local law enforcement as well?

11:08AM 14    A.    All of our reports are available to law enforcement.

11:08AM 15    Q.    And ISPs, internet service providers, must report any

11:08AM 16    known child pornography violations to NCMEC alone, correct?

11:08AM 17    A.    That's my understanding.

11:08AM 18    Q.    In other words, they're not obligated to report it to any

11:08AM 19    other entity under the law?

11:08AM 20    A.    That's my understanding.

11:08AM 21    Q.    And when NCMEC confirms it's received a report, confirms

11:08AM 22    to the ISP that they've received a report, the ISP must treat

11:09AM 23    that confirmation as a request to preserve evidence issued by

11:09AM 24    the Government itself, correct?

11:09AM 25    A.    That's correct, for 90 days.

NEWMAN - CROSS-EXAMINATION

| | | |
|---|---|---|
| 11:09AM | 1 | Q.   And the failure of ISPs to comply with those obligations |
| 11:09AM | 2 | opens them to civil and criminal liability, correct? |
| 11:09AM | 3 | A.   That's my understanding. |
| 11:09AM | 4 | Q.   And NCMEC is statutorily authorized to receive contraband, |
| 11:09AM | 5 | including child pornography, knowingly and to review its |
| 11:09AM | 6 | contents intentionally, correct? |
| 11:09AM | 7 | A.   My understanding. |
| 11:09AM | 8 | Q.   In other words, NCMEC can possess child pornography, |
| 11:09AM | 9 | whereas an average citizen obviously would not have such a |
| 11:09AM | 10 | right, correct? |
| 11:09AM | 11 | A.   Correct.  I would say we access it, yes, uh-huh. |
| 11:09AM | 12 | Q.   Okay.  You spoke a little earlier about the grants |
| 11:09AM | 13 | received by NCMEC.  I'd like to direct your attention in that |
| 11:09AM | 14 | binder in front of you to Exhibit F. |
| 11:10AM | 15 | THE COURT:  This is Defendant's F, Mr. Centrone? |
| 11:10AM | 16 | MR. CENTRONE:  Yes, Your Honor. |
| 11:10AM | 17 | THE COURT:  Okay. |
| 11:10AM | 18 | BY MR. CENTRONE: |
| 11:10AM | 19 | Q.   And this is the NCMEC 2021 annual report. |
| 11:10AM | 20 | A.   Uh-huh. |
| 11:10AM | 21 | Q.   Reviewing that report, does it refresh your memory that |
| 11:10AM | 22 | Government grants and contracts make up about $42 million of |
| 11:10AM | 23 | NCMEC's revenue in 2021? |
| 11:10AM | 24 | A.   I'm sorry, I'm not familiar with the exact numbers. |
| 11:10AM | 25 | Q.   Sure.  If you look on page 4 of the report, there's a -- |

NEWMAN - CROSS-EXAMINATION

| | | |
|---|---|---|
| 11:10AM | 1 | there's a section entitled "Financials" and the top line |
| 11:11AM | 2 | reflects Government contracts and grants. |
| 11:11AM | 3 | A.   Uh-huh. |
| 11:11AM | 4 | Q.   Do you see that? |
| 11:11AM | 5 | A.   I do. |
| 11:11AM | 6 | Q.   It's a total of $41,863,909? |
| 11:11AM | 7 | A.   I do see that. |
| 11:11AM | 8 | Q.   Okay.  And that's out of approximately $61 million of a |
| 11:11AM | 9 | total budget, correct, if you look at the bottom line of the |
| 11:11AM | 10 | same financial page? |
| 11:11AM | 11 | A.   Yes. |
| 11:11AM | 12 | Q.   The work NCMEC does to aid the enforcement and prosecution |
| 11:11AM | 13 | of sex offenders serves a public function, correct? |
| 11:11AM | 14 | A.   In what regard? |
| 11:11AM | 15 | Q.   It's contributing to enforcement of laws and prosecution |
| 11:11AM | 16 | of violators of law? |
| 11:11AM | 17 | A.   The sex offender team, I am not familiar with that.  I |
| 11:11AM | 18 | don't work on that team.  My understanding is that they assist |
| 11:12AM | 19 | the marshals with absconded sex offenders. |
| 11:12AM | 20 | Q.   At least one federal appellate court has found that NCMEC |
| 11:12AM | 21 | is a state actor for Fourth Amendment purposes, correct? |
| 11:12AM | 22 |          MS. FAVORIT:  Objection.  Requesting legal |
| 11:12AM | 23 | conclusion. |
| 11:12AM | 24 |          THE COURT:  Mr. Centrone, why would the witness be |
| 11:12AM | 25 | qualified to render such an opinion about a matter that's a |

NEWMAN - CROSS-EXAMINATION

| | | |
|---|---|---|
| 11:12AM | 1 | published opinion? |
| 11:12AM | 2 | MR. CENTRONE: I don't believe it is asking for a |
| 11:12AM | 3 | legal opinion or a legal conclusion. |
| 11:12AM | 4 | THE COURT: You'll have to establish a foundation why |
| 11:12AM | 5 | this witness would know that. |
| 11:12AM | 6 | BY MR. CENTRONE: |
| 11:12AM | 7 | Q. Has NCMEC ever been called to testify in a hearing such as |
| 11:12AM | 8 | today where it's had to establish whether or not it is a state |
| 11:12AM | 9 | actor, to your knowledge? |
| 11:12AM | 10 | A. I -- I believe that that has happened. |
| 11:13AM | 11 | Q. How often has that happened, to your knowledge? |
| 11:13AM | 12 | MS. FAVORIT: Objection. Relevance to this hearing. |
| 11:13AM | 13 | MR. CENTRONE: This is -- |
| 11:13AM | 14 | THE COURT: Overruled. |
| 11:13AM | 15 | BY MR. CENTRONE: |
| 11:13AM | 16 | Q. You can answer. |
| 11:13AM | 17 | A. I'm sorry, can you repeat the question? |
| 11:13AM | 18 | Q. Sure. How often has that happened, to your knowledge? |
| 11:13AM | 19 | A. I don't know. |
| 11:13AM | 20 | Q. Okay. Are you aware of any -- the results of any such |
| 11:13AM | 21 | hearings? |
| 11:13AM | 22 | A. All I know is the role of NCMEC was an issue in those |
| 11:13AM | 23 | cases. That's all I know. |
| 11:13AM | 24 | Q. You're not aware of how those cases resolved with respect |
| 11:13AM | 25 | to that particular issue? |

NEWMAN - CROSS-EXAMINATION

| | | |
|---|---|---|
| 11:13AM | 1 | MS. FAVORIT: Objection. Relevance. |
| 11:13AM | 2 | THE COURT: Overruled. |
| 11:13AM | 3 | THE WITNESS: I don't know the exact details of it. |
| 11:13AM | 4 | BY MR. CENTRONE: |
| 11:13AM | 5 | Q. What do you know? |
| 11:13AM | 6 | A. I just know that the role of NCMEC was -- was raised to |
| 11:13AM | 7 | understand what our specific role was versus what the |
| 11:13AM | 8 | Government's role was, and so I know, you know, obviously as a |
| 11:13AM | 9 | consequence to that, we had already been making changes to our |
| 11:14AM | 10 | CyberTipline reports. We do change the format and some of the |
| 11:14AM | 11 | information just to make it crystal clear and improve |
| 11:14AM | 12 | transparency about what our role is and isn't and what is done |
| 11:14AM | 13 | before we receive information. So as a result, we improved the |
| 11:14AM | 14 | information we provide in CyberTipline reports to make sure |
| 11:14AM | 15 | that it is incredibly clear. |
| 11:14AM | 16 | Q. Was the NCMEC board of directors changed as a result of |
| 11:14AM | 17 | those hearings? |
| 11:14AM | 18 | A. I don't know that. |
| 11:14AM | 19 | Q. I want to -- I want to put a little bit of a finer point |
| 11:14AM | 20 | on some of your testimony about the hash matches. The way I |
| 11:14AM | 21 | understand it is that a hash match is -- you called it a |
| 11:14AM | 22 | digital fingerprint. It's effectively a way to compare one |
| 11:14AM | 23 | image with another image without ever actually looking at the |
| 11:15AM | 24 | picture in that image; is that correct? |
| 11:15AM | 25 | A. My understanding -- again, I'm not a digital forensic |

**NEWMAN - CROSS-EXAMINATION**

11:15AM  1    examiner.  My understanding with MD5, it is a true match.  So

11:15AM  2    that would mean that that image seen on one computer is exactly

11:15AM  3    the same image on another computer.

11:15AM  4    Q.   But that's based on the computer code, correct, the MD5

11:15AM  5    is --

11:15AM  6    A.   On the algorithm, uh-huh.

11:15AM  7    Q.   Correct.  So it's based on the -- and I'm not a technology

11:15AM  8    expert either, but it's based on the computer code that

11:15AM  9    comprises the image, not the contents of a photo itself, for

11:15AM  10   instance; is that fair?

11:15AM  11   A.   That's fair.

11:15AM  12   Q.   So if a hash code of one image is the same as an image

11:15AM  13   already in NCMEC's database, it would be categorized the same

11:15AM  14   way?

11:15AM  15   A.   Correct.

11:15AM  16   Q.   Without -- again, without ever looking at the photo.  I

11:15AM  17   believe you testified earlier that it happens automatically; is

11:15AM  18   that correct?

11:15AM  19   A.   Correct.  That doesn't necessarily mean that we won't look

11:16AM  20   at the image again, though, but yes, it's applied.  As

11:16AM  21   mentioned, we have a high volume of images and videos that come

11:16AM  22   into us so we do use that to help with previously-seen files.

11:16AM  23   Q.   And you looked earlier at the CyberTipline report and the

11:16AM  24   use of the phase, "Did the reporting ESP view entire contents

11:16AM  25   of uploaded file," correct?

NEWMAN - CROSS-EXAMINATION

11:16AM  1    A.   Correct.
11:16AM  2    Q.   And I believe that's located on what is identified at the
11:16AM  3    top of the CyberTipline as page 3.  You can refer to the
11:16AM  4    Government's copy or in the binder there Exhibit A of the --
11:16AM  5    it's the same thing, which you could see the Bates stamps at
11:16AM  6    the bottom match up to the Government's copy.
11:16AM  7         THE COURT:  Just to be clear, Mr. Centrone, are you
11:16AM  8    referring to Government's 1?
11:16AM  9         MR. CENTRONE:  Government's 1, correct, Your Honor,
11:16AM  10   and Defendant's A are identical copies of the same document, as
11:16AM  11   identified by the Bates stamp at the bottom.
11:17AM  12        THE COURT:  Are you directing the witness to
11:17AM  13   Government's 1 or Defendant's A?
11:17AM  14   BY MR. CENTRONE:
11:17AM  15   Q.   I'll go ahead and just for clarity direct you to
11:17AM  16   Defendant's A since I'm the one doing the questioning.  And
11:17AM  17   just to go back to what we were talking about, this report
11:17AM  18   contains summary information about the seven images that are at
11:17AM  19   issue in this case and broken down by image file name, and also
11:17AM  20   in each summary includes the question, "Did reporting ESP view
11:17AM  21   entire contents of uploaded file," correct?
11:17AM  22   A.   Correct.  This is all information provided to us by Yahoo.
11:17AM  23   Q.   Okay.  So that's a question that the ISP answers when
11:17AM  24   submitting the CyberTipline report?
11:17AM  25   A.   Correct.

NEWMAN - CROSS-EXAMINATION

11:17AM  1    Q.    And is that question worded the exact same way when it's

11:18AM  2    answered by the ISP?

11:18AM  3    A.    That is the question that they're answering on their end

11:18AM  4    and as displayed here.  Is that the question?

11:18AM  5    Q.    Yes.  I suppose to put a finer point on it, I'm asking is

11:18AM  6    it verbatim the same question?

11:18AM  7    A.    I believe that it is.

11:18AM  8    Q.    Okay.

11:18AM  9         THE COURT:  When you say, Ms. Newman, is that

11:18AM  10   information reflected here, are you referring to a particular

11:18AM  11   page on Defendant's Exhibit A?

11:18AM  12        THE WITNESS:  Yes, what is provided in Exhibit A in

11:18AM  13   the Section A pages.  So that's page -- CyberTipline page 1

11:18AM  14   through 5.

11:18AM  15   BY MR. CENTRONE:

11:18AM  16   Q.    Is there an official definition written down somewhere

11:18AM  17   that's used by NCMEC that defines the phrase, "Did reporting

11:19AM  18   ESP view entire contents of uploaded file?"

11:19AM  19   A.    There is not a definition.

11:19AM  20   Q.    So NCMEC does not have an official definition of that

11:19AM  21   term?

11:19AM  22   A.    I mean, we just have the implied definition of what that

11:19AM  23   question is, which is that they viewed the entire content of

11:19AM  24   the uploaded image or video.

11:19AM  25   Q.    So because NCMEC doesn't have an official definition,

**NEWMAN - CROSS-EXAMINATION**

11:19AM  1    NCMEC, I assume, does not train ISPs as to what the definition

11:19AM  2    of that phrase means?

11:19AM  3    A.   Again, we leave that up to the companies to be truthful in

11:19AM  4    their responses to what that question is.

11:19AM  5    Q.   But the company could misinterpret the meaning of that

11:19AM  6    question if they're not provided official guidance; is that

11:19AM  7    fair?

11:19AM  8    A.   I believe during the onboarding when electronic service

11:19AM  9    providers onboard to make reports to us, that is reviewed with

11:20AM  10   them.

11:20AM  11   Q.   Can you elaborate on that?  I'm not sure what that means.

11:20AM  12   A.   I'm not part of the process so I don't know the exact

11:20AM  13   protocol, but certainly for an electronic service provider to

11:20AM  14   make a report to us, upload those files through a secure

11:20AM  15   server, you know, we reach out, and we onboard them to the ways

11:20AM  16   of making a CyberTipline report.  Completing that field is

11:20AM  17   covered as part of that, so they understand what that field

11:20AM  18   means should they choose to use it.

11:20AM  19   Q.   How can they understand what that field means if NCMEC

11:20AM  20   doesn't have an official definition of that field?

11:20AM  21   A.   It's possible that we do.  I'm not part of the onboarding.

11:20AM  22   I have just never seen a written document of that, but I

11:20AM  23   believe that there is direction that's provided for that.

11:20AM  24   Q.   But you don't know sitting here what that direction is?

11:20AM  25   A.   I personally don't know.

NEWMAN - CROSS-EXAMINATION

11:20AM   1    Q.   Who would know?

11:20AM   2    A.   The person who's responsible for onboarding our electronic

11:21AM   3    service providers.

11:21AM   4    Q.   Do you know who that is?

11:21AM   5    A.   We have a team who does that, so it would be one of three

11:21AM   6    people.

11:21AM   7    Q.   Which -- can you identify those three people, just for my

11:21AM   8    own edification?

11:21AM   9    A.   Fallon McNulty, Aaron Hunter (phonetic).  Those would

11:21AM  10    probably be your best two.

11:21AM  11    Q.   Gotcha.  But sitting here today, you don't know if ISPs

11:21AM  12    are made aware of any official definition when they are

11:21AM  13    completing that form?

11:21AM  14    A.   As I mentioned, they're given instruction and direction on

11:21AM  15    what all of the fields are that they can fill out.  I

11:21AM  16    personally have not seen if there is a definition there, but I

11:21AM  17    know we do provide definitions for all of our fields, so I am

11:21AM  18    just making the assumption that there is a definition for that

11:22AM  19    one, but I have personally not seen it, and I can't quote it

11:22AM  20    back to you.  But we do provide guidance for them on how to

11:22AM  21    complete a CyberTipline report with the fields, should they

11:22AM  22    choose to use them.

11:22AM  23    Q.   Okay.  Is there a separate CyberTipline report for ISPs

11:22AM  24    that's different than the one for reports from the public?

11:22AM  25    A.   Yes, they can -- I mean, they can make reports through the

**NEWMAN - CROSS-EXAMINATION**

| | | |
|---|---|---|
| 11:22AM | 1 | public mechanism, but they can access an API, which allows them |
| 11:22AM | 2 | to make automated reporting on their end. |
| 11:22AM | 3 | Q.   In other words, the ISP, similar to the way NCMEC can |
| 11:22AM | 4 | auto-populate portions of the CyberTipline report, can |
| 11:22AM | 5 | auto-populate portions of its own report? |
| 11:22AM | 6 | A.   I'm sorry, can you ask that -- |
| 11:22AM | 7 | Q.   Sure.  So you said NCMEC provides an API that allows the |
| 11:23AM | 8 | ISPs to automate portions of their reporting to NCMEC, correct? |
| 11:23AM | 9 | A.   Correct. |
| 11:23AM | 10 | Q.   So NCMEC auto-populates portions of its report, correct, |
| 11:23AM | 11 | as we saw earlier? |
| 11:23AM | 12 | A.   In Section B, once that information is received by us. |
| 11:23AM | 13 | Q.   Well, we also talked about the first page, for instance, |
| 11:23AM | 14 | being automated? |
| 11:23AM | 15 | A.   Right. |
| 11:23AM | 16 | Q.   So ISPs can do the same?  They can auto-populate their |
| 11:23AM | 17 | CyberTipline reports? |
| 11:23AM | 18 | A.   They can. |
| 11:23AM | 19 | Q.   Potentially without a human ever looking at it? |
| 11:23AM | 20 | A.   They can. |
| 11:23AM | 21 | MS. FAVORIT:  Objection.  Speculation. |
| 11:23AM | 22 | MR. CENTRONE:  This is within the witness's |
| 11:23AM | 23 | knowledge, Your Honor. |
| 11:23AM | 24 | THE COURT:  If the witness knows. |
| 11:23AM | 25 | MR. CENTRONE:  If the witness knows. |

**NEWMAN - CROSS-EXAMINATION**

11:23AM  1          **THE COURT:**  So, Ms. Newman, the question that has

11:23AM  2     been propounded here, like all of these questions, you may

11:23AM  3     answer it if you know.

11:23AM  4          **THE WITNESS:**  They can.  That's up to the companies

11:23AM  5     to decide how they want to report to us, and that's where that

11:24AM  6     documentation of what those fields means is relevant with the

11:24AM  7     API so they understand what each of those fields means.

11:24AM  8     BY MR. CENTRONE:

11:24AM  9     Q.   But they can?  They can do that?

11:24AM  10    A.   Uh-huh.

11:24AM  11    Q.   And NCMEC has no way to verify whether an ISP reporting

11:24AM  12    through the CyberTipline has -- such as Yahoo here -- has

11:24AM  13    actually viewed an image, correct?

11:24AM  14    A.   Like can we verify that they did view the entire contents?

11:24AM  15    Q.   Or viewed the image, yes.

11:24AM  16    A.   We can't verify that.

11:24AM  17    Q.   And you --

11:24AM  18    A.   We rely on the accuracy of that statement.

11:24AM  19    Q.   And you don't do any investigation?

11:24AM  20    A.   We do not, investigations.

11:24AM  21    Q.   And NCMEC has no way to know how Yahoo interpreted the

11:24AM  22    phase, "Did reporting ESP view entire contents of uploaded

11:24AM  23    files?"

11:24AM  24    A.   No.  As I mentioned, we provide guidance in that

11:24AM  25    documentation for the API, but that is up to them to determine.

NEWMAN - CROSS-EXAMINATION

11:25AM   1   Q.   But, again, sitting here today, you do not know what that

11:25AM   2   guidance is?

11:25AM   3   A.   I do not know what the definition is.  I know it's

11:25AM   4   provided.  I just don't know what it is.

11:25AM   5   Q.   So NCMEC has no way to know whether if Yahoo answered yes

11:25AM   6   to that question, it was accurate or a mistake, correct?

11:25AM   7   A.   You'd have to ask Yahoo.

11:25AM   8   Q.   We talked earlier about how the CyberTipline report

11:25AM   9   incorrectly stated that NCMEC did not view the images when it

11:25AM  10   had; is that right?

11:25AM  11   A.   Correct.  It listed that it was a hash match, but we had

11:25AM  12   actually viewed six of the seven files before making it

11:25AM  13   available to law enforcement.

11:25AM  14   Q.   Which images did NCMEC view, and which one did it not?

11:25AM  15   A.   Could I reference?

11:25AM  16   Q.   Yes, please.

11:25AM  17   A.   On page 6 of the CyberTipline report.

11:25AM  18        THE COURT:  Is that 6 as identified at the top of the

11:25AM  19   page?

11:26AM  20        THE WITNESS:  Yes, uh-huh.

11:26AM  21        THE COURT:  That's, again, Defendant's Exhibit A,

11:26AM  22   Mr. Centrone?

11:26AM  23        MR. CENTRONE:  Yes, Your Honor.

11:26AM  24        THE COURT:  Okay.

11:26AM  25        THE WITNESS:  You'll see in the middle there's an

NEWMAN - CROSS-EXAMINATION

| | | |
|---|---|---|
| 11:26AM | 1 | uploaded file information section.  You'll see those file names |
| 11:26AM | 2 | there which correspond back to the previous section that we |
| 11:26AM | 3 | were looking at.  Those were provided by Yahoo.  The one that |
| 11:26AM | 4 | was not viewed ahead of this being made available to law |
| 11:26AM | 5 | enforcement was image.4-1.gif. |
| 11:26AM | 6 | BY MR. CENTRONE: |
| 11:26AM | 7 | Q.   Sorry.  Just to clarify, that was the one that was not |
| 11:26AM | 8 | viewed by NCMEC, correct? |
| 11:26AM | 9 | A.   As part of this report. |
| 11:26AM | 10 | Q.   Correct.  Okay. |
| 11:26AM | 11 | A.   It had previously been reviewed, but not as part of this |
| 11:26AM | 12 | report. |
| 11:26AM | 13 | Q.   And do I understand from your earlier testimony that |
| 11:26AM | 14 | that's because that image had already been categorized by |
| 11:27AM | 15 | NCMEC, and the other six had not? |
| 11:27AM | 16 | A.   Correct.  That one had not been -- that one had already |
| 11:27AM | 17 | been labeled, so it was not reviewed as part of this report. |
| 11:27AM | 18 | The other six were viewed as part of this report.  It's |
| 11:27AM | 19 | possible others had been labeled ahead of time.  Regardless, |
| 11:27AM | 20 | they were viewed as part of this report. |
| 11:27AM | 21 | Q.   And do I understand correctly then that that would be the |
| 11:27AM | 22 | first time NCMEC has reviewed those specific images? |
| 11:27AM | 23 | A.   Not necessarily. |
| 11:27AM | 24 | Q.   So NCMEC may have already reviewed the images but had not |
| 11:27AM | 25 | categorized them previously; is that correct? |

**NEWMAN - CROSS-EXAMINATION**

11:27AM  1   A.   That's correct.

11:27AM  2   Q.   I'm a little bit confused.  So in other words, the hash

11:27AM  3   matches could have been in NCMEC's database, and I believe they

11:27AM  4   were, correct?

11:27AM  5   A.   That I don't know.

11:27AM  6   Q.   Okay.  But the -- as we referred to them earlier, the

11:28AM  7   labels such as "CP unconfirmed" or "Child clothed" had not been

11:28AM  8   previously made?

11:28AM  9   A.   I'm not able to determine that from this report, so we

11:28AM  10  would be able to find that through a manual process, but at the

11:28AM  11  time, again, we were transitioning our workflows so the

11:28AM  12  automated service and the information did not marry up, but

11:28AM  13  it's possible that we had seen that hash value before, but it

11:28AM  14  was before we were labeling files, so it would flag that we

11:28AM  15  needed to look at it again to apply that label.

11:28AM  16  Q.   But you're speculating about that in this particular

11:28AM  17  instance, correct?

11:28AM  18  A.   I am.

11:28AM  19  Q.   Okay.  So do I understand correctly then that sitting here

11:28AM  20  right now, you don't know whether the image had been previously

11:28AM  21  labeled prior to a type of relabeling that NCMEC did again when

11:28AM  22  reviewing those six images?

11:29AM  23          THE COURT:  Mr. Centrone, not to interject too

11:29AM  24  heavily here, but I've lost -- since I've got to make a

11:29AM  25  decision on this matter, when you say "that image," to what

NEWMAN - CROSS-EXAMINATION

11:29AM   1    specific image of the seven, I would assume, are you referring?

11:29AM   2           MR. CENTRONE:  I'm referring to the six of the seven

11:29AM   3    that NCMEC is now correcting its previous report to say that

11:29AM   4    when they previously said they did not view them, that now

11:29AM   5    they're saying they have.

11:29AM   6           THE COURT:  So you said "that image," singular.

11:29AM   7    You're referring to images?

11:29AM   8           MR. CENTRONE:  I apologize.  That's correct.

11:29AM   9           THE COURT:  That's okay.  I just want to make sure

11:29AM  10    that when the time comes for me to review this important

11:29AM  11    testimony, like all of it, that I understand to what precisely

11:29AM  12    you and the witness are referring.  So maybe it would be best

11:29AM  13    if you could just rephrase.

11:29AM  14           MR. CENTRONE:  Sure.  And I apologize, Your Honor,

11:29AM  15    because I thought I understood the earlier testimony, but I

11:29AM  16    guess I didn't, so I'm just -- I'm literally just asking for

11:29AM  17    clarity.

11:29AM  18           THE COURT:  That's okay.

11:29AM  19    BY MR. CENTRONE:

11:29AM  20    Q.   So let's back up a little bit.  So of the seven images, we

11:30AM  21    know image 4-1.gif had not been previously viewed -- excuse me,

11:30AM  22    had been -- now I'm confusing things -- had been previously

11:30AM  23    viewed by NCMEC.

11:30AM  24    A.   Correct, and labeled.

11:30AM  25    Q.   And labeled?

**NEWMAN - CROSS-EXAMINATION**

11:30AM  1   A.   Uh-huh.

11:30AM  2   Q.   The other six images of the seven that are set forth in

11:30AM  3   the CyberTipline report, sitting here right now, we do not know

11:30AM  4   whether those images had been previously viewed?

11:30AM  5   A.   Correct.

11:30AM  6   Q.   And we do not know whether they had been previously

11:30AM  7   labeled?

11:30AM  8   A.   Correct.

11:30AM  9   Q.   All of those six other images --

11:30AM  10  A.   It's possible that they were all labeled as part of this

11:30AM  11  report.  I just don't have that information.  I would need to

11:30AM  12  do -- we would need to do a manual service to find that.

11:30AM  13       I do know that six of the seven, though, were viewed

11:30AM  14  as part of this report.

11:30AM  15  Q.   But, again, we don't know if that was the first time they

11:31AM  16  were viewed by NCMEC?

11:31AM  17  A.   Correct.

11:31AM  18  Q.   And we don't know whether it was the first time they were

11:31AM  19  labeled by NCMEC?

11:31AM  20  A.   Correct.

11:31AM  21  Q.   Okay.  How was it discovered after-the-fact that NCMEC

11:31AM  22  actually did view those images when the CyberTipline report

11:31AM  23  says they were not viewed?

11:31AM  24  A.   Really just as part of our protocol once we receive the --

11:31AM  25  the notification that there would be a case surrounding this

**NEWMAN - CROSS-EXAMINATION**

11:31AM  1    CyberTipline report, we looked further into it.  We realized

11:31AM  2    that we had actually viewed those files.

11:31AM  3    Q.   But how was that discovered?  Was it written down

11:31AM  4    somewhere?

11:31AM  5    A.   It's visible to us on the back end of the system.

11:31AM  6    Q.   Okay.  Is that -- is that a standard procedure when a case

11:31AM  7    is developing such as the matter we're here for today?

11:31AM  8    A.   Yes.  I mean, we'll look through the system and just make

11:31AM  9    sure that we understand everything surrounding the files and

11:32AM  10   the report.

11:32AM  11   Q.   Does that back end part of that process that you just

11:32AM  12   described, does that tell you when the images were viewed?

11:32AM  13   A.   It does not.  It gives a time frame.  Because the files

11:32AM  14   are reviewed in a separate system, we -- outside the

11:32AM  15   CyberTipline, we just know when that that has been updated into

11:32AM  16   the CyberTipline.  So I do know on September 14th is when the

11:32AM  17   CyberTipline system learned that those files had been viewed.

11:32AM  18   So it would have been sometime from the time that the CyberTip

11:32AM  19   was made to NCMEC and September 14th that those files were

11:32AM  20   reviewed.

11:32AM  21        Now, we can find that.  Again, it's a manual process,

11:32AM  22   so that is something that could be done.  It's just not easily

11:32AM  23   findable right now.

11:32AM  24   Q.   Okay.  Does that same back end part of the software tell

11:32AM  25   you who viewed the images at NCMEC?

**NEWMAN - CROSS-EXAMINATION**

| | | |
|---|---|---|
| 11:32AM | 1 | A.   It doesn't.  That would be part of the manual process, but |
| 11:32AM | 2 | we do have that. |
| 11:33AM | 3 | Q.   And I take it from your testimony that that manual |
| 11:33AM | 4 | process, despite this case being -- going on, was not |
| 11:33AM | 5 | performed, correct? |
| 11:33AM | 6 | A.   It was not. |
| 11:33AM | 7 | Q.   Has any additional information as part of the review that |
| 11:33AM | 8 | you just described as part of -- part of the review that was |
| 11:33AM | 9 | done in this case, has any additional information been provided |
| 11:33AM | 10 | to the Government here? |
| 11:33AM | 11 | A.   Not to my knowledge. |
| 11:33AM | 12 | Q.   The CyberTip at issue here identified as Defendant's |
| 11:34AM | 13 | Exhibit A was received on September 10th, 2020, correct? |
| 11:34AM | 14 | A.   Correct. |
| 11:34AM | 15 | Q.   And it was not forwarded to the North Port Police |
| 11:34AM | 16 | Department until I believe November 10th, 2020; is that -- is |
| 11:34AM | 17 | that correct? |
| 11:34AM | 18 | A.   It was made available to law enforcement on October 22nd. |
| 11:34AM | 19 | Q.   Okay.  So in between November 10th -- excuse me, |
| 11:34AM | 20 | September 10th and October 22nd, what was the -- what was the |
| 11:34AM | 21 | reason for the delay between the CyberTip initial report and |
| 11:34AM | 22 | the making available to law enforcement?  What was done in that |
| 11:34AM | 23 | interim period? |
| 11:34AM | 24 | A.   Volume of reports that we're receiving.  As mentioned, we |
| 11:35AM | 25 | have an increasing volume of CyberTip reports that are received |

NEWMAN - CROSS-EXAMINATION

11:35AM  1   each year and subsequently each day.  Because there were no

11:35AM  2   escalating factors in this case as reported to us and because

11:35AM  3   there was no urgent prioritization, it remained in the queue

11:35AM  4   until October 22nd.

11:35AM  5   Q.   Okay.  Section C of the CyberTipline report which is --

11:35AM  6   which can be found on page 7 of Defendant's Exhibit A, what

11:35AM  7   is -- what is that information under NCMEC note number 1?

11:35AM  8   A.   This indicates where our analyst now is intervening with

11:36AM  9   this report.  So the information provided in NCMEC notes

11:36AM  10  indicate the work done by our staff.

