```
1          IN THE UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
2                   TAMPA DIVISION

3

4    UNITED STATES OF AMERICA,      )
                                    )
5               Plaintiff,          )
                                    )
6                                   ) Case No.
          vs.                       ) 8:21-CR-00355-WFJ-CPT
7                                   )
                                    )
8    GREGORY ALLEN WILLIAMSON,      )
                                    )
9               Defendant.          )

10

11

12   _____

                        MOTION HEARING
13      BEFORE THE HONORABLE CHRISTOPHER P. TUITE
            UNITED STATES MAGISTRATE JUDGE
14
                       MAY 11, 2023
15                     10:08 A.M.
                     TAMPA, FLORIDA
16   _____

17

18

19

20

21        Proceedings transcribed via courtroom digital audio
     recording by transcriptionist using computer-aided
22   transcription.
     _____
23
               DAVID J. COLLIER, RMR, CRR
24          FEDERAL OFFICIAL COURT REPORTER
          801 NORTH FLORIDA AVENUE, 7TH FLOOR
25             TAMPA, FLORIDA  33602
```

1    **APPEARANCES:**

2

3    **FOR THE GOVERNMENT:**

4

5            *Abigail King*

6            *Erin C. Favorit*

7            United States Attorney's Office

8            400 North Tampa Street, Suite 3200

9            Tampa, Florida  33602

10           (813) 274-6000

11

12

13   **FOR THE DEFENDANT:**

14

15           *Gus M. Centrone*

16           Kynes, Markman & Felman, P.A.

17           P.O. Box 3396

18           Tampa, Florida  33601-3396

19           (813) 221-1118

20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2                    – – – o0o – – –

3          THE COURT:  Good morning, everyone.

4          Madam Clerk, if you could please call the case.

5          COURTROOM DEPUTY:  United States of America versus

6   Gregory Allen Williamson, Case Number 8:21-CR-355.

7          THE COURT:  And if I could please have the

8   appearances of counsel for the record, beginning with the

9   Government.

10          MS. FAVORIT:  Good morning, Your Honor.  Erin Favorit

11   on behalf of the United States.

12          MS. KING:  And Abigail King on behalf of the

13   United States.

14          THE COURT:  Good morning to you both.  Are you both

15   going to participate in argument here or is one of you going to

16   take the lead?

17          MS. KING:  I think I'll be taking the lead, but we

18   both may participate.

19          THE COURT:  Okay.  Thank you.

20          And for the defense?

21          MR. CENTRONE:  Good morning, Judge.  Gus Centrone for

22   Gregory Williamson, who is present with me in the courtroom.

23          THE COURT:  Good morning to you both as well.

24          The Court has before it defendant's second motion to

25   suppress found at document 134, the Government's response to
```

```
1   same found at doc 138, and then a notice of supplemental
2   authority filed by Mr. Centrone found at document 162.
3           Does that represent, Ms. King, the entirety of the
4   briefing so far?
5           MS. KING:  Yes, Your Honor, that is my understanding.
6           THE COURT:  Okay.  Mr. Centrone, would you agree?
7           MR. CENTRONE:  I do, Your Honor.
8           THE COURT:  One small housekeeping matter before
9   I get started.  I just remind the parties to keep in mind the
10  local rules.  Ms. King, it may be the case that the font here
11  is not size 13, but -- it appears to be smaller, and the
12  supplemental authority that -- notice that you filed,
13  Mr. Centrone, you may want to look at the requirements relative
14  to that, but, again, just a small housekeeping matter for
15  future reference.
16          Mr. Centrone, I'm going to begin with you.  Just as a
17  broad question, this appears to be purely a -- I'm sorry,
18  Ms. Favorit.
19          MS. FAVORIT:  I'm so sorry to interrupt, Your Honor.
20          Since we're on the record, I just wanted to make the
21  Court aware, and for the defendant's benefit, that we did
22  extend a plea agreement that upon this hearing is considered
23  rejected and will not be reoffered, so I just wanted to make
24  that very clear before we get started.
25          THE COURT:  Okay.
```

1           MS. FAVORIT:  Thank you.

2           MR. CENTRONE:  And -- and --

3           THE COURT:  Under Rule 11 the Court cannot involve

4   itself at all in plea discussions or negotiations, but,

5   Mr. Centrone, you've stood, do you wish to say something?

6           MR. CENTRONE:  And just since that's on the record,

7   Your Honor, I'll put on the record that I went over the

8   plea agreement with my client in detail and we discussed it

9   thoroughly.

10          THE COURT:  Okay.  And you've made a decision on

11  that?

12          MR. CENTRONE:  My client has decided not to accept

13  the offer at this time.

14          THE COURT:  Okay.  Again, the Court will not involve

15  itself in plea negotiations.  If there is a time when a plea is

16  sought to be entered, like we do in all cases, I'll leave it to

17  the parties to so notify the Court.

18          Mr. Centrone, I had begun to articulate that this

19  appears to be a strictly legal issue, but I want to make sure

20  that I understand your position accurately.  Do you believe

21  this motion requires an evidentiary hearing of any kind?

22          MR. CENTRONE:  May I approach the podium, Your Honor?

23          THE COURT:  Sure.  I take it the answer will be a bit

24  more lengthy.

25          MR. CENTRONE:  No, I -- no, Your Honor.  The answer

1    to the question is no, I do not anticipate an evidentiary

2    hearing is necessary for this.  I approached in case Your Honor

3    had additional questions that I could be prepared for.

4              THE COURT:  Okay.  Well, if you'll just give me a

5    moment.

6              Ms. King, do you agree that this is strictly a legal

7    issue that can be resolved on the record before the Court?

8              MS. KING:  Yes, Your Honor.

9              THE COURT:  Okay.  And then, Mr. Centrone, returning

10   to you, I'm familiar with these cases.  Magistrate judges, as

11   you know, routinely are called upon to review warrants similar

12   to the ones at issue here, so these issues, even before your

13   motion was filed, is something that I think all judges in my

14   position are fairly familiar with.

15             What do you say to the Government's argument that

16   this case is more like *Alford* than it is like *Blake*?

17             MR. CENTRONE:  I disagree, Your Honor.  One of the

18   key differences between this case and the *Alford* case is the

19   language of what is requested in the warrant itself, and,

20   Judge, the *Alford* case doesn't go into the facts very much at

21   all, so we don't quite know the complete circumstances, but in

22   that case the warrant is requesting a broad swath of types of

23   data --

24             THE COURT:  When you say "that case," you're

25   referring to *Blake* or *Alford*?

1          MR. CENTRONE:  *Alford*.

2          THE COURT:  Okay.

3          MR. CENTRONE:  The *Alford* case, the warrant is

4     requesting a broad range of items of data, as in this case, but

5     the key difference, Judge, is in that case the warrant language

6     explicitly ties those items to, quote -- to, quote, items

7     which, quote, may aid in obtaining the identification and/or

8     location of the individual who contacted K-mart in Hamilton,

9     Montana via phone call to various phone numbers on

10    September 16th, 2014 at approximately 2145 hours.

11          That limitation, that type of limitation, saying

12    please give us a lot of types of data but limited to this

13    issue, what happened at this time on this day at this place, is

14    the key distinction.  There's nothing like that in the warrant

15    here that's --

16          THE COURT:  What do you say to the argument though

17    that one of the issues with respect to the Yahoo e-mail account

18    is to whom it belonged, so that obtaining information from

19    creation until -- the period in November I believe was the end

20    date at least in part specified, but irrespective of the end

21    date, information obtained from the creation of the account

22    through even the present would assist in identifying to whom

23    the account belonged or was used by?

24          MR. CENTRONE:  I would say that saying "from creation

25    of the account to present," or in this case it's shortly before

1    the warrant was issued, is the same as no limitation at all.

2         THE COURT:  But are you aware that at creation,

3    for example, if you were to establish a Yahoo account, you

4    would have to provide certain personally identifying

5    information to establish the account?

6         MR. CENTRONE:  There is no requirement that that

7    information be correct and accurate.

8         THE COURT:  But it's -- it's a probable cause

9    standard though, so it's -- it's not that it is definitively

10   true, the question is would the information relative to the

11   establishment of the account, let's say, a companion e-mail

12   account, a recovery account, as it's sometimes called, or a

13   date of birth or a name, which could be accurate or could be a

14   nickname or it could be some other identifying -- and if

15   there's an IP address associated with the account at that

16   moment or a physical address or anything like that, is there

17   probable cause to believe that that information that's provided

18   at the creation of the account, probable cause, lead to

19   information that would link an individual with the account?

20        MR. CENTRONE:  Interestingly, Your Honor, in the

21   warrant application Detective Keller goes through the various

22   categories of items to be searched and seized and provides a

23   rationale for his requests, and, you know, we can get into it

24   later, but I believe those rationales are insufficient.  He

25   does not do that for the item requesting account creation

1    information.  There is no -- there is no statement in the
2    warrant's application saying I believe this information, I have
3    probable cause for these reason to ask for this information,
4    and, Your Honor, I'm referring to the exhibit to my motion and
5    it's starting on page 5 of the warrant.
6             THE COURT:  Here's what the warrant says on page --
7    I'll use the docket entry, 134-1, page 6.
8             Yahoo, otherwise known as Oath Holdings, Inc.,
9    maintains information about their customers, including primary
10   e-mail addresses, secondary e-mail addresses for account
11   password recovery, applications, websites, and services that
12   are allowed to access the user's Yahoo account or use the
13   user's Yahoo account as a password login, and account login
14   activity.
15            So the very items to which I referred.
16            MR. CENTRONE:  Um-hum.  And it doesn't explain this
17   is what I want that information for, and lower in that
18   paragraph --
19            THE COURT:  Well, isn't it evident from the warrant
20   that part of the reason for the warrant is to affiliate or
21   associate the Yahoo e-mail account with an individual?
22            MR. CENTRONE:  I'm not certain of that, Your Honor.
23   By this point in the investigation the detective had the
24   IP address that was used allegedly for the images that were
25   uploaded in the NCMEC report and had already found the address

1    associated with that IP account, with that IP address.

2            THE COURT:  Let's assume for the moment that there's

3    an address affiliated with the account.  Is it the argument of

4    the defense that at that point law enforcement can't seek to

5    corroborate that information or confirm that information

6    through soliciting information from Yahoo?  In other words, if

7    law enforcement receives a piece of information, are they then

8    precluded from seeking a warrant to corroborate or confirm a

9    piece of information?

10           MR. CENTRONE:  No, I don't believe they are

11   precluded, but that's nowhere in this warrant application.

12           THE COURT:  What is not in this application?

13           MR. CENTRONE:  That I am asking for this information

14   to corroborate the information that I already have.  In fact,

15   Your Honor, if you look on page --

16           THE COURT:  But it says, I know that Yahoo, in the

17   next paragraph, may not verify the true identity of an account

18   creator, account user or any other person who accesses a user's

19   account using login credentials.  These are all issues of

20   identity.  For these reasons it's necessary to examine

21   particularly unique identifying information that can be used to

22   attribute the account data to a certain user.

23           MR. CENTRONE:  Um-hum.

24           THE COURT:  Doesn't that address the very topic to

25   which we're now referring?

