1          UNITED STATES DISTRICT COURT
           MIDDLE DISTRICT OF FLORIDA
2                TAMPA DIVISION

3  UNITED STATES OF AMERICA,   )
                               )   8:21-cr-355-WFJ-CPT-1
4          PLAINTIFF,          )   Tampa
                               )   August 15, 2023
5          v.                  )   9:59 a.m.
                               )
6  GREGORY ALLEN WILLIAMSON,   )
                               )
7          DEFENDANT.          )

8      TRANSCRIPT OF MOTION HEARING AND STATUS CONFERENCE
           BEFORE THE HONORABLE WILLIAM F. JUNG
9              UNITED STATES DISTRICT JUDGE

10 APPEARANCES:

11 For the Government:
       MS. ERIN CLAIRE FAVORIT
12     MS. ABIGAIL KING
       United States Attorney's Office
13     Suite 3200
       400 N. Tampa Street
14     Tampa, FL 33602-4798

15 For the Defendant:
       MR. GUS M. CENTRONE
16     Kynes Markman & Felman, PA
       P.O. Box 3396
17     Tampa, FL 33601-3396

18 Also Present:  James Keller, FBI

19

20

21
   Court Reporter:          Tracey Aurelio, CRR, RMR, RDR
22                          Federal Official Court Reporter
                            801 N. Florida Avenue, 15th Floor
23                          Tampa, Florida 33602
                            (813) 301-5448
24
           Proceedings recorded by mechanical stenography,
25 transcript produced by computer.

1  _____

2      (Proceedings commenced at 9:59 a.m.)

3          THE COURT:  Good morning.  Let's call the case,

4  please.

5          THE COURTROOM DEPUTY:  Yes.  The Court calls

6  8:21-cr-355-WFJ-CPT, United States of America v. Gregory Allen

7  Williamson.

8          Counsel, if you can please state your appearance for

9  the record starting with the government.

10         MS. FAVORIT:  Good morning, Your Honor.  Erin Favorit

11  and Abigail King on behalf of the United States.  And here at

12  counsel table we also have James Keller, FBI TFO.

13         THE COURT:  Thank you.

14         MR. CENTRONE:  Good morning, Judge.  Gus Centrone for

15  Defendant Greg Williamson who is present with me in the

16  courtroom.

17         THE COURT:  All right.  We are here on a couple of

18  these items.  Let's just talk about, I guess, the first one.

19  The prime one would be the second motion to suppress, which is

20  134, and the R&R is at 173.  I have read everything, I think

21  pretty much, certainly your pleadings.

22         So the purpose for this, Mr. Centrone, since it's

23  your motion, is -- I have read it and I think I understand

24  everything -- just to make sure that, two things, that the

25  parties have a full chance to make sure they've got a full

1    record and to highlight anything that you want to make sure

2    that I haven't missed.  I mean, I read the *Blake* case, *Alford*,

3    that *Mercery* case out of Macon, Georgia, which said *Leon*

4    wasn't carrying the day, et cetera, et cetera.

5           Anyway, so Mr. Centrone, just if there are some super

6    important bullet point highlights, we want to make sure you

7    have that record and make sure I understand everything.

8           MR. CENTRONE:  Sure.  Thank you.  May I use the

9    podium?

10          THE COURT:  You can stand, sit, whatever you want.

11   The only rule is you've got to be around a mic.

12          MR. CENTRONE:  Yes, sir.

13          Judge, I don't think there's any disagreement between

14   the parties about kind of the scope of the issue that's up for

15   your review, which is, you know, I think it boils down to

16   which case, *Alford* or *Blake*, is more analogous here.  And I

17   think, without a doubt, it's the *Blake* case that's analogous

18   here.

