**POLICY STATEMENT** Organizational Principles to Guide and Define the Child Health Care System and/or Improve the Health of all Children



# The Child Witness in the Courtroom

Robert H. Pantell, MD, FAAP, COMMITTEE ON PSYCHOSOCIAL ASPECTS OF CHILD AND FAMILY HEALTH

abstract



Beginning in the 1980s, children have increasingly served as witnesses in the criminal, civil, and family courts; currently, >100 000 children appear in court each year. This statement updates the 1992 American Academy of Pediatrics (AAP) policy statement "The Child as a Witness" and the subsequent 1999 "The Child in Court: A Subject Review." It also builds on existing AAP policy on adverse life events affecting children and resources developed to understand and address childhood trauma. The purpose of this policy statement is to provide background information on some of the legal issues involving children testifying in court, including the accuracy and psychological impact of child testimony; to provide suggestions for how pediatricians can support patients who will testify in court; and to make recommendations for policy improvements to minimize the adverse psychological consequences for child witnesses. These recommendations are, for the most part, based on studies on the psychological and physiologic consequences of children witnessing and experiencing violence, as well as appearing in court, that have emerged since the previous AAP publications on the subject. The goal is to reduce the secondary traumatization of and long-term consequences for children providing testimony about violence they have experienced or witnessed. This statement primarily addresses children appearing in court as victims of physical or sexual abuse or as witnesses of violent acts; most of the scientific literature addresses these specific situations. It may apply, in certain situations, to children required to provide testimony in custody disputes, child welfare proceedings, or immigration court. It does not address children appearing in court as offenders or as part of juvenile justice proceedings.

*Department of Pediatrics, University of California San Francisco, San Francisco, California, and Department of Pediatrics, John A. Burns School of Medicine, University of Hawaii, Honolulu, Hawaii*

*Dr Pantell conceptualized and drafted the initial manuscript critically reviewed the revised manuscript, and approved the final manuscript as submitted.*

*This document is copyrighted and is property of the American Academy of Pediatrics and its Board of Directors. All authors have filed conflict of interest statements with the American Academy of Pediatrics. Any conflicts have been resolved through a process approved by the Board of Directors. The American Academy of Pediatrics has neither solicited nor accepted any commercial involvement in the development of the content of this publication.*

*Policy statements from the American Academy of Pediatrics benefit from expertise and resources of liaisons and internal (AAP) and external reviewers. However, policy statements from the American Academy of Pediatrics may not reflect the views of the liaisons or the organizations or government agencies that they represent.*

*The guidance in this statement does not indicate an exclusive course of treatment or serve as a standard of medical care. Variations, taking into account individual circumstances, may be appropriate.*

*All policy statements from the American Academy of Pediatrics automatically expire 5 years after publication unless reaffirmed, revised, or retired at or before that time.*

**DOI:** 10.1542/peds.2016-4008

Address correspondence to Robert Pantell, MD. E-mail: robert.pantell@ucsf.edu

PEDIATRICS (ISSN Numbers: Print, 0031-4005; Online, 1098-4275).

Copyright © 2017 by the American Academy of Pediatrics

**FINANCIAL DISCLOSURE:** The author has indicated he has no financial relationships relevant to this article to disclose.

**FUNDING:** No external funding.

**To cite:** Pantell RH and AAP COMMITTEE ON PSYCHOSOCIAL ASPECTS OF CHILD AND FAMILY HEALTH. The Child Witness in the Courtroom. *Pediatrics.* 2017;139(3):e20164008

## BACKGROUND

Children were first allowed to provide courtroom testimony with the 1895 US Supreme Court decision allowing a 5.5-year-old to serve as a witness. It is now estimated that substantially more than 100 000 children appear in court each year.[1] With growing awareness of child abuse and a continual increase in reported abuse cases, a 1982 Presidential Task Force on Victims of Crime recommended 62 reforms,

including some intended to benefit child victims. However, despite the task force's recommendations, "children remained unheard and re-victimized in criminal and delinquency courts."[2]

