UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:21-cr-355-WFJ-CPT |
| PLAINTIFF, | ) | Tampa |
| | ) | March 11, 2024 |
| v. | ) | 8:56 a.m. |
| | ) | |
| GREGORY ALLEN WILLIAMSON, | ) | |
| | ) | |
| DEFENDANT. | ) | |

DAY 1
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:
    MS. ERIN CLAIRE FAVORIT
    MS. LINDSEY NICOLE SCHMIDT
    United States Attorney's Office
    Suite 3200
    400 N. Tampa Street
    Tampa, FL 33602-4798

For the Defendant:
    MR. BJORN ERIK BRUNVAND
    MS. WILLENGY RAMOS-WICKS
    Bjorn E. Brunvand, PA
    615 Turner Street
    Clearwater, FL 33756

Court Reporter:         Tracey Aurelio, CRR, RMR, RDR
                        Federal Official Court Reporter
                        801 N. Florida Avenue, 15th Floor
                        Tampa, Florida 33602
                        (813) 301-5448

        Proceedings recorded by mechanical stenography,
transcript produced by computer.

```
 1                    I N D E X

 2    Jury sworn                                      110

 3    Opening Statement
      Counsel for the Government                      112
 4
      ASHLEY GUIZZOTTI
 5      Direct Examination (Ms. Favorit)              119
        Cross-Examination (Mr. Brunvand)             128
 6      Redirect Examination (Ms. Favorit)           136

 7    JEFFREY PASLER
        Direct Examination (Ms. Schmidt)             138
 8
      CHRISTINE TAYLOR
 9      Direct Examination (Ms. Schmidt)             144
        Cross-Examination (Mr. Brunvand)             155
10      Redirect Examination (Ms. Schmidt)           157

11    CHARLES SLOAN
        Direct Examination (Ms. Schmidt)             158
12
      ERIC WEDIN
13      Direct Examination (Ms. Schmidt)             166
        Cross-Examination (Mr. Brunvand)             171
14      Redirect Examination (Ms. Schmidt)           172

15

16

17

18

19

20

21

22

23

24

25
```

_____

 2      (Proceedings commenced at 8:56 a.m.)

 3           THE COURT:  Let's just go on the record.  I don't

 4  have my robe on, but I'm not expecting the venire for a

 5  minute.  They are coming in, 10 minutes, 15 minutes?

 6           THE COURTROOM DEPUTY:  About 10 minutes.

 7           THE COURT:  Is it Juror 11?  FYI, Juror 11, normally

 8  they don't have phones.  He is monitoring his serum glucose or

 9  insulin or whatever, so he is going to have a phone.

10           Government, when do you expect the female, young

11  female with the dog?  What time do you expect that?

12           MS. FAVORIT:  I would expect her tomorrow.  I will

13  bring her first thing in the morning.  So I'm not sure when

14  she will get on.

15           THE COURT:  Tell me, this screen is -- just orient me

16  for a minute about the screen.  This is for the exhibits?

17           MS. FAVORIT:  Yes, Your Honor.  This is for the child

18  pornography specifically.  So I have the redacted version I'll

19  show up there, and then that way it limits who is looking at

20  it.

21           THE COURT:  Super.  So I know Mr. Brunvand has picked

22  juries with me before.  So I will do just the most basic stuff

23  and then I'm going to throw the questions to you guys.  So the

24  government will go first.  You probably heard me say this

25  already.  Please don't say, who has a nonrefundable plane

1  ticket this week?  And then we'll get 15 hands.  So ask

2  questions, any question you want to pick a jury, not to argue

3  the case, argue the law or talk about the law, anything like

4  that.

5           Anything else from the government?

6           MS. FAVORIT:  The last pretrial matter I wanted to

7  address, Your Honor, is there's a Sarasota homicide trial

8  ongoing that we are sharing witnesses with.  We have narrowed

9  it down to two witnesses that we are sharing with them.  And I

10 brought the case number and the judge's name and the judge's

11 phone number in case you needed it, but one of those witnesses

12 we have for today, so I expect that will be no issue.

13          THE COURT:  Hold on.  We are kind of getting into the

14 merits here.  So give me just a second.  I will go put on the

15 appropriate attire and we will start the formal proceedings

16 now.  Give me a second.  Give the defense a chance to say

17 hello.

18      (Brief recess taken.)

19          THE COURT:  Back on the record.  We're in 21-cr-355.

20 Let's just start the case here.

21          Appearances for the government, please.

22          MS. FAVORIT:  Good morning, Your Honor.  Erin Favorit

23 on behalf of the United States.  And I'm also here with --

24          MS. SCHMIDT:  Lindsey Schmidt, on behalf of the

25 United States, Your Honor.

1          MS. FAVORIT:  And at our counsel table is James

2    Keller, the case agent.

3          THE COURT:  Special Agent Keller, who are you with,

4    sir?

5          THE WITNESS:  I'm Task Force Officer James Keller,

6    North Port Police Department but with FBI.

7          MR. BRUNVAND:  Good morning, Your Honor.  Bjorn

8    Brunvand and Willengy Ramos-Wicks on behalf of Gregory

9    Williamson.

10          THE COURT:  Well, thank you.

11          So we were just talking a little bit about

12    housekeeping.  So the witnesses we are sharing with Sarasota,

13    who is the judge?

14          MS. FAVORIT:  Your Honor, it's Judge Thomas Krug.

15          THE COURT:  I don't know Judge Krug, but I'm sure

16    Mr. Brunvand does.  We'll deputize him if we need some

17    diplomacy with the other colleague.

18          So are you still thinking we'll be done -- your best

19    estimate, government, we'll be done this week?

20          MS. FAVORIT:  Absolutely, Your Honor.  The reason I

21    did want to bring it up is our forensic agent is a pretty

22    significant witness in our case, but he is going to testify in

23    the homicide trial tomorrow.  So he is essentially not

24    available to us because the courthouses are, you know, an hour

25    and 30 minutes away.  So it's not like he -- I would

1  absolutely put him in a car and bring him here if I could, but

2  I just don't expect to be able to make that happen.  So we

3  have him all day Wednesday.  So that's the plan.  I was just

4  concerned if for some reason we got through our case and he's

5  my last witness, you know, he won't be available until

6  Wednesday morning.

7        THE COURT:  I'll just tell them I think we'll be done

8  this week.

9        Mr. Brunvand, do you disagree with that?

10        MR. BRUNVAND:  I do not disagree with that.  I think

11  Thursday we will be done.

12        THE COURT:  Worse comes to worst, I'm sure you can

13  put somebody in a police cruiser and get him up here in an

14  hour if we had to.

15        MS. FAVORIT:  We have some backup plans, and we are

16  calling our witnesses a little bit out of order just to

17  accommodate that trial.

18        THE COURT:  How are we looking here?

19        FYI, Juror Number 40 -- Mr. Smith, question.  What do

20  you mean she's already on the list?

21        THE COURTROOM DEPUTY:  They created the jury list.

22  They just told the jury department this.

23        THE COURT:  Juror 40 is a convicted felon.  I don't

24  think she would say that if it weren't true, so I'm going to

25  let her go.  There are all kinds of issues.  She is not

1  legally capable of sitting.  If she sat, there would probably

2  be some crime somewhere.

3          Anything else?  They are coming up now or in a

4  minute?

5          THE COURTROOM DEPUTY:  She asked if I can go and get

6  them, Judge.

7          THE COURT:  So we've probably got maybe 10 minutes

8  here.  Anything else?

9          We'll be at ease.  Thank you.

10     (Brief recess taken.)

11          THE COURT:  Counsel, Number 40, I misspoke.  She has

12  her rights restored.  So she will be among the live jurors

13  here, so to speak.

14          He is going to bring them in when they are ready.

15  Depending on what we get left, we'll probably get two

16  alternates.  You'll have one strike if we have two.  If we

17  have more than two, you'll have two strikes.  I don't know if

18  COVID is gone or not.  I think it's gone to some extent.

19          And government, at some point I will have you read

20  out your witnesses.

21          Mr. Brunvand, do you want me to recognize you for

22  that purpose also or just leave it be?

23          MR. BRUNVAND:  I would like for the government maybe

24  to include my witness --

25          THE COURT:  Sure.

1          MR. BRUNVAND:  -- when they announce witnesses.

2          THE COURT:  Make sure they have that lady's name.

3          MR. BRUNVAND:  I think they do.

4          THE COURT:  We have one juror that wants to know if

5    he can bring his wife up to jury selection.  I said, yes, as

6    long as there's room.

7          We'll be at ease.  I think they are going to get some

8    more chairs in here.

9       (Brief recess taken.)

10         THE COURT:  We normally pick jurors on 17.  There is

11   more room.  Somebody is using it now, so we are going to play

12   a little musical chairs here for just a moment.

13         Let's call the case, please, Mr. Smith.

14         THE COURTROOM DEPUTY:  The Court calls Case Number

15   21-cr-355, United States of America v. Gregory Williamson.

16         Counsel for the government, please identify

17   yourselves.

18         MS. FAVORIT:  Good morning, Your Honor.  Erin Favorit

19   on behalf of the United States.  And I'm also here with --

20         MS. SCHMIDT:  Lindsey Schmidt on behalf of the United

21   States.

22         THE COURT:  And defense, please?

23         MR. BRUNVAND:  Good morning.  Bjorn Brunvand and

24   Willengy Ramos-Wicks on behalf of Greg Williamson.

25         THE COURT:  Thank you.

1              So the case is United States v. Williamson.  My name

2    is Bill Jung.  I'm a U.S. District Judge from the Middle

3    District of Florida which, as you know, stretches from

4    Jacksonville across the state, Orlando all the way down to

5    Naples.

6              So thank you for being here.  I know it's

7    inconvenient.  Especially the older you get, trust me, that

8    hour you lost is more and more painful, but thank you.  I

9    appreciate it.

10             You know, if we're going to keep our country the

11   way -- it's pretty tough times these days, a lot of places,

12   this thing, this jury right, which we have had since day one

13   in this country, is one of the most important things that

14   keeps a democracy going, because you don't get this in Cuba or

15   China or Russia for wherever we don't want to be.  One thing

16   they don't have is a jury right.  And the reason why, it is

17   sort of the ultimate protection.

18             This is a dispute between the United States of

19   America and Mr. Williamson.  If I got me and the general at

20   MacDill Air Force Base and Donald Trump and Joe Biden in here,

21   we are powerless to decide this.  There is a dispute of facts

22   in this case.  I have no power to decide this.  Donald Trump,

23   Joe Biden, General -- whatever his name is -- the only people

24   that have that power to decide this dispute between the United

25   States of America and Mr. Williamson are you.  And so that's

1    to protect all of us to have this right.  So it's an important

2    thing and it requires you -- other than in times of war, there

3    is no greater service to your country than what we're doing

4    here.

5         So this is a criminal case.  I expect we will be

6    done, absent some big issue, we'll be done this week.  Unless

7    there is some big thing that comes up, I'm sure we'll be done

8    this week.

9         So let me just talk about it a little bit.  I'm Bill

10   Jung.  This was Officer Brian Archambault.  He's a retired

11   FHP.  He's here for security.  We don't need him for security

12   in this case, but we had a case last week where we needed him

13   a little bit for security, but he's also here to help you all.

14        Jeremiah Smith is the deputy clerk.  And I call him

15   the COO, chief operating officer.  I'm the CEO.  He's the COO.

16   He makes sure the train runs on time and we keep straight on

17   our exhibits.  And he is also here for your assistance,

18   Mr. Smith, Officer Arch we call him, Officer Archambault.  And

19   then Tracey Aurelio is over here.  She's the court reporter.

20   She is taking down everything we say, not for the jury this

21   week but for the permanent record.  So the jury will not have

22   her work product, but the permanent record will have it later.

23        What we are about to do now is to pick a jury, of

24   course.  Each side wants a jury that can be fair, impartial

25   and be a judge of the facts.  I do the law, and you all do the

1    facts.  So we will ask some questions.  If there is anything

2    embarrassing that you don't want to talk about in public, we

3    can always come over to the sidebar, and the lawyers will come

4    up and we will do it at the sidebar.

5           Generally we are going to run -- the jury can tell

6    me, but generally we are going to run about 9:00 to 5:00.  If

7    you can start a little earlier or go a little longer, the more

8    evidence we hear, the faster the case goes and it might end a

9    little bit sooner, but that will be up to the jury.  And we

10   will try to be done roughly at 5:00.  And then the jury will

11   have whatever time they have at their leisure to deliberate on

12   the case afterward in private.

13          So it's a criminal matter.  The United States has

14   brought criminal charges.  And whatever the charges are, there

15   are three rules of criminal procedure that also have been with

16   us.  They protect me.  I've got three boys like age 24 to 19.

17   Every time they go out and come home at 2:00 a.m. I'm like,

18   oh, God.  They protect them.  They protect you.  They protect

19   your families, these principles.

20          And the first one is that the charge, the indictment

21   that the government has brought is not proof of anything.

22   It's simply a piece of paper that hails you into court.  So

23   the fact that Mr. Williamson was indicted just simply means

24   he's got to come and defend.  It doesn't mean anything else.

25   He's got no obligation to put on any evidence.  The government

```
 1  bears the burden of proof at all times in this case.  The
 2  defense, Mr. Brunvand and his team, Ms. Ramos-Wicks and
 3  Mr. Williamson have no burden to put on any evidence.  And as
 4  he sits here, just like me and you if we got arrested or
 5  charged, Mr. Williamson is innocent.  And he's innocent unless
 6  and until a jury unanimously finds to the contrary at the end
 7  of the case.  That stays with him, that presumption.  He is
 8  not required to testify.  If he doesn't testify, it can't be
 9  held against him.  And those protections stay with him the
10  whole time, just like they stay with me and you or our family
11  or everyone in this country.
12          So let me say one other thing about the charges as
13  well.  These charges, the allegations are child pornography
14  and sexual abuse of a minor.  Now, you might say, well, I'm
15  all against that, I can't be a juror here.  Well, of course
16  you can.  What if this were a murder case?  We are all against
17  murder.  And the question isn't whether we are against murder,
18  or sometimes I get it on the drug cases, I'm against fentanyl.
19  Well, everybody is against fentanyl being sold on the street.
20  That's not the issue.  The issue is the government's
21  allegations proven beyond a reasonable doubt by them.  That's
22  the issue.
23          The best example is, if you lived here, a certain
24  age, like I have, you remember when the Sunshine Skyway
25  crashed.  How could you sit in a jury on that?  Forty-one
```

1    people dead, I think a school bus, you know.  But that's not

2    the issue.  That's not the issue.

3         The issue is did the engineers forget to put in the

4    right support structure?  Was it the boat driver that drove it

5    into the side of the thing?  Was it an act of God because it

6    came down during one of these big, you know, whatever you want

7    to call it, Florida thunder boomers that you can't see 5 feet

8    in front of your face?  That's the issue.

9         So the nature of these charges, although we would all

10   say we are certainly against what the charge is, is not the

11   issue.  The issue is what are the facts.  Who, if anyone, did

12   it, and can the government prove that.  That's the issue.  So

13   I just wanted to state that out front because I get that

14   often.

15        The other one I get is with the law enforcement

16   witnesses, you know, well, I back the blue.  I can't -- how

17   can I judge a police officer?  They're put upon and all this.

18   In this day and age, my brother was a cop for 30 years, that's

19   not the issue either.  These kids I got at home, I just love

20   them like oxygen, but when one of them says gee, Dad, I don't

21   know how the beer cans got in the back of my car, my car, my

22   little BS meter shoots off.  So that's the same thing.

23        Whether you support police officers or support law

24   enforcement is not relevant.  The question is, are you unable,

25   is your mind so weak that you can't -- that like my kid, who I

love to the end of the earth, I can't say, oh, yeah, they flew

in there, huh?  So that's the issue I get sometimes as well.

So let's do this.  The government has a list of

potential witnesses and they may not call all these.  So you

heard these numbers up here.  You heard the names here.

Government, why don't you read out those witnesses,

and then we'll ask anyone if they know any of these folks.

MS. FAVORIT:  Task Force Officer James Keller,

Special Agent Charles Sloan, Detective Lee Wallace, Commander

Jeffrey Pasler, Erick Quevedo, Leslie Santos, Jack Knuckles,

Detective Eric Wedin, Aliona Williamson, Deea Apostol, Brooke

Buzzell, Christine Taylor, Ashley Guizotti, and Elisa

Williamson.

THE COURT:  This district has many counties.  What

county was the location of most of the government's factual

charges?

MS. FAVORIT:  The County of Sarasota and the City of

North Port.

THE COURT:  Some of these names are fairly common,

but does anybody know any of these participants,

Mr. Williamson, me, Bill Jung, Jeremiah Smith or these witness

or the lawyers?  Anybody think, yes, I go to church with this

person or played, you know -- if you know Officer Arch, he

plays on, I guess it's over 30 hockey team.  Oh, yeah, I'm on

his rival team.  Anybody know these names we've said?  I don't

1   see any.

2          So we are going to do what I call name, rank, and

3   serial number.  I'll do the first one.  See if I have the

4   script.  So do me a favor.  We've got a lot of people here.

5   When you are talking, please stand up and give us your juror

6   number to help Ms. Aurelio.

7          So I'm going to do the first one.  So I'm just going

8   to say I'm Juror Number 12.  So, all right.  I'm Juror

9   Number 12, Bill Jung.  I live in Brandon.  I have lived there

10  since 1983.  I've got a law degree.  I'm a judge.  I was a

11  retired lawyer.  I'm married.  My wife was a law clerk in this

12  building, actually, and then she's a stay-at-home mom now.

13  This next one is hard because the children's ages always

14  change.  I have four, 24, 22, 19 and 18.  No.  Twenty and 18.

15  Don't tell him I said that.  And two of them are in college.

16  One does computers in Seattle with Microsoft, and one of them

17  is like a property manager in Virginia.  I did not serve in

18  the military.  And then on your juror service, if you served

19  on a jury, tell us is it criminal or civil and did you reach a

20  verdict, but don't say, you know, what the verdict was or

21  anything like that.  And I was called twice for jury duty.  I

22  never sat.

23          So that was mine.  And let's just get right going

24  with Mr. Simpson.  And we will go all the way down.  And the

25  acoustics are bad, so please be sure you talk into that mic.

1          Yes, sir.

2          PROSPECTIVE JUROR:  My name is Andrew Simpson.  I

3  live in Gibsonton, lived four years there, Florida for six.

4  Graduated high school.  I window tint right now.  I previously

5  used to drive a semi.  I am married.  My wife doesn't work.  I

6  have two children.  One is 27 and she's in marketing.  And

7  one's 25.  She's in health care.  I didn't serve in the

8  military, and I did serve on a criminal case in Detroit.  It

9  settled before we started.

10         THE COURT:  Thank you.

11         PROSPECTIVE JUROR:  I'm Paula Hough.  I have lived in

12  Tampa since like 2003, but then I lived in Pensacola for a

13  couple years and moved back in 2021.  I've lived in Florida my

14  whole life.  My highest level of education is a bachelor's

15  degree, and I currently work in health care.  I'm not married.

16  I don't have any kids.  I have a dog.  I haven't served in the

17  military.  I had a jury thing before, but I had to say no

18  because I was in school.

19         THE COURT:  Thank you.

20         PROSPECTIVE JUROR:  Hi.  I'm Shawn Bryant.  I have

21  lived in St. Petersburg since 1995.  I moved to Florida in

22  1983.  I graduated from high school.  I'm working in health

23  care.  Single.  I have two children.  They are both in health

24  care.  I have no military, and I never served on a jury.

25         THE COURT:  Thank you.

1          PROSPECTIVE JUROR:  Good morning.  My name is Yan

2    Ping Qi, and I currently live in Tampa.  I have been here

3    about five years in total.  I have lived in Florida for about

4    eight years.  Highest level education is a master's in public

5    health.  And currently an epidemiologist.  I am married, and

6    my husband is a physician.  And we have two children, one age

7    four, one age six.  And I have not had any previous military

8    service, and I have not served on a jury before.

9          THE COURT:  Thank you.

10          PROSPECTIVE JUROR:  My name is Graham Hinlicky.  I

11    live in Davenport.  I moved there last February.  I have lived

12    in Florida since 2015.  I have a master's in education.  I

13    currently work as a server at Disney World.  I am engaged.  My

14    partner, he works from home, trying to start his own business.

15    I don't have any kids.  I've never been in the military.  And

16    I have only been called for a jury three times but never

17    served.

18          THE COURT:  Thank you.

19          PROSPECTIVE JUROR:  My name is Paul Helton, Juror

20    Number 6.  I live in north Sarasota, moved there in September.

21    I lived in Manatee County since 2008.  Lived in Florida since

22    '79.  I have two master's degree.  I'm a Baptist pastor, and

23    I'm also a commercial analyst at a bank.  My wife is -- I'm

24    married.  My wife is a school teacher.  I have five children

25    ages 18, 15, 14, 13, and 10.  I have no military service.  I

1  have been summoned for jury duty several times.  I served once

2  as an alternate on a criminal case that was settled before we

3  tried the case.

4          THE COURT:  Thank you.

5          PROSPECTIVE JUROR:  Rachel Drake, Juror Number 7.  I

6  have lived in Lakeland, Florida, for about 17 years.  I have

7  lived in Florida about 29 or 39 years.  I have an associate's.

8  I'm a project support manager.  I'm married.  My husband works

9  at Publix produce receiver.  No military service.  I have

10  served on one jury in Florida.  It was criminal, and the case

11  was settled.

12          THE COURT:  Thank you.

13          PROSPECTIVE JUROR:  Crystal Grissom, Juror Number 8.

14  I live in Lakeland, Florida, been there about six years,

15  Florida my whole life.  Some college.  I'm a fabricator/welder

16  and married to a mechanic.  I have two children, 13 and 5.

17  Never been in the military and never served on a jury.

18          THE COURT:  Thank you.

19          PROSPECTIVE JUROR:  My name is Katherine Kempker.

20  I'm Juror Number 9.  I've lived in Palmetto about three years

21  now.  I lived in Florida for about six.  My highest level of

22  education is, I'm almost done with my bachelor's degree for

23  education.  I'm a pre-K teacher.  I'm divorced.  I'm a single

24  parent of two young children, 11-year-old and a 9-year-old.

25  No military service and never been on a jury.

1          THE COURT:  Thank you.

2          PROSPECTIVE JUROR:  Good morning.  My name is Peggy

3   Marrero, Juror 10.  I have lived in the State of Florida for

4   my whole life.  I live in Polk County, in Winter Haven.  I

5   have been there for five years where I am now.  My highest

6   level of education was my GED.  I'm retired.  I worked for

7   Walt Disney world for 28 years, retired in 2022.  I'm

8   divorced.  I had two children.  My oldest son, he's 49.  He is

9   in the process of becoming a truck driver.  My youngest

10  daughter, she passed away in 2018.  And I have no military

11  service.  I had been called to do jury duty twice but never

12  went through.

13         THE COURT:  Thank you.

14         PROSPECTIVE JUROR:  Good morning.  My name is Gary

15  Garbelman, Juror Number 11.  I have lived in Apollo Beach,

16  Florida, for 40 years.  I've lived in Florida 64 years.

17  Highest level of education is two years of college.  I'm a

18  Florida state home inspector.  I'm married.  My wife is

19  retired.  I have two daughters, 40 and 38.  The 40-year-old is

20  a stay-at-home mom.  The 38 works for a staffing company.  I

21  have never served in the military.  I have been called for

22  jury duty three times but never served.

23         THE COURT:  Thank you.

24         PROSPECTIVE JUROR:  Good morning.  Juror Number 12,

25  John Buntin.  I've lived in Temple Terrace, Florida, for 45

1    years.  I've lived in Florida for 70 years here in Tampa.  I

2    have some college education.  I own a construction steel

3    fabrication plant here in Tampa.  I am married.  My spouse is

4    a retired insurance underwriter.  I have four children ages 44

5    through 58.  No military service.  I have served jury duty

6    twice.  And we did reach a conclusion.

7              THE COURT:  Thank you.

8              PROSPECTIVE JUROR:  Sean Malzone, Juror Number 13.

9    New Port Richey, lived there for seven years, in Florida all

10   my life.  I attended technical school.  I'm self-employed,

11   marine mechanic.  I am married.  She is a marketing director.

12   No children.  No military service.  And I've never been to

13   jury duty before.

14             THE COURT:  Thank you.

15             PROSPECTIVE JUROR:  Eric Kamka, Juror Number 14.

16   I've live in Lakeland for the past 12 years.  High school

17   education.  I am a warehouse associate.  Not married.  No

18   kids.  No military service.  I have been summoned four times

19   but never served.

20             PROSPECTIVE JUROR:  I'm Lurlene Diaz.  I'm Number 15.

21   I live in Lutz.  I have lived there for 18 months.  I have

22   lived in the State of Florida for three years.  I have a

23   bachelor's degree in Bible.  I am the executive director of

24   Created Women, which is a residential recovery program for

25   survivors of human trafficking in the Tampa Bay area.  Before

```
 1  that I was a retired Salvation Army officer, which means I'm a
 2  pastor, of 33 years.  Let's see.  I am married.  My husband is
 3  also a retired Salvation Army officer, currently still works
 4  for the Salvation Army as the director of property for the
 5  State of Florida.  I have three children, one I gave birth to.
 6  He is 33 years old.  He's a psychologist.  I have two children
 7  that I raised.  I was the guardian.  One was a survivor of
 8  human trafficking and adopted at 14.  And my other daughter I
 9  adopted at 3.  No military experience.  I have never served as
10  a juror before.
11          THE COURT:  Thank you.
12          PROSPECTIVE JUROR:  Good morning.  My name is
13  Charley.  I'm Juror Number 16.  I currently live in
14  Clearwater, and I've lived in Florida for about 10 years.
15  Highest level of education is high school.  And I'm currently
16  a full-time nursing student and a patient care tech.  I am
17  married, and my husband is a deputy with Pinellas County
18  Sheriff's Office.  We do have one child.  He is approximately
19  one year old.  And I have no prior military service, and I
20  have never been called for jury duty.
21          THE COURT:  And let me ask you, so your husband is a
22  law enforcement officer?
23          PROSPECTIVE JUROR:  Yes.
24          THE COURT:  So I'm married.  And if my wife says, oh,
25  did you take the trash out, sometimes I said, yeah, but I
```

```
 1   really didn't.  And I'm sure your husband would never do that,

 2   but will you be able to adjudge these law enforcement officers

 3   just like you would anybody else?

 4          PROSPECTIVE JUROR:  Yes, sir.

 5          THE COURT:  Thank you.

 6          PROSPECTIVE JUROR:  I'm Juror Number 17.  My name is

 7   Melvia Scott.  I've resided in Wimauma, Florida, for eight

 8   years.  I have lived in Florida my whole life.  My highest

 9   level of education I have a doctorate degree in business

10   administration.  My current occupation is I'm an adjunct

11   professor and real estate agent.  My previous occupation was

12   as a school administrator.  I am not married.  I don't have

13   any children.  I have never been married.  I don't have any

14   previous military experience, and I have been called several

15   times for jury duty.  I think I served one time.  I don't

16   remember, but I do remember they called several times.

17          THE COURT:  Thank you.

18          PROSPECTIVE JUROR:  Good morning.  Juror 18, Jesse

19   Gaytan.  I currently live in Tampa, lived there about four

20   years.  I've lived in Florida about 30 years.  Highest level

21   of education is bachelor's in information technology.  My

22   occupation, I work in IT for Hillsborough County.  Currently

23   married.  My wife works as a financial advisor for St. Pete

24   College.  We have no children.  No military service, and I

25   have never served on a jury.
```

1          THE COURT:  Thank you.

2          PROSPECTIVE JUROR:  Good morning, everyone.  My name

3    is Kimesha Norris.  I'm Juror 19.  I've resided in St. Leo,

4    Florida, since 2019.  I have lived in Florida for about five

5    years since 2019.  Highest level of education, I have a

6    master's degree in clinical and mental health counseling.  I'm

7    currently working in higher education as the associate

8    director of Residence Life and Director of Spirit Groups.  I

9    am not married.  I'm single.  I don't have any children.  I

10   have never served in the military, and I have been summonsed

11   like three times, but I never served.