11:36AM  11  Q.   And what is that work?

11:36AM  12  A.   You can see here she -- she lists a CTTA query for the

11:36AM  13  reported identifiers return negative results.  And then

11:36AM  14  subsequently you see information here on page 7, page 8, and

11:36AM  15  into page 9 regarding the IP address that was received by Yahoo

11:36AM  16  and doing a lookup for that.

11:36AM  17  Q.   So, in other words, a human found the IP address connected

11:36AM  18  to the images discussed in the previous part of the report and

11:36AM  19  found where -- where that IP address originated?

11:36AM  20  A.   I believe that this IP address is associated with the

11:36AM  21  suspect information provided by Yahoo, and so you can see we

11:37AM  22  use MaxMind, which is just an open source IP lookup company,

11:37AM  23  and it geolocated back to North Port, Florida.  Therefore, we

11:37AM  24  made this report available to the Central Florida ICAC.

11:37AM  25  Q.   So do I understand correctly then that Yahoo provides the

**NEWMAN - CROSS-EXAMINATION**

11:37AM  1    IP address associated with the images, and then NCMEC

11:37AM  2    effectively investigated who that IP address belonged to or at

11:37AM  3    least what service provider it belonged to?

11:37AM  4    A.    So Yahoo provided an IP address affiliated with this

11:37AM  5    report.  We ran, yes, a geo lookup for that.  To clarify, we

11:37AM  6    did not find an individual per se.  We just found that it

11:37AM  7    resolved back to North Port, Florida.

11:37AM  8    Q.    And then that information was also forwarded with this

11:38AM  9    report to law enforcement, correct?

11:38AM  10   A.    Correct.

11:38AM  11   Q.    You referred earlier to the CTTA query on the same page.

11:38AM  12   What is that?

11:38AM  13   A.    As regular course of business, when we received

11:38AM  14   identifiers such as an email, screen name, IP address, we run

11:38AM  15   that through the whole entire CyberTipline system, so over

11:38AM  16   100 million CyberTip reports that we've received, as well as

11:38AM  17   TA, which is our technical assistance, which is requests from

11:38AM  18   law enforcement.  We run those identifiers through that

11:38AM  19   database just to see if there are any related reports.

11:38AM  20   Q.    And the answer here to that is no, correct?

11:38AM  21   A.    Correct.  She reported return negative or relevant

11:38AM  22   results.

11:38AM  23        MR. CENTRONE:  Just one moment, Your Honor.

11:38AM  24        THE COURT:  Sure.

          25

**NEWMAN - CROSS-EXAMINATION**

11:39AM  1   BY MR. CENTRONE:

11:39AM  2   Q.   Thank you for your patience, Ms. Newman.  I just have a

11:39AM  3   couple of questions to -- frankly, for my own edification, to

11:39AM  4   learn a little bit more about the CyberTipline reports.

11:39AM  5          Under -- on page 3 of the CyberTipline report,

11:39AM  6   Defendant's Exhibit A, under the section that says, "Additional

11:39AM  7   information submitted by the reporting ESP" --

11:39AM  8   A.   Uh-huh.

11:39AM  9   Q.   Do you see that?

11:39AM  10  A.   I do.

11:39AM  11  Q.   There's a reference to "Message ID" followed by a long

11:39AM  12  stream of letters?

11:39AM  13  A.   Uh-huh.

11:39AM  14  Q.   What is that referring to?

11:39AM  15  A.   I don't know.  You'd need to ask Yahoo.

11:39AM  16  Q.   So that information comes from Yahoo?

11:39AM  17  A.   Yes, all information in Section A is from Yahoo.

11:39AM  18  Q.   But it would be populating a field on NCMEC's report?  In

11:40AM  19  other words, correct?  Do I understand that correctly, that

11:40AM  20  NCMEC provides the opportunity for a message ID in their fields

11:40AM  21  that -- that the ISPs populate by themselves?

11:40AM  22  A.   Yes, we have many, many fields that are available for them

11:40AM  23  to populate.  This is just displaying what was populated by

11:40AM  24  them.

11:40AM  25  Q.   I understand.  Okay.  On the same page and then the

NEWMAN - REDIRECT EXAMINATION

11:40AM 1  following couple of pages, each image summary includes a

11:40AM 2  question, "Did reporting ESP view the EXIF of uploaded file?"

11:40AM 3  A.   Uh-huh.

11:40AM 4  Q.   What's an EXIF?

11:40AM 5  A.   Again, I'm not a digital forensic examiner.  EXIF

11:40AM 6  information, as I understand it, is what's called metadata

11:40AM 7  which can be associated with a digital file.  So it could be

11:40AM 8  information surrounding when that picture was taken, which kind

11:41AM 9  of camera was taken with it, you know, information about the

11:41AM 10 camera at the time the picture was taken, that sort of thing.

11:41AM 11 Q.   And do I understand correctly from this -- from these

11:41AM 12 summaries for each image, whatever information that it's

11:41AM 13 referring to was not provided by Yahoo?

11:41AM 14 A.   Correct.

11:41AM 15      MR. CENTRONE:  Okay.  All right.  I have no further

11:41AM 16 questions.  Thank you very much.

11:41AM 17      THE WITNESS:  Thank you.

11:41AM 18      THE COURT:  Thank you, Mr. Centrone.  Any redirect,

11:41AM 19 Ms. Favorit?

11:41AM 20      MS. FAVORIT:  Yes, Your Honor.

11:41AM 21                  REDIRECT EXAMINATION

11:41AM 22                  BY MS. FAVORIT:

11:41AM 23 Q.   Why does NCMEC run the IP address provided by Yahoo in

11:41AM 24 this case?

11:41AM 25 A.   IP address helps us geolocate a potential jurisdiction for

NEWMAN - RECROSS-EXAMINATION

11:41AM  1    the -- again, the independent review and assessment by law

11:41AM  2    enforcement, but provides an impression or starting point for a

11:42AM  3    potential case related to the CyberTipline report.

11:42AM  4    Q.   Were any changes made at NCMEC whether or not the

11:42AM  5    CyberTipline team opens these attached images or not?

11:42AM  6    A.   Yes.  So we are only permitted to view these files if one

11:42AM  7    or two -- one or both of these two questions are answered in

11:42AM  8    the affirmative, and those two questions are:  "Did reporting

11:42AM  9    ESP view entire contents of uploaded file," and/or "Did

11:42AM  10   reporting ESP view the" -- or I'm sorry.  "Were entire contents

11:42AM  11   of uploaded file publicly available?"  One of those two has to

11:42AM  12   be yes for us to view the file.

11:42AM  13   Q.   If the answer had been no, would NCMEC view the file?

11:42AM  14   A.   No.

11:42AM  15            MS. FAVORIT:  I don't have any further questions.

11:42AM  16            THE COURT:  Okay.  Any recross, Mr. Centrone?

11:43AM  17            MR. CENTRONE:  Very, very briefly.

11:43AM  18                      RECROSS-EXAMINATION

11:43AM  19                      BY MR. CENTRONE:

11:43AM  20   Q.   Following up on the Government's last question, if either

11:43AM  21   answer had been no, why wouldn't NCMEC view them?

11:43AM  22   A.   Based on just -- again, trying to be very transparent

11:43AM  23   about what role we play in that.  So if the answer to both had

11:43AM  24   been no, we don't view those files.  We still do send them on

11:43AM  25   to law enforcement, but we do indicate that we have not

NEWMAN - RECROSS-EXAMINATION

| | | |
|---|---|---|
| 11:43AM | 1 | reviewed the files. |
| 11:43AM | 2 | MR. CENTRONE:  Okay.  No further questions.  Thank |
| 11:43AM | 3 | you. |
| 11:43AM | 4 | THE COURT:  Ms. Newman, a question or two.  One of |
| 11:43AM | 5 | these designations is, as I understand it, "Apparent child |
| 11:43AM | 6 | pornography." |
| 11:44AM | 7 | THE WITNESS:  Yes. |
| 11:44AM | 8 | THE COURT:  Is that correct? |
| 11:44AM | 9 | THE WITNESS:  Yes. |
| 11:44AM | 10 | THE COURT:  Referring in particular -- I'll stay with |
| 11:44AM | 11 | Defendant's Exhibit A, page 6 of the exhibit.  It's got a Bates |
| 11:44AM | 12 | stamped DISC-01131.  What is the definition or your |
| 11:44AM | 13 | understanding at least of what is "Apparent child pornography"? |
| 11:44AM | 14 | THE WITNESS:  As NCMEC uses that label, we define |
| 11:44AM | 15 | that to mean that the activity depicted in the image or video |
| 11:44AM | 16 | meets the federal definition of child pornography and that it |
| 11:44AM | 17 | is overtly clear that it is a child that's involved in that |
| 11:44AM | 18 | activity. |
| 11:44AM | 19 | THE COURT:  Why is the term "Apparent" used then? |
| 11:44AM | 20 | THE WITNESS:  We reserve that because to use child |
| 11:44AM | 21 | pornography is truly the federal definition and because we are |
| 11:44AM | 22 | not the final determiners of what is legal or illegal, we just |
| 11:45AM | 23 | add that context to ensure that that's just NCMEC vernacular. |
| 11:45AM | 24 | THE COURT:  There's also been discussion or testimony |
| 11:45AM | 25 | about a hash match, and as I understand your testimony -- |

NEWMAN - RECROSS-EXAMINATION

11:45AM  1    correct me if I don't understand it properly -- is the hash

11:45AM  2    match here solely to the GIF image found on page 6 as the first

11:45AM  3    image.4-1. --

11:45AM  4              THE WITNESS:  In this case, the hash match was used

11:45AM  5    by the system to say that we already knew that image and it

11:45AM  6    already had a label, so that is why that image was not reviewed

11:45AM  7    as part of this report.

11:45AM  8              THE COURT:  And to be clear, the hash match pertained

11:45AM  9    only to the GIF file or image?

11:45AM  10             THE WITNESS:  In terms of it already recognizing that

11:45AM  11    and not needing human review.

11:46AM  12             THE COURT:  That's overall a "yes?"

11:46AM  13             THE WITNESS:  Overall a "yes."

11:46AM  14             THE COURT:  Okay.  Based on my questions,

11:46AM  15    Ms. Favorit, anything further for Ms. Newman?

11:46AM  16             MS. FAVORIT:  No, Your Honor.

11:46AM  17             THE COURT:  Thank you.  Mr. Centrone?

11:46AM  18             MR. CENTRONE:  Just very briefly just to make sure I

11:46AM  19    understand, Your Honor.

11:46AM  20                        RECROSS-EXAMINATION

11:46AM  21                        BY MR. CENTRONE:

11:46AM  22    Q.  So the Judge's question about image.4-1.gif, the way I

11:46AM  23    understand it, there was a hash match as to that image.  With

11:46AM  24    respect to the other six, was there a hash match, or do we not

11:46AM  25    know?

NEWMAN - RECROSS-EXAMINATION

11:46AM  1   A.   We don't know.  All we do know is that we then did -- we

11:47AM  2   did review it as part of this report.  So if there was a prior

11:47AM  3   hash match, we still looked at it as part of this report.

11:47AM  4   Q.   So similar to how you testified earlier that with respect

11:47AM  5   to those other six images we don't know if they had been

11:47AM  6   previously labeled and we don't know if they had been

11:47AM  7   previously reviewed by a human, we don't know if they had a

11:47AM  8   prior hash match either; is that correct?

11:47AM  9   A.   Correct.

11:47AM  10          MR. CENTRONE:  Okay.  Thank you.  No further

11:47AM  11  questions.  Thank you, Your Honor.

11:47AM  12          THE COURT:  Thank you.  That brings me then to the

11:47AM  13  question going back to Defendant's Exhibit A, which is the same

11:47AM  14  and so represented as Government's 1.

11:47AM  15          Looking at the Tipline report, can you discern

11:47AM  16  from the Tipline report which image or images in particular the

11:47AM  17  term "hash match" as used on the report refers to?

11:48AM  18          THE WITNESS:  The one file that is a hash match is

11:48AM  19  image.4-1.gif.  The other six, I'm uncertain if they were hash

11:48AM  20  matches and have been seen before.  Regardless, we did view

11:48AM  21  those, a human did view those, as part of this report.

11:48AM  22          THE COURT:  And what in the report leads you to the

11:48AM  23  conclusion that the hash match at least refers to the 4-1.gif

11:48AM  24  image?

11:48AM  25          THE WITNESS:  There's nothing in this report per se.

NEWMAN - RECROSS-EXAMINATION

| | | |
|---|---|---|
| 11:48AM | 1 | It's more something that we found as a course of processing the |
| 11:48AM | 2 | preparations for this case that we learned that the other six |
| 11:48AM | 3 | had, in fact, been viewed by us.  We had inaccurately listed |
| 11:49AM | 4 | that they all were hash matches and, in fact, only one was, and |
| 11:49AM | 5 | the other six were viewed as part of our processing of this |
| 11:49AM | 6 | report. |
| 11:49AM | 7 | THE COURT:  Okay.  Thank you, Ms. Newman.  Again, |
| 11:49AM | 8 | Ms. Favorit, anything further? |
| 11:49AM | 9 | MS. FAVORIT:  No, Your Honor. |
| 11:49AM | 10 | THE COURT:  Thank you.  Mr. Centrone? |
| 11:49AM | 11 | MR. CENTRONE:  No, Your Honor, thank you. |
| 11:49AM | 12 | THE COURT:  Okay.  Ms. Newman, thank you.  You may |
| 11:49AM | 13 | step down. |
| 11:49AM | 14 | (Witness excused.) |
| 11:49AM | 15 | THE COURT:  Ms. Favorit, it's ten to 12:00.  I'm |
| 11:49AM | 16 | happy to continue, although I would ordinarily take a short |
| 11:49AM | 17 | recess.  How long is your next witness? |
| 11:49AM | 18 | MS. FAVORIT:  Your Honor, before this witness leaves, |
| 11:49AM | 19 | may she be excused? |
| 11:49AM | 20 | THE COURT:  Mr. Centrone, any reason Ms. Newman needs |
| 11:49AM | 21 | to remain? |
| 11:49AM | 22 | MR. CENTRONE:  No.  I don't think so, Your Honor. |
| 11:49AM | 23 | THE COURT:  Okay.  Ms. Newman, you're free to go. |
| 11:49AM | 24 | MS. FAVORIT:  I believe the next witness will be just |
| 11:49AM | 25 | as lengthy as Ms. Newman.  So if you were interested in taking |

| | | |
|---|---|---|
| 11:49AM | 1 | a lunch break at all, I don't mind stopping in the middle of |
| 11:49AM | 2 | testimony either.  I'll defer to the Court. |
| 11:49AM | 3 | THE COURT:  I have a 2:00 hearing which I expect, |
| 11:49AM | 4 | counsel, to be short -- in other words five or ten minutes -- |
| 11:50AM | 5 | so why don't we take a lunch break now, and we'll resume at |
| 11:50AM | 6 | 1:00 by the courtroom clock, okay?  We'll be in recess. |
| | 7 | (Recess from 11:50 a.m. to 1:05 p.m.) |
| 12:57PM | 8 | THE COURT:  Good afternoon, everyone.  Madam clerk, |
| 1:05PM | 9 | if you could again call the case, please. |
| 1:05PM | 10 | COURTROOM DEPUTY:  United States versus Gregory Allen |
| 1:05PM | 11 | Williamson, 8:21-CR-355. |
| 1:05PM | 12 | THE COURT:  If I could again have appearances of |
| 1:05PM | 13 | counsel, beginning with the Government? |
| 1:05PM | 14 | MS. FAVORIT:  Good afternoon again, Your Honor.  Erin |
| 1:05PM | 15 | Favorit on behalf of the United States. |
| 1:05PM | 16 | MS. KING:  And Abigail King on behalf of the United |
| 1:05PM | 17 | States. |
| 1:05PM | 18 | THE COURT:  Good afternoon, again, to you both.  And |
| 1:05PM | 19 | for the defense? |
| 1:05PM | 20 | MR. CENTRONE:  Good afternoon, Judge.  Gus Centrone |
| 1:05PM | 21 | for Gregory Allen Williamson who is present with me in court. |
| 1:06PM | 22 | THE COURT:  Good afternoon, again, to you both.  As a |
| 1:06PM | 23 | housekeeping matter, counsel, my hearing is scheduled for 3:00. |
| 1:06PM | 24 | I had hoped that we would be done by then.  Let's see how we |
| 1:06PM | 25 | do. |

1:06 PM  1         Ms. Favorit, you can call your next witness.

1:06 PM  2         MS. FAVORIT:  United States calls Ashley Guizzotti.

1:06 PM  3         COURTROOM DEPUTY:  Please raise your right hand.

1:06 PM  4                    (Witness sworn.)

1:06 PM  5         COURTROOM DEPUTY:  Thank you.  And if you'll please

1:06 PM  6  state your name for the record and spell your last name.

1:07 PM  7         THE WITNESS:  Ashley Guizzotti, G-u-i-z-z-o-t-t-i.

1:07 PM  8         COURTROOM DEPUTY:  Thank you.  You may be seated.

1:07 PM  9         THE COURT:  Ms. Guizzotti, you'll see that there's a

1:07 PM  10  microphone when you find yourself seated on the stand.  If you

1:07 PM  11  just orient or position that microphone so that we can clearly

1:07 PM  12  hear you.

1:07 PM  13         Thank you.  And with that, Ms. Favorit, you may

1:07 PM  14  proceed.

1:07 PM  15         MS. FAVORIT:  Thank you, Your Honor.

1:07 PM  16                    ASHLEY GUIZZOTTI,

1:07 PM  17  a witness called on behalf of the Government, being first duly

1:07 PM  18  sworn, was examined and testified as follows:

1:07 PM  19                    DIRECT EXAMINATION

1:07 PM  20                    BY MS. FAVORIT:

1:07 PM  21  Q.   Ms. Guizzotti, what do you do for a living?

1:07 PM  22  A.   I work at Yahoo currently as the legal services manager

1:07 PM  23  for the trust and safety team.

1:07 PM  24  Q.   What is your educational background?

1:07 PM  25  A.   I have an undergrad at Buffalo State College for poli-sci.

GUIZZOTTI - DIRECT EXAMINATION

1:07PM  1    Q.   Do you have any related experience prior to working at

1:07PM  2    Yahoo?

1:07PM  3    A.   Not prior to working at Yahoo, but prior to the position

1:07PM  4    I'm in now, I was a contact moderator since 2016 for Yahoo.

1:08PM  5    Q.   What does a legal service manager do?

1:08PM  6    A.   Currently I manage a lot of the project work for trust and

1:08PM  7    safety, which includes the process and the tooling for

1:08PM  8    reviewing CSAM and detecting CSAM.

1:08PM  9    Q.   You said "CSAM".  Can you tell me what that stands for?

1:08PM  10   A.   It's Child Sexual Abuse Material.

1:08PM  11   Q.   And what are your day-to-day responsibilities?

1:08PM  12   A.   Currently it's understanding our internal tool that we --

1:08PM  13   our content moderators review the imagery on and its

1:08PM  14   capabilities.  I mean, if it breaks, like, I will contact

1:08PM  15   engineers, so and so like that.  Just like daily maintenance of

1:08PM  16   maintaining the tool to review CSAM and report it.

1:09PM  17   Q.   Can you tell me what Yahoo is?

1:09PM  18   A.   Yahoo is an email service provider primarily for email.

1:09PM  19   We also host products like Yahoo Finance and Yahoo Sports.

1:09PM  20   Q.   What is the mission of Yahoo?

1:09PM  21   A.   Yahoo -- the mission is to inspire and entertain users on

1:09PM  22   a personal level.  An example would be if you're -- if you play

1:09PM  23   fantasy sports, we like to give you a personal experience for

1:09PM  24   fantasy sports.

1:09PM  25   Q.   Why was Yahoo established?

GUIZZOTTI - DIRECT EXAMINATION

1:09 PM   1    A.    My understanding is to be an internet search provider.  It

1:09 PM   2    has since, like, came to be an email provider.

1:09 PM   3    Q.    Do you know when it was established?

1:09 PM   4    A.    Not offhand.

1:09 PM   5    Q.    Is it a non-profit organization?

1:09 PM   6    A.    No.  We are a private company.

1:10 PM   7    Q.    Is it a government organization?

1:10 PM   8    A.    No.

1:10 PM   9    Q.    What makes it a private company?

1:10 PM  10    A.    We are owned by a private equity firm named Apollo.

1:10 PM  11    Q.    Does Yahoo make money off of its users?

1:10 PM  12    A.    No.  Yahoo makes money based on ad revenue,

1:10 PM  13    advertisements.

1:10 PM  14    Q.    Approximately how many people does Yahoo employ?

1:10 PM  15    A.    The last I had heard, it was around 6,000 people.

1:10 PM  16    Q.    You mentioned that currently Yahoo is owned by Apollo.

1:10 PM  17    A.    Uh-huh.

1:10 PM  18    Q.    In September of 2020, do you know who owned Yahoo?

1:10 PM  19    A.    Yes, Verizon.

1:11 PM  20    Q.    Have there been any significant changes in your department

1:11 PM  21    from Verizon to Apollo ownership?

1:11 PM  22    A.    No.

1:11 PM  23    Q.    I want to go specifically focusing on email users.  How

1:11 PM  24    does an individual sign up for email with Yahoo?

1:11 PM  25    A.    Really all you need is -- I mean, you state your name and

GUIZZOTTI - DIRECT EXAMINATION

1:11PM  1   what email you would like and a phone number, I believe.

1:11PM  2   Q.   Does a user interested in obtaining a Yahoo email, are

1:11PM  3   they required to agree to a terms of service?

1:12PM  4   A.   Yes.

1:12PM  5   Q.   Can you tell me what a terms of service is?

1:12PM  6   A.   It's the terms that Yahoo as a company creates to abide

1:12PM  7   by, basically rules to use our services.

1:12PM  8   Q.   Does a user have to agree to that in order to obtain

1:12PM  9   email?

1:12PM  10  A.   Yes.

1:12PM  11  Q.   What happens if a user does not agree to those terms and

1:12PM  12  service?

1:12PM  13  A.   They are not able to use our services.

1:12PM  14  Q.   I'm going to show you what's been identified as Government

1:12PM  15  Exhibit 5 which we've labeled "Yahoo Terms of Service."  Do you

1:12PM  16  recognize that exhibit?

1:12PM  17  A.   I do.

1:12PM  18  Q.   What do you recognize it to be?

1:12PM  19  A.   What the Yahoo terms of service was -- I believe was in

1:12PM  20  2020.

1:13PM  21  Q.   Have you had an opportunity to review this prior to the

1:13PM  22  hearing today?

1:13PM  23  A.   I did.

1:13PM  24  Q.   And is it your understanding that this terms of service

1:13PM  25  was in effect in September of 2020?

GUIZZOTTI - DIRECT EXAMINATION

1:13 PM  1   A.   It is.

1:13 PM  2   Q.   What significance does a terms of service have for a user

1:13 PM  3   who might be using Yahoo's email service?

1:13 PM  4   A.   I mean, in the way that it's significant to my

1:13 PM  5   responsibilities is the -- the piece of the member conduct.  It

1:13 PM  6   is to not use our services abusively.

1:13 PM  7   Q.   I'm now going to show you Government Exhibit Number 3,

1:13 PM  8   which is the declaration that you prepared on behalf of Yahoo.

1:14 PM  9   Do you recognize this document?

1:14 PM  10  A.   I do.

1:14 PM  11  Q.   What do you recognize it to be?

1:14 PM  12  A.   A declaration of what I do at Yahoo and my understanding

1:14 PM  13  of reviewing CSAM.

1:14 PM  14  Q.   Does this document reference the terms of service

1:14 PM  15  agreement at all?

1:14 PM  16  A.   It does.

1:14 PM  17  Q.   And would you please read item number 4 to the Court?

1:14 PM  18  A.   "Under the Yahoo terms of service in effect at the time

1:14 PM  19  Yahoo filed CyberTip number 79384716 with NCMEC, users agreed

1:14 PM  20  in pertinent part to not use the Yahoo services to upload,

1:14 PM  21  post, email, transmit, or otherwise make available any content

1:14 PM  22  that is unlawful, harmful, threatening, abusive, harassing,

1:15 PM  23  tortious, defamatory, vulgar, obscene, libelous, invasive of

1:15 PM  24  another's privacy, hateful, or racially, ethnically or

1:15 PM  25  otherwise objectionable or harm to minors in any way."

GUIZZOTTI - DIRECT EXAMINATION

1:15PM  1   Q.   Do you know why Yahoo has included that section in its

1:15PM  2   terms of service?

1:15PM  3   A.   My understanding is because we need to protect our users,

1:15PM  4   we need to protect our reputation as a company.  We can't host

1:15PM  5   abusive material, especially a harm to minor.

1:15PM  6   Q.   And in bullet number 5 of this declaration, is that kind

1:15PM  7   of outlining the Yahoo's interests in enforcing these terms of

1:15PM  8   service?

1:15PM  9   A.   Absolutely.

1:15PM  10  Q.   Does Yahoo enforce that terms of service?

1:16PM  11  A.   We do.

1:16PM  12  Q.   How do they go about enforcing it?

1:16PM  13  A.   If my team finds illegal content, specifically abuse to

1:16PM  14  minors, we disable their account.

1:16PM  15  Q.   I want to focus on the "harm to minors in any way".  What

1:16PM  16  does that mean to Yahoo?

1:16PM  17  A.   That could be solicitation, sharing or distributing

1:16PM  18  typically imagery or videos of a minor in an abusive way or a

1:16PM  19  sexual way.

1:16PM  20  Q.   Does Yahoo actively search users' emails for that

1:16PM  21  material?

1:16PM  22  A.   No.

1:16PM  23  Q.   How does Yahoo find that type of material?

1:17PM  24  A.   We cross-reference with a hash list that is maintained by

1:17PM  25  NCMEC.  If we come across the same hash, we scan, and it could

GUIZZOTTI - DIRECT EXAMINATION

1:17PM  1   be a hit on our servers, like in our email.  We only do that

1:17PM  2   for emails that are sent.  It is not upon upload.  It is when a

1:17PM  3   user explicitly sends an email, that sent email will be scanned

1:17PM  4   against a known hash list.

1:17PM  5   Q.   I'm going to break that down.  Let's start with the hash

1:17PM  6   list.

1:17PM  7   A.   Sure.

1:17PM  8   Q.   What is your understanding of the contents of the hash

1:17PM  9   list?

1:17PM  10  A.   So the contents is a lot of known already -- they've

1:17PM  11  already been known as a positive identification of CSAM.  We

1:17PM  12  use technologies from Microsoft, Google, our own known

1:17PM  13  proprietary lists, and like I said, NCMEC can maintain the --

1:18PM  14  the -- like, the appropriateness of the images.

1:18PM  15  Q.   I'm going to go through a few hypotheticals to understand

1:18PM  16  what you've testified to.

1:18PM  17  A.   Sure.

1:18PM  18  Q.   So an email user has uploaded an image as an attachment to

1:18PM  19  an email but never sends that email.  Is that something Yahoo

1:18PM  20  will search and find?

1:18PM  21  A.   No, we would never find it.

1:18PM  22  Q.   Why not?

1:18PM  23  A.   Because we only scan on a sent event.  You have to send

1:18PM  24  out that email.  That's where the scanning takes place.

1:18PM  25  Q.   So same hypothetical.  The user has uploaded an image as

GUIZZOTTI - DIRECT EXAMINATION

1:18PM   1    an email attachment and emails it, and it is now sent.

1:18PM   2    A.    Yes.

1:18PM   3    Q.    Is that now something that Yahoo will scan?

1:19PM   4    A.    Right, yes.

1:19PM   5    Q.    Is that a human person scanning the email attachments?

1:19PM   6    A.    So at that level, it is still just cross-referencing the

1:19PM   7    known hash list, and once -- say it, you know, sets off that it

1:19PM   8    had a match, that then gets sent for human review.  So in

1:19PM   9    theory, I mean, at that point a human will review if it was hit

1:19PM  10    as a match.

1:19PM  11    Q.    Okay.  We'll move on to that in a minute.

1:19PM  12    A.    Okay.

1:19PM  13    Q.    In the same hypothetical scenario, the image uploaded to

1:19PM  14    that email, it's sent out.  Yahoo has now scanned that image,

1:19PM  15    comparing to this hash list.  What if there is no hash list

1:19PM  16    match?  What happens?

1:19PM  17    A.    Nothing.  We move on.  That case is essentially closed,

1:19PM  18    and we are not -- as moderators, we are not able to retrieve

1:20PM  19    it.  It's essentially deleted.

1:20PM  20    Q.    Now, if -- same hypothetical, the email has that photo

1:20PM  21    attachment and that attachment does match something from the

1:20PM  22    hash list.  What happens now?

1:20PM  23    A.    It gets sent to a queue for a human moderator to review.

1:20PM  24    Q.    So at that point it kind of moves to your team?

1:20PM  25    A.    Right.

GUIZZOTTI - DIRECT EXAMINATION

1:20 PM  1    Q.   Okay.   Is it a computer or software system that does the

1:20 PM  2    scanning of those images at that level?

1:20 PM  3    A.   It is an internal tool we call Radar.

1:20 PM  4    Q.   You talked a little bit about PhotoDNA.   Can you explain

1:20 PM  5    what that is?

1:20 PM  6    A.   The way I explain PhotoDNA is every image on the internet

1:21 PM  7    quite literally has like a fingerprint.   It's -- it's only that

1:21 PM  8    image.   So it's what we would have to match is that identical

1:21 PM  9    fingerprint again to make sure that it is a match.

1:21 PM  10   Q.   Now, we called it a hash list.

1:21 PM  11   A.   Uh-huh.

1:21 PM  12   Q.   Is it actually a database of photos and videos?

1:21 PM  13   A.   No.

1:21 PM  14   Q.   Is it quite literally a list of image and file names?

1:21 PM  15   A.   No, it's not even file names.   It's those hash -- which is

1:21 PM  16   a bunch of 1s, 0s.   It's a string of letters or numbers.

1:21 PM  17   Q.   If you were to read those strings of letters and numbers,

1:21 PM  18   it's not going to be an image or a video?

1:21 PM  19   A.   No.

1:22 PM  20   Q.   I want to move on to same hypothetical.   Now your team is

1:22 PM  21   involved because there is a hash match.   What happens next?

1:22 PM  22   A.   So it gets into a queue, as I said, and an agent will

1:22 PM  23   review if the hit was, in fact, CSAM.   If it is, we will

1:22 PM  24   archive the rest of the images in that email to view more than

1:22 PM  25   just the original hash.   The videos and images will then all be

GUIZZOTTI - DIRECT EXAMINATION

1:22PM    1    queued to go into like a stage 2 review.

1:22PM    2    Q.    Where are these images stored at this point?

1:22PM    3    A.    In our internal Radar tool.

1:22PM    4    Q.    Does anybody at your company have access to that?

1:22PM    5    A.    Just the trust and safety agents.