```
 1              MR. CENTRONE:  At best indirectly.
 2              THE COURT:  This is often -- it goes on to read --
 3    accomplished by analyzing associated account data, usage, and
 4    activity through communication, connected devices, locations,
 5    associates, and other accounts.
 6              Isn't that information on its face directed toward
 7    linking the Yahoo account to a particular individual or, in its
 8    words, a certain user?
 9              MR. CENTRONE:  Judge, all I have to go on is what's
10    in the warrant application.  I don't think that's an
11    unreasonable interpretation.
12              THE COURT:  You don't think it's an unreasonable --
13    it's a double negative, so --
14              MR. CENTRONE:  I'm sorry.  Your Honor's
15    interpretation may be reasonable, but with respect to all of
16    the other items, he says, this is what I am looking for it for,
17    but not the topic we're discussing, not the -- not the user
18    creation.  He explains, if Your Honor continues on to the
19    subsequent pages, the itemized items beginning with calendar,
20    there's a statement in each of those items that says, I believe
21    this information is pertinent because, you know, fill in the
22    blanks.  He does not do that with the user creation info that
23    we're discussing, so we're left to speculate whether
24    Your Honor's interpretation is correct or whether this is
25    boilerplate that he includes in every search warrant.
```

1           THE COURT:  Well, there may be boilerplate in every

2    search warrant, but the reason that it's boilerplate is because

3    it applies, so -- I understand the argument.

4           Let me just have you pause and go to Ms. King or

5    Ms. Favorit.  I suspect it's Ms. King.  You have the pole

6    position, if you will, Ms. King, sitting on the -- or sitting

7    in the chair closest to defense counsel.  That's typically the

8    person who is going to take the lead, so -- it does help if you

9    come to the lecturn.  We've been notified that when

10   stenographers are trying to prepare a transcript they sometimes

11   have trouble with the mics that are at the table.  I think

12   that's in large part if not entirely because the speaker is

13   more distant from the microphone, and the lecturn resolves that

14   issue.

15          MS. KING:  May I approach, Your Honor?

16          THE COURT:  Please.

17          What do you say to this argument that Mr. Centrone

18   has advanced that the Court's comments are all well and good,

19   where is it in the warrant?

20          MS. KING:  Your Honor, if I may just grab the

21   warrant.

22          THE COURT:  Absolutely.

23          MS. KING:  Your Honor, it's the Government's position

24   that the Court's questioning of defense does bring to light the

25   totality of the circumstances that are involved in reviewing a

1   warrant for probable cause.  In this warrant for the Yahoo

2   account there is specific factual basis described that lead the

3   Judge reviewing the warrant to understand the probable cause

4   and determine the probable cause behind why that warrant is

5   required.

6            Defense goes on to argue that it's not specific as to

7   why they need the information of the primary e-mail addresses,

8   secondary e-mail addresses, different attribution of that

9   account, but the Government posits that that's very clear as it

10  goes through what -- the probable cause listed in the factual

11  basis of this warrant, and the warrant is to be taken as a

12  whole.

13           THE COURT:  Where would the Court find that?  In

14  other words, you -- when you say it's clear by a review of the

15  warrant, can you identify aspects of the warrant that would

16  lead to that conclusion?

17           MS. KING:  Yes, Your Honor.  So at the beginning of

18  the warrant, on page 1, we do have that they -- the user

19  account identified by user name is vladlover50@yahoo.com.

20           THE COURT:  Where are you reading, just for the

21  record?  I've got 134-1.

22           MS. KING:  Looks like I'm looking at 138-2, but I can

23  try to pull 134-1 as well.

24           THE COURT:  It looks to be on the first page of the

25  application, where -- The Description of the User Account, in

1    all caps, or Accounts.

2            MS. KING:  Yes, Your Honor.

3            THE COURT:  Is that the area to which you're

4    referring?  Okay.

5            MS. KING:  Yes, Your Honor.

6            And so in doing so it draws the attention to that

7    specific account.  There is no other identifying information

8    provided by the affiant to show that he knows who this account

9    belongs to.

10           As it goes into the facts stated in support, it looks

11   like bullet point number 4 shows the probable cause that there

12   is a NCMEC cyber tip in which vladlover50@yahoo.com uploaded

13   apparent child pornography on September 8th, 2020, and then

14   also lists additional dates in which apparent child pornography

15   was also uploaded by that Yahoo account.  It indicates that the

16   Yahoo user account was disabled and the account was preserved.

17           As the probable cause factual basis goes on, it

18   indicates further in paragraph 14 that the -- well, in

19   paragraph 13 it indicates that there is an address associated

20   with the subscriber for the Comcast IP address, and then at

21   paragraph 14 it indicates -- the affiant indicates that

22   probable cause exists for that user account.  So all of the

23   then subsequent -- what the affiant is seeking goes to that

24   probable cause of that specific user account.

25           THE COURT:  Okay.  Mr. Centrone.

1        Thank you, Ms. King.

2        Just to complete the argument on this particular

3   point on identification and *Alford*, what do you say to

4   Ms. King's argument that the use of the reported user,

5   for example, as opposed to specifically identifying a person,

6   and that the lack of any identification of a specific person as

7   the user of the account, just from a point of common sense

8   here, reveals that it's not known, or at a minimum needs to be

9   corroborated or confirmed?

10       MR. CENTRONE:  Um, it's -- it's possible, Your Honor.

11  Again, I don't think that's an unreasonable interpretation,

12  I think it's a reasonable interpretation, but regardless we're

13  all speculating about that, we're all inferring from other --

14  from other parts of the warrant where --

15       THE COURT:  The difference between speculating, which

16  is a term typically used as guessing, as opposed to

17  inferring -- inferring, as you know, for example,

18  inferentially -- circumstantial evidence by I think the

19  Eleventh Circuit Pattern Jury Instructions is considered the

20  same as direct evidence, it can be by a jury, so --

21       MR. CENTRONE:  Um-hum.

22       THE COURT:  The common example of somebody comes into

23  the courthouse with an umbrella and the umbrella is dripping

24  and they're wet all over, one -- it can be inferred -- we're

25  not speculating.

```
1              MR. CENTRONE:  Right.

2              THE COURT:  It could be inferred that it's raining

3     outside and a jury could so find.

4              MR. CENTRONE:  Sure.  It can also be inferred when

5     someone gives an itemized list of items and says, this is my

6     rationale for seeking these items, and excludes one of --

7     excludes the subject we're talking about, that they're not

8     providing a rationale for that search.  I suppose --

9              THE COURT:  Let's assume for the --

10             MR. CENTRONE:  -- inferences are reasonable, but

11    I also think that even if the Government's interpretation is

12    correct with respect to the issue of the subscriber

13    information, the information related to the creation of the

14    account, that doesn't bless the rest of the warrant as not

15    being overbroad, and the Government hasn't argued that certain

16    portions are severable and others are not.  That argument is

17    not before the Court.

18             THE COURT:  It is before the Court in a way, because

19    in Irving it's something that's -- the supplemental notice --

20    and I was going to bring it up --

21             MR. CENTRONE:  Yeah.

22             THE COURT:  -- so let's -- let's deal with that.

23    I was going to ask for supplemental briefing on severability.

24             MR. CENTRONE:  And I believe, Your Honor, in Irving

25    the Court dropped a footnote.
```

```
 1              THE COURT:  It's footnote 41.

 2              MR. CENTRONE:  Right.  That the parties don't discuss

 3    it, I'm not ruling on it, and they throw out the whole warrant.

 4              THE COURT:  But I'm bringing it up as to whether it

 5    applies here.

 6              MR. CENTRONE:  And, Your Honor, I spent mere minutes

 7    researching that topic, so -- so if Your Honor wants

 8    supplemental briefing for a more complete answer, I think that

 9    would be appropriate here.

10              THE COURT:  I mean, there -- and I don't know who

11    bears the burden here.  It could be some preliminary research

12    suggests that -- or may suggest that the defense's lack of

13    bringing up, you know, what portions of the report or the

14    seized evidence fall within the overbreadth area may inure to

15    the detriment of the defendant, so if the defense wants to make

16    the argument that severability is off the table, I can't tell

17    you at this point, Mr. Centrone, if that is not -- even if the

18    Court were to accept that, if that would not inure to the

19    detriment of your client.  I just don't know the answer to that

20    question.  I'm aware of the doctrine.

21              MR. CENTRONE:  Yeah.  Likewise, Your Honor, I don't

22    know the answer to that question either.

23              THE COURT:  How much time would it take you to

24    provide supplemental briefing on severability and the extent to

25    which it applies?
```

1          MR. CENTRONE:  Seven -- seven days?

2          THE COURT:  I was thinking something like that.

3          Ms. King, I know that -- let me -- if I could have

4    you return.

5          MR. CENTRONE:  Yes.

6          THE COURT:  I appreciate you coming to the lectern.

7          Ms. King, how much time would you need to provide

8    supplemental briefing on severability?  And then the question

9    would be if you both submit things at the same time, you don't

10   get a chance -- I know there's a lot of briefing in this case,

11   it's been a very interesting case with a lot of fairly -- not

12   novel, but certainly issues that are at the fore of more of the

13   recent precedent that's been coming out.

14         MS. KING:  Your Honor, if the Court were to require

15   supplemental briefing the Government would be seeking 14 days.

16   Myself and Ms. Favorit are both out of the office sporadically

17   next week, so we would be seeking an additional week in order

18   to be able to dedicate the proper time to that briefing.

19         THE COURT:  Well, I don't know that the Court would

20   require it.  It would provide the parties an opportunity to

21   brief the issue.  So it seems -- it's mentioned in *Irving,* it's

22   something which, as I mentioned, the Court is aware of, and

23   I -- as we sit here right now, I don't know how this issue

24   plays out, and I would be looking at it anyway.

25         MS. KING:  Yes.