19          The *Alford* case, frankly, if the warrant here looked

20   anything like the *Alford* warrant, we wouldn't be having this

21   conversation.  I don't think I would have much of a leg to

22   stand on.  I don't think -- and I said this to Judge Tuite

23   when we did argument before him.  I don't think there's really

24   anything wrong with the *Alford* warrant hardly at all, because

25   even though it's asking for a wide array of types of data, you

1  know, emails and pictures and that kind of thing, it's laser

2  focused on the crime at issue in that case and the information

3  that was needed to address that issue, which was, okay, this

4  phone call was made in this human trafficking investigation to

5  a Kmart on a certain day, at a certain place, at a certain

6  time.  So while it's saying give me all of this information,

7  it's saying give me all of this information only insofar as it

8  applies to that.  So it will tell us the identity of the

9  person who called this Kmart on this date on this time at this

10 place.  It's all black and white in the warrant.

11          That is not what we have here.  What we have here is

12 give us all the account activity, which could be everything.

13 And, yes, it's further subdivided, you know, it's further

14 enumerated, but it all falls under a category of give us

15 everything.  And that's where I think Judge Tuite's R&R misses

16 the mark, is that, yes, it does address identity, which I

17 think there is an argument, that because an issue like the

18 identity of who created this account is kind of untethered in

19 time from --

20          THE COURT:  We are only talking 18 months because the

21 thing was established, opened 6/10/19, and he was arrested 18

22 months and 2 weeks later.

23          MR. CENTRONE:  That's right, Judge, but law

24 enforcement didn't know that.  And the warrant language is

25 from creation of the account, and I think that's an important

1  point.  While, yes, ultimately it ended up not being a

2  spectacularly large period of time, law enforcement didn't

3  know that at the time.  If it had been five years older than

4  it actually was --

5        THE COURT:  In hindsight -- of course we are all

6  dealing with hindsight -- that's what the exclusionary rule is

7  for -- what should the officer have said?  So I don't know

8  whether it was in S.B.'s name, the account.  My guess is he --

9  and I think that was the defendant's wife.  It's probably a

10 female name like, I don't know what her name was, Sally

11 something, and so how is he supposed to -- what should he have

12 done, because he's trying to figure out who owns this account,

13 who runs this account, okay.  It's in a female's name

14 probably.  I assume she has a female name.  And, you know, in

15 my experience, 85 percent of these cases the defendants are

16 male, maybe more.  I have -- in five years, I've had one child

17 pornography case that involved a female, and it was the mother

18 who was selling the daughter.

19        So how would he have couched that issue to identify

20 who is running this account?  Don't you have to look at all

21 the stuff, you know, and figure out, well, here is Vlad, who

22 is Vlad, you know?

23        MR. CENTRONE:  A couple points on that, Your Honor.

24 The account that was in the wife's name was the Comcast

25 Internet account.

1              THE COURT:  Yes.

2              MR. CENTRONE:  We're talking about the Yahoo email

3      account.

4              THE COURT:  Right, right, but that's all he knew is

5      that there was -- I don't know if she had a female name.  I

6      assume she did.  So that doesn't give him any clues as to who

7      is running Vlad.  How could he figure that out without

8      basically looking at a lot of stuff?

9              MR. CENTRONE:  Well, and that's what *Blake* gets into,

10     Your Honor.  It's that, okay, what did he know at the time.

11     He knew that there were pictures and emails.  There were

12     specific -- he had the specific dates and times of those

13     emails.  Had he, for instance, drafted a warrant that was,

14     okay, analogous to *Alford*, provide all information that

15     identifies who sent these emails on these particular dates and

16     times, that would have still revealed a substantial amount of

17     information even if it was just targeted to only the emails

18     that were the subject of the NCMEC report in this case.  And

19     what *Blake* says is that you start narrow and you expand.

20             While still staying targeting in the language of

21     *Blake*, you expand your scope as you learn more information.

22     You don't skip to the end and say, okay, I want absolutely

23     everything and then I will sort out later what's important to

24     me.  That's the deficiency here.

25             Had it been a warrant that's along the lines of, you

1  know, all the types of data but only the data that reveals the

2  identity of the creator of this account, the user of this

3  account or who sent these pictures on these dates, you know,

4  these particular emails that they had, that's targeted.

5  That's, in the words of *Coolidge*, as limited as possible.

6       THE COURT:  Somebody at Yahoo has to lay out the

7  account and make kind of a law enforcement determination.

8  What shows the sender of these emails or the owner of these

9  emails?