A growing body of scientific literature on the psychological and physiologic consequences of children witnessing and experiencing violence, as well as appearing in court, has supported modifications of courtroom procedures.[3–7] To decrease the stress experienced by children appearing in courts, various accommodations were developed, ranging from allowing children to hold comforting objects to being accompanied by a support person while testifying. Recently, specially trained facility dogs have been allowed to offer comfort for witnesses (www.courthousedogs.com). These accommodations have been challenged legally, particularly those attempting to allow children to testify outside the presence of the accused. Notably, in the 1988 decision *Coy v Iowa*,[8] the US Supreme Court ruled that a screen between a child witness and defendant violated the confrontation clause of the sixth amendment. However, in 1990, in *Maryland v Craig*,[9] the US Supreme Court ruled that closed-circuit televised testimony is acceptable when there is a "case specific finding of necessity." Also in 1990 came the passage of the Victims of Child Abuse Act,[10] which has been subsequently modified and provides protection to both child victims and witnesses.[11] Guidelines from the US Attorney General followed in 2005,[12] which state that "A primary goal of such (justice department) officials, therefore, shall be to reduce the trauma to child victims and witnesses caused by their contact with the criminal justice system." Although the federal statute and guidelines offer substantial protection for children who are victims or witnesses of a crime, particularly live testimony by 2-way closed-circuit television or videotaped testimony, most cases are tried not in federal court but rather in courts under state jurisdiction. The National Conference of Commissioners on Uniform State Laws drafted The Uniform Child Witness by Alternative Methods Act in 2002,[13] which encouraged states to allow victims and witnesses younger than 13 years to testify by alternative (closed-circuit) methods, which, to date, has only been enacted in a small number of states. However, all states have laws to minimize the impact on children of appearing in court through allowing support people or comfort objects or provisions for excluding the press. However, some states, such as California, have codes that apply only to victims of physical and sexual abuse and exclude children who witness violence; these children are covered by the federal statute.

To further protect the rights of child victims and witnesses, the 2005 Attorney General's report provided for the appointment and payment of a guardian ad litem (GAL) to protect the interests of the child.[7] However, title 18[11] provides for GALs only in cases involving child abuse or exploitation in child welfare proceedings and criminal cases but does not address children witnessing other violent crimes, such as murder of a mother by a father. Nevertheless, some states have expanded the provisions set by the federal code to offer services to children witnessing violence. (For more information about state laws, contact the American Academy of Pediatrics [AAP] Division of State Government Affairs at stgov@aap.org.) In addition to GALs, a network of nearly 1000 community programs train and support citizen volunteers to advocate for the best interests of abused and neglected children in courtrooms and communities as court-appointed special advocates (www.casaforchildren.org).

Violence in the home and directed toward children is responsible for a substantial proportion of court actions involving children. The National Child Abuse and Neglect Data System reported 3.4 million child protective service referrals, 686 000 substantiated unique instances of abuse, 146 000 removals from the home (in 44 states), and 1640 deaths in 2012. Whether confirmed reports of child abuse reach court is highly variable. In the United States, 21.4% cases of child abuse reach court, ranging from 3.2% of cases in Mississippi to 56.0% of cases in New Hampshire.[14] The number of these cases in which children testify is unknown. The percentage of children with court-appointed representation also is highly variable, with a national average of 17.0%, but only 0.7% in Virginia compared with 69.7% in Arizona and 49.4% in Hawaii.[14]

In addition, the number of cases being tried in which children are not victims but witnesses to violence is unknown. In 2009, it was reported that one-quarter of children in the United States had witnessed violence and 9.8% had witnessed intrafamilial violence.[15]

## COMPETENCE

The purpose of child testimony in court is to provide trustworthy evidence. The qualifications for a child to provide testimony include the following:

- sufficient intelligence, understanding, and ability to observe, recall, and communicate events;
- an ability to comprehend the seriousness of an oath; and
- an appreciation of the necessity to tell the truth.

The ability of children to provide trustworthy testimony must be considered in terms of a developmental context as well as

Downloaded from www.aappublications.org/news by guest on October 18, 2021

the circumstances of the event precipitating a court appearance, the ongoing influences in the current home, and the environment and processes leading up to and including appearance in the courtroom. The ability to recall events evolves throughout childhood, as does the ability to understand and contextualize these events, including the ability to distinguish an experience and thoughts as one's own or someone else's. Truthfulness and lying also have different meanings throughout an individual's moral development. Building on the work of Piaget and Kohlberg, Ekman[16] has developed a comprehensive view of lying as a developmental process. The development of abstract thinking and moral development continues throughout childhood and adolescence and into adulthood. Indeed, the US Supreme Court's recognition that brain maturation and cognitive development continue well into adulthood was part of the basis for its decisions prohibiting capital punishment (*Roper v Simmons*[17]) and mandatory life imprisonment without parole (*Miller v Alabama*[18]) for individuals younger than 18 years.

Substantial research has been conducted on the abilities of children to provide trustworthy testimony.[6,19–26] The following are some of the findings.

- Memory: Memory development begins at birth as infants quickly develop the abilities to recognize the faces and voices of their caregivers. Memory underscores basic language development as older infants and toddlers develop the ability to associate words with objects and actions, and children as young as 3 years can recall and articulate experiences. For purposes of court testimony, there is an extensive experimental literature on the validity and reliability of children's recall of events,[19] with a study of a medically invasive event being recalled reliably by 3- to 7-year-olds (mean age: 5.3 years).[20] However, over time and under variable external circumstances, information provided in interviews can change. Ceci and Bruck[24] pointed out that memory may change over time as a result of constructive processes that serve to fill in the gaps that occur as the original memory weakens. Some of this change occurs because, as children gather more experience, they may embellish an event with circumstances that occurred in a similar, although unrelated event. In experimental studies, the accuracy of information retained over time is challenging for both children and adults; because of the wide variability in recall, predictors of accuracy could not be determined.