12         THE COURT:  All right.  Thank you.

13         PROSPECTIVE JUROR:  Good morning.  My name is

14   Brittany Davis-Rogers.  I currently live in Safety Harbor,

15   Florida, which I've lived for 18 months.  I have lived in

16   Pinellas County my entire life.  Highest level of education is

17   technical certificate as well as some college.  My current

18   occupation is director of provider relations at a health

19   insurance company.  I'm divorced.  I have two children.  One

20   is 22.  She is a leasing consultant.  And I have a son whose

21   age is 12.  I have never had any previous military service.  I

22   have been called once for jury service but never selected.

23         THE COURT:  Thank you.

24         PROSPECTIVE JUROR:  Good morning.  My name is Scott

25   Laris.  I'm Juror Number 21.  I live in Palm Harbor, Florida,

1  lived there about 13 years.  Native New Yorker, relocated

2  here.  I have an AAS in electrical engineering.  I'm retired.

3  I was a regional vice president of engineering for a large

4  cable company in the State of Florida.  I am married.  My

5  spouse is a teaching assistant.  I do have three children.  My

6  oldest son works in the American Academy of Pediatrics in

7  Virginia.  And I have two grandchildren.  And my youngest two

8  are 21 years old, both in college.  I don't have any military

9  service.  I have been called for jury duty in New York state

10  but didn't serve.  And this is the first time in Florida that

11  I have been called.

12          THE COURT:  Thank you.

13          PROSPECTIVE JUROR:  Good morning.  My name is Nancy

14  Edwards.  I'm Juror Number 22.  I've lived in Lakeland

15  currently for 30 years.  I have been in Florida for 42 years.

16  Highest level of education is an MBA.  My occupation now is a

17  Department of Health inspector.

18          THE COURT:  Hold on the acoustics are always bad.

19  And we have been trying to rig it, so to speak.  Let's try

20  that again.  Thank you, Ms. Harris.  Let's try that again.

21          PROSPECTIVE JUROR:  Edwards.  I'm not married.  I

22  have four children.  They are all adopted.  I have not served

23  in the military.  I have served on a jury before.  And, yes,

24  there was a verdict.

25          THE COURT:  Thank you.

```
 1          PROSPECTIVE JUROR:  My name is Vione Harris.  I'm

 2   Juror Number 23.  I've lived in Brandon for about 21 years.  I

 3   have been here in the State of Florida 32 years.  I have

 4   completed two years of college, and I have a certificate in

 5   business.  I am retired, bookkeeper, housewife.  I'm a widow.

 6   I have two stepchildren.  Their ages are 51 and 49.  No

 7   previous military service, and I was called as a juror in

 8   Michigan but didn't serve.

 9          THE COURT:  Thank you.

10          PROSPECTIVE JUROR:  Good morning.  My name is Rafael

11   Garcia.  I'm Juror Number 24.  I live in Riverview, Florida.

12   Moved here a year and a half ago from New Jersey.  My highest

13   level of education is high school, GED.  My occupation is a

14   sales representative for a plastics company.  I am divorced.

15   I do have four children from ages ranging from 4 to 14.  I

16   have no previous military service.  And I was called for jury

17   duty one time before but -- summoned one time before but never

18   served.

19          THE COURT:  Thank you.

20          PROSPECTIVE JUROR:  My name is James Arndt, Juror

21   Number 25.  I live in Tarpon Springs, lived there for nine

22   years.  I've been in the State of Florida since 2005.  Highest

23   education is one year of college.  Sales manager for an

24   electrical manufacturer.  I'm married, and my spouse is not

25   employed at this time.  I have three children, ages 44, 41,
```

1 and 26.  I do not have previous military service.  And I have

2 been asked to serve on a jury three times but have not served.

3    THE COURT:  Thank you.

4    PROSPECTIVE JUROR:  Good morning.  My name is Kailey

5 Worthington.  I'm Juror 26.  I have lived in St. Petersburg,

6 Florida, for four years.  I have a master's degree in

7 occupational therapy.  I am an occupational therapist.  I am

8 engaged to a physical therapist.  I do not have children.  I

9 have never served in the military, and I have never been

10 called for jury duty.

11    THE COURT:  Thank you.

12    PROSPECTIVE JUROR:  My name is Gary Clark.  I'm Juror

13 Number 27.  I've lived in Myakka City in Manatee County for 42

14 years.  I have lived in Florida for 66 years.  I have a

15 two-year degree in sales.  I was in the motorcycle business

16 for 40 years, retired previously and now own a butcher shop

17 down in Manatee County.  I'm married, and she works as a

18 bookkeeper.  I have two children, one is 39 that's an RN, and

19 one is 35 that's a music teacher.  I have not had any military

20 experience.  And I have been called to jury duty probably

21 three or four times but never served.

22    THE COURT:  Thank you.

23    PROSPECTIVE JUROR:  Good morning.  My name is Derek

24 Guenther.  I'm Juror 28.  I have lived in St. Pete Beach for

25 30 years, been in Florida my whole life.  I have a bachelor's

1    in chemical engineering.  I'm a senior application scientist

2    at a company called Ocean Optics.  I'm not married.  I have no

3    kids and never served in the military.  I've been called for

4    jury duty a couple times but never had to sit.

5              THE COURT:  Thank you.

6              PROSPECTIVE JUROR:  I'm Deb Henretta.  I have been

7    six years in Sarasota.  I've lived in Florida for six years.

8    I have an honorary Ph.D. in the humane letters but a master's

9    in advertising.  I'm currently an independent board director

10   on several public boards and an operating partner at a Tier I

11   private equity.  My previous occupation was president of

12   Procter & Gamble.  Married.  My spouse is a semiretired

13   lawyer.  He had a full-time career as a legal aid attorney.  I

14   have three children ages 34, 32, and 26.  One is a teacher in

15   Venice.  One is a pediatrician in St. Petersburg.  And one is

16   an EMT in Cincinnati, Ohio.  I have never served in the

17   military, and I have not had previous jury experience.

18             THE COURT:  Thank you.

19             PROSPECTIVE JUROR:  My name is Jared, Juror

20   Number 30.  I have been in Florida since 2017, relocated from

21   Massachusetts.  Highest level of education is a master's in

22   HR.  I am currently a store manager at CVS.  Single, no kids,

23   no military service.  And selected for jury five times but

24   served once, and it was a verdict.

25             THE COURT:  Thank you.

1          PROSPECTIVE JUROR:  Hello.  My name is Jennifer

2    Russell.  I'm Juror Number 31.  I live in Seminole, Florida,

3    and I've lived there five, almost six years.  I have lived in

4    Florida for 31 years.  My highest level of education is a

5    master's.  I'm currently a buyer, and I'm not married.  I have

6    one child five years old with one on the way.  I do not have

7    previous military service, and I've been summoned once but I

8    have yet to serve.

9          THE COURT:  Thank you.

10          PROSPECTIVE JUROR:  My name is Joshua Guzman.  My

11    number is 32.  I have lived in North Port for a total of 14

12    years.  I lived in Florida my whole life.  My highest level of

13    education is twelfth grade.  My current occupation is a

14    traveling marketing agent for South Events.  I'm single, no

15    children.  I have not served in the military, and I have been

16    called for jury duty once but did not serve.

17          THE COURT:  Thank you.

18          PROSPECTIVE JUROR:  Good morning.  My name is Emanuel

19    Alicea, Juror 33.  I've lived in Lake Wales for 8 months,

20    Sarasota for 31 years.  I work at Home Depot as a retail

21    associate.  My highest education is high school.  I'm not

22    married.  I have no children.  I had no military service, and

23    I was summoned once but never served.

24          THE COURT:  Thank you.

25          PROSPECTIVE JUROR:  Good morning.  My name is Barton

1   Jones.  I live in St. Petersburg.  I have lived there for

2   eight years.  I have been in Florida for eight years.  I have

3   a master's degree.  I'm a consulting civil engineer.  And I

4   have been a consulting civil engineering for 57 years.  I am

5   married.  My wife is self-employed as a real estate agent.  I

6   have two children, ages 56 and 47.  My 56-year-old son retired

7   in 2008, 16 years major league baseball.  My 47-year-old son

8   works for State Farm Insurance in Illinois.  I have no

9   military service.  I have been summoned three times and have

10  never served.

11          THE COURT:  Thank you, sir.

12          PROSPECTIVE JUROR:  I'm Ann Marie Jessup.  My number

13  is 35.  I have been living in Palmetto, Florida, for 43 years.

14  I have an AA degree, and I'm currently working at Rolla Hill

15  Academy (phonetic) in education.  I have been married since

16  1991.  And my husband works at Workmen Comp Payroll Company.

17  I have two children, one adopted and he is 23.  And he is a

18  chef at a hospital.  And my daughter is soon to be 19, and she

19  is in college.  No military, and I have been summoned a few

20  times, but I have only served once and there was a verdict.

21          THE COURT:  Thank you.

22          PROSPECTIVE JUROR:  My name is Caryn Turner.  I'm

23  Juror Number 36.  I live in Davenport and have been living

24  there for 25 years.  I have also lived in Florida for my

25  entire life, so 25 years.  I have a master's in tourism and

1  hospitality management.  I work at Disney doing guest

2  relations.  I'm not married, so no spouse.  I don't have any

3  children, no military service, and I've never been on a jury.

4          THE COURT:  Thank you.

5          PROSPECTIVE JUROR:  Good morning.  My name is Mike

6  Helfmann.  And I'm just moved here in 2021 to Sun City Center,

7  Florida, lived before that in the State of Illinois and Texas.

8  I have a BA in psychology.  My current occupation, I work with

9  Hillsborough County Public Schools.  I'm a quality assurance

10  manager there.  I worked 20 years as an elementary school

11  teacher.  I'm not married.  I don't have any children, no

12  military service, and I have never served on a jury.

13          And it just went out.

14          THE COURT:  All right.  Let's see if that mic went

15  out on us here.

16          There we go.

17          PROSPECTIVE JUROR:  My name is Earl Wallace.  I'm

18  Juror Number 38.  I currently live in Winter Haven.  I have

19  been in Florida since 2000.  Educations is a high School

20  diploma.  My current occupation is a mechanic.  I am married.

21  My wife is a stay-at-home.  I do not have any children.  No

22  military experience, and I have never served as a juror.

23          THE COURT:  Thank you.

24          PROSPECTIVE JUROR:  Hi.  I'm Thanya Castner,

25  Juror 39.  I have lived in Bradenton for 48 years.  I have

1    lived in Florida most of my life.  State the highest level of

2    education, high school degree.  My occupation is I'm in

3    mortgage lending.  I'm a loan processor.  I am divorced.  I

4    have three children.  My eldest daughter is a teacher.  She is

5    38.  I have a son who is a dermatologist.  He is 32.  And I

6    have a daughter who is an assistant golf pro.  She is 28.  I

7    have no military service.  Previous jury, yes.  I have been

8    summoned seven times and have served once in a civil case, and

9    there was a verdict.

10         THE COURT:  Thank you.

11         PROSPECTIVE JUROR:  Good morning.  My name is

12   Elizabeth Lanoue.  I live in Sarasota.  I was born in

13   Bradenton.  Highest level of education is high school.  I am

14   an operations administer at a lawn and pest control company.

15   I'm divorced.  Children are -- son is 34, and my daughter is

16   33.  No military service.  First time summoned.

17         THE COURT:  Thank you.

18         PROSPECTIVE JUROR:  Hi.  My name is Jamie Lauro,

19   Number 41.  I live in New Port Richey, Florida.  I've lived

20   there three years, lived in Florida 40 years.  I'm a high

21   school graduate.  My current occupation is a medical

22   assistant.  I am married.  And my husband works for Pinellas

23   County government.  I do not have any children.  I do not have

24   any military service background.  And I was summoned years ago

25   and everything was canceled due to Legionnaires' disease in

1  the building.

2          THE COURT:  Thank you.

3          PROSPECTIVE JUROR:  Hello.  My name is Hannah

4  Millman.  I have lived in Clearwater for five years.  I have

5  lived in Florida my whole life.  I have a bachelor's degree in

6  psychology.  I am a supervisor at BayCare.  I'm not married.

7  I have no children.  Never been in the military and never

8  served on a jury.

9          THE COURT:  Thank you.

10          PROSPECTIVE JUROR:  My name is Kelly Knight.  I am

11  Juror Number 43.  I have lived in Florida for 14 years.  I

12  currently live in New Port Richey and have lived there for 14

13  years.  I have a bachelor's degree.  I'm a registered nurse.

14  I am married.  My husband is a radiology technologist.  We

15  have four children, two biological, two stepchildren, ages 14,

16  16, 19, 24.  The 19-year-old, she works in health care.  My

17  stepson works as a dispatcher at Tampa International Airport.

18  Never served in the military.  I have been summoned once in

19  Michigan, but I have never served.

20          THE COURT:  Thank you.

21          PROSPECTIVE JUROR:  Good morning.  My name is Glori

22  Reid.  I'm Juror 44.  I have lived in Brandon for 50 years

23  now.  Highest level of education is an AA.  I'm a dental

24  officer manager.  My husband is a dentist.  We have three

25  children; two doctors and one nurse.  Never served in the

1  military, and I have been called several times for jury

2  service and never served.

3          THE COURT:  Thank you.

4          PROSPECTIVE JUROR:  Good morning.  I am Blake

5  Ottinger.  I'm Juror Number 45.  I have lived in Florida,

6  Largo, Florida, my whole life of 26 years.  I work in retail.

7  I worked in retail for 10 years.  No kids, no spouses.

8  Highest level of education is high school diploma.  I have

9  never served in the military.  And then, no, I have never been

10 selected for jury duty.  This is my first time.

11         THE COURT:  Thank you.

12         PROSPECTIVE JUROR:  My name is Ryan Ashmeade.  I'm

13 Juror Number 46.  I live in Tampa and have lived in Tampa my

14 whole life, apart from one year in Atlanta.  I'm close to

15 getting my AA.  I work as a manager at the restaurant Jerk

16 Hut.  I'm single.  I have no kids.  I never had military

17 service, and I never served on a jury.

18         THE COURT:  Thank you.

19         PROSPECTIVE JUROR:  Hello.  My name is Monica Maddox.

20 I'm Juror Number 47.  I live in Haines City, Florida,

21 currently.  I have lived there 16 years but in Florida for 49

22 years.  So I'm 49 years old.  My highest level of education is

23 a high school graduate with some college.  I currently work at

24 State Farm Insurance.  I have worked there my entire career.

25 My marital status is married.  By husband is a crane operator

```
1   at Mosaic.  We have three beautiful girls, 25, which works at

2   State Farm also in marketing; 22, which is graduating this

3   fall with BA as UFF; and 16, which is a high school student.

4   Never served in any military, and I have been summoned once in

5   Polk County but never served.

6           THE COURT:  Thank you.

7           PROSPECTIVE JUROR:  My name is Roy Pulliam,

8   Number 48.  I am from Tampa.  I have lived here since 1972

9   when I moved to Florida.  Highest education is high school and

10  some technical courses.  My occupation is airport operations

11  manager at Peter O. Knight Airport on Davis Island.  Previous

12  occupations range from everything, truthfully, from dishwasher

13  to corporate finance officer.  I'm married.  My wife's

14  occupation is in strategic planning and crisis management.  No

15  children.  Never been in the military.  Been called for jury

16  duty twice.  Ended up as an alternate on one trial that was

17  not resolved.

18          THE COURT:  Thank you.

19          PROSPECTIVE JUROR:  Hi.  Good morning.  My name is

20  Sonya.  I'm Juror 49.  I'm from Lakeland.  I'm living in

21  Florida for 20 years.  My education is high school.  I'm

22  married but I'm separated.  I have one son.  He is 19 years

23  old and work for YMCA.  No military service and this is my

24  first time in jury service.

25          THE COURT:  Thank you.
```

1          PROSPECTIVE JUROR:  Christine Burgan, Juror 50.  I

2    have lived in Spring Hill for 36 years, been in Florida for

3    49.  High school graduate.  Office manager and property

4    manager.  I'm married.  My husband is a radiographer.  I have

5    three children.  My 38-year-old is in sales; 34, sales; 29 is

6    in clerical, all boys.  No military.  I have been called twice

7    but never served.

8          THE COURT:  Thank you.

9          PROSPECTIVE JUROR:  Good morning.  My name is Arlene

10   Kelleher.  I'm Juror Number 51.  I currently live in New Port

11   Richey.  I have lived there for two and a half years, as well

12   as in Florida.  I have a master's degree in science.  I am a

13   retired registered nurse.  My husband is -- I am married.  My

14   husband is retired from construction.  I have three children,

15   44, 33, 31.  One is retired police officer, behavioral

16   analyst, and a safety engineer.  I was in the Air Force as a

17   clerk.  And I served on two juries, one is a civil case in

18   Florida, and the other was a criminal case in Massachusetts.

19         THE COURT:  Thank you.

20         PROSPECTIVE JUROR:  See, we keep Officer Arch in

21   shape for his hockey league by having him run around here.

22         Yes, ma'am.

23         PROSPECTIVE JUROR:  Mary Occean, Number 52.  Wesley

24   Chapel for three years.  Tax certificate.  Administrative

25   business partner at Google.  I'm married, no kids, never

1   served.  I served on a criminal trial in New York.  There was

2   a verdict.  And grand jury in Atlanta.

3          THE COURT:  Thank you.

4          PROSPECTIVE JUROR:  Good morning.  My name is

5   Lorraine Magulick.  I'm from Seminole, Florida.  I have been

6   there for 32 years.  I lived in Florida for 42 years.  My

7   highest level of education is high school.  I am retired, but

8   I watch my grandchildren.  I'm retired from a school

9   cafeteria.  My husband is retired.  My children, I have a son

10  who is 39.  He is a physician and a platoon colonel in the Air

11  Force.  My daughter is a high school teacher.  My son, well,

12  she is 37.  My son is 32, and he lives in Berlin, Germany, and

13  works for a computer company.  I have no military service and

14  I have been summoned four times but never served.

15         THE COURT:  Thank you.

16         PROSPECTIVE JUROR:  Juror 55, Kevin Webster.  I have

17  lived in Florida for 35 years, Davenport for seven.  High

18  school diploma, highest education.  I'm currently a sales

19  manager for Bernie Little Distribution, former grocery manager

20  for Publix supermarkets.  Single.  No children.  Never served

21  in the military.  And I have been summoned three times, never

22  served on a jury.

23         THE COURT:  Thank you.

24         PROSPECTIVE JUROR:  I think I'm Juror 58.  My name is

25  Ramses Rosa.  I have lived in Brandon for 18 years, Florida

1  for 30.  Highest education is high school.  I'm a cloud

2  engineer.  Prior to that I was a unified communication admin.

3  I'm married.  I have two kids, 16 and 14.  Fifteen years in

4  the Navy.  I was an electronics technician.  And I have never

5  been selected for jury duty.

6         THE COURT:  Thank you.

7         PROSPECTIVE JUROR:  My name is Stu Schimkat.  I'm

8  Juror Number 53.  I've lived in Dunedin for 32 years.  I've

9  been in Florida 52 years.  I have a master's.  I'm an

10  engineer.  I'm married.  My wife is a homemaker.  I have two

11  children, 35 and 32, a consultant and an engineer.  No

12  military service.  Been summoned twice but never served.

13         THE COURT:  Thank you.

14         PROSPECTIVE JUROR:  My name is Adrienne Zampella.

15  I'm Juror Number 56.  I live in Port Richey, Florida.  I have

16  lived there for 37 years.  I have lived in Florida for 37

17  years.  I have a high school diploma.  I am a data entry

18  operator for the Pasco County School District.  I'm married.

19  My husband is retired.  I have two children.  My oldest passed

20  away in 2003.  My son is 30, and he is a teacher, middle

21  school teacher.  I have no military service experience, and I

22  did serve on a jury in Brooklyn, New York, and it was a

23  criminal case and there was a verdict.

24         THE COURT:  All right.  Well, thank you very much.

25         Ladies and gentlemen, the test for serving on a jury,

1   of course, is that your country needs you to do so.  Now, I

2   don't want anybody here if they are donating a kidney

3   Wednesday morning or something.  We are going to be done this

4   week.  So I need to know, is there -- and gross inconvenience

5   is not -- of course it's inconvenient, especially if you're

6   driving up from Sarasota or something.  I would rather not be

7   here, that's not the test.  The test is I cannot sit this

8   week.  I have something like, you know, I'm donating a kidney

9   or my wife is donating a kidney.

10         Does anyone have an absolute hardship and you cannot

11   sit?  Not that it's inconvenient.  If that's the case, I need

12   to hear from you now.

13         Give me your name and number, please.

14         PROSPECTIVE JUROR:  My name is Yan Ping Qi, and I'm

15   Juror Number 4.  And I'm unable to serve because, one, we are

16   going out of town tomorrow; and Number 2, I have a special

17   needs son who requires medical and therapy multiple times a

18   week, and I have to be there to supervise it.

19         THE COURT:  Thank you.

20         PROSPECTIVE JUROR:  Katherine Kempker, Juror

21   Number 9.  I'm a single parent of two young children.  Their

22   father is not in the picture and is out of state.  My mother

23   is ill.  I have no one to care for my children.

24         THE COURT:  How old are they?

25         PROSPECTIVE JUROR:  My son is 11, and my daughter is

1   9.

2              THE COURT:  All right.  Thank you.

3              PROSPECTIVE JUROR:  Sean Malzone, Number 13.  I own

4   my own business.  I'm the only business operator, and being

5   out is detrimental to my business financially.  I also have

6   another issue I don't wish to say.

7              THE COURT:  Give me that last part.

8              PROSPECTIVE JUROR:  I said I have another issue, but

9   I don't wish to say it out loud.

10             THE COURT:  Why don't we come sidebar on that, and

11  we'll have the lawyers come up.

12       (Bench conference on the record.)

13             THE COURT:  She takes that right here.  Just tell us

14  about that other issue.

15             PROSPECTIVE JUROR:  With all due respect to you,

16  Judge, and the court system, I have zero faith in the judicial

17  system.  I am Old Testament.  I believe in capital punishment

18  and the death penalty.

19             THE COURT:  Well, that's certainly a law.  The

20  government has not charged the death penalty here.

21             PROSPECTIVE JUROR:  And I believe if you are here,

22  you're guilty.

23             THE COURT:  You are not going to get out by saying

24  that.

25             PROSPECTIVE JUROR:  That's fine.

1          THE COURT:  Any questions for this man?

2          MS. FAVORIT:  If you were instructed on the law

3   specifically by the judge, will you follow the law?  So he

4   will tell you this is the law, this is how you make a

5   decision.  Can you follow that?

6          PROSPECTIVE JUROR:  I mean, I'm a law-abiding

7   citizen, yes.  I don't know how to specifically answer that.

8          THE COURT:  Anything else from you?

9          MR. BRUNVAND:  No.

10          THE COURT:  Thank you.

11      (End of bench conference.)

12          THE COURT:  Anyone else you know?  It is a gross

13   hardship sometimes.  And I will tell you a story.  My father

14   was drafted in the Army.  He didn't want to go to the Army.

15   He was very, very unhappy about that.  His country needed him

16   and he went.  So your country needs you.  This is sort of the

17   equivalent of being drafted, however briefly.

18          All right.  Who else?  Absolute hardship.  Not that

19   it's grossly inconvenient or a problem.  That you cannot sit.

20          PROSPECTIVE JUROR:  Charley Creaser, Juror Number 16.

21   I am currently nine days away from graduating nursing school.

22   And to sit for my boards, I have to have a specific amount of

23   clinical hours.  If I were to serve this week, that would set

24   me over my maximum limit of attendance and therefore require

25   me to retake my last quarter of nursing school.

1          THE COURT:  All right.  Thank you.

2          PROSPECTIVE JUROR:  Juror Number 17, Melvia Scott.

3   This week I'm on medical watch due to having EKGs last week

4   with my blood pressure.  So I was supposed to be to the doctor

5   tomorrow morning just because I was hospitalized last week.

6   So I have to have a medical procedure tomorrow just watching

7   my blood pressure, so I have to be there.

8          THE COURT:  All right.  Thank you.

9          PROSPECTIVE JUROR:  My name is Vione Harris.

10          THE COURT:  I'm sorry.  I'm sorry.  I interrupted

11   you.  You were going to tell me your juror number.  I'm sorry.

12          PROSPECTIVE JUROR:  Juror Number 23, Vione Harris.  I

13   have a hardship with -- I had a death in the family, and I

14   need to go home to Michigan, which is next week.  I also care

15   for a dementia cousin by marriage, and he is 85 years old.  I

16   have somebody watching him today, but I can't continue doing

17   that, and with the funeral coming up.