1:23PM    6    Q.    Do all images and videos get added to this hash list?

1:23PM    7    A.    No.

1:23PM    8    Q.    Why not?

1:23PM    9    A.    All videos and images might not be true CSAM.

1:23PM   10    Q.    Have you called law enforcement at this point when a hash

1:23PM   11    match takes place?

1:23PM   12    A.    No.

1:23PM   13    Q.    Do you ever call law enforcement at this point?

1:23PM   14    A.    No.

1:23PM   15    Q.    Those human moderators, do they receive any training?

1:23PM   16    A.    Yes.  Our moderators are housed in the legal department,

1:23PM   17    so we get a lot of legal counsel on what we can and cannot

1:23PM   18    consider CSAM as well as we do monthly calibrations with our

1:24PM   19    lawyer and managers, and then onboarding is a lot of shadowing

1:24PM   20    of images and detection of images, and then explanations and

1:24PM   21    just onboarding training, understanding what to submit and what

1:24PM   22    not to submit.

1:24PM   23    Q.    What is a calibration?

1:24PM   24    A.    So we meet with our manager and our lawyer with the

1:24PM   25    definition of what CSAM is, and we go over like gray area

GUIZZOTTI - DIRECT EXAMINATION

1:24PM  1  images, anything that could be borderline, say within age or

1:24PM  2  borderline sexual versus modeling, like just little nuances of

1:24PM  3  if our agents aren't a hundred percent positive that it would

1:24PM  4  be considered CSAM, we kind of table it until we can get a

1:24PM  5  legal call, and we do that monthly.

1:25PM  6  Q.   If your team determines that something is not a hundred

1:25PM  7  percent certain that it's CSAM, what happens?

1:25PM  8  A.   We ask our lawyer, and then aside from that, we do not

1:25PM  9  submit it.

1:25PM  10  Q.   Is that process part of how you decide whether or not to

1:25PM  11  report these images?

1:25PM  12  A.   Typically only on gray area content.

1:25PM  13  Q.   I want to talk a little bit about the reporting process.

1:25PM  14  Are you familiar with CyberTipline?

1:25PM  15  A.   I'm familiar to submit a CyberTip.

1:25PM  16  Q.   Do you submit CyberTips?

1:25PM  17  A.   Yes.

1:25PM  18  Q.   Who do you submit CyberTips to?

1:25PM  19  A.   NCMEC.

1:26PM  20  Q.   At what point does Yahoo generate a report to NCMEC?

1:26PM  21  A.   After reviewing the contents or the images and videos of

1:26PM  22  an account, and then we submit to NCMEC.

1:26PM  23  Q.   What type of information is required to send to NCMEC?

1:26PM  24  A.   We include the user's name, their email address, I believe

1:26PM  25  their IP address, and the files.

GUIZZOTTI - DIRECT EXAMINATION

1:26PM 1  Q.  When you say "the files," are those like the images or

1:26PM 2  videos?

1:26PM 3  A.  Not the images, but their hash values and typically their

1:26PM 4  file names.

1:26PM 5  Q.  Do you send contents of emails?

1:26PM 6  A.  No.

1:26PM 7  Q.  Under any circumstances?

1:26PM 8  A.  No.

1:27PM 9  Q.  Is submitting a tip an automatic computer process?

1:27PM 10 A.  It is pretty automatic.  The only non-automatic thing

1:27PM 11 would be the moderator selecting which images to include.

1:27PM 12 Q.  Can you tell us a little bit about what that might look

1:27PM 13 like at your end when you're submitting a CyberTip?

1:27PM 14 A.  Sure.  So after going through the contents and you select

1:27PM 15 the images, there is like a review page, and it will kind of

1:27PM 16 tell you the images that are going to be reported.  We have to

1:27PM 17 confirm that I have identified CSAM and I personally reviewed

1:27PM 18 them, and then we click a button that literally says, "Submit

1:27PM 19 to NCMEC."  It's a pretty automatic process, automative

1:27PM 20 process.

1:27PM 21 Q.  And I know we refer to email contents.  I want to be a

1:27PM 22 little more specific.  Does it sometimes include the subject

1:28PM 23 line of the email?

1:28PM 24 A.  It can if there is one.

1:28PM 25 Q.  But not the body of the email?

GUIZZOTTI - DIRECT EXAMINATION

1:28PM 1    A.    Not at all.

1:28PM 2    Q.    Does that remain even if the body of the email seems

1:28PM 3    emergent?

1:28PM 4    A.    Yes, we don't include the body.

1:28PM 5    Q.    I'm going to show you Government Exhibit 1.  Do you

1:28PM 6    recognize this exhibit?

1:28PM 7    A.    I do.

1:28PM 8    Q.    What do you recognize it to be?

1:28PM 9    A.    The CyberTip report sent to NCMEC.

1:28PM 10   Q.    Okay.  Does it look the same as the report that you submit

1:28PM 11   to NCMEC from Yahoo?

1:29PM 12   A.    Yes.

1:29PM 13   Q.    Okay.  Do you ever see it in this format after you submit

1:29PM 14   it?

1:29PM 15   A.    No.

1:29PM 16   Q.    I'm going to go to page -- page 4 of Government Exhibit 1,

1:29PM 17   which is also page 3 of the CyberTipline report.  Listed on

1:29PM 18   this page we have, "Suspect information."  Is that provided by

1:29PM 19   Yahoo?

1:29PM 20   A.    It is.

1:29PM 21   Q.    Okay.  And I think I need to lay a little more foundation.

1:29PM 22   This a CyberTip that came from Yahoo in September of 2020?

1:29PM 23   A.    Yes.

1:29PM 24   Q.    Okay.  And just for record purposes, it says,

1:30PM 25   "CyberTipline report 79384716."

GUIZZOTTI - DIRECT EXAMINATION

1:30 PM   1    A.    Yes.

1:30 PM   2    Q.    And is it your understanding that this is the CyberTipline

1:30 PM   3    report in question today?

1:30 PM   4    A.    Yes.

1:30 PM   5    Q.    Okay.  Going back to that page, we also see, "Uploaded

1:30 PM   6    file information," including the number of uploaded files and

1:30 PM   7    some descriptions.  Does that come from Yahoo?

1:30 PM   8    A.    It does.

1:30 PM   9    Q.    We'll start with the first one.  It says, "File name," and

1:30 PM  10    it's image.4-1.gif.  Can you tell me where that file name would

1:30 PM  11    have come from?

1:30 PM  12    A.    The user.

1:30 PM  13    Q.    What about the MD5?  Do you know what that is?

1:30 PM  14    A.    That is the hash.  I had spoke earlier of hashes.  That's

1:31 PM  15    what that would look like.

1:31 PM  16    Q.    Do you manually type that in?

1:31 PM  17    A.    No.

1:31 PM  18    Q.    Where does it come from?

1:31 PM  19    A.    The image itself.

1:31 PM  20    Q.    Now, I see a question, "Did recording ESP review the

1:31 PM  21    entire contents of uploaded file," and the response is, "Yes."

1:31 PM  22    Can you explain what that means?

1:31 PM  23    A.    That is the check box after reviewing the images and

1:31 PM  24    videos and before submitting to NCMEC that we need to sign off

1:31 PM  25    on that we had reviewed the content, the images and videos that

GUIZZOTTI - DIRECT EXAMINATION

1:31PM  1    we are submitting.

1:31PM  2    Q.   How do you know a human person reviewed these images?

1:31PM  3    A.   That is the process and really the only way to submit a

1:31PM  4    CyberTip.

1:31PM  5    Q.   Does Yahoo ever submit a CyberTip without viewing the

1:31PM  6    images or videos?

1:31PM  7    A.   Never.

1:31PM  8    Q.   Why not?

1:31PM  9    A.   A human literally needs to check the images.  Say like in

1:32PM  10   a gallery view, we check box the images as well as checking the

1:32PM  11   button that says, "Submit to NCMEC."  I don't see that

1:32PM  12   happening without somebody to click buttons.

1:32PM  13   Q.   As you click those buttons, can you visually see the file

1:32PM  14   attachments at that point?

1:32PM  15   A.   Yes, in a gallery view.

1:32PM  16   Q.   Okay.  And were you working in the same position in

1:32PM  17   September of 2020?

1:32PM  18   A.   Currently, no.  I was a content moderator in September of

1:32PM  19   2020.

1:32PM  20   Q.   Is that the role that we've been speaking about today?

1:32PM  21   A.   Yes.

1:32PM  22   Q.   Were you actually the one who submitted this particular

1:32PM  23   CyberTip report?

1:32PM  24   A.   I was not.

1:32PM  25   Q.   Do you know who did?

**GUIZZOTTI - DIRECT EXAMINATION**

1:32PM 1   A.   I do.

1:32PM 2   Q.   And who is that person?

1:32PM 3   A.   Jessica Hines.

1:32PM 4   Q.   Was she a member of the same team that you were?

1:33PM 5   A.   She was.  She was my senior manager of trust and safety at

1:33PM 6   the time.

1:33PM 7   Q.   Do you have the same process now as in 2020?

1:33PM 8   A.   We do.

1:33PM 9   Q.   Did you ever report the suspect from this CyberTip to law

1:33PM 10  enforcement?

1:33PM 11  A.   No.

1:33PM 12  Q.   Why not?

1:33PM 13  A.   We don't have any contact with law enforcement.

1:33PM 14  Q.   Why do you report it to NCMEC?

1:33PM 15  A.   To my understanding, we are only privileged to report to

1:33PM 16  NCMEC.

1:33PM 17  Q.   What happens to the user after the report is submitted to

1:33PM 18  NCMEC?

1:33PM 19  A.   We disable their account.

1:33PM 20  Q.   Is there any other reason that Yahoo might search or scan

1:34PM 21  a user's content?

1:34PM 22  A.   No.

1:34PM 23  Q.   I just want to ask you a couple more specifics about this

1:34PM 24  case.  Do you know how many images were reported to NCMEC?

1:34PM 25  A.   Seven.

87

GUIZZOTTI - DIRECT EXAMINATION

1:34PM   1   Q.   Were all seven reviewed by a human?

1:34PM   2   A.   Yes.

1:34PM   3   Q.   I want to move on to IP addresses.

1:34PM   4   A.   Okay.

1:34PM   5   Q.   What is your understanding of what an IP address is?

1:34PM   6   A.   An IP is short for internet protocol, and it's an address

1:34PM   7   given to any device.  My understanding how we use it as an IP

1:35PM   8   address is if you send an email, for an example, it needs to go

1:35PM   9   somewhere; i.e., an address.

1:35PM  10   Q.   Is an IP address required to send an email message?

1:35PM  11   A.   Yes.

1:35PM  12   Q.   Does Yahoo maintain IP address information?

1:35PM  13   A.   We do.

1:35PM  14   Q.   Was there any IP address information in this particular

1:35PM  15   case?

1:35PM  16   A.   Yes.

1:35PM  17   Q.   Was that information put into the CyberTipline report?

1:35PM  18   A.   It was.

1:35PM  19   Q.   Why would that be included?

1:35PM  20   A.   I'm not sure.

1:35PM  21   Q.   Does an email user need to be logged in to Yahoo in order

1:35PM  22   to send an email?

1:35PM  23   A.   Yes.

1:35PM  24   Q.   Does Yahoo maintain time stamps from when emails are sent?

1:35PM  25   A.   Yes.

GUIZZOTTI - DIRECT EXAMINATION

1:36PM 1  Q.   When a user logs in to their email account with Yahoo,

1:36PM 2  there a record of that?

1:36PM 3  A.   Yes.

1:36PM 4  Q.   How long can a user stay logged into Yahoo?

1:36PM 5  A.   A couple of weeks.

1:36PM 6  Q.   Does a Yahoo email user need to be re-logged in to submit

1:36PM 7  an email?  I'm going to make that a little more clear.

1:36PM 8        You said that they stay logged in for a few weeks.

1:36PM 9  If a user is still logged in, but they're going to send an

1:36PM 10 email, do they have to re-log in to do that?

1:36PM 11 A.   No.

1:36PM 12 Q.   Does Yahoo maintain information every time somebody opens

1:36PM 13 their own Yahoo email account?

1:36PM 14 A.   No, I believe just registration and log in.

1:37PM 15 Q.   Can you tell me what a persistent log-in session is?

1:37PM 16 A.   Sure.  So you typically have multiple devices, whether

1:37PM 17 it's your computer or your cellphone, and you are logged in to

1:37PM 18 Yahoo.  You can be logged in to Yahoo without re-logging for

1:37PM 19 weeks at a time between different devices.  For an example, I

1:37PM 20 could be logged out of my computer but still logged in by my

1:37PM 21 cellphone pretty much at any given time.

1:37PM 22 Q.   Would there be a new log in when an email is sent?

1:37PM 23 A.   No.

1:37PM 24 Q.   If a user actively logs out, will they have to re-log in

1:37PM 25 to access their email?

GUIZZOTTI - DIRECT EXAMINATION

1:37PM 1   A.   It depends.  On the same device, yes.  If I log out of my

1:37PM 2   computer, I would have to log back in.  However, if I log out

1:37PM 3   on my computer, I could still be logged in on my cellphone.

1:38PM 4   Q.   Referencing the persistent log-in session, does that

1:38PM 5   expire at some point?

1:38PM 6   A.   I don't know.

1:38PM 7   Q.   I want to reference again Government Exhibit Number 3,

1:38PM 8   which is your declaration, and I want to go to page 3 of that.

1:38PM 9   Specifically I want to focus on bullet 14.  In reference to

1:38PM 10  this particular CyberTipline report, could you read for us

1:38PM 11  bullet 14?

1:38PM 12  A.   "Yahoo's records also reflect a time stamp for the last

1:38PM 13  active session for the account reported in CyberTip report

1:38PM 14  number 79384716 as beginning on September 5th, 2022 (verbatim),

1:39PM 15  at 9:29:59.  This time stamp value in Yahoo's records

1:39PM 16  corresponds to the date and time when the user either logged in

1:39PM 17  the reported account or extended a previous log-in session.  By

1:39PM 18  logging in or by extending a log in session, the user would

1:39PM 19  remain logged into the Yahoo account on the same device for a

1:39PM 20  period of two weeks.  Yahoo mail users must be logged into an

1:39PM 21  account to send email messages."

1:39PM 22          THE DEFENDANT:  Thank you.

1:39PM 23          THE COURT:  Ms. Favorit, when you say "bullet 14,"

1:39PM 24  it's the same as paragraph 14?

1:39PM 25          MS. FAVORIT:  It is.  That's the better way to put

GUIZZOTTI - DIRECT EXAMINATION

1:39PM   1    it, Your Honor.

1:39PM   2         **THE COURT:** I understood. I just wanted to make

1:39PM   3    sure. Thank you.

1:39PM   4    **BY MS. FAVORIT:**

1:39PM   5    Q.   I want to ask if there are any labels given to CSAM images

1:40PM   6    or videos by Yahoo.

1:40PM   7    A.   Sometimes.

1:40PM   8    Q.   Would that be something that ends up in a CyberTipline

1:40PM   9    report?

1:40PM   10   A.   Yes.

1:40PM   11   Q.   Can you explain how that might end up in there?

1:40PM   12   A.   So the label that we would use is like A1 is a -- it's

1:40PM   13   considered like worst of the worst. A is prepubescent minor.

1:40PM   14   1 is sexual encounter. So I would label like a

1:40PM   15   worst-of-the-worst image as an A1. If I choose to submit it as

1:40PM   16   an A1, which is another click, that would be relevant on the

1:40PM   17   CyberTip.

1:40PM   18   Q.   Did this particular CyberTip have a label?

1:40PM   19   A.   I don't think so, no.

1:41PM   20   Q.   To your knowledge, does Yahoo receive any benefit from

1:41PM   21   NCMEC to participate in the CyberTipline reports?

1:41PM   22   A.   No.

1:41PM   23   Q.   You mentioned never calling law enforcement in these

1:41PM   24   particular instances. Post-sending a report, does Yahoo talk

1:41PM   25   to law enforcement?

GUIZZOTTI - CROSS-EXAMINATION

| | | |
|---|---|---|
| 1:41 PM | 1 | A.   Another team can intake a search warrant or a subpoena, |
| 1:41 PM | 2 | but that would not be my responsibility or my organization. |
| 1:41 PM | 3 | Q.   If you know the answer, would law enforcement need a |
| 1:41 PM | 4 | search warrant or subpoena to receive information from Yahoo? |
| 1:41 PM | 5 | A.   Yes. |
| 1:41 PM | 6 | Q.   Is Yahoo required to scan for child sexual abuse material? |
| 1:42 PM | 7 | A.   No. |
| 1:42 PM | 8 | Q.   But they choose to do that? |
| 1:42 PM | 9 | A.   Voluntarily. |
| 1:42 PM | 10 | Q.   What benefit does Yahoo receive by implementing this |
| 1:42 PM | 11 | system? |
| 1:42 PM | 12 | A.   We want to keep our users safe, first and foremost, as |
| 1:42 PM | 13 | well as our business responsibility to create a safe |
| 1:42 PM | 14 | environment. |
| 1:42 PM | 15 | MS. FAVORIT:  May I have a moment, Your Honor? |
| 1:42 PM | 16 | THE COURT:  Absolutely. |
| 1:42 PM | 17 | MS. FAVORIT:  I don't have any further questions, |
| 1:42 PM | 18 | Your Honor. |
| 1:42 PM | 19 | THE COURT:  Thank you, Ms. Favorit. |
| 1:43 PM | 20 | Defense have any cross? |
| 1:43 PM | 21 | MR. CENTRONE:  I do.  Thank you, Your Honor. |
| 1:43 PM | 22 | CROSS-EXAMINATION |
| 1:43 PM | 23 | BY MR. CENTRONE: |
| 1:43 PM | 24 | Q.   Good afternoon. |
| 1:43 PM | 25 | A.   Hi.  How are you? |

GUIZZOTTI - CROSS-EXAMINATION

1:43 PM  1  Q.  Good.  Can you pronounce your last name again for me?

1:43 PM  2  A.  Guizzotti.

1:43 PM  3  Q.  Thank you.

1:43 PM  4  A.  It's less fancy than it looks.

1:43 PM  5  Q.  As a fellow Italian, I know the feeling.

1:43 PM  6      Yahoo has a policy of reporting child pornography to

1:43 PM  7  law enforcement, correct -- excuse me, to NCMEC, correct?

1:43 PM  8  A.  To NCMEC.

1:43 PM  9  Q.  And, in fact, is obligated under federal law to do -- to

1:43 PM  10  do just that if it finds child pornography?

1:43 PM  11  A.  Only when we are made aware, yes.

1:43 PM  12  Q.  Do you know how much money Yahoo spends on its searching,

1:43 PM  13  analysis, and reporting of child pornography?

1:43 PM  14  A.  I have no idea.

1:43 PM  15  Q.  Ballpark?

1:43 PM  16  A.  I don't know.

1:43 PM  17  Q.  I mean, we are -- is it fair to say we're probably talking

1:44 PM  18  at least a million dollars?

1:44 PM  19      MS. FAVORIT:  Objection, Your Honor.  This witness

1:44 PM  20  says she does not know.

1:44 PM  21      THE COURT:  Mr. Centrone, foundation?

1:44 PM  22      MR. CENTRONE:  There was a discussion in direct about

1:44 PM  23  the --

1:44 PM  24      THE COURT:  Are you withdrawing that question?

1:44 PM  25      MR. CENTRONE:  I'll rephrase, Your Honor.

GUIZZOTTI - CROSS-EXAMINATION

1:44PM  1        THE COURT:  Okay.

1:44PM  2   BY MR. CENTRONE:

1:44PM  3   Q.    Does Yahoo make any money from reviewing the reported

1:44PM  4   child pornography?

1:44PM  5   A.    No.

1:44PM  6   Q.    Nobody pays Yahoo to do it, correct?

1:44PM  7   A.    Correct.

1:44PM  8   Q.    Yahoo hires trust and safety moderators, correct?

1:44PM  9   A.    Yes --

1:44PM 10   Q.    Presumably they get paid a salary --

1:44PM 11   A.    Yes.

1:44PM 12   Q.    H- correct?  It employs software that we discussed such as

1:44PM 13   PhotoDNA and Radar, correct?

1:44PM 14   A.    Correct.

1:44PM 15   Q.    Presumably that costs money, correct?

1:44PM 16   A.    Yes.

1:44PM 17   Q.    Yahoo is a corporation that's purpose is to make money,

1:45PM 18   correct?

1:45PM 19   A.    Right.

1:45PM 20   Q.    Has Yahoo ever calculated how much money it would lose if

1:45PM 21   it failed to actively search for CSAM material?

1:45PM 22   A.    Not to my knowledge.

1:45PM 23   Q.    You've never seen any data regarding the financial benefit

1:45PM 24   to Yahoo by actively searching for CSAM, correct?

1:45PM 25   A.    No.

GUIZZOTTI - CROSS-EXAMINATION

1:45 PM  1    Q.   Ms. Guizzotti, there's a -- that binder in front of you,

1:45 PM  2    I'd like to direct you to tab H of that binder.  This is a

1:46 PM  3    document entitled, "Yahoo Compliance Guide for Law

1:46 PM  4    Enforcement."  Have you ever seen this before?

1:46 PM  5    A.   No.  This would not be my team of trust and safety.

1:46 PM  6    Q.   Who would maintain that?

1:46 PM  7    A.   I'm not sure.

1:46 PM  8    Q.   I'm going to direct you to page six of that compliance

1:46 PM  9    guide.  Do you see a header number 2, "General information?"

1:46 PM  10   A.   I do.

1:46 PM  11   Q.   Can you read that first sentence of that -- of that

1:46 PM  12   section?

1:47 PM  13   A.   "This compliance guide is designed to assist law

1:47 PM  14   enforcement in understanding Yahoo's policies and practices

1:47 PM  15   with regard to retention and disclosure of electronic

1:47 PM  16   information and to provide answers to frequently asked

1:47 PM  17   questions related to subpoenas and other legal process."

1:47 PM  18   Q.   Okay.  Can you go ahead and read the rest of that

1:47 PM  19   paragraph for me?

1:47 PM  20   A.   Absolutely, sure.  "The policies and procedures in this

1:47 PM  21   guide are subject to change without notice, and this document

1:47 PM  22   is not meant to be distributed to individuals or organizations

1:47 PM  23   that are not law enforcement entities, including Yahoo

1:47 PM  24   customers, consumers, or civil litigants.  Nothing in this

1:47 PM  25   guide is intended to create any enforceable rights against

GUIZZOTTI - CROSS-EXAMINATION

|   |   |   |
|---|---|---|
| 1:47 PM | 1 | Yahoo.  Yahoo will make reasonable efforts to advise law |
| 1:47 PM | 2 | enforcement of significant changes in policies or procedures |
| 1:47 PM | 3 | through updates to this guide." |
| 1:48 PM | 4 | **Q.**   Okay.  I want to ask you to turn to page 12 of the same |
| 1:48 PM | 5 | document. |
| 1:48 PM | 6 | THE COURT:  It's Defendant's Exhibit H? |
| 1:48 PM | 7 | MR. CENTRONE:  Correct, same exhibit, Your Honor. |
| 1:48 PM | 8 | BY MR. CENTRONE: |
| 1:48 PM | 9 | **Q.**   Do you see a section there entitled, "VI. NCMEC reporting |
| 1:48 PM | 10 | procedures?" |
| 1:48 PM | 11 | **A.**   I do. |
| 1:48 PM | 12 | **Q.**   Can you go ahead and read that section for me? |
| 1:48 PM | 13 | **A.**   "Yahoo has worked with law enforcement and the National |
| 1:48 PM | 14 | Center for Missing and Exploited Children, NCMEC, to develop |
| 1:48 PM | 15 | practices for reporting instances of apparent child |
| 1:48 PM | 16 | pornography, CP, as required by 18 USC 2258A."  Keep going? |
| 1:48 PM | 17 | **Q.**   Yes, please. |
| 1:48 PM | 18 | **A.**   "Yahoo -- |
| 1:48 PM | 19 | THE COURT:  Mr. Centrone, if you could just pause for |
| 1:48 PM | 20 | a moment. |
| 1:48 PM | 21 | MR. CENTRONE:  Yes, sir. |
| 1:48 PM | 22 | THE COURT:  Is there a reason why this witness, who's |
| 1:48 PM | 23 | not familiar with this document, is being asked to read it? |
| 1:48 PM | 24 | It's in evidence. |
| 1:49 PM | 25 | MR. CENTRONE:  I'm trying to include it in the |

GUIZZOTTI - CROSS-EXAMINATION

1:49PM    1    transcript as well, Your Honor, for ease of reference later on.

1:49PM    2              THE COURT:  I think the Court is anticipating having

1:49PM    3    post-hearing submissions.

1:49PM    4              MR. CENTRONE:  Sure.

1:49PM    5              THE COURT:  So just in the interests of time.

1:49PM    6              MR. CENTRONE:  Okay.  There's -- I do have a couple

1:49PM    7    of questions about this section that I believe the witness

1:49PM    8    would have information on based on her --

1:49PM    9              THE COURT:  Okay.  It's fine for you to ask her

1:49PM   10    questions about an area about which she has -- a property

1:49PM   11    foundation has been laid, but just to simply read documents

1:49PM   12    into the record which are already in evidence, I think we can

1:49PM   13    use our time a little better.

1:49PM   14    BY MR. CENTRONE:

1:49PM   15    Q.   Ms. Guizzotti, do you see in the second paragraph of that

1:49PM   16    same section, the NCMEC reporting procedures section, that it

1:49PM   17    says, "Yahoo may learn about possible CP on its networks from a

1:49PM   18    variety of sources, including abuse reports from users, tips

1:49PM   19    from NCMEC and law enforcement, and internal proactive

1:49PM   20    efforts"?

1:50PM   21              With respect to this particular case, the portions of

1:50PM   22    this statement that relate to abuse report from users, tips

1:50PM   23    from NCMEC and law enforcement do not apply here, correct?

1:50PM   24    This was an internal discovery by Yahoo?

1:50PM   25    A.   Correct.

GUIZZOTTI - CROSS-EXAMINATION

1:50PM   1   Q.   Okay.   In the next paragraph, and I believe you testified
1:50PM   2   to this earlier, it says, "Yahoo will disable public access to
1:50PM   3   materials and escalate material to Yahoo's legal department
1:50PM   4   upon the discovery."  I assume that's also in addition to, as
1:50PM   5   you testified, disabling of the account, correct?
1:50PM   6   A.   Right.
1:50PM   7   Q.   And nothing in here relates to disclosure to law
1:50PM   8   enforcement, correct?
1:50PM   9   A.   Correct.
1:50PM  10   Q.   Ms. Guizzotti, I'd like to turn your attention to
1:51PM  11   Defendant's Exhibit G in the same binder, and this is a public
1:51PM  12   report by Yahoo titled, "Yahoo's Efforts to Combat Sexual Abuse
1:51PM  13   Material."  Have you seen this before?
1:51PM  14   A.   I have.
1:51PM  15   Q.   And this report states that in 2019, and I'm specifically
1:51PM  16   referring -- I believe it carries over to the second page of
1:51PM  17   two of this same exhibit, that Yahoo reported 5,359 accounts to
1:51PM  18   NCMEC for trafficking in CSAM in 2019.  Is that -- does that
1:51PM  19   comport with your understanding of Yahoo's --
1:51PM  20   A.   It does, yes.
1:51PM  21   Q.   And then on the first page, it says, "In 2021, Yahoo
1:51PM  22   reported 5,498 accounts to NCMEC for trafficking and CSAM."
1:51PM  23   Does that also comport with your understanding of Yahoo's
1:51PM  24   reporting?
1:51PM  25   A.   It does.

GUIZZOTTI - CROSS-EXAMINATION

1:51 PM 1    Q.   And this report states that Yahoo not only reports to

1:52 PM 2    NCMEC, but after such reports, will continue investigating CSAM

1:52 PM 3    in some certain instances; is that correct?

1:52 PM 4    A.   It is.

1:52 PM 5    Q.   Including the filing of supplemental reports to NCMEC

1:52 PM 6    which involve Yahoo taking it on itself to investigate and

1:52 PM 7    identify the actual individuals who commit these acts; is that

1:52 PM 8    correct?

1:52 PM 9    A.   Yes.

1:52 PM 10   Q.   And it's under no -- Yahoo is under no legal obligation to

1:52 PM 11   do that, correct?

1:52 PM 12   A.   Correct.

1:52 PM 13   Q.   Was -- was such a report -- was such a supplemental report

1:52 PM 14   filed in this case?

1:52 PM 15   A.   No.

1:52 PM 16   Q.   Thank you.  I'm going to turn to some different questions.

1:52 PM 17        We talked before that Yahoo is compelled by federal

1:52 PM 18   law to report any CP it finds on its network, correct?

1:53 PM 19   A.   Once it finds it, yes.

1:53 PM 20   Q.   And it's compelled to report it specifically to NCMEC,

1:53 PM 21   correct?

1:53 PM 22   A.   Correct, yes.

1:53 PM 23   Q.   And, in fact, it's illegal for Yahoo not to report child

1:53 PM 24   pornography, correct?

1:53 PM 25   A.   Correct.

GUIZZOTTI - CROSS-EXAMINATION

1:53PM  1   Q.   And Yahoo would be subject to a fine if such material was

1:53PM  2   not reported, correct?

1:53PM  3   A.   Yes.

1:53PM  4   Q.   Has Yahoo ever received such a fine to your knowledge?

1:53PM  5   A.   I don't know.

1:53PM  6   Q.   Just one moment, please.

1:53PM  7        I'd like to draw your attention to Exhibit E in that

1:53PM  8   same binder, which is a digital -- a Verizon digital safety

1:53PM  9   policy.

1:54PM  10        THE COURT:  E as in echo?

1:54PM  11        MR. CENTRONE:  Yes, sir.

1:54PM  12        THE COURT:  Thank you.

1:54PM  13   BY MR. CENTRONE:

1:54PM  14   Q.   There should be a letter tab for E.  I believe you're

1:54PM  15   looking at a --

1:54PM  16   A.   I think I got it.  Oh, there we go.

1:54PM  17        THE COURT:  Ms. Guizzotti, have you found Exhibit E?

1:54PM  18        THE WITNESS:  I did.  Thanks.

1:54PM  19        THE COURT:  Okay.

1:54PM  20   BY MR. CENTRONE:

1:54PM  21   Q.   Have you -- are you familiar with this document?  Have you

1:54PM  22   seen this before?

1:54PM  23   A.   I have.

1:54PM  24   Q.   Okay.  And this is a Verizon document.  I understand

1:54PM  25   Verizon no longer owns Yahoo, but was -- or I believe they're

**GUIZZOTTI - CROSS-EXAMINATION**

1:54PM   1   actually a minority owner now, but are -- was this digital

1:55PM   2   safety policy in place in 2020?

1:55PM   3   A.   I'm not sure.

1:55PM   4   Q.   Okay.  This -- this document refers to a close partnership

1:55PM   5   between Verizon and NCMEC.  Given your role at the company, is

1:55PM   6   that your experience?  Would you also identify the relationship

1:55PM   7   as close between Verizon and NCMEC?