```
 1          THE COURT:  You've seen before when Judge Jung asked

 2   for supplemental briefing previously on some issues, so this is

 3   one of those types of things, and I would like to avoid having

 4   Judge Jung have to seek supplemental briefing when we could

 5   perhaps address it here.

 6          MS. KING:  And the Government would absolutely want

 7   to participate in that supplemental briefing.

 8          THE COURT:  Okay.  So 14 days.  Mr. Centrone, that

 9   doesn't seem to be too great, and I don't want to -- if

10   Ms. Favorit or Ms. King for whatever reason are out of the

11   office, it doesn't seem too much additional time and you may

12   both find it to be favorable.

13          What do the parties say about just having the parties

14   mutually submit, as often is the case with the findings of fact

15   and conclusions of law, on the same date?  Any objection to

16   doing it that way?  You're not going to have -- Mr. Centrone,

17   since you're looking to stand up first here, you wouldn't have

18   the benefit of the Government's view of things and nor would

19   they have yours, but --

20          MR. CENTRONE:  Is Your Honor considering,

21   for instance, stipulated facts, like --

22          THE COURT:  No, just briefing on the issue.  And I'm

23   thinking out loud here, quite frankly, that if the Court were

24   to see a need for further briefing or argument on it, it could

25   just have the parties come in, so why don't we just have a
```

1    joint sub -- not a joint submission, both parties file their

2    respective submissions --

3              MR. CENTRONE:  Yes, sir.

4              THE COURT:  -- 14 days out.

5         Ms. King, I see you're nodding your head in approval.

6    I take it that that is your assention to that approach?

7              MS. KING:  Yes, Your Honor.

8              THE COURT:  Okay.  I was going to have a discussion

9    about severability, but I -- in court here, but it makes sense

10   to -- given the way things have evolved, for that to be

11   briefed.

12             Mr. Centrone, I'll return to you.  We were talking

13   about *Alford*.  I have *Alford* in front of me.  It asked -- it

14   warranted in that case for any and all records, files, data and

15   other forms of information, including, which -- from which one

16   can infer that it's not limited, names, users names, dates of

17   birth, IP addresses, home addresses, phone numbers, e-mail

18   addresses, photos, videos, e-mail content, search history, call

19   history, or other information which is not specified held by

20   Google.

21             Now, it does link it to an individual who or whom

22   contacted K-mart on a specific date, but what do you say to the

23   argument that a similarly wide array of data, I believe is your

24   characterization, or swath I think is the word that you used,

25   is here linked to a specific Yahoo e-mail account?  In other

1  words, there's a -- it's tied to something, the identity of who

2  is the individual responsible or to whom the child pornography

3  can be attributed.

4       MR. CENTRONE:  Well, I think a key distinction,

5  Your Honor, is that by including the limitation at the end of

6  that paragraph, tying it to a specific instance, a specific

7  time, a specific place, effectively what they're doing is

8  telling in that case Google, in the *Alford* case it's Google,

9  saying you conduct a search and give us what you think is

10 relevant to this limitation, versus here where law enforcement

11 is saying give us absolutely everything in this account and

12 we'll sort out what's important and what's not.  I think that's

13 a key distinction.

14      Yahoo and Google, all these big companies have

15 divisions that respond to subpoenas, respond to search

16 warrants, and they provide guidelines for doing it.  By tying

17 it to the specific date, the company responsible for producing

18 the information can say, for instance, okay, I don't --

19 you know, there is no search data on that date related to a

20 phone call to K-mart, there is -- so I'm not going to produce

21 anything, there are no photos related to that day and a phone

22 call at K-mart, I'm not going to produce anything.

23      Here it's the opposite, it is give us absolutely

24 everything, give us every single e-mail, give us every single

25 internet search, give us every single photo, give us every

1   single GPS location, all those things --

2          THE COURT:  What do you say to the argument that all

3   of those -- assume for the moment that -- and, again, it's just

4   a hypothetical.  Assume for the moment that the warrant is

5   soliciting identifying information to link the Yahoo e-mail

6   account with an individual.  Assume for the moment it's validly

7   doing so.  Why wouldn't the wide swath, as you characterize it,

8   of information, to include the information that you just

9   identified, why would that not go to that purpose?

10         And just keep in mind that in *Alford* it's virtually,

11  if not -- or appears so, it's virtually unlimited.  In other

12  words, there's a whole bunch of categories, but then it says

13  "or other information," all of which presumably go to

14  identifying or linking the individual tied --

15         MR. CENTRONE:  If I understand Your Honor

16  correctly --

17         THE COURT:  -- to that account?

18         MR. CENTRONE:  -- what that's saying is, effectively,

19  okay, if somebody sends an e-mail and puts a name at the bottom

20  of that e-mail, that is identifying information, therefore it

21  is relevant.  I think that's opening a door to a whole lot of

22  Constitutional problem by saying, okay, somebody -- any word in

23  an e-mail could be identifying, therefore we get to see every

24  e-mail from the beginning of time.  I think under *Coolidge,*

25  for instance, that would not pass the test of being as limited

 1   as possible to what is necessary for the search.  I think

 2   that's an unconstitutionally broad interpretation of what is

 3   identifying information, especially given the fact that there

 4   is nothing inherently reliable about any of this information.

 5   There's nothing inherently reliable about the subscriber

 6   information.  You can put whatever you want when you sign up.

 7   There's nothing inherently reliable about signing your name in

 8   an e-mail.  You can write whatever you want.  Otherwise it

 9   opens the door to saying, give me everything and I will get to

10   interpret what is right and what is not, with -- without the

11   probable cause to support that broad of a search.

12              THE COURT:  Okay.  If I could talk to Ms. King.

13              MR. CENTRONE:  Yes, Your Honor.

14              THE COURT:  Ms. King, I've posited an argument with

15   Mr. Centrone about why a wide swath of information couldn't be

16   sought under the theory that it's identifying.  What would

17   cabin that?  In other words, if one could look at a Yahoo

18   e-mail account and ask for the entirety of the account and say,

19   well, I want to look at it because it could be identifying or

20   it could link an individual to that account, wouldn't that be a

21   situation where it essentially just swallows the

22   Fourth Amendment whole, at least the particularity requirement?

23              MS. KING:  I think the missing portion of that is the

24   probable cause that connects the search to what is being sought

25   after.  It's not any random person on a street who has an

1   e-mail account that the Government is able to just search

2   everything for.  In this we have a specific Federal crime that

3   was committed, and as such the agent then sought the

4   identifying information that, as the Court has already noted,

5   is usually created and put into the account at the creation

6   date to identify that person, whether it be a recovery e-mail

7   or a name or a phone number.

8           THE COURT:  Where is that though?  I don't want to

9   lose -- have you lose your train of thought, but where is that

10  in the warrant?

11          MS. KING:  Um --

12          THE COURT:  In other words, where is it specified

13  that that occurs at the inception of an account?  How would one

14  know that, from the warrant?

15          MS. KING:  I'm looking at the document 134-1, page 6,

16  in which it discusses the background on Oath Holdings,

17  Incorporated, and it does indicate in this that there is unique

18  identifying information that can be used to attribute the

19  account data to a certain user, this is often accomplished by

20  analyzing associated account data, usage, and activity through

21  communication, connected devices, locations, associates, and

22  other accounts.

23          THE COURT:  Where in the warrant does it specify that

24  that's provided at the creation of the account?

25          MS. KING:  For these reasons it may be necessary to

1  search and analyze data from when the Yahoo account was

2  initially created to most current activity.

3          So I don't know that it necessarily specifically

4  states that that information is input at the creation of the

5  account, but I do believe that is more of a common sense

6  understanding in today's day and age of account creations and

7  how that does work.

8          THE COURT:  How does the Court draw a dividing line

9  between what you've just described, in other words something

10 that's in the public domain sufficiently so that judges should

11 be assumed to be aware of it and it doesn't need to be

12 specified in the warrant, from those items that should be

13 specified in the warrant?

14         MS. KING:  I think it would be a case-by-case basis,

15 Your Honor.  I don't know that the Government is in a position

16 to give a response that would be --

17         THE COURT:  Well, pertinent to this warrant, what

18 would be in the public domain?  You've already articulated what

19 you believe to be one thing, which is that at the creation of

20 account you have to provide information to create the account,

21 the Government's argument, as I understand it, that that is now

22 sufficiently part of the public domain.  There's an ancillary

23 argument to which you've alluded, which is it's inferred from

24 the affidavit because they talk about that information and link

25 it to the creation of the account, but just to the broader

1   question, besides the -- let me give you another question, and

2   I'm going to ask the same one of Mr. Centrone.

3           To what extent does it have to specify that browsing

4   history could contain relevant -- or there's probable cause to

5   believe could contain evidence relevant to child pornography?

6   Does that need to be specified by the affiant in a CP warrant?

7           MS. KING:  Um --

8           THE COURT:  It's not in this --

9           MS. KING:  Yeah.

10          THE COURT:  In this particular warrant.

11          MS. KING:  I'm of the opinion that it doesn't have to

12  be, but --

13          THE COURT:  Why?  What would be the argument?

14          MS. KING:  It is the user, that there is probable

15  cause to believe that that user has used that account for

16  illegal activity, and thus in doing so, if they're submitting

17  in this case known NCMEC images, they're getting that image

18  from somewhere, so that image would likely be pulled from the

19  internet.  The browsing history thus would be relevant to that.

20          THE COURT:  Okay.  If I could just have Mr. Centrone

21  come to the argument -- I appreciate the attorneys' willingness

22  to trade places at the podium.

23          So, Mr. Centrone, the same argument.

24          MR. CENTRONE:  Yes.

25          THE COURT:  There was a time when telephones first

1   were invented and the first pen register or something that may

2   have been utilized and the technology had to be explained about

3   what is a telephone and how does it work.  We're long past that

4   timeframe.  Maybe the same is true of other items.  But as

5   judges look at warrants more and more, things like IP addresses

6   arguably become part of the public domain, maybe they don't,

7   but what do you say to that argument, for example, with respect

8   to browsing history and this particular crime, which is child

9   pornography?

10          MR. CENTRONE:  I would say, Judge, at this point in

11  the investigation, when this warrant was submitted, what

12  law enforcement had was the NCMEC report saying there were --

13  you know, alleging that there were pornographic images attached

14  to e-mails.  They don't have to be from a Google search on the

15  internet, they can be handed off by flash drive, and at this

16  point law enforcement had no idea where these images came from.

17          THE COURT:  But let me just play devil's advocate,

18  so -- in the interest somewhat of time, but also getting to the

19  area of the Court's concern.

20          So the information that law enforcement had at the

21  time was that the Yahoo e-mail account appeared to be connected

22  to child pornographic images.  Let's assume for the moment

23  that's the hypothetical that's being posed, that that's true.

24  Would browsing history, asking to obtain the browsing history

25  from that Yahoo e-mail account, would it be necessary, putting