10      MR. CENTRONE:  I don't think that's a law enforcement

11 determination, Your Honor.  I think that's a relevancy

12 determination similar to civil practice when you send a

13 subpoena to a provider and say give us the data that's

14 relevant to these issues.  These companies have entire

15 departments dedicated to that.  I don't think that's any

16 stretch for them.  I don't think that's something they are not

17 capable of doing, by any means.

18      THE COURT:  Okay.

19      MR. CENTRONE:  So that's the bird's eye view crux of

20 it, Judge.  And if Your Honor has more specific questions, I'm

21 happy to get into it, but that's --

22      THE COURT:  Just, by the way, I'm so impressed by the

23 defense production and defense in this case.  So many lawyers

24 just have lost their ardor and just kind of go through the

25 motions, and the least path of resistance follows.  And so the

```
 1   work product, Mr. Centrone, was just fantastic.

 2            MR. CENTRONE:  Thank you so much.  I appreciate that.

 3            THE COURT:  And that other trial you had in front of

 4   me on the petition gathered -- I don't know if Jim Feldman

 5   told you, but when I saw him, he said, oh, I heard Gus was in

 6   trial.  I said, yes, the other side just got outlawyered.

 7            MR. CENTRONE:  Thank you.

 8            THE COURT:  So tip of the cap.

 9            MR. CENTRONE:  Thank you, sir.

10            THE COURT:  So here is just things that are in my

11   head.  The particularity requirement, well, of course, all

12   cases or most of them cite to it.  It just seems so

13   antediluvian the concept, but the king's agents, they said

14   give me a warrant.  I want to go to Benjamin Franklin's house

15   and find a crime and toss his house and find a crime, a

16   general warrant.  You know, so that's where we start.

17            Here we knew, we, the world, the law enforcement knew

18   that this account had at the -- what's it called -- CSAM for

19   the acronym.  They knew that.  And this is why I never give

20   the two points for having a computer, because all of these are

21   computer crimes.  It has been at least 25 years since anybody

22   ever had a portfolio and a notebook of 8 by 10 glossies, maybe

23   40 years.  By definition it's a computer crime almost by

24   definition.  I have never seen one that didn't involve the

25   Internet in the last 25 years.
```

1          And then it's also reasonable to assume that, not

2     always, but reasonable to assume that these pieces of

3     contraband don't spontaneously generate, not like a guy that

4     goes down the street and shoots someone.  They often, not

5     always, but they often are traded, kept, created, kind of like

6     trading cards and very, very often involve transmission in

7     emails like this one over the Internet.  So it's not quite --

8     you know, it's someone's house and he criticized the king;

9     therefore, we are going to go in there and look for a crime.

10    So anyway, that's an issue.

11         Okay.  And on -- here is another hard question for

12    you.  Maybe the other one wasn't so hard.  You handled it with

13    aplomb.  So you basically reside with -- I will mispronounce

14    the case, *Mercery*, where you say that, well, no reasonable

15    police officer after *Blake* could believe this was a good faith

16    exception.  *Leon* does not apply.

17         MR. CENTRONE:  Correct.

18         THE COURT:  That may be, but at least two judges, one

19    of whom I know and respect, made what you view to be the

20    mistaken conclusion that the police officer made, which was

21    that it was not overbroad.  The one that issued the warrant,

22    you know, I assume they at least know something about the

23    Fourth Amendment, and then the one in this building.  So we

24    have three people that don't -- that have already reviewed

25    this, the police officer and then the two judges, Judge Tuite

1 and the state court judge, that didn't think it was overbroad.

2        You know, and whether you disagree with Judge Tuite's

3 reasoning or not -- and I agree with you.  It is -- this is

4 not a pinpoint warrant here.  Okay.  Give me the gun that we

5 know is buried behind the oak tree, okay, but it's certainly

6 within the realm of reason, his reasoning.  So that's also the

7 issue on *Leon*.

8        Anything else on *Leon*?  Is it *Mercery*?  And then I

9 think you cited one or two other different court cases beyond

10 the Eleventh Circuit.