- Assessing children's memories of their maltreatment, especially sexual abuse, has substantial methodologic challenges. Nevertheless, Goodman et al[23] indicate that "maltreatment should lead to enhanced memory for negative emotionally laden or stressful information in most individuals, but also that certain subsets of maltreated individuals may have memory deficits for negative or traumatic experiences." These subsets include individuals with dissociative symptoms and individuals who experienced particularly severe abuse. A major research challenge is to develop a valid and reliable predictive tool[23] for the accuracy of children's recall of their maltreatment.

- Suggestibility: Suggestibility, as defined by Ceci and Bruck,[24] "refers to the degree to which children's encoding, storage, retrieval and reporting of events can be influenced by a range of social and psychological factors." Experimental studies showed that young children can be induced to recall events that did not occur and that they are less likely to deny events that did occur. In a classic experiment, "the Sam Stone study," which took place over 10 weeks, 3- to 4-year-olds in a control group had excellent recall, and only 10% assented to false statements.[25] However, if the character in the study was stereotyped with "clumsiness," 42% of children assented to false statements; adding questioning suggestive to stereotyping raised the false assenting rate to 72%. Older children 6 to 8 years of age had a false assenting rate only half as high as that in 3- to 5-year-olds and followed a similar stepwise pattern.[25] Substantial experimental literature exists on children being subject to suggestibility by parents and authority figures as well as intimidation during police or courtroom procedures.[19,25] In addition, because of their willingness to be responsive to adults, children are more likely to answer complex, ambiguous questions than adults.[26] This tendency can be exploited by attorneys interested in diminishing the credibility of a child's testimony.

- Lying: Ekman[16] has defined lying as when "one person intends to mislead another, doing so deliberately" and has stated, "there are two primary ways to lie: to conceal and to falsify." He points out that all children (and adults) lie and that making statements that are knowingly untruthful occurs in children as young as 3 years but that the underlying motivation for and understanding of lying differs according to age, stage of moral development, and external factors. Experimental studies have documented that 3- to 4-year-olds lie and that they are more likely to lie to cover up the misbehavior of a friend than a stranger.[16] If caught doing something they were

Downloaded from www.aappublications.org/news by guest on October 18, 2021

asked not to do (in a videotaped study), one-third of 4- to 6-year-olds will deny the act, with girls being much more likely to do so than boys.[16] Developmentally, although 3- to 4-year-olds are more likely to label anything that is not true as a lie, older children can distinguish between a mistake and intentional misrepresentation. Given that many children lie spontaneously in experimental situations that have no immediate consequences for the child, it is not surprising that under coercive situations, especially if asked by a parent or authority figure to do so, children will lie. Younger children may be coerced into lying to please parents, and older children may lie if threatened. The ability to detect whether a child is lying for professionals, including psychologists, psychiatrists, and law enforcement, is no better than chance and often significantly less than chance.[25,27–32]

Although a child's stage of development is the most likely factor influencing the quality of testimony in a courtroom appearance, other critical components include the nature of and duration of time since the event, the postexperience interviews, the preparation for court, and the nature of the courtroom experience. A conceptual model for the interplay of important variables influencing the accuracy of child testimony has been developed by Sas.[33]

Because trustworthy information is critical in achieving justice for the child and accused individual, principles have been established to address the needs of children before, during, and after trials. As research identified potential challenges of forensic interviews, including variability in responses in differing circumstances, the Eunice Kennedy Shriver National Institute of Child Health and Human Development issued a protocol for interviewing that has been documented to improve the accuracy of children's testimony (http://www.nichdprotocol.com/the-nichd-protocol).[34] Various states have adopted specific forensic interviewing protocols to ensure uniformity of practice. These forensic interviews generally are conducted within Child Advocacy Centers, known in some states as Child Justice Centers. The American Bar Association Center on Children and the Law also has issued a handbook discussing the language capabilities of children for use during court procedures.[35]

## IMPACT OF TESTIFYING

The support of children after they have provided testimony, although critically important, has received insufficient attention. Assessing the consequences of children testifying in court has many methodologic challenges; however, long-term studies have documented a number of issues, which are summarized here.[6,36,37] Studies have established clearly that children experience anxiety surrounding court appearances and that the main fear is facing the defendant. Other fears include being hurt by the defendant, embarrassment about crying or not being able to answer questions, and going to jail. The more frightened a child is, the less he or she is able to answer questions. The greatest predictors of inadequate responses are young age and severity of abuse. Postponements cause emotional difficulties, and having to testify more than once is associated with long-term mental health problems. The use of shielding procedures, such as testifying via a 2-way video-monitoring system, is less stressful for children than court appearances, and children providing shielded testimony give more accurate and detailed information. Although mock trials indicate that juries do not provide different verdicts for shielded or courtroom testimony, some studies have suggested that jurors are less likely to believe child witnesses who give shielded testimony.[37] It also has been documented that children have more long-term emotional problems if the assailant receives a light sentence; this finding is especially true for children who did not testify.[37] Therefore, testifying may improve outcomes for some children. For older children, experience as a witness in court has a negative effect on their view of legal system. International studies have documented that with substantial preparation of children for trial, emotional consequences are not different between those testifying inside the courtroom and those testifying outside the courtroom. For short-term consequences, in a matched control study in 218 children, those who testified, compared with those who did not testify, were more likely to experience anxiety and indicated that delay in testifying increased their anxiety.[38] Anxiety diminished after the trial, except for those without maternal support. Documented[37] and theoretical benefits for children testifying in court include decreased anxiety, feeling less victimized, and having a greater sense of control. A child's anxiety can be decreased through the use of child advocates and other support people.