18          THE COURT:  All right.  Thank you.

19          PROSPECTIVE JUROR:  Hello.  I'm Juror Number 31,

20   Jennifer Russell.  So unfortunately I do have a doctor's

21   appointment today.  It's prenatal, and it does involve an

22   ultrasound.  So it is truly difficult to reschedule.  And also

23   unfortunately this week my son is out of school.  And I am the

24   primary caregiver.  So it would be extremely difficult to find

25   his care for the week.

```
 1          THE COURT:  How old is your son?

 2          PROSPECTIVE JUROR:  He is five.

 3          THE COURT:  Thank you.

 4          PROSPECTIVE JUROR:  Juror Number 29.  It doesn't

 5   really impact this week, but it would impact on Sunday if

 6   there were any circumstance this would extend.  I'm on a

 7   public board.  We only meet quarterly, four times a year.  And

 8   we have a board meeting coming up Sunday, Monday, Tuesday.  I

 9   chair the nominating governance committee, and there are some

10   actions that are critical.

11          THE COURT:  It is a little hard to hear you.  You

12   have a board meeting Monday and Tuesday?

13          PROSPECTIVE JUROR:  Sunday, Monday, and Tuesday.

14          THE COURT:  That's up in Cincinnati.

15          PROSPECTIVE JUROR:  Columbus.  And I also -- my

16   daughter has an infant, and I provide child care three days a

17   week.

18          THE COURT:  All right.  Thank you.

19          PROSPECTIVE JUROR:  My name is Gary Clark.  I'm Juror

20   Number 27.  I'm a sole owner-operator of a butcher shop in

21   Manatee County.  I have lots of customers' meat hanging in my

22   walk-in cooler that's due to be processed this week or will

23   spoil and I will be liable for these animals.  So it's very

24   inconvenient for me to be able to take away on such a time

25   like this.
```

1          THE COURT:  All right.  Thank you.

2          PROSPECTIVE JUROR:  Hi, my name is Jamie, Number 41.

3   Two things.  I'm on call for my 80-year-old mother.  Secondly,

4   I have an 85 percent ruptured eardrum in my right ear that's

5   left me with two holes that I have sometimes a hard time

6   hearing.  If it stays quiet and one person is speaking at a

7   sole time, I'm okay.  But echoes are difficult sometimes for

8   me because I can't wear a hearing aid and I don't sign.

9          THE COURT:  The acoustics in the trial will be better

10  than this.  And we also have some hearing assistance some,

11  like TV ears and stuff people can wear also.  Thank you.

12         PROSPECTIVE JUROR:  Hi.  I'm Thanya Castner.  I'm

13  Juror Number 39.  I take care of my granddaughter on Monday

14  and Wednesday mornings and take her to school and also on

15  Tuesdays and Thursday afternoon for my daughter who is not

16  able to afford to pay for care after school and before school.

17  She's a teacher, and she starts early in the morning and gets

18  out too late in order to pick her up from school.  And I have

19  been doing that for her since she started school.  She's eight

20  years old.  I have been taking care of her.  And they lived

21  with me for a while.  And now she is on her own and drops my

22  granddaughter off in the morning and I take her to school, and

23  I do that on Thursday and Tuesdays after school.

24         THE COURT:  All right.  Thank you.

25         PROSPECTIVE JUROR:  Mary Occean, 52.  I'm flying out

1  to New York for my mother's ninetieth birthday and I'm

2  coordinating all of the events.

3          THE COURT:  And when is that?

4          PROSPECTIVE JUROR:  Her birthday is actually

5  Wednesday.

6          THE COURT:  This week?  And what airline are you

7  flying with?

8          PROSPECTIVE JUROR:  Delta.

9          THE COURT:  Thank you.

10          I see no other hands.

11          Ladies and gentlemen -- okay.  Now remember, this

12  isn't it's inconvenient, it's going to cost me money.  It cost

13  my dad money when he was drafted in the Army.  This is I can't

14  sit.  Go ahead.

15          PROSPECTIVE JUROR:  My name is Stu Schimkat.  I'm

16  Juror 53.  I'm excused for next week.  So I'm fine for this

17  week.

18          THE COURT:  Absent some real issue, we are going to

19  be done this week for sure.  Anyone else?

20          Thank you.  I appreciate it.  Your country

21  appreciates it.  We are not going to operate unless we have

22  jurors.

23          So it would now be time for the lawyers to ask you

24  questions.  Let me just say this much.  The mind can only

25  absorb what the backside can endure.  So does anybody need a

 1  break?  We will keep going unless I see some hands.  I see a

 2  hand or two.  Why don't we take a little break here.  Two

 3  things.  I told the lawyers don't interact with the jurors.

 4  So if you see them in the hall and they are looking down at

 5  their shoes or whatever, they are not being rude.  I told them

 6  to.  And when we come back, the lawyers will ask questions.

 7  And this is a weird setup.  I'm sorry.  I didn't design the

 8  courtroom.  They will turn their backs to some of you.  Like

 9  if they are addressing these folks, they won't be facing you.

10  They are not being rude.  It is all they can do to get around

11  in this room.

12          So thank you.  Let's try to take a break here for 15

13  minutes.  Do me a favor.  I don't know a thing about this case

14  other than what's on that piece of paper, and neither do you.

15  So please don't discuss it with each other or look on outside

16  sources and look up who is this Jeremiah Smith on Google or

17  anything like that or Officer Arch's hockey team.  They're

18  really not that good, frankly.  So just leave it right here.

19  We'll see you back here as close as we can to 15 minutes.

20  Last thing, remember where you're seated, please, and who your

21  seat mates are.  Thank you.

22      (Recess taken.)

23          THE COURT:  Question, government.  Do I have a copy

24  of the exhibits like on a memory stick or something?

25          MS. FAVORIT:  Yes, Your Honor.  We will provide you

1  that now.

2          THE COURT:  Or a book is fine, whatever.

3          MS. FAVORIT:  We have the child sexual abuse material

4  in a book, and it's also on the drive.  There's two options.

5  You can do all the exhibits together, or there is an exhibit

6  that's digital where CSAM is separated from all the exhibits.

7          THE COURT:  So this will have everything on it?

8          MS. FAVORIT:  Yes.  Thank you.

9          THE COURT:  Thank you.

10          MS. FAVORIT:  Will there be a limit for jury

11  selection for the parties?

12          THE COURT:  Give that to me one more time.

13          MS. FAVORIT:  How long do I have for my portion of

14  the jury selection?

15          THE COURT:  You have what you need.  So I'm not going

16  to have a clock on you, but I think if you -- I'll just tell

17  you, I find myself getting real itchy at about the 60-minute

18  mark, and the jury's about had enough by that time.  I

19  wouldn't use that much time.  I cut somebody off once at 78

20  minutes.

21          The most important thing and, frankly, more of a

22  defense issue than a government is just ask questions.  And

23  Mr. Brunvand won't, but at the last trial we got a lot of

24  argument in voir dire.  It's not for argument.  And I'm about

25  the only person in this building that lets this much voir dire

```
 1   in.  And you would be surprised what some of them say in these
 2   questions.  So I'm sure you won't need that much time, but you
 3   take the time you need.  We are just not going to argue the
 4   law.  We are not going to argue the case.  And rarely does the
 5   government.  It is usually the defense because they are more
 6   reactive.  The nature of the beast that you act, they react.
 7   That's how the process typically goes.  Not always.
 8           MS. FAVORIT:  Thank you, Judge.
 9       (Venire panel escorted into the courtroom.)
10           THE COURT:  Ladies and gentlemen, I appreciate your
11   patience, and that of course goes with it.  I keep this thing
12   on my desk.  "All good judges are patient and they pay close
13   attention."  And I'm only the judge of the law.  You all are
14   judges of the fact.  So it applies to you also.  So thank you.
15   I really appreciate it.  It is actually a pretty hard job to
16   be a juror, as you may find out.
17           So the government will have some questions.  And I
18   call on them to go first, not because they're special but
19   because they always bear the burden of proof.  The defense has
20   no such burden.
21           So I will be happy to hear from the government if you
22   have some questions for the panel.  Thank you.
23           MS. FAVORIT:  Yes, Your Honor.  Thank you.
24           Good morning everyone.  Can everyone hear me?  I
25   think this might be the best location to visually see you all.
```

1    I have a special chart that has your names and numbers on

2    them, but it looks like relevant wacky, so I may not know

3    where you are located in the room.  So again, if you are going

4    to raise your hand and speak, if you can say your juror number

5    and your name, that would be very helpful.  So for those of

6    you who have probably forgotten, my name is Erin Favorit, and

7    I represent the United States.  And at this point we are going

8    to be asking questions to figure out which jurors are going to

9    be fair and impartial for the case that we have today.

10         So that could mean maybe you will be a fair and

11   impartial juror for another type of case, but we really need

12   to figure out for this type of case.  And just to give a quick

13   example on how I kind of want you to think about your answers

14   before you give them, if I was to get on a plane today and I

15   meet the pilot and I make a handshake to the pilot and I say,

16   so are we going to make it to my destination today, and the

17   pilot says, I think so, or the response is, maybe, that might

18   make me a little bit nervous, like, will we get there?  Why

19   did they say I think so?  Can they do what they are supposed

20   to do?  So I want you to relate that to your responses as a

21   juror.

22         I'm going to ask you a question over and over.  You

23   will hear me repeat, could you be fair and impartial on this

24   case?  So we're seeking yes or no.  Sometimes it's not

25   possible and we understand, but if you are able to pick a

```
 1  side, yes or no, that's what we're looking for.  So when we go

 2  figure out who is going to sit on this particular case, we are

 3  going to think back, yes, they said they could be fair and

 4  impartial in this case and we won't be thinking, well, they

 5  said, maybe.  Okay?

 6         All right.  So my favorite question to start with is

 7  I really want to know how excited you were to be here today.

 8  And we are going to do a scale 1 to 10.  A 1 is you would

 9  rather be sitting at a dentist office getting a root canal.

10  And 10, you got your jury summons in the mail and you thought

11  finally this is my time, I get to be on a jury.  Maybe you

12  like watching Law & Order shows and you are very curious of

13  how this happens.  So you really wanted to be here.

14         So because there's a lot of you, I would love each of

15  your scale numbers 1 through 10.  I'm going to try to start at

16  the beginning, and then I will interrupt a couple of you when

17  I get a high number or a really low number.

18         So we will start with Juror Number 1.

19         PROSPECTIVE JUROR:  Andy Simpson, Juror Number 1, a

20  5.

21         MS. FAVORIT:  Thank you.

22         PROSPECTIVE JUROR:  Juror Number 2, Paula Hough,

23  honestly like a 2 to 3.

24         PROSPECTIVE JUROR:  Shawn Bryant, Juror Number 3,

25  maybe a 3.
```

1          PROSPECTIVE JUROR:  Yan Ping Qi, Juror Number 4, a 5.

2          PROSPECTIVE JUROR:  Juror Number 5, Graham Hinlicky,

3    a zero.  I had to drive here from Key Largo this morning.

4          PROSPECTIVE JUROR:  Paul Helton, Juror 6, a 7.

5          PROSPECTIVE JUROR:  Rachel Drake, Juror 7, about a 3.

6          PROSPECTIVE JUROR:  Crystal Grissom, Juror 8, 3 or 4.

7          PROSPECTIVE JUROR:  Katherine Kempker, Juror

8    Number 9, about a 2.

9          PROSPECTIVE JUROR:  Peggy Marrero, Juror Number 10,

10   I'd say a 7.

11         PROSPECTIVE JUROR:  Gary Garbelman, Juror Number 11,

12   about a 3.

13         PROSPECTIVE JUROR:  John Buntin, Juror Number 12, a

14   6.

15         PROSPECTIVE JUROR:  Sean Malzone, Juror Number 13,

16   1 and a half.

17         PROSPECTIVE JUROR:  Eric Kamka, Juror 14, 3.

18         PROSPECTIVE JUROR:  Lurlene Diaz, Juror 15, a 4.

19         PROSPECTIVE JUROR:  Charley Creaser, Juror 16, about

20   a 7.

21         PROSPECTIVE JUROR:  Melvia Scott, Juror Number 17,

22   about a 3.

23         PROSPECTIVE JUROR:  Jesse Gaytan, Juror 18, probably

24   a 2.

25         PROSPECTIVE JUROR:  Kimesha Norris, Juror 19, about a

1    7.

2              PROSPECTIVE JUROR:  Brittany Davis-Rogers, Juror 20,

3    a 6.

4              PROSPECTIVE JUROR:  Scott Laris, 21.  I'd say a 7.

5              PROSPECTIVE JUROR:  Nancy Edwards, Juror 22, 3.

6              PROSPECTIVE JUROR:  Vione Harris, Juror 23, 5.

7              PROSPECTIVE JUROR:  Rafael Garcia, Juror Number 24, a

8    3.

9              PROSPECTIVE JUROR:  James Arndt, Juror 25, a 7.

10             PROSPECTIVE JUROR:  Kailey Worthington, Juror 26, a

11   6.

12             PROSPECTIVE JUROR:  Gary Clark, Juror 27, a 3.

13             PROSPECTIVE JUROR:  Derek Guenther, Juror 28, a 4.

14             PROSPECTIVE JUROR:  Deborah Henretta, Juror 29, 3.

15             PROSPECTIVE JUROR:  Jared, Juror 30, 1.

16             PROSPECTIVE JUROR:  Jennifer Russell, Juror 31, 6.

17             PROSPECTIVE JUROR:  Joshua Guzman, Juror 32, 1.

18             PROSPECTIVE JUROR:  Emanuel Alicea, Juror Number 33,

19   a 5.

20             PROSPECTIVE JUROR:  Barton Jones, Juror Number 34, 6.

21             PROSPECTIVE JUROR:  Ann Marie Jessup, 35.  I would

22   say a 3.

23             PROSPECTIVE JUROR:  Caryn Turner, Juror Number 36, a

24   7.

25             PROSPECTIVE JUROR:  Mike Helfmann, Number 37, a 6.

```
1              PROSPECTIVE JUROR:  Earl Wallace, Juror Number 38, 7.

2              PROSPECTIVE JUROR:  Thanya Castner, Juror Number 39,

3   5 or 6.

4              PROSPECTIVE JUROR:  Elizabeth Lanoue, 40, and I'm a

5   9.

6              PROSPECTIVE JUROR:  Jamie Laurel 41, a 3.

7              PROSPECTIVE JUROR:  Hannah Millman, Number 42, 5.

8              PROSPECTIVE JUROR:  Kelly Knight, Number 43, a 4.

9              PROSPECTIVE JUROR:  Glori Reid, Number 44, 7.

10             PROSPECTIVE JUROR:  Blake Ottinger, Number 45,

11  probably a 6.

12             PROSPECTIVE JUROR:  Ryan Ashmeade, Number 46, 7, 8.

13             PROSPECTIVE JUROR:  Monica Maddox, 47, and I'm a 10.

14             PROSPECTIVE JUROR:  Roy Pulliam, Juror 48, a 6.

15             PROSPECTIVE JUROR:  Sonia Perez.  I'm 49, a 1.

16             PROSPECTIVE JUROR:  Christine Burgan, Number 50, a 6.

17             PROSPECTIVE JUROR:  Arlene Kelleher, Number 51, a 9.

18             PROSPECTIVE JUROR:  Mary Occean, Number 52, a 4.

19             PROSPECTIVE JUROR:  Lorraine Magulick, Number 54, a

20  4.

21             PROSPECTIVE JUROR:  Kevin Webster, 55, a 5.

22             PROSPECTIVE JUROR:  Adrienne Zampella, 56, a 5.

23             PROSPECTIVE JUROR:  Stuart Schimkat, Number 53, a 3.

24             PROSPECTIVE JUROR:  Juror Number 57, Ramses Rosa, 6.

25             MS. FAVORIT:  I'm sorry to make you work with the
```

1   microphone.  I didn't realize.  I apologize ahead of time.

2        I have to pick on a couple people who did -- I did

3   have a zero, we are off the charts.

4        So Mr. Hinlicky, and you're Juror Number 5, so you

5   drove from Key Largo this morning?

6        PROSPECTIVE JUROR:  Yes.

7        MS. FAVORIT:  What kind of morning was that like?

8        PROSPECTIVE JUROR:  I got up at 2:00 a.m.  I was down

9   in Key Largo for a wedding.  I put in for a postponement

10  because I was going to be away this weekend for a wedding.

11  And then I was approved the postponement but then was told to

12  call in on the 8th to be here today while I was in Key Largo.

13       MS. FAVORIT:  Knowing you didn't get a lot of sleep

14  obviously and maybe there could be some resentment that you're

15  here today, if you happen to be selected as a juror, could you

16  still listen to the evidence, follow the law, pay attention?

17       PROSPECTIVE JUROR:  Yes, but also I have other issues

18  with this particular case that I will talk about separately.

19       MS. FAVORIT:  I will make a note of that.  And if I

20  forget, please remind me when I finish.  Okay.

21       Mr. Boissonneau, I have a 1; is that right?

22       PROSPECTIVE JUROR:  Yes.

23       MS. FAVORIT:  Juror Number 30.  How did we end up at

24  the "rather be at the root canal" scenario?

25       PROSPECTIVE JUROR:  Six times a charm.

1       MS. FAVORIT:  So you haven't been picked?

2       PROSPECTIVE JUROR:  I have been picked once.

3       MS. FAVORIT:  And you did get to a verdict?

4       PROSPECTIVE JUROR:  Yes.

5       MS. FAVORIT:  Is there anything about that experience

6   that made you not want to be here today?

7       PROSPECTIVE JUROR:  Not really.  I know so many

8   people who have never been contacted once for federal court,

9   but I have been called six times.

10      MS. FAVORIT:  You must have a lucky number or name.

11  If you were selected as a juror, would you be able to be fair

12  and impartial and listen to the evidence?

13      PROSPECTIVE JUROR:  Yes.

14      MS. FAVORIT:  And Juror Number 32, Mr. Guzman, I had

15  you as a one.

16      PROSPECTIVE JUROR:  Hello.

17      MS. FAVORIT:  Hi.  What puts you at I'd rather be at

18  a root canal?

19      PROSPECTIVE JUROR:  The nature of the case.

20      MS. FAVORIT:  Is there anything specific about it or

21  just because it's child pornography?

22      PROSPECTIVE JUROR:  I was -- I have experienced

23  sexual assault as a child.  So this type of nature, although

24  probably not specific, I'd just rather not deal with it.  If

25  it was another type of case, I would be more likely listening.

1          MS. FAVORIT:  Totally understand.  I'm sorry to hear

2     that.  If you happen to be selected as a juror, knowing you

3     don't want to hear this type of evidence --

4          PROSPECTIVE JUROR:  No.

5          MS. FAVORIT:  You cannot be fair and impartial?

6          PROSPECTIVE JUROR:  No.

7          MS. FAVORIT:  Thank you for your response.

8          Ms. Maddox, Number 47, I have you as a 10.  So I

9     wanted to know what puts you on the excited to be here scale?

10          PROSPECTIVE JUROR:  I love talking to people.  I've

11    just never been summoned, and I thought it was my duty.  The

12    drive is an hour and a half, and my kids are at spring break.

13    I just had to get myself up and get myself here.  It was no

14    problem.  I love talking to everybody around me.

15          MS. FAVORIT:  Thank you.

16          And then right next to you, Ms. Perez-Acosta, I have

17    you as a one.  What got us on that scale?

18          PROSPECTIVE JUROR:  It's because my first language is

19    Spanish, and it's hard for me to speak, understand very well

20    English.  That's why.

21          MS. FAVORIT:  Are you able to understand what we've

22    been saying so far?

23          PROSPECTIVE JUROR:  A little bit.

24          MS. FAVORIT:  If we were to escalate that to legal

25    talk where we're talking about the law, is that something you

1  could follow along with?

2          PROSPECTIVE JUROR:  I don't think so.

3          MS. FAVORIT:  Thank you.

4          I bothered enough people about their opinions to be

5  here.

6          A couple of you mentioned that you had previously sat

7  on juries.  I just have the same blanket question for

8  everybody.  Is there anyone who has previously served on a

9  jury that had a bad experience and that could affect maybe

10  their decision making on this case?

11          PROSPECTIVE JUROR:  Adrienne Zampella, Juror Number

12  56.  I served on a jury in Brooklyn, New York, and we ended up

13  having to be sequestered, and it was not pleasant in the hotel

14  room.

15          MS. FAVORIT:  That sounds miserable.

16          PROSPECTIVE JUROR:  It was, but I did my civic duty.

17  And it was not best of situations being in a jury room and

18  trying to convince the one holdout that we thought --

19          MS. FAVORIT:  Don't tell me what the verdict was.

20          PROSPECTIVE JUROR:  Trying to convince that person to

21  change their opinion.  And because of that person, we ended up

22  being sequestered.  And I had just gotten married and was a

23  newlywed, and I really wanted to be home with my husband

24  rather in a hotel room with a complete stranger.  So that was

25  the experience I had.

1          MS. FAVORIT:  How long were you sequestered for?

2          PROSPECTIVE JUROR:  Just the night.

3          MS. FAVORIT:  One night.  Knowing that it's highly,

4    highly unlikely any sequestration would happen with this

5    jury --

6          THE COURT:  We ain't doing that.  Not to worry.

7          MS. FAVORIT:  It would have to be something wild.

8          PROSPECTIVE JUROR:  I do have another situation that

9    I'm not sure should be noted, is that I work in a school in

10   the guidance department.  And we have the students that come

11   in who see the counselors, to come see the counselors.  And we

12   have had several students who had been molested, and I have

13   seen the kind of effect it has on the children.  So I think I

14   could be impartial, but I do have that experience with kids

15   that have been abused.

16         MS. FAVORIT:  Okay.  Thank you.  Hang on to the

17   microphone for a second.  Could be fair and impartial even

18   though you had a previous, maybe bad experience serving as a

19   juror?

20         PROSPECTIVE JUROR:  Yeah, as long as we are not

21   sequestered.

22         MS. FAVORIT:  That will not be an issue.  And your

23   work with the students in the guidance counselor's office, you

24   said the word "think" you can be fair and impartial.  We're

25   flying a plane.

1          PROSPECTIVE JUROR:  It's really hard because even

2    though my children haven't been molested or me personally, I

3    see the effect on these students and how it affects them in

4    all areas.  I think I can be impartial, but I do have that

5    experience in dealing with those kids and how it has affected

6    their schooling and has affected their home lives and a lot of

7    things.  So I think I can.  It's hard for me to make that

8    distinction of yes or no.  Does that make sense?

9          MS. FAVORIT:  It does make sense, which is why I give

10   the caveat, let's try to do it.  Knowing that this case will

11   have nothing to do with, you know, kids at a counselor's

12   office, you are going to get totally different facts, it is

13   the government's burden to put on the facts, you will be

14   instructed on the law, will that experience dictate how you

15   are going to make a decision?

16         PROSPECTIVE JUROR:  I can't really say yes or no.

17   You know what I'm saying?  I can't -- I don't know if that,

18   the experience of seeing the effects on these students will

19   not make me partial or biased is what I'm trying to say.

20         MS. FAVORIT:  Thank you.

21         Have any of you or any family member or close friend

22   ever been the victim of a crime?  So we will start with this

23   section of the jury.

24         THE COURT:  And I always have to caveat that.  We are

25   not talking about someone, like, threw an egg at your car,

 1  some high school kid at a sock hop.  A serious crime that

 2  would affect your ability to sit or judge.

 3          Sorry.  Go ahead, counsel.

 4          PROSPECTIVE JUROR:  I have the same situation.  I

 5  don't want to talk about it on the microphone.

 6          MS. FAVORIT:  Thank you.  I made a note of that.

 7          Has anybody, yourself or close person to you been the

 8  victim of a crime, and not like a petty crime?

 9          PROSPECTIVE JUROR:  Sean Malzone, Number 13.  Family

10  member sexual abuse.

11          MS. FAVORIT:  Okay.  Was anybody prosecuted or

12  charged in that matter?

13          PROSPECTIVE JUROR:  Yes, the uncle was.

14          MS. FAVORIT:  Did you ever have to speak to police or

15  appear in court?

16          PROSPECTIVE JUROR:  No, ma'am.

17          MS. FAVORIT:  Is there anything about that experience

18  which could any way affect your ability to be fair and

19  impartial on this case?

20          PROSPECTIVE JUROR:  No, but we already spoke, so.

21          MS. FAVORIT:  Just about this question.

22          PROSPECTIVE JUROR:  No.

23          MS. FAVORIT:  Anybody else in this section?

24          PROSPECTIVE JUROR:  Lurlene Diaz, Number 15.  I was

25  the victim of sexual violence.

1          MS. FAVORIT:  I'm very sorry to hear that.  Was

2     anybody prosecuted or charged?

3          PROSPECTIVE JUROR:  Yes, somebody was charged.  The

4     case was dropped, lack of evidence.

5          MS. FAVORIT:  Is there anything about that experience

6     that could affect your ability to be fair and impartial on

7     this case?

8          PROSPECTIVE JUROR:  I'm not sure.  That experience, I

9     have done a lot of work to resolve that experience, but I work

10    for survivors of human trafficking.  And I would like to say

11    that I'm fair.  Every day I make judgment calls that affect

12    people's lives.  And I do it based on facts and information

13    that's gathered, so I'm very good at that.  However, many of

14    the women that I serve have not received justice nor will they

15    receive justice.  And so I think this case reflects many of

16    the women I serve and betrayal.

17         MS. FAVORIT:  Thank you.

18         PROSPECTIVE JUROR:  Paula Hough, Juror Number 2.  I

19    was sexually assaulted in college.

20         MS. FAVORIT:  I'm very sorry that happened to you.

21    Was anyone prosecuted or charged.

22         PROSPECTIVE JUROR:  Unfortunately not.  I didn't

23    report it to the police.

24         MS. FAVORIT:  Okay.  Is there anything about that

25    experience which in any way would possibly affect your ability

1  to be fair and impartial?

2         PROSPECTIVE JUROR:  I can be fair and impartial.  Not

3  to be like one of those zodiac girls, but I'm a Libra, so

4  scales of justice.  So I believe in justice and the due

5  process.  I think I could be fair.

6         MS. FAVORIT:  I'm writing down Libra.

7         PROSPECTIVE JUROR:  Katherine Kempker, Juror

8  Number 9.  I was sexually assaulted in high school.  And then

9  I was sexually abused and everything in my last marriage.

10 It's not a thing I went to trial and everything.  I just

11 separated.

12        MS. FAVORIT:  Did you ever call the police?

13        PROSPECTIVE JUROR:  Yes.

14        MS. FAVORIT:  Do you feel like you were treated

15 fairly?

16        PROSPECTIVE JUROR:  No, not really.

17        MS. FAVORIT:  Is there anything about that experience

18 that would affect your ability to be fair and impartial in

19 this case?

20        PROSPECTIVE JUROR:  Yes, just having gone through it,

21 and not really anyone ever really believed in me, and then

22 also having kids.  I just can't imagine them going through

23 what I went through.

24        MS. FAVORIT:  Thank you for sharing.

25        Is that everybody on this side?  Let's go back here.

1  Did anybody raise their hand?

2          PROSPECTIVE JUROR:  Joshua Guzman, Number 32.

3          MS. FAVORIT:  Yourself or somebody close to you?

4          PROSPECTIVE JUROR:  Yes.  Myself and my eldest

5  sisters.