1:55PM   8   A.   I don't know.

1:55PM   9   Q.   And this document also identifies a $2 million donation

1:55PM  10   from Verizon to NCMEC.  Were you aware of that donation?

1:55PM  11   A.   No.

1:55PM  12   Q.   Okay.  It's illegal for the general public to possess

1:55PM  13   child pornography, of course, correct?

1:55PM  14   A.   Of course, yes.

1:55PM  15   Q.   And, in fact, it's a very serious crime.  But Yahoo is

1:56PM  16   allowed to possess federal -- well, is allowed by federal law

1:56PM  17   to possess child pornography, correct?

1:56PM  18   A.   Yes.

1:56PM  19   Q.   And it's granted an exemption from liability under federal

1:56PM  20   law to do so, correct?

1:56PM  21   A.   Correct.

1:56PM  22   Q.   With respect to your testimony earlier about Yahoo's

1:56PM  23   policies regarding the review of alleged CSAM materials, how do

1:56PM  24   you know those policies were followed here?

1:56PM  25   A.   Our agents are trained under our legal guidance, and we

GUIZZOTTI - CROSS-EXAMINATION

1:56 PM  1    follow certain guidelines and factors determining what CSAM is.

1:56 PM  2    Q.   I understand.  That's essentially another policy though;

1:57 PM  3    isn't it?  You have a policy to train people.  You have a

1:57 PM  4    policy to train -- to provide guidance about CSAM, but how do

1:57 PM  5    you know those policies were actually followed in this

1:57 PM  6    particular instance?

1:57 PM  7    A.   I've never had any complaints with a senior manager

1:57 PM  8    maintaining and doing this process.  She was a very good agent

1:57 PM  9    at the time, and that would be my best --

1:57 PM  10   Q.   So is it fair to say you don't have any personal knowledge

1:57 PM  11   whether in this particular instance all the policies were

1:57 PM  12   followed?

1:57 PM  13   A.   That's correct.

1:57 PM  14   Q.   Okay.  Have you ever heard of someone at Yahoo being

1:57 PM  15   disciplined for not viewing images --

1:57 PM  16   A.   No.

1:57 PM  17   Q.   -- that are part of a CyberTip report?

1:57 PM  18   A.   No.

1:57 PM  19   Q.   No one has ever been disciplined for not doing their job?

1:57 PM  20   A.   I wouldn't be privy to that.

1:58 PM  21   Q.   Okay.  So, is it a -- okay.  So is it correct that you

1:58 PM  22   don't know whether --

1:58 PM  23   A.   I don't know.

1:58 PM  24   Q.   Okay.  You referred earlier to a gallery when images are

1:58 PM  25   attached to a CyberTipline report; is that correct?

GUIZZOTTI - CROSS-EXAMINATION

1:58 PM    1    A.    Right.

1:58 PM    2    Q.    Are those full screen images or thumbnails?

1:58 PM    3    A.    They can be either, depending on the agent's preference.

1:58 PM    4    Q.    Could it also just be a title of the file?

1:58 PM    5    A.    No.

1:58 PM    6    Q.    It would be an image?

1:58 PM    7    A.    It would be an image.

1:58 PM    8    Q.    But, again, you don't have any personal knowledge in this

1:58 PM    9    particular instance of what happened here, correct?

1:58 PM    10   A.    Correct.

1:59 PM    11   Q.    With respect to the language in the CyberTip report that

1:59 PM    12   you testified earlier regarding the uploaded file

1:59 PM    13   information -- and if you need to refresh your memory, I'd

1:59 PM    14   direct you to Exhibit A in the binder.  It's the same -- it's

1:59 PM    15   the same as Government's Exhibit 1.  For instance, we were

1:59 PM    16   looking at page 3 earlier.  And there's a line in there, "Did

1:59 PM    17   reporting ESP view entire contents of uploaded file?"  Does

1:59 PM    18   NCMEC provide any guidance to Yahoo about what that phrase

1:59 PM    19   means?

1:59 PM    20   A.    No.

1:59 PM    21   Q.    Does Yahoo have its own internal definition of what that

1:59 PM    22   phrase means and what's required to meet it?

1:59 PM    23   A.    It's pretty self-explanatory.  We review the entirety of

1:59 PM    24   the account.

1:59 PM    25   Q.    So is that a no?

## GUIZZOTTI - CROSS-EXAMINATION

2:00 PM  1  A.  No to -- I'm sorry.  Can you repeat the question?

2:00 PM  2  Q.  Whether Yahoo has any internal guidance regarding that

2:00 PM  3  statement, that question.

2:00 PM  4  A.  That would be our internal guidance is to review the

2:00 PM  5  account.

2:00 PM  6  Q.  I understand, but I'm talking about the definition of that

2:00 PM  7  phrase in particular.

2:00 PM  8  A.  Oh, right.  No.

2:00 PM  9  Q.  Internal definition that Yahoo uses --

2:00 PM  10  A.  No.

2:00 PM  11  Q.  -- in order to maintain consistent application of that.

2:00 PM  12  Somewhere it's written down, and trust and safety moderators

2:00 PM  13  are trained on it.

2:00 PM  14  A.  It is our training.  It is in -- yes, it's our training

2:00 PM  15  that we review the entire account and check that we had done

2:00 PM  16  so.

2:00 PM  17  Q.  When you say entire account, what does that refer to?

2:00 PM  18  A.  The images and videos that were archived to review upon

2:01 PM  19  the initial hit, detection of positive CSAM.

2:01 PM  20  Q.  But it's not written down anywhere to your knowledge?

2:01 PM  21  A.  No.

2:01 PM  22  Q.  Okay.  When do trust and safety moderators receive that

2:01 PM  23  training?

2:01 PM  24  A.  Upon onboarding when they're hired as well as monthly

2:01 PM  25  calibrations.  We review our best practices and policies.

104

GUIZZOTTI - CROSS-EXAMINATION

2:01 PM 1  Q.   Would those monthly calibrations refer to new policies or

2:01 PM 2  going over the exact same policies every month?

2:01 PM 3  A.   If there any updates, any new policy on the addendums,

2:01 PM 4  then yes.

2:01 PM 5  Q.   Okay.  But not -- not necessarily rehashing the same

2:01 PM 6  onboarding training every month --

2:01 PM 7  A.   Correct.

2:01 PM 8  Q.   -- if I understand that correctly?

2:01 PM 9  A.   Correct.

2:01 PM 10  Q.   Okay.

2:01 PM 11  A.   Yes.

2:01 PM 12  Q.   Does Yahoo maintain any internal documentation about a

2:02 PM 13  CyberTip report it makes besides the CyberTip itself?

2:02 PM 14  A.   Besides the CyberTip itself, the only thing we use is

2:02 PM 15  called our tracker.  It's an internal Excel sheet maintained by

2:02 PM 16  the agents of what they're working on at the time.

2:02 PM 17  Q.   And when you say the agents, you mean the trust and safety

2:02 PM 18  moderators?

2:02 PM 19  A.   The trust and safety moderators, yes.

2:02 PM 20  Q.   And of what they're working on at the time, does that mean

2:02 PM 21  that previous cases are no longer tracked?

2:02 PM 22  A.   It's a running document.

2:02 PM 23  Q.   Okay.  So it would have a historical --

2:02 PM 24  A.   Yes.

2:02 PM 25  Q.   What is in that tracker spreadsheet?

**GUIZZOTTI - CROSS-EXAMINATION**

2:02PM  1    A.   The -- so we call it a GUID, which is an internal jargon

2:02PM  2    for the Yahoo address; the date that we found the initial hit;

2:02PM  3    the date that we archived the rest of the videos and the

2:03PM  4    images; and then if we reviewed it or not.

2:03PM  5    Q.   When you say Yahoo address, what kind of address is that

2:03PM  6    referring to?  Is that --

2:03PM  7    A.   Like the email address.

2:03PM  8    Q.   And who -- so that would be of the trust and safety

2:03PM  9    moderator who was assigned that -- that report; is that

2:03PM 10    correct?

2:03PM 11    A.   Right.

2:03PM 12    Q.   Do you know if that tracker document has been turned over

2:03PM 13    to the Government here as a result of a search warrant or

2:03PM 14    subpoena?

2:03PM 15    A.   I provided it.

2:03PM 16    Q.   When did you provide it?

2:03PM 17    A.   Today.

2:03PM 18    Q.   Okay.

2:04PM 19         MS. FAVORIT:  Your Honor, may I make a quick

2:04PM 20    clarification from what the witness just testified to about

2:04PM 21    that tracker document?

2:04PM 22         THE COURT:  Isn't that more appropriately handled on

2:04PM 23    redirect?

2:04PM 24         MS. FAVORIT:  That's fine.

2:04PM 25         THE COURT:  It hasn't been raised here by

GUIZZOTTI - CROSS-EXAMINATION

2:04PM  1    Mr. Centrone.  I don't know if there's an issue, but --

2:04PM  2         MR. CENTRONE:  Well, Your Honor, I was not aware of

2:04PM  3    this document, and my question was sincere because I didn't

2:04PM  4    know the answer to it.  If the Government has a copy, I'd like

2:04PM  5    to see a copy of it and see if I have any questions to follow

2:04PM  6    up.  I have not been provided a copy.

2:04PM  7         THE COURT:  All right.  With that, Ms. Favorit,

2:04PM  8    what's your response?

2:04PM  9         MS. FAVORIT:  I don't have a copy of that, Your

2:04PM  10   Honor.  Yahoo provided legal counsel today, and I think that it

2:04PM  11   was prepared for defense -- a subpoena request and didn't

2:04PM  12   really involve the Government, but I was just made aware that

2:04PM  13   she does have that document --

2:04PM  14        THE COURT:  When you say "she," to whom are you

2:04PM  15   referring?

2:04PM  16        MS. FAVORIT:  I'm sorry, counsel for Yahoo.

2:04PM  17        THE COURT:  Okay.  So do I understand the

2:04PM  18   Government's position, Ms. Favorit, that the Government is not

2:05PM  19   in possession, in custody, and control of the document that's

2:05PM  20   at issue?

2:05PM  21        MS. FAVORIT:  That's correct, Your Honor.

2:05PM  22        THE COURT:  Mr. Centrone?

2:05PM  23        MR. CENTRONE:  I -- when this hearing was previously

2:05PM  24   scheduled, Your Honor, my subpoena to Yahoo included a request

2:05PM  25   for any such documents if -- to the deponent, if there was a

GUIZZOTTI - CROSS-EXAMINATION

2:05PM  1   document that they had that I'd like to see a copy.  I assume

2:05PM  2   the Government isn't planning on calling the legal counsel as

2:05PM  3   well.  I think I'd like to go ahead see if we can just

2:05PM  4   streamline this, and I can just get a copy of it real quick

2:05PM  5   from counsel.

2:05PM  6        THE COURT:  Ms. Favorit, we have an attorney here

2:05PM  7   from what you're reporting, and the record should reflect that

2:05PM  8   there's somebody standing in the gallery.  So that person is

2:05PM  9   not on record.  So for this hearing, I look to you at least

2:05PM  10  initially.  When you say a document is not in the possession,

2:06PM  11  custody, or control of the Government, do you have the ability

2:06PM  12  to acquire it, exercise control over it at all?

2:06PM  13       MS. FAVORIT:  I could do that right now by accepting

2:06PM  14  that document from that counsel and handing it to defense.  I

2:06PM  15  suppose I would be in custody and control at that time, but I

2:06PM  16  have not been.

2:06PM  17       THE COURT:  I don't know if custody, control --

2:06PM  18  possession, custody, and control is defined merely by physical

2:06PM  19  possession.  It's defined typically, at least in a number of

2:06PM  20  discovery contexts, more broadly.  So it sounds to me like you

2:06PM  21  have the ability to acquire it, which without going back and

2:06PM  22  looking at case law, would seem to me to indicate that the

2:06PM  23  Government does have the document in its possession, custody,

2:06PM  24  and control, and therefore if you have the ability to acquire

2:06PM  25  the document and you can do that in open court here, it seems

GUIZZOTTI - CROSS-EXAMINATION

2:07 PM   1   like that would be the appropriate next step.

2:07 PM   2           MS. FAVORIT:  Yes, Your Honor.  I just want to make

2:07 PM   3   it very clear, I have not never been in possession as the

2:07 PM   4   Government of this document.  I didn't request for possession

2:07 PM   5   of it.  I became aware because defense listed it in his

2:07 PM   6   subpoena, but the Government never, ever has received or even

2:07 PM   7   viewed a copy of this document.  I just happened to know about

2:07 PM   8   it from the subpoena and later counsel as of -- in the middle

2:07 PM   9   of the hearing that she had that document.  So I was just

2:07 PM  10   assisting and facilitating that since it seemed like the

2:07 PM  11   witness maybe was confused and thought the Government was in

2:07 PM  12   possession of it, and I just want to make it very clear that we

2:07 PM  13   were not.

2:07 PM  14           THE COURT:  Okay.  Mr. Centrone, any objection to the

2:07 PM  15   document being provided to you now?

2:07 PM  16           MR. CENTRONE:  No, Your Honor.  I'd just like a

2:07 PM  17   moment to review it and see if I have --

2:07 PM  18           THE COURT:  Absolutely.  Why don't we take a

2:07 PM  19   five-minute recess --

2:07 PM  20           MR. CENTRONE:  Sure.

2:07 PM  21           THE COURT:  -- for you to acquire the document.  If

2:07 PM  22   you need additional time, if you'd so advise my courtroom

2:07 PM  23   deputy.

2:07 PM  24           MR. CENTRONE:  Yes, sir.

2:07 PM  25           THE COURT:  Unless we hear from you otherwise, we'll

**GUIZZOTTI - CROSS-EXAMINATION**

| | | |
|---|---|---|
| 2:08PM | 1 | assume five minutes is enough.  We'll be in recess. |
| 2:08PM | 2 | MR. CENTRONE:  Thank you, Judge. |
| | 3 | (Recess from 2:08 p.m. to 2:18 p.m.) |
| 2:18PM | 4 | THE COURT:  The record should reflect we've taken |
| 2:18PM | 5 | roughly a ten-minute recess.  Mr. Centrone, have you acquired |
| 2:18PM | 6 | the document in question? |
| 2:18PM | 7 | MR. CENTRONE:  I have, Your Honor. |
| 2:19PM | 8 | THE COURT:  Have you had sufficient opportunity to |
| 2:19PM | 9 | review the document? |
| 2:19PM | 10 | MR. CENTRONE:  I have, Your Honor. |
| 2:19PM | 11 | THE COURT:  And, again, any objection to receiving |
| 2:19PM | 12 | the document here this afternoon? |
| 2:19PM | 13 | MR. CENTRONE:  No, Your Honor. |
| 2:19PM | 14 | THE COURT:  What is the document?  Can you identify |
| 2:19PM | 15 | it for the record? |
| 2:19PM | 16 | MR. CENTRONE:  Sure.  It is a three-page document |
| 2:19PM | 17 | that looks like a printout of effectively an Excel spreadsheet. |
| 2:19PM | 18 | So I spoke to Yahoo's counsel, and she informed me that if one |
| 2:19PM | 19 | were to view this on a computer screen, you would be seeing |
| 2:19PM | 20 | these columns with information underneath all across the |
| 2:19PM | 21 | screen.  Since it's printed, they're spread out over a few |
| 2:19PM | 22 | pages. |
| 2:19PM | 23 | THE COURT:  Any objection to that description, |
| 2:19PM | 24 | Ms. Favorit? |
| 2:19PM | 25 | MS. FAVORIT:  No, Your Honor. |

GUIZZOTTI - CROSS-EXAMINATION

| | | |
|---|---|---|
| 2:19PM | 1 | THE COURT:  Are you seeking to admit this document? |
| 2:19PM | 2 | MR. CENTRONE:  I am, Your Honor, and I've discussed |
| 2:19PM | 3 | with the Government, and the Government will stipulate to its |
| 2:19PM | 4 | admission. |
| 2:19PM | 5 | THE COURT:  Okay.  I have you at H as in -- |
| 2:20PM | 6 | MR. CENTRONE:  I believe it would be I, Your Honor. |
| 2:20PM | 7 | THE COURT:  Right.  The last exhibit was H, so I |
| 2:20PM | 8 | would be the next one. |
| 2:20PM | 9 | MR. CENTRONE:  Yes, sir. |
| 2:20PM | 10 | THE COURT:  Do you have an exhibit tab there or |
| 2:20PM | 11 | sticker? |
| 2:20PM | 12 | MR. CENTRONE:  I do have an extra.  One moment, |
| 2:20PM | 13 | Judge. |
| 2:20PM | 14 | THE COURT:  Thank you, Ms. Favorit, for helping out. |
| 2:20PM | 15 | MR. CENTRONE:  Paralegal gave me an envelope full of |
| 2:20PM | 16 | them, and now I can't find it. |
| 2:20PM | 17 | THE COURT:  Are you going to present this document, |
| 2:20PM | 18 | which is now Defendant's I, to this witness? |
| 2:20PM | 19 | MR. CENTRONE:  I am, Your Honor. |
| 2:20PM | 20 | THE COURT:  Okay.  And do you formally move for its |
| 2:20PM | 21 | admission? |
| 2:20PM | 22 | MR. CENTRONE:  I do, Your Honor. |
| 2:20PM | 23 | THE COURT:  Any objection, Ms. Favorit, just to be |
| 2:20PM | 24 | clear? |
| 2:20PM | 25 | MS. FAVORIT:  There's no objection, Your Honor. |

GUIZZOTTI - CROSS-EXAMINATION

| | | |
|---|---|---|
| 2:20PM | 1 | THE COURT:  All right.  Defendant's I is admitted. |
| 2:20PM | 2 | MR. CENTRONE:  Thank you. |
| 2:20PM | 3 | THE COURT:  You may proceed, Mr. Centrone. |
| 2:20PM | 4 | MR. CENTRONE:  Thank you, sir. |
| 2:20PM | 5 | THE WITNESS:  Thank you. |
| 2:20PM | 6 | BY MR. CENTRONE: |
| 2:20PM | 7 | Q.  Ms. Guizzotti, I just handed you a copy of the document I |
| 2:21PM | 8 | just obtained that has now been entered as evidence as |
| 2:21PM | 9 | Exhibit I for the Defendant.  Is this the tracker spreadsheet |
| 2:21PM | 10 | that you were describing earlier? |
| 2:21PM | 11 | A.  It is, yes. |
| 2:21PM | 12 | Q.  If you don't mind, I'd like to take you through each |
| 2:21PM | 13 | column just so I can have a full understanding of what it means |
| 2:21PM | 14 | because some of it is not necessarily in layman's terms. |
| 2:21PM | 15 | For instance, the first column on the first page is |
| 2:21PM | 16 | labeled GUID.  What does that stand for? |
| 2:21PM | 17 | A.  It's a GUID ID.  That's what we call it, and it's the |
| 2:21PM | 18 | user's internal reference. |
| 2:21PM | 19 | THE COURT:  If you could just pause for a moment. |
| 2:21PM | 20 | Mr. Centrone, do you have a copy for the Court? |
| 2:21PM | 21 | MR. CENTRONE:  Do we have an extra copy?  Yes, Your |
| 2:21PM | 22 | Honor. |
| 2:21PM | 23 | THE COURT:  Thank you.  It's easier to follow along. |
| 2:21PM | 24 | MR. CENTRONE:  Of course. |
| 2:21PM | 25 | THE COURT:  The other alternative or option, since |

GUIZZOTTI - CROSS-EXAMINATION

2:21PM  1    it's in evidence, you could put it on the Elmo, if you'd like,

2:21PM  2    or not.

2:21PM  3              MR. CENTRONE:  I prefer to not do it, Your Honor, but

2:22PM  4    if Your Honor has a copy and is satisfied with that copy, then

2:22PM  5    I'll try and be as plain as possible about following along.

2:22PM  6              THE COURT:  You can proceed as you wish.

2:22PM  7              MR. CENTRONE:  Thank you.

2:22PM  8    BY MR. CENTRONE:

2:22PM  9    Q.   So, Ms. Guizzotti, you testified this is an -- effectively

2:22PM  10   a user ID; is that correct?

2:22PM  11   A.   Right, an internal.

2:22PM  12   Q.   So this would be how Yahoo refers to a specific user --

2:22PM  13   A.   A Yahoo email address, yes.

2:22PM  14   Q.   Okay.  The next column looks like it's blank, but it's

2:22PM  15   titled YID.  What does that refer to?

2:22PM  16   A.   It's Yahoo ID.  Which is would be typically instead of the

2:22PM  17   GUID.

2:22PM  18   Q.   So would that be like an email address?

2:22PM  19   A.   It would be the email address.

2:22PM  20   Q.   Okay.  Any idea why it's not filled in here?

2:22PM  21   A.   It's -- it happens on an automatic system, like what

2:22PM  22   pulls, and it's usually just one or the other.

2:22PM  23   Q.   Okay.  So is this entire document generated automatically

2:22PM  24   without human intervention?

2:22PM  25   A.   No.  We pop -- the agents populate it from our Radar tool,

GUIZZOTTI - CROSS-EXAMINATION

2:23 PM  1    which is the CSAM review tool, and then we populate the

2:23 PM  2    information into this -- into these boxes.

2:23 PM  3    Q.   Okay.  You just described information being kind of

2:23 PM  4    auto-populated?

2:23 PM  5    A.   Right.

2:23 PM  6    Q.   What information --

2:23 PM  7    A.   My apologies.  So the automatic piece of that would be on

2:23 PM  8    the Radar tool side, and I would copy either the GUID or the

2:23 PM  9    YID.

2:23 PM  10   Q.   I understand.  Okay.  The next column is author IP.  What

2:23 PM  11   does that refer to?

2:23 PM  12   A.   It is the IP address that the image was located at.

2:23 PM  13   Q.   Okay.  In other words, that's associated with the user as

2:23 PM  14   well?

2:23 PM  15   A.   Right.

2:23 PM  16   Q.   Okay.  The next is platform AOL mail or Yahoo mail.  It

2:23 PM  17   says Yahoo.  Is that because this is a Yahoo email account?

2:24 PM  18   A.   Yes.

2:24 PM  19   Q.   Does Yahoo also own AOL?

2:24 PM  20   A.   We do.

2:24 PM  21   Q.   And it uses the same trust and safety moderators to

2:24 PM  22   moderate the email content?

2:24 PM  23   A.   Yes, same team, yep.

2:24 PM  24   Q.   The next is column is "Creation time," and a parenthetical

2:24 PM  25   "Radar."  It's a number that does not look like a time of day.

GUIZZOTTI - CROSS-EXAMINATION

2:24 PM   1   What does that refer to?

2:24 PM   2   A.   It is a unix time stamp.  You can -- and it populates

2:24 PM   3   actually to a time and date.

2:24 PM   4   Q.   Okay.  Can you kind of decipher this particular --

2:24 PM   5   A.   Without say, like, the calculator, I cannot.

2:24 PM   6   Q.   When you say calculator, what are you referring to?

2:24 PM   7   A.   A unix time, it's kind of -- it's -- again, it's like an

2:24 PM   8   engineering term, like an IP address.  It's a bunch of numbers,

2:24 PM   9   right?  Like, this is a string of numbers, and this unix time

2:24 PM  10   when say submitted or populated into, like, a unix calculator,

2:24 PM  11   it can be displayed in the time and date stamp as like you and

2:24 PM  12   I would know it.

2:25 PM  13   Q.   Okay.  Is -- do Yahoo's trust and safety moderators speak

2:25 PM  14   unix time or is that something that's done automatically?

2:25 PM  15   A.   It's done automatically.

2:25 PM  16   Q.   So sitting here right now, you cannot tell us what date

2:25 PM  17   and time this information was --

2:25 PM  18   A.   I cannot.

2:25 PM  19   Q.   Okay.  But is this referring to creation of -- of what

2:25 PM  20   exactly?

2:25 PM  21   A.   The creation of the archive.  So upon detection of that --

2:25 PM  22   of an initial CSAM hit, we archive the rest of the contents,

2:25 PM  23   and we essentially create a case.  This would be the creation

2:25 PM  24   of that case.

2:25 PM  25   Q.   The rest of the contents of what?

GUIZZOTTI - CROSS-EXAMINATION

2:25 PM  1    A.    The email that was originally --

2:25 PM  2    Q.    Okay.  So not, for instance, the entire contents of a

2:25 PM  3    user's account?

2:25 PM  4    A.    The images and videos.

2:25 PM  5    Q.    For all the emails or the emails that are tagged --

2:25 PM  6    A.    The email that was with the initial hit of the initial

2:26 PM  7    scanning.

2:26 PM  8    Q.    Would that be one email or -- for instance, in this

2:26 PM  9    instance, the images identified in the CyberTip report take

2:26 PM  10   place over several months.  Is this referring only to one of

2:26 PM  11   those?

2:26 PM  12   A.    No, we do archive all images and videos of the email

2:26 PM  13   account.

2:26 PM  14   Q.    At the same time?

2:26 PM  15   A.    Correct.

2:26 PM  16   Q.    Okay.  Turn to the next page.  The next column if we were

2:26 PM  17   reading this kind of left to right is mail message ID.  What

2:26 PM  18   does that refer to?

2:26 PM  19   A.    It is the -- like the email ID.

2:26 PM  20   Q.    Can you elaborate please, like the ID of a specific email?

2:26 PM  21   A.    Correct, that the initial hit was in.

2:26 PM  22   Q.    So, again, this is referring only to one email?

2:26 PM  23   A.    Only one email would this message ID be, yes.

2:27 PM  24   Q.    And each email has a different message ID?

2:27 PM  25   A.    To my understanding, yes.

GUIZZOTTI - CROSS-EXAMINATION

2:27PM   1   Q.   Is that something that's automatically done by Yahoo?

2:27PM   2   A.   Yes.

2:27PM   3   Q.   And is each email assigned such an ID whether it's

2:27PM   4   something that's going through the CyberTip process or not, or

2:27PM   5   is this only reserved for those emails in the CSAM reporting

2:27PM   6   process?

2:27PM   7   A.   So this is referred to the initial -- the image that was

2:27PM   8   the initial hit of why we scanned in the first place, so that

2:27PM   9   initial hit.

2:27PM   10  Q.   No, I understand.  My question is more -- is more general.

2:27PM   11  Do all -- does every single email that is sent by a Yahoo email

2:27PM   12  user get assigned such a message ID, or is this limited to

2:27PM   13  emails that are in the CSAM reporting process internally in

2:27PM   14  Yahoo?

2:27PM   15  A.   All emails have a message ID.

2:27PM   16  Q.   Okay.  And that's something that's automatically created

2:28PM   17  by Yahoo?

2:28PM   18  A.   Correct.

2:28PM   19  Q.   Okay.  The next column is archiving agent.  What does that

2:28PM   20  refer to?

2:28PM   21  A.   It is the agent that took the initial hit and then

2:28PM   22  archived the -- all of the images and videos of the entire

2:28PM   23  account.

2:28PM   24  Q.   Would that be the same as the person who did the -- a

2:28PM   25  human review to the account?

GUIZZOTTI - CROSS-EXAMINATION

2:28PM  1    A.    Yes.

2:28PM  2    Q.    Always?

2:28PM  3    A.    Not always.

2:28PM  4    Q.    How do you know that's the same here, if you do know

2:28PM  5    that's the case?

2:28PM  6    A.    I know that the same agent did submit this CyberTip, and

2:28PM  7    that is who reviewed the images.

2:28PM  8    Q.    How do you know that?

2:28PM  9    A.    Because you have to submit -- you have to check the images

2:28PM  10   at the same -- on the same screen that you submit to NCMEC.

2:28PM  11   Q.    No, I understand.  I'm asking how do you know from this or

2:28PM  12   from some other document that the same person is the same

2:29PM  13   archiving agent identified in this column?

2:29PM  14   A.    I don't.

2:29PM  15   Q.    You don't know?  Okay.

2:29PM  16   A.    I don't.

2:29PM  17   Q.    The next column is date, time archival started, and it

2:29PM  18   reads September 8th, 2020.  Is that a normal date, or is that a

2:29PM  19   unix date?

2:29PM  20   A.    Nope, that's a normal date.

2:29PM  21   Q.    Is that auto-populated, or is that put in by a human?

2:29PM  22   A.    That would be inputted by Jessie in this.

2:29PM  23   Q.    And next column is number of images, and this says 167 it

2:29PM  24   looks like to me; is that correct?

2:29PM  25   A.    Correct.

GUIZZOTTI - CROSS-EXAMINATION

2:29PM 1   Q.   As we've discussed before, that the CyberTip report

2:29PM 2   relates to seven images.  Where does this 167 number come from?

2:29PM 3   A.   So as I understand it, we would have reviewed 167 in

2:29PM 4   total, and the difference would be we only submitted seven to

2:29PM 5   NCMEC.

2:30PM 6   Q.   Okay.  Let me unpack that a little bit.  So the account is

2:30PM 7   flagged as potentially containing CSAM, and then 167 what,

2:30PM 8   separate emails were reviewed?

2:30PM 9   A.   It doesn't need to be separate emails, but images and

2:30PM 10  videos of the account were archived to be reviewed.  So it can

2:30PM 11  be across a series of emails.

2:30PM 12  Q.   And how is it determined which get that review?  And I

2:30PM 13  apologize because this is the first I'm hearing about this, so

2:30PM 14  I'm trying to feel my way through it a little bit, but what --

2:30PM 15  what -- how do you know what to look at to go say, "Okay.

2:30PM 16  We're going to review 167 images"?

2:30PM 17  A.   To my understanding, that would be all of his images and

2:31PM 18  videos in his email account.

2:31PM 19  Q.   Every -- every email ever sent from that account; is that

2:31PM 20  what you're saying?

2:31PM 21  A.   Yes.

2:31PM 22  Q.   You would -- is that normal that you would look at every

2:31PM 23  single email -- I assume you're talking about email

2:31PM 24  attachments, correct?

2:31PM 25  A.   Right.

GUIZZOTTI - CROSS-EXAMINATION

| | | |
|---|---|---|
| 2:31 PM | 1 | Q. That are images or videos? |
| 2:31 PM | 2 | A. Yes. |
| 2:31 PM | 3 | Q. Something similar would get -- would then get reviewed? |
| 2:31 PM | 4 | A. Correct. |
| 2:31 PM | 5 | Q. Is that -- does that happen in each and every instance of |
| 2:31 PM | 6 | CyberTip reporting? |
| 2:31 PM | 7 | A. Every time we get a hit on a positive CSAM image, we |
| 2:31 PM | 8 | archive the entire account of all videos and images and human |
| 2:31 PM | 9 | review them. |
| 2:31 PM | 10 | Q. Going back to the beginning of time, the beginning of when |
| 2:31 PM | 11 | the account was created? |
| 2:31 PM | 12 | A. Correct. |
| 2:31 PM | 13 | Q. Okay. So do I understand correctly then that 167 images |
| 2:31 PM | 14 | were viewed, and seven were -- were determined worthy of |
| 2:32 PM | 15 | reporting to NCMEC? |
| 2:32 PM | 16 | A. Yeah. |
| 2:32 PM | 17 | Q. Okay. The next column is agent reviewing archive, and |
| 2:32 PM | 18 | it's the name Chris. What is that referring to? |
| 2:32 PM | 19 | A. That is another agent, and how I read this is he could |
| 2:32 PM | 20 | have been a secondary reviewer given the amount of images. So |
| 2:32 PM | 21 | Jessie and Chris could have both reviewed this account and |
| 2:32 PM | 22 | because this is our tracker, it's more for like bandwidth of |
| 2:32 PM | 23 | where our agents are working, he would have submitted his name |
| 2:32 PM | 24 | in this column. |
| 2:32 PM | 25 | Q. Are you -- are you speculating about that, that that's |

GUIZZOTTI - CROSS-EXAMINATION

2:32PM  1  what this could be, or do you know?