```
1   aside what the best practice might be, but would it be

2   necessary for an affiant to say somebody who has engaged in

3   child pornography would utilize the internet, browse the

4   internet to look for related content?

5           MR. CENTRONE:  I think at bare minimum it would have

6   to say that.  I think the best practice would be to say "and in

7   this case I have information that that is what occurred here."

8   Now --

9           THE COURT:  You've seen many warrants where --

10  I'm sure, they're sometimes called pedigree paragraphs, which

11  will say, for example, back in the day, that those who are

12  engaged in drug trafficking commonly utilize weapons to protect

13  and enforce their trade.  In fact, there's Circuit law to that

14  effect.  In other words, it's so commonplace now that it's

15  recognized in some Circuit opinions.  So if -- an affiant who

16  was submitting a warrant for a house for a drug trafficker,

17  would they need to include that in a paragraph, called the

18  pedigree paragraph often, that says, I know based on training

19  and experience that traffickers of narcotics, which is a

20  dangerous trade, often will employ weapons to enforce or

21  protect the trade?

22          MR. CENTRONE:  I think that would be a better

23  practice, but to the extent it's --

24          THE COURT:  That's why I phrased the question as

25  is it compelled in order to sustain the warrant.
```

1            Let's say you were to seize the -- putting aside

2    plain view, you could find --

3            MR. CENTRONE:  Right.

4            THE COURT:  -- arguably -- back in the day I was told

5    this by judges who crossed out such things, that while you --

6    in looking for a particle of cocaine, a weapon would be found

7    in plain view, so it's a moot point, but putting that aside.

8            MR. CENTRONE:  Right.  And I think the -- I think the

9    analogy that Your Honor is making is -- and please correct me

10   if I'm wrong, is is that the same thing, warrants are --

11   weapons are so common in the drug trade that therefore it

12   doesn't -- you know, doesn't need to be explained.

13           THE COURT:  Or sufficiently common.  I would qualify

14   it.  I don't want to overstate it, but it's a tool of the drug

15   trade.  There's probable cause reflected in even case law

16   that -- and probably cause is less than a preponderance.

17           MR. CENTRONE:  Sure.

18           THE COURT:  Would you agree?

19           MR. CENTRONE:  Do I agree that probable cause is less

20   than a preponderance of the evidence?  For the purpose of what

21   we're discussing, yeah, I think that's --

22           THE COURT:  Okay.  So --

23           MR. CENTRONE:  I think that's correct.

24           THE COURT:  -- there's probable cause to believe, in

25   my hypothetical, that weapons are affiliated with the drug

 1    trade.

 2            MR. CENTRONE:  Um-hum.

 3            THE COURT:  And if that's in the public domain,

 4    reflected in case law, does an affiant need to state it?

 5            MR. CENTRONE:  And so to apply to this case, is

 6    searching images on the internet the equivalent of weapons in

 7    the drug trade, and --

 8            THE COURT:  To child pornographers.  Specific to this

 9    crime.

10            MR. CENTRONE:  Correct.

11            THE COURT:  It's not -- you know, other crimes might

12    be different, but --

13            MR. CENTRONE:  Has that been sufficiently established

14    to be, you know, common knowledge?  I don't think so,

15    Your Honor.

16            THE COURT:  But when you say you don't think so,

17    doesn't that -- we'll get to *Leon* in a second, but to the

18    extent there's any ambiguity about the matter, doesn't that --

19    moving ahead a little bit, doesn't that bear on good faith?

20            MR. CENTRONE:  Well, that brings us to the other

21    issue.

22            THE COURT:  Let me just have you stay with the first

23    one, but if you'll just answer that one in brief and then you

24    can return to it.

25            MR. CENTRONE:  Let me reiterate the Court's question

1  to make sure I understand it.

2          So you're asking does it need to be set forth in a

3  warrant application that distributors or consumers of child

4  pornography use internet searches to find that pornography?

5  Is that so commonly established that --

6          THE COURT:  I've phrased it differently.  Is there

7  probable cause to believe that -- is it sufficiently known that

8  there's probable cause to at least believe that?

9          MR. CENTRONE:  Without -- without putting it in a

10  warrant, no, Your Honor, I don't think I could agree with that.

11  I think the difference is that everybody knows drug dealers

12  carry guns.  It's in every movie anybody has ever seen.  I

13  don't think child pornography has the same kind -- you know,

14  particularly the methods of how child pornography is obtained

15  has the same kind of common knowledge.  So, in other words,

16  I don't think the correct analogy is weapons and the drug

17  trade.  I think the correct analogy is how drugs are made in

18  the drug trade, how is it obtained, how is it -- how is it

19  distributed.  It's not -- I don't -- I don't think the analogy

20  stands, Your Honor, because of that, and I don't think --

21          THE COURT:  Why did the *Alford* -- let me just change

22  gears for a moment.  I appreciate your argument.

23          Why did *Alford* allow browsing history when it was

24  purely about identification, and how is that construed here?

25  I understand it's tied to something individually in *Alford*,

1    that's the argument you've made.

2              MR. CENTRONE:  A couple points on that.

3              When they say in the warrant request in *Alford*,

4    "any and all records" and later "other information," that's

5    effectively negating everything in between, which includes

6    search history, and again, it's putting it on the producer of

7    the information, the person responding to this search warrant,

8    in this case Google in *Alford*, you tell us what will help us

9    identify --

10             THE COURT:  When you say -- the "you" refers --

11             MR. CENTRONE:  I'm sorry.  Google tell

12   law enforcement what will identify these people, and -- and

13   the -- and the difference is that Google may say, okay, I've

14   looked at the search history, nothing identifies that person

15   related to this phone call at this -- on this date at this time

16   to this place, there is nothing, so I am not going to produce

17   anything, versus I want to see every search in this person's

18   account from the beginning of time, without limitation.

19   That's -- that's -- and therefore you pro -- you, Google,

20   produce to me, law enforcement, absolutely everything.

21   That's -- that's the kind of general rummaging that the case

22   law warns against.  That is in no way as limited as possible to

23   obtain the necessary information.  Especially in a case like

24   this, where there is no basis to conclude -- at this point,

25   when this warrant was issued, there was no basis to conclude

1    that search -- search history involved -- was involved in this

2    case at all.

3            THE COURT:  Going to *Blake* -- and I'm thinking about

4    it because I'm looking again at *Alford*.  As I read *Blake*, and

5    I'm curious, Mr. Centrone, as to whether you agree, did it

6    reach the issue in *Blake* as to whether the Facebook warrants

7    were unconstitutionally overbroad?

8            MR. CENTRONE:  I think it's fair to say they punt on

9    that.  Other cases that have interpreted *Blake* have concluded

10   that they did not reach the issue because they found good faith

11   applied.  I think that other cases that have looked at breadth

12   of a search warrant and found it overbroad but nonetheless

13   found good faith applied have -- have effectively said,

14   I believe this warrant is overbroad but good faith applies, and

15   in *Alford* -- excuse me, in *Blake* they don't do that, but --

16           THE COURT:  Would you agree with me that the

17   summary -- and it's an unpublished decision, so I mean this in

18   no disrespect to the author, but in *Alford,* in addressing

19   *Blake*, it says, we concluded warrants requiring Facebook to

20   disclose virtually every kind of data that could be found in a

21   social media account were unconstitutional.

22           Does that appear to maybe take *Blake* a little further

23   than it actually went?  Because I read it as saying, as you

24   have articulated, it expressed concerns --

25           MR. CENTRONE:  Yeah.

1    THE COURT:  -- but it, in the end, as you said,

2  punted on the issue or didn't address it.

3    Would you agree that that's a fairer reading of *Blake*

4  and what's articulated here in *Alford*?

5    MR. CENTRONE:  I do, Your Honor, but I think a key

6  difference is that the *Blake* decision goes much more into

7  detail about the law on these issues and gets much further down

8  the road in the analysis than *Alford* does, it's a much more

9  detailed opinion, and I think there's enough there for a

10  reasonable person to conclude that, at minimum, if the Eleventh

11  Circuit did rule on that issue, they would have found the

12  warrant in *Blake*, the Facebook warrant, to be overbroad.

13    THE COURT:  Are you speculating or inferring?

14    MR. CENTRONE:  I'm inferring in this instance,

15  Your Honor.

16    THE COURT:  I appreciate, Mr. Centrone, that -- you

17  humoring me there.

18    Okay.  Thank you, Mr. Centrone.

19    MR. CENTRONE:  Thank you, Your Honor.

20    THE COURT:  Ms. King, same questions really.

21    We talked about browsing history and to what extent

22  it's in the public domain that somebody who has engaged in

23  child pornography -- I'm using browsing history as one example

24  from the warrant, putting aside the extent to which browsing

25  history could be revealing of identification -- the identity,

 1   rather, of the Yahoo user.  What do you say to the general

 2   proposition about the connection between a child pornographer

 3   and browsing history and other such things?

 4            MS. KING:  I think in the Court's reference of the

 5   typical pedigree paragraph that is included in these child

 6   pornography warrants, obviously the warrant that we are looking

 7   at in this case in Doc 134-1 is a State-level search warrant,

 8   but what we typically see in the Federal search warrants

 9   is that common notion of browsing history is directly connected

10   to the online activity of child pornography viewers,

11   distributors, receivers, producers.  That is where they are

12   getting their content.  It is a -- just because it is usually

13   mentioned in the warrant doesn't mean that a warrant becomes

14   facially insufficient if it is not mentioned, and the

15   individual -- while there aren't movies like there are on

16   drug dealers about child pornography, any individual that is

17   signing warrants, dealing with child pornography on a daily or

18   weekly or monthly basis, has knowledge of the realm of child

19   pornography, knows that these individuals are utilizing

20   internet searches and internet chats.

21            THE COURT:  Let me just have you pause for a moment.

22            What do you say then to the argument that -- in the

23   case law that says a judge's review of a warrant is restricted

24   or confined to the four corners of the warrant?  And there are

25   plenty of cases that say that.

1          MS. KING:  I think it is still sufficient in this

2    warrant to support the probable cause of the use of the Yahoo

3    account.

4          THE COURT:  So then the question would be why.

5          So what I hear your argument -- there are two

6    arguments.  One is -- and you've articulated one of them.  One

7    is that judges routinely see this and then therefore they're

8    aware.  That's one argument.  The other argument which I was

9    posing to Mr. Centrone is at what point does certain behavior

10   or certain technology become part of the public domain such

11   that it doesn't, like a telephone back in the day or a linkage

12   between weapons and drug trafficking, have to be specifically

13   articulated in a warrant?

14         MS. KING:  I think that this is very well-established

15   within the public domain, and the agent does touch on it on

16   page 8 where he does indicate that the search history would

17   reveal information relevant to this ongoing criminal

18   investigation by revealing what information the suspect sought

19   and when he sought it, thereby alluding to the fact that, as we

20   all know, as is a common understanding of these crimes and in

21   the public domain, that the internet is used to obtain these

22   images and videos.

23         THE COURT:  Okay.  Thank you, Ms. King.

24         Mr. Centrone, let's move along to *Leon,* good faith.

25         Beginning with the probable cause issue -- so you had

1  relied on what we'll call prongs 3 and 4 of the *Leon* good faith

2  analysis, those being exceptions, the third exception being the

3  affidavit is so lacking in indicia of probable cause as to

4  render official belief in its existence entirely unreasonable,

5  so the -- at the time that you drafted your motion, your second

6  motion to suppress, you didn't have the benefit of Judge Jung's

7  ruling on the report and recommendation.  You now have that.

8  What is your view as to whether the argument about the third

9  exception is mooted by that ruling, or the law of the case

10  anyway?

11         MR. CENTRONE:  I believe that's correct, Your Honor,

12  that it is mooted, and that the argument against applying the

13  good faith exception is centered on the fourth prong, which is

14  what the *Mercery* Court and the *Irving* Court held for the

15  good faith exception not to apply, that --

16         THE COURT:  So just keep in mind the standard there,

17  and I'll just emphasize some of the language.

18         So, in effect, I don't have a quote here, but the

19  gist of the fourth exception is the warrant has to be so

20  facially deficient that the executing officer could not

21  reasonably have assumed it was valid.  So there are a couple of

22  descriptors in there.  One, the warrant must not simply be

23  facially deficient, it has to be so facially deficient that an

24  executing officer could not reasonably have assumed it was

25  valid.  That seems to be a fairly meaningful and robust

1   threshold.

2        MR. CENTRONE:  I would agree, Your Honor, but like

3   the *Mercery* court, I think it's un -- objectively unreasonable

4   to say in a warrant, give me absolutely everything pertaining

5   to this account, especially in this instance where the probable

6   cause is not there for several of these items, if not almost

7   all of the items.  It is objectively unreasonable to rely on

8   that and believe that that is valid, and like the *Mercery* court

9   found, *Blake* is the law of the land in this -- in this state,

10  it applies to the -- to the officer here and the search warrant

11  here.  Either that means something or it doesn't.  By --

12       THE COURT:  Yeah.  *Alford* is post-*Blake*.

13       MR. CENTRONE:  Al --

14       THE COURT:  An unpublished decision.

15       MR. CENTRONE:  Yeah, and --

16       THE COURT:  Post-*Blake*.

17       MR. CENTRONE:  And *Alford*, again, is a -- they call

18  *Alford* a -- you know, kind of in between the Facebook and the

19  Microsoft warrants in *Blake* in the *Alford* case.  I don't see

20  any issue with the *Alford* warrant because of the limitations it

21  imposed, and because it effectively shifted the duty to

22  determine what is -- what is responsive to this search to the

23  person producing the information, the person who has the

24  information.

25       THE COURT:  So when you say this -- you had mentioned

1    this earlier.  So when you say that you draw a distinction

2    between when a warrant, as it did in this case, asks an ESP

3    turn over everything in the account and then the executing

4    officer looks through that account using a set of criteria, a

5    set of categories of information, you draw a distinction

6    between that and the Google warrant in *Alford*?

7            MR. CENTRONE:  Yes, a couple distinctions.  One,

8    again, by including that limiting information, the person

9    producing the information, in that case Google, can say this is

10   what's relevant, this answers your question to the best of our

11   knowledge, this is what we have on this phone call at this date

12   on this place at this time, versus the other part of that,

13   law enforcement doing it, and Your Honor suggested a set of

14   criteria that they would look for --

15           THE COURT:  Well, let me just -- because I'm just

16   focusing in on the fact that in *Alford* it appears that Google

17   made the determination --

18           MR. CENTRONE:  Right.

19           THE COURT:  -- in terms of applying -- we'll call

20   them the criteria.  I know you think the criteria overbroad, so

21   I don't want to focus on that for the moment, just the fact

22   that Google is a one-step process, that Google just does the

23   screening itself.  In this instance the executing officer is

24   tasked with doing the screening because he attests in his

25   affidavit that Yahoo won't do that, that they're not going --