11        MR. CENTRONE:  Yes, Judge.

12        With respect to *Leon* in particular, had there been

13 some attempt to limit this, you know, say, by time period, for

14 instance, let's say the warrant asked for everything in the

15 last year or two years or whatever it was, had there been that

16 attempt, had there been an attempt to narrow the type of data

17 sought, you know, I think those provide an out for *Leon*

18 purposes.  Okay.  That's why, you know, a reasonable officer

19 would say, yeah, this is fine.

20        That doesn't exist here.  Give me everything in the

21 account from the beginning of time.  And under *Blake*, you

22 know, when the courts from up high, on high come and issue

23 these proclamations, if they're not followed going forward, we

24 erode the Fourth Amendment continuously in that regard.

25        Had there -- long story short, Judge, had there been

1  some attempt to tie it to put some kind of focus that would

2  have said, okay, this officer was not trying to get absolutely

3  everything.  He had his -- he knew that he wasn't entitled to

4  absolutely everything.  He had to give some rationale here,

5  some limit, then I think I would have a much tougher road to

6  hoe to argue that good faith doesn't apply here.

7         But because that's not the case, that's why I think

8  this case lines up so well with that *Mercery* case, including,

9  unlike *Blake*, more egregious than *Blake*, that the warrant

10 allowed not just the search as it did in *Blake* but also as in

11 *Mercery*, the seizure of everything in the items.  The *Mercery*

12 Court found that important, and I do too.

13        So, Judge, that's where I'm hanging my hat on the

14 *Leon* argument is that there has to be some line, because if

15 there's not, you know, while the Eleventh Circuit is issuing

16 these orders saying this is what's okay, this is what's not,

17 that doesn't mean this is what we all do going forward, I

18 don't know what we are all doing here, frankly.  So that's

19 where I come down on that.  I think that's why the *Mercery*

20 case is spot on to this particular case.

21        THE COURT:  In hindsight, by your lights, the police

22 officer gets no credit that this is only an 18-month period.

23        MR. CENTRONE:  Not a doubt.

24        THE COURT:  Turned out to be.

25        MR. CENTRONE:  Not in hindsight, Judge.  I mean, not

1  that it turned out to be.  It was just luck.

2         THE COURT:  That's irrelevant.

3         MR. CENTRONE:  Yes, Judge.

4         THE COURT:  All right.  Well, I understand your

5  points on that.

6         Let me ask Ms. Favorit, so it's still the

7  government's contention that the motion should be denied based

8  on the forensic arguments that you all made about *Leon* and

9  also the underlying facts; is that correct?

10        MS. FAVORIT:  That's correct, Your Honor.  And any

11 further questions, Ms. King is prepared for this particular

12 argument.

13        THE COURT:  We're not going to give her a chance to

14 shine, because notwithstanding Mr. Centrone's formidable

15 forensic talents, I'm going to adopt -- whether I write

16 something separately or just simply adopt Judge Tuite's order

17 and deny the second motion to suppress.

18        Having said that, I can't imagine that it could be

19 better well preserved, both as a matter of preservation and as

20 a matter of expression.

21        So maybe Mr. Williamson doesn't know it, but he is

22 getting a half million dollars worth of lawyering here.  And

23 anyway, the motion is denied.  And I will get an order out.

24 We will have to think about it.  I might just adopt Judge

25 Tuite's, and we might say a few words on our own.

1          Okay.  Let's talk a little bit just about the other

2   stuff.  Ms. Favorit, on the trade inscriptions, here's a

3   problem with some motions in limine.  I don't really know the

4   case, you know, so it is my understanding there is like a VCR

5   machine that says made in China or something.  And it seems to

6   me that that is likely to be -- let's say the thing is

7   admitted anyway because you took it from the house and it

8   contained whatever, evidence, that that would be a

9   circumstantial evidence that the thing, assuming someone

10  didn't like get a little post-it note and put on there "Made

11  in China," circumstantial evidence that the thing was made in

12  China or wherever it was from.

13          But I'm just uncomfortable pinioning myself right now

14  in limine saying that because I haven't seen the thing.  I

15  don't know exactly what they are or how it's going to be

16  presented.  So, you know, I'm going to carry that with the

17  case, but, you know, let me see if I can find something here.