In a study of long-term consequences, 176 children were interviewed 12 years after testifying.[6] Children who testified when they were younger had more severe externalizing symptoms. Testifying repeatedly was associated with worse mental health outcomes, and testifying about severe abuse had higher levels of trauma-related problems. Children who did not testify had worse outcomes if the accused received a light sentence.

These studies indicate the need for ongoing psychosocial support and counseling, not only for any

victimization that may have occurred but also for children's experiences of testifying at trial. The recognition of these consequences and the provision of postwitness counseling services can be provided through existing public resources, privately funded organizations, and volunteer organizations.

## IMMIGRATION COURTS

Current AAP policy asserts that no child, under any circumstance, should be required to represent himself or herself in an immigration proceeding.[39] However, by some estimates, nearly 70% of unaccompanied children and >70% of families with children must represent themselves, without attorneys, in immigration court.[40,41] Not surprisingly, children without counsel are far more likely to be deported.[3] Although federal regulations require that immigration courts provide interpreters for children who prefer languages other than English,[42] children may also experience difficulties in understanding proceedings as a result of age, development, culture, and a history of trauma. Similar to recommendations involving children in other courtroom proceedings, recommendations for immigration court cases involving unaccompanied alien children offer strategies that courts can use to support children in immigration proceedings, including preparation of children, use of child-sensitive questioning, allowing a young child to bring a toy or personal item into the courtroom, permitting the child to testify while seated next to an adult or friend, and removal of the judge's robe.[43] Although immigration courts do not appoint GALs for children placed in removal proceedings,[43,44] a personal representative or a GAL has the potential to increase children's understanding of proceedings and offer support for children in the courtroom.[43]

## ROLE OF THE PEDIATRICIAN

The pediatrician can help a child who is scheduled to appear in court in a number of ways, as follows:

1. If a pediatrician becomes aware of an impending divorce and potential custody dispute in which a child will be testifying, advising the parents to be aware of the stress and potential impact on the child's mental health is appropriate. Referring the child for mental health services, advising the parents not to use the child as a pawn or a messenger, and suggesting family counseling all may be appropriate, depending on the circumstances.

2. If, in the course of caring for a child, the pediatrician learns of a pending appearance in court, he or she can elicit the child's concerns, assure the child that he or she will not be judged for truthful answers, and help refer the family to individuals who can arrange an advance court visit. Court-appointed victims' advocates and GALs generally can arrange these services. Some states allow, and others mandate, special child advocates, including GALs, who may be lawyers. (For more information on your state, contact the AAP Division of State Government Affairs at stgov@aap.org.) The role of a GAL is to represent the child's best interests. State laws vary about whether a GAL is appointed, up to what age a GAL will represent a child, and GAL qualifications. In some situations, a lawyer may represent the wishes of the child, the traditional role of legal representation, whereas another individual represents a different position reflecting the child's best interests.[27] Pediatricians should be wary of appearing to coach the child, which can be used to the detriment of the prosecution in a criminal case. Similarly, pediatricians should obtain whatever extensive history is needed for the medical care and immediate safety of the child but should avoid trying to become "investigators."

3. A referral to a mental health provider is strongly recommended for the event causing the court appearance as well as to help deal with the stress of encountering the legal system.

4. The pediatrician can make efforts to request coordination of interviews to lessen fatigue on the child. Coordination of interviews is mandated in federal legislation but varies across states. The function of Children's Advocacy Centers is to bring the various investigative groups together to witness a single interview by a skilled forensic interviewer. They are specifically designed for the purpose of reducing the number of interviews, providing support to child victims, and eliciting forensic information.

5. When a child will appear in court, it should be encouraged, in states where it is allowed, for the child to be permitted accompaniment by support people and comfort objects. Pediatricians can encourage supportive family/friends to attend court to reduce the child's unfamiliarity with surroundings.

6. The pediatrician is encouraged to become aware of state statutory accommodations and judicial allowances if a patient is to appear in court. These include potential exclusion of the press and nonessential people, shielding of witness identity, and limiting repetition of questions. Depending on state law, judges may have substantial discretion in what will be allowed. Pediatricians

Downloaded from www.aappublications.org/news by guest on October 18, 2021

can work with the attorneys in the case (whether prosecutor, child's attorney, GAL, etc) and ask that they petition for these accommodations.