6          MS. FAVORIT:  Was anybody charged or prosecuted?

7          PROSPECTIVE JUROR:  No.

8          MS. FAVORIT:  Were the police called?

9          PROSPECTIVE JUROR:  No.

10          MS. FAVORIT:  Based on that experience, do you think

11  you could be fair and impartial?

12          PROSPECTIVE JUROR:  No.

13          MS. FAVORIT:  Thank you.

14          Anyone else on this side of the room?  I see no more

15  hands.

16          Over here.

17          PROSPECTIVE JUROR:  Ann Marie Jessup, 35.  In high

18  school, a close friend of mine was tried and found guilty for

19  the same thing.

20          MS. FAVORIT:  Is there anything about that experience

21  that would affect your ability to be fair and impartial in

22  this case?

23          PROSPECTIVE JUROR:  I hope not.  I'd say --

24          MS. FAVORIT:  Knowing that it's totally different

25  facts, totally different people, you haven't heard any

1  evidence yet, could you follow the law and be fair and

2  impartial?

3          PROSPECTIVE JUROR:  Yes.  I would try, yes.

4          MS. FAVORIT:  Anyone else on this side of the room?

5          PROSPECTIVE JUROR:  Roy Pulliam, Juror 48, my cousin

6  was murdered in Philadelphia three years ago during a

7  carjacking.  The guy just got convicted for a murder a month

8  ago, and they hadn't sentenced until May 1.  It was an ordeal.

9  It was no fun and nothing I would want anybody else to have to

10 go through.

11         MS. FAVORIT:  Were you called as a witness in that

12 case?

13         PROSPECTIVE JUROR:  No.

14         MS. FAVORIT:  Based on that experience, would you be

15 able to be fair and impartial on this case?

16         PROSPECTIVE JUROR:  Maybe.

17         MS. FAVORIT:  What's your hesitation?

18         PROSPECTIVE JUROR:  What?

19         MS. FAVORIT:  What is your hesitation with a maybe?

20         PROSPECTIVE JUROR:  I don't know if you know

21 Philadelphia, but it's a very liberal prosecuting attorney,

22 and it was just pulling teeth to get anything done on it.  And

23 it's kind of got me maybe a little bit harsh on things right

24 now.

25         MS. FAVORIT:  Okay.  Knowing we're a totally

```
 1  different state, totally different government, attorneys and

 2  defense --

 3            PROSPECTIVE JUROR:  Yeah, yeah.

 4        MS. FAVORIT:  -- could you be fair and impartial.

 5            PROSPECTIVE JUROR:  Probably.

 6        MS. FAVORIT:  I'm on a plane and I'm scared.

 7            PROSPECTIVE JUROR:  On a scale of 1 to 10, no.  I do,

 8  but --

 9        MS. FAVORIT:  Thank you.  Anybody else over there?

10        Okay, this little corner.  I see no hands raised.

11        Is there anybody either themselves or someone close

12  to you who has ever been arrested, charged with a criminal

13  case?  We will start again with this side of the room.

14            PROSPECTIVE JUROR:  John Buntin, Juror 12.  My nephew

15  was in a fight, shot an individual and was charged with

16  involuntary manslaughter.

17        MS. FAVORIT:  Was that recently?

18            PROSPECTIVE JUROR:  In the past two years.

19        MS. FAVORIT:  Were you involved with the case at all?

20            PROSPECTIVE JUROR:  Not at all.

21        MS. FAVORIT:  Do you think that he has been treated

22  fairly?

23            PROSPECTIVE JUROR:  Absolutely.

24        MS. FAVORIT:  Is there anything about that experience

25  that would affect your ability to be fair and impartial on
```

1  this case?

2         PROSPECTIVE JUROR:  Not at all.

3         MS. FAVORIT:  Thank you.  Anybody else on this side

4  of the room?

5         PROSPECTIVE JUROR:  Graham Hinlicky, 5.  Sorry to

6  speak over and over again.  A good friend of mine was accused

7  of a similar offense and was sent to jail for five years.

8         MS. FAVORIT:  Do you think he was treated fairly?

9         PROSPECTIVE JUROR:  Not really.

10        MS. FAVORIT:  Would it affect your ability to be fair

11 and impartial?

12        PROSPECTIVE JUROR:  Yes.  Kind of with other stuff.

13 Sorry.

14        MS. FAVORIT:  Thank you.  Anybody else on this side?

15 Did you raise your hand before?

16        PROSPECTIVE JUROR:  What was the question again?

17        MS. FAVORIT:  Have you yourself or anyone close to

18 you been accused of a crime?

19        Okay.  Back here.

20        PROSPECTIVE JUROR:  Derek Guenther, Juror 28.  My

21 younger brother back in 2008 was involved in drug-related

22 charges, and he was convicted and has affected his life a bit.

23 It was when he was a minor, so he was 17.  And the detectives

24 kind of -- he was very much responsible for his own poor

25 decisions.  Of course everyone is, but the detectives had

1   strung things along, undercover agents kind of walking down a

2   path to keep him doing the wrong thing over the course of a

3   year until he was 18 and then tried everything as an adult.

4   So with the experience that our family went through and then

5   he still deals physically and psychologically and all that

6   today and of course employment wise and all the other things

7   that come with it.

8        MS. FAVORIT:  Do you think he was treated fairly by

9   the criminal justice system?

10       PROSPECTIVE JUROR:  No.

11       MS. FAVORIT:  Based on that experience, would it

12  affect your ability to be fair and impartial on this case?

13       PROSPECTIVE JUROR:  Potentially.  There would be --

14  yeah, there is a potential hangup there.

15       MS. FAVORIT:  Thank you.

16       Anybody else on this side?  I see no more hands.

17       How about over here?

18       PROSPECTIVE JUROR:  Arlene Kelleher, Number 51.  My

19  son was charged in a road rage case in Massachusetts and is

20  due to go to trial in April.  He was a police officer at the

21  time and has since been retired for post traumatic stress

22  syndrome.  So that's due to happen next month.

23       MS. FAVORIT:  Are you a witness on that case?

24       PROSPECTIVE JUROR:  I'm not.

25       MS. FAVORIT:  Do you think he has been treated fairly

1  by the criminal justice system?

2          PROSPECTIVE JUROR:  We are talking about a totally

3  different state, unfortunately.  No, I don't think he has

4  been.

5          MS. FAVORIT:  Would that experience affect your

6  ability to be fair and impartial?

7          PROSPECTIVE JUROR:  It would not, because I truly

8  believe that that's incredibly important.  And if I can do my

9  part to be impartial and fair, then that's part of the reason

10 why I said it's a nine and why I'm here.

11         MS. FAVORIT:  Thank you.

12         Anybody else on this side of the room?

13         PROSPECTIVE JUROR:  Elizabeth Lanoue, Number 40.  I

14 have personal experience, but I would rather not go into it in

15 front of a roomful of people.

16         MS. FAVORIT:  Can we call you back in then?

17         PROSPECTIVE JUROR:  Sure.

18         MS. FAVORIT:  Anybody in the corner?  I feel like I

19 keep abandoning you all.  Thank you.

20         Has anybody been a witness on a case in any type of

21 judicial proceeding where you were called as a witness?  We

22 have two back here.  Go ahead.  Say your name.

23         PROSPECTIVE JUROR:  Joshua Guzman, Number 32.

24         MS. FAVORIT:  Is that related to what we have been

25 discussing previously?

```
 1              PROSPECTIVE JUROR:  No.  I was a security officer

 2   back in 2022.

 3              MS. FAVORIT:  Were you called for thefts?

 4              PROSPECTIVE JUROR:  During one of my shifts, some guy

 5   damaged some property.  I called the police.  I was asked to

 6   be a witness.  Just because it was COVID, I couldn't attend

 7   the trial, so I was called on the phone.

 8              MS. FAVORIT:  Was your experience with that going to

 9   affect how you judge witnesses on this case?

10              PROSPECTIVE JUROR:  No.

11              MS. FAVORIT:  What about your ability to be fair and

12   impartial?

13              PROSPECTIVE JUROR:  No.  I was kind of confused by

14   the question.  Sorry.

15              MS. FAVORIT:  Sorry.  Could be a fair and impartial

16   juror on this case even though you have a prior experience as

17   a witness?

18              PROSPECTIVE JUROR:  Yes, I guess, to answer that

19   question.

20              MS. FAVORIT:  Thank you.

21              PROSPECTIVE JUROR:  Jared, Juror Number 30.

22              MS. FAVORIT:  What were you a witness for?

23              PROSPECTIVE JUROR:  I was a witness for a theft at

24   CVS.  And I'm a witness on two other cases at the moment.

25              MS. FAVORIT:  Were you working at CVS at the time?
```

1          PROSPECTIVE JUROR:  Correct.

2          MS. FAVORIT:  Is that the two pending cases as well.

3          PROSPECTIVE JUROR:  One is Sam's Club and the other

4    was CVS.

5          MS. FAVORIT:  But you were working at both?

6          PROSPECTIVE JUROR:  Correct.

7          MS. FAVORIT:  And were you a manager during those

8    times?

9          PROSPECTIVE JUROR:  Correct.

10          MS. FAVORIT:  Is there anything about that experience

11    that would affect your ability to be fair and impartial on

12    this case?

13          PROSPECTIVE JUROR:  No.

14          MS. FAVORIT:  And would you be able to follow the law

15    when the judge instructs you on how to determine a witness's

16    credibility?

17          PROSPECTIVE JUROR:  Yes.

18          MS. FAVORIT:  Thank you.

19          PROSPECTIVE JUROR:  Kailey Worthington, Juror 26.  I

20    was called to be a witness but didn't actually end up going,

21    so I don't know if it counts.

22          MS. FAVORIT:  I think that counts.  What was it for?

23          PROSPECTIVE JUROR:  I was in high school, and I was

24    at a marina in Maryland.  And there was a guy on his boat who

25    was naked.  So I was called to bear witness to that situation.

1          MS. FAVORIT:  Bear witness was just very appropriate.

2          PROSPECTIVE JUROR:  Yes.

3          MS. FAVORIT:  Is there anything about your experience

4   as being a potential witness on that case that will affect

5   your ability to be fair and impartial on this case?

6          PROSPECTIVE JUROR:  Not a thing.

7          MS. FAVORIT:  Anybody over here as a witness on a

8   case?  I don't think there were any other hands.  We have one.

9          PROSPECTIVE JUROR:  Gary Garbelman, Juror 11.  I was

10  a witness in a divorce proceeding.

11         MS. FAVORIT:  Was that your own divorce or somebody

12  else's.

13         PROSPECTIVE JUROR:  No.  It was someone else's

14  divorce.

15         MS. FAVORIT:  I don't know.  Maybe you get called as

16  a witness.

17         PROSPECTIVE JUROR:  No.

18         MS. FAVORIT:  Is there anything about that that would

19  affect your ability to be fair and impartial in this case?

20         PROSPECTIVE JUROR:  Not at all.

21         MS. FAVORIT:  Thank you.

22         Anybody I missed?  We have one.

23         PROSPECTIVE JUROR:  John Buntin, Juror Number 12.  I

24  witnessed an automobile accident that resulted in a death.

25         MS. FAVORIT:  And you were called as a witness?

```
 1              PROSPECTIVE JUROR:  Correct.

 2              MS. FAVORIT:  Is there anything about that experience

 3    that would affect your ability to be fair and impartial in

 4    this case?

 5              PROSPECTIVE JUROR:  No, ma'am.

 6              MS. FAVORIT:  Thank you.

 7              Anybody else?

 8              Does any member of the jury panel have strong

 9    feelings or opinions concerning the United States government,

10    or more specifically FBI, North Port Police Department,

11    Sarasota County Sheriff's Office?  Maybe you had a bad

12    experience or an amazing experience.  Anybody?

13              PROSPECTIVE JUROR:  Juror Number 2, Paula Hough.  My

14    friend works for the Department of Justice at this time.

15              MS. FAVORIT:  What do they do for the Department of

16    Justice.

17              PROSPECTIVE JUROR:  They kind of -- I think she,

18    like, processes, like, evidence.  I know that they had that

19    one case with the girl that was, like, murdered on the camping

20    trip in the van.  Her name was Gabby.  She was the one that

21    processed the letters or something, like the journal.

22              MS. FAVORIT:  What's her name?

23              THE COURTROOM DEPUTY:  Ariana Kongel.

24              MS. FAVORIT:  Thank you.  I did forget.  I'm so

25    sorry.  Would that affect your ability to be fair and
```

1  impartial?

2          PROSPECTIVE JUROR:  No.

3          MS. FAVORIT:  Okay.

4          Anybody else?  Bad experience with one of these

5  parties?  I see no other hands.

6          Since we are on the subject of law enforcement, a

7  couple of you have mentioned maybe children or spouses or

8  friends that worked in law enforcement.  Is there anybody who

9  has somebody really close to them that works in law

10 enforcement?  We will start on this side again.

11         PROSPECTIVE JUROR:  Charley Creaser, Juror Number 16.

12 My husband works as a deputy for Pinellas County.

13         MS. FAVORIT:  And the judge kind of asked you a

14 couple questions earlier.  I think the general principle is

15 that every witness is treated the same.  So it could be

16 someone who is unhoused, and it could be, you know, a priest

17 and you are supposed to judge their credibility the same.  So

18 knowing that, that that's the law, would you be able to follow

19 that law even when a law enforcement officer testifies?

20         PROSPECTIVE JUROR:  Yes, ma'am.

21         MS. FAVORIT:  This side, is it the same person we're

22 talking about.

23         PROSPECTIVE JUROR:  I also had an issue.

24         MS. FAVORIT:  And that was Juror Number 2.

25         PROSPECTIVE JUROR:  Paula Hough.  So I have a

sorority sister who's like my best friend, she's a deputy for

Escambia County.  And then one of my other good friends, he's

also a deputy with Escambia County.

      MS. FAVORIT:  Is there anything about your

relationship with them that would affect your ability to be

fair and impartial?

      PROSPECTIVE JUROR:  No.

      MS. FAVORIT:  And the same question about judging law

enforcement the same as any other witness.  Would you be able

to follow the law?

      PROSPECTIVE JUROR:  Yes, ma'am.

      MS. FAVORIT:  Anyone else on this side?

      How about back here?

      PROSPECTIVE JUROR:  Barton Jones, Juror Number 34.

My younger son is in law enforcement in the State of Illinois.

      MS. FAVORIT:  Is there anything about your

relationship with him that would affect your ability to be

fair and impartial?

      PROSPECTIVE JUROR:  No, ma'am.

      MS. FAVORIT:  Would you be able to follow the law on

the principles of witnesses that, you know, everybody is kind

of treated the same?

      PROSPECTIVE JUROR:  Yes, ma'am.

      MS. FAVORIT:  Thank you.

      Back here?

1              PROSPECTIVE JUROR:  Arlene Kelleher, Number 51.  My

2     son is recently retired from the police department.

3              MS. FAVORIT:  Yes.  Anything about that that would

4     affect your ability to be fair and impartial or not be able to

5     follow the law with witnesses?

6              PROSPECTIVE JUROR:  No.

7              PROSPECTIVE JUROR:  Kelly Knight, Number 43.  My

8     ex-husband is a police officer.  My father is a police

9     officer.  My mother's a police officer.

10             MS. FAVORIT:  It is kind of a good mix.

11             PROSPECTIVE JUROR:  Yes, both ways.

12             MS. FAVORIT:  Would you be able to be fair and

13    impartial in this case?

14             PROSPECTIVE JUROR:  Yes.

15             MS. FAVORIT:  Could you follow the law on all

16    witnesses, you know, will have the same level of credibility

17    before they walk in the door?

18             PROSPECTIVE JUROR:  Yes.

19             MS. FAVORIT:  Okay.  Thank you.

20             PROSPECTIVE JUROR:  Monica Maddox, Number 46 -- or

21    47.  I'm sorry.  My brother-in-law is chief of staff at Polk

22    County Sheriff's Department, Steve Lester.

23             MS. FAVORIT:  Same two questions.  Can you be fair

24    and impartial in this case?

25             PROSPECTIVE JUROR:  Yes.

1          MS. FAVORIT:  Would it affect your ability to -- you

2    know, you would favor police officers over a regular civilian?

3          PROSPECTIVE JUROR:  No.

4          MS. FAVORIT:  Anyone else on this side?

5          Anyone over here in our corner?

6          Kind of the inverse.  Does anybody have a really bad

7    experience with law enforcement where you would distrust them

8    more than a civilian witness or a witness who might be a

9    priest?  I don't know why I keep using that example, but

10   anybody?  I see no hands.

11         So we have kind of already discussed that this case

12   is a child pornography case.  And the judge said it very well

13   that nobody wants to be, you know, the juror selected for the

14   child pornography case, but there is a difference between I

15   don't want to be here, I don't want to see it versus I

16   absolutely cannot under no circumstances.

17         So I would like to know if there is anyone who hasn't

18   already spoken about their personal experiences.  Like maybe

19   if you did tell me that and you have a different reason you

20   could raise your hand, but is there anybody who could

21   absolutely not sit on this case because it's child

22   pornography?  I see no hands raised.

23         On the same subject, I know I asked about anyone who

24   has been a victim of a crime or accused of a crime.  I want to

25   specifically ask about a sexually-based crime.  I know I got a

1   lot of responses already.  But in the event that I missed

2   anybody, is there anyone who is a victim of a sexually-based

3   crime other accused of a sexually-based crime, either yourself

4   or someone close to you that you have not already told us?

5           We have two people back here.

6           PROSPECTIVE JUROR:  Yan Ping Qi, Number 4.  I would

7   prefer to speak in private.

8           MS. FAVORIT:  We will make a note of that.  Thank

9   you.

10          PROSPECTIVE JUROR:  Juror Number 2, Paula Hough.  My

11  late aunt was murdered in a domestic violence.

12          MS. FAVORIT:  Okay.  When was that?

13          PROSPECTIVE JUROR:  I believe in like the late '80s,

14  early '90s.  I wasn't born yet.  This happened in Panama City,

15  Florida.

16          MS. FAVORIT:  Is there anything based on that

17  experience that would prevent you from being fair and

18  impartial in this case?

19          PROSPECTIVE JUROR:  No.

20          MS. FAVORIT:  Is there anybody else in the room who

21  hasn't given me a response on that?  I see no other hands.

22          PROSPECTIVE JUROR:  I feel like I --

23          THE COURT:  Hold on.  We've got to get that mic.  I'm

24  sorry.

25          PROSPECTIVE JUROR:  I said that my husband was an

 1  attorney for legal aid.  That was the job that --

 2         THE COURT:  I'm sorry, ma'am.  Will you stand up and

 3  give us your number?  I'm sorry.

 4         PROSPECTIVE JUROR:  Sorry.  Juror 29.  I had

 5  previously mentioned that my husband was an attorney.  He

 6  spent most of his time at Legal Aid of Cincinnati, but he did

 7  spend time as the director of an organization called ProKids,

 8  which is an organization of CASAs who speak on behalf of the

 9  abused and neglected, either cases of disputes over who gets

10  child custody or in cases of abuse and neglected children.  So

11  I feel like I should put that out there.

12         MS. FAVORIT:  Would that prevent you from being fair

13  and impartial in this case?

14         PROSPECTIVE JUROR:  I would hope not.

15         MS. FAVORIT:  If we're on a plane --

16         PROSPECTIVE JUROR:  I think I have a hard time

17  because I saw sort of the ugliness of abused and neglected

18  children, and putting children in a sexually explicit way is a

19  form of abuse.

20         THE COURT:  Right.  But, ma'am, the issue is

21  everybody is against child abuse and sexual abuse.  The issue

22  is what happened here and whether your, which I can tell very

23  large and prodigious mind can judge this evidence thumbs up,

24  thumbs down, sideways, upside down, fairly as presented to

25  you.  That's the issue.  We're all against, you know, sexual

1   abuse and all that.

2          PROSPECTIVE JUROR:  I would do my very best to do

3   that.  I think that's the best I can do.

4          THE COURT:  All right.

5          MR. BRUNVAND:  Can I ask the number of that

6   particular juror?

7          MS. FAVORIT:  Twenty-nine.

8          I saw no other hands.

9          On the same subject, there will be discussions on --

10  frank and graphic discussions about child pornography and

11  sexual activity.  Does anybody in this room have a personal

12  belief that there is a First Amendment right or the government

13  should not prosecute child pornography?  I see no hands.

14         Does anyone here believe that in order for a picture

15  or a video to be child pornography, it has to be a very little

16  kid and not just someone under 18?  I see no hands raised.

17         A witness who is under the age of 18 is to be treated

18  the same as any other witness on the case.  Is there anybody

19  here who believes an adult is automatically more credible as a

20  witness than a child?  So you've got an adult testifying, a

21  child testifying.  Is there anyone who thinks they

22  automatically believe someone because they are 18 or older?  I

23  see no hands raised.

24         Is there anyone here who thinks that a minor child

25  would not be capable of telling the truth?  Kind of the same

1  concept.  I see no hands raised.

2       Does anybody here have a certain expectation about

3  how a child might testify?  Like, you have an expectation of

4  what that might look like?  I see no hands raised.

5       I'm going to do a quick example.  Is there anybody

6  over here who has been to a wedding recently in the last year?

7  Okay.  We will use you.  I would call out your name, but I'm

8  confused.

9       PROSPECTIVE JUROR:  Stu Schimkat, Juror 53.

10      MS. FAVORIT:  What wedding did you attend?

11      PROSPECTIVE JUROR:  A friend's son and his fiancee.

12      MS. FAVORIT:  When was that?

13      PROSPECTIVE JUROR:  October.

14      MS. FAVORIT:  And what color was the dress that the

15  bride wore?

16      PROSPECTIVE JUROR:  White.

17      MS. FAVORIT:  What color was the cake?

18      PROSPECTIVE JUROR:  White.

19      MS. FAVORIT:  And what color were the bridemaid

20  dresses?

21      PROSPECTIVE JUROR:  It was a variety of pastels.

22      MS. FAVORIT:  That sounds pretty.  And can you tell

23  me what the first dance song was?

24      PROSPECTIVE JUROR:  No.  I don't remember.

25      MS. FAVORIT:  Can you tell me what the rings looked

1  like?

2         PROSPECTIVE JUROR:  Wedding rings.

3         MS. FAVORIT:  Can you tell me the first person that

4  you shook hands with at the wedding?

5         PROSPECTIVE JUROR:  No, because I shook hands with a

6  lot of people.

7         MS. FAVORIT:  And I'm going to go right next to you.

8         PROSPECTIVE JUROR:  Ramses Rosa, Juror Number 57 or

9  8.  I don't know.

10        MS. FAVORIT:  Do you think he actually went to that

11 wedding?

12        PROSPECTIVE JUROR:  Yes.

13        MS. FAVORIT:  Why do you think that?

14        PROSPECTIVE JUROR:  Because he said so.

15        MS. FAVORIT:  Did he know the important parts, like

16 in his memory.

17        PROSPECTIVE JUROR:  Yes.

18        MS. FAVORIT:  What about the minor details that he

19 didn't know?

20        PROSPECTIVE JUROR:  You forget minor details if it's

21 not all the time.

22        MS. FAVORIT:  And does that mean that it did not take

23 place?

24        PROSPECTIVE JUROR:  No.

25        MS. FAVORIT:  Thank you.  We will hand it right here.

1    We will just keep going with the row.

2           PROSPECTIVE JUROR:  The same question?

3           MS. FAVORIT:  Can you say your name and juror number,

4    please?

5           PROSPECTIVE JUROR:  Adrienne Zampella, Juror

6    Number 56.

7           MS. FAVORIT:  When talking about something that

8    happened, do you always tell it exactly the same way each

9    time?

10          PROSPECTIVE JUROR:  If it's true, yeah.

11          MS. FAVORIT:  What about minor details that you might

12   leave out, would that mean that it didn't happen?  For

13   example, the wedding.

14          PROSPECTIVE JUROR:  Okay.  Can you rephrase that

15   question?

16          THE COURT:  Counsel, let's just focus in on questions

17   to the jurors rather than argumentative illustrations.  If you

18   have any more questions, we will take those at this time.

19          MS. FAVORIT:  Thank you.  Does anybody have a

20   religious belief that you cannot make judgment of someone to

21   find an individual guilty or not guilty?  Anybody have an

22   issue with that?

23          PROSPECTIVE JUROR:  I'm Catholic.  Adrienne Zampella,

24   Juror 56.  I'm Catholic, and although the Bible says there are

25   certain things that are abominable sins, my Lord, Jesus Christ

1  says we are not to judge anybody, that he will have the final

2  judgment.

3          MS. FAVORIT:  And knowing that you have that belief,

4  would you be able to follow the law as a juror if you are in

5  the back and you've been instructed on the law and you have to

6  say guilty or not guilty?

7          PROSPECTIVE JUROR:  Yes, because Jesus Christ has the

8  final judgment, not me.

9          MS. FAVORIT:  Thank you.  Does anybody here not have

10  a computer or a cell phone?  I see no hands raised.

11          Is there anybody here who didn't raise your hand in

12  response to something I asked you before?  I see no hands

13  raised.

14          Thank you all very much for your time.

15          THE COURT:  All right.  And Mr. Brunvand as defense

16  lawyer has no duty or burden, but if he had questions, we

17  would take them at this time.

18          MR. BRUNVAND:  Thank you, Your Honor.  I will get on

19  this side as well.

20          My name is Bjorn Brunvand.  I represent Greg

21  Williamson.  I'm going to ask a few questions of everyone as a

22  group, and I may pick on some individuals.  Before I start

23  asking the questions, I want to emphasize how important it is.

24  And I apologize if my back is turned towards you.  I mean no

25  disrespect.  How important it is that what you say in this

1  courtroom here today is what you feel.  It's your opinion

2  about who you are, because we have a very, very brief moment

3  for us to try to pick a jury that can be fair and impartial

4  and try this case, and we don't know very much about you.

5        And the important thing is that in the courtroom,

6  obviously we all want to be able to say that we can follow the

7  law.  It's sort of like in the classroom as a child we want to

8  do what the teacher tells us to do.  And as an employee, we

9  want to do what the employer says.  So the beautiful thing

10  about voir dire is that as long as you are speaking the truth

11  about your background, about who you are, how you feel so that

12  we don't have anyone that arrives on a jury with an agenda,

13  that's what we're trying to find out.  Okay?