2:32PM  2  A.    In my experience, that's the only reason why another agent

2:32PM  3  would be listed, yes.

2:32PM  4  Q.    Okay.  Do you know what Chris this is referring to, who

2:32PM  5  that could be?

2:32PM  6  A.    I do know who that would be.

2:32PM  7  Q.    Who is that?

2:33PM  8  A.    Chris Wayne.

2:33PM  9  Q.    Wayne?

2:33PM  10  A.    Wayne.

2:33PM  11  Q.    W-a-y-n-e?

2:33PM  12  A.    Yes, sir.

2:33PM  13  Q.    With respect to the seven images in particular that are

2:33PM  14  the subject of the CyberTip report, do you know whether Jessie

2:33PM  15  or Chris or some combination thereof reviewed those particular

2:33PM  16  images?

2:33PM  17  A.    I would not know.

2:33PM  18  Q.    Do you know who would know?

2:33PM  19  A.    No.

2:33PM  20  Q.    And as we talked about before, this -- I believe you said

2:33PM  21  this is the only other documentation besides the CyberTip

2:33PM  22  report itself, and I don't see anything here that breaks down

2:33PM  23  kind of who did what.

2:33PM  24  A.    Right.

2:33PM  25  Q.    So is it fair to say there is no such documentation that

GUIZZOTTI - CROSS-EXAMINATION

2:33PM  1   identifies who did which review?

2:33PM  2   A.   Correct.

2:33PM  3   Q.   Okay.  Okay.  The next column says full archive,

2:33PM  4   parenthetical, all chapters, reviewed and submitted, and in

2:34PM  5   parenthetical, including pending, yes, no.  What is that

2:34PM  6   referring to?

2:34PM  7   A.   So that is if all -- all of the archives, so 167 images

2:34PM  8   would have been the archive in total.  We break that down by

2:34PM  9   chapters.  In 167 images, there wouldn't be chapters.  Say if

2:34PM  10  there were 10,000 images, we break our chapters down by a

2:34PM  11  thousand.  In this case, there would only be one chapter, and

2:34PM  12  all of them were reviewed.

2:34PM  13  Q.   But as we just discussed, we don't know which agent

2:34PM  14  reviewed which images?

2:34PM  15  A.   Correct.

2:34PM  16  Q.   The next column is YID deactivated and legal notes added

2:34PM  17  in AMT.  What does that refer to?

2:34PM  18  A.   So we deactivated the account upon -- following the CP,

2:35PM  19  and then we added the legal notes, and that is to preserve the

2:35PM  20  account.  Since a deactivated account for Yahoo could

2:35PM  21  essentially be purged within 30 days, we want to preserve the

2:35PM  22  information longer on these accounts.

2:35PM  23  Q.   Okay.  So YID refers to Yahoo ID?

2:35PM  24  A.   Yes.

2:35PM  25  Q.   What is does AMT refer to?

GUIZZOTTI - CROSS-EXAMINATION

2:35PM    1    A.    It's our internal account tool.

2:35PM    2    Q.    And what does that mean?  Can you elaborate on that?

2:35PM    3    A.    It's where the person's email would be say -- their

2:35PM    4    account email would be, their name would be, and maybe like

2:35PM    5    their registration IP would be, just like very basic details of

2:35PM    6    their account.  It's an internal tool.

2:35PM    7    Q.    But it allows for the adding of legal notes?

2:35PM    8    A.    Correct.

2:35PM    9    Q.    Who adds those legal notes?

2:35PM   10    A.    The trust and safety agent.

2:35PM   11    Q.    So is it fair to say there is another piece of Yahoo

2:36PM   12    software that has additional information about it?  If this

2:36PM   13    says legal notes were added to AMT, it would have additional

2:36PM   14    information about, for instance, the CyberTip reporting?

2:36PM   15    A.    It would not have the CyberTip or even the basis of why.

2:36PM   16    The only legal note would be a preservation note, like, "Don't

2:36PM   17    purge in 30 days."

2:36PM   18    Q.    Is that because that is the only note that the system

2:36PM   19    allows for, the AMT system allows for?

2:36PM   20    A.    I don't know.

2:36PM   21    Q.    I guess I'm asking can somebody go into the AMT system and

2:36PM   22    type a narrative of findings or information or work done or

2:36PM   23    anything about this particular investigation?

2:36PM   24    A.    I don't know.

2:36PM   25    Q.    Have you ever seen legal notes in AMT, what it looks like?

GUIZZOTTI - CROSS-EXAMINATION

2:36PM  1    A.    I have.

2:36PM  2    Q.    Okay.  What does it look like?

2:36PM  3    A.    It's a box that we -- I mean, yes.  I guess it's text box

2:37PM  4    that we write, like, the date and time and preservation.

2:37PM  5    Q.    When you say "we," do you mean trust and safety --

2:37PM  6    A.    Trust and safety agents, yes.

2:37PM  7    Q.    Legal notes, for instance, would not include notes from

2:37PM  8    Yahoo's counsel?

2:37PM  9    A.    Right.  It would only be the agent that deactivated the

2:37PM  10   account.

2:37PM  11          THE COURT:  Mr. Centrone, just in the interests of

2:37PM  12   making sure that we stay on a course that leads us to a -- in

2:37PM  13   the end conclusion or evidence and testimony dealing with

2:37PM  14   pertinent matters, I've allowed you a lot of latitude here to

2:37PM  15   inquire about a number ancillary matters having to do with

2:37PM  16   Defense Exhibit I.  With respect to any further questions,

2:37PM  17   you'll have to establish some relevancy here.

2:37PM  18          MR. CENTRONE:  I appreciate the latitude, Your Honor,

2:37PM  19   and, again, because I have only seen this document for the

2:38PM  20   first time, I am asking some questions just to familiarize

2:38PM  21   myself.  Now it appears there may be additional notes

2:38PM  22   somewhere, but unless I'm mistaken, the Government doesn't have

2:38PM  23   those.  I don't know if Yahoo's counsel brought them.  So at

2:38PM  24   this point I think I've gotten everything I need on that

2:38PM  25   particular question.  There's one more column that is blank,

GUIZZOTTI - CROSS-EXAMINATION

2:38PM   1    and that's my last question about this document.

2:38PM   2              THE COURT:  Okay.  Ms. Favorit, as to any other

2:38PM   3    documents, are you aware of any other documents --

2:38PM   4              MS. FAVORIT:  I am not aware, Your Honor.

2:38PM   5              THE COURT:  -- from your discussions or interactions

2:38PM   6    with Yahoo?

2:38PM   7              MS. FAVORIT:  No, Your Honor.  We didn't discuss

2:38PM   8    outside of this one document being provided this morning that I

2:38PM   9    already explained to Your Honor.

2:38PM  10              THE COURT:  Okay.  Mr. Centrone, at some point the

2:38PM  11    Court will have to take another recess, roughly in 20 minutes.

2:38PM  12    You can confer with Yahoo's counsel or the attorney with Yahoo

2:38PM  13    who's here today, as I understand it, and remains in the

2:39PM  14    gallery about whether there are any other documents, but even

2:39PM  15    if you're to be given the documents, I just want to make sure

2:39PM  16    that there's a reason to inquire in such great detail about

2:39PM  17    each item in the document.

2:39PM  18              MR. CENTRONE:  I appreciate that, Your Honor, and I

2:39PM  19    will do that.  Again, given that I haven't been provided these

2:39PM  20    documents before and Yahoo is represented by outside counsel so

2:39PM  21    I can't pick up the phone and ask somebody at Yahoo these

2:39PM  22    questions, this is the best opportunity to not have to reinvent

2:39PM  23    the wheel down the road and hopefully save us time down the

2:39PM  24    road as well.

2:39PM  25              But, again, with respect to this document and

GUIZZOTTI - CROSS-EXAMINATION

2:39PM    1    I'm not aware of any other documents --

2:39PM    2            THE COURT:  Which is Defense Exhibit I?

2:39PM    3            MR. CENTRONE:  Correct, sir.  There's only one column

2:39PM    4    left, and it appears to be blank.

2:39PM    5            THE COURT:  Okay.  If you could proceed with some

2:39PM    6    reasonable dispatch here.

2:39PM    7            MR. CENTRONE:  Thank you, sir.  I should be able to

2:39PM    8    finish by 3:00 for your hearing, Your Honor.

2:39PM    9            THE COURT:  I would hope so.

2:39PM    10    BY MR. CENTRONE:

2:40PM    11    Q.   Ms. Guizzotti, on the last page of Defense Exhibit I,

2:40PM    12    there's a column that says additional notes, correct?

2:40PM    13    A.   Correct.

2:40PM    14    Q.   And it appears to be blank --

2:40PM    15    A.   Correct.

2:40PM    16    Q.   -- is that correct?  What would normally go in additional

2:40PM    17    notes column?

2:40PM    18    A.   I really can't think of an example.  Typically it is

2:40PM    19    empty.

2:40PM    20    Q.   Okay.  This is a -- this is a spreadsheet.  My layman's

2:40PM    21    understanding of how a spreadsheet works is they can be changed

2:40PM    22    over time and not necessarily capture prior information that

2:40PM    23    may have been in some of these columns.  Is that the case here

2:40PM    24    as well?

2:40PM    25    A.   I don't think it's been altered if that's what you're

GUIZZOTTI - CROSS-EXAMINATION

2:40PM  1   asking.

2:40PM  2   Q.   And I don't mean anything nefarious.  I just mean updated

2:40PM  3   and information that may have been blank or different or may

2:40PM  4   have changed.

2:40PM  5   A.   But you're right.  It is editable.  It can be edited, yes.

2:40PM  6   Q.   Okay.  I'm going to move on to ask some questions about

2:41PM  7   the Terms of Service, which you should still have up there as

2:41PM  8   Government Exhibit 5.  I think you're looking at the defense

2:41PM  9   exhibits.

2:41PM  10  A.   Oh, my apologies.  I don't have 5 here.

2:41PM  11  Q.   Okay.  I'm going to go ahead and hand you another copy

2:41PM  12  then.

2:41PM  13  A.   Okay.  Thank you.

2:41PM  14       MR. CENTRONE:  If the record can reflect I've handed

2:41PM  15  the witness a copy of Government's Exhibit 5, which is the

2:41PM  16  Yahoo Terms of Service that were discussed earlier.  I would

2:41PM  17  note that I marked on that particular copy, but no words, just

2:41PM  18  some symbols.

2:41PM  19  BY MR. CENTRONE:

2:41PM  20  Q.   With respect to the Terms of Service that you discussed

2:41PM  21  earlier about the uploading of material that violates Yahoo's

2:42PM  22  terms of service, nothing in that term indicates that the

2:42PM  23  information will be disclosed to law enforcement, correct?

2:42PM  24  A.   Correct.

2:42PM  25  Q.   Okay.  And Yahoo's internal procedure is simply to disable

GUIZZOTTI - CROSS-EXAMINATION

2:42PM  1    the account, correct?

2:42PM  2    A.    Correct.

2:42PM  3    Q.    Okay.  All right.  My last area of questioning is about

2:42PM  4    the -- the discussion had earlier about the log-in, which

2:42PM  5    there's a copy of the relevant log-in that was provided here as

2:42PM  6    Defense Exhibit D in that binder.  Do you have that in front of

2:42PM  7    you?

2:42PM  8    A.    I do.

2:42PM  9    Q.    So this is a list of the log-ins related to the vladlover

2:43PM  10   Yahoo account that's at issue in this case, correct?

2:43PM  11   A.    Correct.

2:43PM  12   Q.    And this reflects the date and time that the

2:43PM  13   information -- that the account was logged into?

2:43PM  14   A.    Yes.

2:43PM  15   Q.    And this shows a final log-in of September 5th, correct,

2:43PM  16   at the top of that page?

2:43PM  17   A.    That's correct.

2:43PM  18   Q.    And just to clarify, September 5th, 2020, correct?

2:43PM  19   A.    Yes.

2:43PM  20   Q.    And that's preceded by daily log-ins in the few days

2:43PM  21   leading up to September 5th, such as a log-in on August 31st,

2:43PM  22   September 1st, September 2nd, September 3rd, and September 4th.

2:43PM  23   Do I understand that correctly?

2:43PM  24   A.    Yes.

2:43PM  25   Q.    So on each of those days, it would have been logged into,

128

GUIZZOTTI - CROSS-EXAMINATION

| | | |
|---|---|---|
| 2:43PM | 1 | that account, correct? |
| 2:43PM | 2 | A.   Yes. |
| 2:43PM | 3 | Q.   Does that mean that the owner of the account must have |
| 2:43PM | 4 | logged out manually on those other dates if it reflects that he |
| 2:43PM | 5 | or she is logging back in on September 5th? |
| 2:43PM | 6 | A.   Yes. |
| 2:43PM | 7 | Q.   Is Yahoo able to track when an account is either manually |
| 2:44PM | 8 | or automatically logged out the way it is -- the same way it's |
| 2:44PM | 9 | able to track log-ins? |
| 2:44PM | 10 | A.   No. |
| 2:44PM | 11 | Q.   No, that information does not exist? |
| 2:44PM | 12 | A.   No. |
| 2:44PM | 13 | Q.   Okay.  So when you testified earlier about the -- that an |
| 2:44PM | 14 | account is logged out automatically after two weeks, we don't |
| 2:44PM | 15 | know that that's what actually happened here, correct? |
| 2:44PM | 16 | A.   Correct. |
| 2:44PM | 17 | Q.   We don't know when the account was logged out, correct? |
| 2:44PM | 18 | A.   No. |
| 2:44PM | 19 |         MR. CENTRONE:  Okay.  Just one moment, Your Honor. |
| 2:44PM | 20 |         THE COURT:  Sure. |
| 2:44PM | 21 |                  (Pause.) |
| 2:45PM | 22 |         MR. CENTRONE:  I have no further questions.  Thank |
| 2:45PM | 23 | you so much. |
| 2:45PM | 24 |         THE COURT:  Thank you, Mr. Centrone. |
| 2:45PM | 25 |         MR. CENTRONE:  Thank you, Judge. |

GUIZZOTTI - RECROSS-EXAMINATION

2:45PM    1      **THE COURT:**  Any redirect, Ms. Favorit?

2:45PM    2      **MS. FAVORIT:**  Briefly, Your Honor.

2:45PM    3                        **REDIRECT EXAMINATION**

2:45PM    4                        **BY MS. FAVORIT:**

2:45PM    5    Q.   On cross-examination, you were told about a donation from

2:45PM    6    Verizon to NCMEC.  Were any special privileges granted to Yahoo

2:45PM    7    because of this donation?

2:45PM    8    A.   No.

2:45PM    9    Q.   And on these CyberTipline report information submitted by

2:45PM   10    Yahoo to NCMEC, when it says, "Did ESP review entire contents

2:45PM   11    of files uploaded," what does that mean to you?

2:46PM   12    A.   That means that we reviewed every image that we are

2:46PM   13    submitting to NCMEC.

2:46PM   14    Q.   Is there any evidence in this particular case that the

2:46PM   15    policies were not followed for viewing those images?

2:46PM   16    A.   No.

2:46PM   17      **MS. FAVORIT:**  I have no further questions.

2:46PM   18      **THE COURT:**  Thank you.  Any brief recross,

2:46PM   19    Mr. Centrone?

2:46PM   20      **MR. CENTRONE:**  Very briefly, Your Honor.

2:46PM   21                        **RECROSS-EXAMINATION**

2:46PM   22                        **BY MR. CENTRONE:**

2:46PM   23    Q.   My recollection of your testimony was that you were not

2:46PM   24    aware of that $2 million donation?

2:46PM   25    A.   That's correct.

GUIZZOTTI - RECROSS-EXAMINATION

2:46PM 1    Q.   So you don't know whether any special privileges were

2:46PM 2    conveyed or not?

2:46PM 3    A.   I would not have received any.

2:46PM 4    Q.   Okay.  Well, I believe the question was about Yahoo in

2:46PM 5    general, not about --

2:46PM 6    A.   Yahoo in general, that's correct.  I wouldn't know.

2:46PM 7        MR. CENTRONE:  Okay.  Okay.  No further questions.

2:46PM 8    Thank you.

2:46PM 9        THE WITNESS:  Thank you.

2:46PM 10       THE COURT:  If you'll give me a moment.

2:46PM 11                     (Pause.)

2:47PM 12       THE COURT:  Ms. Guizzotti?

2:47PM 13       THE WITNESS:  Guizzotti, yes.

2:47PM 14       THE COURT:  If you could kindly step down.

2:47PM 15   Mr. Centrone, any reason for Ms. Guizzotti to remain --

2:47PM 16       MR. CENTRONE:  No, Your Honor.  Thank you.

2:47PM 17       THE COURT:  You're excused.  You may head back to

2:47PM 18   Buff State.

2:47PM 19       THE WITNESS:  Thank you.  Go Bills.

2:47PM 20                     (Witness excused.)

2:47PM 21       THE COURT:  Ms. Favorit, any way we can squeeze in

2:47PM 22   another witness here, at least on direct?

2:47PM 23       MS. FAVORIT:  Your Honor, may I just briefly ask

2:47PM 24   defense his intentions on calling a certain witness or not?

2:47PM 25       THE COURT:  Absolutely.

| | | |
|---|---|---|
| 2:47PM | 1 | MS. FAVORIT: Thank you. |
| 2:47PM | 2 | (Pause.) |
| 2:48PM | 3 | MS. FAVORIT: Your Honor, the United States calls |
| 2:48PM | 4 | Jessica Hines. |
| 2:48PM | 5 | THE COURT: Okay. Ms. Hines, if you could kindly |
| 2:48PM | 6 | come forward here to my courtroom deputy, who sits to my right, |
| 2:48PM | 7 | your left, she is going to swear you in. |
| 2:48PM | 8 | COURTROOM DEPUTY: Would you raise your right hand? |
| 2:48PM | 9 | (Witness sworn.) |
| 2:48PM | 10 | COURTROOM DEPUTY: Would you please state your name |
| 2:48PM | 11 | for the record and spell your last name? |
| 2:48PM | 12 | THE WITNESS: Jessica Hines, H-i-n-e-s. |
| 2:48PM | 13 | COURTROOM DEPUTY: Thank you. You may be seated. |
| 2:49PM | 14 | THE COURT: Ms. Hines, you'll see when you get on the |
| 2:49PM | 15 | witness stand there that there's a microphone. If you could |
| 2:49PM | 16 | situate that microphone such that we can clearly hear you. |
| 2:49PM | 17 | THE WITNESS: Okay. |
| 2:49PM | 18 | THE COURT: With that, Ms. Favorit, you may proceed. |
| 2:49PM | 19 | MS. FAVORIT: Thank you, Your Honor. |
| 2:49PM | 20 | JESSICA HINES, |
| 2:49PM | 21 | a witness called on behalf of the Government, being first duly |
| 2:49PM | 22 | sworn, was examined and testified as follows: |
| 2:49PM | 23 | DIRECT EXAMINATION |
| 2:49PM | 24 | BY MS. FAVORIT: |
| 2:49PM | 25 | Q.  Ms. Hines, at some point did you work for Yahoo? |

**HINES - DIRECT EXAMINATION**

2:49PM  1    A.   Yes, I did.

2:49PM  2    Q.   When was that?

2:49PM  3    A.   I believe -- let me think about it real quick.  I've job

2:49PM  4    hopped a little bit, but I believe I started in 2019.

2:49PM  5    Q.   What did you do at Yahoo?

2:49PM  6    A.   In terms -- I had two roles at Yahoo.  First I was an

2:49PM  7    E-crimes investigator, and then I was the senior manager for

2:49PM  8    trust and safety.

2:49PM  9    Q.   What is your educational background?

2:49PM  10   A.   I studied psychology and sociology at Virginia Tech.

2:50PM  11   Q.   And prior to working at Yahoo, did you have any relevant

2:50PM  12   work experience?

2:50PM  13   A.   I believe so, yes.

2:50PM  14   Q.   Could you explain what that might be?

2:50PM  15   A.   Sure.  Prior to working at Yahoo, I worked for the

2:50PM  16   National Center for Missing and Exploited Children within

2:50PM  17   NCMEC's CyberTipline, and then I worked for YouTube as a policy

2:50PM  18   enforcement manager focusing on child safety, and then was an

2:50PM  19   E-crimes investigator at Yahoo.

2:50PM  20   Q.   What was your job description or role at Yahoo as -- was

2:50PM  21   it investigator?

2:50PM  22   A.   Yeah, E-crimes investigator.  I would investigate possible

2:50PM  23   crimes on the platform, generally child safety cases or other

2:51PM  24   types of harmful activity.

2:51PM  25   Q.   What about as a senior manager for trust and safety?

HINES - DIRECT EXAMINATION

2:51 PM  1    A.    Yes.   For trust and safety, I oversaw the trust and safety

2:51 PM  2    team, so I oversaw a group of individuals that reviewed child

2:51 PM  3    exploitation material, and that was reported to NCMEC

2:51 PM  4    CyberTipline, and also other types of user-generated content,

2:51 PM  5    such as maybe comments, that could be abusive to Yahoo's

2:51 PM  6    platform.

2:51 PM  7    Q.    I'm going to do my best to streamline your testimony

2:51 PM  8    because this Court's heard from previous witnesses, but was one

2:51 PM  9    of your responsibilities reporting CyberTips to NCMEC?

2:51 PM  10   A.    Yes.

2:51 PM  11   Q.    Did you work in this capacity in September of 2020?

2:51 PM  12   A.    Yes.

2:52 PM  13   Q.    What was your role at that time?

2:52 PM  14   A.    I believe it was a policy manager-- or sorry, the senior

2:52 PM  15   manager for trust and safety.

2:52 PM  16   Q.    Does that mean you were generating reports for NCMEC?

2:52 PM  17   A.    Yes.

2:52 PM  18   Q.    I want to show you Government Exhibit Number 1.  I'm going

2:52 PM  19   to walk up and see if you have that in front of you.  Do you

2:52 PM  20   recognize this document?

2:52 PM  21   A.    I recognize it as a CyberTip, but to the specific one, not

2:52 PM  22   necessarily.

2:52 PM  23   Q.    About how many CyberTips while working at Yahoo would you

2:52 PM  24   have submitted to NCMEC approximately?

2:52 PM  25   A.    I would estimate in the hundreds, possibly over a thousand

**HINES - DIRECT EXAMINATION**

2:53PM   1   CyberTips.

2:53PM   2   Q.   Because we are here today and you are testifying, are you

2:53PM   3   aware if you were the individual who submitted the CyberTip

2:53PM   4   79384716?

2:53PM   5   A.   For the reason why I'm here, yes.

2:53PM   6   Q.   Do you have any independent recollection of submitting

2:53PM   7   that CyberTip?

2:53PM   8   A.   I do not.

2:53PM   9   Q.   If you were to review this CyberTip, would that refresh

2:53PM  10   your recollection?

2:53PM  11   A.   No.

2:53PM  12   Q.   Based on Yahoo records, were you listed as the individual

2:53PM  13   who submitted this CyberTip report?

2:53PM  14   A.   If Yahoo indicated that I did, then I probably did.

2:54PM  15   Q.   Speaking specifically to this CyberTipline, I'm going to

2:54PM  16   be a little bit more general since you don't have that

2:54PM  17   independent recollection.  Did you help your team submit

2:54PM  18   reports to NCMEC?

2:54PM  19   A.   Yes.

2:54PM  20   Q.   If you were submitting that report, what information would

2:54PM  21   you have from Yahoo to give to NCMEC?

2:54PM  22   A.   NCMEC would receive images from an account that was

2:54PM  23   flagged and reviewed for child exploitation material as well as

2:54PM  24   certain account information and possible -- the transmission

2:54PM  25   information, the transmission details.

**HINES – DIRECT EXAMINATION**

2:54 PM 1    Q.    Were the images or attachments to this report reviewed by

2:54 PM 2    you before submitting to NCMEC?

2:54 PM 3    A.    Yes.

2:54 PM 4    Q.    Did you ever not review the images or videos that are

2:54 PM 5    attached to the CyberTip reports?

2:55 PM 6    A.    No.

2:55 PM 7    Q.    Would that have been in violation of your policy as a

2:55 PM 8    trust and safety moderator at Yahoo?

2:55 PM 9    A.    Yes.

2:55 PM 10   Q.    Does only one person review the information before

2:55 PM 11   submitting reports to NCMEC?

2:55 PM 12   A.    Not necessarily.

2:55 PM 13   Q.    Is there any system of checks and balances before

2:55 PM 14   submitting a report?

2:55 PM 15   A.    Yes.

2:55 PM 16   Q.    Would that involve another individual looking at these

2:55 PM 17   images or the report?

2:55 PM 18   A.    Yes.

2:55 PM 19   Q.    I want to reference again Government Exhibit 1, and I'm

2:55 PM 20   going to go to the fifth page of the exhibit.

2:55 PM 21   A.    Is that the CyberTipline fifth page, or is it the actual

2:55 PM 22   fifth page?

2:55 PM 23   Q.    It's the third line of the CyberTipline and the fifth page

2:56 PM 24   of the document.

2:56 PM 25   A.    Okay.

HINES - DIRECT EXAMINATION

2:56PM  1    Q.   Okay.  Not specifically this CyberTip, but do you
2:56PM  2    recognize the contents where it says "uploaded file" and what
2:56PM  3    that might contain?
2:56PM  4    A.   Yes.
2:56PM  5    Q.   There's a question here.  "Did reporting ESP view entire
2:56PM  6    contents of uploaded file?"  Do you recognize that question?
2:56PM  7    A.   Yes.
2:56PM  8    Q.   Is that something that you working at Yahoo would have
2:56PM  9    entered as part of the report?
2:56PM  10   A.   Yes.
2:56PM  11   Q.   The response here is, "Yes."  What does that mean to you
2:56PM  12   as a previous trust and safety moderator at Yahoo?
2:56PM  13   A.   That I reviewed the files that were submitted in this
2:56PM  14   report.
2:56PM  15   Q.   Is it possible that the "yes" was an accident?
2:56PM  16   A.   No.
2:56PM  17   Q.   Why not?
2:57PM  18        MR. CENTRONE:  Objection.  She's asking questions
2:57PM  19   about a document this witness already says she has no
2:57PM  20   recollection of.
2:57PM  21        THE COURT:  Overruled.  She's testified --
2:57PM  22        MR. CENTRONE:  These are --
2:57PM  23        THE COURT:  If I could just address the objection.
2:57PM  24   She's testified generally that she's aware of the reports and
2:57PM  25   the system or processes in place, so on that grounds, I'm going

**HINES - DIRECT EXAMINATION**

2:57PM  1  to allow the question and the answer.  I'll take it for what

2:57PM  2  it's worth, and you can explore the matter on cross if you

2:57PM  3  wish, Mr. Centrone.

2:57PM  4         You may proceed Ms. Favorit.

2:57PM  5         MS. FAVORIT:  Thank you, Your Honor.

2:57PM  6  BY MS. FAVORIT:

2:57PM  7  Q.  You can answer the question, which I believe was what does

2:57PM  8  that mean to you, that the answer is "yes" here?

2:57PM  9  A.  That I had reviewed the images in this report.

2:57PM  10  Q.  And if you had generated a report and not answer as yes,

2:57PM  11  what does that mean to you?

2:57PM  12  A.  That I reviewed the files in this report.

2:58PM  13  Q.  Did you as a trust and safety moderator call law

2:58PM  14  enforcement when child sexual abuse material was discovered?

2:58PM  15  A.  No.

2:58PM  16  Q.  Did you ever call NCMEC in that same role before

2:58PM  17  submitting these reports?

2:58PM  18  A.  No.

2:58PM  19  Q.  In your role as Yahoo trust and safety moderator, did you

2:58PM  20  ever determine the actionability of these images?

2:58PM  21  A.  Can you rephrase?

2:58PM  22  Q.  Did you determine what to do with these images apart from

2:58PM  23  submitting a report?

2:58PM  24  A.  Just reporting the files.

2:58PM  25  Q.  Would you have any other role after a NCMEC report was

**HINES - DIRECT EXAMINATION**

2:59PM  1    submitted?

2:59PM  2    **A.**    No.

2:59PM  3         **MS. FAVORIT:**  I don't have any further questions.

2:59PM  4         **THE COURT:**  Thank you.  Any cross-examination,

2:59PM  5    Mr. Centrone?

2:59PM  6         **MR. CENTRONE:**  I do, Judge, but it's now 3:00.  Did

2:59PM  7    you want to have your 3:00 hearing or --

2:59PM  8         **THE COURT:**  How much cross do you have?

2:59PM  9         **MR. CENTRONE:**  Probably about 10 or 15 minutes.

2:59PM  10        **THE COURT:**  Okay.  We'll take a recess.  I can't tell

2:59PM  11   you that -- exactly how long it'll take.  If you could move

2:59PM  12   your materials to the side to allow counsel for the next case

2:59PM  13   to come forward.  Mr. Centrone, you've got plenty of room to

2:59PM  14   your right, my left.  Ms. Favorit and Ms. King, it will be a

2:59PM  15   little more challenging on your end, but I'm sure you can

2:59PM  16   accommodate counsel.  If counsel would stay close by.

2:59PM  17        Ms. Hines, you may step down.  You're still

2:59PM  18   under oath.  Ms. Favorit since you concluded your direct

2:59PM  19   examination, the ordinary practice would be that the witness is

3:00PM  20   now Mr. Centrone's, and you're not allowed to speak to the

3:00PM  21   witness.  Any reason to think that wouldn't be the appropriate

3:00PM  22   course here?

3:00PM  23        **MS. FAVORIT:**  No, Your Honor.  I have no reason to

3:00PM  24   speak to the witness.

3:00PM  25        **THE COURT:**  Okay.  We'll be in recess on that case.