```
 1    as a business practice, they decline to be the screener.
 2                MR. CENTRONE:  Well --
 3                THE COURT:  And so do you -- are you arguing that the
 4    two-step process is Constitutionally infirm?
 5                MR. CENTRONE:  I would argue a couple things,
 6    Your Honor.  We saw at the last evidentiary hearing on the
 7    first motion to suppress Yahoo has a manual for how to comply
 8    with law enforcement when it comes to subpoenas and search
 9    warrants, so I don't think that's factually accurate, that
10    Yahoo won't screen.
11                THE COURT:  I asked before if you had an
12    evidentiary -- I don't recall that even -- this two-step issue
13    being raised anywhere in your -- in your submission, so when
14    you mentioned it -- or contesting that there was a -- even at
15    the earlier hearing where you brought up in a Franks challenge
16    inaccurate information, I don't recall seeing that in your
17    findings of fact and conclusions of law, so --
18                MR. CENTRONE:  Right.
19                THE COURT:  I don't know if it's too late to do that
20    now, but I just want to make sure I understand your argument,
21    that -- as to whether it's true or not true.  I didn't realize
22    that that was something that's in dispute.  I just was focusing
23    on, in theory, a two-step process as articulated by Keller
24    versus a one-step process as apparently was the case in Alford.
25                MR. CENTRONE:  And -- and -- and I don't -- I don't
```

```
 1   think there are facts in dispute.  I -- going by the language
 2   of the warrant in Alford versus the language of the warrant
 3   here, it's not a matter of screening, it's -- it's explicitly
 4   what they're asking for.
 5              THE COURT:  Okay.  So just pause for a moment.
 6   I take it from that that you're not challenging the fact that
 7   there's a two-step process as opposed to a one-step process,
 8   you're focusing on simply the overbreadth of the criteria
 9   that's used by Keller to screen out the information supplied to
10   him by Yahoo?
11              MR. CENTRONE:  I think that -- I think we're on the
12   same page about that, yes.  Yes, Your Honor.
13              THE COURT:  So, just to be clear, because we're
14   always making a record and I want to make sure that
15   I understand your position, you're not challenging the two-step
16   process in and of itself?
17              MR. CENTRONE:  I don't think a two-step process is
18   inherently unconstitutional, if that is what you're asking, and
19   that's not part of my --
20              THE COURT:  I'm asking are you challenging the
21   two-step process alone.  When I say that, I'm isolating just to
22   that, putting aside the overbreadth -- alleged overbreadth of
23   the criteria.
24              MR. CENTRONE:  That issue alone, no.
25              THE COURT:  Okay.
```

```
 1              MR. CENTRONE:  And --

 2         THE COURT:  It's just the overbreadth of the criteria

 3    used by Keller to screen out the information he got from Yahoo.

 4    Do I understand it correctly?

 5              MR. CENTRONE:  I think that's right, Your Honor, but

 6    I would also point out that according to the warrant

 7    application there is no screening, they are -- unlike --

 8    unlike, for instance, the warrant in Blake, which did have a

 9    limitation of this will apply to the instruments and fruits and

10    instrumentalities of the crime and that is what will be seized

11    from the search when law enforcement goes through the

12    information in Blake from Facebook, here it's worse and it's

13    closer to the Mercery case because there is no limitation, the

14    warrant explicitly says they are going to seize everything,

15    everything is part of the -- everything that is given as part

16    of the search will also be seized, it is coextensive, and I can

17    point Your Honor to the several paragraphs in the warrant where

18    that's explicit.

19              THE COURT:  If you would.

20              MR. CENTRONE:  Sure.  So on -- I believe it would

21    be -- and I -- docket 134-1, page 8, there is a paragraph

22    heading Records To Be Searched and/or Seized.