18          So I have this clock here.  Of course, there's no

19  battery in it.  So if this clock is otherwise admissible, it

20  says made in Indonesia, okay, under U.S. patents, made in

21  Indonesia.  This clock is otherwise admissible.  It does seem

22  to me that that would be -- it is coming with the clock, if

23  the clock is admissible, but I'm not going to -- I'm just not

24  comfortable entering an order from on high that that's just

25  fine.  So I'm sorry.  I'm just going to carry that with the

1   case.

2           Now, let's talk about this other motion in limine,

3   Mr. Centrone, 133, which is the -- I'll call it the young

4   female sort of abuse thing.  You had several arguments that

5   it's extrinsic.  And if it's not extrinsic, it's 403 and also

6   it could be 404(b).  It shouldn't come in.  And again, the one

7   problem with ruling in limine is I don't know the case.  But

8   let me -- so it's my understanding that Count 1 are -- I

9   haven't seen all this or anything like that, but Count 1, the

10  same, we'll just call it the child.  I know she was what at

11  the time?  Maybe 15, 16?  What was the age?

12          MR. CENTRONE:  At least 15, Your Honor.

13          THE COURT:  I don't want to say "the girl."  That

14  sounds pejorative.  So Count 1 alleges that there were

15  explicit messages, enticement type messages to this child.

16  And then Counts 2 and 4 are pictures of the child.  And are

17  they alleged to be -- I know you aren't agreeing to all of

18  this, sexual abuse pictures of the child or lascivious,

19  whatever the word is?

20          MR. CENTRONE:  Yes, Judge.  And for context, it was a

21  hidden camera.

22          THE COURT:  Oh, right.

23          MR. CENTRONE:  In the phone charger in her room.  And

24  we don't agree that they are lascivious.

25          THE COURT:  That's Count 2 through 4.  That's the

1  same child.  And then Count 5 and 6 are distribution, and

2  that's not involving the child allegedly?

3            MR. CENTRONE:  No.  My understanding is that is

4  emails attaching images sent to the child.

5            THE COURT:  To the child.

6            MR. CENTRONE:  With some of the enticement messages

7  as well.

8            THE COURT:  Five and six.  And then seven is pictures

9  sent to the child allegedly.  I'm not saying you agree with

10  it, but that's what it's claiming?

11            MR. CENTRONE:  Correct.

12            THE COURT:  And then 8 is possession.  And this

13  was -- I think your strongest point was whatever the physical

14  abuse that the female is going to relate to sort of predates

15  these counts?

16            MR. CENTRONE:  Correct.  There's overlap, but it

17  predates it.  I don't have an exact date, but based on the

18  numbers, it predates it by about a year.  You know, I think

19  it's more, to me anyway, more compelling that the government

20  is arguing it's intrinsic, that the abuse is intrinsic to the

21  case, but they didn't find out about it until a year after the

22  case was indicted.  The child had made prior, two prior

23  statements to social services and law enforcement saying, no,

24  this never happened.  So I don't know how it can be intrinsic

25  to the charge when they didn't know it happened at the time

1    they made the charge.

2          THE COURT:  Well, they just -- I mean, of course

3    that's the heart of your motion, but it wouldn't be the first

4    time they, you know, found the bag of gold from the bank

5    robbery and then someone said, oh, yeah, the guy had a gun

6    also.

7          MR. CENTRONE:  Sure.

8          THE COURT:  So the prime point is, it was late

9    discovered, and it predates these substantive counts.

10         MR. CENTRONE:  Correct, Judge.  And importantly, that

11   the time period of those substantive counts, the time period

12   alleged in Count 1 is explicitly tied to the creation of the

13   Vlad email account.  That's the date it's created is the date

14   that the conduct is alleged to have begun, you know, which I

15   think further demonstrates that this is focused on the emails

16   and not any kind of physical abuse.

17         THE COURT:  I don't have the indictment in front of

18   me.  Does it say on or about?  Sometimes it says that a date

19   no later than or a date no earlier than.