7. Appeals are common and may lead to retrials. Children experience anxiety while waiting to learn whether there will be a second trial and whether they will need to endure testifying in court again. This situation creates continuing stress and an emotional rollercoaster for children.[45] Consequently, ongoing and long-term follow-up by the pediatrician usually is necessary to monitor a child for depression, sleep disorders, and changes in school functioning, with appropriate referral for counseling and mental health services. Being alert to parent/guardian depression also is important because of the potential impact on the child.

8. As a child advocate, the pediatrician may encourage the parent, guardian, or GAL to obtain for the child witness all of the special accommodations, services, and judicial allowances available under federal and state law (eg, coordination of interviews, comfort objects, exclusion of the press and nonessential people from court, shielding of witnesses' identity, attendance by supportive people). By assuming a supportive role, the pediatrician not only promotes the best possible and least traumatizing court experience for the child but also, by allowing the child to accurately provide information, potentially contributes to the integrity of the legal process.

9. Pediatricians are likely to encounter children traumatized in a variety of situations. In addition to being aware of and able to recognize psychological trauma, they should be willing to respond. Psychologists experienced in trauma management are available in many communities and can be a valuable resource for pediatricians. In addition, the AAP resource "Helping Foster and Adoptive Families Cope With Trauma" may be helpful for children in foster or adoptive families who must testify in court.

## AAP POLICY RECOMMENDATIONS

1. The AAP supports the 1990 Child Victims' and Child Witnesses' Rights Act,[10] the comprehensive legal reforms of the 2002 Uniform Child Witness Testimony by Alternative Methods Act,[13] and the 2005 Attorney General guidelines.[12]

2. The AAP, in concurrence with portions of the federal guidelines, encourages state chapters to support state legislation expanding rights currently granted to sexually and physically abused witnesses to all children who have witnessed violent acts and who are testifying in court.

3. The AAP urges state chapters to advocate that state courts do whatever is necessary, within the framework of existing state laws and resources, to prevent psychological harm to the child victim/witness as a result of participating in the judicial process.

4. The AAP supports expanding specific statutory and judicial accommodations, consistent with the development of new evidence that supports the ability of child witnesses to provide accurate information, to support their well-being during and after a trial. A supportive interview enhances the accuracy of a child's testimony,[46] and accurate testimony by a child, in turn, supports the best interests of society and adults involved in the legal proceeding.

5. Given the complexities of the legal system and the documented stresses experienced by children in the courtroom, the AAP recommends that state chapters advocate for the judicial system to appoint and pay for GALs routinely to represent the best interests of children during all legal procedures.

6. In forensic interviews preceding a trial, the use of a validated format for interviewing, such as that of the *Eunice Kennedy Shriver* National Institute of Child Health and Human Development, is strongly recommended. As new validated instruments are developed, the AAP recommends state chapters ensure that such measures are used appropriately in the court system.

7. The AAP recommends the application of developmentally appropriate and scientifically effective methods for addressing children who are to be witnesses; questions should be developmentally appropriate, nonambiguous, and nonthreatening. To limit fatigue and improve the accuracy and reliability of child responses, there should be a limited number of questions per hour, specified breaks consistent with age, and prohibition of irrelevant questions designed to embarrass the child or that are demeaning or imply the child is incompetent. In addition, it is recommended that only individuals with qualifications and experience working with child witnesses be allowed to question children.

8. The AAP recommends that confidentiality be maintained with respect to child witnesses before, during, and after any courtroom appearance. Publicity and loss of privacy may prolong the child's sense of shame and stigma stemming from the

Downloaded from www.aappublications.org/news by guest on October 18, 2021

abuse beyond the immediate courtroom appearance. Furthermore, public disclosure of events precipitating a school-aged child's appearance in court has the potential to lead to exclusionary behavior and bullying by other children.[47]

9. On the basis of studies of the psychological consequences of children testifying, the AAP recommends mandatory state-funded, evidence-based therapies for traumatized children, including child victims and child witnesses. In federal court, these services should be supported similarly.

10. State chapters should consider identifying an individual with expertise in children testifying (child abuse pediatrician or individual with legal, legislative, or related experience) who is willing to assist with advocacy issues and to consult with pediatricians and parents about the process of helping children who will become or already are witnesses in court.

11. Given the substantial gaps in knowledge despite important work by several groups of investigators, funding of research should be increased by states to improve and ensure the ability of children to provide accurate information in court. Federal funding also should be made available to develop interventions to improve outcomes for children appearing in court.

12. For immigrant children facing deportation proceedings that include serving as a child witness, the AAP supports universal access to pro bono legal representation and recommends that GALs or community-based court advocates be encouraged to support them.