14        I want to give you a brief example of what I'm

15  talking about.  So this is the story that Lou Baskhea

16  (phonetic) talked about.  He was a professor out in California

17  in the '80s.  And he talks about an elementary school teacher

18  who is teaching the class how to draw a tree.  And this is

19  back when they had chalkboards and chalk, not computers and

20  television screens.  And the teacher brought out a brown

21  crayon and a green crayon and did a little brown line on the

22  chalkboard and did a little round green circle and then

23  finished up with a little brown line and said to the class,

24  this is the tree.  Now, you class, draw a tree.  Well, little

25  Johnny said that's not a tree.  That's a lollipop.  I know

1  what a tree looks like, and he drew his little Picasso tree.

2  Okay?  He spoke from the heart.  That's what we want.

3        So when you are being asked can you fly the plane and

4  you're not sure, say so.  If you're being asked can you fly

5  the plane and you're sure, say so.  Is that fair?  Everyone

6  agree?  Okay.

7        Now, presumption of innocence is one of the things

8  His Honor said we've had it with us our entire history.  That

9  means that as Mr. Williamson sits before you, you are to

10  presume him innocent, right?  You understand?  And can we

11  agree that outside of this setting, outside of the courtroom

12  setting when we are maybe at the kitchen table learning about

13  news of horrible things, that may not be the first thing that

14  comes to mind, I wonder if the person is innocent.  Anyone in

15  here walk into this courtroom and say to yourself, I wonder

16  what the defendant is innocent of?  Anyone here in the first

17  panel?  No.  How about in the back, anyone who came in with

18  that thought, I wonder what he is innocent of?  So it is a

19  different setting, right?

20        So my question now is, and I'm going to have to pick

21  on some people.  Let me get my little chart.  I may have to

22  pick on some people because public speaking is one of the

23  biggest fears that we all have.  And presumably some of you,

24  as it was getting closer to the point the microphone was going

25  to be in your hand might have experienced a little bit of

1  relief when it passed you, when you had had your moment.

2        So why do you think -- do we have any volunteers?

3  Why do you think we have this added protection, that when

4  someone is accused of a crime by the government, they are to

5  be presumed innocent?  Anyone in the jury box here have any

6  thoughts on why that is the case?  All right.  Let's pick on

7  someone then.  Juror Number 14, what are your thoughts on

8  that?  And please tell us your name and what are your thoughts

9  on that?

10        PROSPECTIVE JUROR:  Eric Kamka, Juror 14.  So people

11  don't go into it with a bias.

12        MR. BRUNVAND:  Okay.  Okay.  But it's not just, hey,

13  both sides are equal, right?  It's despite the fact that he

14  has been charged with this terrible crime, as His Honor has

15  indicated, this is not about whether child pornography is good

16  or bad.  We can all agree that it's bad.  As you look at him,

17  he has been indicted and charged with a crime, and you are

18  being told that you have to presume him innocent.  Any

19  thoughts on why that added protection?  Why is it not just a

20  simple balancing thing?  No thoughts?

21        PROSPECTIVE JUROR:  No.

22        MR. BRUNVAND:  That's fine.  That's fine.

23        How about Juror Number 12, Mr. Buntin.  Any thoughts

24  on that, Mr. Buntin?

25        PROSPECTIVE JUROR:  Well, false accusations, you hear

 1   it all the time.  So how do you find the truth from the

 2   untruth?  Facts do that.

 3            MR. BRUNVAND:  If it's a civil case where people are

 4   fighting over money or contracts and what have you, that

 5   presumption doesn't exist.  Any thoughts on why, when it is a

 6   criminal case, we have this added protection?

 7            PROSPECTIVE JUROR:  If you are convicted, it is a bad

 8   thing.  If you are falsely convicted, it's a terrible thing.

 9   It ruins your life, your family's life, a lot of people.

10            MR. BRUNVAND:  Right.  So to avoid wrongful

11   convictions; is that fair?

12            PROSPECTIVE JUROR:  Fair.

13            MR. BRUNVAND:  Okay.  Juror Number 6, Mr. Helton,

14   what are your thoughts on that?  Why do we have this added

15   protection when someone is accused of a crime in federal court

16   and state court?

17            PROSPECTIVE JUROR:  It's better for 100 guilty people

18   to walk free than one innocent person to be locked up.  That's

19   how I understand it.

20            And do you agree with that idea?

21            PROSPECTIVE JUROR:  Yeah.  Yes, sir.

22            MR. BRUNVAND:  So would you say that maybe our

23   founding fathers recognized that we're not perfect, we make

24   mistakes?

25            PROSPECTIVE JUROR:  Yes, sir.

```
 1              MR. BRUNVAND:  And even though we're now several

 2  hundred years later, do you think that we still make mistakes?

 3              PROSPECTIVE JUROR:  Yes, sir.

 4              MR. BRUNVAND:  Can jurors make mistakes?

 5              PROSPECTIVE JUROR:  Yes, sir.

 6              MR. BRUNVAND:  Prosecutors can make mistakes?

 7              PROSPECTIVE JUROR:  Yes, sir.

 8              MR. BRUNVAND:  We are all capable of making mistakes,

 9  right?

10              PROSPECTIVE JUROR:  Yes, sir.

11              MR. BRUNVAND:  Thank you very much.

12              Anyone in the back corner behind the prosecution,

13  does anyone have any thoughts, or do I need to pick on

14  someone?

15              PROSPECTIVE JUROR:  I will volunteer.

16              MR. BRUNVAND:  Thank you so much.  Stand up and give

17  your juror number and name.

18              PROSPECTIVE JUROR:  Scott Laris, 21.  We don't know

19  the facts.

20              MR. BRUNVAND:  Okay.  You don't know the facts.  So

21  here's the interesting thing.  You don't know the facts, but

22  you do know that he has been indicted and charged with a

23  crime, right?  Yes?

24              PROSPECTIVE JUROR:  Yes.

25              MR. BRUNVAND:  And so this is a good way to
```

1    transition to the next protection, and that is that the

2    government has to prove the case beyond every reasonable doubt

3    and that we have no burden.  And so if, for example, even if

4    you hear the facts and you believe that he may be guilty but

5    there is a reasonable doubt and you recognize that there's a

6    reasonable doubt, what would your verdict have to be?

7            PROSPECTIVE JUROR:  It would have to be not guilty if

8    there was reasonable doubt.

9            MR. BRUNVAND:  Okay.  Regardless of how you might

10   feel, right?

11           PROSPECTIVE JUROR:  Correct.

12           MR. BRUNVAND:  Why do you think that is part of the

13   protections that the founding fathers started out with so long

14   ago?

15           PROSPECTIVE JUROR:  Just for protection.

16           MR. BRUNVAND:  Okay.  Okay.

17           PROSPECTIVE JUROR:  Somebody is not wrongly in prison

18   for something that they may not have done.

19           MR. BRUNVAND:  To make sure, as I believe it was

20   Juror Number 6 had indicated, to make sure that innocent

21   people are not convicted and go to prison.

22           PROSPECTIVE JUROR:  Right.

23           MR. BRUNVAND:  Okay.  All right.

24           Anyone else have any thoughts, agreements, or

25   disagreements with the discussions we have had so far about

1  these protections?  Anyone?

2        Now, another protection that my client has,

3  Mr. Williamson has, is that he has the absolute right not to

4  testify.  And if he does not testify, the Court will instruct

5  you that you cannot in any way, shape, or form consider that

6  against him.  Okay?

7        Now, can we agree that that protection does not exist

8  at home?  Can we agree with that?  Can we agree that probably

9  when His Honor finds the empty beer can in the back of the

10 car, the right not to say anything probably doesn't exist,

11 right?  As parents, if little Johnny, we tried to find out who

12 had his or her hand in the cookie jar and little Johnny --

13 let's say, little Johnny says, Mom, I don't have to answer

14 that and you can't consider that, it's not part of our daily

15 routine.  Can we agree with that?

16        Ma'am, what's your name and juror number?

17        PROSPECTIVE JUROR:  Lurlene Diaz, 15.

18        MR. BRUNVAND:  Do you agree with that?

19        PROSPECTIVE JUROR:  Yeah, I do.

20        MR. BRUNVAND:  Why do you think we have this added

21 protection, that when someone is accused of a crime, that you

22 as jurors are being told that you can't consider it?  Meaning

23 if you're on the jury and one of the other jurors says, you

24 know, he didn't testify and I want to know what he had to say

25 and so I think he must be guilty because he didn't testify,

1  you would have to say to that juror what?

2      PROSPECTIVE JUROR:  If he didn't testify?

3      MR. BRUNVAND:  If he didn't testify.

4      PROSPECTIVE JUROR:  It doesn't matter in the case.

5  It is the other evidence that has to come in.

6      MR. BRUNVAND:  Right.  But would you agree that we

7  all have a naturally tendency to want to hear what people say?

8      PROSPECTIVE JUROR:  Yeah.

9      MR. BRUNVAND:  How do you put that aside?  And it's

10 okay if someone says, you know what?  I don't know that I can

11 do that.  How do you put that aside?

12     PROSPECTIVE JUROR:  I think sometimes it's good that

13 the person doesn't testify for several reasons.  I think

14 sometimes people aren't good presenters, and they just fumble

15 through it which would escalate things for them.  I think

16 oftentimes, if it is emotional charged things, I think that

17 with the questioning, that it could make it appear to be

18 something different than it is.

19     MR. BRUNVAND:  Okay.  So the idea is that as jurors,

20 as humans, we may misinterpret the way someone portrays

21 themself on the witness stand.

22     PROSPECTIVE JUROR:  Correct.

23     MR. BRUNVAND:  And that we want to make sure, again

24 going back to what Mr. Helton said, we want to make sure that

25 we don't make mistakes.

```
 1              PROSPECTIVE JUROR:  Correct.

 2              MR. BRUNVAND:  Anyone have such -- well, anyone here

 3     have such strong feelings about wanting to hear what

 4     Mr. Williamson has to say, that if he was not to take the

 5     stand, that you would not be able to afford him that

 6     protection?  Anyone here in this group who feels very strongly

 7     about I need to hear from the defendant or I'm not going to be

 8     able to?

 9              Yes.  So juror number's.

10              PROSPECTIVE JUROR:  Thirteen.

11              MR. BRUNVAND:  Is that how you feel?

12              PROSPECTIVE JUROR:  Yes, sir.

13              MR. BRUNVAND:  Which is fine.  I mean, based on your

14     background and experience, you can't afford that protection?

15              PROSPECTIVE JUROR:  I feel like if I was innocent,

16     especially if I was innocent, I would want to say something.

17              MR. BRUNVAND:  Sure, absolutely.  Understood.

18              And in the back row I think it's Juror Number 4?

19              PROSPECTIVE JUROR:  Yes.

20              MR. BRUNVAND:  How do you feel about that?

21              PROSPECTIVE JUROR:  I think everyone should be

22     afforded the opportunity.

23              THE COURT:  Ma'am, just talk a little louder.

24              PROSPECTIVE JUROR:  Sorry about that.  I think

25     everyone should be afforded the opportunity to explain their
```

1  side of things.

2        MR. BRUNVAND:  Sure, sure.  And everyone is afforded

3  the opportunity to explain their side, but the protection that

4  we are talking about is a protection that basically says if

5  you're a juror, that should Mr. Williamson not take the

6  witness stand, you cannot consider that in evaluating whether

7  or not he's guilty --

8        PROSPECTIVE JUROR:  Correct.

9        MR. BRUNVAND:  -- or not guilty.  How do you feel

10 about that?  Do you feel like you could not afford him that

11 added protection?

12        PROSPECTIVE JUROR:  I feel like as a juror I would

13 need him to tell his side of the story in order to make a

14 decision.

15        MR. BRUNVAND:  Because of your background and

16 experience, you believe that you cannot be fair and impartial

17 as it relates to that protection?

18        PROSPECTIVE JUROR:  Correct.

19        MR. BRUNVAND:  Anyone else who has strong feelings

20 here in this panel?  And when I say "this panel," for the

21 record it's the group sitting in the jury box who feels the

22 same way?  Yes.

23        PROSPECTIVE JUROR:  Juror Number 9.  Just from my

24 past, I would have to hear from him.

25        MR. BRUNVAND:  So that's a protection that you would

1  not be able to afford him?

2          PROSPECTIVE JUROR:  Yeah.

3          MR. BRUNVAND:  The other protections that we talked

4  about, you're okay with?

5          PROSPECTIVE JUROR:  Yes.

6          MR. BRUNVAND:  But not if someone chooses not to

7  testify?

8          PROSPECTIVE JUROR:  Yes.

9          MR. BRUNVAND:  Very good.

10         Anyone else?

11         PROSPECTIVE JUROR:  I have something to say.

12         MR. BRUNVAND:  Juror number?

13         PROSPECTIVE JUROR:  I'm Juror Number 10, Peggy

14  Marrero.  It's the old saying, you're not guilty until proven.

15  The facts aren't there --

16         MR. BRUNVAND:  Sure.

17         PROSPECTIVE JUROR:  -- until it comes out.  We won't

18  know the facts.

19         MR. BRUNVAND:  If it comes out.

20         PROSPECTIVE JUROR:  If he doesn't testify, we won't

21  know.

22         MR. BRUNVAND:  Well, and that's, you know, that's the

23  question, right?  So we don't know much about you.  We just

24  met.  We've all just met.  And some of you have such strong

25  feelings about that particular issue that you may not be able

1    to set it aside.  That's the question.  I mean, if you can set

2    it aside, wonderful.  If you have doubts or you can't set it

3    aside, we need to know.  And how do you feel about that, that

4    you cannot set it aside?

5            PROSPECTIVE JUROR:  I feel like I could if there's

6    information there.  It may not be totally from him, but if

7    there is information there that comes out throughout the case,

8    then, yes, I will be able to say how I feel.

9            MR. BRUNVAND:  You will be able to deliberate?

10           PROSPECTIVE JUROR:  Yes.

11           MR. BRUNVAND:  And so let's assume that he doesn't

12   testify, okay, and you are on the jury and one of the other

13   jurors says, I think he's guilty because he didn't testify.

14   What would you tell that other juror?

15           PROSPECTIVE JUROR:  Well, we would have to get all

16   the facts.

17           MR. BRUNVAND:  And what's the judge's instruction as

18   to that issue?  Cannot consider it.  Are you able to do that?

19           PROSPECTIVE JUROR:  Yes.

20           MR. BRUNVAND:  Would you tell the other juror, if the

21   other juror was considering it?  Would you say, remember the

22   Court's instruction.  We can't consider that.

23           PROSPECTIVE JUROR:  Right.  We have to follow the

24   rules.

25           MR. BRUNVAND:  Okay.  All right.  Very good.  Thank

1    you so much.

2              Was there someone else in here?  I don't think so.

3              What about in the back corner behind the prosecution,

4    anyone who feels very strongly about that issue, about not

5    being able to follow the Court's instructions as it relates to

6    a defendant not testifying?  Anyone?  No?  What about in the

7    back corner?  I'm not neglecting you over here.

8              Juror Number 47, what are your thoughts on this?  You

9    were confused about your number earlier.

10             PROSPECTIVE JUROR:  You know I don't know my number.

11   I feel like, you know, I walk in and I hear what it's about,

12   and I was the first to be like I don't think I can do that.

13   But as we sit here, if that was me or my husband or my family

14   member that's been charged with this, I would want to know the

15   facts.  I feel like it's a crime.  For people to get on the

16   stand, they can tell their story how they have it.  They can

17   lie, manipulate.  I want to go with the facts and the facts

18   only.  If that was my family member, I would want to know the

19   facts.  I wouldn't want to just say, look at that guy.  He's

20   guilty because he's sitting in that chair.  So I don't think

21   he would need to testify.  I don't know if I would believe it.

22   You know, I hate to say that.  I don't know if I would believe

23   it differently if he was to testify or not testify.  I would

24   go with what the facts were and what I could see.

25             MR. BRUNVAND:  Do you agree in the home setting -- do

1  you have children?

2          PROSPECTIVE JUROR:  I have three girls, yes.

3          MR. BRUNVAND:  So one of your daughters, you are

4  trying to figure out which one of your daughters did something

5  that you told them not to do and they did it nevertheless, and

6  you're questioning them.  And they say, we don't have to

7  answer your question, Mom.  That wouldn't apply at home; would

8  you agree?

9          PROSPECTIVE JUROR:  I agree.

10          MR. BRUNVAND:  And would you agree that as humans we

11  do want -- we have this desire to hear from people, right?

12  What's your explanation, right?

13          PROSPECTIVE JUROR:  I think with my girls, knowing

14  them and raising them, I can see when they are lying and not

15  lying.  I have that parental feeling, I guess I could say.

16  But again, I would go with the facts.  And if -- I don't know

17  if -- I don't know.  But, no, I do feel like when it's my

18  family my children, depending on what the charge is, I would

19  want to hear from them what they have to say.  But again, I

20  would want to know what the facts were.

21          THE COURT:  And let me interrupt for a minute.  So

22  the question is whether -- you guys do the facts.  I do the

23  law.  So if I find beer clans in the back of my car, that

24  kid's got the burden of explaining.  Of course, there won't be

25  any innocent explanation.  He has the burden of telling me how

```
 1   the Coors cans, which I don't like Coors anyway, how the Coors

 2   cans got in the car.

 3          Mr. Williamson and Mr. Brunvand and Ms. Ramos, they

 4   have no burden.  So that's the issue.  They have no burden.

 5          Now, that kid with the beer cans or Johnny in the

 6   cookie jar, the parent is going to say you better do some

 7   explaining.  There's no burden on this side of the room.  And

 8   that's I think the right answer there.  And that's what the

 9   law is.  It's always been that way.

10          Go ahead, Counselor.

11          MR. BRUNVAND:  Thank you, Your Honor.

12          Mr. Garbelman?

13          PROSPECTIVE JUROR:  Yes.  Gary Garbelman, Juror 11.

14          MR. BRUNVAND:  Mr. Garbelman, if you were asked to

15   render a verdict right now, what would the verdict have to be?

16          PROSPECTIVE JUROR:  Not guilty.

17          MR. BRUNVAND:  Thank you very much.

18          Miss Charley, the same question to you.

19          PROSPECTIVE JUROR:  Charley Creaser, Juror 16.  It

20   would still be not guilty.  I need information, background.

21          MR. BRUNVAND:  Mr. Andrew?

22          PROSPECTIVE JUROR:  Juror Number 1.  The same

23   question, not guilty with no facts.

24          MR. BRUNVAND:  Anyone disagree with that?

25          Can I have a moment, Your Honor?
```

1            THE COURT:  Yes.  Thank you.

2            MR. BRUNVAND:  I know there were some jurors who

3    wanted sidebar.

4            THE COURT:  We will address that after I excuse them

5    for lunch.  So right now why don't we all go to lunch.  Here's

6    what we're going to do, please.  Let's try to get back at

7    1:00.  Remember where you're at, where you're seated.  We will

8    have a jury picked by then or thereabouts, and we will start

9    this trial.

10           So let's take a lunch break.  Please don't discuss

11   the case or look on Google or something.  There is nothing in

12   the paper about this or anything like that, but we always get

13   in trouble.  We had a big truck wreck case, and the one juror

14   went down and took pictures of the scene.  Of course, all the

15   traffic lights had been changed and reworked since the two

16   years, and it really ruined the whole trial.  So don't look on

17   outside sources.  We know nothing about this case, you and I,

18   so please don't discuss it.  We will see you back at 1:00.

19   Thank you.

20           (Jury escorted out of the courtroom.)

21           THE COURT:  The ones that you wanted to come sidebar

22   was Qi and Hinlicky, I think, the one that drove up from Key

23   Largo.  It would be my intention to grant a cause strike on

24   those two anyway.

25           MR. BRUNVAND:  There were a few others that wanted to

1  go sidebar, Your Honor, other than those two.

2          THE COURT:  Who else?

3          MR. BRUNVAND:  Forty is one.

4          THE COURT:  Hold on.

5          MR. BRUNVAND:  Just 40, I guess.

6          THE COURT:  Forty.  Okay.  I missed her.  Sorry.

7          How soon can we get fed and confer so we can do these

8  strikes?

9          Government, how much time do you need to grab some

10 lunch, because you're going to open right after lunch, of

11 course.

12         MS. FAVORIT:  Thirty minutes, Your Honor.

13         THE COURT:  Are you okay with that?

14         MR. BRUNVAND:  Yes, Your Honor.

15         THE COURT:  So we'll meet here at 20 'til.  We have

16 lots of jurors, so I'm going to be very generous with cause

17 strikes because we've got plenty of people.  So we'll start

18 striking at 20 'til.

19         MR. BRUNVAND:  Okay.

20         THE COURT:  And we will do two alternates.  You get

21 one strike on the alternates.

22     (Lunch recess taken.)

23         THE COURT:  And Ms. Favorite, do we have the strikes,

24 or do we need to wait?

25         MS. FAVORIT:  I have the strikes.

1          THE COURT:  Government, give me your first strike for

2    cause.  Give me your first strike for cause.

3          MS. FAVORIT:  The first strike for cause is Juror

4    Number 5.  He said he couldn't be fair, I think on several

5    occasions.

6          THE COURT:  Any objection to that one?

7          MR. BRUNVAND:  No objection.

8          THE COURT:  He is stricken for cause.  Hinlicky.

9          Defense, I will take your first strike for cause.

10         MR. BRUNVAND:  Number 4, Your Honor.

11         THE COURT:  She has a special needs son.  There is no

12   right to silence.

13         Any objection, government?

14         MS. FAVORIT:  No objection.

15         THE COURT:  So 4 is stricken for cause.

16         Government, I'll take your next strike for cause.

17         MS. FAVORIT:  Moving for cause on Juror Number 13.  I

18   had concerns about his ability to be fair and impartial with

19   the things he said at the bench.  We kind of recovered but

20   then he had issues later.

21         THE COURT:  What says the defense on that?

22         MR. BRUNVAND:  I have to objection.  I think he is

23   full of it, but I don't want him on the jury.

24         THE COURT:  Yes.  Somebody told him to say that to

25   get off.  I agree, for cause.

```
 1                    Defense, I will take your next strike for cause.

 2                    Number 13 is stricken for cause.

 3                    MR. BRUNVAND:  Number 9, Your Honor.

 4                    THE COURT:  Number 9, two young kids.

 5                    Government, what do you say to that?

 6                    MS. FAVORIT:  I did have a note.  I don't remember on

 7      what, but no objection.

 8                    THE COURT:  No objection on 9.  She's got nobody for

 9      the kids.  It's spring break, et cetera.  Number 9 is stricken

10      for cause.

11                    Government, I will take your next strike for cause.

12                    MS. FAVORIT:  Number 15, she has the human

13      trafficking survivor experience.  I think she was vacillating

14      on whether or not she could be fair and impartial.

15                    THE COURT:  What says the defense?

16                    MR. BRUNVAND:  No objection.

17                    THE COURT:  All right.  I'll strike 15 for cause.

18                    Defense, I will take your next strike for cause.

19                    MR. BRUNVAND:  Your Honor, I'm going to ask for cause

20      Number 2, primarily because of her history of being a sexual

21      assault victim.  She didn't say that she couldn't be fair and

22      impartial, but that's my concern.

23                    THE COURT:  All right.  Well, I will deny that strike

24      for cause.

25                    Government, give me your next strike for cause.
```

1  She's a Libra she said.  So it's interesting.  I will say

2  that.  It's very interesting.

3          Government, I'll take your next strike for cause.

4          MS. FAVORIT:  Your Honor, I didn't know how you

5  wanted to handle Juror Number 16, the nursing student with her

6  boards.

7          THE COURT:  Any objection?

8          MR. BRUNVAND:  No objection.

9          THE COURT:  I feel sorry for these students, although

10  who knows.  Granted.  Sixteen is stricken for cause.

11          I will take the defense strike for cause.

12          MR. BRUNVAND:  Twenty-nine, Your Honor.

13          THE COURT:  Twenty-nine, okay.  What says the

14  government?

15          MS. FAVORIT:  I didn't have her as having fair and

16  impartial issues, and her board meeting was on Sunday.

17          THE COURT:  I'm not going to strike her for cause.

18  Overruled.  I'm not going to grant the strike for cause.  She

19  did say her husband was an attorney, worked in the child abuse

20  thing, but she didn't cross the line.  She wants off the jury.

21  I don't think there's any doubt about that.

22          MR. BRUNVAND:  The only thing I would add that,

23  Judge, I believe that when you followed up on it, I think the

24  best she was able to say was "I'll try."

25          THE COURT:  We will come back to that.  Right now I'm

 1  denying that for cause.  Just make a note, and let's don't

 2  forget.

 3            Government, give me your next strike for cause.

 4            MS. FAVORIT:  Juror Number 17, she had the blood

 5  pressure monitoring and her -- she mentioned a doctor's

 6  appointment but then said procedure in the morning.  So I

 7  either want to ask her, like, can that be rescheduled.

 8            THE COURT:  Yeah.  What says the defense?

 9            MR. BRUNVAND:  No objection.

10            THE COURT:  Seventeen is stricken for cause.

11            Defense, I'll take your next strike for cause.

12            MR. BRUNVAND:  Thirty-two, Your Honor.

13            PROSPECTIVE JUROR:  Thirty-two.  Any objection on

14  that one?

15            MS. FAVORIT:  No, Your Honor.

16            THE COURT:  Thirty-two is stricken for cause.

17            Government, I'll take your next strike for cause.

18            MS. FAVORIT:  Number 23, Your Honor.  She was the one

19  who is caring for a dementia family member who is 85 and she

20  got coverage for today.

21            THE COURT:  Right.  Funeral coming up.  What says the

22  defense?