HINES - CROSS-EXAMINATION

```
 1              (Recess from 3:00 p.m. to 3:43 p.m.)
 2         THE COURT:  Good afternoon, everyone.  I believe we
 3    finished -- or no, we didn't.  Mr. Centrone, you're
 4    cross-examining Ms. Hines?
 5         MR. CENTRONE:  Correct, Your Honor.  Thank you.
 6         THE COURT:  Okay.  You may proceed, Mr. Centrone.
 7         MR. CENTRONE:  Thank you.
 8         THE COURT:  Ms. Hines, I'll remind you, you're still
 9    under oath.
10                       CROSS-EXAMINATION
11                      BY MR. CENTRONE:
12    Q.   Good afternoon, Ms. Hines.  I know you've got a flight to
13    catch, so I'm going to be as quick as I possibly can.  I just
14    want to reiterate for the record, you have no personal
15    recollection of CyberTip report number 79384716, correct?
16    A.   Correct.
17    Q.   And no personal recollection of reviewing the images
18    associated with that CyberTip, correct?
19    A.   Correct.
20    Q.   Your testimony on direct was effectively you -- and please
21    correct me if I'm misstating it, but I understood your
22    testimony to be on direct that effectively you believe you
23    reviewed the images because you always viewed the images with
24    respect to a CyberTip report.  Is that a fair characterization?
25    A.   Yes.
```

HINES - CROSS-EXAMINATION

3:45 PM  1   Q.   What policies or procedures does Yahoo have in place to

3:45 PM  2   ensure that such images are viewed before a CyberTipline is

3:45 PM  3   submitted?

3:45 PM  4   A.   I think in terms of physically submitting the report, you

3:45 PM  5   cannot go to the submission stage without selecting files.

3:45 PM  6   Q.   And when you say select files, what does that mean?

3:45 PM  7   A.   Individually clicking each image that I viewed and

3:45 PM  8   selecting them to be sent to NCMEC.

3:45 PM  9   Q.   So you're attaching files to the CyberTip report to

3:46 PM  10  those -- what does that look like on your screen?  Are they

3:46 PM  11  file names?  Are they thumbnails?  Are they -- you know, I've

3:46 PM  12  seen icons of an image instead of the image itself on computer

3:46 PM  13  screens.  What does that actually look like?

3:46 PM  14  A.   It's a gallery view of all of the images that were

3:46 PM  15  archived for that account.  So it is image thumbnails in files

3:46 PM  16  that are visually on the screen, kind of like in a gallery-type

3:46 PM  17  viewer.

3:46 PM  18  Q.   How big are those images?

3:46 PM  19  A.   I mean, it depends on how you have your screen formatted,

3:46 PM  20  but there is the ability to get the files, like, larger and

3:46 PM  21  enhance them to full screen, but generally it depends on how

3:47 PM  22  the computer screen is formatted.

3:47 PM  23  Q.   And you said that archive contains all of the images from

3:47 PM  24  that account, correct?

3:47 PM  25  A.   The archive contains all of the images, but there's, like,

HINES - CROSS-EXAMINATION

3:47PM  1   file limits on each page so you can, like, scroll through.

3:47PM  2   Q.   So X number of files per page; is that what you're saying?

3:47PM  3   A.   (Witness nodding head affirmatively.)

3:47PM  4   Q.   Does it also list the file names?

3:47PM  5   A.   I believe -- yes, the tool does allow at the time a view

3:47PM  6   of the file names.

3:47PM  7   Q.   To ask it another way, are you looking at the file names

3:47PM  8   to choose which images to attach, or are you looking at the

3:47PM  9   pictures and going by the content of the pictures?

3:47PM  10  A.   The pictures.

3:47PM  11  Q.   Not the file names?

3:47PM  12  A.   Correct.

3:47PM  13  Q.   Okay.  My understanding from some earlier testimony is

3:48PM  14  that if a photo is quote-unquote, you know, in a "gray area",

3:48PM  15  there would be a legal call regarding whether to attach that

3:48PM  16  image to a CyberTip report from Yahoo.  Is that your

3:48PM  17  recollection as well from having worked there?

3:48PM  18  A.   Can you just ask one more time?  I'm sorry.

3:48PM  19  Q.   Sure.  My understanding from earlier testimony was that if

3:48PM  20  an image is quote-unquote "gray area" -- in other words, if a

3:48PM  21  trust and safety moderator is not sure whether an image is

3:48PM  22  CSAM, it should be -- it would be subject to a legal call and

3:48PM  23  discussed, I take it, with somebody from the legal department

3:48PM  24  to review that image prior to submitting it to NCMEC.  Did you

3:48PM  25  ever participate in those kind of meetings?

**HINES - CROSS-EXAMINATION**

3:48 PM   1   A.   Yes, the calibrations, yes.

3:48 PM   2   Q.   If you -- if you go to the binder in front of you, Defense

3:49 PM   3   Exhibit A is another copy of the same CyberTip report.  It's an

3:49 PM   4   identical copy to the Government's Exhibit 1 that you looked at

3:49 PM   5   earlier.

3:49 PM   6          And I'm going to draw your attention to what's

3:49 PM   7   identified at the top as page six, Section B of the CyberTip

3:49 PM   8   report.  Let me know when you have that in front of you.

3:49 PM   9   A.   Yep, I have Section B in front of me.

3:49 PM  10   Q.   At the bottom, the section that says "Files and

3:49 PM  11   Categorization," there's one of the files, image.120-jpeg.  Do

3:49 PM  12   you see that?

3:49 PM  13   A.   Yes.

3:49 PM  14   Q.   And that's categorized as child clothed, and I'll

3:49 PM  15   represent to you that it was not identified as child

3:50 PM  16   pornography.  Why would that have been included in the

3:50 PM  17   submission to -- on the CyberTip report if it was not child

3:50 PM  18   pornography?

3:50 PM  19   A.   There are instances in which there could be files that

3:50 PM  20   still are of child sexual exploitation that may not have a

3:50 PM  21   minor that is nude, so based on my evaluation of that file, I

3:50 PM  22   included it in the CyberTip report.

3:50 PM  23   Q.   But you have no personal memory of that or what is -- what

3:50 PM  24   the contents of that photo are, correct?

3:50 PM  25   A.   I do not, no.

HINES - CROSS-EXAMINATION

3:50PM   1   Q.   All right.  Do you remember having a legal call about this

3:50PM   2   case?

3:50PM   3   A.   I do not, no.

3:50PM   4   Q.   Okay.  In the front pocket of that binder is what's been

3:51PM   5   marked as Defense Exhibit I, which is a -- what's been

3:51PM   6   described to us as a tracker report from Yahoo.  Are you

3:51PM   7   familiar with this kind of document generally from your time at

3:51PM   8   Yahoo?

3:51PM   9   A.   Yes.

3:51PM  10   Q.   Okay.  If you flip to page 2, there's a column that says

3:51PM  11   "Archiving Agent, Jessie."  Is that how you were referred to in

3:51PM  12   the Yahoo system, Jessie?

3:51PM  13   A.   Yes.

3:51PM  14   Q.   Okay.  And there's another column that says "Agent

3:51PM  15   Reviewing Archive, Chris."  Do you know who that's referring

3:51PM  16   to?

3:51PM  17   A.   Yes.

3:51PM  18   Q.   Who was that referring to?

3:51PM  19   A.   It was a former Yahoo employee on the trust and safety

3:51PM  20   team.

3:51PM  21   Q.   And what was his name?

3:51PM  22   A.   I forgot his last name, but his name was Chris.  I'm

3:51PM  23   sorry.

3:51PM  24   Q.   In between those columns, there's a column that says

3:51PM  25   "Number of Images, 167," and we heard testimony earlier that

HINES - CROSS-EXAMINATION

3:52PM 1  that would have been the total number of images associated with

3:52PM 2  the email account at issue; is that your understanding as well?

3:52PM 3  A.   Yes.

3:52PM 4  Q.   Okay.  And not all of those images would have been

3:52PM 5  submitted as part of the CyberTipline report; just that that

3:52PM 6  would be the total number of images at all connected with the

3:52PM 7  account.  Is that your understanding as well?

3:52PM 8  A.   Correct.

3:52PM 9  Q.   And then presumably seven of those images were the images

3:52PM 10  that were associated with the CyberTipline report; would that

3:52PM 11  be correct?

3:52PM 12  A.   Yes.

3:52PM 13  Q.   Okay.  Between yourself and Chris -- which, by the way,

3:52PM 14  does the name Chris Wayne ring a bell for you?

3:52PM 15  A.   Yes.

3:52PM 16  Q.   Would that be the Chris that this is referring to?

3:52PM 17  A.   Correct.

3:52PM 18  Q.   Okay.  Between yourself and Chris, who would have reviewed

3:52PM 19  which images?  Do you have any way of knowing that?

3:53PM 20  A.   For the archiving agent, I would have -- or so -- let me

3:53PM 21  go back.  Chris and I would have had the -- both have the

3:53PM 22  opportunity to review the images that were reported.

3:53PM 23  Q.   It's your testimony that both of you would have reviewed

3:53PM 24  all of the 167 images identified in this report?

3:53PM 25  A.   As I interpret this, that Chris would have been the one

HINES - CROSS-EXAMINATION

3:53 PM  1    reviewing the images in this report.

3:53 PM  2    Q.   Chris would have reviewed the images in the CyberTipline

3:53 PM  3    report, not yourself?

3:53 PM  4    A.   I would have been -- like, as I see this document, I would

3:53 PM  5    have been the one to have archived -- to review the email that

3:53 PM  6    was transmitted and flagged for images, and then Chris Wayne

3:54 PM  7    would have been the individual that would have reviewed and

3:54 PM  8    submitted the CyberTipline report.

3:54 PM  9    Q.   So looking at the document now, you don't believe you were

3:54 PM  10   the one who submitted this CyberTipline report?

3:54 PM  11   A.   Based on this document, it would have been Chris that

3:54 PM  12   would submit the CyberTipline report.

3:54 PM  13   Q.   Okay.  You're no longer working for Yahoo, correct?

3:54 PM  14   A.   Correct.

3:54 PM  15   Q.   And were you terminated, or did you leave freely?

3:54 PM  16   A.   I left freely.

3:54 PM  17   Q.   Okay.  Did you ever receive any disciplinary action while

3:54 PM  18   you were there?

3:54 PM  19          MS. FAVORIT:  Objection.  Relevance.

3:54 PM  20          THE COURT:  Overruled.

3:54 PM  21          THE WITNESS:  No.

3:54 PM  22   BY MR. CENTRONE:

3:54 PM  23   Q.   Did you testify earlier that you were an E-crimes

3:54 PM  24   investigator?  Was that with Yahoo as well?

3:54 PM  25   A.   Yes.

**HINES - CROSS-EXAMINATION**

3:54 PM  1    Q.    Okay.  Would that be someone who investigates information

3:54 PM  2    that came from CyberTips?  What does an E-crimes investigator

3:55 PM  3    do?

3:55 PM  4    A.    Yes, they provide additional analysis on CyberTipline

3:55 PM  5    reports for the more egregious cases.

3:55 PM  6    Q.    And is that information transmitted to law enforcement?

3:55 PM  7    A.    No.  That information is sent to NCMEC.

3:55 PM  8    Q.    To NCMEC.  Okay.  Would this be referring to supplemental

3:55 PM  9    reports, so-called supplemental reports from -- from Yahoo that

3:55 PM  10   come after a CyberTipline report?

3:55 PM  11   A.    Yes.

3:55 PM  12   Q.    And the information comes -- goes to NCMEC.  Yahoo is

3:55 PM  13   under no obligation to do that, correct?

3:55 PM  14   A.    No, it's voluntary.

3:55 PM  15   Q.    Okay.  And you previously worked for NCMEC.  Can you

3:55 PM  16   refresh my memory of when that was?

3:55 PM  17   A.    So long ago.  I believe I started in 2012 and left in

3:55 PM  18   2019.

3:55 PM  19   Q.    And what did you do when you were there?

3:56 PM  20   A.    I was an analyst within the CyberTipline, and then I

3:56 PM  21   was -- when I left, I was in -- the supervisor for electronic

3:56 PM  22   service provider relations.

3:56 PM  23   Q.    And why -- just briefly, why did you leave NCMEC?

3:56 PM  24   A.    I had a really nice offer from Google.

3:56 PM  25   Q.    Oh, it was from Google?  So you didn't leave to join

**HINES - CROSS-EXAMINATION**

3:56 PM 1    Yahoo?  You left to join Google?

3:56 PM 2    **A.**   Yes.  Google owns YouTube.

3:56 PM 3    **Q.**   Okay.  Do I understand correctly you're now working with

3:56 PM 4    Amazon?

3:56 PM 5    **A.**   Yes.

3:56 PM 6    **Q.**   Okay.  What is your current work?

3:56 PM 7    **A.**   I am a policy -- a senior policy manager focusing on child

3:56 PM 8    safety.

3:56 PM 9            **MR. CENTRONE:**  Okay.  Just one moment, Your Honor.

3:56 PM 10           **THE COURT:**  Sure.

3:56 PM 11                       (Pause.)

3:57 PM 12           **MR. CENTRONE:**  No further questions.  Thank you so

3:57 PM 13   much.

3:57 PM 14           **THE COURT:**  Thank you.  Any redirect, Ms. Favorit?

3:57 PM 15           **MS. FAVORIT:**  No, Your Honor.

3:57 PM 16           **THE COURT:**  Thank you.  Ms. Hines, you may step down.

3:57 PM 17   Any reason for Ms. Hines to remain, Mr. Centrone?

3:57 PM 18           **MR. CENTRONE:**  Not for me, Your Honor.

3:57 PM 19           **THE COURT:**  Ms. Favorit?

3:57 PM 20           **MS. FAVORIT:**  No, Your Honor.

3:57 PM 21           **THE COURT:**  Thank you.  Ms. Hines, you may step down,

3:57 PM 22   and you're excused.

3:57 PM 23           **THE WITNESS:**  Thank you.

3:57 PM 24           **THE COURT:**  Thank you.

3:57 PM 25                       (Witness excused.)

3:57 PM  1        THE COURT:  Ms. Favorit, if you want to call your

3:57 PM  2   next witness?

3:57 PM  3        MS. FAVORIT:  Your Honor, the next witness would be

3:57 PM  4   Detective Keller, which AUSA King is going to do.  I know we

3:57 PM  5   consulted with defense.  I wasn't sure how long Your Honor

3:57 PM  6   intended on remaining in court today.  I don't know that we

3:58 PM  7   would finish him in an hour with those questions, and I do

3:58 PM  8   believe Ms. King is going to discuss <u>Franks</u> prior to his

3:58 PM  9   testimony being presented.

3:58 PM  10       THE COURT:  I'm going to hear from Mr. Keller today.

3:58 PM  11  We'll see how far we go.  We'll probably go to 5:00, so we can

3:58 PM  12  begin.

3:58 PM  13       MS. KING:  And then, Your Honor, just a matter of

3:58 PM  14  housekeeping.  The United States is ready to call Detective

3:58 PM  15  Keller.  However, there has not been a ruling by this Court as

3:58 PM  16  to whether the <u>Franks</u> hearing -- whether the predicate has been

3:58 PM  17  met by defense and the Government is expected to move forward

3:58 PM  18  with the <u>Franks</u> hearing.  I am prepared to go forward with that

3:58 PM  19  testimony as well if the Court does make that ruling today.

3:58 PM  20       THE COURT:  I've explained, I think, to the parties,

3:58 PM  21  it's a situation when the matter is before the Court on -- in

3:58 PM  22  this case, myself, on a Report and Recommendation.  So I think

3:58 PM  23  what I indicated to the parties previously and I'll just

3:59 PM  24  reiterate today is just to move forward on all aspects of the

3:59 PM  25  <u>Franks</u> hearing.  I don't think it's that complicated.  I can't

<table>
<tr><td>3:59PM</td><td>1</td><td>make a definitive ruling because it's a Report and</td></tr>
</table>

3:59PM   1   make a definitive ruling because it's a Report and

3:59PM   2   Recommendation, and what I want to avoid is having the matter

3:59PM   3   to go up to Judge Jung and for whatever reason, for it to come

3:59PM   4   back down, and then we would be here all over again.

3:59PM   5          So I understand the parameters of the Franks

3:59PM   6   hearing.  I've conducted them before.  I just think in the

3:59PM   7   interests of judicial economy and scarce judicial resources

3:59PM   8   that we just move forward.

3:59PM   9          You can make your arguments at the end of the

3:59PM   10   hearing about where the cutoff should be and whether it's

3:59PM   11   pertinent that that testimony has been elicited, but I just

3:59PM   12   think if -- looking at the big picture here, it just makes the

3:59PM   13   most sense to do it that way so that we're not sending the

4:00PM   14   matter up to the Judge and having it come back down.

4:00PM   15          I've looked at a number of cases that you'll

4:00PM   16   find if you look online.  Many courts have proceeded that way.

4:00PM   17   I think that just makes the most sense here.  I'm not

4:00PM   18   intimating that in every case I would do it, but Mr. Keller is

4:00PM   19   going to be on the stand.  I suspect there's going to be areas

4:00PM   20   of cross-examination which may cut into Franks-related matters

4:00PM   21   which arguably would come in anyway, and rather than parse this

4:00PM   22   with a fine scalpel on each of those matters, we could be here

4:00PM   23   much longer just doing that alone.  So why don't we just

4:00PM   24   proceed on the full ambit of a Franks hearing?

4:00PM   25          Mr. Centrone, you're well aware that you have

| | | |
|---|---|---|
| 4:00PM | 1 | some obligations under <u>Franks</u> to make a showing, and just to |
| 4:00PM | 2 | reiterate something that I mentioned to the parties previously, |
| 4:00PM | 3 | is that the Court anticipates having the parties submit |
| 4:00PM | 4 | post-hearing submissions, which includes the <u>Franks</u>.  So, |
| 4:01PM | 5 | Mr. Centrone, you'll have to address certain matters that are |
| 4:01PM | 6 | with respect to the <u>Franks</u> hearing, including materiality as I |
| 4:01PM | 7 | recall, but the weight to that. |
| 4:01PM | 8 | Ms. King, when you're ready. |
| 4:01PM | 9 | **MS. KING:**  Thank you, Your Honor.  If I could have |
| 4:01PM | 10 | just one more moment. |
| 4:01PM | 11 | **THE COURT:**  Sure. |
| 4:01PM | 12 | (Pause.) |
| 4:02PM | 13 | **MS. KING:**  Your Honor, at this time -- |
| 4:02PM | 14 | **THE COURT:**  Are you prepared to proceed? |
| 4:02PM | 15 | **MS. KING:**  Yes.  Thank you, Your Honor.  At this time |
| 4:02PM | 16 | the United States would called Detective James Keller. |
| 4:02PM | 17 | **THE COURT:**  Okay, Mr. Keller, Detective, if you could |
| 4:02PM | 18 | kindly come forward as with the other witnesses, take the oath |
| 4:02PM | 19 | with my courtroom deputy. |
| 4:02PM | 20 | **COURTROOM DEPUTY:**  Please raise your right hand. |
| 4:02PM | 21 | (Witness sworn.) |
| 4:02PM | 22 | **COURTROOM DEPUTY:**  And if you could please state your |
| 4:02PM | 23 | full name for the record. |
| 4:02PM | 24 | **THE WITNESS:**  James Keller. |
| 4:02PM | 25 | **COURTROOM DEPUTY:**  Thank you.  You may be seated. |

KELLER - DIRECT EXAMINATION

4:02 PM   1        THE COURT:  Detective, as I've indicated to the other

4:02 PM   2   witnesses, if you'll arrange the microphone at an appropriate

4:02 PM   3   level so that you can speak well into it and we can clearly

4:02 PM   4   hear you.

4:02 PM   5             Counsel, there are a number of matters on the

4:02 PM   6   witness stand that may or may not have particular significance

4:03 PM   7   to Detective Keller.  Do those need to remain, Ms. King?

4:03 PM   8        MS. KING:  I do not believe so.  If I may approach

4:03 PM   9   the witness stand, I will absolutely investigate it.

4:03 PM  10        THE COURT:  Absolutely.

4:03 PM  11        MS. KING:  Your Honor, if I may inquire?

4:03 PM  12        THE COURT:  You may.

4:03 PM  13        MS. KING:  Thank you.

4:03 PM  14                    JAMES KELLER,

4:03 PM  15   a witness called on behalf of the Government, being first duly

4:03 PM  16   sworn, was examined and testified as follows:

4:03 PM  17                  DIRECT EXAMINATION

4:03 PM  18                  BY MS. KING:

4:03 PM  19   Q.   Detective Keller, good afternoon.  Where do you work?

4:03 PM  20   A.   I work with the North Port Police Department.

4:03 PM  21   Q.   How long have you worked there?

4:03 PM  22   A.   I've worked there for nine years and about nine months.

4:03 PM  23   Q.   What kind of training did you have to become a North Port

4:03 PM  24   Police Department officer?

4:03 PM  25   A.   So I attended the Police Academy in Sarasota County,

**KELLER - DIRECT EXAMINATION**

1    Florida.

2    Q.    And then are you currently an officer, or do you hold

3    another role?

4    A.    I am a detective, and then I am also a task force officer

5    with the FBI.

6    Q.    What kind of detective are you?

7    A.    Currently I'm assigned as Internet Crimes Against Children

8    or also known as ICAC.

9    Q.    What kind of training did you have to become a detective

10   of that capacity?

11   A.    So I attended multiple trainings through ICAC, which is

12   put on through DOJ, to include training such as online

13   undercover chat and concepts for investigations, and then I

14   also do -- or I have done training on NCMEC CyberTips and the

15   intake of those called investigative techniques, and I've also

16   attended other webinars on the matter, and on-the-job training.

17   Q.    You also are a task force officer --

18   A.    Correct.

19   Q.    -- with the FBI?

20   A.    Correct.

21   Q.    What does that job entail?

22   A.    So being a task force officer with the FBI and then also

23   being a state -- certified state police officer, I can work

24   investigations on a state level or transition to a federal

25   level, and what that means is I work hand in hand with other

**KELLER - DIRECT EXAMINATION**

4:05 PM   1   special agents with the FBI, and I receive guidance and

4:05 PM   2   on-the-job training through them.

4:05 PM   3   Q.   Are you an employee of the National Center for Missing and

4:05 PM   4   Exploited Children, also known as NCMEC?

4:05 PM   5   A.   No.

4:05 PM   6   Q.   Are you an employee of Yahoo?

4:05 PM   7   A.   No.

4:05 PM   8   Q.   Are you familiar with CyberTip reports?

4:05 PM   9   A.   Yes.

4:05 PM  10   Q.   I know you indicated you had some training in that.  How

4:05 PM  11   else are you familiar with that?

4:05 PM  12   A.   Just from the training.  It was a 40-hour course that I

4:05 PM  13   took with the training, and then also just from learning from

4:05 PM  14   other ICAC investigators and through working multiple cases

4:05 PM  15   since 2019.

4:05 PM  16   Q.   What is your understanding of what an electronic service

4:06 PM  17   provider is?

4:06 PM  18   A.   Electronic service provider is -- it's a type of business,

4:06 PM  19   such as -- in this case is Yahoo.  Other examples would be

4:06 PM  20   Google, YouTube, Discord.  They are just businesses that do

4:06 PM  21   business electronically.

4:06 PM  22   Q.   Now, moving back to a CyberTip, what is your involvement

4:06 PM  23   in the creation of those reports?

4:06 PM  24   A.   I'm not involved in the creation of CyberTips.

4:06 PM  25   Q.   How do you receive a CyberTip?  How do you get involved or

**KELLER - DIRECT EXAMINATION**

| | | |
|---|---|---|
| 4:06PM | 1 | start looking at a CyberTip? |
| 4:06PM | 2 | A.   So specifically I'm involved in the Central Florida ICAC |
| 4:06PM | 3 | Task Force where -- my department has an MOU with, and what |
| 4:06PM | 4 | that does is it basically designates me at my department as the |
| 4:06PM | 5 | receiver of CyberTips that NCMEC assigns to the Central Florida |
| 4:06PM | 6 | Task Force which geolocates to the city of North Port. |
| 4:07PM | 7 | Q.   You said MOU.  What does that mean? |
| 4:07PM | 8 | A.   It's a memo of understanding, which means there's an |
| 4:07PM | 9 | agreement between two agencies on how they work together. |
| 4:07PM | 10 | Q.   What do you do once you receive a CyberTip? |
| 4:07PM | 11 | A.   So through an online portal, I receive a CyberTip through |
| 4:07PM | 12 | ICAC, and what I do when I receive it is I open up the |
| 4:07PM | 13 | document, and I review the PDF document, and then I -- I look |
| 4:07PM | 14 | at -- I read the CyberTip, see what it entails, see who it's |
| 4:07PM | 15 | from, see if they viewed any of the images on it, and then we |
| 4:07PM | 16 | look at the images that they provided us. |
| 4:07PM | 17 | Q.   Do you contact the electronic service provider once you |
| 4:07PM | 18 | receive the CyberTip? |
| 4:07PM | 19 | A.   No. |
| 4:07PM | 20 | Q.   Do you contact NCMEC once you receive the CyberTip? |
| 4:07PM | 21 | A.   No. |
| 4:08PM | 22 | Q.   Do you receive any additional information from the ESP or |
| 4:08PM | 23 | NCMEC outside of the CyberTip? |
| 4:08PM | 24 | A.   No. |
| 4:08PM | 25 | Q.   Is the CyberTip the only report that you're looking at at |

KELLER - DIRECT EXAMINATION

4:08PM  1  the start of that investigation?

4:08PM  2  A.   Yes.

4:08PM  3  Q.   Now, you indicated that you look at images or attachments

4:08PM  4  that come with that CyberTip; is that correct?

4:08PM  5  A.   Correct.

4:08PM  6  Q.   Do you always view those attachments?

4:08PM  7  A.   So our policy, how we conduct these investigations, have

4:08PM  8  changed over time.  At the time of receiving this CyberTip,

4:08PM  9  yes, I would review and look at all of the images that were

4:08PM  10  provided to me.

4:08PM  11  Q.   And that was back in September of 2020?

4:08PM  12  A.   I believe when I received the tip, it was the end of

4:08PM  13  November of 2020.

4:08PM  14  Q.   Okay.  And what is the policy now?

4:08PM  15  A.   Now we look at -- so when I open up a CyberTip in the

4:09PM  16  online portal, I only look at the PDF.  I examine the PDF, and

4:09PM  17  if the ESP has reviewed the image or if the image was made

4:09PM  18  publicly available, then I will review it.  If it has -- if

4:09PM  19  those two criterias or one of the two have not been met, then a

4:09PM  20  search warrant is sought.

4:09PM  21  Q.   Now, when you receive a CyberTip report, what information

4:09PM  22  are you specifically looking for in order to open an

4:09PM  23  investigation?

4:09PM  24  A.   So there's a couple things that we look at, so the -- I

4:09PM  25  look at specifically the IP addresses associated with the

**KELLER - DIRECT EXAMINATION**

4:09 PM  1    CyberTip, so whether or not it either shows up as an upload IP

4:09 PM  2    or a last log-in IP or just an incident date IP, and then I

4:09 PM  3    take those IPs, and I search those to a publicly available site

4:10 PM  4    called MaxMind, and it gives us an approximate geolocation.

4:10 PM  5              And then what I do off that is I do a subpoena to who

4:10 PM  6    that ISP is -- which is an internet service provider such as

4:10 PM  7    Comcast, it could be Verizon, Frontier, CenturyLink, any of

4:10 PM  8    those -- and then I find out exactly where the incident

4:10 PM  9    occurred in order to determine whether I have jurisdiction or

4:10 PM  10   not.

4:10 PM  11             The other thing I do is I look at the images, and I

4:10 PM  12   reviewed images to see if they are child pornography images or

4:10 PM  13   CSAM, sexually abusive material, as it relates to Florida state

4:10 PM  14   statute, and part of my criteria for that is looking at it to

4:10 PM  15   see hey, does that image or video contain a minor?  Is that

4:10 PM  16   minor somehow engaged in a sexual act or displaying, like,

4:10 PM  17   sexual organs in a way to cause sexual stimulation to the

4:11 PM  18   viewer?  Once all those criterias are met, then I determine

4:11 PM  19   that it is CSAM at that point.

4:11 PM  20   Q.   How can you tell if someone is a minor?

4:11 PM  21   A.   So through my training and experience -- I have kids

4:11 PM  22   myself.  I've been around kids my whole life.  What I like to

4:11 PM  23   do is with these images, such as the residential search

4:11 PM  24   warrant, I give approximate ages.  I don't know the exact ages

4:11 PM  25   on the minors I'm looking at in these videos or images, but I

**KELLER - DIRECT EXAMINATION**

4:11 PM    1    gave an approximate based upon my own life experiences and

4:11 PM    2    training and experience.

4:11 PM    3    Q.    Now, is there a scenario in which you receive a CyberTip

4:11 PM    4    from NCMEC through the portal and you decide not to open an

4:11 PM    5    investigation?

4:11 PM    6    A.    Yes.

4:11 PM    7    Q.    Could you please elaborate on that for the Court?

4:11 PM    8    A.    Sometimes we're given CyberTips, and we look at the image

4:11 PM    9    or the video, and it just doesn't seem like we can determine

4:12 PM    10   that it's a minor in that material, and I'm -- the way that I

4:12 PM    11   run my investigations is I'm very conservative, so if I have

4:12 PM    12   the chance to go lower on the age range or higher on the age

4:12 PM    13   range, I almost always go higher.  That way I don't want to --

4:12 PM    14   you know, I don't want to have any issues or -- with the

4:12 PM    15   approximation of ages.  I'd just rather kind of play it safe

4:12 PM    16   than sorry, be conservative on it.  And so specifically for

4:12 PM    17   those cases that we decide not to investigate, I just determine

4:12 PM    18   that it's just too much age difficult, so we just won't open an

4:12 PM    19   investigation.

4:12 PM    20   Q.    So based on that, there are scenarios in which your

4:12 PM    21   determination based on your training and experience in viewing

4:12 PM    22   whatever image has been submitted to you may be a different

4:12 PM    23   classification or categorization than what NCMEC provided?

4:13 PM    24   A.    Yes, and that is very -- that happens often.

4:13 PM    25   Q.    Now, do you ever contact an electronic service provider to

KELLER - DIRECT EXAMINATION

4:13 PM   1   request that an investigation be initiated?

4:13 PM   2   A.   No.

4:13 PM   3   Q.   Do you ever contact an electronic service provider to

4:13 PM   4   request for them to search a user's account without a warrant?

4:13 PM   5   A.   No.

4:13 PM   6   Q.   Do you have any relationship with an electronic service

4:13 PM   7   provider in which you're instructing them on how to maintain

4:13 PM   8   their platform or user accounts?

4:13 PM   9   A.   No.

4:13 PM   10  Q.   Did you review a CyberTip in this case?

4:13 PM   11  A.   Yes.

4:13 PM   12  Q.   Now, I'm showing you what has already been stipulated and

4:13 PM   13  entered into evidence as Government Exhibit 1.

4:13 PM   14        MS. KING:   Your Honor, may I approach the witness?

4:13 PM   15        THE COURT:   You may.

4:14 PM   16        THE WITNESS:   Thank you.

4:14 PM   17  BY MS. KING:

4:14 PM   18  Q.   So I am showing you Government's Exhibit 1, which is

4:14 PM   19  CyberTipline report 79384716.   Do you recognize this

4:14 PM   20  CyberTipline report?

4:14 PM   21  A.   Yes.