23              THE COURT:  I'm looking at it now.

24              MR. CENTRONE:  Okay.  Your affiant wishes to search,

25    seize, and analyze the data described below, et cetera,
```

1  et cetera, and that's -- that's the information that's

2  requested in the warrant.

3          On the next page, the Wherefore paragraph towards the

4  bottom, quote, and to seize any and all of the aforesaid

5  property found by such search warrant.

6          And then in the warrant itself, so this would be

7  134-1, page 12, at the -- at the very top, it's the paragraph

8  that's carried over from the prior page, that the -- Yahoo is

9  commanded to produce the information, "said Yahoo

10 (Oath Holdings, Inc.) account described above, and diligently

11 search said account and seize as evidence any of the

12 following," and it's everything, and then at the bottom of that

13 page, "You are further directed to bring the property so seized

14 before a court."  The -- again, unlike *Blake*, which had a

15 limitation that such information --

16         THE COURT:  But isn't the evidence to be seized here

17 on page 12, as you mentioned --

18         MR. CENTRONE:  Um-hum.

19         THE COURT:  -- any of the following?

20         MR. CENTRONE:  I'm sorry, and then followed by the

21 bullet point categories?

22         THE COURT:  Correct.

23         MR. CENTRONE:  Yes, which are overbroad.

24         THE COURT:  I understand that's -- it goes back to --

25 I've referred to them as criteria.  We can refer to them as

1   categories.

2          So the argument that I hear, if you -- if one is to

3   distill it down to its core, is that the categories listed --

4   and this is how I understood your warrant in the first place --

5   are overbroad.

6          MR. CENTRONE:  Yes, for various reasons, and one of

7   those reasons is that, unlike in *Blake*, which, as we discussed,

8   would have -- I believe would have been found to be overbroad

9   had the Eleventh Circuit made such a ruling, unlike that case

10  it's -- it's closer to the *Mercery* case, because in the *Blake*

11  case what is to be seized as pursuant to the search is the

12  instrumentalities of the crime, and that is not the case in

13  this case.

14         THE COURT:  Doesn't --

15         MR. CENTRONE:  The search is coextensive with the

16  seizure.

17         THE COURT:  Doesn't the *Blake* case draw a distinction

18  in the Facebook account, when it talks about the breadth of the

19  search, as to the fact that the required disclosures of

20  virtually every kind of data that can be found in a social

21  media account were unnecessary, and a component of that was

22  that here they knew to whom the Facebook account belonged,

23  unlike with the Yahoo account?

24         In other words, if you look at *Blake*, the quote is:

25  The Facebook warrant or warrants are another matter.  They

1  required disclosure to the Government of virtually every kind

2  of data that could be found in a social media account -- and it

3  references a page cite -- and unnecessarily so.

4          And in the instance of the Facebook account, they

5  make specific note, do they not, that law enforcement knew that

6  the account was associated with a particular individual, and it

7  writes, I believe it's on page 966:  Finally, the FBI also

8  applied for and received two almost identical search warrants

9  for Moore's Facebook account.  Because the account was

10  associated with the S.B. e-mail address and Moore's phone

11  number, the FBI knew it belonged to her.

12          MR. CENTRONE:  I think if Your Honor --

13          THE COURT:  Doesn't it distinguish *Blake* from *Alford*

14  and to this case where the identification or the association of

15  the account was not known?

16          MR. CENTRONE:  No, Your Honor.  I think if Your Honor

17  looks at page 974 of the opinion, they say the Facebook

18  warrants, quote, required disclosure to the Government of

19  virtually every kind of data that could be found in a social

20  media account, and unnecessarily so.  And then the next

21  sentence is:  With respect to private instant messages,

22  for example, the warrants could have limited the request to

23  messages sent or from persons suspected at that time of being

24  prostitutes or customers.

25          Here, in this case, the -- law enforcement had the

1  specific dates and specific message IDs of specific Yahoo

2  e-mails.  That's -- that's the analogy here, is that the *Blake*

3  court would have found that they could have limited the search

4  to those e-mails, gotten those e-mails, gotten more

5  information, and then done a further -- further investigation

6  based on --

7  　　　　THE COURT:  But unlike in *Blake*, they didn't know the

8  identifier or the person to whom the Yahoo account was

9  associated, or --

10  　　　　MR. CENTRONE:  They had --

11  　　　　THE COURT:  -- with whom.

12  　　　　MR. CENTRONE:  I don't know that that's true, because

13  at that time they had the IP address from -- that was

14  associated with the -- with the e-mails in the NCMEC report,

15  they had the residential address and who lived at that address.

16  　　　　THE COURT:  They had a female.  I think it was

17  Sara Barnes.

18  　　　　MR. CENTRONE:  I think that's a typo, maybe carried

19  over from a prior -- there's no Sara Barnes that I know of

20  that's associated with this case.

21  　　　　THE COURT:  Okay.  So --

22  　　　　MR. CENTRONE:  But in the discovery it says they had

23  the subscriber information and had -- and had --

24  　　　　THE COURT:  But I go back to my original question,

25  sir, not original, but a question of some time ago, which is:

1  Isn't the point of the investigation to tie the Yahoo e-mail

2  account to an individual, in the form of beyond a reasonable

3  doubt proof, which requires an identification of the individual

4  and sufficient corroborating information to convince a jury

5  beyond a reasonable doubt?

6           MR. CENTRONE:  Within Constitutional guidelines.

7           THE COURT:  No, I understand that, but then when you

8  use the -- when the Eleventh Circuit uses the phrase "and

9  unnecessarily so," here -- are you -- is it stipulated that --

10 for example, that your client is the user of the Yahoo e-mail

11 account?

12          MR. CENTRONE:  No.

13          THE COURT:  I didn't think so.  And so I suspect it's

14 something that if this case proceeds to trial, which it appears

15 that it will, the Government will have to prove that beyond a

16 reasonable doubt.

17          Wouldn't the Yahoo e-mail account data, to include

18 creation of the account and potentially personally identifying

19 information -- won't that be zealously fought by the defense,

20 that it's not your client's account?  Isn't that information

21 relevant, in other words, or at least probable cause to believe

22 it's relevant?

23          MR. CENTRONE:  Um, I think that brings us back to a

24 couple issues, including --

25          THE COURT:  Well, just if you could help me out --

1            MR. CENTRONE:  Yeah.

2            THE COURT:  -- what is the answer to that question?

3            MR. CENTRONE:  Is the --

4            THE COURT:  Is the information of who is using this

5    account, isn't there probable cause to believe that's relevant?

6            MR. CENTRONE:  Yes.  I don't think that's the end of

7    the discussion, however.

8            THE COURT:  Okay.

9            MR. CENTRONE:  I think that that brings us back to

10   issues of severability, as we've discussed we're going to --

11   we're going to brief further, because we're focused on this one

12   aspect of the warrant, which is --

13           THE COURT:  But, to be clear, you intimated that it

14   hadn't been raised, and now I sense that it's something that

15   you wish very much to pursue.

16           MR. CENTRONE:  If -- if Your Honor plans to rule

17   against me, sure.

18           THE COURT:  I'm not intending to -- intimating one

19   way or the other which way the Court is going to rule, but the

20   reason of argument is to simply address difficult issues, so

21   I hope you -- both sides appreciate that, because these are

22   issues with which the Court has to tangle.

23           MR. CENTRONE:  Of course.  Of course, and they are

24   difficult issues and they are nuanced issues, and, yes, the

25   user of -- or at least who purports to be the user of an e-mail

1    account or the associated subscriber data could definitely be

2    relevant.  The issue that I think we have to grapple with is a

3    couple things.  One, as we discussed, severability, but also

4    overbreadth.  And, again, the lack of -- as we've already

5    discussed in some detail, the lack of probable cause or the

6    need to, at best, infer probable cause from the warrant when

7    it's not explicitly saying "I am seeking this information in

8    order to determine who owns this Yahoo account," that the rest

9    has to be inferred.

10        THE COURT:  Let me -- before I have the Government

11   come up, you had mentioned, I believe, it may have been *Alford*,

12   *Blake*, or both, that it was important that the warrant

13   identified or linked the information to be seized to a

14   particular offense.  Do I recall that correctly?

15        MR. CENTRONE:  I believe that's more -- I believe

16   that's an argument the Government raised in its response.

17   I don't -- I think there has to be probable cause as to a

18   specific offense.  I don't think there's anything controversial

19   about that.  I think the holdings in *Blake* and its -- and its

20   progeny that we have discussed is more along the lines of how

21   does the probable cause that's set forth in the warrant relate

22   to what is being asked for in the warrant.  In other words,

23   for instance, as we've discussed, at the time of the warrant

24   there was no indication of internet searches, and the probable

25   cause in the warrant for the internet search history is

 1   basically, let's see, I believe a review of the suspect's
 2   search history would reveal information relevant to the ongoing
 3   criminal investigation by revealing what information the
 4   suspect sought and when he sought it, is saying I want the
 5   search history because it will tell me the search history.
 6   I don't think that's a particularly meaningful basis for it,
 7   and there's, again --
 8            THE COURT:  And to what extent is that cabined though
 9   by the intro to the records to be searched and/or seized?  Your
10   affiant wishes to search, seize, and analyze the data described
11   below, being stored at Yahoo, for any instruments, articles,
12   and/or things which are contraband, or used in the commission
13   of, or may constitute evidence of a specific offense,
14   possession of child pornography?
15            MR. CENTRONE:  And, I'm sorry, are we -- are we
16   turning to the issue of the --
17            THE COURT:  No, you're reading the information the
18   suspect sought and when he sought it.  Isn't that cabined by --
19   that it's tied to possession of child pornography?
20            MR. CENTRONE:  I -- I think -- I think it's in -- at
21   least inferred that what they're -- everything they're
22   requesting is tied to child pornography.  The question is is
23   there probable cause to believe that searching for this item,
24   in this case we're discussing search history, is there any
25   reason to believe it was involved.  The same way with calendar

1    entries that they seek, there was no problem -- there was no

2    information that anything related to this case involved

3    calendar entries.

4             THE COURT:  Getting ahead on the severability

5    analysis, is there calendar data that you seek to suppress?

6             MR. CENTRONE:  I -- I am not -- standing here right

7    now, I am not aware of calendar data that is pertinent -- that

8    would be introduced as evidence at trial, but to the extent

9    there is any, I would argue it does need to be suppressed.

10            THE COURT:  Okay.  All right.

11            MR. CENTRONE:  But, again, the point being it's not

12   what -- it's not necessarily what specific crime and statute is

13   being violated as what is the probable cause that supports

14   asking for this item, and here it's lacking, there is -- there

15   is -- and to the extent the rest of it is overbroad based on --