20         MR. CENTRONE:  From an unknown date but at least as

21   early as on or about June 10, 2019, through on or about

22   January 27, 2021.

23         THE COURT:  I have reviewed this.  And again I

24   appreciate your work, and it's easy for me to say that when

25   the work -- because I'm just talking and you're the one

1   working.  And I feel bad that your skills have not, you know,

2   rendered the fruits that you desire them to render currently,

3   but I'm going to admit the testimony of the girl or the child.

4   And then we will see whether you want -- and you will have to

5   make -- I will give you a standing objection, but you have to

6   make it at the time on the trial record, and then we will see

7   whether it would earn you, or whatever the word is.  You may

8   not want it, but if it's sufficiently a 404(b) creature, or

9   whatever you want to call it, part and parcel of 404(b), then

10  I would, you know, instruct them contemporaneously and in the

11  jury instructions, but it sounds like it's pretty intrinsic to

12  me.  And you will have to -- so I'm denying your motion

13  without prejudice.

14       So plan on in your defense preparation that that's

15  going to come in.  Whether it comes in, right now it's not --

16  in my mind it's not smelling like 404(b), but if it is, then

17  we will take care of it that way.  So your motion at 133 is

18  denied without prejudice.

19       Let's talk more a minute.  Have I touched on the

20  motions here?  Ms. Favorit, it was a bit of a punt, but I gave

21  you a kind of hint that, you know, if the thing has, like I

22  said, inscripted, it's likely to be circumstantial evidence of

23  what you want it to say even though we have a well couched

24  objection.  But anyway, so the 404(b) extrinsic motion in

25  limine I have just denied without prejudice.  I have denied

1   the second motion to suppress.

2          Ms. Favorit, anything else I'm missing here?

3          MS. FAVORIT:  No, Your Honor.  I believe that was all

4   of our pretrial issues at this time.

5          THE COURT:  Defense, Mr. Centrone, anything else I'm

6   missing?

7          MR. CENTRONE:  No.  I don't believe so, Your Honor.

8          THE COURT:  So we are going to trial in September.  I

9   understand it's a jury trial; is that right, government?

10         MS. FAVORIT:  That's correct, Your Honor.

11         THE COURT:  Now, your office used to have some funds

12  for jurors who needed counseling after these cases.  So see if

13  you still have that.  Okay?  And I'm not going to get into

14  that brain-dead decision that your supervisor made to have a

15  jury trial, but it's brain dead, and please tell her I said

16  that.  And it's expensive, and it's very damaging to a jury,

17  and it's utterly unnecessary.  Tell her I said all of that and

18  that I'm disappointed in her in making that decision.

19         All right.  You guys, so September jury trial

20  schedule starts the 11th of September.  Right now you would be

21  Number 2 up.  There is a civil case.  Oh, it's going to be a

22  biggy too going about a week.  And there is pretrial on that

23  in 48 hours.  And I think it's going to go, but just be ready

24  in case.

25         Will that work, Ms. Favorit?  You are the one that's

1  got to marshal the witnesses initially.  Does that sound

2  doable, the 11th or the week after?

3           MS. FAVORIT:  Your Honor, I would prefer the week

4  after, the 18th, so that we could prepare our victim for a

5  more certain date.  It's really difficult to cancel.  But

6  apart from that, Your Honor, I am on annual leave through the

7  8th, and I'll be out of town.  So I'm coming back into town

8  the night before the 11th.  So as a personal matter, I would

9  also request to not do that week.  It would just be difficult

10  for me to prepare the witnesses when I'm out of town.

11           THE COURT:  Notwithstanding what I said about the

12  jury trial, I want to accommodate you because I know none of

13  these mistaken choices are yours.

14           Any reason we can't specially set this on the 18th?

15           MR. CENTRONE:  No, Judge.  I would be fine with a

16  date certain with that.

17           THE COURT:  Would that be better for you,

18  Ms. Favorit?

19           MS. FAVORIT:  Yes, Your Honor.  I really appreciate

20  that.

21           THE COURT:  Mr. Gooding-Butts, do we have any

22  special -- we have that thing going the 11th.

23           THE COURTROOM DEPUTY:  Correct, other than -- the

24  following, the 18th, we don't have anything specially set,

25  Judge.

1          THE COURT:  We will specially set this on the 18th.

2    What's your take, counsel?  A week?

3          MS. FAVORIT:  Yes, Your Honor.  I believe it should

4    be done before the week is over.