## FUTURE RESEARCH

Substantial gaps exist in our knowledge of how to optimize the care of children in the courtroom. A limited number of long-term follow-up studies on the adverse consequences of child testimony have been conducted, and no prospective studies on the benefits of specific system improvements to benefit the child or the legal system have been performed. Adding questions to ongoing national and longitudinal data collection efforts would be invaluable in providing partial answers to some of these questions. Because a number of accommodations for courtroom appearances have been implemented by some states, a natural study of comparative effectiveness could be accomplished by comparing interstate data. Finally, with advances in technology and changes in law, interventions should be developed and tested for their ability to reduce adverse consequences and improve outcomes for children interacting with the judicial system.

## ADDITIONAL RESOURCES

American Academy of Pediatrics. helping foster and adoptive families cope with trauma. Available at: www.aap.org/traumaguide

American Bar Association, Center on Children and the Law. Bar-youth empowerment. Available at: www.americanbar.org/groups/child_law

Khoury A. Seen and heard: involving children in dependency court. American Bar Association Child Law Practice. 2006;25:145–155

### ACKNOWLEDGMENTS

We are grateful for the thoughtful contributions on early drafts by Charene Mack, RN, Laura Rosenbury, JD, and Lois Weithorn, JD, PhD.

### AUTHOR

Robert H. Pantell, MD, FAAP

### CONTRIBUTORS

Julie Linton, MD, FAAP
Marsha Griffin, MD, FAAP

### COMMITTEE ON PSYCHOSOCIAL ASPECTS OF CHILD AND FAMILY HEALTH, 2016–2017

Michael Yogman, MD, FAAP, Chairperson
Benjamin S. Siegel, MD, FAAP, Past Chairperson (2009-2014), Committee Member (2004-2009)
Thresia Gambon, MD, FAAP
Arthur Lavin, MD, FAAP
Gerri Mattson, MD, FAAP
Jason Richard Rafferty, MD, MPH, EdM
Lawrence Sagin Wissow, MD, MPH, FAAP

### CONSULTANT

George J. Cohen, MD, FAAP – *National Consortium for Child and Adolescent Mental Health Services*

### LIAISONS

Sharon Berry, PhD – *Society of Pediatric Psychology*
Terry Carmichael, MSW – *National Association of Social Workers*
Edward R. Christopherson, PhD, FAAP – *Society of Pediatric Psychology*
Norah Johnson, PhD, RN, CPNP-BC – *National Association of Pediatric Nurse Practitioners*
L. Read Sulik, MD – *American Academy of Child and Adolescent Psychiatry*

### STAFF

Stephanie Domain, MS

### ABBREVIATIONS

AAP: American Academy of Pediatrics
GAL: guardian ad litem

POTENTIAL CONFLICT OF INTEREST: The author has indicated he has no potential conflicts of interest to disclose.

Downloaded from www.aappublications.org/news by guest on October 18, 2021

**REFERENCES**

1. Ceci SJ, de Bruyn E. Child witnesses in court: a growing dilemma. *Children Today*. US Department of Health and Human Services; 1993;22(1). Available at: www.pbs.org/wgbh/pages/frontline/shows/innocence/readings/childwitnesses.html. Accessed January 21, 2016

2. American Bar Association, Criminal Justice Section. Report to the House of Delegates. Recommendation for Legal Advice and Counsel to Child Victims of Crime. Washington, DC: American Bar Association; February 2009. Available at: www.americanbar.org/content/dam/aba/publishing/criminal_justice_section_newsletter/crimjust_policy_my09101d.authcheckdam.pdf. Accessed January 21, 2016

3. Garner AS, Shonkoff JP; Committee on Psychosocial Aspects of Child and Family Health; Committee on Early Childhood, Adoption, and Dependent Care; Section on Developmental and Behavioral Pediatrics. Early childhood adversity, toxic stress, and the role of the pediatrician: translating developmental science into lifelong health. *Pediatrics*. 2012;129(1). Available at: www.pediatrics.org/cgi/content/full/129/1/e224

4. Shonkoff JP, Garner AS; Committee on Psychosocial Aspects of Child and Family Health; Committee on Early Childhood, Adoption, and Dependent Care; Section on Developmental and Behavioral Pediatrics. The lifelong effects of early childhood adversity and toxic stress. *Pediatrics*. 2012;129(1). Available at: www.pediatrics.org/cgi/content/full/129/1/e232

5. Drury SS, Mabile E, Brett ZH, et al. The association of telomere length with family violence and disruption. *Pediatrics*. 2014;134(1). Available at: www.pediatrics.org/cgi/content/full/134/1/e128

6. Quas JA, Sumaroka M. Consequences of legal involvement on child victims of maltreatment. In: Lamb M, LaRooy D, Katz C, Malloy L, eds. *Children's Testimony*. Cambridge, United Kingdom: University of Cambridge Press; 2012:323–350

7. Cooper TA. Sacrificing the child to convict the defendant: secondary traumatization of child witnesses by prosecutors, their inherent conflict of interest, and the need for child witness counsel. *Cardozo Public Law, Policy, and Ethics Journal*. 2011;9:239–286