23            MR. BRUNVAND:  No objection, Your Honor.

24            THE COURT:  Twenty-three is stricken for cause.

25            Defense, I'll take your next strike for cause.

```
 1              MR. BRUNVAND:  Fifty-six, Your Honor.

 2              THE COURT:  Fifty-six.  Okay.  Right.  New York

 3   accent.  What says the government?

 4              MS. FAVORIT:  No objection, Your Honor.

 5              THE COURT:  She gave the answer, religious thing.

 6   Fifty-six is stricken for cause.

 7              What says the government, next strike for cause?

 8              MS. FAVORIT:  Juror Number 28.  When asked about his

 9   brother who had been convicted, drug related, he said he

10   couldn't be fair.

11              THE COURT:  I deny that strike for cause.

12              Defense, I'll take your next strike for cause.

13              MR. BRUNVAND:  Your Honor, we don't have any other.

14              THE COURT:  And I have reserved on that Procter &

15   Gamble -- did she say she was the president of Procter &

16   Gamble?

17              MR. BRUNVAND:  Something like that.

18              THE COURT:  She's flying Lear jets.

19              Government, any more for cause?

20              MS. FAVORIT:  May I have a moment, Your Honor?

21              THE COURT:  Yes.

22              MS. FAVORIT:  Number 49 for the use of Spanish versus

23   English.

24              THE COURT:  I thought she was pretty good.  She has

25   been here 20 years.  What says the defense?
```

```
 1              MR. BRUNVAND:  We have no objection to 49.

 2              THE COURT:  Forty-nine.  It seems to be a pretty

 3    popular way to get out of jury duty.  Forty-nine is stricken

 4    for cause.

 5              Defense, any other strikes for cause?

 6              MR. BRUNVAND:  No, Your Honor.

 7              THE COURT:  The government, strikes for cause?

 8              MS. FAVORIT:  I do not believe so, Your Honor.

 9              THE COURT:  So here's one.  Talk to me about 27.

10    He's a butcher.  All his prime rib is going to go rotten.

11              MR. BRUNVAND:  No objection, Your Honor.

12              MS. FAVORIT:  No objection.

13              THE COURT:  I'm going to strike 27.

14              Any others for cause?  Last chance, government, for

15    cause.

16              MS. FAVORIT:  Your Honor, Juror Number 48, talking

17    about his cousin in the carjacking.  When I asked him on these

18    charges could he be fair, he said he can't be fair.

19              THE COURT:  Because his cousin was murdered in a

20    carjacking in Philly, right?

21              MS. FAVORIT:  Yes.

22              THE COURT:  I'm denying that for cause.

23              Any strikes for cause from the defense?

24              MR. BRUNVAND:  No, Your Honor.

25              THE COURT:  Let me ask you guys a question here.
```

1   Thirty-one, what do your notes say on that?  Is she all right?

2   I don't want her to get picked and then she's going to throw a

3   big fit.

4        MR. BRUNVAND:  We should excuse 31, Your Honor.

5        THE COURT:  What do you think, government?  Any

6   objection to that?

7        MS. FAVORIT:  We don't object if we have enough

8   jurors, but she said she had a prenatal doctor's appointment

9   today, and I don't know that she would make that anyway.

10       THE COURT:  So you don't object?  I'm going to strike

11  her for cause.

12       MS. FAVORIT:  Okay.

13       THE COURT:  Here's what we have for cause.  So the

14  cause strikes are as follows.

15       Oh, back to Procter & Gamble lady.  Government, do

16  you object to that if I strike her for cause?  She plainly

17  doesn't want to sit.  She's wearing a mask.  She's not

18  comfortable, et cetera, et cetera.

19       MS. FAVORIT:  No objection.

20       THE COURT:  So 29 is struck for cause.  That was

21  granted, Mr. Brunvand's request.

22       So here's what we have for cause.  Correct me if I'm

23  wrong.  I have been wrong before, I promise.  We have 4, 5, 9,

24  13, 15, 16 and 17, 23, 27, 29, 31, 32, 49, 56.  Does everybody

25  agree with that?  There are no more.

1        Government, give me your first peremptory.  You have

2   six.  And you can back-strike.

3        MS. FAVORIT:  Your Honor, are we going in order?  So

4   from the first 12 people?

5        THE COURT:  So your first 12.  So they are 1, 2, 3,

6   6, 7, 8.  That's your first six.  11, 12, 14 is your first

7   nine.  18, 19 and 20 is your twelve.  You can strike anywhere

8   you want, but there's your twelve.

9        MS. FAVORIT:  I'm going to strike Juror Number 10.

10       THE COURT:  The government's first strike is

11  Number 10, Marrero.

12       The defense has ten strikes, and I'll take their

13  first now.

14       MR. BRUNVAND:  Number 2, Your Honor.

15       THE COURT:  Number 2, Hough, is the first defense

16  strike.

17       I will take the government's second strike.

18       MS. FAVORIT:  Which number are we going up to now?

19       THE COURT:  Well, you are up to 21.

20       MS. FAVORIT:  I will strike Juror Number 6.

21       THE COURT:  Number 6 is the second strike, the

22  Baptist preacher who is also a banker.  Six is stricken.

23       Defense, I'll take your second strike of ten.

24       MR. BRUNVAND:  Accept.

25       THE COURT:  Say it again.

1          MR. BRUNVAND:  We accept.

2          THE COURT:  Okay.  Government, if we have a double

3     pass then the first twelve we keep.  So government, we will

4     take your third strike.

5          MS. FAVORIT:  Acceptable, Your Honor.

6          THE COURT:  You pass?

7          MS. FAVORIT:  Yes.

8          THE COURT:  Mr. Brunvand, I will take your second

9     strike or a pass.

10          MR. BRUNVAND:  Accept, Your Honor.

11          THE COURT:  We have twelve.  Our petit jury is as

12     follows:  Simpson, Number 1; Bryant, Number 2; Drake is

13     Number 3.  I'm sorry.  I better stick to these numbers that

14     are on this page.  The third juror is Drake, Number 7.  Your

15     fourth juror is Grissom, Number 8.  Your fifth juror is

16     Garbelman, Number 11.  Your sixth juror is Number 12, Buntin.

17     Your seventh juror is Number 14, Kamka.  That's your seventh

18     juror.  Your eighth juror is Gaytan, Number 18.  Your ninth

19     juror is Norris, 19.  Your tenth juror is Brittany Rogers,

20     Number 20.  Your eleventh juror is Scott Laris, 21.  And your

21     twelfth juror is 22, Edwards.

22          Does everyone agree with that?

23          MR. BRUNVAND:  Yes, Your Honor.

24          THE COURT:  Hearing no objections.

25          Let's pick -- I don't know.  You want to do two

 1    alternates?  That ought to be enough for a week.

 2            I'll take a strike, government.  Your first alternate

 3    is going to be Garcia, and your second one is Arndt.  Your

 4    third one is going to be Worthington.  And your fourth one is

 5    going to be Guenther.  So government, if you have a strike on

 6    the alternate, I just gave you the four, lucky alternates,

 7    we'll take that now.

 8            MS. FAVORIT:  No strikes, Your Honor.

 9            THE COURT:  What says Mr. Brunvand on the alternates?

10    Right now you're getting Garcia followed by Arndt.

11            MR. BRUNVAND:  Accept.

12            THE COURT:  We have two alternates.  Garcia is our

13    first alternate.  That would be Juror 13.  And Arndt is

14    Juror 14, our second alternate.

15            As soon as they are ready, we will bring in only this

16    jury.  Mr. Smith, you can release everyone else.  We will

17    bring in these 14, and we will start this trial.

18            You guys want to say five after in case you need to

19    open, get your papers ready to open and all of that?

20            MS. FAVORIT:  Yes, Your Honor.

21            THE COURT:  I'm assuming we have our first witness

22    ready and et cetera, et cetera?

23            MS. FAVORIT:  Yes.

24            THE COURT:  Thank you.  Take a super quick break.

25    Thank you, Counsel.

1          (Brief recess taken.)

2          THE COURT:  Thank you, ladies and gentlemen, you have

3    been selected to try this case.  And we are very honored.  And

4    I want to tell you, we will work very hard to be good stewards

5    of your time.  So thank you.

6          Mr. Smith, will you please swear the jury, please.

7          THE COURTROOM DEPUTY:  Can all of you please stand

8    and raise your right hand and be sworn.

9     (Jury sworn.)

10         THE COURTROOM DEPUTY:  Thank you.  You may be seated.

11         THE COURT:  Ladies and gentlemen, just a couple brief

12   instructions.  It's your duty to find from the evidence what

13   the facts are.  You and you alone are judges of the facts, and

14   then you will apply those to the law that I'm going to give

15   you.

16         Nothing that I say or do in this trial has any

17   bearing upon the facts.  What I say is not evidence.  What the

18   lawyers say is not evidence.  And you may hear objections, you

19   know, objection, Your Honor.  That's just a pretty standard

20   thing.  And then if I say, "overruled," that means I don't

21   find the objection merited and the evidence comes in.  If I

22   say, "sustained," then that means the objection was proper and

23   we should disregard the evidence.  And whether the lawyers

24   object or not has no bearing upon -- it's just something that

25   we do.

1          If I ask you to disregard any evidence, you've just

2   kind of got to erase it from your mind.  It's not easy to do,

3   and that doesn't happen very much.

4          Most important thing, a couple things.  I already

5   told you the hallmarks of a criminal case, that the defendant

6   is presumed innocent until you decide otherwise, unanimously,

7   if you do.  So he has a clean slate.  The burden is always on

8   the government by beyond a reasonable doubt.  And I will

9   define all that.  And the defendant nor any of the defense has

10  any burden to put on any evidence whatsoever.  And if they do,

11  that's not to be -- if they do, that's fine.  You adjudge any

12  defense presentation.  And if they don't, it's not considered

13  in any way against them.

14         So I basically said generically the charges -- and

15  the government is going to do an opening statement and perhaps

16  the defense, and they may summarize or more explain these

17  charges to you.

18         So just do me a favor.  When we leave here in the

19  evening, just leave the case here.  You don't want to carry it

20  home with you in your mind.  I know that's easy to say.  You

21  can use the notes if you want.  Mr. Smith will turn them into

22  powder in the super shredder at the end of the case.  Just

23  remember that your recollection, what you hear, what you see

24  is what counts.  So the notes are an aid, but they are not

25  required.  And, of course, you don't want to rely on your

1    neighbor's notes and not pay attention during the trial.

2          So at this time we will recognize the government for

3    their opening statement.  I call it sort of previews of coming

4    attractions.  And both sides, these are very professional

5    lawyers on both sides.  What they say isn't evidence, but they

6    will suggest to you what they believe the evidence may show.

7          All right, Counsel.  Yes, ma'am.

8                        **OPENING STATEMENT**

9                   **COUNSEL FOR THE GOVERNMENT**

10         MS. SCHMIDT:  Secrets.  A secret video camera, a

11   secret email address, and a secret collection of images of

12   children being raped and abused.  The evidence will show that

13   those are the tools that the defendant, Gregory Williamson,

14   used to manipulate, to harass, to entice and to sexually abuse

15   his then 12-year-old stepdaughter Deea.

16         And you will hear that this case is about Deea.  It

17   is about how she received hundreds of emails from the

18   defendant that were sexually explicit in nature.  It's about

19   how many of those emails attached child pornography.  And you

20   will hear about how the defendant videotaped Deea naked in her

21   bedroom, and it is about how he sexually abused her starting

22   when she was just 12 years old.

23         But you will also hear this case didn't start with

24   Deea.  It started with a tip from Yahoo about an email address

25   Vladlover50@Yahoo.com.  And that name is a little difficult to

1    hear sometimes through some of the witnesses.  So I will spell

2    it for the first time; V as in Velcro, L as in love, A as in

3    apple, and D as in dog, vladlover50@Yahoo.com.  And throughout

4    this trial you will hear that the owner of the Vladlover

5    account was the defendant.  And you'll hear how law

6    enforcement determined that Vladlover50 belonged to the

7    defendant.  And you'll hear how it was flagged by Yahoo for

8    sending child pornography.  You will also hear that law

9    enforcement searched the defendant's home where he lived with

10   his stepdaughter Deea.  You will hear that they found his cell

11   phone, his computer and a hard drive, and each electronic

12   device contained pictures of child pornography.

13          Several of these images will be shown to you

14   throughout the trial.  You will see a photograph of a baby and

15   an erect penis, of toddlers with semen on them, and you will

16   see images of young children being sexually abused.  And the

17   evidence will show that not only did the defendant collect

18   images of other children, he produced images of his

19   12-year-old stepdaughter Deea naked.

20          You will see that these images were taken without

21   Deea's knowledge.  They show her breasts.  They show her

22   vagina, and they show her genitals.  And you might be asking

23   yourself, how did he get images of Deea without her knowing?

24   Well, you will hear that he gave her a, quote, unquote gift.

25   This gift she had asked for, a charger so she could charge her

cell phone.  And this charger look like any other phone

charger you've seen that you can plug into an outlet and

charge your phone.  But what Deea didn't know was that inside

this charger was a secret camera.  And this camera would

videotape her as she walked around her bedroom, naked, while

she changed, after she showered and in the nude.

And you will see and here that this evidence and

these photos were stored on the defendant's cell phone.  And

you will learn while the defendant was recording Deea naked in

her bedroom, he was also sending her emails.  And Ms. Favorit

told you during jury selection that you will see and hear

things during this trial that will be uncomfortable.

And I want to make sure I get the defendant's words

correctly in these emails.  The defendant told Deea with so

much love to pop your cherry and watch you have your first

orgasm.  I would so love to caress and rub your body and your

puffy little tits until you become so wet and horny that you

pushed my head down to your cunt and made me lick it.

You'll see emails where he told Deea, would love to

watch you masturbate and see you cum all over your finger or

in your panties.  You will see that he also sent her videos.

One of those videos was titled, "Dirty Minded Teen Seduced Her

Stepfather and Sucked His Cock Before He Fucked Her Brains

Out."  And you will also see that on many occasions the

defendant sent child pornography to Deea.  You will hear that

1   those are the words that the defendant said to a 12-year-old

2   girl.  Those are the pictures and videos that the defendant

3   sent to a 12-year-old girl.  And you will hear that he did so

4   using the very same email address that started this

5   investigation, Vladlover50.

6          But you will also hear throughout the trial that the

7   defendant, he got sloppy.  On occasion, not only did he send

8   Deea emails from the Vladlover50 account.  You'll see that he

9   also sent emails from his work email.  DispatchWH@gmail.com,

10  and you'll hear throughout trial that the defendant's job

11  involved brokering in the trucking industry.  You'll also see

12  that he sent emails to Deea using his personal email address,

13  which included his name, WilliamsonGregory@hotmail.com.  And

14  you'll also see that he sent Deea sexually explicit emails

15  using another account.

16         You will see one of the emails that the defendant

17  sent Deea from his work email referenced a time where the

18  defendant sexually abused Deea.  You'll see that on occasion

19  he also sent work-related emails related to his trucking

20  business on the Vladlover account.  And you will see that he

21  sent pornographic images of Deea naked to himself using his

22  work email.  And not only will you see these emails and these

23  photographs, but you will hear from several witnesses

24  including Deea.  And Deea will tell you her story.  Deea will

25  tell you how she received hundreds of emails that were

1  sexually explicit.

2       She will tell you how the defendant gave her a USB

3  charger, and she will tell you that the defendant sexually

4  abused her time and time again.  You will also hear that she

5  didn't initially disclose this, that she did not tell anyone

6  about the abuse afraid that if she told a single person about

7  her reality that she would lose everything, that her family

8  would lose everything.

9       Because of the defendant's conduct, we are here

10  today.  He is charged with an eight-count indictment.  And

11  later on in the trial, Judge Jung will instruct you on the

12  elements of each of those charges, but for now I just want to

13  give you have a high-level summary and a quick preview of what

14  those charges are.  They are eight counts, but they can be

15  grouped into four major categories.

16       The first category is enticement of a minor to engage

17  in sexually explicit activity.  This count and these charges

18  relate to the hundreds of emails that the defendant was

19  sending Deea describing how he wanted to sexually abuse her.

20       The second is attempted or actual production of child

21  pornography.  These relate to the images the defendant

22  produced of Deea using the secret camera in the USB charger

23  that he gave her.

24       The third category of charges is distribution of

25  child pornography.  This count relates to the images of other

1    children being raped and abused that were sent to Deea.

2          And the last category of charges is possession of

3    child pornography.  That charge relates to evidence found at

4    the defendant's home on a laptop, on his computer, and on his

5    hard drive, which contained hundreds of images of child

6    pornography.

7          Over the next several days, we will walk through the

8    evidence piece by piece and bit by bit.  And as we do so, the

9    defendant's secrets will unravel.  And at the close of trial,

10   Ms. Favorit will have the opportunity to stand up before you

11   and explain the evidence you heard and the evidence you saw

12   and why beyond a reasonable doubt we have proven that it was

13   the defendant who enticed Deea to engage in sexual activity.

14   It was the defendant who sexually abused Deea.  And it was the

15   defendant who possessed and distributed and produced child

16   pornography.

17         And at the close of trial, we will ask that you find

18   the defendant guilty on all eight counts.

19         THE COURT:  Thank you, ma'am.

20         Sir, do you care to open at this time?  You're not

21   required to.

22         MR. BRUNVAND:  No, Your Honor.  We would reserve.

23         THE COURT:  You will waive opening at this time.

24         MR. BRUNVAND:  We would reserve opening, yes, Your

25   Honor.  We are not doing one at this time.

1          THE COURT:  Ladies and gentlemen, the defense can

2     either open -- again, it's the government's burden, but the

3     defense, if they wish to waive opening, they may waive until

4     it is time for the governments case to be over and the defense

5     case may or may not present.  So Mr. Brunvand has waived

6     opening at this time.

7          All right.  Let's call your first witness,

8     government.

9          MS. FAVORIT:  Your Honor, at this time we would move

10    our business records into evidence.

11         THE COURT:  All right.  Why don't you give those to

12    me.  Let's hear the numbers.

13         MS. FAVORIT:  1, 1X, 1.19, 13, 14, 15, 16, and 17.

14         THE COURT:  All right.  As stated, those exhibits

15    will be admitted.

16         Ladies and gentlemen, these are, quote, unquote,

17    business records.  So if you had a traffic accident and there

18    was a business record from the accident, you know, to show

19    that you owned title to the car or something, that may be

20    admissible.  And you may consider this evidence for any import

21    or lack of import you deem appropriate.

22         Yes, ma'am?

23         MS. FAVORIT:  May I approach?

24         THE COURT:  Yes, you may.

25         MS. FAVORIT:  The United States calls Ashley

DIRECT EXAMINATION OF ASHLEY GUIZZOTTI

1  Guizzotti.

2        MR. BRUNVAND:  Your Honor, we would invoke the rule

3  as well.

4        THE COURT:  All right.  So the rule on witness

5  sequestration is invoked.  That's just a lawyer rule, ladies

6  and gentlemen, a judge rule where the potential witnesses are

7  excluded from the courtroom.  So you don't have one witness

8  coming and going to school on what the other witnesses say.

9        THE COURTROOM DEPUTY:  Please raise your right hand

10  and be sworn.

11      (Witness sworn.)

12        THE COURTROOM DEPUTY:  Please state your full name

13  and spell your last name for the record.

14        THE WITNESS:  Ashley Guizzotti, G-U-I-Z-Z-O-T-T-I.

15        THE COURT:  Thank you.  You may be seated.

16      **ASHLEY GUIZZOTTI, CALLED BY THE GOVERNMENT, SWORN**

17                      **DIRECT EXAMINATION**

18  BY MS. FAVORIT:

19  Q    Good afternoon.

20  A    Hi.

21  Q    What is it that you do for a living?

22  A    I work at Yahoo.  I'm a legal services manager for the

23  trust and safety team.

24  Q    How long have you worked there?

25  A    Since 2016.  Eight years.

DIRECT EXAMINATION OF ASHLEY GUIZZOTTI

1  Q    What does a legal service manager do?

2  A    Currently I'm responsible for the policies, processes,

3  work flow for child safety and trust in safety as a whole.

4  And it's a mitigating abuse on Yahoo platform.

5  Q    What is your educational background?

6  A    I have a bachelor's degree from Buffalo State in

7  political science.

8  Q    Do you have any related experience?

9  A    I do.  So prior to my current role as a service manager,

10 I was a moderator for content 2016 to 2021.

11 Q    What does a moderator do?

12 A    We review child pornography, and we submit it to the

13 National Center for Missing and Exploited Children.

14 Q    What are your current responsibilities as a manager?

15 A    Just reviewing the policy for our trust and safety team,

16 reviewing the work flow, the training for the moderators right

17 now.

18 Q    Can you tell us what Yahoo is?

19 A    Yeah.  Yahoo is, it's an electronic service provider.  We

20 have products such as Yahoo Sports, Yahoo Finance, Yahoo News.

21 We also host Yahoo email.

22 Q    Can anyone make a Yahoo email address?

23 A    Yeah.  If you are over the age of 16, you can create an

24 email address, yes.

25 Q    Does the user have to agree to anything to create an

DIRECT EXAMINATION OF ASHLEY GUIZZOTTI

1   email?

2   A    Yeah.  You have to agree to our terms of service.

3   Q    Specifically related to this case, can you give us some

4   terms of service examples?

5   A    Sure.  So it would be like a member conduct, like an

6   agreement that a user must abide by to not use our services in

7   an abusive way.  An example might be, you know, don't spam

8   anything, don't harass anybody, bully anybody, but also no

9   harm to minors is in that conduct as well.

10  Q    How does Yahoo find that type of conduct?

11  A    So in regards to a child pornography, we do scan when you

12  send an email.

13  Q    How does Yahoo take measures to scan?

14  A    We use technologies that's called CSAi Match.  We also

15  use photo DNA.  These are technologies that we employ to scan

16  known child pornography instances.

17  Q    Would Yahoo know about material that was never sent?

18  A    No.  It would need to be a sent email.

19  Q    Does it require use of the Internet to send an email?

20  A    Yes.

21  Q    How does photo DNA and CSAi Match search for videos -- or

22  images?  I'm sorry.

23  A    So there is like a larger database that these

24  technologies use.  And what that database is are known child

25  pornography images and videos to the industry.  And that's the

DIRECT EXAMINATION OF ASHLEY GUIZZOTTI

1    National Center for Missing and Exploited Children.  They

2    manage that list essentially.  So if there are hash matches

3    or, if you will, like a thumbprint of an image that we then

4    detect as a match, we would determine that to be potential

5    child pornography.

6    Q    You mentioned a hash match.  Could you tell us what that

7    is?

8    A    Yes.  A hash match, so any image or video has a hash.

9    It's like kind of the term on the back end of the images, like

10   title if you will.  So not like the image itself but the

11   actual like fingerprint of the image is what we call it.  So

12   that hash would be what we match to understand if it's

13   potential child pornography.

14   Q    Are the programs that Yahoo runs, are they comparing the

15   actual images or those hash matches?

16   A    The hash matches at that point, yes.

17   Q    What does Yahoo do when there is a match on the system

18   for sent child pornography?

19   A    So if there is a machine hit, is what we would call it,

20   if there's a machine hit that it was a match to a hash, it

21   then gets into a queue for a trust and safety moderator to

22   review.

23   Q    How do the human moderators determine if it's child

24   pornography?

25   A    So they can -- at that point it's in their queue, and

DIRECT EXAMINATION OF ASHLEY GUIZZOTTI

1  they can review the actual image.  They can see the image to

2  determine if it's child pornography.

3  Q    So the human moderator is reviewing the actual image?

4  A    At this point, yes.

5  Q    What happens if a moderator decides it's not child

6  pornography?

7  A    It's essentially like they can mark it that it was a

8  false positive and deleted from our system.

9  Q    What happens if a moderator determines it is child

10 pornography?

11 A    If it is child pornography, they then archive that image

12 along with all of the other attachments, images, and videos in

13 the sent email account.

14 Q    Does anyone from Yahoo call law enforcement?

15 A    No.

16 Q    Why not?

17 A    Our policy is that we review -- we review the images and

18 videos.  And when we determine it's child pornography, we then

19 report it to the National Center for Missing and Exploited

20 Children.

21 Q    So the National Center for Missing and Exploited

22 Children, is that a separate entity from Yahoo?

23 A    It is, yes.

24 Q    Do the human moderators receive any training?

25 A    Yeah.  We are housed in the legal organization of Yahoo,

DIRECT EXAMINATION OF ASHLEY GUIZZOTTI

1  and we receive training from legal counsel.

2  Q    Do you have that training?

3  A    I do.

4  Q    How does Yahoo actually report to the National Center for

5  Missing and Exploited Children?

6  A    So once a moderator is able to see all the images and

7  videos that we now archived from the account, they can view

8  those images in a gallery view.  We can select those images,

9  and then we, in that same internal tool that you select those

10  images, we can click a button that basically says submit to

11  NCMEC, which is the National Center for Missing and Exploited

12  Children.

13  Q    What content is sent to -- we'll now call it NCMEC, which

14  is the National Center for Missing and Exploited Children.

15  A    So the basic user data that the user would have filled

16  out to make their email address, which is a name, a phone

17  number, the email address, the images that we selected to

18  submit to NCMEC.  And with those images is the IP address, the

19  message ID, which again is the jargon of the images and the

20  file name.

21  Q    Are there any email contents sent?

22  A    No.  There is no, like, text.

23  Q    You mentioned an IP address.  Can you tell us what that

24  means?

25  A    Yeah.  So an IP address is like the address of the device

DIRECT EXAMINATION OF ASHLEY GUIZZOTTI

1  or the network that the sender would have been on to send the

2  email.

3  Q    Can that effectively give an approximate location of the

4  user?

5  A    Right.  That's what that is.

6  Q    Were you are working in this capacity in September of

7  2020?

8  A    Yes.  I was a content moderator.

9  Q    Was a Yahoo account flagged associated with Vladlover50?

10 A    Yes.

11 Q    Were you the one who flagged it?

12 A    I was not.

13 Q    Do you know who did?

14 A    I do.

15 Q    Was it a member of the same team?

16 A    It was.  At the time it was a senior member of the trust

17 and safety team.

18 Q    Did you review materials associated with the Vladlover50?

19 A    I did, yes.

20 Q    Are those records kept in the regular course of business

21 at Yahoo?

22 A    Yes.

23 Q    Can you tell me what happened in that instance,

24 September 2020?

25 A    Yes.  So the machine matched, got a hit that potential

DIRECT EXAMINATION OF ASHLEY GUIZZOTTI

1  child pornography was sent from that account.  Upon that, a

2  moderator did review it, the senior member moderator did

3  review that it was in fact child pornography.  They archived

4  the rest of the account, meaning the images and videos in the

5  account of the attachments and reviewed the rest of all of the

6  images.  After doing so, I believe there were seven images

7  that were deemed child pornography in which they selected and

8  reported to NCMEC.

9  Q    Was this process followed where a human moderator reviews

10  the actual images?

11  A    It was, yes.

12  Q    And did the notes confirm that it was child pornography?

13  A    Yes.

14  Q    Did you review those images at some point?

15  A    I have, yes.

16  Q    And did you make the same determination?

17  A    I agree they were child pornography, yes.

18  Q    Was a report sent to the National Center for Missing and

19  Exploited Children?

20  A    Yes.

21  Q    What information about this account was sent?

22  A    The email address that sent the images, the user

23  information that we have, which was a name, a phone number, an

24  IP address, and then the seven images.

25  Q    Do you recall the email address?

DIRECT EXAMINATION OF ASHLEY GUIZZOTTI

1   A    Vladlover50.

2   Q    What about the account name?

3   A    I believe the name that was on the account is Vlad Vlad,

4   like V-L-A-D.

5   Q    Had Yahoo received any complaints about this email

6   account?

7   A    Not to my knowledge, no.

8   Q    Was this email user ever reported by anyone?

9   A    No.

10  Q    How would you know that?

11  A    If there is ever a report or a complaint on an email

12  address, like we have an internal database that you could

13  reference, essentially pop in that email address and a history

14  would populate.