4:14 PM   22  Q.   Can you please explain to the Court where you look -- or

4:14 PM   23  what you looked for in the CyberTipline report to determine how

4:14 PM   24  to start?

4:14 PM   25  A.   Yes.   So I start on the first page.   I look at -- start

**KELLER - DIRECT EXAMINATION**

4:14 PM   1   from the top, when it was received by NCMEC, and then I go down

4:14 PM   2   to the incident type, about the middle of page 1 where it says

4:14 PM   3   "Apparent Child Pornography.  Files not reviewed by NCMEC, but

4:14 PM   4   Hash Match," and then about how many uploaded files total.

4:14 PM   5           Then the second page is table of contents.  Proceed

4:15 PM   6   to the third page, which is the ESP submitter, which in this

4:15 PM   7   case is Yahoo.

4:15 PM   8   Q.   Now, does the ESP submitting agency have any significance

4:15 PM   9   to you?

4:15 PM   10   A.   They have no bearing on my investigation other than they

4:15 PM   11   are the ones that submitted these images.

4:15 PM   12   Q.   So in reviewing this CyberTip, did you view any other

4:15 PM   13   files than the seven files there were the subject of the upload

4:15 PM   14   for this NCMEC CyberTip?

4:15 PM   15   A.   No.

4:15 PM   16   Q.   Did you view these seven files?

4:15 PM   17   A.   Yes.

4:15 PM   18   Q.   And did you eventually submit for a Yahoo account search

4:16 PM   19   warrant and a residential search warrant based on your view of

4:16 PM   20   those files?

4:16 PM   21   A.   Yes, based upon the view of the files and the response

4:16 PM   22   from Comcast.

4:16 PM   23   Q.   And what do you mean by the response from Comcast?

4:16 PM   24   A.   The IP address that was in this CyberTip, I submitted a

4:16 PM   25   subpoena to Comcast to try to find out the address that it

**KELLER - DIRECT EXAMINATION**

4:16 PM  1  resulted to, and it did come back to a residence within the

4:16 PM  2  city of North Port.

4:16 PM  3  Q.   Why did you obtain a search warrant for the Yahoo account

4:16 PM  4  in this case?

4:16 PM  5  A.   So there's a couple of reasons why I submit -- I apply and

4:16 PM  6  try to obtain a search warrant to the ESP in ICAC

4:16 PM  7  investigations.  It's for a number of reasons.  First, I want

4:16 PM  8  to confirm that the images that they provided I can obtain

4:16 PM  9  through a search warrant, or at least try to.  And then another

4:17 PM  10  one is other information that can be found surrounding those

4:17 PM  11  images such as -- through my training and experience through

4:17 PM  12  ESPs, I've also obtained much more child pornography from doing

4:17 PM  13  a search warrant to an ESP.  And then also if these are with

4:17 PM  14  emails, then I can -- I can evaluate to see if there's any

4:17 PM  15  exculpatory evidence or if there's something that would

4:17 PM  16  exonerate the owner of that account, such as someone else

4:17 PM  17  accessing it or something.

4:17 PM  18  Q.   So in this case you viewed the seven files that were

4:17 PM  19  uploaded?

4:17 PM  20  A.   Yes.

4:17 PM  21  Q.   And did you make a determination as to whether each file

4:17 PM  22  was child sexual abuse material or CSAM?

4:17 PM  23  A.   Yes.

4:17 PM  24  Q.   How did you make that determination?

4:17 PM  25  A.   By visually looking at them in their -- in its entirety

161

**KELLER - DIRECT EXAMINATION**

4:18PM   1   and describing them.

4:18PM   2   Q.   And you said that you described them.  Where did you

4:18PM   3   describe them?

4:18PM   4   A.   So I described them in first the Yahoo search warrant and

4:18PM   5   application for that, and then also in the residential search

4:18PM   6   warrant, which is even more detailed in my descriptions.

4:18PM   7   Q.   And the residential search warrant is Government

4:18PM   8   Exhibit 2.  Your Honor, may I approach the witness?

4:18PM   9        THE COURT:  You may.

4:18PM  10   BY MS. KING:

4:18PM  11   Q.   Are those the detailed explanations of each photo that you

4:18PM  12   viewed as subject of this NCMEC CyberTip?

4:18PM  13   A.   Yes.

4:19PM  14        MS. KING:  Your Honor, may I have a quick moment to

4:19PM  15   confer?

4:19PM  16        THE COURT:  Sure.

4:19PM  17                 (Pause.)

4:19PM  18   BY MS. KING:

4:19PM  19   Q.   Now, do you typically include a description of the images

4:20PM  20   that you view when you're applying for a warrant?

4:20PM  21   A.   I do include a description of the images.  Sometimes not

4:20PM  22   all the images though.

4:20PM  23   Q.   Okay.  And what's the minimum amount of images that you

4:20PM  24   need in order to submit a case to get a judge to sign a

4:20PM  25   warrant?

**KELLER - DIRECT EXAMINATION**

4:20 PM 1    A.   Well, the possession of even one image of CSAM is in

4:20 PM 2    violation, so I've done search warrants from just one image all

4:20 PM 3    the way up to a couple of images or more.

4:20 PM 4    Q.   Now, at any point in your application for a search warrant

4:20 PM 5    of the Yahoo account of vladlover50@yahoo.com, did you

4:20 PM 6    misrepresent the contents of the photos that you viewed?

4:20 PM 7    A.   No.

4:20 PM 8    Q.   At any point when you were applying for the residential

4:20 PM 9    search warrant in this case, did you misrepresent the contents

4:21 PM 10   of the photos that you viewed?

4:21 PM 11   A.   No.

4:21 PM 12   Q.   Now, as we view the CyberTip, at some point in your -- in

4:21 PM 13   the Exhibit 2 in your residential search warrant, you indicate

4:21 PM 14   a NCMEC categorization?

4:21 PM 15   A.   Correct.

4:21 PM 16   Q.   Could you please explain to the Court what this NCMEC

4:21 PM 17   categorization is?

4:21 PM 18   A.   Yeah.  So the NCMEC categorization, when I receive a

4:21 PM 19   CyberTip from NCMEC, just like in law enforcement when we

4:21 PM 20   receive a tip from a civilian or private entity, we treat it

4:21 PM 21   just as that, a tip, and so we take what they say as a

4:21 PM 22   suggestion, but ultimately it comes down to me as the sworn law

4:21 PM 23   enforcement officer to view it myself and make a determination,

4:21 PM 24   not -- it's not on NCMEC.  It's on me.

4:21 PM 25   Q.   So where do you get that information that it had been

163

**KELLER - DIRECT EXAMINATION**

4:22PM  1   categorized as child pornography previously?

4:22PM  2   A.    From the NCMEC CyberTip.

4:22PM  3   Q.    Okay.  And that would be Government Exhibit 1?

4:22PM  4   A.    That would be page -- it says 6, but --

4:22PM  5            THE COURT:  Ms. King, remind me what exhibit is that?

4:22PM  6            MS. KING:  This is Government Exhibit Number 1, Your

4:22PM  7   Honor.

4:22PM  8            THE COURT:  Page 6?

4:22PM  9            THE WITNESS:  I think it's really page 8, but at the

4:22PM  10  top right it says 6 in red letter.

4:22PM  11  BY MS. KING:

4:22PM  12  Q.    Is that under Section B?

4:22PM  13  A.    Yes.

4:22PM  14  Q.    And could you please explain to the Court where you're

4:22PM  15  getting this previous categorization of child pornography by

4:23PM  16  NCMEC?

4:23PM  17  A.    So there's two areas on this page.  In almost the very

4:23PM  18  center of the page, there's a question that says, "Does listed

4:23PM  19  files match file previously viewed and categorized from a

4:23PM  20  CyberTip report?"  That answer by NCMEC is, "Yes."  And then in

4:23PM  21  the categorization to the right, it says "CP," which stands for

4:23PM  22  child pornography, and then in the parentheses is

4:23PM  23  "Unconfirmed."  However, I'm the one that reviews it in order

4:23PM  24  to confirm it.

4:23PM  25  Q.    So based on your training and experience, you're able to

**KELLER - DIRECT EXAMINATION**

4:23 PM  1  confirm that these images are meeting the definition of child

4:23 PM  2  pornography?

4:23 PM  3  **A.**   Yes.

4:23 PM  4  **Q.**   At any point in your application for a search warrant of

4:23 PM  5  the subject Yahoo account in this case, did you intentionally

4:23 PM  6  misrepresent the NCMEC image categorization of child

4:24 PM  7  pornography?

4:24 PM  8  **A.**   No.

4:24 PM  9  **Q.**   At any point in your application for a search warrant of

4:24 PM  10  the residence in this case, did you intentionally misrepresent

4:24 PM  11  the previous NCMEC categorization of child pornography?

4:24 PM  12  **A.**   No.

4:24 PM  13  **Q.**   Now, when you submitted your affidavit in support of

4:24 PM  14  probable cause for a search warrant in this case of the

4:24 PM  15  residence, did you know the last log-in date for the

4:24 PM  16  vladlover50@yahoo.com account?

4:24 PM  17  **A.**   Yes, for the residential search warrant.

4:24 PM  18  **Q.**   And how did you know that?

4:24 PM  19  **A.**   Because before I submitted the residential search warrant,

4:24 PM  20  I obtained search warrant results back from Yahoo from the

4:24 PM  21  first search warrant that I completed, and then in those

4:24 PM  22  results, there is a log where it has all the IPs associated

4:25 PM  23  with the account, and I was aware of the last log-in IP from

4:25 PM  24  those results.

4:25 PM  25  **Q.**   What bearing does that information have on your

**KELLER - DIRECT EXAMINATION**

4:25PM    1    investigation and affidavit of probable cause?

4:25PM    2    A.    Has no bearing.  From my training and experience, from

4:25PM    3    dealing with many CyberTips, this isn't uncommon to see with

4:25PM    4    the last log-in date.  Sometimes in CyberTips, that's all that

4:25PM    5    we're provided is the last log-in IP address, and then that's

4:25PM    6    what we do our legal paperwork off of.  But from what I know is

4:25PM    7    that people can -- from my training and experiences, I know

4:25PM    8    that people can stay logged into accounts for a significant

4:25PM    9    period of time.

4:25PM   10    Q.    So the last log-in date doesn't necessarily mean the last

4:25PM   11    access date?

4:25PM   12    A.    Correct.

4:25PM   13    Q.    In your submission and in your affidavit of probable cause

4:26PM   14    for a residential search warrant in this case, did you

4:26PM   15    intentionally omit the information of the last log-in date of

4:26PM   16    the vladlover50@yahoo.com account?

4:26PM   17    A.    No.  I did not see the relevance of it.

4:26PM   18    Q.    And is that because of the training and experience and

4:26PM   19    knowledge that you just testified to for the Court?

4:26PM   20    A.    Correct.

4:26PM   21    Q.    Now, in your warrant application for the Yahoo account, is

4:26PM   22    there anything that you excluded or omitted that could have

4:26PM   23    potentially exonerated the suspect?

4:26PM   24    A.    No.

4:26PM   25    Q.    And that's the same for both the Yahoo and residential

**KELLER - DIRECT EXAMINATION**

4:26PM  1    search warrants?

4:26PM  2    A.   Correct.

4:26PM  3    Q.   Now, was there anything that you thought could have been

4:26PM  4    detrimental to your case and to your probable cause that you

4:26PM  5    decided to exclude or omit from your probable cause affidavit

4:27PM  6    in the Yahoo account search warrant?

4:27PM  7    A.   No.  In fact, I think I provided even more information.

4:27PM  8    Q.   What do you mean by that?

4:27PM  9    A.   Sometimes -- like, the amount of images that I described

4:27PM  10   and provided is in this case kind of above and beyond what I

4:27PM  11   typically do.

4:27PM  12   Q.   And the same question for the residential search warrant.

4:27PM  13   Is there anything that you --

4:27PM  14        MR. CENTRONE:  Your Honor, I'm going to go ahead and

4:27PM  15   object.  I was counseled against a deposition style line of

4:27PM  16   questioning, and that appears to be where we're going.  All of

4:27PM  17   this is outside the scope of the issues in the motion.

4:27PM  18        THE COURT:  Ms. King?

4:27PM  19        MS. KING:  Your Honor, this is directly relevant to

4:27PM  20   the Franks issue that defense has brought up in the fact that

4:27PM  21   they're alleging that Detective Keller intentionally omitted

4:27PM  22   information that would have been pertinent to the probable

4:28PM  23   cause finding in this case for these search warrants.

4:28PM  24        THE COURT:  Overruled.

4:28PM  25   BY MS. KING:

KELLER - DIRECT EXAMINATION

1    Q.   So for the residential search warrant, did you

2    intentionally omit or exclude any information that you thought

3    may be detrimental to your case?

4    A.   No.

5         MS. KING:  Your Honor, may I have a moment to confer?

6         THE COURT:  Absolutely.

7         MS. KING:  Just a few more questions if the Court

8    will allow.

9         THE COURT:  Absolutely.

10        MS. KING:  Thank you, Your Honor.

11   BY MS. KING:

12   Q.   When you wrote the search warrant for the Yahoo account in

13   this case, did you know NCMEC's internal definition of "CP

14   Unconfirmed" as it's viewed on page 6 of Government's

15   Exhibit 1?

16   A.   You're referring to the categorization to the right-hand

17   side?

18   Q.   Yes.  Did you know NCMEC's internal definition of what "CP

19   Unconfirmed" means?

20   A.   No.

21   Q.   And in your search warrants, is there a reason that you

22   provide the categorizations from NCMEC?

23   A.   It was just additional information that I decided to

24   provide in this affidavit, which I don't always provide in

25   affidavits, but for some reason I did in this one.

KELLER - DIRECT EXAMINATION

4:29PM  1   Q.   So it's additional to the detailed descriptions of each

4:29PM  2   image you gave?

4:29PM  3   A.   Correct.  I was trying to be as detailed as I could.

4:29PM  4       MS. KING:  Nothing further at this time, Your Honor.

4:29PM  5       THE COURT:  Thank you.  Any cross, Mr. Centrone?

4:29PM  6       MR. CENTRONE:  Yes, Judge.  We're at 4:30.  I

4:29PM  7   probably have about an hour and a half worth of questions.  I'm

4:30PM  8   not sure how Your Honor would like to handle that, if Your

4:30PM  9   Honor would like --

4:30PM 10       THE COURT:  As I said before, let's go to 5:00.

4:30PM 11       MR. CENTRONE:  Okay.

4:30PM 12       THE COURT:  I wasn't intending for this hearing to

4:30PM 13   continue until tomorrow, so I'm interested in getting as much

4:30PM 14   done as we can.

4:30PM 15       MR. CENTRONE:  Sure.

4:30PM 16       THE COURT:  You may begin your cross.

4:30PM 17       MR. CENTRONE:  If that's the case, Your Honor, my

4:30PM 18   preference would be to go all the way through to finish the

4:30PM 19   testimony so we don't have to come back at all.

4:30PM 20       THE COURT:  I understand that may be your preference,

4:30PM 21   but that's not of my staff.  So why don't we get started?

4:30PM 22   We're going to finish at 5:00 as I've indicated.

4:30PM 23       MR. CENTRONE:  I'm sorry, I missed that last part.

4:30PM 24       THE COURT:  We're going to finish at 5:00 as I

4:30PM 25   previously indicated.

KELLER - CROSS-EXAMINATION

4:30 PM   1          MR. CENTRONE:  Yes, sir.

4:30 PM   2                    CROSS-EXAMINATION

4:30 PM   3                    BY MR. CENTRONE:

4:30 PM   4   Q.    Good afternoon, Detective Keller.

4:30 PM   5   A.    Good afternoon.

4:30 PM   6   Q.    You said you've previously received training on

4:30 PM   7   CyberTipline reports.  Who provided that training?

4:30 PM   8   A.    That was through ICAC task force funded by DOJ.

4:30 PM   9   Q.    So that was not training from NCMEC?

4:30 PM  10   A.    Correct.

4:30 PM  11   Q.    Did NCMEC in any way participate in that training?

4:31 PM  12   A.    I think the particular class I attended, there were some

4:31 PM  13   employees who attended the class, but not that facilitated it.

4:31 PM  14   Q.    I apologize.  Just to clarify, you said there were

4:31 PM  15   employees of NCMEC who attended the class but were not teaching

4:31 PM  16   the class; is that fair?

4:31 PM  17   A.    Yes.

4:31 PM  18   Q.    Okay.  Are you familiar with what a hash match is?

4:31 PM  19   A.    Yes.

4:31 PM  20   Q.    What is your definition of a hash match?

4:31 PM  21   A.    A hash match is if you take a -- it could be a video,

4:31 PM  22   image, a document file that you have saved on your computer,

4:31 PM  23   and you can basically run it through an algorithm, and it will

4:31 PM  24   give you what's called a hash match, which is a unique

4:31 PM  25   identifier similar to a fingerprint.

KELLER - CROSS-EXAMINATION

4:32 PM 1  Q.   And that's without viewing the image itself, correct?

4:32 PM 2  A.   Correct.

4:32 PM 3  Q.   It's based on a computer code.  Is that your

4:32 PM 4  understanding?

4:32 PM 5  A.   From the algorithm.

4:32 PM 6  Q.   And by algorithm, what do you mean?

4:32 PM 7  A.   The algorithm that processes the image to provide you the

4:32 PM 8  hash.

4:32 PM 9  Q.   And you're aware that NCMEC maintains a database of such

4:32 PM 10  hash matches?

4:32 PM 11  A.   Yes.

4:32 PM 12  Q.   And how they've previously categorized images?

4:32 PM 13  A.   Yes.

4:32 PM 14  Q.   You testified at the time you submitted the warrant

4:32 PM 15  applications we were just discussing, you did not know the

4:32 PM 16  definition of "CP Unconfirmed;" is that correct?

4:33 PM 17  A.   By NCMEC standards, no.

4:33 PM 18  Q.   Did you -- at the time you made the warrant applications,

4:33 PM 19  did you do any investigation at all into what the meaning of

4:33 PM 20  that phrase is?

4:33 PM 21  A.   No, other than I knew that CP stands for child

4:33 PM 22  pornography.

4:33 PM 23  Q.   What is your understanding now of what "CP Unconfirmed"

4:33 PM 24  means?

4:33 PM 25  A.   Now is that they believe that -- by they, NCMEC, believes

KELLER - CROSS-EXAMINATION

4:33PM 1  that it meets the federal definition of child pornography, but

4:33PM 2  it needs to be confirmed.

4:33PM 3  Q.  What needs to be confirmed?

4:33PM 4  A.  The age of the minor.

4:33PM 5  Q.  When did you become aware of NCMEC's definition?

4:33PM 6  A.  Just recently.

4:33PM 7  Q.  Well, recently -- you were in the courtroom when we

4:33PM 8  discussed it earlier.  Is that how recent or before that?

4:33PM 9  A.  That recent.

4:33PM 10  Q.  So you first learned about it today in this courtroom?

4:33PM 11  A.  Right, from NCMEC.

4:33PM 12  Q.  Okay.  And it's your understanding now that the phrase "CP

4:34PM 13  Unconfirmed" means the same as your use of the phrase "age

4:34PM 14  difficult" in the warrant application; is that correct?

4:34PM 15  A.  I would disagree with that.

4:34PM 16  Q.  Based on what?

4:34PM 17  A.  Well, if they're saying that "CP Unconfirmed" means it

4:34PM 18  could have been age difficult for them, it can be completely

4:34PM 19  different from what I determine to be age difficult under

4:34PM 20  Florida state statute.

4:34PM 21  Q.  Okay.  I understand that, and I wasn't trying to imply

4:34PM 22  otherwise.  I was just trying to determine that it was

4:34PM 23  effectively the same definition, understanding that different

4:34PM 24  people could reach different conclusions about that, what would

4:34PM 25  be age difficult.  Is that -- does that help elaborate on the

**KELLER - CROSS-EXAMINATION**

4:34PM  1    question for you?

4:34PM  2    **A.**   Yes.

4:34PM  3    **Q.**   Okay.  So given that qualification, do you now understand

4:34PM  4    that age difficult means -- excuse me, that "CP Unconfirmed" is

4:35PM  5    effectively used the same as the phrase you use, "age

4:35PM  6    difficult," in the warrant applications?

4:35PM  7    **A.**   Yes.

4:35PM  8    **Q.**   If you can't determine the age of the person in the photo,

4:35PM  9    then it's not probable that it is child pornography; is that

4:35PM  10   correct?

4:35PM  11   **A.**   Can you say that again?

4:35PM  12   **Q.**   Sure.  "Probable" means more likely than not; is that a

4:35PM  13   fair definition?

4:35PM  14        **MS. KING:**  Your Honor, I'm going to object to this

4:35PM  15   line of questioning as calling for a legal conclusion by the

4:35PM  16   witness.

4:35PM  17        **THE COURT:**  Mr. Centrone?

4:35PM  18        **MR. CENTRONE:**  It is his job to determine probable

4:35PM  19   cause.  I'm trying to figure out that we're all on the same

4:35PM  20   page as what "probable" means.

4:35PM  21        **THE COURT:**  And what's your definition of "probable

4:35PM  22   cause?"  In other words, if the detective has a view of

4:36PM  23   probable cause that's different than the legal standard --

4:36PM  24        **MR. CENTRONE:**  Okay.  Let me ask him.

4:36PM  25   BY MR. CENTRONE:

KELLER - CROSS-EXAMINATION

4:36PM   1   Q.   Detective, what is your view of probable cause?  What does

4:36PM   2   that mean?

4:36PM   3   A.   My view of probable cause is when a reasonable officer,

4:36PM   4   based upon the facts and circumstances presented to them at a

4:36PM   5   given time, that they believe that a crime did, has, or was

4:36PM   6   about to be, occurred.

4:36PM   7   Q.   Okay.  So given that, if a photograph is age difficult,

4:36PM   8   how -- meaning you are not -- you, as a trained detective, are

4:36PM   9   unable to determine whether the person in the photo is a minor,

4:36PM  10   how is it probable cause -- how does that lend to probable

4:36PM  11   cause that a crime has or is about to occur based on your

4:37PM  12   definition?

4:37PM  13   A.   You're referring to an age difficult?

4:37PM  14   Q.   Yes, sir.

4:37PM  15   A.   Okay.  Now, is that age difficult on NCMEC standards or my

4:37PM  16   standards?  Because on my standards, no, it would not meet

4:37PM  17   probable cause.

4:37PM  18   Q.   And I am asking about your standards.  So just to clarify,

4:37PM  19   just to put a fine point on it, age difficult does not equal

4:37PM  20   child porn, correct, by your -- by your testimony just now?

4:37PM  21   A.   It means that it needs to be --

4:37PM  22        MS. KING:  Your Honor --

4:37PM  23        THE COURT:  Yes, Ms. King?

4:37PM  24        MS. KING:  Again, objection to legal conclusion being

4:37PM  25   requested of this witness.

KELLER - CROSS-EXAMINATION

4:37PM  1          THE COURT:  Mr. Centrone?

4:37PM  2          MR. CENTRONE:  I'm -- as he just testified, he

4:37PM  3  applies a standard of age difficult that has some meaning to

4:37PM  4  him that lends itself to whether probable cause occurred.

4:37PM  5  Probable cause is the standard for the issuance of a warrant.

4:38PM  6  While Mr. -- while Detective Keller may not be a lawyer, I

4:38PM  7  think he's more than qualified to opine on the nature of

4:38PM  8  probable cause.

4:38PM  9          THE COURT:  So to both counsel, Ms. King, when a

4:38PM 10  detective or an agent, or in this case a task force officer,

4:38PM 11  submits a warrant, said agent or officer makes a representation

4:38PM 12  about probable cause.  So in part, that answers -- it would

4:38PM 13  seem at least, as I mentioned -- in part your objection.  At

4:38PM 14  the same time, Mr. Centrone, hypothetically if Mr. -- or

4:38PM 15  Detective Keller has a different understanding, let's say his

4:38PM 16  probable cause standard is higher than the legal standard, what

4:38PM 17  relevance is that to the Court in the end?  In other words,

4:38PM 18  when the Court has to evaluate it, it has to evaluate it by the

4:39PM 19  legal standard of probable cause, irrespective of what your

4:39PM 20  view or what the detective's view of probable cause may be

4:39PM 21  individually.  Your view, if it was informed by Eleventh

4:39PM 22  Circuit case law or otherwise binding authority, would be

4:39PM 23  different, but --

4:39PM 24          MR. CENTRONE:  Well, if his standard was higher than

4:39PM 25  the legal standard for probable cause, I think that is as

KELLER - CROSS-EXAMINATION

1  relevant as knowing whether his standard is lower than the

2  legal standard for --

3      THE COURT:  How is that relevant to the Court's

4  determination?

5      MR. CENTRONE:  Because there's case law, Judge,

6  that -- with respect to the Franks issues, whether a fact

7  submitted in a warrant is clearly critical to a finding of

8  probable cause goes to the materiality issue.

9      THE COURT:  Isn't that a determination that the Court

10  makes?  In other words, how is Detective Keller's view of

11  probable cause going to influence or at least validly influence

12  the Court's consideration?  I'm just asking you the question.

13  It's a curious point.

14      I mention something for Ms. King to consider and

15  something for you to consider, and let's make the hypothetical

16  even broader.  Let's say Mr. -- or Detective Keller's probable

17  cause is less than the legal standard.  Doesn't the Court have

18  to apply the appropriate legal standard on a Franks challenge

19  or on any challenge to a warrant, irrespective of the views of

20  a witness in a particular case?

21      MR. CENTRONE:  Sure, Judge, but it goes -- again,

22  whether a fact represented in a warrant goes to a finding of

23  probable cause, goes to -- it's clearly critical to a finding

24  of probable cause, just like materiality can be -- for

25  recklessness can be inferred as well.

**KELLER - CROSS-EXAMINATION**

4:41PM    1          Contrary to the Government's representations a

4:41PM    2    few moments ago, my argument is not regarding Detective

4:41PM    3    Keller's intention.  Recklessness is not required in

4:41PM    4    intentional misrepresentation.  It can stem from the failure to

4:41PM    5    investigate things that should have been investigated.

4:41PM    6          So all of these issues go -- speak to the heart

4:41PM    7    of that.

4:41PM    8          THE COURT:  I may have missed it.  I didn't hear you

4:41PM    9    address probable cause.  I understand -- you're talking about a

4:41PM    10   different -- you're talking about a scienter, whether it's an

4:41PM    11   affirmative attempt to misrepresent as opposed to reckless

4:41PM    12   disregard.  I'm talking about probable cause and Detective

4:41PM    13   Keller's view of what -- probable cause.  How is that relevant

4:41PM    14   to the Court's consideration of that issue now?

4:41PM    15         MR. CENTRONE:  And we may be talking past each other

4:41PM    16   a little bit, Judge.

4:41PM    17         The issue of whether the warrant was supported

4:41PM    18   by probable cause in general is certainly a legal finding that

4:42PM    19   the Court can make regardless of Detective Keller's view on

4:42PM    20   that, but that's not the issue we're talking about.  We're

4:42PM    21   talking about -- we are talking about a -- an issue of intent,

4:42PM    22   because one of the Franks issues is one of intent.  One of

4:42PM    23   those threshold questions is one of intent.

4:42PM    24         THE COURT:  Okay.  Then I'll rephrase my question.

4:42PM    25   How does your inquiry about probable cause go to scienter?

KELLER - CROSS-EXAMINATION

4:42 PM  1       **MR. CENTRONE:**  Because it goes to whether or not

4:42 PM  2   there was probable -- whether or not Detective Keller

4:42 PM  3   understood there was probable cause or not and whether that

4:42 PM  4   probable cause -- and obviously I haven't finished this line of

4:42 PM  5   questioning -- is clearly critical to the warrant application

4:42 PM  6   and, therefore, whether such recklessness or such materiality

4:43 PM  7   can be inferred under the case law.

4:43 PM  8       **THE COURT:**  I'm going to allow the question in part

4:43 PM  9   because, Ms. King, your questions that you asked on direct

4:43 PM  10  asked about whether items were intentionally or inadvertently

4:43 PM  11  omitted, and in some ways you touched upon these issues.  So

4:43 PM  12  I'm going to allow the inquiry, Mr. Centrone, but I may be

4:43 PM  13  forced to revisit this issue because I still don't see the

4:43 PM  14  connection you're drawing with probable cause.  As I understand

4:43 PM  15  it, subject to further briefing on the matter -- which the

4:43 PM  16  parties will have an opportunity to do -- those are judicial

4:43 PM  17  determinations that are made.  When I say "those," I'm

4:43 PM  18  referring to probable cause to support the warrant itself to

4:43 PM  19  the extent that's implicated here, and to the extent that once

4:43 PM  20  you exclude the challenge portions of the warrant, whether it's

4:44 PM  21  sufficient with those portions excluded, if any, to establish

4:44 PM  22  probable cause.

4:44 PM  23       Detective Keller's view of probable cause

4:44 PM  24  doesn't seem to me to be relevant to how the Court views that

4:44 PM  25  determination, but I'm going to allow you to ask the question.

**KELLER - CROSS-EXAMINATION**

4:44 PM  1            I will say though that you mentioned probable

4:44 PM  2    cause is being more probable than not.  I'd be curious to see

4:44 PM  3    authority on that.  My understanding of probable cause is it's

4:44 PM  4    less than a preponderance, and your suggestion to Mr. Keller,

4:44 PM  5    Detective Keller that it's more than that would seem not to be

4:44 PM  6    supported by the case law, but I'll wait to see what you have

4:44 PM  7    to offer on the back end.

4:44 PM  8            MR. CENTRONE:  I don't know that that will need to be

4:44 PM  9    addressed because I don't -- I agree with a large portion of

4:44 PM  10   what Your Honor is saying.  Again, we might be more on the same

4:44 PM  11   page on this than we think, but I --

4:44 PM  12           THE COURT:  Let's do this.  Why don't you proceed

4:44 PM  13   with your question, if you could kindly ask it again, and then

4:44 PM  14   we'll go from there.

4:45 PM  15           Ms. King, I understand your objection.  We'll

4:45 PM  16   keep an eye on things as we move forward.

4:45 PM  17           MR. CENTRONE:  And my recollection is I received an

4:45 PM  18   answer to my last question.

4:45 PM  19           THE COURT:  I think Mr. -- Detective Keller was in

4:45 PM  20   the process of answering.  He hadn't finished his answer, so

4:45 PM  21   why don't you ask the question again?

4:45 PM  22           MR. CENTRONE:  Sure.

4:45 PM  23   BY MR. CENTRONE:

4:45 PM  24   Q.   I believe -- I believe we left off, Detective Keller, with

4:45 PM  25   we were talking about age difficult.  We were talking about

KELLER - CROSS-EXAMINATION

4:45 PM  1    if -- and I believe your answer to one of my questions was if

4:45 PM  2    the age of a person -- if you could not determine the age of a

4:45 PM  3    person in a photo, that that person was a minor, that that to

4:45 PM  4    you would not raise -- would not raise to the level of probable

4:45 PM  5    cause of a crime being committed; is that correct?