16   again, you know, you can -- you could say, okay, this case

17   involved e-mails, which it did, but then saying, okay, now

18   I want to see every e-mail from this account ever, then we get

19   into overbroad, even though the probable cause may be there to

20   say this case involved e-mails, therefore I want to look at

21   e-mails, then we get to, okay, well, what e-mails, what is --

22   what is as limited as possible, under the language of *Coolidge,*

23   to meet that requirement, the Constitutional requirement of the

24   Fourth Amendment.

25            THE COURT:  Okay.  Thank you.

1          Ms. King?  Ms. King, we talked about a number of

2     issues, I'm happy to hear from you on any one of them, but I'm

3     curious as to your thoughts on *Leon.*

4          MS. KING:  One thing --

5          THE COURT:  If you want to bring that microphone just

6     slightly down.

7          MS. KING:  Yes.  Down to my height.

8          One thing that I did first want to put on the record

9     is in document 134-1 it was discussed -- the two-step process,

10    not contesting the two-step process, but on page 5 is the

11    language that I think was being potentially alluded to but not

12    explicitly stated on the record, at the bottom of page 5, where

13    it indicates that, quote:  Because the out-of-state electronic

14    communication service or remote computing service provider has

15    no reasonable means to distinguish evidence of the crimes from

16    any other records contained within the sought-after account,

17    your Affiant seeks to compel the service provider to seize a

18    copy of all records pertaining to the account and provide the

19    entirety of the records to your Affiant.  Once your affiant has

20    obtained those records, your Affiant and/or other

21    representatives from his or her agency shall conduct an actual

22    search of the items obtained from the out-of-state electronic

23    communications service or remote computing service provider in

24    order to sort the evidence of the violations articulated above

25    and specifically sought herein, which may be intermingled with

1    innocent or innocuous documents or records.

2         So that is specifically and explicitly stated within

3    the four corners of the document of the search warrant.

4         Additionally, the Government did, I believe, touch on

5    this in our response; however, I think an extremely important

6    distinguishing factual basis factor between our case here and

7    the *Blake* and *Mercery* cases as it relates to overbreadth and

8    what is being sought by the warrants is that in *Blake* and

9    *Mercery* both of those cases were post-arrest, and I think that

10   that is an extremely important distinguishing factor.

11        The law enforcement agencies at that point -- the

12   individuals have already been charged.  There was a date range

13   already associated with those crimes, and specific crimes had

14   already been charged.  It was past the investigative point

15   within those cases.  So the -- as it relates, in the review of

16   probable cause, to the search warrants in those cases, there

17   are issues that arise because of the knowledge that

18   law enforcement had at that time post-arrest, post being

19   charged, of the dates of offense of the crime itself.

20        Here we have a pre-arrest investigative portion of

21   the crime where law enforcement knows a crime has been

22   committed, they have received a NCMEC cyber tip, and they are

23   pursuing investigative leads as to that NCMEC cyber type, so

24   I think that that is a very important distinguishing factor.

25   As you look at the probable cause in this search warrant to

1    this investigation, the probable cause listed in the search

2    warrants in *Blake* and *Mercery* don't necessarily fully connect

3    to the crimes that were in front of that law enforcement at

4    that time, and I do believe that that is part of the

5    distinction there and why overbreadth may have been addressed

6    there.

7            THE COURT:  Okay.  And then on *Leon*?  Unless you have

8    anything else that you wish to point out.

9            MS. KING:  No, not as it relates to that.

10           And then *Leon,* I think there has been no evidence

11   presented that this warrant is so facially deficient that it

12   wouldn't be reasonable to presume it valid.  I just don't

13   believe that we've reached that point.  I don't believe that

14   the case law supports that contention.

15           As -- the Court had an evidentiary hearing, the -- we

16   were able to get into the mind of the detective who was

17   executing the search warrant, and I don't believe that there

18   was anything in his head that would have -- the document does

19   not read facially deficient, nor does it read so facially

20   deficient that he -- the executing officer could not presume it

21   valid.  I don't believe that there's been any evidence of that

22   within the four corners of the warrant document.

23           THE COURT:  What do you say as to the analysis or the

24   framework that the Court should use?  Both *Alford* and *Blake*

25   talk about the issue there being a close question, or a close

1  enough question.  How do you square that with the fourth

2  exception which talks about a warrant being so fatally

3  deficient?  It seems to me that it's on the other end of the

4  spectrum from something that is a close question.  Not on the

5  other end of the spectrum, but removed from.

6          MS. KING:  I may not be fully understanding the

7  Court's question, but --

8          THE COURT:  Not surprised, because I'm thinking how

9  poorly I articulated that.

10          So the terminology is that a -- in sum and substance,

11  without having it directly in front of me, fourth exception is

12  the warrant was so fatally deficient that a reasonable officer

13  could not have thought it to be valid, as opposed to a warrant

14  is -- presented a close question as to what it was valid --

15  whether it was valid or not and therefore *Leon* applies.

16          MS. KING:  I mean, I think --

17          THE COURT:  Those two formulations appear to me to be

18  different.

19          MS. KING:  Yes, I would agree with that.

20          THE COURT:  So how do you square this language in

21  *Alford* and in *Blake* with the formulation of a warrant having to

22  be so fatally deficient as opposed to this phraseology that

23  it's a close question?

24          Stated more simply, do you think the standard is that

25  it has to be a close question or so fatally deficient, if you

1  believe those two things to be distinct?

2          MS. KING:  I think it has to be so facially deficient

3  as evidenced and detailed in the *Leon* case, *United States*

4  *versus Leon,* 104 Supreme Court 3405, from 1984.  I think that

5  that is the standard across the board when viewing if the

6  good faith exception applies and that is what the Court should

7  be reviewing in determining whether that good faith exception

8  applies.

9          THE COURT:  Okay.  Thank you, Ms. King.

10         Mr. Centrone, I'll give you a moment to weigh in on

11  that.

12         So there's phrasing that the Court uses in *Blake*

13  as -- I believe it's to the effect of something being close

14  enough, and in *Alford* there's language to the effect of whether

15  the warrant should have been further limited in scope is a

16  close question, and then concluding the warrant was not so

17  obviously flawed that the agent could not have reasonably

18  believed it to be valid.

19         I think these can -- *Blake* and *Alford* can be read

20  consistent with the *Leon* language.  I just -- in re-reviewing

21  these cases I noticed this language about something being a

22  close question.  I don't understand the Eleventh Circuit to be

23  reformulating *Leon*, do you?

24         MR. CENTRONE:  No.  I would say that that's -- that

25  the close question language is probably dicta, Your Honor.

1    And with respect to --

2            THE COURT:  I take it that -- let me just have you

3    pause for a moment -- one could read it as it is a close

4    question and therefore it can't be so obviously defective.

5    That's essentially the gist, for example, in *Alford*, that if

6    something --

7            MR. CENTRONE:  I see it could be read that way,

8    Your Honor.  Again, I think that's probably dicta and not

9    setting a standard, and I would -- I would point out a couple

10   things.

11           Again, as we've discussed, what the *Mercery* Court

12   held on the good faith issue, on the *Leon* issue, is that

13   basically this is the law under *Blake* and the officer should

14   have known that, he should have known you can't submit a

15   blanket warrant for everything in anybody's account all the

16   time.  If we don't hold law enforcement to that standard, it's

17   meaningless, effectively all an officer has to do is do it

18   anyway and say, well, I didn't know and, okay, *Blake*, and,

19   all right, it's overbroad but it's good faith.  It's not

20   setting any standard at all.  It's meaningless.

21           The *Irving* case makes a point that the off -- as

22   here, the officer who executed the search is the same one who

23   prepared the affidavit for the search.  Again, that's what

24   happened here.  And he didn't limit the search in the proper

25   Constitutional way, and that was a factor in determining that

1    the good faith exception did not apply.

2            THE COURT:  By the way, just a quick note in *Irving*.

3    If you look at footnote 41, this goes back to our original

4    discussion, the Court mentions the parties do not discuss

5    severability of the warrant but it does not appear applicable

6    in the case.  So, in other words --

7            MR. CENTRONE:  Yeah, I noticed that too --

8            THE COURT:  I'm trying to --

9            MR. CENTRONE:  -- Your Honor, and --

10           THE COURT:  -- be clear here that the Court in

11   entertaining severability, or whatever moniker this doctrine

12   goes by -- quite frankly, I haven't looked at it closely enough

13   to know whether severability is the way it's characterized here

14   in the Eleventh Circuit, to the extent it applies or not, but

15   in *Irving* the Court found it not to be applicable, or not

16   apparently to be applicable, in any event, irrespective of

17   whether it was raised, which would explain its easy readiness

18   to not go further on the issue.

19           MR. CENTRONE:  Right.  And why it found it

20   inapplicable, I -- I don't know, and --

21           THE COURT:  I agree with you, we would be

22   speculating.

23           MR. CENTRONE:  Yeah, I can't tell you if it's

24   applicable here or not.  I guess we'll find out when we do some

25   further briefing.

1          I would like to address a few of the other points --

2          THE COURT:  Sure.

3          MR. CENTRONE:  -- the Government made.

4          With respect to the language in the warrant

5     application about Yahoo not being able to distinguish and

6     therefore will do the searches, well, they're not limiting

7     their searches to give them an ability to distinguish.  I don't

8     think that that's a get out of jail free card on that issue.

9     The warrant says give us everything, it doesn't say limit it to

10    these things, therefore they don't have an opportunity --

11         THE COURT:  Just to be clear -- I want to make sure

12    for the record that it's -- the Court's understanding is

13    correct, which is you're not challenging the two-step process.

14         MR. CENTRONE:  Correct.

15         THE COURT:  I think what Ms. King was pointing out,

16    if I understand her point, is that the second step in this case

17    involved an application of the categories or criteria to what

18    was received from Yahoo, which is where you're arguing there is

19    an infirmity because the categories are overbroad.  Do

20    I understand that correctly?

21         MR. CENTRONE:  I believe so, Your Honor.  I would --

22         THE COURT:  You say, "I believe".  Belief could be

23    construed by others as being wishy-washy.

24         MR. CENTRONE:  Us lawyers always being wishy-washy.

25         THE COURT:  Well, I want to make clear for the