5          THE COURT:  Why don't you see if there is still this

6    money, because some jurors have actually wanted counseling.

7          Now, the other thing Judge Bucklew told me is when

8    they had this money -- of course, I'm not going to mention

9    this to a juror until after the trial, but it was only enough

10   for two sessions.  So see if it exists.  Some jurors, like a

11   couple of them, were disturbed enough where they wanted more

12   than two sessions.  And just let us know on that.  And if we

13   get a juror and there's no money after two sessions, I might

14   make your office pay for it, pay for the additional if such a

15   thing happens.

16         All right.  Okay.  So we're good, not in the normal

17   course, but in this course because for some reason you are

18   wanting the jurors to see all this.  All right.  Special set.

19   Don't suffer in silence.  If anybody needs anything, just

20   call.

21         Do me a favor, both of you all.  Look, this

22   presentation equipment is not any good.  It's old stuff.  So

23   come up and play with it, because there's kind of nothing

24   worse than, Judge, my laptop is not hooking up.  Well, it's

25   not your fault.  It's our equipment that's bad.

1          And then also if the government, if you can give me

2    the week before -- I normally don't need this, but I do

3    obviously here in this case, a thumb drive with your exhibits

4    so I can go through them.  Sometimes there is 403 stuff.

5          Do you anticipate that you are going to -- I guess

6    you are -- to put these images up on this big screen?

7          MS. FAVORIT:  I would anticipate doing that, Your

8    Honor.

9          THE COURT:  All right.  I guess we will do that.  I

10   may think about that.  I may have to just hand them out on a

11   piece of paper like we used to do it.

12         MS. FAVORIT:  I can do that as an alternative, Your

13   Honor.

14         THE COURT:  Let's think about it.  I haven't seen

15   them.  I have seen some of this type of stuff that just -- we

16   are not putting that up on the screen, but I haven't seen

17   this.  And you will let me know because you are going to give

18   me that thumb drive that Monday before.  Okay?  Is that good?

19         MS. FAVORIT:  Yes.  I can give you a thumb drive

20   ahead of time.

21         THE COURT:  I will look at it.  It kind of depends at

22   what level, and I don't know because I haven't seen it.  Okay.

23   So if we don't hear from you all -- and do me a favor.  To the

24   extent you can, see if you can agree on the jury instructions.

25   I'm real likely to just get as close and as tight to the

1   standards as possible and not go far off of that.  And, of

2   course, we would want to see those that week before.

3   Realistically I'm not going to be looking at any jury

4   instructions or anything until that week before, okay?

5           Anything else, government?  I appreciate your

6   presentation and however easy it was for you all today because

7   on the big one you won.  So anything else?

8           MS. FAVORIT:  No, Your Honor.  Thank you.

9           THE COURT:  Well, thank you.

10          Yes, sir, anything else?

11          MR. CENTRONE:  No.  Thank you, Your Honor.

12          THE COURT:  We will see you all that 18th if we don't

13  hear from you.  Thank you.

14      (Proceedings concluded at 10:36 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1 | UNITED STATES DISTRICT COURT    )
  |                                 )
2 | MIDDLE DISTRICT OF FLORIDA      )

3

### REPORTER TRANSCRIPT CERTIFICATE

4

5 |     I, Tracey Aurelio, Official Court Reporter for the United
States District Court, Middle District of Florida, certify,
pursuant to *Section 753, Title 28, United States Code*, that
6 | the foregoing is a true and correct transcription of the
stenographic notes taken by the undersigned in the
7 | above-entitled matter (Pages 1 through 23 inclusive) and that
the transcript page format is in conformance with the
8 | regulations of the Judicial Conference of the United States of
America.

9

10 |     /s    *Tracey Aurelio*
   |     _____
11 |     Tracey Aurelio, RMR, RDR, CRR
   |     Official Court Reporter
12 |     United States District Court
   |     Middle District of Florida
13 |     Tampa Division
   |     Date:  December 6, 2023

14

15

16

17

18

19

20

21

22

23

24

25