8. *Coy v Iowa*, 487 US 1012 (1988)

9. *Maryland v Craig*, 497 US 836 (1990)

10. Victims of Child Abuse Act, Pub L No. 101-647 (1990)

11. Child victims' and child witnesses' rights. 18 USC §3509 (2011)

12. US Department of Justice. Attorney general guidelines for victim and witness assistance. Washington, DC: US Department of Justice; 2011 (updated 2012). Available at: www.justice.gov/sites/default/files/olp/docs/ag_guidelines2012.pdf. Accessed January 21, 2016

13. National Conference of Commissioners on Uniform State Laws. Uniform Child Witness Testimony by Alternative Methods Act. Tucson, AZ: National Conference of Commissioners on Uniform State Laws; 2002. Available at: www.uniformlaws.org/shared/docs/child_witness_testimony/child_witness_final_02.pdf. Accessed January 21, 2016

14. US Department of Health and Human Services, Administration for Children and Families, Administration on Children, Youth and Families, Children's Bureau. Child Maltreatment 2012. Washington, DC: US Department of Health and Human Services; 2013. Available at: www.acf.hhs.gov/programs/cb/resource/child-maltreatment-2012. Accessed January 21, 2016

15. Finkelhor D, Turner H, Ormrod R, Hamby SL. Violence, abuse, and crime exposure in a national sample of children and youth. *Pediatrics*. 2009;124(5):1411–1423

16. Ekman P. Lying, leakage, and clues to deceit. In: *Telling Lies*. New York, NY: WW Norton; 1985:25–42

17. *Roper v Simmons*, 543 US (2005)

18. *Miller v Alabama*, 567 US (2012)

19. Faigman D, Ceci C. Children's memory and testimony. In: Faigman D, Blumenthal J, Cheng E, Mnookin J, Murphy E, Sanders J, eds. *Modern Scientific Evidence: The Law and Science of Expert Testimony. Vol 2*. St Paul, MN: West/Thomson Publishing Co; 2009–2010:559–645

20. Merritt KA, Ornstein PA, Spicker B. Children's memory for a salient medical procedure: implications for testimony. *Pediatrics*. 1994;94(1):17–23

21. Poole DA, White LT. Two years later: effect of question repetition and retention interval on the eyewitness testimony of children and adults. *Dev Psychol*. 1993;29(5):844–853

22. Lepore SJ. Child witness: cognitive and social factors related to memory and testimony. *Issues in Child Abuse Accusations*. 1991;3(2):65–89

23. Goodman GS, Quas JA, Ogle CM. Child maltreatment and memory. *Annu Rev Psychol*. 2010;61:325–351

24. Ceci SJ, Bruck M. Suggestibility of the child witness: a historical review and synthesis. *Psychol Bull*. 1993;113(3):403–439

25. Leichtman MD, Ceci SJ. The effects of stereotypes and suggestions on pre-schoolers reports. *Dev Psychol*. 1995;31(4):568–578

26. Zajac R, Gross J, Hayne H. Asked and answered: questioning children in the courtroom. *Psychiatry, Psychology and Law*. 2003;10(1):199–209

27. Leach AM, Talwar V, Lee K, Bala N, Lindsay RC. "Intuitive" lie detection of children's deception by law enforcement officials and university students. *Law Hum Behav*. 2004;28(6):661–685

28. Bruck M, Ceci SJ, Hembrooke H. Reliability and credibility of young children's reports. From research to policy and practice. *Am Psychol*. 1998;53(2):136–151

29. Ceci SJ, Bruck M. *Jeopardy in the Courtroom: The Scientific Analysis of Children's Testimony*. Washington, DC: American Psychological Association; 1995

30. Goodman GS, Melinder A. Child witness research and forensic interviews of young children: a review. *Legal and Criminological Psychology*. 2007;12(1):1–19