15  Q    Was this tip completely initiated by Yahoo?

16  A    It was, by our scanning.

17  Q    Did you have any involvement with the search warrant in

18  this case?

19  A    No.  That's another team.

20  Q    Was this the end of Yahoo's responsibility?

21  A    The trust and safety team then, once we report to NCMEC,

22  we disable that account.

23  Q    Was this account disabled?

24  A    It was.

25       MS. FAVORIT:  May I have a moment, Your Honor?

CROSS—EXAMINATION OF ASHLEY GUIZZOTTI

1    I have no further questions.

2    THE COURT:  Cross, please?

3    MR. BRUNVAND:  Thank you.

**CROSS—EXAMINATION**

5  BY MR. BRUNVAND:

6  Q    Good afternoon.

7  A    Hi.

8  Q    You were talking about when you open up a Yahoo account,

9  that there are certain documents, that you agree to certain

10 conditions of having an account; would that be fair?

11 A    Terms of service.

12 Q    Terms of service?

13 A    Yeah.

14 Q    And so just to make sure I understand.  If I'm opening a

15 Yahoo account and I put in the name of the email address that

16 I want, right?

17 A    Right.

18 Q    And that can be just about anything?

19 A    If it's not being used already, yes, you can create

20 anything.

21 Q    And then I had to submit a phone number?

22 A    A phone number, I believe, is the only requirement.

23 Q    No identification or anything like that?

24 A    No, we don't.

25 Q    And so then once I have done all that, then usually

CROSS-EXAMINATION OF ASHLEY GUIZZOTTI

1  something pops up on the screen.  And it has like this small

2  print document.  And it basically says you can scroll through

3  it and read it before you can have the account, right?

4  A    Right.

5  Q    And that's where you find that information?

6  A    Yes.

7  Q    Okay.  And that's where you find the information you

8  mentioned about you can't spam?

9  A    Right.

10  Q    And what's spam?

11  A    It would be like abusing your email by emailing a bunch

12  of people, something repetitive.

13  Q    It's almost like a mass marketing type thing where you

14  are spewing out hundreds of emails a minute?

15  A    I mean, it could be on an individual level.

16  Q    Sure.

17  A    So a lot smaller than that.  But even -- I would say

18  unwanted.  So if you are the receiver of an unwanted email,

19  that would be me spamming you.

20  Q    But one scenario that involves spam is where someone is

21  just sending out mass mailings, hundreds of emails a minute

22  potentially, right?

23  A    Sure.

24  Q    And does Yahoo, similar to Google and other servers, have

25  a method where if spam is suspected, you shut down the email

CROSS-EXAMINATION OF ASHLEY GUIZZOTTI

1  account so that it won't continue to spew out the information?

2  A    Yeah.  There's a couple of safeguards.  I'm not quite

3  familiar with all of them.

4  Q    Okay.

5  A    But I don't think we would disable an account, but there

6  might be an investigation.

7  Q    Sometimes email accounts are compromised, right?

8  A    Right.

9  Q    So if I have an email account and I have a password for

10  the email account and I don't share the password, even then

11  sometimes it can be compromised, right?

12  A    Right.

13  Q    Someone else, can be someone known to me or someone not

14  known to me, manages to access that email and use that email

15  as if it was me, right?

16  A    Yeah.

17  Q    And that can happen whether it's spam, right?

18  A    Yes.

19  Q    Or child pornography?

20  A    Yes.

21  Q    And you have no way of telling from where you were

22  whether or not this was a compromised email, right?

23  A    I don't.

24  Q    Right.  You have no way of knowing whether or not someone

25  else may have actually initiated these emails?

1  A    Yeah.  I would not have that information.

2  Q    You don't know whether or not someone else may have

3  attached the seven images that were determined to be child

4  pornography, right?

5  A    Right.

6  Q    Yahoo has a system, I think you referred to it as

7  potential child pornography DNA, right?

8  A    Yes.  Photo DNA.

9  Q    Photo DNA.  And that's not -- when you are scanning, you

10 are not actually looking at the photos, right?  You are

11 looking for a code or a number?

12 A    On the back end, the automatic scanning is codes and

13 numbers.  But once it populates, we do review that image.

14 Q    Right.  But I'm talking about the initial thing that

15 brings it to your attention is this number that pops up,

16 right?

17 A    Yes.

18 Q    So you have a list of these code or numbers that say here

19 is something that we are concerned, based on what we know,

20 that this may be child porn?

21 A    Yeah.  It is not a list.

22 Q    Database?

23 A    It's a database, yes.

24 Q    Database.  Could a database be a list?  I mean, it's not

25 like a list where you see it written down.

CROSS-EXAMINATION OF ASHLEY GUIZZOTTI

1  A    But again, it is like more of an automatic scanning of

2  this database.  It is nothing that I'm referencing on an

3  individual level.

4  Q    Understood.  Understood.  You said it's a machine hit, I

5  think you said, right?

6  A    Yes.

7  Q    And presumably Yahoo has the ability, when there is a

8  machine hit, to basically say, okay, we have a potential

9  problem here.  We are not going to forward this email to the

10 recipient until we can further investigate?

11 A    We don't do anything proactive like that.  It would need

12 to be sent for the scanning to start.

13 Q    Do you know whether or not Yahoo has that ability?

14 A    I don't.

15 Q    But you know that it's the computer that basically says

16 here is something of concern.  You better do some additional

17 investigative work, right?

18 A    Yes.

19 Q    But whether or not Yahoo has the ability when that comes

20 in -- and the concern is child porn, right?

21 A    Correct.

22 Q    Okay.  And so whether or not Yahoo has the ability then

23 to say let's pause the delivery of this email because we are

24 concerned that it's child pornography, that you don't know?

25 A    I don't know.

CROSS-EXAMINATION OF ASHLEY GUIZZOTTI

1  Q    Okay.  Someone else might know it, but you don't know it?

2  A    I don't know, yeah.

3  Q    So it goes through.  It gives you the warning.  And as

4  far as you know, it then gets delivered?

5  A    It is delivered, yes.

6  Q    Assuming it doesn't -- I mean, the recipient may not get

7  it if it goes into a junk folder or a spam folder, but it

8  leaves Yahoo?

9  A    It does, right.

10  Q    When you look at the images that are of concern, do you

11  rate these images?  Do you have a rating system?

12  A    We do.  It could be determined as like worst of the worst

13  which would be more of a sexual activity versus -- that would

14  be an A category.  A B category would be, say, just like

15  nudity or an image of a minor.

16  Q    Okay.  And did the A category have numbers, or is it

17  just --

18  A    Yes.  We have A1 and A2.  And again, A1 is worst of the

19  worst.  It would be like intercourse, where two would be, say,

20  a lascivious display or like masturbation or something a

21  little less egregious.

22  Q    And then the B category?

23  A    B is older.  So not -- it's post pubescent.  So still

24  under the age of 18 but maybe a little older.

25  Q    And sometimes it's not clear whether or not someone is

CROSS-EXAMINATION OF ASHLEY GUIZZOTTI

1  under the age of 18 or over the age of 18, right?

2  A    That's correct.

3  Q    How do you categorize those?

4  A    So if it's -- under the age of 18 would be considered a B

5  category.

6  Q    Understood.  But if you're not sure if an image depicts

7  someone the age of 18 or versus over the age of 18, how do you

8  categorize that?

9  A    Based on our training, we would have to be pretty sure.

10  I get that there might be outliers, but we are trained to the

11  best of our ability to determine based on like, say, the

12  Tanner scale or just looking at the individual in the photo

13  that they are a minor.

14  Q    Is that an individual decision for the various

15  individuals who are --

16  A    For the moderators, yes.  That's why they are trained in

17  that.

18  Q    And the images in this case, were they rated on the A1 to

19  A2 to B1 to B2 scale?

20  A    They were not.

21  Q    Why not?

22  A    I wasn't the moderator that reviewed this account.  But

23  my guess is that they were not considered worst of the worst.

24  A lot of the time moderators might only put a label on say A1

25  versus that B2 category.

CROSS-EXAMINATION OF ASHLEY GUIZZOTTI

1  Q    You testified about the fact that, based on what you

2  understand, there had been no complaints placed with Yahoo

3  about this particular email account?

4  A    Correct.

5  Q    Explain again what's the process when a complaint comes

6  in?

7  A    Yeah.  So any intake whether it's through our concierge,

8  our customer service, maybe even an internal somebody emailed

9  somebody at the company, if there's inquiry about an email

10 account, a note is put on that email account.  And you can

11 search that email account and find out if there was any sort

12 of history or prior history to that account.

13 Q    So how does one contact Yahoo with a complaint about an

14 email account?

15 A    Typically the majority, it would be contacting our help

16 form.

17 Q    And the help form, is that an electronic submission?

18 A    It would be, yes.

19 Q    And so assuming the electronic submission with a

20 complaint makes it through the channels of the underlying

21 travels as well as making it through the machine at Yahoo and

22 makes it to the person who would then evaluate it, that's the

23 only scenario where you would have notes that someone

24 complained, right?

25 A    Yes.

REDIRECT EXAMINATION OF ASHLEY GUIZZOTTI

1  Q    So potentially someone might complain, but if it's not

2  submitted properly or if it didn't make it through the

3  various, you know, stops along the way online, then you may

4  not know it, right?

5  A    Correct.

6  Q    You indicated that you yourself viewed the images, the

7  seven images in this case?

8  A    I have.

9  Q    When was that?

10 A    If I were to guess, it was late 2020.

11         MR. BRUNVAND:  Can I have a moment?

12         That's all I have.  Thank you, Your Honor.

13         THE COURT:  Redirect, please?

14                **REDIRECT EXAMINATION**

15 BY MS. FAVORIT:

16 Q    Is Yahoo a private company?

17 A    It is a private company.

18 Q    And why do you take measures to search for child

19 pornography on your platform?

20 A    A lot of it is to protect our users, but we also have

21 business interests that if we were a haven for this content,

22 we wouldn't have users.  They wouldn't want to use our

23 product.

24 Q    Does Yahoo have sworn law enforcement officers?

25 A    No.

REDIRECT EXAMINATION OF ASHLEY GUIZZOTTI

1    Q    Do you all investigate email accounts?

2    A    No.

3    Q    Why do you have human moderators and don't just let the

4    photo DNA stand?

5    A    It's a fail-safe, right?  Like, we want to be able to be

6    a hundred percent sure that based on our training we determine

7    that it is in fact child pornography.

8    Q    And you mentioned not worst of the worst, some images.

9    Is that still child pornography?

10   A    It is.

11   Q    And in this particular case, did multiple people

12   determine it was child pornography?

13   A    Yes.

14   Q    And just to cover the email being sent or not sent, I

15   just want to give you a quick scenario.  An individual writes

16   a draft email.  They attach a photo into their email but they

17   never send it.  It just sits in the draft.  Would that be

18   detected by Yahoo at all?

19   A    No.

20   Q    So if that email, the hit, send, it uploads, goes through

21   the Internet, the receiver gets the email, is then Yahoo

22   involved?

23   A    Correct.

24        MS. FAVORIT:  I have no further questions.

25        THE COURT:  Thank you, ma'am.  You have may step

DIRECT EXAMINATION OF JEFFREY PASLER

1  down.

2          Let's call your next witness, please.

3          MS. SCHMIDT:  The United States will call Commander

4  Jeffrey Pasler.

5          THE COURT:  Thank you.

6      (Witness sworn.)

7          THE COURTROOM DEPUTY:  Please state your full name

8  and spell your last name.

9          THE WITNESS:  Jeff Pasler, P-A-S-L-E-R.

10         THE COURTROOM DEPUTY:  Thank you.  You may be seated.

11      **JEFFREY PASLER, CALLED BY THE GOVERNMENT, SWORN**

12                    **DIRECT EXAMINATION**

13  BY MS. SCHMIDT:

14  Q    Good afternoon, Commander Pasler.  Where do you currently

15  work?

16  A    The City of North Port.

17  Q    Do you work in the police department?

18  A    Yes, ma'am.

19  Q    How long have you worked for the North Port Police

20  Department?

21  A    Sunday will be 26 years.

22  Q    And what is your current job title?

23  A    Currently I'm watch commander from assign to patrol.

24  Q    And what does watch commander entail?

25  A    It's basically the supervisor for the patrol division

DIRECT EXAMINATION OF JEFFREY PASLER

1    that's working at that time.

2    Q    So what are your current duties in that role?

3    A    I oversee a squad of about 14 people, other officers.

4    Q    Have you held other roles in law enforcement over your

5    25-plus-year career?

6    A    Yes, ma'am.

7    Q    Have you been an undercover officer?

8    A    I spent 10 years as an undercover officer.

9    Q    And generally speaking, what does an undercover officer

10   do?

11   A    It was a squad, a unit where basically we did anything

12   that you didn't need a regular officer for, that we were to --

13   I guess it's hard to explain.  We were plainclothes officers,

14   plainclothes squad, and we performed duties that a normal

15   police officer in uniform couldn't do.

16   Q    Could you give a couple of examples of a scenario where

17   law enforcement might use an undercover officer?

18   A    Most of my career that I was in was through narcotics,

19   buying and purchasing narcotics, stolen items, that type of

20   thing, working in a capacity, like I said, to do something

21   where an officer in uniform couldn't do.

22   Q    As an undercover officer, would you also participate in

23   search warrants?

24   A    Yes, ma'am.

25   Q    Would you sometimes create ruses?

DIRECT EXAMINATION OF JEFFREY PASLER

1   A    All the time, yes.

2   Q    And why would law enforcement want to create a ruse for a

3   search warrant?

4   A    To explain ruses, basically to, I guess use the word to

5   trick or get somebody away.  From a law enforcement

6   standpoint, we want to remove the element from the house that

7   we are doing a search warrant on.  It makes it safer for the

8   officer, makes it safer for defendant, and it also makes it

9   safer as far as preserving evidence.

10  Q    Was it common for law enforcement to use a ruse in cases

11  involving child pornography?

12  A    Yes, ma'am.

13  Q    And why is that?

14  A    The same thing as narcotics.  To bring that person away

15  from the device or narcotics that could be in that residence.

16  Q    Is there a concern that someone might delete evidence?

17  A    Absolutely.

18  Q    Were you involved in a ruse on January 27, 2021, at the

19  2575 Rolling Road home in North Port, Florida?

20  A    Yes, ma'am.

21  Q    What was your role on that day?

22  A    At the beginning of that day, Detective Keller put on an

23  operations briefing.  It was for a residential search warrant.

24  During that briefing, my role or my task job that day was to

25  be the undercover to lure the suspect from the residence so he

DIRECT EXAMINATION OF JEFFREY PASLER

1   could be detained so they could serve the search warrant once

2   that happened.

3   Q    And what was the plan regarding how you would get the

4   defendant out of the home?

5   A    In this particular incidence, I portrayed a construction

6   worker.  And my objective was to get the suspect away from the

7   house.  Do you want me to go through the ruse itself?

8   Q    Sure.  We'll get there.  Once again, when you approached

9   the residence, what was the first thing that you saw?

10  A    From memory, I believe there were two vehicles in the

11  driveway.  It was a typical house, two-car garage.  Normally I

12  would go to the front door.  In this case, the garage door was

13  open and it had one of those screened enclosures across the

14  double doors or for the door to keep bugs or insects out.

15  Q    Did you see anyone inside the garage?

16  A    There was a gentleman in the garage facing away from me

17  on a computer.

18  Q    And what did you do next?

19  A    I don't remember if I verbally or knocked on the screen

20  to get his attention to talk to me.

21  Q    Did he turn around at that point?

22  A    Yeah, he did.  He still was seated in the chair, but he

23  did turn around and acknowledge my existence.

24  Q    Do you see the person you saw sitting at the computer

25  here in the courtroom today?

DIRECT EXAMINATION OF JEFFREY PASLER

1  A    I do.

2  Q    Can you please describe him by an article of clothing?

3  A    He has a red tie on.

4       MS. SCHMIDT:  Your Honor, let the record reflect that

5  the witness has identified the defendant.

6       THE COURT:  Yes.

7  BY MS. SCHMIDT:

8  Q    At that point, did the defendant come outside with you?

9  A    After a couple minutes he did.

10 Q    Was there any hesitation on his part?

11 A    Yeah.  Do you want me to explain what I did?

12 Q    Please do.

13 A    In this case, I knocked on the screen door or got his

14 attention.  I was portraying a construction worker.  And I let

15 the gentleman know that I had just backed my vehicle, turned

16 around in the street and backed my vehicle into his van in the

17 driveway.  And I wanted him to come out and assess the damage

18 so I could contact my supervisor.

19 Q    Did the defendant come outside of the garage?

20 A    Yes, he did.

21 Q    Did he bring any electronics with him?

22 A    He did not.

23 Q    Where did you take the defendant after he exited the

24 garage?

25 A    My objective was to bring him down to the end of the

DIRECT EXAMINATION OF JEFFREY PASLER

1   driveway towards the last vehicle to where my truck was parked

2   and to lure his attention to the rear bumper of that vehicle.

3   Q    Was the defendant detained at that point?

4   A    He was.

5   Q    Did you have any other involvement in the investigation

6   aside from this ruse?

7   A    No.  That was the only time that I had anything to do

8   with this case per Detective Keller wanting me just to do that

9   situation.  I didn't have anything to do with the

10  investigation.

11          MS. SCHMIDT:  One moment, please, Your Honor.

12          No further questions for this witness.

13          THE COURT:  Have we any cross?

14          MR. BRUNVAND:  No.  Thank you, Your Honor.

15          THE COURT:  Thank you, sir.  Please step down.

16          Let's call your next witness, please.

17          MS. SCHMIDT:  Your Honor, the United States would

18  call Christine Taylor.

19          THE COURT:  Taylor, Christine Taylor.

20          THE COURTROOM DEPUTY:  Raise your right hand and be

21  sworn.

22      (Witness sworn.)

23          THE COURTROOM DEPUTY:  Please state your full name

24  and spell your last name for the record.

25          THE WITNESS:  Christine Taylor, T-A-Y-L-O-R.

DIRECT EXAMINATION OF CHRISTINE TAYLOR

1          THE COURTROOM DEPUTY:  Thank you.  You may be seated.

2      **CHRISTINE TAYLOR, CALLED BY THE GOVERNMENT, SWORN**

3                    **DIRECT EXAMINATION**

4  BY MS. SCHMIDT:

5  Q    Good afternoon, Ms. Taylor.  Where do you currently work?

6  A    I work for the North Port Police Department.

7  Q    What is your current role?

8  A    My current role is a Records Technician II.

9  Q    And what does a records technician do?

10 A    My job is to review the officers' reports for accuracy

11 and completeness.  My job is also to disseminate the reports

12 to other agencies or to the public.  And if the public is

13 asking for it, I review the report to make sure it is public

14 record.  If not, I redact the report according to public

15 record law 119.

16 Q    And how long have you worked for the North Port Police

17 Department?

18 A    I have been there now for 11 years and 7 months.

19 Q    Have you held other roles during your time at North Port

20 Police Department?

21 A    Yes, I have.

22 Q    What was your role in 2021?

23 A    I was a crime scene investigator.

24 Q    And what were your duties as a crime scene investigator?

25 A    My duties as a crime scene investigator is to respond to

DIRECT EXAMINATION OF CHRISTINE TAYLOR

1  crime scenes, to document the scene via with photographs,

2  sketches.  I also then process the scenes, collect evidence.

3  And after scenes, I would also process the evidence for

4  further analysis and/or send it out to other agencies for

5  analysis.

6  Q    You mentioned collecting evidence.  Did you collect

7  evidence in relation to search warrants in that role?

8  A    Yes, I did.

9  Q    Did you have to obtain special training to become a crime

10  scene investigator?

11  A    Yes.

12  Q    Please describe your training.

13  A    I am a certified crime scene investigator with the

14  International Association for Identification.  I also hold two

15  degrees, one in criminal justice studies and one in criminal

16  forensic studies.  Those are bachelor's degrees.  And I have

17  over 300 hours of continuing forensic education.

18  Q    So when you arrive on-scene to collect evidence relating

19  to a search warrant, what's the first thing that happens?

20  A    Upon arrival on-scene, I would meet with the lead

21  detective on the lead on-scene.  I would find out the scope of

22  the search warrant.  Upon hearing what the scope is, I would

23  start with overall photographs of the exterior of the scene.

24  I would then go ahead and do interior photographs.  And I

25  would assign each room an alphabetical number, well,

DIRECT EXAMINATION OF CHRISTINE TAYLOR

1    alphabetical A, B, C, so on and so forth.

2    Q    At some point after you would take the photographs, might

3    you collect evidence?

4    A    Yes.

5    Q    And who would decide what evidence should be collected?

6    A    So detectives on-scene would decide which pieces of

7    evidence were within the scope of the search warrant.

8    Q    And what happens once a detective determines that a piece

9    of evidence should be collected?

10   A    The detective would inform me of the piece of evidence.

11   I would go ahead and photograph the piece of evidence as is,

12   where it's located.  I would then go ahead and assign it a

13   numerical marker.  Then I would photograph it again with the

14   marker as well as any identifiers on the piece of evidence,

15   for example, a serial number, if there is any like certain

16   scratches or anything that would be different from another

17   piece of equipment or item.

18   Q    Describe your process for packaging the evidence.

19   A    Depending on the piece of evidence, the item would be

20   packaged accordingly, either paper or plastic or a box

21   depending on the size of the piece of evidence.  I would then

22   go ahead and put down the pertinent information like the item

23   number, what marker number it had, where it was located, a

24   description of the item as well as the case number.  And I

25   would then seal the piece of evidence, the packaging with my

DIRECT EXAMINATION OF CHRISTINE TAYLOR

1    initials and the date that it was sealed.

2    Q    How would you memorialize where a piece of evidence was

3    found?

4    A    Through photographs as well as a property receipt which

5    gives a description of the item, the location where it was

6    located.

7    Q    And what is the purpose of creating the property receipt

8    you just described and packaging the evidence?

9    A    It's for chain of custody.  Property receipts -- so if I

10   were to give a piece of evidence to another detective for

11   further analysis, I would sign it out to them utilizing a

12   property receipt.  Or when I bring it back to the station, I

13   sign it over to the property and evidence room utilizing that

14   same receipt.

15   Q    Were you involved in the January 27, 2021, search of a

16   home on Rolling Road in North Port, Florida?

17   A    Yes, I was.

18   Q    When you arrived on-scene, what were you told about the

19   scope of the search?

20   A    I was informed that we were searching for

21   computer-related equipment, tablets, cell phones, digital

22   media storage like hard drives or external drives, USB disks,

23   so on and so forth that would hold any type of digital media.

24   Q    So what was your understanding specifically of your role

25   that day?

                    DIRECT EXAMINATION OF CHRISTINE TAYLOR

1   A    My job was to photograph and assist the detectives in the

2   collection of the evidence.

3   Q    And in doing so, did you follow the general procedure you

4   just described?

5   A    Yes.

6            MS. SCHMIDT:  Permission to approach, Your Honor?

7            THE COURT:  Yes.

8   BY MS. SCHMIDT:

9   Q    I'm showing you what's been marked Government's

10  Exhibit 12.1 through 12.20.  Do you recognize these?

11  A    Yes, I do.

12  Q    What are they?

13  A    They are copies of the photographs that I took on-scene.

14  Q    And do they fairly and accurately depict the scene the

15  day of the search warrant?

16  A    Yes, they do.

17           MS. SCHMIDT:  Your Honor, the government at this time

18  would offer Government Exhibits 12.1 through 12.20 into

19  evidence.

20           THE COURT:  12.1 through 12.20; is that correct?

21           MS. SCHMIDT:  Yes, Your Honor.

22           THE COURT:  They're admitted.

23  BY MS. SCHMIDT:

24  Q    I'm showing you what has been marked as Government

25  Exhibit 12.1.  Can you please describe what is depicted in

DIRECT EXAMINATION OF CHRISTINE TAYLOR

1   12.1?

2   A    12.1 is a depiction of the exterior of the residence on

3   Rolling Road.

4   Q    And that was the residence where the search warrant was

5   executed?

6   A    That is correct.

7   Q    And I'm showing you what's been marked as Government

8   Exhibit 12.3.  What is shown in Exhibit 12.3?

9   A    That is an additional shot of the exterior of the front

10  of the residence with a view into the garage.

11  Q    Now I'm showing you what's been marked as Government

12  Exhibit 12.6.  What is shown in Exhibit 12.6?

13  A    That is an interior shot of the garage with multiple

14  bicycles as well as two desks, one holding a computer.

15  Q    Did the detectives ask you to collect any evidence from

16  this garage?

17  A    Yes, they did.

18  Q    What did they ask you to collect?

19  A    They asked me to collect a Gateway all-in-one computer as

20  well as a Samsung cellular phone.

21         MS. SCHMIDT:  Permission to approach, Your Honor?

22         THE COURT:  Yes.

23  BY MS. SCHMIDT:

24  Q    I'm showing you what's been marked as Government's

25  Exhibit Number 5.  Do you recognize this?

DIRECT EXAMINATION OF CHRISTINE TAYLOR

1  A    Yes, I do.

2  Q    How do you recognize it?

3  A    I recognize it from the label on the packaging, which has

4  our case number, the location in which it was located, and a

5  description of the piece of evidence.

6  Q    And are your initials on this as well?

7  A    Yes.

8  Q    And so what is Government's Exhibit Number 5?

9  A    It is the Gateway computer, it's an all-in-one.

10        MS. SCHMIDT:  Your Honor, at this point the

11  government would move -- ask for the permission to admit

12  Government Exhibit Number 5 into evidence.

13        THE COURT:  All right.  Number 5 is admitted.

14        MS. SCHMIDT:  Permission to publish, Your Honor.

15        THE COURT:  Yes.

16        And ladies and gentlemen while they are opening that

17  up, we usually take an afternoon break, you know, 3:00, 3, 15

18  something like that, run until 5:00, but this is not the

19  Bataan Death March.  So there's nothing worse than needing a

20  break.  If you need a break, don't be shy.  Just raise your

21  hand or get Mr. Smith or Officer Arch's attention, but usually

22  we run until 3:00 roughly, something like that.

23        MR. BRUNVAND:  Your Honor, could we approach briefly?

24        THE COURT:  Yes.

25        MR. BRUNVAND:  I just want to make sure I have

DIRECT EXAMINATION OF CHRISTINE TAYLOR

1  renewed the pretrial motions as far as the suppression motions

2  and what have you and that I'm not waiving anything.

3          THE COURT:  Those motions were fully preserved.  And

4  I appreciate counsel bringing it up, and they will remain

5  preserved through trial.

6          MR. BRUNVAND:  Thank you, Your Honor.

7          THE COURT:  And you are very polite.  You will

8  anyway, but you don't have to ask to approach.