4:45 PM  6    A.    Yes.  If it's age difficult, I don't include it in

4:46 PM  7    probable cause.  However, I don't want to exclude the

4:46 PM  8    possibility with -- if it's later determined that that child is

4:46 PM  9    identified and determined to be a minor, then it would be a

4:46 PM  10   crime.

4:46 PM  11   Q.    Fair enough.  But that would require further

4:46 PM  12   investigation, correct?

4:46 PM  13   A.    Correct.

4:46 PM  14   Q.    And whether a -- a photograph -- the participant in

4:46 PM  15   photograph is age difficult, you would think that would be a

4:46 PM  16   material fact to include in a warrant application; correct?

4:46 PM  17   A.    Sometimes.

4:46 PM  18   Q.    Well, you included it here I believe in your view of

4:46 PM  19   whether these images were age difficult in both of the

4:46 PM  20   residence warrant application and the Yahoo warrant

4:46 PM  21   application; is that correct?

4:46 PM  22   A.    Yes.

4:46 PM  23   Q.    So is it fair to say you viewed it as material to include?

4:47 PM  24   A.    Yes.

4:47 PM  25   Q.    Okay.  I'm going to turn your attention to the binder in

**KELLER - CROSS-EXAMINATION**

4:47 PM  1    front of you.  Tab B is the Defendant's copy -- Exhibit B is

4:47 PM  2    the Defendant's copy of the warrant application related to the

4:47 PM  3    residence at issue.

4:47 PM  4         Do you have that in front of you?

4:47 PM  5    A.   Yes.

4:47 PM  6    Q.   Okay.  In your warrant application to search

4:47 PM  7    Mr. Williamson's residence, you found that four of the seven

4:47 PM  8    images in your opinion were child pornography and the other

4:47 PM  9    three of the seven were either age difficult or not child

4:47 PM  10   pornography.  Is that a fair assessment?

4:47 PM  11   A.   Yes, on page 4?

4:47 PM  12   Q.   Yes, sir.

4:47 PM  13   A.   Yes, four out of the seven I determined to be child

4:47 PM  14   pornography.

4:47 PM  15   Q.   And just for the record, I'm referring to paragraphs that

4:48 PM  16   are numbered in this warrant application, specifically

4:48 PM  17   paragraph number 4 through 9.  Is that -- are we on the same

4:48 PM  18   page as that?

4:48 PM  19   A.   Yes.

4:48 PM  20   Q.   Referring to paragraph 4, the last paragraph says --

4:48 PM  21   excuse me, the last sentence in that paragraph says, "NCMEC

4:48 PM  22   categorized this image previously as child pornography."

4:48 PM  23        Based on your understanding now, do you understand

4:48 PM  24   that to not be correct?

4:48 PM  25   A.   At the time that I wrote the warrant, I did it based upon

**KELLER - CROSS-EXAMINATION**

4:48 PM   1   the CyberTip that I have.

4:48 PM   2   Q.   Are you referring, as we discussed earlier, to your

4:48 PM   3   previous understanding of the definition of "CP Unconfirmed"

4:48 PM   4   which has now been changed?

4:49 PM   5   A.   Yes.

4:49 PM   6   Q.   So is it fair to say at the time you submitted this

4:49 PM   7   warrant application, you believed that NCMEC had categorized

4:49 PM   8   this image previously as child pornography, but now it is your

4:49 PM   9   understanding that that is not the case?

4:49 PM   10  A.   Yes.

4:49 PM   11  Q.   And, again, for the record, I was discussing just now

4:49 PM   12  image labeled 4-1.gif.

4:49 PM   13         The next paragraph, paragraph 5 in the warrant

4:49 PM   14  application refers to image .125-1.jpeg.  The last sentence of

4:49 PM   15  that paragraph makes the same statement.  "NCMEC had

4:49 PM   16  categorized this image previously as child pornography."  Is it

4:49 PM   17  your understanding now that that is also not correct?

4:49 PM   18  A.   Correct.

4:49 PM   19  Q.   And then skipping to paragraph 8, image.97-1.jpeg, the

4:50 PM   20  last sentence of that paragraph includes the same statement.

4:50 PM   21  "NCMEC had categorized this image previously as child

4:50 PM   22  pornography."  Is it also your understanding now that that is

4:50 PM   23  not correct?

4:50 PM   24  A.   Yes.

4:50 PM   25  Q.   And at the time -- or prior to the warrant application

**KELLER - CROSS-EXAMINATION**

4:50 PM 1  having been made, did you do any investigation into the

4:50 PM 2  definition of "CP Unconfirmed" as used by NCMEC?

4:50 PM 3  A.   No.

4:50 PM 4  Q.   Okay.  So is it fair to say that this warrant application

4:50 PM 5  omits that NCMEC found those images that we just discussed to

4:50 PM 6  be age difficult instead of child pornography?

4:50 PM 7  A.   Can you --

4:50 PM 8  Q.   Sure.

4:50 PM 9  A.   -- clarify that?

4:50 PM 10 Q.   With respect to the images we just discussed, specifically

4:50 PM 11 identified in paragraph 4, 5, and 8 of your warrant

4:50 PM 12 application, is it fair to say that the application omits that

4:50 PM 13 NCMEC found them to be age difficult or by its classification

4:50 PM 14 CP unconfirmed?

4:51 PM 15 A.   Under the new standards, what you're talking about, yes.

4:51 PM 16 Q.   When you say new standards, do you mean your now -- your

4:51 PM 17 present understanding of that?

4:51 PM 18 A.   Correct.

4:51 PM 19 Q.   Okay.  For another three of these images -- and I'm going

4:51 PM 20 to go through them one by one -- you found that they were

4:51 PM 21 either age difficult or not child pornography; is that correct?

4:51 PM 22 A.   Correct.

4:51 PM 23 Q.   So the fourth image -- and I'm looking at paragraph 7 of

4:51 PM 24 your warrant application, which refers to image.120-1.jpeg, you

4:51 PM 25 concluded that the image is child erotica and not child sexual

**KELLER - CROSS-EXAMINATION**

4:51PM 1   abusive material; is that correct?

4:51PM 2   A.   Correct.

4:51PM 3   Q.   So, therefore, it did not lend to your determination of

4:51PM 4   whether there was probable cause for a warrant application; is

4:51PM 5   that correct?

4:51PM 6   A.   Correct.

4:51PM 7   Q.   Okay.  With respect to paragraph 9 of this warrant

4:52PM 8   application, this paragraph refers to two images in the same

4:52PM 9   paragraph, both image.5-1.jpeg and image.118.jpeg; is that

4:52PM 10  correct?

4:52PM 11  A.   Correct.

4:52PM 12  Q.   And with respect to those images, you found them to be age

4:52PM 13  difficult in your opinion; is that correct?

4:52PM 14  A.   Correct.

4:52PM 15  Q.   Meaning that they also did not contribute to your

4:52PM 16  determination of whether that was probable cause for issuance

4:52PM 17  of a warrant, correct?

4:52PM 18  A.   Correct.

4:52PM 19  Q.   Okay.  With respect to the -- give me just one moment,

4:52PM 20  please.

4:52PM 21       With respect to the image that we have not talked

4:52PM 22  about yet that's in this same page, which is identified at

4:52PM 23  paragraph 6, which is image.1-1.jpeg, that image was allegedly

4:53PM 24  uploaded to Yahoo on September 8th, 2020; is that correct?

4:53PM 25  A.   Let me just verify that through the CyberTip.  It was

184

**KELLER - CROSS-EXAMINATION**

4:53 PM    1    paragraph 6?  Image 1 -- image.1-1.jpeg?

4:53 PM    2    Q.    Yes, sir.

4:53 PM    3    A.    Yes, September 8th, 2020.

4:53 PM    4    Q.    Okay.  And in this paragraph, the last sentence says,

4:53 PM    5    "NCMEC had categorized this image previously as apparent child

4:53 PM    6    pornography;" is that correct?

4:53 PM    7    A.    Correct.

4:53 PM    8    Q.    What was your understanding at the time -- because this

4:53 PM    9    appears to be the only one of these images that has that NCMEC

4:53 PM    10   label described in it.  What was your understanding at the time

4:53 PM    11   of "apparent child pornography" versus "child pornography" as

4:54 PM    12   it's used by NCMEC and described by you in the other

4:54 PM    13   paragraphs?

4:54 PM    14   A.    My interpretation of that apparent -- switch it out with

4:54 PM    15   obviously -- child pornography, such as it's -- it's clear

4:54 PM    16   that's child pornography.

4:54 PM    17   Q.    That was your understanding at the time you made this

4:54 PM    18   warrant application?

4:54 PM    19   A.    Yes.

4:54 PM    20   Q.    How is that distinguished from the other references to

4:54 PM    21   child pornography and NCMEC's categorization as child

4:54 PM    22   pornography?

4:54 PM    23   A.    Well, I knew the CyberTip where it said unconfirmed, but I

4:54 PM    24   viewed myself as the person to confirm it by viewing and

4:54 PM    25   describing them.

**KELLER - CROSS-EXAMINATION**

4:54 PM  1  Q.   Okay.  Now I understand.  Thank you.

4:54 PM  2       At the time of the warrant application to

4:54 PM  3  Mr. Williams' residence, you had already submitted a warrant

4:54 PM  4  application and obtained a search warrant for -- from Yahoo,

4:54 PM  5  correct?

4:54 PM  6  A.   Correct.

4:54 PM  7  Q.   And you had already received the results back from Yahoo;

4:55 PM  8  is that correct?

4:55 PM  9  A.   Correct.

4:55 PM  10  Q.   Okay.  And included with the results from that warrant was

4:55 PM  11  the spreadsheet containing the dates of the log-ins; is that

4:55 PM  12  correct?

4:55 PM  13  A.   Yes.

4:55 PM  14  Q.   And in the same binder in front of you, Tab D, which is

4:55 PM  15  Defendant's Exhibit D, is that the document you're referring

4:55 PM  16  to?

4:55 PM  17  A.   Yes.

4:55 PM  18  Q.   Okay.  And I believe you testified earlier that the final

4:55 PM  19  log-in was on September 5th, 2020?

4:55 PM  20  A.   Yes.

4:55 PM  21  Q.   And is it your understanding from this list that in the

4:55 PM  22  days leading up to September 5th, there were daily log-ins from

4:55 PM  23  October -- excuse me, from August 31st through September 4th?

4:55 PM  24  A.   Yes.

4:56 PM  25  Q.   What is your understanding of Yahoo's procedures -- and

KELLER - CROSS-EXAMINATION

4:56 PM   1    let me back up a moment.

4:56 PM   2              At the time of the warrant applications here, what

4:56 PM   3    was your understanding of Yahoo's procedures for whether an

4:56 PM   4    account is logged out manually or automatically and how long an

4:56 PM   5    account would be logged in?

4:56 PM   6    A.   So my knowledge is not ESP-specific, but in general my

4:56 PM   7    training and experience with dealing with CyberTips and ICAC

4:56 PM   8    investigations is that -- I see this across multiple

4:56 PM   9    platforms -- is that sometimes people stay logged in for some

4:56 PM   10   period of time.  I don't always have answers on the why, but I

4:56 PM   11   do go off the facts that are presented to me at the time.

4:56 PM   12   Q.   What training did you receive on that?

4:56 PM   13   A.   For --

4:56 PM   14   Q.   For the topic that you just described was based on your

4:57 PM   15   training and experience.

4:57 PM   16   A.   Well, training is IP addresses in general, and then the

4:57 PM   17   experience is actually processing the cases, looking at

4:57 PM   18   results, and doing interviews with people to, like, find out,

4:57 PM   19   "Hey, you know, this is when the incident happened.  It's my

4:57 PM   20   understanding it seems like your account was deactivated.  Can

4:57 PM   21   you talk to me about that?"  And then people can -- defendants

4:57 PM   22   can talk to me about or explain that process with their account

4:57 PM   23   through their ESP, but the training I received is -- it's

4:57 PM   24   actually a couple of different trainings through -- a couple of

4:57 PM   25   different classes from Peer-to-Peer Investigations which I also

**KELLER - CROSS-EXAMINATION**

4:57 PM  1    do, and through the ICAC CyberTip Investigations, which was a

4:57 PM  2    40-hour class.  We go in detail about IPv4s and IPv6s and how

4:57 PM  3    they kind of operate.

4:57 PM  4    Q.   How is that training relevant to the issue we're

4:57 PM  5    discussing of how long an account may be logged in

4:57 PM  6    automatically before it's logged out?

4:57 PM  7    A.   So those have no bearing on the logging in or logging out.

4:58 PM  8    It's just how they operate.

4:58 PM  9    Q.   Okay.  With respect to your experience, just to clarify,

4:58 PM  10   nobody from Yahoo told you, "Hey, this is an account -- this is

4:58 PM  11   how long an account is logged in before it's automatically

4:58 PM  12   logged out;" is that correct?

4:58 PM  13   A.   Correct.

4:58 PM  14   Q.   So you had no direct information from Yahoo or some person

4:58 PM  15   teaching you about Yahoo or even other internet service

4:58 PM  16   providers about the same topic.  Is that fair to say?

4:58 PM  17   A.   Correct.

4:58 PM  18   Q.   Okay.  As part of the investigation in this case in

4:58 PM  19   particular, did you investigate how Yahoo logs out accounts?

4:58 PM  20   A.   No.

4:58 PM  21   Q.   Did you -- you received this log-in list that we just

4:58 PM  22   discussed as part of your subpoena response.  Did you ask for a

4:59 PM  23   similar list of log-outs?

4:59 PM  24   A.   No.  This was from search warrant results, not subpoena

4:59 PM  25   results.

KELLER - CROSS-EXAMINATION

4:59 PM  1    Q.   I apologize.  Correct.  Correct.

4:59 PM  2    A.   No, I -- I don't recall a case off the top of my head that

4:59 PM  3    I ever received sign-outs.

4:59 PM  4    Q.   Whether from Yahoo or any other service provider?

4:59 PM  5    A.   Correct.

4:59 PM  6    Q.   Did you ask for them here or in any other cases?

4:59 PM  7    A.   I would have to refer to evidence sought section of the

4:59 PM  8    Yahoo search warrant for that answer.

4:59 PM  9    Q.   Okay.  If you'd like, a copy is at Exhibit tab C of that

4:59 PM  10   same binder, if you'd like to refresh your memory.

5:00 PM  11   A.   So most of the time, I always ask for any and all captured

5:00 PM  12   IP addresses, so it would be anything that the ESP or ISP

5:00 PM  13   retains.  In this case it was -- I just asked for internet

5:00 PM  14   protocol or IP address, routing information, and then I do

5:00 PM  15   commas to include like sender, receiver, subject line.  I don't

5:00 PM  16   specifically even say log-in on that, but it's just in general

5:00 PM  17   IPs.  So typically in the course of business, I -- for these

5:00 PM  18   ESPs, I haven't seen log-outs, typically just log-ins.

5:00 PM  19   Q.   So you did not ask for one, correct?

5:01 PM  20   A.   Correct, not specifically.

5:01 PM  21   Q.   And you didn't receive one from Yahoo, specifically a list

5:01 PM  22   of log-outs, correct?

5:01 PM  23   A.   Correct.

5:01 PM  24        THE COURT:  Mr. Centrone, how much more do you have?

5:01 PM  25        MR. CENTRONE:  I'm -- I was just looking at my notes,

**KELLER - CROSS-EXAMINATION**

5:01PM   1   Your Honor.  I think if we could power through for maybe 10, 15

5:01PM   2   minutes, I can finish.

5:01PM   3              THE COURT:  If I could have a moment.

5:01PM   4                        (Pause.)

5:01PM   5              THE COURT:  Okay.  Mr. Centrone, on your

5:01PM   6   representation of 10 or 15 minutes.

5:01PM   7              MR. CENTRONE:  Thank you, sir.

5:01PM   8   BY MR. CENTRONE:

5:01PM   9   Q.   And the warrant application for the residence does not

5:01PM  10   discuss any logging out of that account, correct?

5:01PM  11   A.   Correct.

5:01PM  12   Q.   Okay.  And the Yahoo warrant that we just -- that you just

5:02PM  13   looked at, which is at tab C, Defendant's Exhibit C, the

5:02PM  14   probable cause in that warrant application was based on the

5:02PM  15   same images that we just discussed and went through, correct?

5:02PM  16   A.   Correct.

5:02PM  17   Q.   But this warrant does not mention NCMEC's classification

5:02PM  18   of those images.  Why is that?  And specifically I'll direct

5:02PM  19   you to page --

5:02PM  20              THE COURT:  Do you have an exhibit number or letter?

5:02PM  21              MR. CENTRONE:  Yes, Judge.  It's Defendant's

5:02PM  22   Exhibit C, numbered paragraphs 6 through 12.

5:02PM  23   BY MR. CENTRONE:

5:02PM  24   Q.   Detective Keller, do you have that page in front of you?

5:03PM  25   A.   Yeah.  I was just waiting for everyone to get there.  So I

**KELLER - CROSS-EXAMINATION**

5:03 PM  1   didn't include it on this warrant application because typically

5:03 PM  2   I don't include NCMEC's categorization in my search warrants.

5:03 PM  3   Q.   Okay.  You testified earlier, I believe, that at the time

5:03 PM  4   of these warrant applications, it was the policy to view the

5:03 PM  5   images, all images provided, and then that policy later

5:03 PM  6   changed; is that correct?

5:03 PM  7   A.   Correct.

5:03 PM  8   Q.   Okay.  When did that change occur?

5:03 PM  9   A.   It was this year.

5:03 PM  10  Q.   This year being sometime in 2022?

5:03 PM  11  A.   Correct.

5:03 PM  12  Q.   Do you remember approximately what month?

5:03 PM  13  A.   It was actually for State of Florida or for Sarasota

5:03 PM  14  County.  We were given some legal counsel two, three months

5:03 PM  15  ago.

5:03 PM  16  Q.   Okay.  And I apologize.  Where did that counsel come from?

5:04 PM  17  A.   From the State Attorney's Office.

5:04 PM  18  Q.   For --

5:04 PM  19  A.   For Sarasota County, the Twelfth Judicial Circuit in

5:04 PM  20  Florida.

5:04 PM  21  Q.   Okay.  Did you ever speak to the person at Yahoo who

5:04 PM  22  allegedly viewed the images?

5:04 PM  23  A.   No.

5:04 PM  24  Q.   Do you know when they were reviewed?

5:04 PM  25  A.   By Yahoo?

**KELLER - CROSS-EXAMINATION**

5:04 PM  1   Q.   Yeah.

5:04 PM  2   A.   The only date I'm provided is what is on the CyberTip for

5:04 PM  3   the -- between the incident date and the submission date.

5:04 PM  4   That's the only knowledge that I had.

5:04 PM  5   Q.   Did you ever speak to anyone at NCMEC regarding the

5:04 PM  6   CyberTipline report?

5:04 PM  7   A.   No.

5:04 PM  8   Q.   And by that, I mean prior to the warrant application?

5:04 PM  9   A.   Correct.  I have not.

5:05 PM  10  Q.   Did you do any independent investigation of your own of

5:05 PM  11  what was searched prior to you viewing the images, or did you

5:05 PM  12  only rely on the CyberTipline report itself?

5:05 PM  13  A.   I only relied on the CyberTipline report.

5:05 PM  14       MR. CENTRONE:  Just one moment, Judge.

5:05 PM  15       THE COURT:  Sure.

5:05 PM  16                 (Pause.)

5:05 PM  17  BY MR. CENTRONE:

5:06 PM  18  Q.   Detective Keller, the last allegedly illegal activity that

5:06 PM  19  you had knowledge about occurring occurred in September, is

5:06 PM  20  that September 5th, 2020 date; is that correct?  Or excuse me,

5:06 PM  21  September 8th, 2020 date; is that correct?

5:06 PM  22  A.   Correct.

5:06 PM  23  Q.   And you had no evidence of any -- any crime occurring

5:06 PM  24  between that September 8th date and the execution of the search

5:06 PM  25  warrant, correct?

192

KELLER - REDIRECT EXAMINATION

5:06 PM  1   A.   Correct.

5:06 PM  2            MR. CENTRONE:  Okay.  All right.  No further

5:06 PM  3   questions.

5:06 PM  4            THE COURT:  Thank you.  Any redirect, Ms. King?

5:06 PM  5                      (Pause.)

5:07 PM  6            MS. KING:  Your Honor, if I may redirect?

5:07 PM  7            THE COURT:  Sure.

5:07 PM  8                 REDIRECT EXAMINATION

5:07 PM  9                   BY MS. KING:

5:07 PM  10  Q.   Detective Keller, you submitted an affidavit in support of

5:07 PM  11  probable cause for a Yahoo search warrant?

5:07 PM  12  A.   Yes.

5:07 PM  13  Q.   And received results from that Yahoo search warrant?

5:07 PM  14  A.   Yes.

5:07 PM  15  Q.   Did you eventually go through the totality of those

5:07 PM  16  results?

5:07 PM  17  A.   Yes.

5:07 PM  18  Q.   And in what time frame were you able to get through the

5:07 PM  19  totality of those results?

5:07 PM  20  A.   I believe I received the results the end of September, but

5:07 PM  21  due to, like, remote working and trying to coordinate with my

5:08 PM  22  digital forensic lab in order to get the search warrant

5:08 PM  23  response into a forensic tool to parse out the data, I believe

5:08 PM  24  it was the 26th -- January 26th, 2020 -- or 2021, in order to

5:08 PM  25  go through those results in more detail.

KELLER - REDIRECT EXAMINATION

5:08 PM  1   Q.   And in going through those results in more detail

5:08 PM  2   throughout that entire time, were you able to review contents

5:08 PM  3   of emails?

5:08 PM  4   A.   Yes.

5:08 PM  5   Q.   And did that lead you to any conclusion of additional

5:08 PM  6   illegal activity?

5:08 PM  7   A.   Yes.

5:08 PM  8           MS. KING:  Nothing further, Your Honor.

5:08 PM  9           THE COURT:  Thank you.  Any recross, Mr. Centrone?

5:08 PM  10          MR. CENTRONE:  Just one brief moment, Your Honor.

5:08 PM  11                       (Pause.)

5:08 PM  12          MR. CENTRONE:  No recross, Your Honor.  Thank you.

5:08 PM  13          THE COURT:  Okay.  Let's talk quickly about

5:09 PM  14   scheduling.  Ms. Favorit and Ms. King --

5:09 PM  15          MR. CENTRONE:  Judge, I apologize.  I think as -- and

5:09 PM  16   I'm finished with Detective Keller if you'd like to invite him

5:09 PM  17   to step down, but I believe I need to call Mr. Williamson to

5:09 PM  18   the stand to establish standing so that that is not an issue

5:09 PM  19   for me down the road.

5:09 PM  20          THE COURT:  Is standing contested, Ms. King?

5:09 PM  21          MS. KING:  No, Your Honor.

5:09 PM  22          MR. CENTRONE:  Then never mind, if standing is not

5:09 PM  23   contested.

5:09 PM  24          THE COURT:  I'll put a fine point on closing, but I

5:09 PM  25   do want to talk about scheduling.  I notice that Ms. Harris is

5:09 PM  1   here, and sometimes these items require upper level approval.

5:09 PM  2   What is, Ms. Favorit, the time frame for ordering a transcript?

5:09 PM  3   Are you bound by budgetary concerns to order it in a regular

5:09 PM  4   time frame?  I don't know what the court reporter is capable of

5:09 PM  5   doing here, but we can inquire.

5:10 PM  6         MS. FAVORIT:  Your Honor, at my last inquiry, which

5:10 PM  7   was several weeks ago now, it was my understanding there was

5:10 PM  8   something of a 30-day turnaround maybe on a regular transcript.

5:10 PM  9   I don't know if that has to do with the length of the

5:10 PM  10  transcript or not, and now at this point I know it is pretty

5:10 PM  11  lengthy.  Apart from that, I know a rush could be two weeks,

5:10 PM  12  but I wasn't --

5:10 PM  13        THE COURT:  Yeah, the question I have for the

5:10 PM  14  Government is typically the Government pays for the transcript,

5:10 PM  15  and you can tell me what you -- you're able to afford, given

5:10 PM  16  whatever the budgetary constraints are.  Is it 30 days, or is

5:10 PM  17  it expedited?

5:10 PM  18        MS. FAVORIT:  May I have a moment, Your Honor?

5:10 PM  19        THE COURT:  That's why I asked.  Absolutely.

5:10 PM  20                    (Pause.)

5:11 PM  21        MS. FAVORIT:  Your Honor, if I may.

5:11 PM  22        THE COURT:  You may.

5:11 PM  23        MS. FAVORIT:  The preference is to not do expedited

5:11 PM  24  transcripts unless there's an impending trial date that's

5:11 PM  25  within that time frame.  It looks like right now we're set for

5:11PM  1    December, so I think unless we really needed to, we would

5:11PM  2    prefer the regular turnaround time of 30 days for the

5:11PM  3    transcript.

5:11PM  4            THE COURT:  Okay.  If I could have a moment.

5:11PM  5                        (Pause.)

5:11PM  6            THE COURT:  Okay.  That seems agreeable.  So now that

5:11PM  7    we've taken care of that housekeeping matter, I'll return to

5:11PM  8    the evidentiary portion.

5:11PM  9            Ms. King and Ms. Favorit, any additional

5:11PM  10   witnesses, evidence, or testimony?

5:11PM  11           MS. FAVORIT:  No, Your Honor.

5:11PM  12           THE COURT:  Does the Government rest?

5:12PM  13           MS. FAVORIT:  Yes, Your Honor.

5:12PM  14           THE COURT:  Okay.  Mr. Centrone, any witnesses or

5:12PM  15   evidence that you wish to put forth?

5:12PM  16           MR. CENTRONE:  No, Your Honor.

5:12PM  17           THE COURT:  Do you rest?

5:12PM  18           MR. CENTRONE:  Yes, Your Honor.

5:12PM  19           THE COURT:  All right.  Mr. Keller, thank you for

5:12PM  20   your time this afternoon, you may step down.

5:12PM  21                        (Witness excused.)

5:12PM  22           THE COURT:  So the Court will probably enter a

5:12PM  23   scheduling order.  You should talk, Ms. Favorit and Ms. King,

5:12PM  24   with the court reporter about ordering the transcript.  I'll

5:12PM  25   set a briefing scheduling likely that will be two weeks from

5:12 PM   1   the receipt of the transcript no later than 30 days from today,

5:12 PM   2   and then Mr. Centrone, two weeks to respond?

5:12 PM   3          MR. CENTRONE:  Judge, the only complication on my end

5:12 PM   4   is that I've got a two-week trial slated to go in front of

5:12 PM   5   Judge Moody that while we were sitting here actually moved from

5:12 PM   6   October 31st to November 28th.  So, in other words, I'm going

5:12 PM   7   to be -- if it's 30 days from today that we get a transcript,

5:12 PM   8   I'm going to be very, very deep in trial prep for a lengthy

5:13 PM   9   trial.

5:13 PM   10         THE COURT:  How long is the trial?

5:13 PM   11         MR. CENTRONE:  I'm sorry?

5:13 PM   12         THE COURT:  How long is the trial?

5:13 PM   13         MR. CENTRONE:  It's a 10-day trial, Your Honor.

5:13 PM   14         THE COURT:  Modest length.  We could have

5:13 PM   15   simultaneously briefs, so that would be -- 30 days out would be

5:13 PM   16   October -- or November 10th, and then briefs would be due

5:13 PM   17   November 24th.

5:13 PM   18         MR. CENTRONE:  Which I believe is actually

5:13 PM   19   Thanksgiving Day, Your Honor.

5:13 PM   20         THE COURT:  I can adjust that date, but when is your

5:13 PM   21   trial scheduled to begin?

5:13 PM   22         MR. CENTRONE:  The 28th.

5:13 PM   23         THE COURT:  Let me just -- if I could find out.

5:13 PM   24                    (Pause.)

5:14 PM   25         THE COURT:  I'll take it under advisement.

|   |   |
|---|---|
| 5:14 PM | 1 |

          **MR. CENTRONE:**  Thank you.

          **THE COURT:**  Mr. Centrone, I always try to accommodate counsel.  I know the difficulties of dealing with a lengthy trial, but these are all issues that are near and dear to your heart, as they are to Ms. Favorit and Ms. King's.  You've all amply researched these matters, so it's just a question of going through the transcript, I think, in terms of putting things together.

          **MR. CENTRONE:**  And I think that's fair, Your Honor. So --

          **THE COURT:**  So if I can set it not for a due date of Thanksgiving, but some date thereafter -- it may be done in less than 30 days, we won't know for sure, but I'd like to keep this moving, if we can.

          **MR. CENTRONE:**  Sure.  Since the trial has now moved as of today, there may be some preliminary work I can do without the benefit of a transcript that may -- that may make it very possible.

          **THE COURT:**  So let me just talk about -- and then we have to tie this up.  Ms. Favorit and Ms. King, any reason not to do simultaneous briefing?

          **MS. FAVORIT:**  No, Your Honor.

          **THE COURT:**  Okay.  Mr. Centrone?

          **MR. CENTRONE:**  I don't believe so, Your Honor.

          **THE COURT:**  Okay.  So that's probably what I'll do,

| | | |
|---|---|---|
| 5:15PM | 1 | just to get it done before your trial, Mr. Centrone, because |
| 5:15PM | 2 | otherwise we're pushing it off then into December. |
| 5:15PM | 3 | With that, anything further, Ms. Favorit or |
| 5:15PM | 4 | Ms. King? |
| 5:15PM | 5 | MS. FAVORIT:  No, Your Honor. |
| 5:15PM | 6 | THE COURT:  Thank you.  And Mr. Centrone, anything |
| 5:15PM | 7 | further? |
| 5:15PM | 8 | MR. CENTRONE:  No, Your Honor.  Thank you. |
| 5:15PM | 9 | THE COURT:  We'll be in recess. |
| 5:15PM | 10 | (End of proceedings.) |
| 5:15PM | 11 | * * * * * * * * * * * * * * * * * * * * * |
| 5:15PM | 12 | UNITED STATES DISTRICT COURT |
| 5:15PM | 13 | MIDDLE DISTRICT OF FLORIDA |
| 5:15PM | 14 | |
| 5:15PM | 15 | REPORTER TRANSCRIPT CERTIFICATE |
| 5:15PM | 16 | I, Tana J. Hess, Official Court Reporter for the United States District Court, Middle District of Florida, certify, |
| 5:15PM | 17 | pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcription of the |
| 5:15PM | 18 | stenographic notes taken by the undersigned in the above-entitled matter (Pages 1 through 198 inclusive) and that |
| 5:15PM | 19 | the transcript page format is in conformance with the regulations of the Judicial Conference of the United States of |
| 5:15PM | 20 | America. |
| 5:15PM | 21 | |
| 5:15PM | 22 | |
| 5:15PM | 23 | Tana J. Hess, CRR, RMR, FCRR
Official Court Reporter |
| 5:15PM | 24 | United States District Court
Middle District of Florida |
| 5:15PM | 25 | Tampa Division
Date:  October 31, 2022 |