```
 1    record, because if you're challenging the two-step process,
 2    then that's different than what I understand.  I haven't seen
 3    you raise it in the motion, and if you're seeking to raise it
 4    then we should address it.
 5             MR. CENTRONE:  I am not challenging the two-step
 6    process.
 7             THE COURT:  Okay.
 8             MR. CENTRONE:  I am saying before there is even a
 9    process to execute, the warrant was flawed due to its
10    overbreadth, based on the issues I've raised.
11             THE COURT:  Okay.
12             MR. CENTRONE:  And by -- and I did not understand the
13    Government's argument the way Your Honor did.  I understood the
14    Government's argument to be, effectively, well, we have this
15    language and -- you know, that says you can't distinguish it,
16    but there's no -- there's effectively -- my rebuttal, there's
17    no basis for that, and --
18             THE COURT:  When you say "for that," to what are you
19    referring?
20             MR. CENTRONE:  For Yahoo's inability to distinguish
21    what is relevant in the search.
22             THE COURT:  But by Keller applying his own criteria?
23             MR. CENTRONE:  If he did.  I don't -- I don't know if
24    he did or not, but yes.
25             THE COURT:  Okay.
```

1          MR. CENTRONE:  From my understanding, because I've --
2    I've viewed the evidence in the North Port Police Department,
3    obviously it contains sensitive information, so it wasn't
4    produced to me, I went and watched it, and my recollection
5    standing here today, they asked both Detective Keller and
6    another detective, whose name I'm forgetting, when I looked at
7    the Yahoo response whether that was everything Yahoo gave in
8    response to the search warrant and they answered in the
9    affirmative.
10         THE COURT:  The Court can't address that issue, so if
11   there's some difference of opinion there, it hasn't been
12   brought to the Court's attention.  And the only reason I say
13   that, Mr. Centrone, is I just want to make clear that I don't
14   know the merits of what you're arguing there as it relates to
15   what's been disclosed or not disclosed, so I don't want it to
16   be --
17         MR. CENTRONE:  Sure.
18         THE COURT:  -- interpreted that by not saying what
19   I'm saying that the Court has somehow either ruled on that or
20   affirmed it in any respect.
21         MR. CENTRONE:  Of course, and I didn't interpret any
22   of Your Honor's comments in that way.  I was pointing out that
23   it's been discussed today that Detective Keller may or may not
24   have applied some criteria to what was returned from Yahoo and
25   I don't know that to be the case.  I don't have any information

1   that that is what happened.

2        THE COURT:  Going back to what I asked at the outset,

3   that -- I didn't hear there to be any factual disputes here,

4   I'm just making -- every time there is something raised of this

5   type, are you changing your tact there or are you standing by

6   what you've maintained throughout so far anyway, that this is

7   purely a legal issue to be decided by the Court?

8        MR. CENTRONE:  That's correct, Your Honor.

9   I think --

10       THE COURT:  That it's purely a legal issue?

11       MR. CENTRONE:  That it is purely a legal issue, we do

12  not need an evidentiary hearing, that what we are looking at is

13  the four corners of the warrant and the application as it

14  applies, as the law applies to that document.

15       THE COURT:  Okay.

16       MR. CENTRONE:  With respect to the Government's

17  argument that it was a distinction in *Blake* and its progeny

18  that we've discussed today that was -- that it was -- those

19  cases were post-arrest, none of those courts mention anything

20  about that.  I don't think that's accurate.  I think if it was

21  an important distinction, they would have used it in their

22  analysis to reach a conclusion that we are deciding this case

23  because of these factors.  Instead, what they do --

24       THE COURT:  Well, it uses the phrasing, as

25  I mentioned, "unnecessarily so," and I think there's some

discussion in these cases about the fact that they're

fact-specific, and it may be in *Blake*, about -- I can't

remember the exact language, but whether something practically

falls within -- where the investigation is and at the moment.

That may be an extremely poor articulation, I'll have to go

back and look at it again in response to your comments, but --

          MR. CENTRONE:  Well, in the analysis portion of

*Blake*, where they're looking at -- where they say -- you know,

starting with the Facebook warrants are another matter, what

they're talking about is -- after "unnecessarily so," is that

the request could have been limited to e-mails to or from

persons suspected at that time of being prostitutes or

customers, and it goes on, and why -- why we're talking about

this versus the post-arrest distinction is that next it says

disclosures consistent with those limitations, meaning

limitations as to to or from -- who the messages are to or

from, disclosures consistent with those limitations might then

have provided probable cause for a broader although still

targeted search of the Facebook account.

          Here it's a similar situation, they had the specific

dates and specific message IDs of specific e-mails, they could

have requested information related to those e-mails, the

results of which could then have been used for a -- for a

broader although still targeted search of the account, and that

is not what happened.  They skipped ahead and said give us

1  everything and we'll sort out what's important here.

2         THE COURT:  The language that I was thinking about,

3  at least in part, was that under *Alford* where it provides,

4  I believe, again, on page 9 of 653, under the specific

5  circumstances and nature of the activity under investigation,

6  the warrant was as limited as possible because of all the

7  evidence.  These could have helped identify the owner of the

8  Google account.  So there's some -- as you pointed out, I think

9  there's a difference of opinion here between you and the

10 Government.

11        MR. CENTRONE:  Right.  And -- and that's -- I think

12 the reason they say what Your Honor just quoted is on page 653

13 they say the only information Officer Brunner-Murphy had when

14 drafting the language of the warrant was a phone call to K-mart

15 from an anonymous Google Voice number, and they had the --

16 obviously they knew the date of that call.  That -- they had

17 limited information, and still properly limited the warrant to

18 that information, which is what should have happened here.

19        And, again, to move on to one of the other --

20 Government's other arguments about the mind of

21 Detective Keller, again, I think we're all in agreement that we

22 need to be looking at the four corners of this warrant

23 application, but I'd also point out, as I did in my brief, that

24 with respect to good faith, Detective Keller is the same one

25 who was not aware of the limitations respecting -- with respect

1  to Constitutional private searches and had to be educated by

2  the State Attorney's Office.  I don't think that indicates a

3  high level of Constitutional compliance in that case, and,

4  again, that -- we've already had the evidentiary hearing on

5  that, Your Honor has that information in the record already.

6          I think those are the only points I wanted to rebut

7  with respect to the Government's argument, unless Your Honor

8  had any further questions.

9          THE COURT:  I don't, but thank you, Mr. Centrone.

10          Ms. King, anything further for the moment?

11          MS. KING:  Your Honor, at this point -- Your Honor,

12  at this point the Government will rely on its written brief and

13  previous answers to the Court's questions.

14          THE COURT:  And that's not saying that you're not

15  interested in weighing in on severability?

16          MS. KING:  That is correct, Your Honor.

17          THE COURT:  Okay.  Mr. Centrone, the Court is going

18  to take a short recess, but anything further that you wish the

19  Court to take notice of for the moment?

20          MR. CENTRONE:  May I have just one moment,

21  Your Honor?

22          THE COURT:  Absolutely.

23          MR. CENTRONE:  No, Your Honor.  Thank you.

24          THE COURT:  Thank you.  We'll be in recess.

25                            - - - - -

```
 1                    (Recess at 11:45 a.m. until 11:51 a.m.)

 2                              -  -  -  -  -

 3              THE COURT:  The record should reflect the Court took

 4    a recess of roughly five minutes.

 5              I believe we're all set.

 6              Ms. King, anything further from the Government?

 7              MS. FAVORIT:  No, Your Honor.

 8              THE COURT:  Thank you.

 9              Mr. Centrone?

10              MR. CENTRONE:  No, Your Honor.  Thank you.

11              THE COURT:  The Court intends to enter an endorsed

12    order directing the parties to submit briefing on severability,

13    we'll call it that, we may find it to go by a different

14    descriptor for the moment, but I have -- my takeaway here

15    is that both sides know to what I'm referring.

16              Ms. King, would that be fair?

17              MS. FAVORIT:  Yes, Your Honor.

18              THE COURT:  And Mr. Centrone?

19              MR. CENTRONE:  Yes, sir.

20              THE COURT:  Okay.  So we'll have 14 days for further

21    briefing and we'll see where we are there.  I'd ask the parties

22    to not incorporate by reference things, that makes it

23    problematic and challenging for the Court sometimes to figure

24    out what you're incorporating and also can elude page limits.

25              Is there a reason that this would be more than
```

1    ten pages?  I know, Ms. King, you haven't even looked at the

2    issue yet, so it's hard to say.  Maybe Ms. Favorit has the

3    answer on that.

4              MS. KING:  I don't think it needs to be more than ten

5    pages.

6              THE COURT:  Okay.  Mr. Centrone, what do you think?

7              MR. CENTRONE:  I think -- I think that should work,

8    Your Honor.  My only hesitation is because we're not

9    incorporating by reference, we'll likely have to include a lot

10   of language from the warrant, which could take up space, but --

11             THE COURT:  Let's do this, if you need more pages

12   then that, just file a motion asking for relief from that, and

13   just keep in mind the local rules on --

14             MR. CENTRONE:  Yes, Your Honor.

15             THE COURT:  -- font and --

16             MR. CENTRONE:  We'll be as brief as possible.

17             THE COURT:  Okay.  With that, hearing nothing

18   further, I appreciate the level of advocacy from both sides and

19   we'll be in recess.

20                          - - - - -

21             (Proceedings concluded at 5:00 p.m.)

22                          - - - - -

23

24

25

1                        C E R T I F I C A T E

2

3            This is to certify that the foregoing transcript of

4    proceedings taken in a motion hearing in the United States

5    District Court is a true and accurate transcript of the

6    proceedings taken by me in machine shorthand and transcribed by

7    computer under my supervision, this the 6th day of December,

8    2023.

9

10

11                                      /S/ DAVID J. COLLIER

12

13                            DAVID J. COLLIER

14                            OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25