Downloaded from www.aappublications.org/news by guest on October 18, 2021

31. Ekman P. Lying at different ages. In: *Why Kids Lie*. New York, NY: Scribners; 1989:66–97
32. Edelstein RS, Luten TL, Ekman P, Goodman GS. Detecting lies in children and adults. *Law Hum Behav*. 2006;30(1):1–10
33. Sas L. *The Interaction Between Children's Developmental Capabilities and the Courtroom Environment: The Impact on Testimonial Competency*. Ottawa, Canada: Research and Statistics Division, Policy Centre for Victims' Issues, Department of Justice Canada; 2002. Available at: www.justice.gc.ca/eng/rp-pr/csj-sjc/ccs-ajc/rr02_6/rr02_6.pdf. Accessed November 2, 2015
34. Orbach Y, Hershkowitz I, Lamb ME, Sternberg KJ, Esplin PW, Horowitz D. Assessing the value of structured protocols for forensic interviews of alleged child abuse victims. *Child Abuse Negl*. 2000;24(6):733–752
35. Walker AG. *Handbook on Questioning Children: A Linguistic Perspective*, 3rd ed. Chicago, IL: American Bar Association Center on Children and the Law; 2014
36. Quas JA, Goodman GS, Ghetti S, et al. Childhood sexual assault victims: long term outcomes after testifying in criminal court. *Monographs of the Society for Research in Child Development*. 2005;70(2):1–128
37. Quas JA, Goodman GS. Consequences of criminal court involvement for child victims. *Psychol Public Policy Law*. 2012;18(3):392–414
38. Goodman GS, Taub EP, Jones DP, et al. Testifying in criminal court: emotional effects on child sexual assault victims. *Monogr Soc Res Child Dev*. 1992;57(5):1–142; discussion: 143–161
39. Council on Community Pediatrics. Community pediatrics: navigating the intersection of medicine, public health, and social determinants of children's health. *Pediatrics*. 2013;131(3):623–628
40. TRAC Immigration. Representation for unaccompanied children in immigration court. Available at: http://trac.syr.edu/immigration/reports/371/. Accessed July 8, 2016
41. Kids in Need of Defense, Women's Refugee Commission. One year later: where are the refugee mothers and children? Available at: https://supportkind.org/wp-content/uploads/2015/07/One-Year-Later.pdf. Accessed July 8, 2016
42. US Department of Justice. Immigration Court Practice Manual. Chapter 5—motions before the immigration court. Available at: https://www.justice.gov/eoir/office-chief-immigration-judge-0. Accessed July 8, 2016
43. US Department of Justice. Guidelines for immigration court cases involving unaccompanied alien children. Available at: https://www.justice.gov/sites/default/files/eoir/legacy/2007/05/22/07-01.pdf. Accessed July 8, 2016
44. Kids in Need of Defense (KIND). Chapter 1: representing children in immigration matters. Available at: https://supportkind.org/wp-content/uploads/2015/04/Representing-Children-In-Immigration-Matters-FULL-VERSION.pdf. Accessed July 8, 2016
45. Patton WW. Viewing child witnesses through a psychiatric lens: how attorney's ethical duties exacerbate children's psychopathology. *Widener Law Rev*. 2010;16:369–4154
46. Rush EB, Quas JA, Yim IS, Nikolayev M, Clark SE, Larson RP. Stress, interviewer support, and children's eyewitness identification accuracy. *Child Dev*. 2014;85(3):1292–1305
47. Putnam C, Finkelhor D. Mitigating the impact of publicity on child crime victims and witnesses. In: Dowd NE, Singer DG, Wilson RF, eds. *Handbook of Children, Culture, and Violence*. Thousand Oaks, CA: Sage Publications; 2006:114–135

Downloaded from www.aappublications.org/news by guest on October 18, 2021

**The Child Witness in the Courtroom**
Robert H. Pantell and COMMITTEE ON PSYCHOSOCIAL ASPECTS OF CHILD AND FAMILY HEALTH
*Pediatrics* originally published online February 20, 2017;

| | |
|---|---|
| **Updated Information & Services** | including high resolution figures, can be found at: http://pediatrics.aappublications.org/content/early/2017/02/16/peds.2016-4008 |
| **References** | This article cites 23 articles, 5 of which you can access for free at: http://pediatrics.aappublications.org/content/early/2017/02/16/peds.2016-4008#BIBL |
| **Subspecialty Collections** | This article, along with others on similar topics, appears in the following collection(s): **Advocacy** http://www.aappublications.org/cgi/collection/advocacy_sub |
| **Permissions & Licensing** | Information about reproducing this article in parts (figures, tables) or in its entirety can be found online at: http://www.aappublications.org/site/misc/Permissions.xhtml |
| **Reprints** | Information about ordering reprints can be found online: http://www.aappublications.org/site/misc/reprints.xhtml |



**American Academy of Pediatrics**
DEDICATED TO THE HEALTH OF ALL CHILDREN®

Downloaded from www.aappublications.org/news by guest on October 18, 2021

# PEDIATRICS®
OFFICIAL JOURNAL OF THE AMERICAN ACADEMY OF PEDIATRICS

**The Child Witness in the Courtroom**
Robert H. Pantell and COMMITTEE ON PSYCHOSOCIAL ASPECTS OF CHILD AND FAMILY HEALTH
*Pediatrics* originally published online February 20, 2017;

The online version of this article, along with updated information and services, is located on the World Wide Web at:
http://pediatrics.aappublications.org/content/early/2017/02/16/peds.2016-4008

Pediatrics is the official journal of the American Academy of Pediatrics. A monthly publication, it has been published continuously since 1948. Pediatrics is owned, published, and trademarked by the American Academy of Pediatrics, 345 Park Avenue, Itasca, Illinois, 60143. Copyright © 2017 by the American Academy of Pediatrics. All rights reserved. Print ISSN: 1073-0397.



American Academy of Pediatrics
DEDICATED TO THE HEALTH OF ALL CHILDREN®

Downloaded from www.aappublications.org/news by guest on October 18, 2021