9          MS. SCHMIDT:  Thank you, Your Honor.

10      (End of bench conference.)

11          THE COURT:  Go ahead.  You can open that up if you

12  want.

13          MS. SCHMIDT:  Permission to publish, Your Honor?

14          THE COURT:  Yes.

15          Counsel, just make sure that doesn't block any

16  juror's view of the witness.  It doesn't look like it does.

17          MS. SCHMIDT:  Yes, Your Honor.

18          Permission to approach, Your Honor.

19  BY MS. SCHMIDT:

20  Q    I'm handing you what's been marked as Government Exhibit

21  Number 6.  Do you recognize Government Exhibit Number 6?

22  A    Yes, I do.

23  Q    How do you recognize it?

24  A    I recognize it by our packaging and the barcode label

25  that depicts the case number as well as my name on it.

DIRECT EXAMINATION OF CHRISTINE TAYLOR

1  Q    And what is Government Exhibit Number 6?

2  A    It is a Samsung Galaxy Note, black in color cellular

3  phone.

4        MS. SCHMIDT:  Your Honor, at this time the government

5  would move Government Exhibit Number 6 into evidence.

6        THE COURT:  All right.  Number 6 is admitted.

7        MS. SCHMIDT:  Permission to publish, Your Honor?

8        THE COURT:  Yes.

9  BY MS. SCHMIDT:

10  Q    And now both of those, Government Exhibit 5 and 6, those

11  were found in the garage; is that right?

12  A    That is correct.

13  Q    And now I'm showing you what's been marked as Government

14  Exhibit 12.12.  What is depicted in 12.12?

15  A    The picture depicts the an overall photograph of the

16  defendant's room, which is labeled "Room I," and it depicts a

17  bed with a side table and a desk.

18  Q    And how do you know that this room belonged to the

19  defendant?

20  A    I was informed by the detectives on-scene.

21  Q    Did the detectives ask you to collect anything from this

22  room?

23  A    Yes.  Multiple items were taken from this room.

24  Q    And what were they?

25  A    There were two different hard drives along with disks.  I

DIRECT EXAMINATION OF CHRISTINE TAYLOR

1  believe there were some USBs, a whole bunch of digital media

2  equipment.

3  Q    I'm showing you what's been marked as Government

4  Exhibit 8.  Do you recognize this exhibit?

5  A    Yes, I do recognize this.

6  Q    And what is this?

7  A    This is the Seagate hard drive located at marker 17 in

8  Room I.

9  Q    And how do you know that?

10  A    I know that by the label with my handwriting along with

11  the case number and my name and initials on here.

12         MS. SCHMIDT:  At this time, Your Honor, the

13  government would ask to admit Government Exhibit Number 8 into

14  evidence.

15         THE COURT:  All right.  Eight is admitted.

16         MS. SCHMIDT:  Permission to publish, Your Honor?

17         THE COURT:  Yes.

18  BY MS. SCHMIDT:

19  Q    I'm now showing you what's been marked as Government

20  Exhibit 12.17.  What is shown in Exhibit 12.17?

21  A    That is an overall view of the daughter's room located as

22  marker C.  It depicts a bed with floral bedding as well as a

23  blue in color desk.

24  Q    And how did you know that this was the daughter's

25  bedroom?

DIRECT EXAMINATION OF CHRISTINE TAYLOR

1   A    The detectives informed me.

2   Q    And did the detectives ask you to collect any evidence in

3   this bedroom?

4   A    Yes.  Multiple pieces of evidence were collected, as well

5   as an Apple iPhone yellow in color.

6   Q    I'm handing you what's been marked Government Exhibit

7   Number 9.  Do you recognize Government Exhibit Number 9?

8   A    Yes, I do.

9   Q    And what is it?

10  A    It is an Apple iPhone yellow in color and a clear floral

11  case.

12  Q    How do you know that?

13  A    The description of evidence is written on the packaging

14  along with the case number, date collected, and my name.

15        MS. SCHMIDT:  Your Honor, at this time the government

16  would move for the admission of Government Exhibit Number 9.

17        THE COURT:  All right.  Admitted.

18        MS. SCHMIDT:  Permission to publish, Your Honor?

19        THE COURT:  Yes.

20  BY MS. SCHMIDT:

21  Q    Once you had taken photographs throughout the home and

22  packaged the evidence that you were instructed to collect, did

23  you have any other involvement in this case?

24  A    No, I do not.

25        MS. SCHMIDT:  One moment, please, Your Honor.

CROSS-EXAMINATION OF CHRISTINE TAYLOR

```
1              No further questions at this time for this witness.

2              THE COURT:  Cross, please?

3              MR. BRUNVAND:  Thank you.

4                         CROSS-EXAMINATION

5    BY MR. BRUNVAND:

6    Q     Good afternoon.

7    A     Good afternoon.

8    Q     Do you happen to have a box of gloves up there?

9    A     I only had one.

10   Q     Just one?

11   A     Yeah.

12   Q     I noticed when you were first handling the exhibit that

13   has the computer itself, you were wearing the glove, right?

14   A     Yes, I was.

15   Q     Did you bring it with you or --

16   A     I was handed the pair of gloves.

17   Q     All right.  And the reason that you wear gloves is to

18   protect the evidence from any type of cross contamination,

19   right?

20   A     That is correct.

21   Q     So for example, one of the things that sometimes you look

22   at as a forensic examiner is whether or not there might be

23   touch DNA, right?

24   A     That is correct.

25   Q     And you can actually swab objects.  And then you can take
```

CROSS-EXAMINATION OF CHRISTINE TAYLOR

1  the swab and you can test it to see whether or not someone's

2  DNA was on that item, right?

3  A    That is correct.

4  Q    And another thing that you might look for on items such

5  as the items we just looked at are fingerprints, right?

6  A    That is correct.

7  Q    Okay.  And so because of that, the best practice is to

8  use gloves, right?

9  A    That is correct.

10 Q    In fact, to use a different pair of gloves for each item?

11 A    That is correct.

12 Q    And that avoids cross contamination, right?

13 A    Yes.

14 Q    And generally DNA and fingerprints might tell someone who

15 else may have had contact with those various items, right?

16 A    Yes.

17 Q    Do you know whether or not any fingerprints testing was

18 done on any of these items?

19 A    No, there was not.

20 Q    Do you know whether or not any touch DNA testing was done

21 on any of these items?

22 A    No, there were not.

23 Q    Do you know if there was any comparison done to the DNA

24 of my client's stepdaughter?

25 A    No.

REDIRECT EXAMINATION OF CHRISTINE TAYLOR

1  Q    The mother?

2  A    No.

3          MR. BRUNVAND:  No other questions.

4          THE COURT:  All right.  Redirect, please?

5          MS. SCHMIDT:  Yes, Your Honor.

6                    **REDIRECT EXAMINATION**

7  BY MS. SCHMIDT:

8  Q    You were just asked a few questions about whether you did

9  anything like dust for fingerprints or collect DNA.  Why did

10 you not do that in this case?

11 A    Well, when it comes to search warrant for digital

12 forensics, normally fingerprints, latent processing as well as

13 DNA processing would be requested by the detective.  It is not

14 something that's normally done because the evidence is

15 digital.  Also, with this case, the defendant, along with his

16 daughter, the mother, they all live in the residence.  So

17 their fingerprints and DNA is expected to be within the

18 residence.

19 Q    So in your opinion as a crime scene technician, would it

20 have been necessary or appropriate to dust for fingerprints or

21 take DNA?

22 A    In this case, no.

23          MS. SCHMIDT:  No further questions, Your Honor.

24          THE COURT:  Thank you, Ms. Taylor.  You may step

25 down.

DIRECT EXAMINATION OF CHARLES SLOAN

1              Let's call your next witness, please.

2              MS. SCHMIDT:  The United States would call Special

3   Agent Charles Sloan.

4              THE COURT:  All right.  Thank you.

5              THE COURTROOM DEPUTY:  Please raise your right hand

6   and be sworn.

7         (Witness sworn.)

8              THE COURTROOM DEPUTY:  Please state your full name

9   and spell your last name for the record.

10             THE WITNESS:  Charles Sloan, S-L-O-A-N.

11             THE COURTROOM DEPUTY:  Thank you.  You may be seated.

12         **CHARLES SLOAN, CALLED BY GOVERNMENT, SWORN**

13                    **DIRECT EXAMINATION**

14   BY MS. SCHMIDT:

15   Q    Good afternoon, Special Agent Sloan.  Where do you

16   currently work?

17   A    Federal Bureau of Investigation.

18   Q    And is that also known as the FBI?

19   A    Yes.

20   Q    How long have you worked at the FBI?

21   A    Since 2007.

22   Q    And how many years, if you could approximate, is that?

23   A    Seventeen.

24   Q    And what is your current job title?

25   A    Special Agent.

DIRECT EXAMINATION OF CHARLES SLOAN

1  Q    And what are your roles as a special agent?

2  A    Enforcement of the United States Code.

3  Q    And during your time at the FBI, have you worked in

4  multiple divisions?

5  A    Yes.

6  Q    What are some of those divisions?

7  A    El Paso division, Miami division, Tampa division.

8  Q    What type of crimes would you investigate in those

9  divisions?

10  A    Crimes involving gangs and drugs in El Paso, like RICO

11  violations.  Miami was bank robberies, serial robbery, child

12  exploitation, drugs, cargo theft, things like that.  And then

13  Tampa division, I came here in 2018, and initially I was

14  assigned to work child exploitation, child exploitation task

15  force coordinator.  And then eventually I switched and started

16  working other violations.

17  Q    Where were you working in January of 2021?

18  A    Down in Sarasota, our FBI office in Sarasota.

19  Q    And in what unit were you working on?

20  A    I was the child exploitation coordinator for the FBI.

21  Q    And describe what a child exploitation coordinator is.

22  A    It would be different units.  Like basically I would work

23  with local law enforcement and I would be assigned my own

24  cases, but I would work with local law enforcement,

25  specifically task force officers.  And I would be asked to

DIRECT EXAMINATION OF CHARLES SLOAN

1  assist them in their cases, if they needed, and I would go out

2  with them and participate in any activities that they invited

3  me to come to and maybe gauge which cases I thought maybe

4  should go to federal prosecution and transition from state to

5  federal.

6  Q    In that role, did you participate in the January 27,

7  2021, search of the residence on Rolling Road in North Port,

8  Florida?

9  A    Yes.

10 Q    How did you learn about this search?

11 A    Detective Keller, one of our task force agents, contacted

12 me and asked if I would assist him in coming out.

13 Q    And was that common for a local law enforcement to ask

14 for your assistance?

15 A    Yes.

16 Q    What was your role in the execution of the search warrant

17 that day?

18 A    I wasn't a primary role in executing.  I came out, waited

19 for the North Port Police Department to execute the search

20 warrant and secure the residence.  And then I would come up

21 with Detective Keller and participate in any way that he would

22 ask, such as interviews or searching, something like that.

23 Q    At some point during the search, were you handed an

24 electronic device?

25 A    Yes.

DIRECT EXAMINATION OF CHARLES SLOAN

1   Q    What kind of device?

2   A    The black Samsung cell phone.

3   Q    Where was that device found?

4   A    Inside the residence, perhaps in the garage, but I wasn't

5   the one that found it.  I know I went up into the garage and I

6   was handed a cell phone and was asked to transport the cell

7   phone somewhere.

8   Q    And you were handed the device inside the garage?

9   A    Yes, I believe so.

10        MS. SCHMIDT:  Permission to approach, Your Honor?

11        THE COURT:  Yes.

12  BY MS. SCHMIDT:

13  Q    I'm showing you what's been marked as Government

14  Exhibit 6.  Do you recognize this?

15  A    Yes.  I believe that that's the device I transported to

16  the Sarasota Sheriff's Office.

17  Q    And how do you know that?

18  A    Well, it's got Samsung written on it.  And I believe that

19  case number I remember from a photo, but that looks like the

20  device.

21  Q    And so was Government Exhibit Number 6 the device that

22  was given to you during the search?

23  A    Yes, I believe it was.

24  Q    And what did you do with the cell phone once you took

25  custody of it?

DIRECT EXAMINATION OF CHARLES SLOAN

1  A    Transported to the Sarasota Sheriff's Office, their

2  forensic laboratory there.

3  Q    And why did you take it to the Sarasota forensic

4  laboratory?

5  A    Detective Keller asked me to do that.

6  Q    And who did you give the cell phone to in the Sarasota

7  lab?

8  A    Detective Wedin with the Sarasota Sheriff's Office.

9  Q    And was this hand-off recorded in the property receipt

10  for the cell phone?

11  A    I believe they recorded it on their paperwork.  Since

12  this was a state search warrant, I did not record it on my

13  paperwork, but I believe that they recorded it.

14  Q    So it was recorded on someone's device, correct?

15  A    Yes.

16  Q    Aside from delivering the cell phone to the Sarasota

17  crime lab, did you have any other involvement in this case?

18  A    An interview with Mr. Williamson.

19  Q    Besides that, did you have any other involvement in this

20  case?

21  A    No.

22         MS. SCHMIDT:  No further questions for this witness.

23         THE COURT:  Cross, please?

24         MR. BRUNVAND:  One moment, Your Honor.

25         No questions, Your Honor.  Thank you.

DIRECT EXAMINATION OF CHARLES SLOAN

1            THE COURT:  Mr. Sloan, thank you.  You may step down.

2            Let's call your next witness.

3            MS. SCHMIDT:  Your Honor, at this time would it be

4   appropriate to take our mid afternoon break?

5            THE COURT:  Well, we certainly can.  So why don't we

6   break now.  And we'll try and come back at 10 minutes until

7   the hour of three.

8            So thank you ladies and gentlemen.  Please don't

9   discuss the case or look on outside sources.  Thank you.

10       (Recess taken.)

11            MS. FAVORIT:  I'm doing may best to fill time.  I

12  think I just never imagined we would be this fast.  I'm

13  learning my lesson, but the homicide trial released our

14  digital forensic expert.  He has been driving from Sarasota to

15  the courthouse.  His ETA is 3:50 right now.  He was -- we have

16  one short witness before him.  He was my next main witness.

17  He would take the rest of the day.  I'm thinking he won't be

18  here in time after our short witness.

19            THE COURT:  Okay.  So how long do you think your

20  short witness is going to go?

21            MS. SCHMIDT:  Maybe 10 minutes, Your Honor.

22            THE COURT:  All right.  Well, let's think about this.

23  His ETA is 3:50.  I hate for them to sit around.  We will just

24  give them the option.  So we will just tell the jury that the

25  witness got tied up.  And maybe you can give us a better ETA.

DIRECT EXAMINATION OF CHARLES SLOAN

1  Check back with him here when this short witness is done and

2  just give us the ETA.  And then I will let the jury make that

3  call.  Okay?

4         MS. FAVORIT:  Thank you, Your Honor.  And after that

5  I think we will have all the rest of our witnesses here at

6  8:30 tomorrow.  So I think we will probably finish this case a

7  lot sooner than we expected.

8         THE COURT:  You know, typically we will start at

9  9:00.  It really is amazing.  Some of these -- I haven't

10  looked at this list, but some of these people drive 90 minutes

11  to get here.  And just remember, today they got in early too.

12  So I won't be a scoldy, meany federal judge.

13         MR. BRUNVAND:  I had been of the impression that the

14  earliest that we would start the defense case would be on

15  Wednesday.  I have one witness under subpoena for Wednesday,

16  and she has taken off work for Wednesday.  It sounds like they

17  are now going to maybe finish up earlier tomorrow.  I guess it

18  depends on what happens with this witness.  And I'm just

19  trying to figure out if I'm still okay with having my witness

20  lined up for Wednesday.

21         THE COURT:  What do you all think.

22         MS. FAVORIT:  The digital forensic expert is the

23  person on his way.  He's a pretty long witness.  So I imagine

24  if we bump him until tomorrow, I think we would take up the

25  full day.  We would have the case agent, forensic expert,

1  victim.

2         THE COURT:  Very well.  So then I will protect you

3  until Wednesday morning.

4         MR. BRUNVAND:  Thank you, Your Honor.

5         THE COURT:  They went down to get their phones.  They

6  will probably be relieved, frankly, that they can go home

7  early.

8      (The jury returned to the courtroom:)

9         THE COURT:  Ladies and gentlemen, we have one short

10  witness.  The government has a significant computer –– I will

11  call him the computer man.  It might be a female.  I don't

12  know.  A computer witness that is of course in –– as you can

13  imagine, computer witnesses are in demand.  So he got pulled

14  into a trial in Sarasota so will not be here until the

15  morning.  So we have a short witness here.  And I'm sorry.  It

16  may be good because I know y'all got up early to come in for

17  the selection.  So then we will recess for the day a little

18  bit early.  And then is 9:00 best for you all?  Is 8:30 too

19  early?  Does anybody have a problem starting at 8:30.  I think

20  we should go 9:00.  I know we have one witness from St. Leo

21  and some places.  So we will start tomorrow at 9:00 and then

22  wrap up –– nobody's fault, not the government's fault, not my

23  fault, but this person was needed in something going on in

24  Sarasota.

25         So let's get that other witness on, Counsel.

DIRECT EXAMINATION OF ERIC WEDIN

1          MS. SCHMIDT:  Your Honor, at this time the United

2   States would call Eric Wedin.

3          THE COURT:  By the way, we are ahead of schedule, if

4   you're wanting to know.

5          THE COURTROOM DEPUTY:  Please raise your right hand

6   to be sworn.

7      (Witness sworn.)

8          THE COURTROOM DEPUTY:  Please state your full name

9   and spell your last name for the record.

10          THE WITNESS:  Eric Wedin, W-E-D-I-N.

11          THE COURTROOM DEPUTY:  Thank you.  You may be seated.

12          **ERIC WEDIN, CALLED BY THE GOVERNMENT, SWORN**

13                      **DIRECT EXAMINATION**

14   BY MS. SCHMIDT:

15   Q   Good afternoon, Mr. Wedin.  Where do you currently work?

16   A   I currently work at a company called Kroll.

17   Q   What type of business does Kroll do?

18   A   We do incident response and computer forensics for the

19   private sector.

20   Q   And what is your role at Kroll?

21   A   I'm the senior vice president.

22   Q   And generally speaking, what are your duties in that

23   role?

24   A   I manage incidents from start to finish.  So we

25   investigate mainly business email compromises, your

DIRECT EXAMINATION OF ERIC WEDIN

1  ransomware, which you would consider hacking, insider threats,

2  things like that.  So my role is to manage it from the very

3  beginning until the end.  And I have other people I work with

4  that also assist with it.

5  Q    What were you doing before you started working at Kroll?

6  A    Prior to that, I was a consultant for a company called

7  Pondurance for a couple of years.  And then prior to that, I

8  did 18 years in law enforcement.

9  Q    And where were you working in January 2021?

10  A    I was working at the Sarasota County Sheriff's Office.

11  Q    What was your job title at the Sarasota County Sheriff's

12  Office?

13  A    I was a sworn digital forensic examiner.

14  Q    What were your duties generally speaking as a digital

15  forensic examiner?

16  A    As a digital forensic examiner, kept the lab up and

17  running, made sure that the softwares and things were up to

18  date and working properly.  Also, we did everything from

19  examine the evidence, collect the evidence, process the

20  evidence, and then do intake from both our own agency and

21  surrounding agencies.

22  Q    You mentioned intake.  What do you mean by that?

23  A    So the evidence has to get to us somehow, and that can

24  vary.  And so one of the ways that evidence comes is through

25  our partners in the federal agencies.  So I was also a sworn

DIRECT EXAMINATION OF ERIC WEDIN

1  TFO or Task Force Officer.  So we also assisted with the

2  federal agencies and their needs within computer forensics.

3  Q    What type of evidence would you receive?

4  A    Computers, hard drives, portable storage media like thumb

5  drives, things likes that, cell phones, tablets, laptops.

6  Q    Are there procedures in place to track when your lab

7  receives a particular device?

8  A    Yes.

9  Q    What are those?

10  A    So we use chain of custody forms.  Those are forms either

11  from our agency or other agencies.  And they track exactly who

12  handled the evidence that was brought into the lab.  And then

13  once it was brought into the lab, then it was documented

14  through our internal paperwork as to who handled that evidence

15  within our -- within the lab itself.

16  Q    And so walk us through what happens once you take custody

17  of a device.

18  A    So we take custody of the device.  We sign the chain of

19  custody form notating as such.  And then we have an evidence

20  locker or evidence cabinet that's within the digital forensics

21  lab where we store evidence unless it's actively being worked

22  on.

23  Q    And you mentioned a digital forensic lab.  Is that lab

24  secure?

25  A    Yes, it is.

DIRECT EXAMINATION OF ERIC WEDIN

1    Q    Describe how that lab is secure?

2    A    Well, you've got to get through the main building first,

3    right?  And once you get into the main building, then we have

4    our own room.  It's probably about a quarter of the size of

5    this room, and it's behind a swipe card pass, and there's only

6    limited access.  So the employees had access, our supervisors,

7    our immediate supervisors had access.  Not even the sheriff

8    had access to the room.

9    Q    Once a device makes it inside the secure lab, where is

10   the evidence stored?

11   A    In the evidence storage locker.  It's a cabinet, but yes.

12   Q    Is that cabinet also secure?

13   A    It is.

14   Q    Did your lab receive a cell phone on January 27, 2021?

15   A    Yes.

16        MS. SCHMIDT:  Permission to approach, Your Honor?

17        THE COURT:  Yes.

18   BY MS. SCHMIDT:

19   Q    I'm handing you what has been previously admitted as

20   Government Exhibit Number 6.  Do you recognize this?

21   A    Yes, I do.

22   Q    How do you recognize it?

23   A    I recognize it because of this label.  That was actually

24   placed on there by Sarasota County Sheriff's Office.  And then

25   the taped location of the SIM card is exactly how it was

DIRECT EXAMINATION OF ERIC WEDIN

1  before.

2  Q    And is Exhibit 6 the phone that you received in the lab

3  that day?

4  A    Yes.

5  Q    Who gave you the cell phone on that day?

6  A    Special Agent Sloan.

7  Q    Is it common -- is Special Agent Sloan with the FBI?

8  A    Yes.

9  Q    Is it common for an FBI agent to bring a piece of

10 evidence to your lab at the Sarasota County Sheriff's Office?

11 A    Yes.  He would come either once a month or once every

12 other month to drop something off.  We saw him quite a bit.

13 Q    And why would a law enforcement officer bring it to your

14 lab specifically?

15 A    Our turnaround time is pretty fast.  So they like that.

16 Just to put it into context, the task force that I belong to

17 mainly was the Secret Service task force.  And so we got lot

18 of information -- or we got a lot of data from them as well.

19 We were ranked one of the top 10 in volume for data processed

20 in the country at least three years that I know of.

21 Q    And what did you do once you took custody of the cell

22 phone from Special Agent Sloan?

23 A    We took that cell phone.  I signed the chain of custody

24 form, and then I placed it into the cabinet.

25 Q    And by "cabinet," do you mean the evidence cabinet?

CROSS-EXAMINATION OF ERIC WEDIN

1    A    Yes.

2    Q    Was that evidence cabinet inside the secure forensics

3    lab?

4    A    Yes.

5         MS. SCHMIDT:  No further question for this witness,

6    Your Honor.

7         THE COURT:  Cross, please?

8         MR. BRUNVAND:  Briefly, Your Honor.

9         THE COURT:  Yes.

10                    **CROSS-EXAMINATION**

11   BY MR. BRUNVAND:

12   Q    Good afternoon.

13   A    Good afternoon.

14   Q    You're retired, Detective?

15   A    Yes.

16   Q    And the company that you mentioned, is that a company

17   that you formed?

18   A    No.  We have like 6,500 employees.

19   Q    What do you do with the company again?

20   A    I'm the senior vice president.

21   Q    Senior vice president, okay.  And you mentioned that some

22   of the things that you do is you deal with business email

23   compromises?

24   A    Yes.

25   Q    So you stay pretty busy, I assume?

REDIRECT EXAMINATION OF ERIC WEDIN

1   A     Oh, yeah.

2   Q     And business email compromises, would that include where

3   someone basically hijacks a business email?

4   A     Generally that is correct, yes.

5   Q     And they hijack it and they use it to spam emails, for

6   example.  That's one scenario?

7   A     Yes.

8   Q     And they could be overseas?

9   A     Yes.

10  Q     They could be somewhere else in the United States?

11  A     Yes.

12  Q     They could be next door?

13  A     Yes.

14  Q     And somehow they even have the ability to like bounce IP

15  addresses, so sometimes it's hard to track them down?

16  A     Yeah.  I mean, it's a little more complicated than that.

17  They don't usually bounce, but they do use an IP address,

18  usually a privacy VPN which masks the real IP address.

19          MR. BRUNVAND:  That's all I have.  Thank you.

20          THE COURT:  Any redirect?

21                    **REDIRECT EXAMINATION**

22  BY MS. SCHMIDT:

23  Q     In this case, did you conduct any analysis to determine

24  if any of the data on the cell phone had been compromised?

25  A     I did not.

REDIRECT EXAMINATION OF ERIC WEDIN

1           MS. SCHMIDT:  No further questions, Your Honor.

2           THE COURT:  Thank you.

3           Ladies and gentlemen, thank you.  The computer fellow

4  or lady will be here in the morning.  We will start at 9:00.

5  Just leave the case right here, please.  And don't look on

6  outside sources or discuss it on the merits, and we will see

7  you at 9:00.  Thank you very much.

8      (Jury escorted out of the courtroom.)

9           THE COURT:  Thanks, everybody.  We will see you then.

10      (Proceedings concluded at 3:07 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REDIRECT EXAMINATION OF ERIC WEDIN

1 | UNITED STATES DISTRICT COURT   )
                                   )
2 | MIDDLE DISTRICT OF FLORIDA     )

3

**REPORTER TRANSCRIPT CERTIFICATE**

4

5 |     I, Tracey Aurelio, Official Court Reporter for the United
States District Court, Middle District of Florida, certify,
pursuant to *Section 753, Title 28, United States Code*, that
6 | the foregoing is a true and correct transcription of the
stenographic notes taken by the undersigned in the
7 | above-entitled matter (Pages 1 through 174 inclusive) and that
the transcript page format is in conformance with the
8 | regulations of the Judicial Conference of the United States of
America.

9

10 |                                   /s   *Tracey Aurelio*
                                   _____
11 |                                   Tracey Aurelio, RMR, RDR, CRR
                                   Official Court Reporter
12 |                                   United States District Court
                                   Middle District of Florida
13 |                                   Tampa Division
                                   Date:  September 16, 2024

14

15

16

17

18

19

20

21

22

23

24

25