```
 1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                         TAMPA DIVISION

 3   UNITED STATES OF AMERICA,   )
                                 )   8:21-cr-355-WFJ-CPT
 4          PLAINTIFF,           )   Tampa
                                 )   March 12, 2024
 5          v.                   )   9:00 a.m.
                                 )
 6   GREGORY ALLEN WILLIAMSON,   )
                                 )
 7          DEFENDANT.           )

 8                              DAY 2
                      TRANSCRIPT OF JURY TRIAL
 9           BEFORE THE HONORABLE WILLIAM F. JUNG
                   UNITED STATES DISTRICT JUDGE
10
     APPEARANCES:
11
     For the Government:
12       MS. ERIN CLAIRE FAVORIT
         MS. LINDSEY NICOLE SCHMIDT
13       United States Attorney's Office
         Suite 3200
14       400 N. Tampa Street
         Tampa, FL 33602-4798
15
     For the Defendant:
16       MR. BJORN ERIK BRUNVAND
         MS. WILLENGY RAMOS-WICKS
17       Bjorn E. Brunvand, PA
         615 Turner Street
18       Clearwater, FL 33756

19

20

21
     Court Reporter:         Tracey Aurelio, CRR, RMR, RDR
22                           Federal Official Court Reporter
                             801 N. Florida Avenue, 15th Floor
23                           Tampa, Florida 33602
                             (813) 301-5448
24
              Proceedings recorded by mechanical stenography,
25   transcript produced by computer.
```

1                              I N D E X

2   LEE WALLACE
       Direct Examination (Ms. Favorit)                    4
3      Cross-Examination (Mr. Brunvand)                    41
       Redirect Examination (Ms. Favorit)                  49
4
    BROOKE BUZZELL
5      Direct Examination (Ms. Schmidt)                    54

6   DEEA APOSTOL
       Direct Examination (Ms. Favorit)                    65
7      Cross-Examination (Mr. Brunvand)                    103
       Redirect Examination (Ms. Favorit)                  107
8
    JAMES KELLER, II
9      Direct Examination (Ms. Favorit)                    109
       Cross-Examination (Mr. Brunvand)                    198

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 _____

2     (Proceedings commenced at 9:00 a.m.)

3        THE COURT:  I think we are missing one juror yet.

4 Counsel, we will have a charge conference this evening at like

5 5:00 or when we break.  So take a look at that draft you

6 should have over lunch, please.  Very straightforward.  About

7 the only thing I did was -- I'm not going to repeat interstate

8 commerce and lascivious activity like five times.  So I said

9 it all once, and then the next like two times I refer them

10 back to the page.  And then I think there is a third time

11 where I didn't refer them back to page 16 or 17.  So take a

12 look at it.  We'll talk about it tonight.

13        How are we doing, government?  Is there a chance you

14 will rest today?

15        MS. FAVORIT:  I think there is a chance we will rest

16 today.

17        THE COURT:  Good.  And we may have to rework

18 depending on what Mr. Brunvand does on his side and who, if

19 anybody, testifies.  We may have to rework that just a little

20 bit.

21        Let's get that witness lined up here.

22        Thank you.

23     (The jury returned to the courtroom:)

24        THE COURT:  Thank you, ladies and gentlemen.  I sure

25 appreciate it.  We are making very good progress.

4

DIRECT EXAMINATION OF LEE WALLACE

1          So I ask the government to call your next witness,

2    please.

3          MS. FAVORIT:  The United States calls Lee Wallace.

4          THE COURT:  Step forward, sir.

5       (Witness sworn.)

6          THE COURTROOM DEPUTY:  Please state your full name

7    spell your last name for the record.

8          THE WITNESS:  Lee Wallace, W-A-L-L-A-C-E.

9          THE COURT:  Thank you.  You may be seated.

10    **LEE WALLACE, CALLED BY THE GOVERNMENT, SWORN**

11                      **DIRECT EXAMINATION**

12    BY MS. FAVORIT:

13    Q    Good morning.  What is it that you do for a living?

14    A    I'm a digital forensic examiner.

15    Q    Where do you work?

16    A    North Port Police Department.

17    Q    How long have you worked there?

18    A    Since 2004, 19 years.

19    Q    How long have you been a digital forensic examiner?

20    A    Since 2017.

21    Q    What is a digital forensic examiner?

22    A    Digital forensics is a branch of forensics that deals

23    with devices that can have digital evidence on them.

24    Q    What qualifies as a digital device?

25    A    Pretty much anything running electricity can store data,

DIRECT EXAMINATION OF LEE WALLACE

1  change data, retrieve data.

2  Q    Is that like cell phones and computers?

3  A    Yes.

4  Q    Are you also a task force officer?

5  A    Yes.

6  Q    For which agency?

7  A    Homeland Secure Investigations.

8  Q    What do you do for them?

9  A    I'm in the same role for -- they expect to have me do

10 digital forensics for them as well and some case work.

11 Q    What is your educational background?

12 A    An AA in e-commerce.

13 Q    What type of training have you received in order to

14 become a digital forensic examiner?

15 A    I have received the certified forensic examiner

16 certification through IACIS and Cellebrite vendor based

17 certifications for using their software and their tools.

18 Q    Are those national or international organizations?

19 A    IACIS is international.

20 Q    Are any of those trainings specifically related to child

21 pornography investigations?

22 A    No.  They are digital forensics.

23 Q    Do you have any training specifically related to those

24 investigations?

25 A    Yes, yes.  Actually, there is -- we go to a conference

DIRECT EXAMINATION OF LEE WALLACE

1  every year for furthering education in child exploitation.  So

2  I've had investigative basic training on that.

3  Q    You mentioned some certifications.  Which ones do you

4  hold?

5  A    The CFCE through IACIS, the Cellebrite certifications,

6  and SANS Institute advanced mobile device forensics

7  certification.

8  Q    Are you also a sworn law enforcement officer?

9  A    Yes.

10 Q    Have you ever given testimony in deposition since

11 becoming a digital forensic examiner?

12 A    Yes.

13 Q    Approximately how many times?

14 A    Ten.

15 Q    Are those depositions regarding your digital forensics

16 expertise?

17 A    Yes.

18 Q    What would you say your expertise is in?

19 A    Digital forensics.

20 Q    Do you receive ongoing training?

21 A    Yes.

22 Q    What type?

23 A    Digital forensics, due to it constantly changing, and

24 there's institutes that we get to go to that as technology

25 changes, advances, new things come into play, we get courses

DIRECT EXAMINATION OF LEE WALLACE

1    on it.

2    Q    So you state up to date with technology?

3    A    Yes.

4    Q    Do you belong to any professional associations?

5    A    The IACIS is a professional organization.

6    Q    Do you have any experience working on child pornography

7    cases?

8    A    Yes.

9    Q    How often do you get those?

10   A    It can vary, but probably in totality of all the digital

11   forensics that I work on throughout the year, in the high

12   20 percent range.

13   Q    Can you tell me about a day in the life of a digital

14   forensic examiner working on a child pornography case?

15   A    So we are generally involved in the search warrant aspect

16   at the residence or person, and then it will -- the evidence

17   will get seized and taken into property and evidence.  We

18   receive it after legal authority.  And we take it to the lab,

19   and we acquire the evidence from the device and process it and

20   analyze it.

21   Q    About how many phones and computers have you conducted

22   examinations on?

23   A    Over a thousand.

24   Q    Are you also involved in the Internet Crimes Against

25   Children Task Force?

DIRECT EXAMINATION OF LEE WALLACE

1    A    Yes.

2    Q    What is that?

3    A    There's regions.  And so in the region, digital forensics

4    people, a couple investigators, they're involved in Internet

5    crimes against children cyber tips.  And we get assigned them,

6    and then we have to go forward with them.

7    Q    What role do you take within that task force?

8    A    Digital forensics.

9    Q    Were you working in this capacity in January 27, 2021?

10   A    Yes.

11   Q    Were you involved in reviewing a Yahoo search warrant

12   return?

13   A    Yes.

14   Q    What role did you play in that?

15   A    I processed it in a forensic tool to do the analysis.

16         MS. FAVORIT:  May I approach, Your Honor?

17   BY MS. FAVORIT:

18   Q    I'm showing you Exhibit 1.  Do you recognize this?

19   A    Yes.

20   Q    What do you recognize it to be?

21   A    That is the USB drive that is holding the Yahoo return.

22   Q    And are your initials on there?

23   A    Yes.

24   Q    Were you the one who actually put it on that jump drive?

25   A    Yes.  Yes, ma'am.

DIRECT EXAMINATION OF LEE WALLACE

1  Q    Did you assist in reviewing the return in a forensic

2  tool?

3  A    Yes.

4  Q    I'm going to show you what's already entered as

5  Exhibit 1X on the screen.  Do you recognize this document?

6  Oh, is it not on your screen?  Oh, sorry.

7          Do you recognize this?

8  A    Yes.

9  Q    What do you recognize it to be?

10 A    That is the overview of the original -- where the return

11 was processed on.  That is the physical drive that I had the

12 return on for processing it.

13 Q    And is this what came from the jump drive but redacted?

14 A    Yes.

15 Q    And did you assist a Detective James Keller with that?

16 A    Yes.

17 Q    Were you present for the execution of a search warrant at

18 2527 Rolling Road?

19 A    Yes.

20 Q    Was that the home where Gregory Williamson lived?

21 A    Yes.

22 Q    What information did you know about the case prior to the

23 execution of the warrant?

24 A    I knew there was a probability of child pornography being

25 possessed there.

DIRECT EXAMINATION OF LEE WALLACE

1  Q    Is that based on your review of the Yahoo search warrant

2  return?

3  A    Yes.

4  Q    And did that account contain child pornography?

5  A    Yes.

6  Q    What was your role on the day of the search warrant?

7  A    It was to do any on-site previewing that was needed and

8  to assist in the decision making on seizing devices.

9  Q    Did you identify the digital forensics devices to seize?

10 A    Yes.

11 Q    Was any evidence collected?

12 A    Yes.

13 Q    Can you tell us what a preliminary forensic exam is?

14 A    Preliminary is a/k/a previewing to attempt to find child

15 pornography or evidence in a timely manner instead of doing a

16 full exam.

17 Q    What would you consider a full exam of a digital device?

18 A    So a full exam, best practices we follow is to extract

19 phones or forensically image the hard drives prior to analysis

20 because it preserves that drive, and then we can work with

21 that image.

22 Q    Why can't you do a full exam at the search warrant?

23 A    The tools needed to image or extract, you don't want to

24 really do that on-scene.  It's back at the lab.  And you don't

25 want to make -- you don't want to manipulate these devices in

DIRECT EXAMINATION OF LEE WALLACE

1  any way.  They need to go and best practices followed in the

2  lab.

3  Q    Why would you do a preview before you do a full exam at

4  the scene?

5  A    In this case, to attempt to identify child pornography in

6  a timely manner.

7  Q    Did any pieces of evidence that were collected at the

8  scene have a preliminary exam done?

9  A    Yes.

10 Q    Can you tell me which ones?

11 A    The Gateway all-in-one.

12         MS. FAVORIT:  May I approach the evidence, Your

13 Honor?

14         THE COURT:  Of course.

15 BY MS. FAVORIT:

16 Q    I saw you nodding at Exhibit 5.  Is this the Gateway

17 all-in-one?

18 A    Yes, ma'am.

19 Q    What other items did you do a preliminary on?

20 A    A cell phone.

21 Q    Who did that cell phone belong to?

22 A    His wife.

23 Q    Was anything of evidentiary value related to child

24 pornography discovered on the wife's cell phone?

25 A    No.

DIRECT EXAMINATION OF LEE WALLACE

1  Q    I also want to ask you about the Samsung cell phone which

2  is Exhibit 6.

3           May I approach the witness?

4           Do you recognize Exhibit 6?

5  A    Yes.

6  Q    What do you recognize that to be?

7  A    This is the defendant's phone.

8  Q    Were you able to forensically preview this device?

9  A    No.

10  Q    Why not?

11  A    It was secured.  It was screen locked.

12  Q    Does that prevent you from doing that preview we

13  discussed?

14  A    Yes.

15  Q    What did you have to do with this device?

16  A    It needed to go for an extraction to know the location.

17  Q    And is that to do the full forensic analysis?

18  A    That would be to get the data to do a full forensic

19  analysis, yes.

20  Q    Referring back to the Gateway all-in-one, did you find

21  anything of evidentiary value during the preview?

22  A    Yes.

23  Q    What did you find?

24  A    Child pornography.

25  Q    Did you actually review that yourself?

DIRECT EXAMINATION OF LEE WALLACE

1  A     Yes.

2  Q     Did you need a password for that computer for your

3  preview?

4  A     No.

5  Q     How were you able to get into it?

6  A     I ended up having to remove the hard drive.  I opened the

7  case, the housing, took the hard drive out, connected it to a

8  forensic laptop through a write blocker, which allows no

9  changes to that drive, doesn't mount.  It just lets me examine

10  the data.  When it's not encrypted, we are able to do that,

11  and you don't need a password.

12  Q     Whose computer was that according to the search warrant?

13  A     The defendant's.

14  Q     How did you know that?

15  A     I was told he was found at it and near it at the time of

16  the execution.

17  Q     What actions did you take once you found evidence of

18  child pornography on the day of the search warrant?

19  A     I advised the case agent.

20  Q     Now, we're going to move on to the full forensic reviews.

21  Can you share the process of how you would receive a piece of

22  electronic evidence to review?

23  A     I received it through the property and evidence section

24  or I will have it assigned to me on-scene and I will take it

25  right to the lab.

DIRECT EXAMINATION OF LEE WALLACE

1    Q    And do you use that special tooling we have been

2    discussing to conduct those forensic evaluations?

3    A    Yes.

4    Q    Why do you need special tools?

5    A    Well, cell phones require their own special tools.

6    Computers require their own special tools.  And they are to

7    preserve -- they are to keep the data unchanged and in order

8    to get that forensic image or extraction.

9    Q    How do you know which tool to use?

10   A    Through training and knowing the tools.

11   Q    Were you able to fully forensically image and review

12   devices in this case?

13   A    Yes.

14   Q    Which one?

15   A    This all in one, four laptops, another little tower

16   computer, and two loose hard drives.

17   Q    Were they thorough analyses of those devices?

18   A    Yes.

19   Q    Which devices had no evidence of child pornography?

20   A    The four laptops, and I believe one of the loose drives.

21   Q    Did any devices have evidence of the email of

22   Vladlover50@Yahoo.com?

23   A    Yes.

24   Q    Which ones?

25   A    The little tower computer.

DIRECT EXAMINATION OF LEE WALLACE

1  Q    Is the Acer tower?

2  A    Yes.

3  Q    Where was that device found?

4  A    In the defendant's bedroom.

5  Q    I'm going to show you Exhibit 12.12.  Is this the

6  defendant's bedroom that you are referring to?

7  A    Yes.

8  Q    Was this labeled Room I?

9  A    Yes.

10  Q    I'm going to show you 12.13.  Again, is this a zoomed-in

11  picture of the desktop area in the defendant's bedroom?

12  A    Yes.

13  Q    And 12.14.  Can you tell me what's in this photo?

14  A    The Acer.

15  Q    And was this the Vladlover50@Yahoo evidence that you

16  discovered from this tower?

17  A    Yes.

18  Q    Was the Vladlover part of that Yahoo search warrant?

19  A    Yes.

20  Q    I'm showing you what we have identified and entered as

21  Exhibit 8.  Do you recognize this?

22  A    Yes.

23  Q    What do you recognize it to be?

24  A    Hard drive.

25  Q    And where was this found in the search warrant?

DIRECT EXAMINATION OF LEE WALLACE

1   A    I believe in that drawer there.

2   Q    Are you describing from the 12.14 exhibit in that top

3   drawer of the chest of drawers we're looking at?

4   A    According to the report of located evidence found, yes.

5   Q    Did you conduct the forensic extraction on the Seagate

6   hard drive?

7   A    I forensically imaged this hard drive, yes.

8         MS. FAVORIT:  May I approach the witness?

9   BY MS. FAVORIT:

10  Q    I'm showing you what's been marked as 8.1.  Do you

11  recognize this?

12  A    Yes.

13  Q    What do you recognize it to be?

14  A    This is the external hard drive that contains the

15  forensic image of this drive.

16  Q    How do you recognize it?

17  A    I put it on there.

18  Q    And is that a copy of what came from that hard drive?

19  A    It is a physical copy of this drive.

20  Q    Did it appear to have any deletions or alterations when

21  you made that copy?

22  A    Were there any --

23  Q    Is it an exact copy?

24  A    Oh, yes.  It's an exact copy, yes.

25        MS. FAVORIT:  Your Honor, at this time the United

DIRECT EXAMINATION OF LEE WALLACE

1   States moves 8.1 into evidence.

2        THE COURT:  8.1 is admitted.

3   BY MS. FAVORIT:

4   Q    Was the Seagate hard drive manufactured in the United

5   States?

6   A    No.

7   Q    What does it actually say on there?  Is that how you know

8   that?

9   A    Thailand.

10  Q    I'm showing you 8.2.  Do you recognize this?

11  A    Yes.

12  Q    What do you recognize it to be?

13  A    The close-up of the details of this drive.

14  Q    And is that just reflecting the manufacturer location?

15  A    Yes, it does.  It's in there.

16  Q    Does it appear to be a fair and accurate depiction of

17  that Seagate hard drive?

18  A    Yes.

19        MS. FAVORIT:  Your Honor, at this time I move 8.2

20  into evidence.

21        THE COURT:  8.2 is admitted.

22  BY MS. FAVORIT:

23  Q    I want to show you Exhibit 8.3.  Do you recognize this?

24  A    Yes.

25  Q    I realize that 8.3 was a redacted copy, so I have walked

DIRECT EXAMINATION OF LEE WALLACE

1  up 8.3 unredacted.  What do you recognize this to be?

2  A     The unredacted.

3  Q     And did you generate this report?

4  A     Yes.

5  Q     Did you generate it?

6  A     This was the exported -- I possibly identified child

7  pornography that was on that drive.

8  Q     And did it come from the forensic -- is it image or

9  extraction?

10 A     Forensic image, yes.

11 Q     Did this report come from the forensic image of the

12 Seagate?

13 A     Yes.

14 Q     How many images of child pornography, based on your

15 training and experience, were on here?

16 A     On this, four.  And then two were considered age

17 difficult.

18 Q     And I want to bring your attention to 8.3A.  Is this the

19 same report but redacted?

20 A     Yes.

21 Q     Do both 8.3 and 8.3A fairly and accurately depict the

22 report that you generated from the forensic image of the

23 Seagate hard drive?

24 A     Yes.

25       MS. FAVORIT:  Your Honor, at this time I move 8.3 and

DIRECT EXAMINATION OF LEE WALLACE

1   8.3A into evidence.

2           THE COURT:  All right.  8.3 and 8.3A is admitted.

3           MS. FAVORIT:  Your Honor, permission to publish the

4   child pornography?

5           THE COURT:  Yes.

6   BY MS. FAVORIT:

7   Q    I'm going to show you page 3 of 8.3.  If you keep

8   scrolling through the page 4, page 5, page 6, I think they are

9   not loading.  Are they on your screen?

10          That concludes the publishing of 8.3.

11          THE COURT:  Ladies and gentlemen, if you deem it

12  appropriate to examine those matters further, they will be in

13  the jury room with the evidence.  Thank you.

14  BY MS. FAVORIT:

15  Q    I noticed there were some blank boxes on there.  Why is

16  that?

17  A    So when the file system allows something that has been

18  deleted, that space is slowly overwritten as the file system

19  deems fit.  So it appears that data was starting to overwrite

20  where that image originally was.

21  Q    And there's a lot of words on these reports.  What is all

22  of that?

23  A    That's the artifact details of the image above.

24  Q    So is that just details of where this image came from?

25  A    It can.  There will be a source path.  And sometimes

DIRECT EXAMINATION OF LEE WALLACE

1  there will be a date retained depending on how much was

2  overwritten.

3  Q    I'd like to move on to the Gateway all-in-one computer.

4  Where was that found in the search warrant?

5  A    In the garage.

6  Q    I'm going to show you -- well, you are looking at

7  Exhibit 5, but I will also show it on the big screen.  I'm

8  going to show you Exhibit 12.11.  Is that where it was

9  located?

10 A    Yes.

11 Q    Was this Gateway computer manufactured in the United

12 States?

13 A    No.

14 Q    Did you conduct the forensic image on the Gateway

15 all-in-one?

16 A    Yes.

17 Q    How did you conduct a forensic image?

18 A    The hard drive was connected to our forensic tower

19 through a write blocker and forensically imaged.

20 Q    Is it an exact copy or something else?

21 A    An exact copy.

22 Q    I'm going to show you Exhibit 5.1.  Do you recognize

23 this?

24 A    Yes.

25 Q    What do you recognize it to be?

DIRECT EXAMINATION OF LEE WALLACE

1  A    This is the external hard drive that contains the

2  forensic image from the Gateway.

3  Q    How do you recognize it?

4  A    I put it on there.

5  Q    And are your initials on it?

6  A    Yes.

7  Q    Is this the forensic image of the Gateway all-in-one?

8  A    Yes.

9  Q    Was it an exact copy?

10  A    Yes.

11       MS. FAVORIT:  Your Honor, at this time the United

12  States moves in 5.1.

13       THE COURT:  All right.  It's admitted.

14  BY MS. FAVORIT:

15  Q    What tools do you need to review this forensic image?

16  A    You need specialized forensic tools that are able to

17  process the image, decode it, and then parse it.  It will

18  organize it and you are able to do your analysis.

19  Q    I'm going to show you Exhibit 5.2.  Do you recognize

20  this?

21  A    Yes.

22  Q    What do you recognize it to be?

23  A    This is the communications that were categorized from

24  upon processing the forensic image.

25  Q    Are these emails and other communications that were

DIRECT EXAMINATION OF LEE WALLACE

1  parsed from the Gateway device?

2  A    Yes.

3  Q    Did you make this report?

4  A    Yes.

5  Q    Was it generated from that forensic image?

6  A    Yes.

7  Q    Does it appear to be a fair and accurate copy of what you

8  generated?

9  A    Yes.

10         MS. FAVORIT:  Your Honor, at this time I move in 5.2.

11         THE COURT:  Admitted.

12         MS. FAVORIT:  Permission to publish?

13         THE COURT:  Yes.

14 BY MS. FAVORIT:

15 Q    I'm just pulling up the first record from 5.2, page 5.

16 What is this reflecting?

17 A    It's reflecting an email.

18 Q    Could you read us the email name?

19 A    The recipient?

20 Q    From record one, the identifier?

21 A    It's going to be Deea.Apostol1782@gmail.

22 Q    Is that D-E-E-A dot A-P-O-S-T-O-L?

23 A    Yes.

24 Q    And what's the source for this one?

25 A    That is the hard drive that goes to -- it's -- the path

DIRECT EXAMINATION OF LEE WALLACE

1  is users, so this is a Windows thing, so Users, Gateway, App

2  Data, Local, Microsoft, Outlook, Williamson Gregory@hotmail.

3  Q    What is that reflecting?

4  A    That's reflecting email activity out of the user PC

5  Gateway.

6  Q    I'm now going to show you from Exhibit 5.2, page 7.

7  Could you read us record two, the email?

8  A    It is tagged Vlad email and Vladlover50@Yahoo.

9  Q    What is that reflecting?

10  A    The user PC Gateway in Google Chrome.

11  Q    Was there evidence of the Vladlover50@Yahoo.com on this

12  computer?

13  A    Yes.

14  Q    And does your forensic image recover deleted data?

15  A    It can.

16  Q    Were there deleted emails of Vladlover50@Yahoo.com?

17  A    Yes.

18  Q    Was there any evidence of who owned and operated this

19  computer?

20  A    Yes.

21  Q    Who did this belong to according to the computer?

22  A    Gregory Williamson.

23  Q    How do you know that?

24  A    The primary user of this PC Gateway is named Gregory

25  Williamson with his email address.

DIRECT EXAMINATION OF LEE WALLACE

1  Q    I'm showing you what's been marked as Exhibit 5.13.  Do

2  you recognize this?

3  A    Yes.

4  Q    What do you recognize it to be?

5  A    This is the Windows user accounts on the PC Gateway.

6  Q    And did you generate this report?

7  A    Yes.

8  Q    And was it from the voluminous files from the forensic

9  image of the Gateway?

10 A    Yes.

11 Q    And was it made from your forensic tools?

12 A    Yes.  It is a screen capture from the forensic tool.

13 Q    Is it a fair and accurate copy of that report?

14 A    Yes.

15       MS. FAVORIT:  Your Honor, at this time I move in

16 5.13.

17       THE COURT:  Admitted.

18 BY MS. FAVORIT:

19 Q    Does this show evidence of a password being required?

20 A    It does.

21       MS. FAVORIT:  Permission to publish, Your Honor?

22       THE COURT:  Yes.

23 BY MS. FAVORIT:

24 Q    I'm going to show you 5.3, but I'm going to zoom in on

25 the usernames.  Can you read us the username for the Gateway?

DIRECT EXAMINATION OF LEE WALLACE

```
 1  A    PC-Gateway.

 2  Q    And who's the name?

 3  A    Gregory Williamson.

 4  Q    And what is the email associated with the computer?

 5  A    Williamson_Gregory@hotmail.com.

 6  Q    Was there evidence of child pornography on this computer?

 7  A    Yes.

 8  Q    I'm going to show you Exhibit 5.3 and 5.3A.  Do you

 9  recognize these?

10  A    Yes.

11  Q    What do you recognize them to be?

12  A    An email artifact.

13  Q    What do you mean by email artifact?

14  A    Similar to uncovering a lost civilization, there's

15  artifacts.  And they can determine many things through those.

16  We discover digital artifacts.

17  Q    Is 5.3 an email without those artifacts?

18  A    This is basically just one of the emails.

19  Q    And does 5.3A include those artifacts?

20  A    Yes.

21  Q    Did you generate these reports?

22  A    Yes.

23  Q    Were they from the copy of the forensic image of the

24  Gateway?

25  A    Yes.
```

DIRECT EXAMINATION OF LEE WALLACE

1   Q    Are they fair and accurate depictions?

2   A    Yes.

3         MS. FAVORIT:  Your Honor, at this time I move in 5.3

4   and 5.3A.

5         THE COURT:  Admit.

6         MS. FAVORIT:  Permission to publish?

7         THE COURT:  Yes.

8   BY MS. FAVORIT:

9   Q    I'm showing you 5.3.  I'm going to go ahead and zoom in

10  for you.  Was this email actually on the defendant's Gateway?

11  A    It was recovered.  Yes, it was on it.

12  Q    What do you mean "recovered"?

13  A    So when you delete something, there's a file that tracks

14  that.  So it was allowed to be overwritten but had not been

15  overwritten yet.  And this file can be discovered when there's

16  enough data to still observe it correctly.

17  Q    Can you tell us the "from" in this email?

18  A    Gregory Williamson.

19  Q    And what email address?

20  A    Williamson_Gregory@hotmail.com.

21  Q    When was it sent?

22  A    5/20/2020.

23  Q    And who was it to?

24  A    Deea.Apostol1782@gmail.

25  Q    What is the subject line?

DIRECT EXAMINATION OF LEE WALLACE

1   A    "Pay close attention."

2   Q    And what does the body of the email contain?

3   A    The body?

4   Q    Yes.

5   A    It is a hot link to veryfreeporn.com and one of the

6   videos.

7   Q    And what is the signature line on this email?

8   A    Gregory Williamson.

9   Q    What about that phone number?

10  A    (561)430-1142.

11  Q    Are you aware if that's Gregory Williamson's phone

12  number?

13  A    Yes.

14  Q    How do you know that?

15  A    Through the case agent.

16  Q    I'm going to show you 5.3A.  This appears to be the same

17  email, but it looks to be in a different format.  Can you

18  explain that, please?

19  A    So when we tag evidence or items of interest, the tool

20  can export those items into this readable fashion into a PDF

21  so more details can be shown.

22  Q    Did you visit the link in this email?

23  A    Yes.

24  Q    Where did it take you?

25  A    The link in the email was followed.  And the landing page

DIRECT EXAMINATION OF LEE WALLACE

1  was a collage of pornographic videos at veryfreeporn.com.

2  Q    And I see that there is a local time translation.  Can

3  you explain that?

4  A    Right.  So returns are brought to us in UTC, which is

5  standard time in the UK.  And at this time we were UTC minus

6  four.  So basically that's a conversion to our time, just to

7  depict that properly.

8  Q    I'm going to show you Exhibits 5.4, 5.5, 5.6 and 5.7.  Do

9  you recognize these?  I will give you a minute to look through

10  each one, please.

11  A    Yes.

12  Q    What do you recognize them to be?

13  A    All email related.

14  Q    Did you generate these reports from the forensic tool,

15  the Gateway?

16  A    Yes.

17  Q    And are they interpretations of the email and email

18  artifacts from the Gateway?

19  A    Yes.

20  Q    Are they directly from that forensic image?

21  A    Yes.

22  Q    Do they appear to be fairly and accurately depicting the

23  emails parsed from the Gateway?

24  A    Yes.

25         MS. FAVORIT:  Your Honor, at this time I'm offering

DIRECT EXAMINATION OF LEE WALLACE

1    5.4, 5.5, 5.6, and 5.7 into evidence.

2            THE COURT:  Admitted.

3            MS. FAVORIT:  Permission to publish?

4            THE COURT:  Yes.

5    BY MS. FAVORIT:

6    Q    I'm going to show you 5.4.  What is your understanding of

7    this?

8    A    From Gregory Williamson's hotmail.  That's an attachment.

9    Q    Do you know who's in that photo?

10   A    Deea.

11   Q    And that's his stepdaughter?

12   A    Yes.

13   Q    What are these details telling us?

14   A    That it is file name 2.JPEG, has a subject, has to and

15   from, email addresses.

16   Q    And does it show that it had an email attachment?

17   A    Yes.

18   Q    Who sent this email?

19   A    It's Williamson_Gregory@hotmail.com.

20   Q    And who was it addressed to?

21   A    Deea.Apostol1782@gmail.com.

22   Q    When was this sent, if you're able to tell?

23   A    November 17, 2020.

24   Q    What is the subject line?

25   A    "Whatever you are doing, you better stop before your

DIRECT EXAMINATION OF LEE WALLACE

1  mother finds out."

2  Q    Had you seen this photo before?

3  A    Yes.

4  Q    Where?

5  A    I had seen a similar photo, like sort of like I call it a

6  set.  You know, the color balance was the same, same sort of

7  setting in his Samsung.

8  Q    Is that the cell phone?

9  A    Yes.

10 Q    I will show you 5.5.  I'm going to zoom in.  Can you tell

11 me what this is?

12 A    Data from an email.

13 Q    Who is it from?

14 A    Williamson_Gregory@hotmail.com.

15 Q    When was it sent?

16 A    8/3/2020.

17 Q    Who was it to?

18 A    Deea.Apostol1782@gmail.com.

19 Q    What is the subject?

20 A    "Muah."

21 Q    And the content of the email?

22 A    "Love you beautiful."

23 Q    Was this email actually on the defendant's Gateway?

24 A    Yes.

25 Q    I'm going to show you 5.6.  Can you tell us what this

DIRECT EXAMINATION OF LEE WALLACE

1  artifact information is showing us?

2  A    It's showing Vladlover50 being related to the Google

3  Chrome browser.

4  Q    Is google Chrome like an Internet search tool?

5  A    It is a browsing tool to access websites.

6  Q    Is this showing that the Vladlover50 was utilized on the

7  Google Chrome on the Gateway?

8  A    Yes.  It shows -- it has a history of that login at Yahoo

9  with Vladlover.

10  Q    What does the date range mean for this?

11  A    On the left side?

12  Q    Yes, if anything?

13  A    It's saying that this particular record was written to

14  the file system on 9/10 of 2020.

15  Q    Does that mean it's the only dates this email was used?

16  A    No.

17  Q    I'm going to show you 5.7.  What is this we are looking

18  at?

19  A    So we have two things here.  We have on the left a Chrome

20  record related to Chrome -- an email artifact related to

21  Chrome logging in.  And on the right is more Chrome.  And it

22  is considered a history of login.

23  Q    Can you tell me what email login this artifact is

24  showing?

25  A    It's Vladlover40.

DIRECT EXAMINATION OF LEE WALLACE

1 Q    So is that slightly different than Vladlover50?

2 A    Yes.

3 Q    So is that two different emails?

4 A    Yes.

5 Q    Is this demonstrating evidence of the Vladlover40 on the

6 Gateway?

7 A    Yes.

8 Q    I'm going to show you 5.8 and 5.8A.  Do you recognize

9 these exhibits?

10 A    Yes.

11 Q    What do you recognize them to be?

12 A    Child pornography.

13 Q    And is 5.8A the same piece but redacted?

14 A    Yes.

15 Q    Did you generate these from the Gateway computer?

16 A    Yes.

17 Q    Can you please describe the image?

18 A    A male, adult male leaning back.  You can see his torso.

19 There is an approximate three to five-year old female under

20 his arm and holding his penis.

21 Q    And if you give me a moment, I'm actually going to hand

22 you all of the next couple exhibits to save some time.

23        I'm going to show you 5.10, 5.10A, 5.11, 5.11A, 5.12,

24 5.12A, 5.14, 5.14A.  I'm going to give you a moment to look

25 through those exhibits, please.  I'm also going to hand you

DIRECT EXAMINATION OF LEE WALLACE

1  5.14B, 5.15, 5.15A, and 5.15B.  Did I already hand you 5.15?

2  A    It appears so.

3  Q    Okay.  Can you confirm you have 5.9, 5.10, 5.11, 5.12,

4  5.14, 5.15?

5  A    Yes.

6  Q    And all the redacted things associated with it?

7  A    Yes.

8  Q    How do you recognize these exhibits?

9  A    I made them.

10  Q    Were they generated from the forensic image of the

11  Gateway computer?

12  A    Yes.

13  Q    And are they directly parsed from that?

14  A    Yes.

15  Q    Do they fairly and accurately depict the photos and

16  artifacts that you parsed from the Gateway --

17  A    Yes.

18        MS. FAVORIT:  Your Honor, at this time I'm offering

19  5.9, 5.9A, 5.10, 5.10A, 5.11, 5.11, 5.12, 5.12A, 5.14, 5.14A,

20  5.14B, 5.15, 5.15A, and 5.15B into evidence.

21        THE COURT:  Admit.

22  BY MS. FAVORIT:

23  Q    I want to start with 5.9.  I got ahead of myself.  5.8.

24  Will be the first published.

25        Permission to publish the child pornography, Your

DIRECT EXAMINATION OF LEE WALLACE

1   Honor?

2           Can you see if I stand here?

3   A    Yes.

4   Q    What do you recognize this image to be?

5   A    The image I previously described.

6   Q    And based on your training and experience, how did you

7   proximate the age of this child?  Under --

8   A    I'm thinking 3 to 5.

9   Q    I'm going to go ahead and show 5.9.  Again, is this

10  another image from that computer?

11          5.10., 5.11, 5.12, 5.14, 5.15.  Thank you.

12          I'm going to work with the redacted images and talk

13  about them that way.  I'm going to show you 5.8A.  What do

14  these artifacts tell us?

15  A    It tells us that it was recovered from the forensic

16  image.

17  Q    And 5.9A, is it similar?

18  A    Yes.

19  Q    Did you recognize any of these images when you were

20  looking through the Gateway of the child pornography?

21  A    Yes.

22  Q    What did you recognize them from?

23  A    The email return.

24  Q    Did some of these photos include sexual abuse of minors?

25  A    Yes.

DIRECT EXAMINATION OF LEE WALLACE

1  Q    5.10A, again is it just similar artifacts?

2  A    Yes.

3  Q    5.11A.  Is that the same thing?

4  A    Yes.

5  Q    5.12A.  Why are these artifacts generated along with

6  these images when you create these reports?

7  A    There is enough data left behind in these records to give

8  us some of the data.  In this case it doesn't have all the

9  data, but the damage is still there.

10 Q    5.14A, do you recognize this particular image?

11 A    Yes.

12 Q    I'm going to show you 5.14B.  Okay?

13     Can you tell me, it says, "User activity before."

14 What does that mean?

15 A    This was user activity that was related to the time frame

16 of the image that you just showed.

17 Q    So it relates back to 5.14?

18 A    Yes.

19 Q    I'm going to zoom in on this blue highlight.  Can you

20 tell me what this represents?

21 A    Chrome browser activity.

22 Q    Does the date relate back to that image?

23 A    Yes.  That time frame, yes.

24 Q    What was going on on Chrome related to that image?

25 A    It appears to be going to xmikka.com.

DIRECT EXAMINATION OF LEE WALLACE

1  Q    Did you follow that link?

2  A    Instead of following it, I put xmikka into the Google

3  just to see kind of what it would describe, what would be

4  there.

5  Q    Is this what appeared?

6  A    Yes.

7  Q    Could you read that to me, the title?

8  A    X videos teen, free movies, young porn zone, our source

9  present young, teenage models, awesome hot porn for viewing.

10  Freshest juicy girls and strong hard young cocks sex movies.

11  And that's to Xvideosteens.pro.

12  Q    And then we have report activity for a file name.  And

13  could you tell us what the file name is and what it

14  represents?

15  A    So that image that we are speaking of previous to this

16  right here, it was sent to the recycle bin.  And if you see

17  the name, it says "$R."  And we located that in the recycle

18  bin on-scene.  And there's folder opening activity or file

19  opening activity.

20  Q    Just in case, can you explain what the recycle bin is?

21  A    In Windows when you delete, most people have the recycle

22  bin set to let it just go to the recycle bin.  You can clean

23  it out later.  Some people don't do that, but in this case,

24  default, it went to the recycle bin.  And the trash had not

25  been emptied yet.

DIRECT EXAMINATION OF LEE WALLACE

1              So when it goes to the recycle bin, the file system

2    changes the name of the original file, puts this "$R" and it

3    makes an administrative file, which will be "$I" before giving

4    more data about it until it's completely deleted.

5    Q    I see there is user activity after.  Can you tell me what

6    this represents?

7    A    Chrome browser activity.

8    Q    And is this a timeline after the image was on the

9    computer?  I think I misspoke.  After the access date of that

10   image?

11   A    Right.  This is going to be a time frame after the

12   activity of that image.

13   Q    What do the artifacts show that someone was on the

14   computer searching for?

15   A    What I highlighted was "baby top video tgp loli."

16   Q    Based on your training and experience, what is loli?

17   A    Loli is a common search term for finding child

18   pornography on the Internet.

19   Q    Is it typically short for Lolita?

20   A    Yes.

21   Q    Is the name Lolita after a book?

22   A    Yes.

23   Q    Are you aware of that book?

24   A    Yes.

25   Q    What is that book about?

DIRECT EXAMINATION OF LEE WALLACE

1  A    I haven't read it, but cliff notes is, from what I

2  understand, a gentleman is infatuated with one of the family

3  members, a young juvenile in the family.

4  Q    I'm going to show you Exhibit 5.15A.

5       Actually, I notice this was continued, sir, so I'm

6  going to stay on 5.14B, page 5.  What is this highlighted?

7  A    That is browser history, and it appears to be related to

8  an email address.

9  Q    What is the email address?

10  A    Dispatch@heavytransport.org - heavy transport mail.

11  Q    Are you aware of what Gregory Williamson did for a

12  living?

13  A    Yes.

14  Q    What is that?

15  A    Dispatching heavy equipment or purchasing it and working

16  in that field.

17  Q    Do you know whose email address or link that is, the

18  dispatch?

19  A    I don't know.  I didn't work with that one.

20  Q    And is the time in relation to that child pornography

21  photo from 5.14?

22  A    Yeah.

23  Q    And I'm going to show you 5.15A.  Was this that last

24  image of child pornography we looked at?

25  A    Yes, yeah.

DIRECT EXAMINATION OF LEE WALLACE

 1   Q    Is, again, this the artifact data?

 2   A    Yeah.  That's artifact data to that file.

 3   Q    Is that the child pornography image from 5.15?

 4   A    Yes.

 5   Q    And what is the date associated with this child

 6   pornography?

 7   A    1/27/2021.

 8   Q    I'm now going to show you 5.15B.  Is this a similar user

 9   activity report that we had been discussing?

10   A    Yes.

11   Q    Now, does this activity report relate to 5.15?

12   A    Yes.  1/27/2021.

13   Q    I'm just going to click on a couple of these to

14   highlight.  Can you read us a few of the host names?

15   A    Yes.  So these are cookies related to going to

16   topyoungvirgin.com, dirtyselfieshots.com, teen-fucks.net,

17   multiple cookies for that.

18   Q    What is a cookie?

19   A    It's a file that's tossed in your computer so the

20   computer can recognize you when you return.

21   Q    Does this mean that the websites were visited?

22   A    Very likely, yes.

23   Q    Does this demonstrate that the file image of child

24   pornography was recorded on the file system around the same

25   time as this activity?

DIRECT EXAMINATION OF LEE WALLACE

1  A    Well, that's browser history related to that time frame.

2  So very likely.

3  Q    Can you read me a couple of these websites, please?

4  A    Amateurpornalbums.com and nanabook.com.

5  Q    How about some of these, please?

6  A    Littlebreepics, secretphoto.top, lustteens.net, several,

7  then daddyimg.top, youngpicture.top.

8  Q    I see another highlighted marker here.  Can you please

9  explain this?

10  A    That is a Windows link file to a PPP Borrower Application

11  Form.

12  Q    What does that mean, if you know?

13  A    I don't know.  I don't know what that form looks like,

14  but it is included as a link file to something that's likely

15  related to business.

16        MS. FAVORIT:  May I have a moment, Your Honor?

17        THE COURT:  Yes.

18  BY MS. FAVORIT:

19  Q    All of the last child pornography that we went over, did

20  they all come from the Gateway?

21  A    Yes.

22  Q    And we discussed log-ins.  I believe it was 5.2.  It's

23  not 5.2.  That's the entire report, but the log-ins that we

24  discussed with Gregory Williamson as the user for the

25  computer, was this child pornography in Chrome browser under

CROSS-EXAMINATION OF LEE WALLACE

1   that log-in?

2   A    User PC Gateway?

3   Q    Yes.

4   A    Can I refer to real quickly on that one?

5   Q    Yes, please.

6        I'm going to show you 5.13.  This is the log-in

7   information.  Does this refresh your recollection?

8   A    Your original question was?

9   Q    Was the child pornography found under this log-in, or do

10  we know that?

11  A    Due to the nature of the recovery of the images, you

12  can't determine that.

13  Q    Okay.  Thank you.

14       MS. FAVORIT:  I have no further questions.

15       THE COURT:  All right.  Cross, please?

16                    **CROSS-EXAMINATION**

17  BY MR. BRUNVAND:

18  Q    Good morning.

19  A    Good morning, sir.

20  Q    We can agree that some of the images that we just saw are

21  horrific, right?

22  A    Yes, sir.

23  Q    And sad?

24  A    Yes, sir.

25  Q    Unfortunately, a lot of these images, be it photographs

CROSS-EXAMINATION OF LEE WALLACE

1  or video, are created in third-world countries.  Do you agree

2  with that?

3  A    They can be.

4  Q    A lot of them are.  Can you agree with that?

5  A    I can agree with that.

6  Q    The production of a lot of child pornography, the

7  children that are being abused frequently happens in Eastern

8  Europe, right?

9  A    It can be, yes, sir.

10  Q    Sure.  Sure.  The consumers tend to be in the United

11  States and Western Europe, right?

12  A    Yes, sir.

13  Q    But frequently the abuse and the victims are in Eastern

14  Europe and South America and Asia, agree?

15  A    Yes, sir.

16  Q    You indicated that the images that we just looked at that

17  were recovered from the Gateway computer, you could not tell

18  whether or not those images were placed there or downloaded to

19  the computer by what user, right?

20  A    Correct.

21  Q    Okay.  So any one of the people who were the users of

22  that computer could have downloaded those images, correct?

23  A    Yes.

24  Q    And with the exception, I think there was maybe one image

25  that you talked about, where you indicated that it appeared

CROSS-EXAMINATION OF LEE WALLACE

1  that it was in the deleted folder or the recycle bin?

2  A    Yes.

3  Q    The others, do you know what folders they were in?

4  A    No.

5  Q    Can you tell who viewed those images?

6  A    No.

7  Q    Can you tell if they were viewed?

8  A    No.

9  Q    In fact, if any of them were received via email, could

10 they potentially have gone to a junk folder and then gone into

11 the recycle bin without even being viewed?

12 A    When it comes to that recycle bin image, that would have

13 had user manipulation.  The account would have had to have

14 been humanly --

15 Q    So not automatic on that?

16 A    No.

17 Q    Can we agree that as to the emails that were referenced

18 on direct examination, the Vladlover40, Vladlover50, Greg

19 Williamson, all the emails that were there could be emails

20 that Mr. Williamson used and actually accessed, right?

21 A    Yes.

22 Q    Could also be those were accessed by others, right?

23 A    The computer was password protected, so they didn't know

24 it.

25 Q    Well, I mean, anyone else who might have had access to

CROSS-EXAMINATION OF LEE WALLACE

1  the password, for example, would be able to use it, right?

2  A    Correct.

3  Q    Anyone in the household who had access to the password

4  would be able to access the information, yes?

5  A    If they knew the password.

6  Q    Right.  Right.  And they would be able to send emails as

7  if they were Greg Williamson, right, if they had the password?

8  A    And if they had the email passwords as well.  If they

9  logged them out, they would have to log back in.

10 Q    Sure.  So anyone in the household would be able to do

11 that, right?

12 A    With the password, yes, sir.

13 Q    In your background as a forensic investigator involving

14 computers and the Internet, you are familiar with the concept

15 of compromised emails, right?

16 A    Yes.

17 Q    And compromised emails, basically someone from outside of

18 the home, if an email is compromised, can access the email and

19 use the email as if it was their own, right?

20 A    Potentially, yes.

21 Q    So, I mean, someone could be in Eastern Europe or Asia or

22 South America and they could access a computer in the United

23 States in someone's home and send emails from that location,

24 right, if it's compromised?

25 A    A web-based email can be logged in somewhere else, yes.

CROSS-EXAMINATION OF LEE WALLACE

1    Q    Sure.  And Gmail emails are web based, right?

2    A    Yes, sir.

3    Q    Yahoo emails are web based, right?

4    A    Yes.

5    Q    Are there emails that are not web based?

6    A    When they are app based, like Outlook when you run an app

7    and you actually install the certain protocols for sending and

8    receiving.  It won't be web based.  Your old-fashioned emails,

9    in other words before Microsoft 365, you had to configure an

10   email client with all the data to send and receive, yes.

11   Q    Right.  But within the recent years, aren't they all

12   pretty much web based?

13   A    That's the new thing, yes.

14   Q    When you first accessed the Gateway computer that's on

15   the table up there -- you looked at it earlier, right?

16   A    Yes, sir.

17   Q    When you first accessed that, were you wearing gloves?

18   A    No, sir.

19   Q    When you touched it?  No?

20   A    (Witness shakes head.)

21   Q    Is that because you don't have a concern about touch DNA

22   or fingerprinting, or is that processed before you get it?

23   A    Due to the fact that I've got to use tools, it's not

24   congruent with basically wearing a glove, so I didn't wear

25   them.

CROSS-EXAMINATION OF LEE WALLACE

1   Q    Sure.  But handling the items, certainly you could handle

2   it using gloves, right?

3   A    I could have.

4   Q    Latex gloves?

5   A    I can't recall if I took it to the van to take it apart

6   with gloves on or not.

7   Q    So you may have used gloves when you first picked it up?

8   A    Possibly.

9   Q    Don't recall?

10  A    Don't recall.

11  Q    Normally when you're picking up evidence at a scene,

12  would you not normally wear latex gloves to make sure that you

13  don't compromise the evidence?

14  A    Yes.

15  Q    So likely that you probably wore gloves at that point in

16  time?

17  A    I can't recall.

18  Q    Sure.  Understood.  Then when it comes to -- once it's

19  been collected and it comes to you in the laboratory, do you

20  recall whether or not you might have initially at that point

21  worn gloves?

22  A    Not -- only would wear gloves in the lab if there was a

23  concern of fentanyl or something that's hazardous to us.

24  Q    Okay.  Not touch DNA?

25  A    No, sir.

CROSS-EXAMINATION OF LEE WALLACE

1    Q    Not fingerprints?

2    A    No, sir.

3         MR. BRUNVAND:  Could we put up Exhibit 5.4.

4    BY MR. BRUNVAND:

5    Q    The image that we are seeing on page 2, I think, of 5.4,

6    you indicated to the jury that that is who?

7    A    Deea.

8    Q    Deea, okay.  And Deea is Greg Williamson's stepdaughter,

9    right?

10   A    Yes, sir.

11   Q    And are you able to tell when that photo was taken?

12   A    So the details of this particular exhibit is related to

13   the dates of the email.  So I don't know the date on the photo

14   itself.

15   Q    If you look carefully on the photo itself in the lower

16   left corner, do you see 13, space 3, space 20?

17   A    In the yellow?

18   Q    In the yellow?

19   A    Yes.

20   Q    And might that be March 13, 2020?

21   A    If that stamp was correct, yes.

22   Q    Right.  Because we know we don't have 13 months in the

23   year, so it couldn't be -- the first number has to be the day

24   of the month, right?

25   A    Right.  Some devices and tools can -- you can -- it's

CROSS-EXAMINATION OF LEE WALLACE

1  your preference.  I mean, obviously the preference was set

2  with whatever took that.  You could have it the other way

3  around.

4  Q    Sure, sure.  So that might be March 13, 2020, when the

5  photo was taken?

6  A    I don't know, sir.

7  Q    Okay.  Well, can we agree that the numbers on there is

8  13, 3, 20, right?

9  A    Yes.

10 Q    That certainly could be for the 13th day of the third

11 month of 2020?

12 A    Yes, sir.

13 Q    That's consistent with what we sometimes see on these

14 type of images, right?

15 A    I don't see stampedes, like time stamps on images very

16 often.

17 Q    Could we agree that this appears to be a selfie of sorts?

18 A    Yes.

19 Q    And can we agree that the message from what appearances

20 to be Gregory Williamson is, "Whatever you're doing, you

21 better stop before your mother finds out"?

22 A    Yeah.  Yes, sir.

23 Q    Okay.  And again, we can agree that the fact that the

24 email is from Gregory Williamson may or may not mean that the

25 email came from Gregory Williamson, right?

REDIRECT EXAMINATION OF LEE WALLACE

1  A    Well, your details below there, you'll see the email

2  addresses.

3  Q    Sure, sure.  But whoever would have accessed -- like we

4  spoke about this earlier.  Just because it has someone's name

5  in the email doesn't mean that that person is the one that

6  actually sent the email, right?  If they have the log-in

7  information?

8  A    Yes.

9  Q    Or if it was a compromised email, right?

10  A    Yes, sir.

11  Q    Either of those scenarios, it would be someone else

12  sending the email, right?

13  A    Possibly, yes.

14  Q    The message here, you better stop before your mother

15  finds out, sounds like that might be from Gregory Williamson

16  himself, right?  Do you agree?

17  A    Yes, sir.

18        MR. BRUNVAND:  Can I have a moment, please?

19        That's all I have.  Thank you.

20        THE COURT:  Redirect, please?

21                    **REDIRECT EXAMINATION**

22  BY MS. FAVORIT:

23  Q    I wanted to ask you about compromised emails.  Do you

24  have any familiarity with those?

25  A    I have not studied the forensic investigation aspect of

REDIRECT EXAMINATION OF LEE WALLACE

1  that field, no.

2  Q    What about your training and experience as a computer

3  user and law enforcement officer?

4  A    So generally if anybody gets compromised, the technique

5  is the bad guy is going to change your password and you're no

6  longer going to have access to that anymore.  So if you were

7  compromised, there is going to be Internet addresses recorded

8  generally by the electronic service provider, which is Yahoo,

9  that something weird is occurring instead of your common

10  Internet protocol address coming from your home or whatever

11  your common device is, your access to the Internet, and it can

12  be flagged.  They can be halted, reported, and you know,

13  generally they would know about it.

14  Q    You said Internet protocol address.  Is that what we've

15  been calling IP address?

16  A    Yes.

17  Q    If an email account was compromised, would the IP address

18  change from an email location if it's somewhere else?

19  A    It would change on the electronic service provider side.

20  They would see -- they would record this new log-in IP.  And

21  we have seen that.  We see that in cyber tips when accounts

22  get compromised.  It is a very distinct IP change.

23  Q    So an electronic service provider like Yahoo?

24  A    Yes.

25  Q    I wanted to reference back to the two hard drives that

REDIRECT EXAMINATION OF LEE WALLACE

1  were collected; first, the Seagate that we discussed.  Were

2  those connected to a computer at some point in order to have

3  data on them?

4  A    Yes.  So the Seagate appeared to be a driver moved from

5  an old computer because it had folders that are consistent

6  with Windows and being run on another computer.  It was

7  probably discarded.

8  Q    So the Seagate appeared to be from an old computer?

9  A    Yes.

10 Q    And that Acer tower that had the evidence of Vladlover,

11 is that also an older computer or was it a present computer?

12 A    I don't know if that started.  There was a monitor right

13 next to it with peripherals, so it was probably an operational

14 machine.

15 Q    I want to ask you about why you might not use gloves when

16 you're at a search warrant and you're doing digital forensics.

17 A    So we weren't at a home related to narcotics or drugs.

18 And if I took the computer with gloves over to where I worked

19 in the back of a crime scene van, I may have.  But if I'm --

20 generally to manipulate these things properly, not to drop

21 something, I mean, I'm handling a hard drive that is now very

22 valuable, I may not wear them because the likelihood of a

23 print on a drive that has never been removed, you know, I'm

24 not worried about that.

25          And if there is concern of fingerprinting DNA, that

REDIRECT EXAMINATION OF LEE WALLACE

1  is processed by crime scene prior to coming to me.  So that

2  would have been recorded if it was a concern.

3  Q    And in a shared household where you are seeking digital

4  evidence, where do you expect to find the evidence?

5  A    On the storage media.

6  Q    And that's within the computer?

7  A    Correct.

8  Q    So like that's just the monitor.  The actual data is

9  inside it?

10 A    That, yeah, that housing is difficult to access to the

11 hard drive that's inside.  It was not easy to access.

12 Q    And just for a quick example, this laptop that I'm

13 holding here, is there a hard drive somewhere within it?

14 A    There is either a hard drive or a solid state drive.

15 Yeah, there is some sort of storage media inside.

16 Q    And just to address 5.4, I want to talk about the date of

17 the image that we are discussing.  This date was not generated

18 by any of your tooling, was it?

19 A    No.

20 Q    In order to find out the true date that the photo was

21 taken, would you need to look at metadata of the photo itself?

22 A    Yes.

23 Q    But this isn't the origin of the photo.  Was it in an

24 email?

25 A    It was an attachment.  So if that image had been trimmed

REDIRECT EXAMINATION OF LEE WALLACE

1   down, it can lose its metadata as it progresses through

2   devices or apps or web, you know, Facebook and all these other

3   social media accounts.  You upload a photo, it's going to

4   scrub the metadata from it for your own safety.

5   Q    And just to be clear, was this -- who was this sent from

6   and to?

7   A    It's from WilliamsonGregory@hotmail to

8   DeeaApostol1782@gmail.

9   Q    Was this an email where you would include an attachment

10  and it includes a photo?

11  A    Correct.  You would attach that.  2.JPEG appears to be

12  the file name of that.

13          MS. FAVORIT:  I have no further questions, Your

14  Honor.

15          THE COURT:  Thank you.  You may step down.

16          And, Counsel, who is your next witness?

17          MS. FAVORIT:  We have a very brief witness next.

18          THE COURT:  Let's take that brief witness now.  Thank

19  you.

20          MS. SCHMIDT:  Thank you, Your Honor.  The United

21  States would call Brooke Buzzle.

22          THE COURT:  All right.  Thank you.

23          THE COURTROOM DEPUTY:  Please raise your right hand

24  and be sworn.

25      (Witness sworn.)

DIRECT EXAMINATION OF BROOKE BUZZELL

1          THE COURTROOM DEPUTY:  Please state your full name

2    and spell your last name for the record.

3          THE WITNESS:  Brook Buzzell, B-U-Z-Z-E-L-L.

4          THE COURTROOM DEPUTY:  Thank you.  You may be seated.

5    **BROOKE BUZZELL, CALLED BY THE GOVERNMENT, SWORN**

6                   **DIRECT EXAMINATION**

7    BY MS. SCHMIDT:

8    Q    Good morning, Ms. Buzzell.  Where do you currently work?

9    A    The Sarasota County Sheriff's Office.

10   Q    And how long have you worked at the Sarasota County

11   Sheriff's Office?

12   A    Nine years.

13   Q    What is your current position?

14   A    I'm a digital forensic examiner.

15   Q    How long have you been a digital forensic examiner?

16   A    Since 2019.

17   Q    And what are your concurrent duties in that role?

18   A    I perform intake examinations.  I assist with basically

19   anything involving electronics.

20   Q    And what do you mean by "electronics"?

21   A    Things such as SD cards, cell phone, computers, scanners.

22   Q    To become a digital forensic examiner, do you need

23   specialized training?

24   A    I attended and I got my CFCE, which is a Certified

25   Forensic Computer Examiner through IACIS.

DIRECT EXAMINATION OF BROOKE BUZZELL

1  Q    Have you received other training?

2  A    Yes.  I have received multiple trainings.  I've attended

3  NCFI, which was the National Computer Forensic Institute

4  through the United States Secret Service.  I'm sorry.  Lots of

5  acronym.  I hold several GIACs.  So those are global trainings

6  from SANS which is a recognized institution.  I have battle

7  field forensics, which is computers; smartphones forensics;

8  and I just recently got my Mac and iOS forensic certification

9  GIAC.

10 Q    Do you continue training to keep up those certifications?

11 A    Yes.

12 Q    If you could ballpark, how many forensic examinations

13 have you conducted in your career?

14 A    I performed intake examinations, lots of intake.  I would

15 say hundreds if not thousands of devices.

16 Q    And how many cell phones have you performed extractions

17 on?

18 A    I would say hundreds.

19 Q    And have any of those forensic extractions involved

20 devices that potentially contained child pornography?

21 A    Yes.

22 Q    How many?

23 A    I would also say I would rank that in the hundreds since

24 we acquire a large amount of devices from cases with C-SAM.

25 Q    When you say C-SAM?

DIRECT EXAMINATION OF BROOKE BUZZELL

1  A    Child pornography or contraband.

2  Q    And what is your general process when you receive a phone

3  for forensic extraction?

4  A    Well, I would retrieve it from our evidence locker.

5  Generally we get a ticket or somebody requesting help.  I

6  would note the device.  I would take pictures of the device.

7  I would note information notably on the outer of the device

8  such as the IMEI, so the identifier and serial numbers,

9  markings.

10       I would then select a tool which I think would most

11 likely obtain the most full extraction, so the best digital

12 representation of the device.  So in this case I used

13 Cellebrite, which is a widely recognized tool, and it was able

14 to connect to the device and obtain extraction.

15 Q    I'm going to take one step back.  If you could explain,

16 what is Cellebrite?

17 A    So Cellebrite is a tool.  They are actually a company as

18 well.  Well, they are a company.  The tool they offer they

19 call the UFED.  So Cellebrite is a ginormous corporation.

20 They offer a lot of forensic capabilities.  I like them a lot.

21 They are widely known is what I'm trying to say.

22 Q    And is the Cellebrite tool a forensically reliable tool

23 for cell phone extractions?

24 A    Yes.  It's used by thousands of agencies all over the

25 world.

DIRECT EXAMINATION OF BROOKE BUZZELL

1  Q    And when you are using the Cellebrite tool, how do you

2  ensure that the images or extraction accurately copies the

3  data on the phone?

4  A    So what the tool does, in order to answer that question

5  most fully, is that the tool attempts to form a handshake or a

6  connection with the device saying, trust me, I'm your friend,

7  and it attempts to copy as much data as possible.

8  Q    And how do you ensure that the data collected during that

9  handshake is an accurate copy of what was on the phone?

10  A    To call things a copy would be hard to say just because

11  you can't obtain, like, a mirror image, because the phone is

12  giving you what it is able to.  So I can't copy, like, the

13  entire hard drive per se on the phone.  I have to request the

14  phone give me as much as possible.  So you can perform

15  multiple extractions, but since data on the drive -- without

16  getting super technical.  If I need to elaborate, please let

17  me know -- just because data on the phone is consistently

18  changing, minute changes more or less, you know, cleaning up

19  the phone, making things more efficient just because something

20  small may be overwritten or written such as a time or whatnot.

21  So data can be consistently changed.  You would look at the

22  data further on during an examination to validate the data.

23  Q    So if you were using the Cellebrite tool and there was a

24  glitch, would you get some sort of notification?

25  A    Yes.

DIRECT EXAMINATION OF BROOKE BUZZELL

1          THE COURT:  Counsel, I'm getting an indication that

2   one or more of us needs a comfort break.  I'm sorry.  It is

3   about time for that morning break.  So why don't we just take

4   a nice break.  We'll break all the way up to 11:00, a big,

5   full morning break and see you back here at 11:00.

6          Thank you very much, ladies and gentlemen.

7      (Jury escorted out of the courtroom.)

8          THE COURT:  We got a note from a juror that somebody

9   needed to go to the facility.

10          I'm just trying to think mechanically.  Are we going

11   to do this at some point, this, whatever you want to call it,

12   emotional support animal?  Is that next?  When do you think

13   that will be?

14          MS. FAVORIT:  I think that will be next.

15          THE COURT:  So we will excuse the jury just for a

16   minute and bring in the witness and the -- how big is the dog,

17   by the way?

18          MS. FAVORIT:  It's a golden retriever.

19          THE COURT:  I love dogs.  I'm a big dog guy.  And

20   then the thought is the dog hopefully will just stay in the

21   jury box at her feet, so to speak.

22          MS. FAVORIT:  Yes.  And you will probably forget the

23   dog is there.

24          THE COURT:  Famous last words.  Well, that's good.

25   Presently our -- you certainly don't need to know this.  Our

DIRECT EXAMINATION OF BROOKE BUZZELL

1  dog is pawing about every five minutes.  Our dog will start

2  in.

3          Good enough.  So we will do this and take a super

4  quick break and then bring her in.  Is the dog nearby?

5          MS. FAVORIT:  Yes.  In this room.

6          THE COURT:  Okay.  Thank you.

7      (Recess taken.)

8          THE COURT:  Thank you, ladies and gentlemen.

9          MS. SCHMIDT:  May I proceed, Your Honor?

10         THE COURT:  Yes.

11 BY MS. SCHMIDT:

12 Q    Did your lab receive a cell phone for forensic extraction

13 on January 27, 2021?

14 A    Yes.

15 Q    How did that cell phone get to your lab?

16 A    It was brought by North Port.

17 Q    And where was it placed inside your lab?

18 A    Our evidence locker.

19 Q    And is that locker secure?

20 A    Yes.

21 Q    And at some point did you retrieve the phone from that

22 locker?

23 A    Yes.

24 Q    Before you could perform the extraction, did the phone

25 need to be unlocked?

DIRECT EXAMINATION OF BROOKE BUZZELL

1  A    Not necessarily.

2  Q    In this case was the phone locked?

3  A    Yes.

4  Q    Were you provided the security password to the phone?

5  A    I was not provided the passcode.

6  Q    How did you get the phone unlocked?

7  A    So I did not need to have the phone unlocked.  So that is

8  a great capability that Cellebrite offers.  There are exploits

9  available that allow us to bypass security on the device and

10 obtain extraction without needing the passcode.

11 Q    And so were you able to access the data on the device?

12 A    Yes.

13 Q    At that point did you perform an extraction on that cell

14 phone?

15 A    Yes.

16         MS. SCHMIDT:  Permission to approach, Your Honor?

17         THE COURT:  Yes.

18 BY MS. SCHMIDT:

19 Q    I've handed you what has previously been admitted as

20 Government's Exhibit Number 6.  Do you recognize this item?

21 A    Yes.

22 Q    What is it?

23 A    It's a Galaxy Note 8.

24 Q    Was this the cell phone that you received from the

25 evidence locker?

DIRECT EXAMINATION OF BROOKE BUZZELL

1  A    If you have my report, I can reference the IMEI number on

2  the back.

3  Q    Would that help refresh your recollection?

4  A    Yes, it would.

5        MS. SCHMIDT:  Permission to approach, Your Honor.

6  BY MS. SCHMIDT:

7  Q    And I will have you just read it silently to yourself.

8  And when you've read it and your recollection has been

9  refreshed, if you will just put that down and I will reask my

10  question.

11        Was this the cell phone that you received from the

12  evidence locker?

13  A    Yes.

14  Q    And is this the cell phone that you performed the

15  extraction on?

16  A    Yes.

17  Q    What did you do next?

18  A    I placed the extracted data on a hard drive.

19  Q    I'm going to back up.  Can you explain exactly how the

20  extraction works once you had the cell phone?

21  A    I basically plugged it into our tool.  It said I can

22  complete an extraction of this device.  I'm able to bypass the

23  passcode.  I said, that sounds good.  And then I downloaded

24  the data or it downloaded the data.  And then once the data

25  was downloaded, I placed it on an external drive.

DIRECT EXAMINATION OF BROOKE BUZZELL

1          MS. SCHMIDT:  Permission to approach, Your Honor.

2   BY MS. SCHMIDT:

3   Q    I have handed you what's been marked as Government's

4   Exhibit 6.1.  Do you recognize Government Exhibit 6.1?

5   A    I do.

6   Q    What is it?

7   A    It's an exterior hard drive.

8   Q    What is it an external hard drive of?

9   A    It's the hard drive containing the extraction of the

10  device.

11  Q    And how do you know that?

12  A    There is a piece of tape with my initials on it and my ID

13  number.

14  Q    And so this device, that includes the extraction from the

15  Samsung cell phone?

16  A    Yes.

17          MS. SCHMIDT:  Your Honor, at this time we would offer

18  Government's Exhibit 6.1 into evidence.

19          THE COURT:  All right.  It's admitted.

20          MS. SCHMIDT:  Permission to publish, Your Honor?

21          THE COURT:  Yes.

22  BY MS. SCHMIDT:

23  Q    Now, Exhibit 6.1 is a hard drive.  Did you review any of

24  the data pulled from the cell phone?

25  A    I did not review any of the data.

DIRECT EXAMINATION OF BROOKE BUZZELL

1  Q    Why not?

2  A    It was an AOA, which is an assist other agency, so they

3  were basically just asking us to download the device for them.

4  Q    Is it common that you would only perform the extraction

5  to download the device but not actually review any of it?

6  A    Yes.  It's very common because we have access to some

7  very high quality, expensive equipment that surrounding

8  agencies don't, so we will do extractions for them.

9  Q    Were you able to confirm that the extraction worked

10 properly?

11 A    Yes.

12 Q    Did you memorialize the data extraction itself in a

13 report?

14 A    Yes.

15 Q    What did you do with the cell phone and the hard drive of

16 the extraction when you were complete?

17 A    I placed them in our evidence locker.

18 Q    And that evidence locker was secure?

19 A    Yes.

20 Q    Was that your conclusion of your role in this

21 investigation?

22 A    Yes.

23        MS. SCHMIDT:  One moment, Your Honor.

24        No further questions.

25        THE COURT:  Cross, please?

DIRECT EXAMINATION OF BROOKE BUZZELL

1            MR. BRUNVAND:  No cross.  Thank you.

2            THE COURT:  You may step down.

3            Ladies and gentlemen, I'm sorry to do this to you,

4    but I have the smallest, little housekeeping chore ninety

5    seconds before the next witness comes in.  So if you can just

6    step into the hall, please.  Don't get comfortable, and in the

7    next 90 seconds we will have that next witness.  I appreciate

8    it.

9        (Jury escorted out of the courtroom.)

10           THE COURT:  Let's seat them both.  Just bring them

11   both and set them down.

12           We will swear her in.  Just say remain seated.  Let's

13   bring in the jury, please.  Or just don't say anything.  So

14   we'll say, "Call the witness," and you simply say her name.

15   And then you can just stay seated and he can swear you in,

16   okay, as soon as the jury gets here.

17           Okay.  Thank you.

18       (Jury escorted into the courtroom.)

19           THE COURT:  And call your witness, please.

20           MS. FAVORIT:  The United States calls Deea Apostol.

21           THE COURT:  Can you swear Ms. Deea Apostol, please.

22       (Witness sworn.)

23           THE COURTROOM DEPUTY:  Please state your full name

24   and spell your last name for the record.

25           THE WITNESS:  Deea Apostol, A-P-O-S-T-O-L.

DIRECT EXAMINATION OF DEEA APOSTOL

```
 1              THE COURT:  Yes, ma'am.  You may proceed.

 2              MS. FAVORIT:  Thank you.

 3         DEEA APOSTOL, CALLED BY THE GOVERNMENT, SWORN

 4                     DIRECT EXAMINATION

 5   BY MS. FAVORIT:

 6   Q    Good morning.

 7   A    Good morning.

 8   Q    How old are you?

 9   A    I'm 16.

10   Q    Could you tell me what your date of birth is?

11   A    June 7, 2007.

12   Q    Your name is unique.  Do people spell it wrong sometimes?

13   A    Yes.

14   Q    What kind of pronunciations do you get?

15   A    Dea.

16   Q    Are you in school?

17   A    Yes.

18   Q    What grade are you in?

19   A    Tenth grade.

20   Q    Do you like school?

21   A    Yes.

22   Q    Can you tell me who you live with?

23   A    I live with my mom and my three siblings.

24   Q    How old are your three siblings?

25   A    My little brother and little sister are seven.  And my
```

DIRECT EXAMINATION OF DEEA APOSTOL

```
 1  little brother is four, five, about to turn five -- five about
 2  to turn six.
 3  Q    Are the seven year olds twins?
 4  A    Yes.
 5  Q    Is it safe to say you have a busy household?
 6  A    Yes.
 7  Q    Do you help take care of those kids sometimes?
 8  A    Yes.  Whenever my mom needs me to.
 9  Q    What's your mom's name?
10  A    Aliona Williamson.
11  Q    Does she work?
12  A    Yes.
13  Q    What does she do?
14  A    She is an interpreter.
15  Q    Were you born in the United States?
16  A    No.
17  Q    Where were you born?
18  A    I was born in Moldova.
19  Q    Where is Moldova?
20  A    Near Ukraine.  It is in Eastern Europe.
21  Q    Do you speak any other languages?
22  A    Yes.
23  Q    What languages?
24  A    I speak Romanian, understand a little bit of Russian.
25  Q    When did you first visit the United States?
```

DIRECT EXAMINATION OF DEEA APOSTOL

1   A    I first came here in 2016.

2   Q    How old were you in 2016?

3   A    9.

4   Q    Did you speak English?

5   A    No.

6   Q    When did you learn English?

7   A    I learned English when I went through my first year of

8   school here, so third grade.

9   Q    Did you catch on pretty quickly?

10  A    Yes.

11  Q    Did you have any siblings in 2016?

12  A    No.

13  Q    Who did you live with in Moldova?

14  A    I lived with my mom.

15  Q    And when you came to the United States, who did you live

16  with?

17  A    My mom and Greg.

18  Q    Did you know who Greg was when you came here?

19  A    No.

20  Q    Do you know why you came to the United States?

21  A    We came here to visit, as far as I know.

22  Q    Did you ever go home?

23  A    No.

24  Q    Was that ever explained to you?

25  A    No.

DIRECT EXAMINATION OF DEEA APOSTOL

1  Q    What did you think about it?

2  A    I was homesick sometimes, but I got used to it here

3  eventually.

4  Q    What family did you leave behind in Moldova?

5  A    My dad and my grandparents.

6  Q    What was your relationship with your dad like?

7  A    It was fine.  We were fine.

8  Q    Did you stay in contact with him when you moved?

9  A    Not for the first few years, but then I figured out how

10  to, because I just didn't know how to, and I established a

11  relationship with him.

12  Q    You mentioned Greg Williamson.  What did you call him?

13  A    Greg.

14  Q    When did you first meet him?

15  A    I met him when we first got here at the airport.

16  Q    Was that in Miami, Florida?

17  A    Yes.

18  Q    Do you recall how he was introduced to you?

19  A    No.

20  Q    Did you end up living with Greg for the foreseeable

21  future?

22  A    Yes.

23  Q    Did you like Greg?

24  A    Yes.

25  Q    Did he buy you things?

DIRECT EXAMINATION OF DEEA APOSTOL

1  A    Yes.

2  Q    Like what?

3  A    Toys, clothes, whatever I asked for.

4  Q    Did that build a special bond between the two of you?

5  A    Yes.

6  Q    Was third grade the first year of school you spent in the

7  United States?

8  A    Yes.

9  Q    Where did you live?

10 A    We first lived here in North Port in the house, and then

11 we moved to a different, bigger house.  And then we moved up

12 to Spring Hill, and we had two houses in Spring Hill.  And now

13 we live back in North Port.

14 Q    Do you see him in the courtroom today?

15 A    Yes.

16 Q    Could you please describe him by an article of clothing?

17 A    He is wearing a blue jacket.

18 Q    Is he in the red tie?

19 A    Yes.

20       MS. FAVORIT:  Let the record reflect the witness has

21 identified the defendant.

22       THE COURT:  Noted.

23 BY MS. FAVORIT:

24 Q    I want to talk about the second Spring Hill home that you

25 mentioned.  Do you recall how old you were in that home?

DIRECT EXAMINATION OF DEEA APOSTOL

```
 1  A    I was -- I was there from 11 until I turned 12.  And then
 2  I think early 13 I was there; 11, 12 mostly though.
 3  Q    Was that the New Castle Street home?
 4  A    Yes.
 5  Q    What did Greg do for a living?
 6  A    He had like a trucking company.
 7  Q    Did he work from home?
 8  A    Yes.
 9  Q    Who lived in that second Spring Hill home?
10  A    Me, my mom, and my siblings and my dogs.
11  Q    Around how old were the siblings?
12  A    Like a few years old, like really young.
13  Q    Are your siblings' father Greg?
14  A    Yes.
15  Q    Prior to moving into the Spring Hill home, how was your
16  relationship with Greg?
17  A    It was -- it was fine.  We fought sometimes, but nothing
18  that was, like, notable.
19  Q    Did he ever buy you a cell phone?
20  A    Yes.
21  Q    When was that?
22  A    He bought me several, but the most recent one that he
23  bought was the iPhone 11.
24  Q    Do you recall how old you were when you got your first
25  cell phone from him?
```

DIRECT EXAMINATION OF DEEA APOSTOL

1  A    Yeah.  I was turning 12, on my twelfth birthday.

2  Q    Who controlled access to the Wi-Fi in the home?

3  A    Greg.

4  Q    How do you know that?

5  A    Because I would get limited access sometimes to the

6  Internet most of the time.

7  Q    Did you have the password to the Wi-Fi?

8  A    Sometimes I did, but he changed it often, so.

9  Q    At some point living in the second Spring Hill home, did

10 he begin to do things that made you feel uncomfortable?

11 A    Yes.

12 Q    When did that start?

13 A    Just, it started when I was 12, I think.

14 Q    What made you feel uncomfortable to start?

15 A    Just the overaffectionate, like touching that I thought

16 was normal when I was little.  It wasn't.  And that just made

17 me uncomfortable as I grew older.

18 Q    I want to talk about it a little more specifically.  When

19 did you figure out that it wasn't normal?

20 A    When I, like, when I was 11 or 12 I kind of was, like,

21 this isn't right because it just didn't feel right.  I just --

22 yeah.

23 Q    What would he do when he hugged you?

24 A    He would, like, he would grab my butt.

25 Q    Did he do that around other people?

DIRECT EXAMINATION OF DEEA APOSTOL

1   A    No.

2   Q    Did he touch you anywhere else during those hugs?

3   A    Yeah.  He would touch my chest.

4   Q    When you say your chest, do you mean your breast area?

5   A    Yes.

6   Q    Was that over the clothing or under the clothing?

7   A    Both.

8   Q    When are these hugs happening?

9   A    Just whenever, when people weren't there, often.

10  Q    Is that part of what gave you an indication it wasn't

11  normal?

12  A    Yes.

13  Q    Did it escalate at any time?

14  A    Yes.

15  Q    How did it escalate?

16  A    He started, like, trying to just rub me in, like, my

17  personal areas.

18  Q    What age did the hugs that went too far start?

19  A    Twelve.

20  Q    Do you remember the first time he was inappropriate with

21  you?

22  A    Yes.

23  Q    When was that?

24  A    It was in the Spring Hill house.  I went to go see him in

25  the garage, and he started touching me.

DIRECT EXAMINATION OF DEEA APOSTOL

1  Q    Before that incident, did you tell anyone what was going

2  on?

3  A    No.

4  Q    Why didn't you tell anyone?

5  A    Because I just -- I wanted my mom to like work, and I

6  wanted my siblings to, like, be able to have their dad still.

7  Q    Did you feel a sense of responsibility?

8  A    Yes.

9  Q    Why did you feel that way?

10 A    Because, I don't know.  I just wanted my siblings to

11 still have a relationship with him.

12 Q    Was Greg and your mom married?

13 A    Yes.

14 Q    How did you feel about them being married before this

15 happened?

16 A    I didn't care.

17 Q    Did he ever make comments to you that were inappropriate?

18 A    Yes.

19 Q    Can you give me some examples?

20 A    He would just -- every single thing that he used to --

21 not every single thing, but he used to try to talk to me about

22 sexual stuff all the time.

23 Q    In an educational manner?

24 A    No.

25 Q    How do you know that?

DIRECT EXAMINATION OF DEEA APOSTOL

1  A    Because he would describe things, not education, like

2  saying how it was normal what he was doing and that it

3  happened all the time.

4  Q    Did you know the things he was telling you before he told

5  you?

6  A    What do you mean?

7  Q    Like, did you know about sex before Greg --

8  A    No.

9  Q    -- told you about it?  I'm going to repeat my question

10  only because we talked at the same time.  Did you know about

11  sex before Greg told you about it?

12  A    No.

13  Q    How did he introduce it to you?

14  A    He would show me pictures and just, yeah, show me

15  pictures and videos.

16  Q    Were those via email?

17  A    Yes.

18  Q    And what did he say about sex?

19  A    Through the emails.

20  Q    Did he talk about it in person at all?

21  A    It was mostly through the emails, but he talked about it

22  in person sometimes.

23  Q    Was your mom around when he said these things to you?

24  A    No.

25  Q    Did it scare you at all?

DIRECT EXAMINATION OF DEEA APOSTOL

1   A     Yes.

2   Q     Did you spend time alone with him?

3   A     Yes.

4   Q     How often?

5   A     Often.  He was a part of my family, so.

6   Q     Was he responsible for taking you to school in the

7   morning?

8   A     Sometimes.

9   Q     What about picking you up from school?

10  A     Sometimes.

11  Q     What was your mom doing when he was responsible for you?

12  A     She was taking care of the kids, or whenever my mom was

13  busy and I had, like, I needed something, I would go to him.

14  Q     As you got older, you said that it escalated.  Can you

15  explain the escalation?

16  A     Yeah.  One day I went through -- I went to his -- he had

17  a workplace.  He had a workplace in the garage.  And I went

18  there, and he -- I just went in for a normal hug and he

19  touched me.

20  Q     Which home was this in?

21  A     Spring Hill house.

22  Q     Why was he in the garage?

23  A     That's just where he worked.

24  Q     Did he have a computer set up in the garage?

25  A     Yes.

DIRECT EXAMINATION OF DEEA APOSTOL

1    Q    Who was living in that home?

2    A    Me, my mom, him, and my siblings.

3    Q    Can you tell me how he touched you?

4    A    He rubbed my vagina.

5    Q    Over or under the clothing?

6    A    That time over.

7    Q    Did he move his hand at all?

8    A    Yes.

9    Q    In what type of motion?

10   A    Back and forth.

11   Q    Did he say anything to you when he did this?

12   A    No.

13   Q    Was he kissing you?

14   A    No.

15   Q    How did it end?

16   A    Just -- just -- I just walked away.  I pulled off and

17   walked away.

18   Q    Did you speak about that incident with him?

19   A    Yeah.  I asked him -- I was, like, why did you do that?

20   And he goes -- he was, like, oh, well, you didn't move, so.

21   Q    About how old were you?

22   A    I was 12 at the time.

23   Q    Do you know how long he rubbed your vagina for?

24   A    No.

25   Q    Was anyone else in the room?

DIRECT EXAMINATION OF DEEA APOSTOL

1    A      No.

2    Q      Was the computer the same computer that you guys later

3    had in the North Port home?

4    A      The Gateway?

5    Q      Yes.

6    A      Yes.

7    Q      Can you remember the next time that something happened?

8    A      Yeah.

9    Q      When was that?

10   A      That was the outside incident.

11   Q      How close in time from the garage incident to the next

12   one you're about to tell me?

13   A      Probably a few weeks.

14   Q      Can you tell me what happened in this incident?

15   A      He -- I just went outside and he was smoking, and he --

16   he fingered me.

17   Q      When you say fingered you, do you mean he penetrated you

18   with his fingers?

19   A      Yes.

20   Q      How long did that last for?

21   A      I don't know.

22   Q      Was it through your clothing?

23   A      No.  It was underneath the clothes.

24   Q      How did that end?

25   A      The same way.

DIRECT EXAMINATION OF DEEA APOSTOL

1  Q    Can you tell me about an incident that happened outside?

2  A    That was the incident.

3  Q    Was the door closed to the house?

4  A    Which door?

5  Q    I think I need you to explain a little more about the

6  outside, please.

7  A    Yeah.  It was -- it was the -- it wasn't the patio one.

8  It was the outside one.  He was smoking.

9  Q    Do you remember around what time of year it was?

10  A    It was -- it was hot, so probably like spring.

11  Q    Did you -- were you home from school in this incident?

12  A    It was nighttime.

13  Q    Did he kiss you during this time?

14  A    No.

15  Q    Did he say anything to you?

16  A    No.

17  Q    Did you discuss this later?

18  A    Yes.

19  Q    And what was that discussion like?

20  A    It was him saying that I -- that I basically was -- I

21  wanted it, like him saying that I wanted it and that I came

22  back for more.

23  Q    Did the touching continue?

24  A    Yes.

25  Q    How frequently did it happen?

DIRECT EXAMINATION OF DEEA APOSTOL

1    A    I don't -- like weekly sometimes.  It would vary.

2    Q    Did he ever do it around other people?

3    A    No.  No.

4    Q    What about the sexual comments, did those continue?

5    A    Yes.

6    Q    Was he describing what he wanted to do or something else?

7    A    That was more over the email than in person.

8    Q    Did this happen in any other locations, the touching?

9    A    Yeah.  It happened -- it just happened whenever he wanted

10   it to happen.

11   Q    During these times, did you know that it was wrong?

12   A    No.  Well, I had a feeling because he would tell me not

13   to tell anyone.

14   Q    How did that make you feel?

15   A    It just -- it made me feel just embarrassed and like, I

16   don't know, like I couldn't tell anyone.

17   Q    What did you think would happen if you told someone?

18   A    He would just have me and my mom leave and take my

19   siblings, because he would threaten that often.

20   Q    Does it have something to do with where you were born?

21   A    I don't know.

22   Q    I want to talk about your room in the Spring Hill home,

23   but I think it might be best if you draw us a picture because

24   it might be a little bit confusing, if that's okay with the

25   Court.  I have a blank piece of paper.

DIRECT EXAMINATION OF DEEA APOSTOL

1              May I approach?

2              Do you need a break?

3              Your Honor, is there any way we could have a quick

4    break?

5              THE COURT:  A break?

6              MS. FAVORIT:  Yes.

7              THE COURT:  We're going to take a few minutes or

8    what?  What do we need?

9              MS. FAVORIT:  Five minutes, Your Honor.

10             THE COURT:  Let's take a five-minute break, please.

11   Don't discuss the case or look on outside sources.  We'll see

12   you in five minutes.

13         (Recess taken.)

14             THE COURT:  Counsel?

15   BY MS. FAVORIT:

16   Q    Where we last left off, I handed you a piece of paper and

17   a marker.  I wondered if you could draw a picture of what your

18   room looked like at the Spring Hill home.

19             MS. FAVORIT:  May I approach the witness?

20             Your Honor, I'm going to mark this as Government

21   Exhibit 203.  I will add it into the exhibit list.

22             THE COURT:  All right.  That's admitted.

23             MS. FAVORIT:  Thank you.

24   BY MS. FAVORIT:

25   Q    I'm going to go ahead and show the photo that you made.

DIRECT EXAMINATION OF DEEA APOSTOL

1  Okay.  Is this the photo that you just drew?

2  A    Yes.

3  Q    In Spring Hill at that second home, did you have your own

4  room?

5  A    Yes.

6  Q    Did everybody have their own room?

7  A    Yeah.

8  Q    And around what age did you say you were in Spring Hill?

9  A    Twelve.

10 Q    Okay.  So I see that you have written "Bedroom."  Is that

11 the main room?

12 A    Yes.

13 Q    And the left we have a closet, your bed.

14       The house door, is that what leads into the main part

15 of the home?

16 A    Yes.

17 Q    Okay.  Can you explain this patio to me?

18 A    Yeah.  This was -- so this door would lead into, like, an

19 outside area where we had a table and like other stuff.  And

20 then this would just lead outside.

21 Q    Was it special to have a room attached to the patio?

22 A    Yeah.

23 Q    Okay.  I see a door on the patio that you've drawn.  Does

24 that lead --

25 A    That leads outside.

DIRECT EXAMINATION OF DEEA APOSTOL

1  Q    And the door in between your room and the patio, is that

2  another door?

3  A    That leads inside my room, yes.

4  Q    What kind of door is that?

5  A    A glass sliding door.

6  Q    Okay.  Is that a heavy door?

7  A    Yes.

8  Q    What is significant about this sliding door?

9  A    It -- I don't know if it was broken or not, but me

10 personally, I couldn't lock it.

11 Q    You were unable to lock it yourself?

12 A    Yes.

13 Q    Where we left off, you were going to tell me about

14 something that happened in a bedroom.  Was that in the Spring

15 Hill home?

16 A    Yes.

17 Q    Was it in the bedroom photo that we are looking at now?

18 A    Yes.

19 Q    How did you normally get in and out of your room?

20 A    Through the main door, the house door.

21 Q    If someone was to get into your bedroom from the patio,

22 where would they come from?

23 A    Outside.  They would have to go through the outside door

24 to enter the patio and then proceed to use my glass sliding

25 door to get into the house.

DIRECT EXAMINATION OF DEEA APOSTOL

1  Q    At some point, did Greg say something to you about the

2  patio door?

3  A    Yes.

4  Q    What did he tell you?

5  A    He said that if I could not lock my patio door, that he

6  would come in my room and eat me out.

7  Q    Did you know what "eat me out" meant?

8  A    Not then, but I just assumed it was something sexual.

9  Q    What did you interpret it to mean?

10 A    I didn't.  I didn't know what it meant.

11 Q    Do you know what it means now?

12 A    Yes.

13 Q    What does it mean now?

14 A    To give oral sex.

15 Q    At some point did you go to bed that night?

16 A    Yes.

17 Q    Were you able to close that door?

18 A    No, and I didn't even -- I didn't try because I genuinely

19 thought it was a joke.

20 Q    At some point were you woken up?

21 A    Yes.

22 Q    What did you wake up to?

23 A    Him performing the act that he said he was going to do.

24 Q    Was he in your bed?

25 A    Yes.

DIRECT EXAMINATION OF DEEA APOSTOL

1    Q    Was he over, under the covers?

2    A    Under.

3    Q    Did you know that it was him?

4    A    At first I was just -- because I was sleeping, I was just

5    woken up.  And I -- I didn't immediately realize who it was

6    and I just started kicking off, but then I remember what was

7    said the night before and I figured out it was him.

8    Q    Did his mouth touch your vagina?

9    A    Yes.

10   Q    Did his tongue touch your vagina?

11   A    Yes.

12   Q    What did you do?

13   A    I pushed him off, tried.

14   Q    Was he bigger than you?

15   A    Yes.

16   Q    Was it difficult to get him off?

17   A    Yes.

18   Q    Did he eventually get up?

19   A    Yes.

20   Q    How did that happen?

21   A    He just got up.

22   Q    How did he react to being pushed off?

23   A    He just kind of looked at me and was, like, well, you

24   didn't lock the door, so.

25   Q    Did he come from the patio or do you know?

DIRECT EXAMINATION OF DEEA APOSTOL

1  A    I assumed it was from the -- he circled around the house

2  and went to the outside and went into my room.

3  Q    Did he leave through the patio?

4  A    No.  He left through the main house door.

5  Q    At any point did he kiss you on the mouth?

6  A    No.

7  Q    What about another time?

8  A    Yes.

9  Q    When was that?

10  A    When he gave me my phone for my birthday and he

11  forcefully tried to, and I just turned my face.

12  Q    Was it on the mouth or somewhere else?

13  A    On the mouth.

14  Q    Did he use his tongue?

15  A    He tried.

16  Q    Was he successful?

17  A    No.

18  Q    How did that end?

19  A    Because I turned my face and he just left.

20  Q    Were you alone?

21  A    Yes.

22  Q    Where were you?

23  A    In my room.

24  Q    Were you sitting or standing?

25  A    Sitting on my bed.

DIRECT EXAMINATION OF DEEA APOSTOL

1  Q    Where was he?

2  A    He just came through the door because he was giving me my

3  phone, and he handed it to me and tried doing that.

4  Q    I want to show you what's been marked as Government

5  Exhibit 9.

6        MS. FAVORIT:  May I approach?

7  BY MS. FAVORIT:

8  Q    Do you recognize this?

9  A    Yeah.

10 Q    What do you recognize it to be?

11 A    A phone.

12 Q    Is that the same phone from a birthday gift or another

13 phone?

14 A    Yes.

15 Q    Were there any other significant times where he touched

16 you that we haven't talked about?

17 A    No.  Those were the most significant.

18 Q    At some point, did he gift you a USB charger?

19 A    Yes.

20 Q    When was that?

21 A    Whenever I asked him to get me a portable charger, and he

22 just gave me the USB chargers that went along with it and said

23 these just go with it, take it.  And I was, like, okay.

24 Q    How many did he give you?

25 A    Two.

DIRECT EXAMINATION OF DEEA APOSTOL

1  Q    I'm going to show you what's marked as 10 and 11.  Do you

2  recognize these?

3  A    Yes.

4  Q    What do you recognize them to be?

5  A    The USB chargers.

6  Q    Why did you need a charger?

7  A    I didn't.  It was just given to me as an additional with

8  the portable charger that I asked for.

9  Q    Did you use those chargers?

10  A    Yes.

11  Q    Did they function?

12  A    Yes.

13  Q    Were you suspicious about these at all?

14  A    I had a suspicion because it had a round thing in the

15  middle of it that looked like a camera.  And I asked Greg if

16  they were cameras, and he said no.  So I wasn't suspicious

17  after.

18  Q    Did you believe him?

19  A    Yes.

20  Q    What home were you living in when you received these as

21  gifts?

22  A    The Spring Hill house.

23  Q    Is there anything unusual about the light on the USBs?

24  A    Yes.  They would flicker sometimes.

25  Q    Did you use them the whole time you were in Spring Hill?

DIRECT EXAMINATION OF DEEA APOSTOL

1    A    Yes.  Like when I received them, I used them until then.

2    Q    Where did you have them in your room?

3    A    I had one by -- there was -- it's an open room.  So I had

4    one next to the wall next to the patio, which would overlook

5    where I used to change my clothes.  And I had one right next

6    to my bed.

7    Q    Is there a reason you chose those locations?

8    A    I just chose those locations because it was easiest to

9    plug my phone in.

10   Q    Are you able to point out on the drawing where you kept

11   those chargers?

12   A    Yes.  I kept one right here.

13   Q    I think you can draw, if you want to give it a go.  It

14   looks like you are by the house door in the corner of the

15   patio?

16   A    Yes, right next to the glass door, a little down.

17   Q    Down here?

18   A    Yes.

19   Q    Where is the other one?

20   A    The other one is right next to my bed.

21   Q    On this side?

22   A    No.

23   Q    Not the closet side.  On the patio side?

24   A    Yes.

25   Q    Okay.  Thank you.

DIRECT EXAMINATION OF DEEA APOSTOL

1           At some point did you stop using these chargers?

2    A    Yes.

3    Q    When was that?

4    A    When we moved into the house I live in now.

5    Q    Is that in North Port?

6    A    Yes.

7    Q    Did you know that there was a camera in those USB

8    chargers?

9    A    No, just suspicions.

10   Q    Were you aware you were being recorded?

11   A    No.

12   Q    When did you find out?

13   A    I found out when Detective Keller came to my house and

14   said something about a little camera.  And he was describing

15   what sounded to me like the charger.  So I just -- that

16   basically confirmed my suspicion that it was a camera, so I

17   just turned it in to him.

18   Q    Was that after the search warrant?

19   A    Yes.

20          MS. FAVORIT:  Your Honor, at this time I'm going to

21   show the witness 6.4 and 6.5.  I'm going to conditionally

22   request that these be admitted with our next witness

23   authenticating them.

24          THE COURT:  All right.  That's fine.

25   BY MS. FAVORIT:

DIRECT EXAMINATION OF DEEA APOSTOL

1   Q    I'm going to show you Exhibit 6.4.  Have you seen this

2   image before?

3   A    Not since you showed it to me.

4   Q    And is this you?

5   A    Yes.

6   Q    How old were you here?

7   A    Twelve.

8   Q    Have you -- at the time of the search warrant, had you

9   ever seen this photo?

10  A    No.

11  Q    Where are you in relation to your room?

12  A    I'm by my bed.  This is where I was describing where I

13  usually used to change or look for my clothes.

14  Q    I'm going to show you 6.5.  Is this you?

15  A    Yes.

16  Q    Is that the same age?

17  A    Yes.

18  Q    What about the same room?

19  A    Yes.

20  Q    Where is this one?

21  A    This is the bedroom one.

22  Q    So this is in a different location?

23  A    Yeah.  This is the one by my bed.

24  Q    I'm going to zoom in a little bit right here.  That's a

25  bad zoom-in.  Can you tell me what that little square is in

DIRECT EXAMINATION OF DEEA APOSTOL

1  the middle of the photo?

2  A    That's the other charger that took the other picture.

3  Q    Did you have your own email address?

4  A    Yes.

5  Q    What was it?

6  A    I had one that I deleted, which was

7  Deea.Apostol2007@gmail.com.  And then I had the new one

8  Deea.Apostol1782@gmail.  And then my iCloud, which is

9  Deea.Apostol@icloud.com.

10  Q    You said those pretty fast, but I assume it's your first

11  name followed by your last name?

12  A    Uh-huh.

13  Q    If you could just answer "yes" or "no."

14  A    Yes.

15  Q    Thanks.

16        Is there a time that you started receiving strange

17  emails?

18  A    Yes.

19  Q    Can you tell me about that?

20  A    I was 11, and I started receiving these weird emails

21  which would talk about, like, sexual stuff, and I was scared.

22  I was obviously scared, and I told Greg about it.

23  Q    Who did you receive these emails from, to your knowledge,

24  at the time?

25  A    Vlad Vlad.

DIRECT EXAMINATION OF DEEA APOSTOL

1    Q    Is that V-L-A-D?

2    A    (Witness nods head.)

3    Q    Did that mean anything to you?

4    A    No.

5    Q    Why did you go to Greg about the emails?

6    A    Because I just felt like he would understand better

7    because I was -- my mom had spent a lot of the time with the

8    kids at that time.  So me and Greg were closer, and I just

9    went to him about it.

10   Q    How did he respond?

11   A    He just said that, just block them, let them pass,

12   they'll go away.

13   Q    Why were you scared?

14   A    Because the person was -- kept going after I asked them

15   to stop.  And they just kept on going.  And they were asking

16   to meet and do all these things, and I was just scared.

17   Q    Why did you go to Greg for help?

18   A    Because it was -- I was closer with him at the time.

19   Q    Was it always from the same email?

20   A    Yes.

21   Q    You said that you responded?

22   A    Uh-huh.

23   Q    I'm going to show you what's already in evidence as 5.3.

24   Did you also receive emails specifically from Greg?

25   A    Yes.

DIRECT EXAMINATION OF DEEA APOSTOL

1  Q    Is this the emails you were referring to when he's

2  telling you about sexual stuff?

3  A    Yes.

4  Q    Was it common for him to communicate with you via email?

5  A    Yes.

6  Q    Why was that common?

7  A    I don't know.  It's just what he did.

8  Q    Did you read emails that he sent you?

9  A    Yes.

10 Q    Did you ever talk about them with him?

11 A    No.

12 Q    I'm going to show you 5.4.  Do you remember receiving an

13 email from Greg about this photo?

14 A    Yes.

15 Q    Do you remember why he was emailing you?

16 A    No.

17 Q    Could you read the subject line on this one for me?

18 A    "Whatever you're doing, you better stop before your

19 mother finds out."

20 Q    Was that a way for him to communicate with you, via

21 email?

22 A    Yes.

23 Q    I will show you 5.5.  Is this another email that Greg had

24 sent you?

25 A    Yes.

DIRECT EXAMINATION OF DEEA APOSTOL

1  Q    I notice he wrote M-U-A-H.  I would pronounce that muah.

2  Would you pronounce it another way?

3  A    No.

4  Q    What does that mean to you?

5  A    Nothing.

6  Q    Did he often say "muah" to you?

7  A    No.

8  Q    At some point, did you ever see the Vlad account on

9  Greg's computer?

10  A    Yes.

11  Q    When was that?

12  A    Whenever I wasn't allowed to go on the Internet on my

13  phone, I would ask him, and he would let me use his computer,

14  the inside computer.  And that's when I saw the Vlad Vlad.

15  Whenever I was going in to log into my computer, into my

16  account on Google, I saw -- I clicked the three dots, and I

17  saw the accounts linked to the computer, and I saw the Vlad

18  Vlad account.

19  Q    How old were you then?

20  A    Twelve still.

21  Q    Were you surprised to find that?

22  A    Yes.

23  Q    Why were you surprised?

24  A    Because -- I just was because this person was, like,

25  emailing me for well over a year now.  And I was scared, and I

DIRECT EXAMINATION OF DEEA APOSTOL

1  told him about it, and he just didn't seem to know anything

2  and told me and reassured me that he didn't know anything

3  about it, and it was him.

4  Q    Did you confront him?

5  A    Yes.

6  Q    How did that go?

7  A    He just said it was a glitch and that they just attached

8  his name and that it was very common to happen.

9  Q    How long after you discovered Vlad Vlad on his computer

10  did the search warrant happen?

11  A    Nine months, maybe, yeah.

12  Q    After that discovery, did the emails continue to come?

13  A    After he was taken away?

14  Q    Let me rephrase.  When you found the Vlad account on his

15  computer, you confront him, did the emails continue?

16  A    Yes, but he started doing them on his account too.

17  Q    At this point did you know that it was him?

18  A    Yes.

19  Q    I want to talk about the day of the search warrant,

20  January 2021.  Were you present for that?

21  A    Yes.

22  Q    Had you ever called the police?

23  A    No.

24  Q    Did you tell your mom?

25  A    No.

DIRECT EXAMINATION OF DEEA APOSTOL

1  Q    Did you tell anybody at school?

2  A    No.

3  Q    Why didn't you tell anybody?

4  A    I was just scared of what would happen.

5  Q    Did you have the opportunity to speak with some people

6  who asked you questions about Greg?

7  A    Yes.

8  Q    Were you forthcoming with them about what happened?

9  A    Not -- I wasn't fully telling the truth both times.

10 Q    Were you ready to talk about it?

11 A    No.

12 Q    I'm going to show you a couple exhibits.  I will show you

13 Exhibit 8.  Do you know what this is?

14 A    No.

15 Q    Is that a no?

16 A    No.

17 Q    I will show you Exhibit 5.  Do you know what this is?

18 A    Yeah.

19 Q    What is that?

20 A    It's the outside computer.

21 Q    Is that the one where you found the Vlad account?

22 A    No.

23 Q    Which account was that?

24 A    I --

25 Q    I mean, which computer?  I'm sorry.

DIRECT EXAMINATION OF DEEA APOSTOL

```
 1  A    It was the one that had the TV, the big TV hooked to it
 2  with the -- yeah.
 3  Q    Is that the one that had the tower next to it?
 4  A    Yes.
 5  Q    I'm going to show you Exhibit 6.  Do you know what this
 6  is?
 7  A    Yes.
 8  Q    What is this?
 9  A    Gregory's phone.
10       MS. FAVORIT:  Your Honor, again I'm going to show the
11  witness 1.1A and 1.3A for conditional admission.
12       THE COURT:  All right.
13  BY MS. FAVORIT:
14  Q    Do you recognize 1.1A?
15  A    Yes.
16  Q    What do you recognize it to be?
17  A    The Vlad Vlad person.
18  Q    Is that the email thread that you were talking about
19  earlier?
20  A    Yes.
21  Q    Can you tell me who this was from?
22  A    This was from Gregory.
23  Q    Using the Vlad account?
24  A    Yes.
25  Q    And I will just read you a couple back and forth.  It
```

DIRECT EXAMINATION OF DEEA APOSTOL

1  starts on, this one, on July 18, 2019.  "Do you have exploding

2  orgasms in your panties like this?"

3          And then you responded to this email?

4  A    Uh-huh.

5  Q    Is this your response, the, "Stop.  You said you would,

6  so just stop, please.  I don't like you.  I don't harass

7  people like you, so I will be reporting you to the police"?

8  A    Yeah.

9  Q    Did you actually report it to the police?

10 A    No.  I just was threatening him so he would stop, but he

11 didn't.

12 Q    Did your threats to him make it stop?

13 A    No.  It just made him more adamant, I feel.

14 Q    I'm going to show you 1.3A.  Is this another thread that

15 we are discussing?

16 A    Yes.

17 Q    I really can't see that.  I will start at the bottom.  So

18 is this a back and forth between yourself and the Vladlover

19 account?

20 A    Yes.

21 Q    Did you report this or did you block him in any way?

22 A    Yes.

23 Q    How did you do that?

24 A    I blocked him through email, but it didn't actually block

25 it.  It just put it in my spam, and I kept receiving it

DIRECT EXAMINATION OF DEEA APOSTOL

1    anyway.

2    Q    Had you heard of a dispatch email?

3    A    Yes.

4    Q    What email is that?

5    A    That's the email Gregory would use for work.

6    Q    Is that related to his trucking freight business?

7    A    Yes.

8         MS. FAVORIT:  I'm going to conditionally admit, Your

9    Honor, 6.7.

10        THE COURT:  All right.

11   BY MS. FAVORIT:

12   Q    Do you recognize this email?

13   A    Yes.

14   Q    What do you recognize it to be?

15   A    Greg's email.

16   Q    Okay.  I'm going to highlight the "To" and "From."  Can

17   you tell us who it's from, the email?

18   A    It's from Greg to me.

19   Q    And is it dispatchtwh@gmail.com?

20   A    Yes.

21   Q    Is that the account we've been speaking about?

22   A    Yes.

23   Q    And to you, Deea Apostol, at your Gmail?

24   A    Uh-huh.

25   Q    Okay.  I'm going to briefly read this to you.  And then I

DIRECT EXAMINATION OF DEEA APOSTOL

1  just want you to let me know what this is about, okay?

2          "Just because you wanted to be a big girl a few

3  months back does not make me a pervert.  If that was the case,

4  then why did you come back for more and more and make me go

5  outside with you and finger your pussy until you finally did

6  cum, or you forget about that?  I regret the little affair we

7  did have as I thought you were a little more mature than what

8  you really are.  Shame on me.  Since you really aren't a

9  virgin anymore other than you have not had a penis inside you,

10  just make sure to find the one that will satisfy your desires

11  when you finally do.  Perhaps you should wait until you are

12  married."

13          What is this talking about?

14  A    It's talking about the outside.

15  Q    And did you receive it after that incident?

16  A    No.  This was later.  This was way later.

17  Q    Did you know this to come from him?

18  A    Yes.

19  Q    Did you ever talk about it in person, these kind of

20  emails?

21  A    No.

22  Q    I'm going to do the same thing to conditionally admit 6.8

23  and 6.9.

24          I'm showing you 6.8.  Can you tell me who this is to

25  and who this is from?

DIRECT EXAMINATION OF DEEA APOSTOL

1   A    It's from Greg to me.

2   Q    And this one says, "Would love for you to cum all over my

3   dick, muah.  Love you, Deea."

4           Do you remember receiving this email?

5   A    Yes.

6   Q    I will show you 6.9.  Who is this one from?

7   A    Still Greg but using a different account, email.

8   Q    Is that two of your emails?

9   A    Yes.

10  Q    And the email is RRyan0881@gmail.com?

11  A    Yes.

12  Q    And this one says, "When you masturbate, do you cum in

13  your panties or do you take them off?  Would love for you to

14  send me a video of you making yourself cum."

15          How did you know that this was from Greg?

16  A    I just assumed.

17  Q    Did Greg every check on the USBs after you received them

18  as a gift?

19  A    No, at least not while I was home.  That's why I never

20  thought it was a camera after I asked him because he never

21  went in to check on it.

22  Q    And did your family eventually move to North Port?

23  A    Yes.

24  Q    When was that?

25  A    I don't know.

DIRECT EXAMINATION OF DEEA APOSTOL

1    Q    Did you take those USB chargers with you?

2    A    Yes.

3    Q    Did you use them later?

4    A    No.

5    Q    Why didn't you use them anymore?

6    A    They were too big and, like, I had other chargers that I

7    could use.  So I had no need for them anymore.

8    Q    Did you ever confront Greg with name calling?

9    A    Yes.

10   Q    What did you call him?

11   A    A pedophile.

12   Q    How did he take that?

13   A    Not very well.

14   Q    How was your relationship with him at this point?

15   A    Not good.

16   Q    Was it because of what was going on?

17   A    Yes, and also because he used to call me names and just

18   make me feel bad.

19   Q    By this point, was he openly discussing the sexual

20   activity with you?

21   A    Yes.

22   Q    When the police came to your house in January, did you

23   know why?

24   A    No.

25   Q    Were you shocked that he was arrested?

CROSS-EXAMINATION OF DEEA APOSTOL

```
 1   A     Yes.

 2   Q     Why were you shocked?

 3   A     Because I never called the police.

 4         MS. FAVORIT:  May I have a moment, Your Honor?

 5         THE COURT:  Yes.

 6   BY MS. FAVORIT:

 7   Q     Did you have access to Greg's cell phone?

 8   A     No.

 9   Q     Did you have a password to it?

10   A     No.

11   Q     Did you have access to his hard drives?

12   A     No.

13   Q     Did you have any lookcam apps on your phone?

14   A     No.

15   Q     Do you even know what that is?

16   A     No.

17   Q     Since the day of the search warrant, did you receive a

18   single email from Vladlover50?

19   A     No.

20         MS. FAVORIT:  I have no further questions.

21         THE COURT:  All right.  So Mr. Brunvand or Ms. Ramos

22   Wicks may have a question or two, so we will take that at this

23   time.

24                         **CROSS-EXAMINATION**

25   BY MR. BRUNVAND:
```

CROSS-EXAMINATION OF DEEA APOSTOL

1   Q    Good afternoon.

2   A    Good afternoon.

3   Q    I just have a few questions.  The first cell phone, you

4   received it when you were how old?

5   A    Twelve.

6   Q    Twelve?  Okay.  And what did you use it for?

7   A    Everything.

8   Q    Was Snapchat one of the things that you had on it?

9   A    Yes.

10  Q    Any other type of social media?

11  A    Yes.

12  Q    What other type of social media did you use?

13  A    TikTok, Instagram, everything.

14  Q    All right.  And you had indicated that initially when you

15  came to the United States, there was a period of time that you

16  did not have any contact with your father?

17  A    Yes.

18  Q    And then you indicated that at some point you figured out

19  how to have contact with your father.  Was that through some

20  sort of an online feature?

21  A    Yes.

22  Q    And how were you able to communicate with your father?

23  A    There is this app called Fiber where you're able to put

24  in your number and you can communicate with people.

25  Q    And was that primarily the way you were communicating

CROSS-EXAMINATION OF DEEA APOSTOL

1  with your father?

2  A    Yes.

3  Q    And when you first spoke with law enforcement the day of

4  the search warrant, that was at your home in North Port,

5  right?

6  A    Yes.

7  Q    Who was living in the home at the time?

8  A    Me, my mom, Greg, and my siblings and my dog.

9  Q    And how many siblings did you have at that time?

10 A    Three.

11 Q    And were the three siblings Greg's children?

12 A    Yes.

13 Q    So they were born here in the United States?

14 A    Yes.

15 Q    And I think you had indicated that one of the things that

16 you were concerned about was a scenario where you and your

17 mother would have to go back to Moldova and that the three

18 siblings would remain here in the United States?

19 A    Yes, because Greg threatened to do so.

20 Q    On several occasions?

21 A    Yes.

22 Q    And that had to do with your immigration status?

23 A    I assume so.

24 Q    You had indicated that there were times when you were

25 living with Greg and your mother and your siblings when you

CROSS-EXAMINATION OF DEEA APOSTOL

1  had access to the computer, the Gateway computer?

2  A    Yes.

3  Q    There were times when you knew the password to Greg's

4  computer, right?

5  A    Yes.

6  Q    Okay.  Were there multiple times where that was the case?

7  A    Yes.

8  Q    And you recall specifically when you had access and when

9  you did not?

10 A    No.

11 Q    Do you recall whether or not you had the password around

12 the time period shortly leading up to the search warrant?

13 A    No.

14 Q    Don't remember?

15 A    No.

16 Q    You may have had access at the time?

17 A    Yes.

18 Q    When you first spoke with law enforcement, and I believe

19 the search warrant was in November of 2020.  Do you recall?

20 Do you recall the date?

21 A    No.

22 Q    But when the search warrant happened, you spoke with law

23 enforcement, right?

24 A    Yes.

25 Q    And they specifically asked you if Greg Williamson had

REDIRECT EXAMINATION OF DEEA APOSTOL

1  touched you inappropriately, right?

2  A    Yes.

3  Q    And you specifically told law enforcement that he had

4  not?

5  A    Yes.

6  Q    At a later date, maybe a few months later, you speak with

7  someone else, a lady who interviews you, right?

8  A    Yes.

9  Q    And again you were asked if Greg Williamson had touched

10  you inappropriately, right?

11  A    Yes.

12  Q    And again you told her, no, he had not?

13  A    Yes.

14  Q    In fact, it wasn't until later in 2022 that you first

15  spoke with the prosecutor and Detective Keller that you made

16  the allegation that he touched you inappropriately?

17  A    Yes.

18          MR. BRUNVAND:  May I have a moment?

19          That's all I have, Your Honor.  Thank you.

20          THE COURT:  Redirect?

21                    **REDIRECT EXAMINATION**

22  BY MS. FAVORIT:

23  Q    Did you have passwords to Greg's emails?

24  A    No.

25  Q    Did you ever use his phone?

REDIRECT EXAMINATION OF DEEA APOSTOL

1  A    No.

2  Q    Did you create the Vlad Vlad account?

3  A    No.

4  Q    Did you access it?

5  A    No.  I didn't even know it existed until I saw it on his

6  computer.

7  Q    Why didn't you tell those other individuals that you

8  interviewed with what happened?

9  A    Because I wasn't ready to tell.

10  Q    Why did you tell myself and Agent Keller and other law

11  enforcement?

12  A    Because I was ready to tell and to tell my story.

13  Q    Was that a long time after Greg was out of your home?

14  A    Yes.

15  Q    Did that make a difference to you at all?

16  A    Yes, because I was scared.  I was scared of him and what

17  he would do to me.

18        MS. FAVORIT:  No further questions.

19        THE COURT:  All right.  Thank you.  Let's take a

20  lunch break.

21        Please don't discuss the case among yourselves or

22  with anybody or look on outside sources.  Let's try to get

23  back here and just get cracking right after it at 1:15 p.m. if

24  we can.  Thank you.  Please don't discuss the case or look on

25  outside sources.  1:15.

DIRECT EXAMINATION OF JAMES KELLER, II

1      (Recess taken.)

2           THE COURT:  Thank you, ladies and gentlemen.

3  Counsel, let's call your next witness, please.

4           MS. FAVORIT:  The United States calls Task Force

5  Officer James Keller.

6           THE COURT:  All right.  Officer Keller.

7      (Witness sworn.)

8           THE COURTROOM DEPUTY:  Please state your full name

9  and spell your last name for the record.

10          THE WITNESS:  James Edward Keller, II, K-E-L-L-E-R.

11          THE COURTROOM DEPUTY:  Thank you.  You may be seated.

12     **JAMES EDWARD KELLER, CALLED BY THE GOVERNMENT, SWORN**

13                    **DIRECT EXAMINATION**

14 BY MS. FAVORIT:

15 Q    Good afternoon.

16 A    Good afternoon.

17 Q    What is it that you do for a living?

18 A    I am a law enforcement officer with the North Port Police

19 Department.

20 Q    How long have you worked there?

21 A    I worked there just over 11 years.

22 Q    Where are you currently assigned within the North Port

23 Police Department?

24 A    The Criminal Investigations Division.

25 Q    What is the Criminal Investigations Division?

DIRECT EXAMINATION OF JAMES KELLER, II

1  A    So the Criminal Investigations Division is the arm of the

2  police department that we investigate felony crimes, crimes to

3  include felony retail thefts, to burglaries, to sexual

4  batteries, homicides, sex crimes, frauds, crimes as such.

5  Q    Are you also a task force officer?

6  A    Yes.

7  Q    Can you tell me what that is?

8  A    I am a task force officer with the Internet Crimes

9  Against Children Task Force or also short for -- known as

10  ICAC.  And also a task force officer with the FBI for the

11  Child Exploitation and Human Trafficking Task Force.

12  Q    I want to start with what we call ICAC or Internet Crimes

13  Against Children.  What is that task force?

14  A    The Internet Crimes Against Children task force is a

15  nationwide task force that was implemented by the Department

16  of Justice.  And the point of it is because of the rising

17  crimes that occurred over the Internet relating to child

18  sexual activity, such as enticement of minors and child

19  explicit material being posted online, they created a task

20  force nationwide that law enforcement agencies can opt into

21  being part of.

22        And how the task force works is Internet service

23  providers or electronic service providers such as Google or

24  Yahoo, anything like that, they can -- when they become aware

25  of any child exploitation on their servers, they then report

DIRECT EXAMINATION OF JAMES KELLER, II

1  that to NCMEC, which is the National Center for Missing and

2  Exploited Children.  And they then route the cyber tip to the

3  appropriate jurisdiction law enforcement for them to continue

4  the valuation of the cyber tip.

5  Q    You mentioned a cyber tip.  Is that from the electronic

6  service providers?

7  A    Yes.

8  Q    Could it also be from a citizen?

9  A    Yes.

10 Q    Is that the tip that Yahoo did in this case?

11 A    Yes.

12 Q    What is the other agency that you are a task force

13 officer with?

14 A    The FBI.  So I've been part of both task forces since

15 2019.  With the FBI, December 2019 I was deputized federally.

16 And I'm charged with, under that task force, with working with

17 other jurisdictions in my area and on a federal level.  And

18 that allows me to take crimes that occur within the boundaries

19 of the City of North Port and be able to continue those

20 investigations beyond the reach of just our city boundaries.

21 And so that allows me to, if some of these crimes reach around

22 the country or even out of the country, I'm able to continue

23 those investigations and work with other law enforcement

24 officers.

25 Q    What is your educational background?

DIRECT EXAMINATION OF JAMES KELLER, II

1  A    So I have my bachelor's degree in -- it's religion, so

2  Bible and criminal justice.

3  Q    So what type of training did you receive to become a law

4  enforcement officer?

5  A    So for the State of Florida I attended the police

6  academy, which was about a 16-week academy.  And I was able to

7  gain my certificate to become a police officer within Florida.

8  Q    Do you go through ongoing training?

9  A    Yes.

10  Q    Can you tell me any specific training related to law

11  enforcement aside from that academy?

12  A    Some of the advanced classes we're able to attend would

13  be prominently 40-hour classes that we can sign up for.  And

14  those classes I've taken -- taken a lot, but to name a few are

15  sex crimes.  There's case prep and courtroom presentation is a

16  class that was beneficial.  There's other classes such as like

17  speed measurement for when you're trying to get trained just

18  to pull people over for speed.  And there's other more

19  advanced classes that I was able to attend such as robbery

20  investigations and then multiple homicide investigation

21  classes I've attended.

22  Q    Do you have specific specialized training related to

23  child exploitation investigations?

24  A    Yes.

25  Q    Could you tell us some of those?

DIRECT EXAMINATION OF JAMES KELLER, II

1   A    So the ICAC task force allows members of that ICAC task

2   force to attend free trainings.  And those trainings

3   include -- some of note is undercover chat training.  So I was

4   able to go to a 40-hour class in order to have a persona

5   online posing as a child and to try to find people who were

6   looking to exploit children online and try to find them before

7   they find a real child.

8          There's other trainings I've taken such as

9   investigative techniques for ICAC investigations.  And that

10  was a 40-hour class that took me through multiple scenarios of

11  receiving these cyber tips from ICAC and how to properly read

12  them, decipher the information, and then continue an

13  investigation.  Then there was other classes I have taken that

14  are a little bit more technical that are like the peer-to-peer

15  investigations.  So those pertain to offenders who use a

16  network of peer-to-peer, so it means like from one computer to

17  another computer of sharing or distributing child exploitative

18  material.

19  Q    Have you taken any training related to mobile forensic

20  devices?

21  A    Yes.

22  Q    What was that?

23  A    So I am trained with Cellebrite and certified through

24  Cellebrite to complete and conduct extractions, mobile

25  extractions.  And then also, a separate training, I was able

DIRECT EXAMINATION OF JAMES KELLER, II

1  to gain a certificate through Cellebrite in order to examine

2  those extractions.

3  Q    Is that specifically related to cellular devices?

4  A    Yes.

5  Q    Do you also have experience conducting child exploitation

6  investigations?

7  A    Yes.

8  Q    How long have you investigated crimes against children?

9  A    I have been part of multiple investigations.  I became a

10  detective around 2016, and I assisted many other detectives

11  with sex crimes, like child sex crime cases.  And then in 2019

12  is when I officially became part of the ICAC task force, and I

13  started being the lead investigator on those crimes.

14  Q    Were you the lead investigator on the case against Greg

15  Williamson?

16  A    Yes.

17  Q    Were you working in this capacity in November of 2020?

18  A    Yes.

19  Q    What was your role at that time?

20  A    I was a detective for the North Port Police Department.

21  And I was on the ICAC task force, and I had the responsibility

22  of receiving the cyber tips.  Along with our digital forensic

23  lab, we would work these together and continuing the

24  investigation or evaluating the cyber tips.

25  Q    Can you walk us through the process of how you would

DIRECT EXAMINATION OF JAMES KELLER, II

1    receive a cyber tip and what you might do with it?

2    A    Yes.  So the way that cyber tips come, we get cyber tips

3    from Gateway, Instagram, some private citizens where they'll

4    just self-report themselves directly to NCMEC.  We get a

5    number of cyber tips from various platforms.  And how those

6    get routed to the proper police department is, for example,

7    say Google reports an email address.  They provide that email

8    address, basic subscriber information.  And subscriber

9    information would be kind of like when you sign up for

10   something, you put in your name, phone number, email address,

11   just the basic information.  And those things that you share

12   with those electronic service providers, so in this case

13   Google, or my example is Google, then when they notice that

14   something violated like their terms of service or they believe

15   that child exploitation was shared on the servers, they then

16   provide that information to NCMEC, which is the clearinghouse.

17          They also provide -- and we've seen this a number of

18   different ways -- IP addresses.  So sometimes they will

19   provide the IP address for the registration of the account.

20   So that is the IP address which is the Internet protocol

21   address, which is where the subscriber used to first initiate

22   that account.  They sometimes also provide us a list of IP log

23   activities over, like sometimes days or sometimes months.  And

24   then sometimes they only provide us the IP address that's

25   associated with the very specific image that was uploaded that

DIRECT EXAMINATION OF JAMES KELLER, II

1  they are reporting to us.

2         So once those IPs are provided to NCMEC, then NCMEC

3  uses publicly available databases that anyone can use online

4  to put these IPs in to try to research an approximate

5  geolocation.  And the reason why anyone is able to do this is

6  because IP addresses are used by private companies for

7  advertisement and things.  And that way when you are in a

8  certain area, they are able to push certain information to

9  your phone.  So they kind of know where you're at or where

10 you're searching proximately.

11        So say one of those IP addresses like showed up in

12 North Port.  Then NCMEC will forward that cyber tip to the

13 ICAC task force here in Florida.  In Florida we have --

14 Q    I'm going to go ahead and stop you there.  So ICAC

15 receives information that came from an electronic service

16 provider?

17 A    Yes.

18 Q    And does that information include an IP address?

19 A    Yes.

20 Q    Do you obtain that information when you receive a cyber

21 tip?

22 A    Yes.

23 Q    What do you do with that information?

24 A    For the IP address that I receive?

25 Q    Yes.

DIRECT EXAMINATION OF JAMES KELLER, II

1  A    So I verify with the American Registry for Internet

2  Numbers, ARIN, of who that IP address comes back to.  And what

3  I mean by it "comes back to" is which Internet service

4  provider is responsible for that number, such as this case it

5  was Comcast.

6  Q    And I think you were mentioning before that ICAC decides

7  where to send a tip based on what?

8  A    Based on the IP address.

9  Q    Does the IP address give an approximate location?

10  A    Yes.

11  Q    Can you explain just briefly what a cyber tip might look

12  like for you?

13  A    So a cyber tip comes to me in a PDF form, and it's broken

14  down to multiple sections.  The first section is the

15  information that's provided by the electronic service

16  provider.  And that is where the information, the subscriber

17  information, the incident date and time, sometimes they

18  provide additional phone numbers and email addresses and IP

19  addresses, and then they also put the information for the

20  reported images.  Such as, if there is one image, they will

21  provide us like a hash value for that image, the image name,

22  and any other information they can provide us about that

23  image.

24       The next section is going to be information of like

25  what NCMEC does with the cyber tip.  So their independent

DIRECT EXAMINATION OF JAMES KELLER, II

1  research, such as like their research of the IP address or

2  whether or not they reviewed any of the contents, they tell us

3  that information in the second section.

4  Q    What is a hash value?

5  A    So a hash value is a digital fingerprint for media.  And

6  it could be for a text document.  It could be for a photo,

7  video, anything that will be on your computer that you can

8  open up.  It helps to identify that specific image or media.

9  Q    Does a cyber tip begin an investigation sometimes?

10  A    Sometimes.

11  Q    Does it always result in a criminal investigation?

12  A    No.

13  Q    Why might it not?

14  A    So the way I handle cyber tips is -- so I represent the

15  government.  And when I receive a cyber tip and information is

16  provided to me that says, hey, it's reasonable to believe that

17  there's child exploitation material associated with this

18  account and they provide the images, I review the images.  I

19  determine, based upon my training and experience, whether or

20  not it's child exploitation or not child exploitation.

21        If it's not child exploitation and I can sit there

22  and say that's obviously an adult, well, then I'm closing the

23  tip.  I'm not doing any further actions.  It is not my job

24  to -- I have no reasonable basis to continue that

25  investigation and going into a citizen's account and

DIRECT EXAMINATION OF JAMES KELLER, II

1  furthering anything.

2  Q    Going back to November of 2020, did you receive a cyber

3  tip for the case we're here for today?

4  A    Yes.

5  Q    Who was the tip from?

6  A    From Yahoo.

7  Q    What information did it contain?

8  A    It contained subscriber information for an email address

9  with Vlad Vlad with seven images attached to the cyber tip.

10 Q    What was the full email address?

11 A    It was Vladlover50@Yahoo.com.

12 Q    What is the approximate geolocation for the IP address?

13 A    For the reported incident date, the IP address that was

14 geo estimated was in North Port, Florida.

15 Q    How many images did it contain?

16 A    Seven.

17 Q    Did you review those images?

18 A    Yes.

19 Q    Did you determine some of them were child pornography?

20 A    Yes.

21 Q    Can you tell me the phone number that was provided?

22 A    The phone number that was provided, I believe it ends in

23 like 1469.

24 Q    What did you do with the information after reviewing the

25 tip?

DIRECT EXAMINATION OF JAMES KELLER, II

1  A    So I review the tip.  I verify that some of the images

2  were child exploitation material or child pornography.  And

3  the next logical step is to determine, okay, well, where did

4  this come from.  I have an approximate location in North Port,

5  but I need to then find out what's the address it came from.

6  So I submitted an investigative subpoena to Comcast with the

7  IP address for the date and time that Yahoo provided me.

8  Q    Why would you go to Comcast?

9  A    Because I was able to search that IP address in the

10 American Registry for Internet Numbers, and it told me it was

11 registered to Comcast.  And why ARIN -- we refer to it as

12 ARIN, another acronym, is because it's like a -- think of like

13 a phone book.  And ARIN keeps track of all the IP addresses

14 and who was responsible for those IP addresses.  So it's just

15 a phone book for North America.

16 Q    Can you explain why an IP address is connected to

17 Comcast?

18 A    IP addresses associated with Comcast, because if you

19 have, whether it's Comcast, Frontier, Charter Communications,

20 any of these Internet service providers at your house, you

21 have to sign up for the Internet provider.  And then that

22 Internet provider basically gives you an IP address associated

23 with your house, and that is your ticket to reach the

24 Internet, from your house to the Internet.  And that's how

25 information is provided from your house to the Internet.  And

DIRECT EXAMINATION OF JAMES KELLER, II

1    then how information, such as your googling something, that's

2    also how it finds its way back to you at your house to give

3    you what you were looking for.

4    Q    So just a quick example to make sure I understand.  If I

5    have Frontier at my house, would my IP address on my computer

6    associate with Frontier?

7    A    Yes.

8    Q    What is subscriber information?

9    A    So the subscriber information is information such as,

10   say, Comcast.  If you sign up for Comcast, you are going to

11   provide Comcast your name, the service address, the billing

12   address because you're going to be the financially responsible

13   party when you're signing up for the service, and then also

14   sometimes a phone number you'll provide and then one or more

15   email addresses as well.

16   Q    And you mentioned that the Comcast was the electronic

17   service provider in this case?

18   A    Yes.

19   Q    I'm going to show you Exhibit 13.  Did you request that

20   subscriber information from Comcast?

21   A    Yes.

22   Q    Is that Exhibit 13?

23   A    Yes.

24   Q    What information did it provide you?

25   A    So I requested -- in the center of the page that's bold

DIRECT EXAMINATION OF JAMES KELLER, II

1  is the IP address and the incident date and time.  So that was

2  my request to Comcast.  I wanted the subscriber information

3  for whoever was using that IP address at that date and time.

4  And the results that they gave me are here on the screen,

5  which is a subscriber name of Aliona Williamson with the

6  service address of 2575 Rolling Road, North Port, Florida

7  34288.

8  Q    Does Comcast provide Internet service?

9  A    Yes.

10  Q    Who is Aliona Williamson?

11  A    Through my investigation, I learned that this was the

12  adult female residing at this residence.

13  Q    Does that mean that she, according to this document, is

14  Vladlover50?

15  A    No.

16  Q    Why not?

17  A    Because anyone in the house can sign up for the Internet

18  service provider.  Like, for example, at my house, my Internet

19  is not in my name; it's in my wife's name.

20  Q    So is this the information that's just provided from the

21  person signing up for the Internet?

22  A    Correct, and again, the one who is financially

23  responsible.

24  Q    What emails were associated with the subscriber?

25  A    So typically when I see these subpoena results from

DIRECT EXAMINATION OF JAMES KELLER, II

1  Comcast, it's like a default Comcast.net email, but in this

2  case there were actually two separate emails associated that

3  was provided to Comcast, which is dispatchtwh and

4  Williamson_Gregory.

5  Q    And based on your investigation, who did those belong to?

6  A    To Gregory Williamson.

7  Q    Did you follow the phone number from the cyber tip ending

8  in 1469?

9  A    Yes.

10  Q    Where did that take you?

11  A    So that was -- that resulted to Verizon.  So through,

12  again, publicly available websites that anyone can look a

13  phone number on, I was able to tell that that number is -- or

14  the provider for that number responsible is or was Verizon.

15  Q    Later, did you find that phone number associated with

16  anything in this case?

17  A    Yes.  So I did a subpoena to that phone number, and it

18  came back to a lady that lives in Venice.  However, during

19  this investigation I learned that this was a previous phone

20  number for Gregory Williamson.

21  Q    How did you learn that?

22  A    It was confirmed with people who lived at the house and

23  then also through a cell phone extraction of a Samsung.

24  Q    What did you do next after receiving the cyber tip from

25  Yahoo and the subscriber information?

DIRECT EXAMINATION OF JAMES KELLER, II

1  A    So after I get the cyber tip and then now I verified the

2  address in the City of North Port, then the next logical step

3  is to do a search warrant to the Yahoo account in order to

4  obtain the rest of the data associated with that email

5  address.

6  Q    Did you obtain a search warrant for

7  Vladlover50@Yahoo.com?

8  A    Yes.

9  Q    I'm going to show you Exhibit 1.  Have you seen this

10  exhibit before?

11  A    Yes.

12  Q    Is this the Yahoo search warrant return?

13  A    Yes.

14  Q    Well, is the data in there?

15  A    Yes, the data is there.

16  Q    And 1X?

17  A    Yes.

18  Q    What do you recognize this to be?

19  A    That is a forensic report that was created from the email

20  return.  So the email return we had to ingest into a forensic

21  tool in order to be able to read it.  It's much like if you

22  have a Word document on your computer, you need Microsoft Word

23  or some sort of text document program to be able to read that

24  data.  If you don't have that software to read the data,

25  you're not going to be able to read it.  So likewise in this

DIRECT EXAMINATION OF JAMES KELLER, II

1  situation with the results that Yahoo gave me, I had to use a

2  forensic tool in order to be able to read it.

3  Q    So does this contain all the info from the Yahoo search

4  warrant redacted?

5  A    Yes, redacted.

6  Q    I'm going to show you Exhibit 17.  Do you recognize this?

7  A    Yes.

8  Q    What is this?

9  A    It's the subscriber information and kind of like the back

10  end detail of that email address from Yahoo.

11  Q    Do you recognize any of the phone numbers from this?

12  A    Can you zoom in on it?

13       Yes.  So that (941)445-1469, that phone number.

14  Q    I'm going to show you Exhibit 1.1A, 1.2A, 1.3A, 1.4A,

15  1.5A, 1.6A, 1.7A, and 1.8A.  Do you recognize these exhibits?

16  A    Yes.

17  Q    What do you recognize them to be?

18  A    They are screenshots from the Yahoo search warrant

19  return.

20  Q    Did you assist in generating these exhibits?

21  A    Yes, I did.

22  Q    And who did that with you?

23  A    I did that with Detective Lee Wallace.

24  Q    Was that the digital forensic examiner we heard from?

25  A    Yes.

DIRECT EXAMINATION OF JAMES KELLER, II

1  Q    How did you generate this?

2  A    We ingested the emails into the forensic tool, and then

3  we were able to create a report from it.  And we were able to

4  take screenshots of some of the emails.

5  Q    Did they appear to be a fair and accurate depiction of

6  the emails that you discovered within the Yahoo search

7  warrant?

8  A    Yes.

9          MS. FAVORIT:  May I approach the witness?

10          At this time the United States would enter 1.1A,

11  1.2A, 1.3A, 1.4A, 1.5A, 1.6A, 1.7A, and 1.8A.

12          THE COURT:  Admitted.

13          MS. FAVORIT:  Thank you.

14  BY MS. FAVORIT:

15  Q    These exhibits, are they all of the emails that were

16  relevant to this case?

17  A    No.

18  Q    How many other emails were there?

19  A    Like hundreds of them.

20  Q    Are they the only ones that contain content of a sexual

21  nature?

22  A    No.

23  Q    How many others were there of a sexual nature?

24  A    There was a lot.

25  Q    How did you decide to parse these particular emails?

DIRECT EXAMINATION OF JAMES KELLER, II

1  A    The -- we grabbed these because they were pretty

2  explicit.  And it was also the content of like who they were

3  going to.

4         MS. FAVORIT:  Permission to publish 1.1A, Your Honor?

5         THE COURT:  Yes.

6  BY MS. FAVORIT:

7  Q    Looking at 1.1A, can you tell me what this contains?

8  A    Yes.  So this is an email from Vlad Vlad,

9  Vladlover50@Yahoo.com to Vlad Vlad, Vladlover50@Yahoo.com.

10 Q    And when was this email chain from?

11 A    July 23, 2019.

12 Q    And what is the subject?

13 A    "Hello doll face."

14 Q    So is this from Vlad to Vlad?

15 A    Yes.

16 Q    Could you please read us -- starting from the bottom

17 because that appears to be the first one, can you read us this

18 email chain, please?

19 A    Yes.  So the chain, it starts from the bottom to the top.

20 And the document is going between Vladlover -- so it's an

21 email thread.  Vladlover50@Yahoo.com to

22 Deea.Apostol2007@gmail.com all the way to the top, which then

23 was ultimately sent from Vlad Vlad.

24        The first one reads, "Do you have exploding orgasms

25 in your panties like this?"

DIRECT EXAMINATION OF JAMES KELLER, II

1          And then she responded, "Stop.  You said you would,

2   so please just stop.  I don't like you.  I don't harass people

3   like you.  So I will be reporting you to the police."

4          Continues.  "So why you so mad for?  Don't even try

5   to tell me that you have not rubbed yourself."

6          Deea responded, "I don't like you, pedophile."

7          And he said, "I love you," with multiple dots

8   afterwards.

9          And she responded, "I don't.  Just leave me alone,

10  leech."  And then she responded again and said, "Email me one

11  more time and everything goes to the police."

12         And he responded, "Want to get married," with a

13  period, though.  And then he also responded, "I want to cum in

14  your panties."

15  Q    And what is the information that follows after it?

16  A    That's the information that's associated with the email

17  thread.

18  Q    I'm going to publish 1.2A.  Could you tell us what this

19  email is, please?

20  A    So this is an email from Vladlover50@Yahoo.com on

21  August 7, 2019.  It's from Vlad Vlad, Vladlover50@Yahoo.com

22  to -- this name has Duvella, so it's

23  Deea.Apostol2007@Gmail.com.

24  Q    I'm also going to have you read this thread.  We'll start

25  from the bottom.

DIRECT EXAMINATION OF JAMES KELLER, II

1  A    So this starts from the bottom and starts with Deea

2  saying, "Stop messaging me."

3          He replied, "Hi, sweetness.  It was an amazing

4  evening.  Please send picture today."

5          He also wrote, "Please don't wear any panties," but

6  spelled P-N-T-Y-S under your dress today.

7          He also then replied, "Hope your okay.  Haven't heard

8  from you today, sweetness."

9          And then he continued, "Oh, sweetness, you took my

10  cum."

11          And then continued, "Good morning, sweetness."

12  Q    If you can continue, please?

13  A    He wrote, "Oh, sweetness, don't be afraid or ashamed to

14  be in love with a man who is older than you.  Our sex is

15  assume [sic].  I love you."

16          He then wrote, "I'm still waiting for that picture of

17  your wetness."

18          He then continued, "Why are you mad at me, sweetness?

19  I'm so horny for you right now.  I want to lick your wetness

20  until you cum in my face and I fill your pussy up with my

21  cum."

22          He then continued, "Why are you mad at me, sweetness.

23  I'm so horny for you right now.  I want to lick your wetness

24  until you have cum on my face and I fill your pussy up with my

25  cum."

DIRECT EXAMINATION OF JAMES KELLER, II

1  Q     I have scrolled to 1.2A.  Is this more a continuation of

2  this email thread?

3  A     Yes.  So this whole chat starts, I think it's the third

4  page and then works its way up to page 1.

5  Q     I will have you read some of this as well.

6  A     Starting at the bottom, "I get so hard thinking about you

7  and cumming in your panties.  Do you want to watch me cum?"

8         She responded, "No.  Bye."

9         He responded, "I want to watch you cum."

10        Then was a response with no content written in it.

11 And then he responded -- oh, that was from her.

12        Then he responded, "Love when you talk dirty.  Can I

13 lick the cum from your panties?"

14        And she responded, "Bye bye.  This is the last time.

15 Next step police."

16        And then he responded, "Will you sit on me like

17 this?"

18 Q     Go ahead.

19 A     She wrote, "Bye."

20        And he wrote, "Oh, look, you made me cum last night.

21 Do you wear panties under your dresses?"

22        She responded, "Do you die?"

23        He wrote, "Forgot to send this to you.  You made me

24 cum again last night."

25 Q     And from page 4?

DIRECT EXAMINATION OF JAMES KELLER, II

1  A    Deea wrote, "Stop," in all caps.

2        And then he responded, "You really made me cum."

3        She responded, "I'm sorry.  The Gmail account you

4  have contacted is no longer active."

5        He wrote, "Hope you didn't get pregnant."

6        She wrote, "I'm sorry.  The Gmail account you have

7  contacted is no longer active."

8  Q    And the last portion?

9  A    He wrote, "Can't stop thinking 'bout you.  Want to get

10 married?"

11       She wrote, "I'm sorry.  The Gmail account you have

12 contacted is no longer active."

13 Q    Was this thread about five years ago?

14 A    Yes.

15 Q    I'm going to go ahead and show you 1.3A.  Starting on the

16 second page, is this another thread?

17 A    Yes.

18 Q    What is the date range of this thread?

19 A    I think where it ended was August 7, 2019.

20 Q    I'm going to have you read this one.  I will zoom in

21 starting at the bottom.  Go ahead.

22 A    "The police are tracking you down and seeing how many

23 victims there are," is what she wrote.

24       He wrote, "Only in love with you, sweetness."

25       And then he again said, "Just send picture."

DIRECT EXAMINATION OF JAMES KELLER, II

1          She responded, "Anything besides that?"

2          He wrote, "You only need to send wetness pics,

3   nothing else."

4          She wrote, "And you're never going to text me again?"

5   Q    Okay.  Go ahead.

6   A    At the bottom he wrote, "Yes.  Please send pictures,

7   sweetness."

8          She responded, "I dare you to send me anything else.

9   It will be displayed on YouTube warning people about you.

10  Wouldn't your parents be proud?"

11         He responded, "Want me to stop texting you?  Send

12  pictures.  I will go away heartbroken.  I really am in love

13  with you."

14         She responded, "Now stop."

15         He responded, "That's a picture from the web BTW,"

16  means by the way.

17         And then he responded, "That's not you."  Or I'm

18  sorry.  She wrote, "That's a picture from the web BTW."

19         He responded, "That's not you."

20         She responded, "Now stop."

21         Then he wrote, "No, it's not.  I believe you cum in

22  your panties like that, but that's not you."

23         And then she responded at the top, "Stop now.  It's

24  me."

25  Q    And the last portion?

DIRECT EXAMINATION OF JAMES KELLER, II

1  A    So she wrote, "Now stop," at the bottom of the page.

2         And then it moves up.  He wrote, "No, it's not.  I

3  believe you cum in your panties like that, but that's not

4  you."

5         She replied, "Stop now.  It's me."

6         He wrote, "No, it's not."

7         She replied, "I'm not dumb.  I would never send you

8  pictures of me."

9         He wrote, "Are you horny?  Are you dripping with

10 juices?  Want to feel a hard dick in you?"

11        And she responded, "No."

12 Q    I'm going to show you 1.4A.  Do you recognize this

13 exhibit?

14 A    Yes.

15 Q    Can you tell us what this one is?

16 A    Can you zoom in on the top, the "To" and "From" and the

17 body?  Thank you.

18        So this email -- in investigations when you see

19 something that's like a trend and then all of a sudden there's

20 an outlier, this is an outlier.  So I saw a lot of emails of

21 what we just went over.  And then this one here is from Vlad

22 Vlad, Vladlover50@Yahoo.com to an Edward Miller.  So it's

23 CHPship@CHPlogistics.com.  And the date on that is March 3,

24 2020.  The subject, "Piece of shit liar."  And it looks to be

25 some sort of like work email.

DIRECT EXAMINATION OF JAMES KELLER, II

1  Q    I'm going to have you read this thread.  I want to start

2  with this signature from Edward Miller.  Can you tell me --

3  can you read the signature, please?

4  A    Yes.  So this is what leads me to believe that this is

5  related to a work email is because it's Edward Miller is the

6  to, and his title is VP of sales, so vice president of sales.

7  And at the bottom is CHP Logistics, Inc.  And there's some

8  text down there at the bottom of the screen that says we are

9  both -- I guess it starts right above that.  It says, "You the

10 driver or broker?"

11        And then the response is, "We are both."

12 Q    And what did Gregory Williamson do for a living?

13 A    He was a broker for truck drivers.  So he was like the

14 middleman to connect businesses if you need drivers to drive

15 for them, and he connected them with certain drivers.

16 Q    And who does this email thread start from?

17 A    It was from Vlad Vlad or Vladlover50@Yahoo.com.

18 Q    What does is say in the content?

19 A    It says, "You tell this guy you are both.  You are

20 nothing but a scumbag piece-of-shit broker."

21 Q    And what is the response?

22 A    "Shut the hell up."

23 Q    What is Vladlover's response to that?

24 A    "You don't, you piece-of-shit broker.

25 Q    And then the last portion of the content, please?

DIRECT EXAMINATION OF JAMES KELLER, II

1   A    "Fuck off, bitch.  I have both, you moron."

2         And then above that is, "Eddy, Eddy, Eddy, you're

3   just a fat, old delusional fuck that has no idea what he is

4   doing.  Your cancellations speak volumes."

5   Q    And to reiterate, this email1 came from the Yahoo search

6   warrant?

7   A    Correct.

8         MS. FAVORIT:  May I approach?

9   BY MS. FAVORIT:

10  Q    I'm showing you what's marked as 1.5.  Do you recognize

11  this?

12  A    Yes.

13  Q    What do you recognize it to be?

14  A    An email from the Yahoo search warrant return.

15  Q    And what is the difference between 1.5 and 1.5A which is

16  already in evidence?

17  A    1.15 is a nonredacted copy of 1.5A.

18  Q    Is it a fair and accurate depiction of an email you

19  discovered within the Yahoo search warrant?

20  A    Yes.

21        MS. FAVORIT:  Your Honor, at this time I'm offering

22  what's been marked as 1.5 into evidence.

23        THE COURT:  Admitted.

24        MS. FAVORIT:  Permission to publish?

25        THE COURT:  Yes.

DIRECT EXAMINATION OF JAMES KELLER, II

1  BY MS. FAVORIT:

2  Q    I'll show the email with the redacted version.  Are these

3  photo attachments to an email thread?

4  A    Yes.

5  Q    I'm also displaying the 1.5A.  Can you tell me who this

6  is an email to?

7  A    The "To" is Deea.Apostol1782@gmail.com.

8  Q    Who was it from?

9  A    Vlad Vlad, Vladlover50@Yahoo.com.

10 Q    When is the date?

11 A    May 5, 2020.

12 Q    What is the subject?

13 A    Cream.

14 Q    Could you read us the body of the email, please?

15 A    "I so much want to suck on your gorgeous tits while

16 cumming all over your sweet pussy."

17 Q    Are these the redacted images that we just looked at?

18 A    Yes.

19 Q    Were these images attached to the email we just read?

20 A    Yes.

21 Q    It looks like there is some user activity afterwards.

22 Can you please explain this to us?

23 A    The user activity is like a timeline of the emails.  So

24 this shows the emails with, like on the right column all the

25 way to the right of the screen is like the subject line, such

DIRECT EXAMINATION OF JAMES KELLER, II

1    as the one we just read was cream.  So the one before that was

2    cream pie.  This one was cream.  The one after that is making

3    you cum.  And this is over multiple dates.

4    Q    I'm going to show you 1.6.  Do you recognize this?

5    A    Yes.

6    Q    What do you recognize it to be?

7    A    It's another email from the Yahoo search warrant return.

8    Q    Does this one also contain images?

9    A    Yes.

10   Q    Did you pull this from the Yahoo search warrant?

11   A    Yes.

12   Q    And did you generate this exhibit?

13   A    Yes.

14   Q    Is the only difference between 1.6 and 1.6A a redaction?

15   A    Yes.

16   Q    Does 1.6 appear to be a fair and accurate depiction of

17   the email thread that you took from the Yahoo account?

18   A    Yes.

19        MS. FAVORIT:  Your Honor, at this time I'm offering

20   1.6 into evidence.

21        THE COURT:  Admitted.

22        MS. FAVORIT:  Permission to publish?

23        THE COURT:  Yes.

24        MS. FAVORIT:  Thank you.

25   BY MS. FAVORIT:

DIRECT EXAMINATION OF JAMES KELLER, II

1  Q    I'm going to show you 1.6A so we can talk about it.  Who

2  is this an email to?

3  A    Deea.Apostol1782@gmail.com.

4  Q    Who is it from?

5  A    Vlad Vlad, Vladlover50@Yahoo.com.

6  Q    When was it sent?

7  A    May 9, 2020.

8  Q    What is the subject?

9  A    "Popping your cherry."

10  Q    What is the body?

11  A    "Would so much love to pop your cherry and watch you have

12  your first orgasm."

13  Q    And are those images that we just saw the attachments to

14  this email?

15  A    Yes.

16  Q    Looks like we have user activity again afterwards?

17  A    Yes.

18  Q    Could you please explain that to us on this one?

19  A    Again, it's emails.  It's a timeline in chronological

20  order showing the emails before and after, the email we just

21  reviewed.  So this one was, "Popping your cherry," and the one

22  before that was, "Making you cum."

23  Q    I'm now going to show you 1.7A.  Is this another email?

24  A    Yes.

25  Q    Could you tell me who it is to?

                    DIRECT EXAMINATION OF JAMES KELLER, II

1   A     It's to Deea.Apostol1782@gmail.com.  It is also to

2   Deea.Apostol@iCloud.com.

3   Q     Who is it from?

4   A     Vlad Vlad, Vladlover50@Yahoo.com.

5   Q     When was it sent?

6   A     September 5, 2020.

7   Q     What is the subject?

8   A     "I love you."

9   Q     And the body?

10  A     "I want to make you pregnant."

11  Q     Was there an attachment to this email?

12  A     Yes.

13  Q     And is this the photo from that email?

14  A     Yes.

15  Q     Based on your training and experience, is this a photo of

16  a child?

17  A     Yes.

18        MS. FAVORIT:  May I have a quick moment, Your Honor?

19        THE COURT:  Yes.

20  BY MS. FAVORIT:

21  Q     I'm going to go ahead and show you 1.8A.

22        Actually, there's user activity for 1.7A, if we could

23  go over that really quickly.  What is the user activity

24  demonstrating on this one?

25  A     User activity is in chronological order for the timeline.

DIRECT EXAMINATION OF JAMES KELLER, II

1    And it shows the email that we just reviewed, which was titled

2    "I love you" in the subject line.  The email before that was

3    "Making me cum" in the subject line.  And the one after that

4    is a young Asian girl to a different email.

5    Q    I'm going to show you 1.8A.  Is this another email?

6    A    Yes.

7    Q    Who is it to?

8    A    It's to Deea.Apostol17782@gmail.com.

9    Q    Who is it from?

10   A    Vlad Vlad, Vladlover50@Yahoo.com.

11   Q    What is the subject?

12   A    "Making love."

13   Q    Can you please read the content?

14   A    "Watch the end of this.  I want to cum all over your

15   pussy like this while making love."

16   Q    Is there a link in this email?

17   A    Yes.  There's a blue hyperlink in the email that reads,

18   "Tasty looking Russian teen gets creamed after anal/anal

19   in.com."

20   Q    And could you read the description of that link, please?

21   A    So the description of the link, there's like a box

22   underneath the link.  In bold it says, "Tasty looking Russian

23   teen gets creamed after anal/analin.com" with a text under

24   that that reads, "Cute brunette called Sima treats lucky boy

25   orally then rides his hard dick and makes him cum."

DIRECT EXAMINATION OF JAMES KELLER, II

1  Q    Did you attempt to follow this link?

2  A    Yes.

3  Q    Did it work?

4  A    It was no longer a good link.

5  Q    What is the relevance to Russian content to this case

6  based on your investigation?

7  A    So this stood out during the investigation because of the

8  victim and where she immigrated from, which was Moldova, which

9  is a Slovak country.

10 Q    And I'm going show you the next half of our exhibits.

11 I'm going to show you 1.9A, 1.10A, 1.11A, 1.12A, 1.13A, 1.14A,

12 1.15A, 1.16A, 1.17A, and 1.18.  Do you recognize these?

13 A    Yes.

14 Q    What do you recognize them to be?

15 A    More exhibits from the Yahoo email.

16 Q    Did you create these exhibits?

17 A    Yes.

18 Q    Do they appear to be fair and accurate depictions of

19 emails that you parsed from Yahoo?

20 A    Yes.

21      MS. FAVORIT:  At this time, I'm offering those

22 exhibits into evidence.

23      THE COURT:  Admitted.

24      MS. FAVORIT:  Would you like me to read them again?

25      THE COURT:  No.

DIRECT EXAMINATION OF JAMES KELLER, II

1          MS. FAVORIT:  Permission to publish.

2   BY MS. FAVORIT:

3   Q     I'm going to show you 1.9A.  Could you tell me who this

4   is from?

5   A     It's from Vlad Vlad, Vladlover50@Yahoo.com.

6   Q     Who is it to?

7   A     Deea.Apostol1782@gmail.com.

8   Q     And the subject?

9   A     "Making love."

10  Q     And the content?

11  A     "Would love to spend the evening making sweet passionate

12  love to you."

13  Q     And could you read what the link is called?

14  A     "Old man fucks angel teen."

15  Q     I see there's some black boxes.  Could you explain this,

16  please?

17  A     So that's -- the top box that's blacked out is the

18  preview for what that link, the hyperlink would take you to,

19  which is "Old man fuck angel teen."  And when it was followed,

20  this was the notice that we were given on Pornhub, which was,

21  "Video was flagged for verification in accordance with our

22  trust and safety policy."  So it violated some term.

23  Q     I'm going to show you Exhibit 1.10.  Do you recognize

24  this?

25  A     Yes.

DIRECT EXAMINATION OF JAMES KELLER, II

1   Q    What do you recognize it to be?

2   A    So this is another email from the Yahoo search warrant.

3   Q    Does it appear to be a fair and accurate depiction of

4   that Yahoo email?

5   A    Yes.

6   Q    What's the difference between 1.10 and 1.10A?

7   A    1.10A would be a redacted copy.

8        MS. FAVORIT:  Your Honor, at this time I move in

9   1.10.

10       THE COURT:  Admitted.

11       MS. FAVORIT:  Permission to publish?

12       THE COURT:  Yes.

13       MS. FAVORIT:  Thank you.

14  BY MS. FAVORIT:

15  Q    I'm going to use 1.10A to talk about the email.  Can you

16  tell me who this is from?

17  A    From Vlad Vlad, Vladlover50@Yahoo.com.

18  Q    Who is it to?

19  A    Deea.Apostol1782@gmail.com.

20  Q    What is the subject?

21  A    Subject is "Want to watch you masturbate."

22  Q    And the content, please?

23  A    Reads, "Would love to watch you masturbate and see you

24  cum all over your finger or in your panties.  Then I would eat

25  all of your love juices making you cum again on my face."

DIRECT EXAMINATION OF JAMES KELLER, II

1   Q    What is the link titled?

2   A    So the blue hyperlink is titled "Cute teen gets her sweet

3   pussy cream pied by pervert man."

4   Q    And was the photo what we just saw in 1.10?

5   A    Yes.

6   Q    I will show you 1.11.  Do you recognize this?

7   A    Yes.

8   Q    What do you recognize it to be?

9   A    Another email from the Yahoo search warrant return.

10  Q    Did you create this exhibit?

11  A    Yes.

12  Q    What's the difference between 1.11 and 1.11A?

13  A    1.11A is redacted.

14  Q    Is it a fair and accurate depiction of what you created?

15  A    Yes.

16  Q    And you created that directly from the Yahoo search

17  warrant?

18  A    Correct.

19        MS. FAVORIT:  Your Honor, at this time I move in

20  1.11.

21        THE COURT:  Admitted.

22        MS. FAVORIT:  Permission to publish?

23        THE COURT:  Yes.

24        MS. FAVORIT:  Thank you.

25  BY MS. FAVORIT:

DIRECT EXAMINATION OF JAMES KELLER, II

1   Q    I'm going to use 1.11A to talk about it.  Who is this

2   from?

3   A    It's from Vlad Vlad, Vladlover50@Yahoo.com.

4   Q    Who is it to?

5   A    It's Duvella, Deea.Apostol2007@Gmail.com.

6   Q    What is the subject?

7   A    The subject is "Sweetness."

8   Q    Content?

9   A    "Would love to eat you out."

10  Q    And can you read the hyperlink that was within this

11  email?

12  A    Yes.  So at the top of the screen, the blue hyperlink is

13  "Powerful old man thumps a young girl's cunt real hard-porn

14  300.com."

15  Q    Will you read the description underneath that, please?

16  A    So the whiter text at the bottom of the screen reads, "He

17  may look old and frail, but this man has got power packed

18  inside his dick.  The rod stands so tough and erect..."

19  Q    I'm going to show you 1.12A.  Who is this from?

20  A    Vlad Vlad, Vladlover50@Yahoo.com.

21  Q    Who is it to?

22  A    Deea.Apostol1782@gmail.com.

23  Q    What is the subject?

24  A    The subject is, "Watch this, sweetness."

25  Q    Does this have a hyperlink in the email?

DIRECT EXAMINATION OF JAMES KELLER, II

1   A    Yes.  It has a blue hyperlink.

2   Q    Could you read that for us, please?

3   A    It reads, "Dirty minded teen seduced her stepfather and

4   sucked his cock before he fucked her brains out.  Perfect

5   girls."

6   Q    And was this image always blank when you reviewed the

7   emails?

8   A    Yes.

9   Q    Did you try to follow it?

10  A    Yes.

11  Q    And what was the result?

12  A    Just a pornography website.

13  Q    I'm going to show you 1.13A.  Would you please tell us

14  who this is from?

15  A    It is from Vlad Vlad, Vladlover50@Yahoo.com.

16  Q    Who is it to?

17  A    Deea.Apostol1782@gmail.com.

18  Q    When was this sent?

19  A    November 16, 2019.

20  Q    What is the subject?

21  A    The subject is, "Cumming on daddy's prick."

22  Q    What is the content?

23  A    It reads, "Do your eyes roll back in your head and does

24  your body quiver when you cum?  Would love for you to cum all

25  over my prick."

DIRECT EXAMINATION OF JAMES KELLER, II

1   Q    I'm going to show you 1.14A.  Who is this from?

2   A    It's from Vlad Vlad, Vladlover50@Yahoo.com.

3   Q    When was it sent?

4   A    November 29, 2019.

5   Q    Who is it to?

6   A    It's to deea.apostol1782@gmail.com.

7   Q    What is the subject?

8   A    The subject is, "Riding my prick."

9   Q    And what is the content?

10  A    It reads, "Will you ride my hard prick like this until I

11  fill your pussy full of my cum?"

12  Q    What is the hyperlink?

13  A    Blue hyperlink reads, "Cute teen gets fucked for first

14  time."

15  Q    Was this video still on the page when you followed it?

16  A    No, it was not.

17  Q    I'm going to show you Exhibit 1.16.

18       THE COURT:  Give us that number again.

19       MS. FAVORIT:  1.16.

20  BY MS. FAVORIT:

21  Q    Do you recognize this?

22  A    Yes.

23  Q    What do you recognize it to be?

24  A    Another email from the Yahoo search warrant return.

25  Q    Did you create this exhibit?

DIRECT EXAMINATION OF JAMES KELLER, II

1  A    Yes.

2  Q    And does it appear to be a fair and accurate depiction of

3  the photo and email you found on the Yahoo search warrant?

4  A    Yes.

5        MS. FAVORIT:  Your Honor, at this time I move in

6  1.16.

7        THE COURT:  Admit.

8        MS. FAVORIT:  Permission to publish?

9        THE COURT:  Yes.

10        MS. FAVORIT:  Thank you.

11  BY MS. FAVORIT:

12  Q    Who is this from?

13  A    This email is from Vlad Vlad, Vladlover50@Yahoo.com.

14  Q    Who was it to?

15  A    It's to deea.apostol1782@gmail.com.

16  Q    What is the subject?

17  A    Subject is "Virginity."

18  Q    Could you read the body of the email, please?

19  A    The body reads, "I would love so much to caress and rub

20  your body and your puffy little tits until you became so wet

21  and horny that you pushed my head down to your cunt and made

22  me lick it until you couldn't stand it no more.  Then you

23  started French kissing me, forcing your tongue in my mouth

24  whispering that you wanted me to make love to you and to

25  properly fuck you and take your virginity.  Once I did that,

DIRECT EXAMINATION OF JAMES KELLER, II

1  you could not get enough and wanted to fuck all the time."

2  Q    And then the photo that we saw in 1.16, is that what was

3  depicted in the body of this email?

4  A    Yes.

5  Q    Could you read us the name of the hyperlink?

6  A    The blue hyperlink reads, "Innocent virgin teen having

7  her first romantic fuck."

8  Q    And could you read the description below, please?

9  A    Bottom of the screen in the lighter text is the

10 description of, "Innocent brunette teeny give away her

11 virginity for the first time and probably the biggest cock she

12 has ever seen in her..."

13 Q    I'm going to go ahead and show you 1.18.  Can you tell us

14 who this is from?

15 A    This email says from Vlad Vlad, Vladlover50@Yahoo.com.

16 Q    And who is it to?

17 A    It's a bunch of alphanumeric numbers.  It says

18 @comm.craigslist.org.  It means it's like an email response to

19 a Craigslist ad.

20 Q    When was this sent?

21 A    September 6, 2020.

22 Q    What is the subject?

23 A    It's a bunch of characters with exclamation marks.  And

24 in the middle of those characters, it says, "Young Asian

25 girl."

DIRECT EXAMINATION OF JAMES KELLER, II

1  Q    Could you read us the body of the email, please?

2  A    So the body starts with a blue hyperlink for young Asian

3  girl.  And then it says, "Missed connections."  Missed

4  connections is a very specific area of Craigslist where it's

5  known to have -- people go to Missed Connections to try to

6  find other people who are interested in meeting up for sexual

7  purposes.

8        I have personal experience on Missed Connections in

9  undercover investigations.  And the link below gives like a

10  preview that again says the characters, "Young Asian girl

11  Missed Connections," with a description, "I am Asian, 25 year

12  old looking for a guy who knows how to eat pussy.  I live

13  alone."

14        And then the person who sent this email wrote, "Would

15  love to eat your pussy until you were too weak to walk."

16  Q    I'm going to show you Exhibit 2, 3, and 4, as well as 2A,

17  3A, and 4A.

18        I'm going to first ask you about 2, 3, and 4.

19  A    Okay.

20  Q    Do you recognize those?

21  A    Yes.

22  Q    What do you recognize them to be?

23  A    They are more emails from the Yahoo search warrant

24  return.

25  Q    Do these ones contain photographs?

DIRECT EXAMINATION OF JAMES KELLER, II

1  A    Yes.

2  Q    And did you create these exhibits from the Yahoo search

3  warrant?

4  A    Yes.

5  Q    Do they appear to be fair and accurate depictions of

6  content that you found on the search warrant?

7  A    Yes.

8          MS. FAVORIT:  Your Honor, at this time I move 2, 3,

9  and 4 into evidence.

10          THE COURT:  Admitted.

11  BY MS. FAVORIT:

12  Q    Now I'd like to direct your attention to 2A, 3A, and 4A.

13  Are they similar to 2, 3, and 4?

14  A    They are just redacted versions of 2, 3, and 4.

15  Q    Do they fairly and accurately depict those exhibits?

16  A    Yes.

17  Q    And do they come from the Yahoo search warrant?

18  A    Yes.

19          MS. FAVORIT:  Your Honor, at this time I move in 2A,

20  3A, and 4A.

21          THE COURT:  Admitted.

22          MS. FAVORIT:  Permission to publish?

23          THE COURT:  Yes.

24          MS. FAVORIT:  Thank you.

25  BY MS. FAVORIT:

DIRECT EXAMINATION OF JAMES KELLER, II

1  Q    I'm going to display 2A.  Could you tell me who this

2  email is to?

3  A    This email is to deea.apostol1782@gmail.com.

4  Q    And who is it from?

5  A    The email is from Vlad Vlad, Vladlover50@Yahoo.com.

6  Q    What date was it sent?

7  A    January 16, 2020.

8  Q    Could you tell me the subject?

9  A    Subject is, "Your sweetness."

10 Q    And could you read us the body, please?

11 A    Body reads, "This is how you would make me cum all over

12 you."

13 Q    And we mentioned that this had attachments.  Is that what

14 we just looked at in Exhibit 2?

15 A    Yes.

16 Q    Did you review those images when you looked at the search

17 warrant?

18 A    Yes.

19 Q    Based on your training and experience, what did you find

20 them to be?

21 A    I found these images to be child pornography.

22 Q    We have some user activity that follows.  Could you

23 please read us a couple of those?

24 A    Again, this is a timeline of emails before and after this

25 one.  Subject is, "Cum on pussy."  The one after it is, "Your

DIRECT EXAMINATION OF JAMES KELLER, II

1  sweetness in short little dress."

2  Q    I'm going to publish 3.  I will be using 3A to talk about

3  it.  Could you please tell us who this is to?

4  A    This email is to deea.apostol1782@gmail.com.

5  Q    And could you please tell us when this was sent?

6  A    Sent on February 5, 2020.

7  Q    What is the subject?

8  A    Subject reads, "Your sweet pussy."

9  Q    And could you read us the body, please?

10  A    The body reads, "Would love to you [sic] to rub yourself

11  until you became incredibly wet and horny and inserted my

12  prick into your sweet, wet pussy.  Would love to make love to

13  you for hours."

14  Q    The photos that we just saw in Exhibit 3, were they

15  attached to this email?

16  A    Yes.

17  Q    Based on your training and experience, what did you find

18  those photos to be?

19  A    I found one of the photos to be child pornography.

20  Q    And could you explain the user activity, please?

21  A    User activity is the timeline chronological for the

22  emails.  The email before this email we just reviewed has the

23  subject line, "Making love to you," and then the email after

24  it is, "Your sweet pussy," and, "Would love to fuck you slow."

25  Q    It looks like we have an email that was sent after that.

DIRECT EXAMINATION OF JAMES KELLER, II

1   Could you tell us the subject of the email after?

2   A    Yeah.  So this is the subject I just read from the

3   timeline that reads, "Would love to fuck you slow."

4   Q    Was there a link included in that email?

5   A    Yes.  There's a blue hyperlink.

6   Q    And what type of hyperlink is it based on what it's

7   called?

8   A    It is a video, and I know that because the hyperlink ends

9   in dot MP4, which is a video format for a file.

10          MS. FAVORIT:  I'm going to publish Number 4.

11  BY MS. FAVORIT:

12  Q    I will be using 4A to talk about it.  Could you tell us

13  who this email is to?

14  A    The email is to deea.apostol1782@gmail.com and

15  Deea.Apostol@icloud.com.

16  Q    Who is it from?

17  A    Vlad Vlad, Vladlover50@Yahoo.com.

18  Q    When was it sent?

19  A    The email was sent on August -- sorry.  It was sent on

20  September 8, 2020.

21  Q    What is the subject?

22  A    Subject is, "I am in love with you."

23  Q    And the body?

24  A    The body reads, "I want to cum all over your pussy like

25  this."

DIRECT EXAMINATION OF JAMES KELLER, II

1  Q    The photos that we just reviewed from Exhibit 4, were

2  they attached to this email?

3  A    Yes.

4  Q    Based on your training and experience, what did you

5  determine the photo to be?

6  A    Photo is child pornography with a child under five years

7  old.

8  Q    You have some user activity.  Could you please explain

9  this to us?

10  A    User activity, in the top is one of the emails we already

11  covered, the young Asian girl.  And then this email is just

12  duplicated right there.

13  Q    I just want to talk about the timeline for a second.

14  Were they sent within seconds of each other?

15  A    No.

16  Q    About how far apart?

17  A    A couple days apart.

18  Q    Based on your training and experience, is it necessary to

19  use the Internet to send an email?

20  A    Yes.

21  Q    Did you review these things before you ever applied for a

22  residential search warrant?

23  A    Yes.

24  Q    After you reviewed these search warrant return contents,

25  what actions did you take?

DIRECT EXAMINATION OF JAMES KELLER, II

1  A    So once I get the cyber tip, get subpoena results that's

2  in the City of North Port within my jurisdiction and then I do

3  a search warrant to the electronic service provider, the next

4  step I do is prepare for a residential search warrant.  In

5  order to prepare for a residential search warrant, I conduct

6  backgrounds on the house and the people who reside at the

7  house.

8  Q    When you reviewed the Yahoo search warrant return, did

9  you have any idea who Deea Apostol was?

10  A    No.

11  Q    Based on your investigation, did you figure out who she

12  was?

13  A    Yes.

14  Q    How did you do that?

15  A    One of the images in the Yahoo return had some data that

16  led me to Spring Hill.  And I also noticed that in -- so I

17  looked up the residents at the house, which came back to

18  Aliona Williamson and Gregory Williamson.  And I can tell from

19  former records that they had a previous address in Spring

20  Hill.  I then looked up records in Spring Hill and saw that

21  there was documentation that showed a Deea Apostol associated

22  with Gregory Williamson and Aliona Williamson, which led me to

23  believe that someone within the family household was sending

24  these emails to Deea Apostol.

25  Q    Were you aware Deea was a minor at that time?

DIRECT EXAMINATION OF JAMES KELLER, II

1   A    Not at that time.

2   Q    What address was the search warrant for?

3   A    2575 Rolling Road.  I went to school records and verified

4   that she was a minor then.

5   Q    Is the Rolling Road home in North Port, Florida?

6   A    Yes.

7   Q    Is that in the Middle District of Florida?

8   A    Yes.

9   Q    Is Spring Hill also in the Middle District of Florida?

10  A    Yes, it is.

11  Q    Prior to executing the search warrant, what information

12  did you have?

13  A    So prior to executing the search warrant, I had the

14  results from the Yahoo search warrant.  I had information of

15  who was living in the residence.  I had information that there

16  were minors at the residence, one of which was a minor named

17  Deea Apostol, which matched with the recipient to all the

18  emails we just went over.  So because of that, I considered

19  that an exigent case and knew right away as soon as I figured

20  it out that we needed to go to the residence right away.

21  Q    Did you move quickly?

22  A    Yes.  As soon as I found out, I started drafting a

23  residential search warrant to go to the residence.

24  Q    And was that executed on January 27 of 2021?

25  A    Yes.  It was the next day after I discovered that it was

DIRECT EXAMINATION OF JAMES KELLER, II

1   a minor there at the house.

2   Q    Were you the lead investigator?

3   A    Yes.

4   Q    What does that mean when you're the lead investigator at

5   a search warrant?

6   A    So as the lead investigator at a search warrant, I am

7   responsible for assigning tasks to other detectives and crime

8   scene technicians.  And I also tried to go to the house to

9   further my investigation in order to try to further identify

10  who might be behind certain emails or behind the information

11  that I received prior to going to the house.  So I also am

12  responsible for conducting interviews or speaking to people at

13  the house, and then also helping to assist triage electronic

14  devices that would be collected.

15  Q    Who else lived at that home?

16  A    I learned that Aliona Williamson, an adult female there

17  lived at the house.  And then she had a daughter, Deea

18  Apostol, who lived at the house, and then multiple other

19  children along with Gregory Williamson.

20  Q    What part did you play in the search warrant?

21  A    The search warrant, I organized the personnel to respond

22  to the house, and I obtained the signed search warrant for the

23  house.  Then we executed the search warrant.  Once everybody

24  was outside the house, we then started the search of the

25  residence.

DIRECT EXAMINATION OF JAMES KELLER, II

1    Q    And we already heard from forensics.  Were you involved

2    in preliminary exams at all?

3    A    No, not the preliminary exam.

4    Q    At some point, was child pornography discovered?

5    A    Yes.

6    Q    What actions did you take once you found that?

7    A    Once I found out that there was -- so Detective Wallace

8    informed me that the Gateway all-in-one computer, he found an

9    image of child pornography and which others told me that

10   Gregory Williamson was currently on that computer when we

11   arrived at the residence.  So based upon the totality of

12   circumstances of the case, I drafted a probable cause

13   affidavit for Gregory Williamson.

14   Q    I'm going to show you Exhibit 12.  We will put a pause on

15   that.

16        The Gateway all-in-one, did you learn where it was

17   manufactured?

18   A    Yes.

19   Q    Was it in the United States?

20   A    No.

21   Q    And was that based on business records you received?

22   A    Yes.

23   Q    Were other devices collected on that day?

24   A    Yes.

25   Q    What significant devices were collected?

DIRECT EXAMINATION OF JAMES KELLER, II

1  A    There was a Samsung cell phone that was collected.  There

2  were a couple other hard drives that were collected that were

3  of note.  Oh, and then the victim's Apple iPhone was collected

4  as well.

5  Q    I want to talk about the Samsung cellular phone.  Was

6  that manufactured in the United States?

7  A    No.

8  Q    How do you know that?

9  A    Through business records I obtained from the

10  manufacturer.

11  Q    What about the Seagate hard drive, was that manufactured

12  in the United States?

13  A    No.

14  Q    How do you know that?

15  A    Also from business records from the manufacturer.

16  Q    After finding child pornography, was your investigation

17  over?

18  A    No.

19  Q    What did you do when you essentially make a decision at

20  the search warrant and go back and continue your

21  investigation?

22  A    Can you specify?

23  Q    Yes.  Did you review forensically any of the devices?

24  A    Yes.

25  Q    Which one did you review?

DIRECT EXAMINATION OF JAMES KELLER, II

1  A    So I obtained a forensic extraction of the Samsung phone.

2  This is at a later date after the search warrant.  I obtained

3  a forensic extraction of the Samsung phone, and I used

4  Cellebrite, which I'm trained and certified on, to parse out

5  the information from the cell phone into a readable format,

6  and I examined the data from the phone.

7  Q    Did you review the data?

8  A    Yes.

9  Q    Was there anything that you discovered on there that made

10 you decide to go back to the home?

11 A    Yes.  I found a lot of pictures, some videos of what

12 looks like -- what looked like to me was from a secret hidden

13 camera inside of Deea's bedroom.  And because I found those, I

14 had a concern that there were additional possible devices that

15 were covert, that were probably still at the house that we

16 didn't even know about to even look for during the initial

17 search warrant.  So I went back to the house to ask the mother

18 about the pictures.

19 Q    At some point did you go back to the house?

20 A    Yes.

21 Q    Did you see Deea at the search warrant?

22 A    Yes.

23 Q    How old was she at the time?

24 A    She was 13 at the time of the search warrant.

25 Q    Did you show anything to her mother from the secret

DIRECT EXAMINATION OF JAMES KELLER, II

1  camera?

2  A    Yeah.  I showed her the images I found on the Samsung

3  phone that led me to believe there was a camera at the house.

4  Q    And did you identify the person in those photos?

5  A    Yes.  The person in the photos was of Deea Apostol.

6  Q    Where in the home were you talking to Aliona?

7  A    It was right when I -- I knocked on the door.  She let me

8  in the front door, and we were in like the entryway of the

9  front door.  I explained that I wanted to ask her about these

10  pictures I found.

11  Q    While you are talking to her, did Deea approach you?

12  A    Yeah.  Deea was eavesdropping on the conversation, and

13  she popped out from around the corner from the area of the

14  house where her bedroom is.  And she had a white USB charger

15  in her hand.  And she came up to me, and she goes, "I think

16  you're looking for this."

17        MS. FAVORIT:  May I approach the witness?

18        THE COURT:  Yes.

19  BY MS. FAVORIT:

20  Q    I will have you cut those open so you can examine those,

21  please.

22        Would you look at Exhibit 10?

23  A    Yes.

24  Q    Do you recognize this?

25  A    Yes.

DIRECT EXAMINATION OF JAMES KELLER, II

1  Q    What do you recognize it to be?

2  A    A USB charger with a hidden camera in it.

3  Q    Is this the charger that Deea handed you after the search

4  warrant?

5  A    Yes.

6  Q    Does it appear to be in the same or substantially same

7  condition as when you last saw it?

8  A    Yes.

9        MS. FAVORIT:  Your Honor, at this time I move

10 Exhibit 10 into evidence.

11       THE COURT:  Ten is admitted.

12 BY MS. FAVORIT:

13 Q    I'm going to have you do the same thing with Exhibit 11.

14 Do you recognize it?

15 A    Yes.

16 Q    What do you recognize it to be?

17 A    Essentially an identical USB charger with a hidden camera

18 in it.

19 Q    Was this handed to you on the same day?

20 A    Yeah.

21 Q    When was this one handed to you?

22 A    This was handed to me in April, so a couple months after

23 the search warrant.  I was informed about this one that was

24 found at the house.

25 Q    And it wasn't actually physically handed to you, was it?

DIRECT EXAMINATION OF JAMES KELLER, II

1    A    No.

2    Q    Does it appear to be in the same or substantially same

3    condition as when you last saw it?

4    A    Yes.

5            MS. FAVORIT:  Your Honor, at this time I move in

6    Exhibit 11.

7            THE COURT:  Eleven is admitted.

8    BY MS. FAVORIT:

9    Q    I'm showing you Exhibits 10.1, 10.2, 10.3, 10.4, and 10.5

10   and 10.6.

11   A    Okay.

12   Q    Do you recognize these?

13   A    Yes.

14   Q    What do you recognize them to be?

15   A    They are pictures of the USB charger when we collected

16   them.

17   Q    Did you take these photos?

18   A    Yes.

19   Q    Do they appear to fairly and accurately depict the

20   charger when you took photographs of them?

21   A    Yes.

22           MS. FAVORIT:  Your Honor, I move 10.1 through 10.5

23   into evidence.

24           THE COURT:  Admitted.

25   BY MS. FAVORIT:

DIRECT EXAMINATION OF JAMES KELLER, II

1   Q     I'm going to have you look at 11.1 through 11.10.  Do you

2   recognize these?

3   A     Yes.

4   Q     What do you recognize them to be?

5   A     Pictures of the second USB in the collection process.

6   Q     Were you present or did you take those photos?

7   A     Yes, I took those photos.

8   Q     Do they fairly and accurately represent the photos of the

9   USB on that day?

10  A     Yes.

11        MS. FAVORIT:  Your Honor, I admit 11.1 through 11.10

12  into evidence.

13        THE COURT:  Admitted.

14        MS. FAVORIT:  Permission to publish?

15        THE COURT:  Yes.

16  BY MS. FAVORIT:

17  Q     I want to start with the first charger that you received

18  from Deea.  If you could show us how you know it was a camera.

19  A     Yes.  How do you want me to show you?

20  Q     Do you have the physical one?

21  A     Yeah.  So the physical one, on the front of the camera or

22  of the USB in the center is like a darker circle.  If you look

23  at it, it kind of like -- when the light is in there, it

24  reflects a couple different colors, much like a lens that one

25  would see.  And then at the top right, it's a sensor, a light,

DIRECT EXAMINATION OF JAMES KELLER, II

1  something like that.  And I was able to flip it over to the

2  back, because typically with these cameras, when you find

3  them, research them online, there's some sort of way to store

4  digital, like a digital storage, like media or something on

5  like an SD card, micro SD card, something like that.

6          So then as I was examining it, on the back of it

7  where the two prongs are is like a false -- it's not a false

8  door.  It's like a false panel.  And I was able to take a

9  knife around the edge, and you can kind of, like, pry it up.

10 I don't know if I can do it right now without a knife, but if

11 you have like a flat head.

12 Q    Do you want the scissors?

13 A    Yeah.  I'm getting it.  So this is how it comes off, like

14 this.  And then the panel you can set aside.  And then the

15 back of this USB as I'm showing you, so your right, is like a

16 rectangle slot.  And that's a slot for micro SD card.

17 Q    Did it appear to be a normal USB charger until you found

18 that false panel?

19 A    Yes.

20 Q    I'm going to show you 10.5.  Is that a closeup of what

21 you were just talking about?

22 A    Yes.  The center there would be the lens.

23 Q    Do you know what brand this was?

24 A    L-U-O, something like that.

25 Q    I'm going to show you 10.6.  Is this the other side of

DIRECT EXAMINATION OF JAMES KELLER, II

 1  that USB charger?

 2  A    Yes.

 3  Q    Was this something that was manufactured in the United

 4  States?

 5  A    No.

 6  Q    How did you learn that?

 7  A    Through records at the FCC.

 8  Q    Did this USB charger have a memory card?

 9  A    No.

10  Q    So could this device store anything?

11  A    No.

12  Q    Why not?

13  A    Because it needs the memory card to store data on it.

14  Q    Without a memory card, does it need to connect to

15  something to record?

16  A    Yes.

17  Q    Could you explain that to us, please?

18  A    So on like just researching publicly these cameras, it

19  explains that you can connect these cameras to devices,

20  whether it's a computer or a cell phone, you're able to

21  connect the devices.  So I ended up doing an experiment, you

22  can say.  And I took a phone -- and like everyone knows, like,

23  you go to a friend's house and you don't want to use your

24  data.  You have your Wi-Fi, can I connect with your Wi-Fi.

25  And they are like, yeah, sure.  You go to the settings on your

DIRECT EXAMINATION OF JAMES KELLER, II

1   phone, you go to networks, look for the Wi-Fi signal.  And

2   then you -- once you click that, then it shows the available

3   Wi-Fi networks in the area.  Then you select the one that you

4   want.  They prompt you for a password, if they have a

5   password, and then you're granted access to their Wi-Fi.

6          So likewise, this USB charger, you plug in and then

7   it gets power.  Once it's plugged in and has power, it gives

8   off a unique identifier called an SSID.  So that identifier,

9   it looks like a Wi-Fi network when you do the same thing on

10  your phone.  You go to the network, you go to the Wi-Fi

11  networks.  And then so you have that list of available

12  networks open.  Then you plug this in.  Then you will see a

13  new network pop up.  And that new network is what was

14  associated with this USB charger.

15  Q    After reviewing the defendant's Samsung Galaxy, were you

16  able to establish if there was a connection to this device?

17  A    Yes.  That same unique identifier that this USB charger

18  gave off was listed on the -- on the Samsung cell phone as a

19  known network that it connected to.

20  Q    I'm going to direct your attention to Exhibit 11, which

21  is the second charger.

22  A    Yes.

23  Q    Did you go back to the home to collect this?

24  A    Yes.

25  Q    Can you tell me why you went to the home to do that?

DIRECT EXAMINATION OF JAMES KELLER, II

1  A    I was informed by the residents that a second USB charger

2  was found and they would like for me to come collect it.

3  Q    I'm going to show you 11.1.  Could you tell me what this

4  is a photo of?

5  A    So this is the photo of that unique network that I was

6  referring to.  And I'm able to write on this, right?

7  Q    I think so.

8  A    So we all know -- it must be disabled or something.  I

9  can move this around.  So I'm circling.  Here is the Wi-Fi

10 area.  And then when I plugged in this USB, this popped up.

11 And also what helps identify that as being the USB that is

12 associated with this is that's the brand, which the brand is

13 Luohe, which is that first part, and then it's a dash, and

14 then it's a series of letters and numbers.  So that's the

15 unique identifier for it.

16 Q    Is this a phone that you were utilizing?

17 A    Yes.

18 Q    I will show you 11.2.  Is that the same thing?

19 A    Yes.

20 Q    11.3, what is this a photo of?

21 A    So this is the purple desk that's in the garage.  This is

22 the same desk that the all-in-one Gateway computer was sitting

23 on on the day of the search warrant, which Gregory Williamson

24 was sitting behind.

25 Q    11.4.  What is this a photo of?

DIRECT EXAMINATION OF JAMES KELLER, II

1  A    So in that desk, the center top drawer, once it was

2  opened, this is a picture of the second USB charger.

3  Q    And is this how it was when you came to the house?

4  A    Yes.

5  Q    11.5.  And is that the charger that we have entered into

6  evidence as the second charger?

7  A    Yes.

8  Q    Did it function the same as the first one?

9  A    Yes.

10  Q    I'm going to move on to Exhibit 6 which is already in

11  evidence.  Do you recognize this?

12  A    Yes.

13  Q    What is this?

14  A    It's the Samsung cell phone that was collected from the

15  search warrant that day on that same desk that was next to the

16  computer.

17  Q    I'm going to show you 12.8 in evidence.  Is this where it

18  was found at the search warrant?

19  A    Yes.

20  Q    Is that the phone from the desk?

21  A    Yes.

22  Q    Did you review the forensic extraction from this phone?

23  A    Yes.

24  Q    Let me show you 6.1.  Is this a copy of that forensic

25  extraction?

DIRECT EXAMINATION OF JAMES KELLER, II

1   A     Yes.

2           MS. FAVORIT:  May I have a moment, Your Honor?

3           THE COURT:  Yes.

4   BY MS. FAVORIT:

5   Q     I'm going to show you 6.3.  Do you recognize this?

6   A     Yes.

7   Q     What do you recognize it to be?

8   A     It's information from the Samsung extraction that I took

9   snippets of.

10  Q     Did you create this exhibit?

11  A     Yes.

12  Q     And was it directly from the forensic extraction of this

13  Samsung?

14  A     Yes.

15  Q     Does it appear to be a fair and accurate depiction of it?

16  A     Yes.

17          MS. FAVORIT:  Your Honor, I move in Exhibit 6.3.

18          THE COURT:  It's admitted.

19          MS. FAVORIT:  Permission to publish?

20          THE COURT:  Yes.

21  BY MS. FAVORIT:

22  Q     Can you tell us what we are looking at?

23  A     Yes.  So these are the -- so the second big column there

24  from the left to right is SSID.  That's that unique identifier

25  that those USB chargers gave off.  You notice there are three

DIRECT EXAMINATION OF JAMES KELLER, II

1   there.  Two of them match up with the two that we recovered.

2   Unfortunately, there's a third one, and we were never able to

3   recover the third one.

4   Q    I'm going to show you Exhibit 6.2.  Do you recognize this

5   exhibit?

6   A    Yes.

7   Q    What do you recognize it to be?

8   A    It's a report that's generated from the Cellebrite tool

9   of the Samsung cell phone.  Lee loaded the tool into the

10  forensic -- or the extraction into the forensic tool so we can

11  review it during our investigations.  But for us to be able to

12  share that information with someone, there's a couple

13  different formats we can do that.  And one of those formats is

14  to tell the tool, hey, I would like you to make a PDF copy or

15  PDF version of this extraction, and it will generate a PDF

16  version.  So this is all the information from the phone in a

17  PDF version.

18  Q    Was it derived from the forensic extraction of the

19  Samsung Galaxy?

20  A    Yes.

21  Q    When you say "Lee," is that Mr. Wallace, the forensic

22  examiner?

23  A    Yes.

24  Q    Does it appear to be a fair and accurate copy of the

25  exhibit that you created from the extraction of the Samsung

DIRECT EXAMINATION OF JAMES KELLER, II

1   Galaxy?

2   A    Yes.

3          MS. FAVORIT:  Your Honor, I move in 6.2.

4          THE COURT:  Admitted.

5   BY MS. FAVORIT:

6   Q    I'm going to show you 6.10.  Do you recognize this?

7   A    Yes.

8   Q    What do you recognize it to be?

9   A    That's some information from the cell phone extraction

10  and then some research we did on that information.

11  Q    Did you create this exhibit?

12  A    Myself and Detective Wallace did, yes, together.

13  Q    Was it derived from the forensic extraction from the

14  Samsung Galaxy?

15  A    Yes.

16  Q    Does it fairly and accurately depict that information?

17  A    Yes.

18         MS. FAVORIT:  Your Honor, at this time I move in

19  6.10.

20         THE COURT:  Admitted.

21         MS. FAVORIT:  Permission to publish?

22         THE COURT:  Yes.

23  BY MS. FAVORIT:

24  Q    Could you tell me the significance of this exhibit that

25  you created?

DIRECT EXAMINATION OF JAMES KELLER, II

1   A    Yes.  So in the forensic extraction, the forensic tool

2   tries to identify all the applications that are on that phone;

3   however, it can't always completely identify all the

4   applications on the phone because the forensic tool might not

5   support a newer application.

6        An example of this is -- I believe it's TikTok or

7   Snapchat -- if I have a forensic phone that has one of those

8   applications and I use Cellebrite to do a forensic extraction

9   and then I open it up in the forensic tool to examine it, a

10  lot of those databases from those applications don't always

11  show up for me to be able to view it.  And that's only because

12  the forensic tool doesn't really -- it doesn't mean the data

13  is not there.  It just doesn't mean it always knows how to

14  deal with the data, so it tries to give me what it can.

15       So for this exhibit right here, for developer tools,

16  it was trying to tell me, hey, it looks like there are some

17  applications associated with developer applications of a

18  camera-related nature.

19  Q    Can you tell us what this LookCam app is?

20  A    Yes.  So one of the applications that it was trying to

21  tell me was on the phone is LookCam.  And so I went to the

22  application store for, like, if you want to download Facebook

23  or something on your phone, you go to the applications.  Apple

24  will be the Apple Store, but Samsung, Android will be Google

25  Play.  So you go to Google Play because I saw an artifact of

DIRECT EXAMINATION OF JAMES KELLER, II

1  that on the Samsung phone.  And this is what it came up with

2  when I searched that.

3  Q    Can this application work with the cameras that you

4  collected?

5  A    Yes.  It's an application for exactly this, for these

6  cameras that you plug in.  You connect to it, and then this

7  allows you to interface with that connected device.

8  Q    So is there evidence of that application on the

9  defendant's Samsung?

10 A    Yes.

11 Q    I want to show you 6.4 and 6.5.  Do you recognize these?

12 A    Yes.

13 Q    What do you recognize them to be?

14 A    Pictures all on the Samsung device from the secret

15 cameras.

16 Q    Did you pull these from the Samsung Galaxy forensic

17 extraction?

18 A    Yes.

19 Q    Do they fairly and accurately depict information that was

20 pulled from that?

21 A    Yes.

22        MS. FAVORIT:  Your Honor, at this time I move in 6.4

23 and 6.5.

24        THE COURT:  Admitted.

25        MS. FAVORIT:  Permission to publish?

DIRECT EXAMINATION OF JAMES KELLER, II

1          THE COURT:  Yes.

2   BY MS. FAVORIT:

3   Q     Who is this a photo of?

4   A     This is a photo of Deea Apostol.

5   Q     Is this the photo that we were talking about earlier

6   today?

7   A     Yes.

8   Q     Showing you 6.5.  Who is this a photo of?

9   A     Deea Apostol.

10  Q     And these came from the Samsung?

11  A     Correct.

12  Q     Do you know how old she was here?

13  A     She was about 12 there.

14  Q     I'm going to show you Exhibit 6.6 and 6.6A.  Do you

15  recognize these exhibits?

16  A     Yes.

17  Q     What do you recognize them to be?

18  A     They are additional photos recovered from the Samsung as

19  email attachments.

20  Q     And did you create these exhibits?

21  A     Yes.

22  Q     Where did you created them from?

23  A     From the Samsung cell phone.

24  Q     And did you take them from the forensic extraction?

25  A     Yes.

DIRECT EXAMINATION OF JAMES KELLER, II

1   Q    Do they fairly and accurately depict that information?

2   A    Yes.

3          MS. FAVORIT:  Your Honor, I move in 6.6 and 6.6A.

4          THE COURT:  Admitted.

5   BY MS. FAVORIT:

6   Q    What's the difference between 6.6 and 6.6A?

7   A    6.6 is an unredacted copy that includes child

8   pornography, and 6.6A is a redacted version.

9   Q    Who is depicted in these photos?

10  A    Deea Apostol.

11         MS. FAVORIT:  Permission to publish the child

12  pornography?

13         THE COURT:  Yes.

14         MS. FAVORIT:  Could you scroll on that, please.  It

15  looks like on page 4.  Thank you.

16  BY MS. FAVORIT:

17  Q    We are going to work with 6.6A.  Did this information

18  come from the Samsung?

19  A    Yes.

20  Q    Can you tell me what we are looking at?

21  A    So we're looking at an email on the Samsung that was in

22  the trash bin.  And it was from the account

23  dispatchtwh@gmail.com.  And it was to dispatchtwh@gmail.com.

24  Q    So is it to and from that dispatch email?

25  A    Correct.

DIRECT EXAMINATION OF JAMES KELLER, II

1  Q    And those images that we were viewing in 6.6, is that the

2  same image we're looking at attached to that email?

3  A    Yes.

4  Q    And when were those attached?

5  A    The first one was January 14, 2021, local time around

6  1:55 p.m.

7  Q    And was Deea 12 or 13 around this date?

8  A    Yes.  I believe she was 12 at the time.

9  Q    Was there more than one image attached to the email?

10 A    There was different emails.

11 Q    Which page is the first email?

12 A    The first page, the email was sent at 1:55 p.m.

13 Q    And could you describe the image that's attached to this

14 email?

15 A    The image is from, it looks like the level of an outlet

16 plug.  And on the right side of the image, it looks to be a

17 white dresser.  To the left of the dresser is Deea Apostol

18 completely naked except she does have underwear on.  She is

19 bent at the waist bending forward into one of the dresser

20 drawers.  She has no top on, and her breasts are exposed.

21         And at the bottom left corner of the image is a date.

22 It's 2020-05-21 with the time stamp 17:38:07, which means the

23 picture was not taken like around the time of the email.  It

24 was a previous picture.

25 Q    And you reviewed Exhibit 6.4 and 6.5 which showed Deea

DIRECT EXAMINATION OF JAMES KELLER, II

1  clothed in her bedroom?

2  A    Say that again.

3  Q    Exhibit 6.4 and 6.5 were exhibits I showed you previously

4  where Deea is in her bedroom?

5  A    Yes.

6  Q    Does it appear to be the same room?

7  A    Yes, that's the same room.

8  Q    Is page, my 3, maybe your 2, is that the image you just

9  described?

10  A    Yes.

11  Q    What's this next email?

12  A    This is another email.  It's the same day, but it's a

13  little bit -- this email was a little bit before the previous

14  one by, it looks like around 30 minutes before.  And it's also

15  from dispatchtwh@gmail.com to dispatchtwh@gmail.com with

16  "owner" in parentheses next to it.

17  Q    Did this have an attached photograph?

18  A    Yes.

19  Q    Could you describe that photograph, please?

20  A    The photograph looks to be from the same position as the

21  first one I described, around the same level as an outlet

22  plug.  To the right of the photo is a white dresser.  To the

23  left of the dresser is Deea where she has a long-sleeve shirt

24  on.  She has black underwear on but no pants.  So her butt

25  cheeks are being exposed to the camera.  On the bottom left

DIRECT EXAMINATION OF JAMES KELLER, II

1  side of the image is 10-05-18, the time 21:03:57.

2  Q    I'm going to show you 6.7, 6.8, 6.9, and 6.9A.

3         MS. FAVORIT:  May I have a brief moment, Your Honor?

4         THE COURT:  Yes.

5         While we are taking that pause, let's take our

6  afternoon break here, and we will meet back here at 20 minutes

7  until the hour.  Please don't discuss the case or look on

8  outside sources.  Twenty 'til the hour, 3:40.  Thank you.

9      (Recess taken.)

10        THE COURT:  Counsel, you are still on direct.

11 Thanks.

12        MS. FAVORIT:  Thank you.

13 BY MS. FAVORIT:

14 Q    I'm going to show you 6.7, 6.8, 6.9 and 6.9A.  Do you

15 recognize these?

16 A    Yes.

17 Q    What do you recognize them to be?

18 A    They're information that was found on the Samsung device.

19 Q    And were you a part in making these exhibits?

20 A    Yes.

21 Q    Where did you get the information from?

22 A    From the extraction of the Samsung cell phone.

23 Q    Do they fairly and accurately depict information that

24 came from the Samsung?

25 A    Yes.

DIRECT EXAMINATION OF JAMES KELLER, II

1  Q    And does it include other information aside from just

2  emails?

3  A    Yes.

4  Q    And do those fairly and accurately depict the exhibits

5  that you created?

6  A    Yes.

7         MS. FAVORIT:  Your Honor, I move into evidence 6.7,

8  6.8, 6.9, and 6.9A.

9         THE COURT:  Admitted.

10        MS. FAVORIT:  Permission to publish?

11        THE COURT:  Yes.

12 BY MS. FAVORIT:

13 Q    I will show you 6.7.  What account is on here?

14 A    This is that same email address from before where it's

15 going to each other.  It's dispatchtwh@gmail.com.

16 Q    So is it again to himself from himself?

17 A    No.

18 Q    Who is it to?

19 A    It's from that email to deea.apostol1782@gmail.com.

20 Q    Where was this found?

21 A    This was found on the Samsung device, and it shows the

22 artifact that was put in the trash.

23 Q    And what was your understanding about the dispatch email?

24 A    Is that it was an email that Gregory Williamson used

25 prominently for work.

DIRECT EXAMINATION OF JAMES KELLER, II

1  Q    Would you read me the content of this email, please?

2  A    So the body of the email reads, "Just because you wanted

3  to be a big girl a few months back does not make me a pervert.

4  If that was the case, then why did you come back for more and

5  more and make me go outside with you and finger your pussy

6  until you finally did cum, or you forgot about that.  I regret

7  the little affair we did have as I thought you were a little

8  more mature than what you really are.  Shame on me.  Since you

9  really aren't a virgin anymore, other than you have not had a

10  penis inside you, just make sure to find the one that will

11  satisfy your desires when you finally do.  Perhaps you should

12  wait until you are married?"

13  Q    There is a little note at the bottom.  Could you read

14  that to us, please?

15  A    "Sent from Galaxy Note 8."

16  Q    What does that indicate to you based on your training and

17  experience?

18  A    That email was composed and sent from a mobile device,

19  specifically a Galaxy.

20  Q    Is this another email that's similar?  And I'm showing

21  page 3 of Exhibit 6.7.

22  A    Yes.

23  Q    Could you tell us who this is to and who this is from?

24  A    Yes.  This email is on the same day as the previous one,

25  just a little bit different.  And the account "From" was

DIRECT EXAMINATION OF JAMES KELLER, II

1  dispatchtwh@gmail.com, and it was to

2  deea.apostol1782@iCloud.com, so her other email address.

3  Q    And when was it sent?

4  A    The first one was sent around 2:17 p.m. local time.  This

5  one was sent at 12:22 p.m. local time, so a couple minutes

6  after the other email.

7  Q    Can you explain why we're looking at a UTC time but

8  you're giving us a local time?

9  A    Yes, because it's common for digital evidence to amount

10 as Universal Time, and then you calculate what your local time

11 would be depending on where you are in the world and whether

12 or not you are in Daylight Savings Time or not.

13 Q    Could you read us the body of the second email?

14 A    It looks like it is the exact same except the very last

15 sentence.  Do you want me to read the whole thing?

16 Q    Could you read, let's say, the last three sentences for

17 context.

18 A    Okay.  "Since you really aren't a virgin anymore, other

19 than you have not had a penis inside you, just make sure to

20 find the one that will satisfy your desires when you finally

21 do.  Perhaps you should wait until you are married?"

22        Then what was added, "No need to worry about me as I

23 no longer have an attraction to you."

24 Q    And again, could you read the note at the bottom of this

25 email?

DIRECT EXAMINATION OF JAMES KELLER, II

1  A    Yes.  "Sent from my Galaxy Note 8."

2  Q    I'm going to show you Exhibit 6.8.  Can you tell me what

3  email artifacts this represents?

4  A    It's another email.

5  Q    So can you tell us who it is to and who it is from?

6  A    It is to deea.apostol1782@iCloud.com.  And it's from

7  dispatchtwh@gmail.com.

8  Q    And what is the subject?

9  A    Subject is, "I want to sleep with you."

10 Q    Can you tell us when this was sent?

11 A    This was sent on January 15, 2021.  So about seven days

12 before we went to the residence.

13 Q    When you say you went to the residence, you mean the

14 residential search warrant?

15 A    Correct.

16 Q    Could you please read the body of this email?

17 A    "Would love for you to cum over my dick, muah.  Love you,

18 Deea."

19 Q    And this note, please?

20 A    The bottom of it reads, "Sent from my Galaxy Note 8."

21 Q    I'm going to show you Exhibit 6.9.  Can you tell us what

22 6.9 represents?

23 A    Another email from the Samsung cell phone.

24 Q    When was this email sent?

25 A    This was November 13, 2020.

DIRECT EXAMINATION OF JAMES KELLER, II

1  Q    Can you tell us who it is from and who it is to?

2  A    So it is from rryan0881@gmail.com with "owner" in

3  brackets next to it, and to deea.apostol1782@gmail.com, and

4  it's also to deea.apostol@iCloud.com.

5  Q    What is the subject?

6  A    Subject is, "Masturbation."

7  Q    Could you please read us the body of this email?

8  A    "When you masturbate, do you cum in your panties or do

9  you take them off?  Would love for you to send me a video of

10 you making yourself cum."

11 Q    I will show you 6.9A.  Can you tell me what this is in

12 relation to Exhibit 6.9?

13 A    Yes.  So 6.9 is the event on the phone on the timeline of

14 the phone that's highlighted in blue.  So the forensic tool

15 allows us to take all the artifacts it sees and put it into a

16 big timeline so we can see what other activity was going on on

17 the device around that same time.

18 Q    And what does the blue highlighted portion represent?

19 A    The rryan email that I just read.

20 Q    And what is the instant message that appears to be sent

21 close in time to that email?

22 A    So that email that's highlighted in blue was November 13,

23 2020 at 5:45.  That would be UTC time.  And right before that

24 at 5:36 UTC time, the same date, there's a text message,

25 outgoing text message to a phone number that says, "No

DIRECT EXAMINATION OF JAMES KELLER, II

 1  worries.  Just need a pic of stamp dock receipt to send to

 2  customer," which seems consistent with the work activity.

 3  Q    And then can you read some of the messages at the bottom?

 4  A    It's an incoming text message on the same date.  It says,

 5  "Hi.  How we going, sir?"

 6        And then there's another incoming text message from

 7  "Chase online reminder," something to do with bank activity.

 8        And then there's another instant message going out

 9  the same date.  It says, "Please cancel this load.  I have

10  another driver loading on Mon," so Monday, which also seems

11  consistent with a work text message.

12  Q    Were these the same day as that Ryan email?

13  A    Yes.

14  Q    I'm going to show you 6.11 and 6.11A.  Do you recognize

15  these exhibits?

16  A    Yes.

17  Q    What do you recognize them to be?

18  A    They're images and videos that I tagged from the Samsung

19  cell phone of the secret pictures that were taken.

20  Q    What does it mean to tag something?

21  A    So as I have a cell phone extraction opened up in the

22  Cellebrite forensic tool to examine the details, they create

23  an investigator kind of tool to help us tag images or items on

24  the phone that are of note that are relevant to the

25  investigation.

DIRECT EXAMINATION OF JAMES KELLER, II

1          So what that allowed me to do when I found some of

2    these images that were of Deea that looked to be from the

3    camera, I was able to go ahead and tag those into a certain

4    category, and that way it allows me to generate a report with

5    just those items that I tagged in order for me to be able to

6    communicate the information I found to someone else, have them

7    make sense.

8    Q    Were these exhibit tags -- that's the wrong word.  Were

9    these exhibits derived from the forensic extraction of the

10   Samsung Galaxy?

11   A    Yes.

12   Q    Do they fairly and accurately depict that information?

13   A    Yes.

14          MS. FAVORIT:  Your Honor, at this time I move in 6.11

15   and 6.11A.

16          THE COURT:  Admit.

17          MS. FAVORIT:  Permission to publish?

18          THE COURT:  Yes.

19   BY MS. FAVORIT:

20   Q    Knowing this is a series of photos, who is depicted in

21   these photos?

22   A    Deea.

23   Q    Why are they so small in this exhibit?

24   A    So these are thumbnails, because, like I explained

25   earlier, with us exporting these reports to a PDF, there's a

DIRECT EXAMINATION OF JAMES KELLER, II

1  couple different ways to do it.  And in this format, it has so

2  much other information associated with the image, it makes a

3  smaller thumbnail.  There's 200 tagged here, which is just a

4  sample of what I found.

5  Q    Did you find over 200 images of Deea on the defendant's

6  cell phone?

7  A    Yeah.  It was around like just over 800 total images with

8  some videos in there.

9  Q    If you had wanted to, could you have gotten a bigger

10  photo of one of these thumbnails?

11  A    Yes.  I can take those images from the phone and just

12  like download or export the image by itself or a group of

13  images into a folder by itself.

14  Q    Thank you.  I'm going to show 6.11A, the redacted

15  version.  I just wanted to have you explain what this data is

16  in this exhibit.

17  A    Certainly.  So if you look at the left column in the box

18  Number 1 for the file information, there's the name of the

19  image, and then there's the path of the image.  So that gives

20  us information on like where on the phone it was found by the

21  forensic tool.  And then there's an MD5, which is MD5 hash,

22  which is that unique fingerprint for that photo.

23       So, for example, that photo there was found on

24  someone else's computer and I take that MD5 hash and I search

25  it on that computer and that computer has that image, that

DIRECT EXAMINATION OF JAMES KELLER, II

1  image will appear.

2  Q    Did you pull a couple images from this grouping?

3  A    Yes.

4  Q    I'm going to show you Exhibit 7, 7A, 7.1A, 7.2 and 7.2A.

5  Do you recognize these exhibits?

6  A    Yes.

7  Q    What do you recognize them to be?

8  A    Various images from the Samsung device.

9  Q    Are these images of Deea?

10 A    Yes.

11 Q    And are some of them redacted?

12 A    Yes.

13 Q    Did you compile these exhibits?

14 A    Yes.

15 Q    What information -- did you use the forensic extraction

16 to make them?

17 A    Yes.

18 Q    Were they produced on the Samsung Galaxy?

19 A    They were located on the Samsung Galaxy.

20 Q    Do they appear to fairly and accurately depict that

21 information?

22 A    Yes.

23      MS. FAVORIT:  Your Honor, at this time I move 7, 7A,

24 7.1, 7.1A, 7.2, and 7.2A into evidence.

25      THE COURT:  Admitted.  You may publish.

DIRECT EXAMINATION OF JAMES KELLER, II

1          MS. FAVORIT:  Thank you.

2    BY MS. FAVORIT:

3    Q    Can you describe the image before we publish it of

4    Exhibit 7?

5    A    Yes.  So Exhibit 7 is an image that was taken at the

6    ground level, consistent with an outlet, and looks to be

7    Deea's bedroom but from a different angle from some of the

8    other images we saw before.  So it doesn't include the dresser

9    to the right side of the image.  It includes the bed to the

10   left and the window, the sliding glass door to the right.  And

11   then in the center is Deea standing naked from the neck to her

12   ankles with her breasts exposed, but she is wearing underwear.

13   And at the bottom left corner of the photo is a date and time

14   2020-05-05, the time of 11:34:31.

15   Q    Can we switch to the overhead quickly?

16          Is this the redacted image that you are referring to

17   in Exhibit 7?

18   A    Yes.

19   Q    And is this where you were getting the information from?

20   A    Yes.

21   Q    Is this the same bedroom from most of the other photos?

22   A    Yes.

23   Q    Okay.  Let's publish 7.  Thank you.

24          How old was Deea in that image?

25   A    I think she was around 12.

DIRECT EXAMINATION OF JAMES KELLER, II

1  Q    Based on your training and experience, was that child

2  pornography?

3  A    Yes.

4  Q    I want to show you 7A.  It looks like my digital exhibits

5  are not exactly matched.  So this is the 7A.  Could you tell

6  me what this is reflecting?

7         If you can't read it, I will hand it to you.

8  A    I can read it.  So it's activity before the captured

9  image on 5/6/2020.

10 Q    Why was that date significant for this exhibit?

11 A    That's around the time that the image was time stamped.

12 Q    And what is the activity happening on the Samsung?

13 A    Actually, I have a hard time seeing it on the screen.

14        It looks like there are text messages back and forth,

15 reference to a news article with COVID-19.

16 Q    What does the next page represent?

17 A    User activity after the image captured on 5/6/2020.  And

18 it looks like it's one phone call that was made outgoing and

19 then a bunch of cookies, which cookies is like the bread crumb

20 trail when you go to websites, and this said specifically the

21 Samsung Internet browser.  So it was like the native Internet

22 browser on the device.  The websites were visited such as

23 right aid, welding for less, and mybigcommerce.com, and then

24 some other names like rfksrv.com, which I don't know what that

25 is.

DIRECT EXAMINATION OF JAMES KELLER, II

1  Q    Let's publish 7.1.  Thank you.

2         Can you please describe the image from 7.1?

3  A    Yes.  7.1 is an image from the level of a plug outlet and

4  is of -- the right side of the picture has the white dresser,

5  and to the left of the dresser is Deea naked facing the camera

6  from -- the top of the picture captures just above her pubic

7  hair just below her belly button, goes down to the top of her

8  feet.  She is holding a black clothing article in her right

9  hand, but her genitalia is exposed with her pubic hair to the

10 camera.  And at the bottom left corner of the image is the

11 date 2020-05-26, the time 21:12:18.

12 Q    And how old approximately was Deea in that photograph?

13 A    Around 12.

14 Q    Is that a redacted version?

15 A    Yes.

16 Q    Let's move on to 7.2.  Thank you.

17        Could you please describe the image in 7.2?

18 A    7.2 is another image from a -- this is back to the other

19 angle where her bed is to the left and then the sliding glass

20 door is to the right.  Within the background is a white door.

21 And in the center is Deea naked facing away from the camera

22 from just above her butt to her feet.  She's wearing white

23 socks.  She's wearing no pants and no underwear, and her butt

24 cheeks are exposed to the camera.  The bottom left corner of

25 the image is the date 2020-05, it looks like 26, 27.  I think

DIRECT EXAMINATION OF JAMES KELLER, II

1    it's 26.  And the time is 21:12:07.

2    Q    There's a note that says, "Written to device on."  What

3    does that mean?

4    A    Where are you looking at that?

5    Q    I'm sorry.  I'm looking at 7.2A which I'm holding.

6    A    Okay.  Yes, I see it.

7    Q    Okay.

8    A    So what that means, "Written to device on," so that is

9    the time that the device captured that image on the device.

10   It doesn't necessarily mean that that's exactly when the image

11   was taken, but that's when it was transferred to the device.

12   Q    Based on your training and experience, was the image in

13   7.2 child pornography?

14   A    Yes.

15   Q    Moving on, I wanted to show you an exhibit that came from

16   the Gateway just to add some context.  I'm going to show you

17   5.15A.  Is this image significant at all?

18   A    Yes.

19   Q    Why is that?

20   A    Because it was found on the Gateway computer.

21   Q    I'm showing you Exhibit 9.  Do you recognize that

22   exhibit?

23   A    Yes.

24   Q    What do you recognize it to be?

25   A    This is Deea Apostol's Apple iPhone.

DIRECT EXAMINATION OF JAMES KELLER, II

1  Q    I have handed you what's been marked as 9.1.  Do you

2  recognize that?

3  A    Yes.

4  Q    What do you recognize it to be?

5  A    That USB contains the forensic extraction of the victim's

6  iPhone.

7  Q    Did you conduct the forensic extraction?

8  A    Yes, I did.

9  Q    Did you review the forensic extraction?

10 A    Yes, I did.

11 Q    Approaching with 9.2.  Is a forensic extraction of a cell

12 phone an exact copy?

13 A    Not an exact copy.

14 Q    Is it an image?

15 A    It's a forensic extraction.  So it gets all the possible

16 data it can obtain from the cell phone.

17 Q    And were you able to obtain information from Deea's cell

18 phone?

19 A    Yes.

20 Q    And did you initial that forensic extraction in

21 Exhibit 9.1?

22 A    Yes.

23 Q    Did you make that copy of the forensic extraction

24 yourself?

25 A    Yes.

DIRECT EXAMINATION OF JAMES KELLER, II

```
 1            MS. FAVORIT:  Your Honor, at this time I move 9.1
 2  into evidence.
 3            THE COURT:  Admitted.
 4  BY MS. FAVORIT:
 5  Q    And 9.2, what do you recognize that to be?
 6  A    This is some information from the forensic extraction.
 7  Q    Did you create this report?
 8  A    Yes.
 9  Q    Is it a fair and accurate depiction of some information
10  you gathered from the forensic extraction of the iPhone?
11  A    Yes.
12            MS. FAVORIT:  Your Honor, at this time I move in 9.2.
13            THE COURT:  Admit.
14            MS. FAVORIT:  Permission to publish?
15            THE COURT:  Yes.
16  BY MS. FAVORIT:
17  Q    Could you read us the Apple ID for this device
18  information?
19  A    Yes.  It's deea.apostol@iCloud.com.
20  Q    And could you read us the Gmail that was derived from the
21  extraction?
22  A    Yes.  Deea.apostol1782@gmail.com.
23  Q    Was there any evidence of Vladlover on this iPhone?
24  A    Yes.
25  Q    Which Vladlover email?
```

DIRECT EXAMINATION OF JAMES KELLER, II

1    A    It was Vladlover40.

2    Q    What was the status of the email on the phone?

3    A    That email was blocked.

4    Q    Did the name Vlad mean anything to you based on your

5    training and experience?

6    A    Yes.

7    Q    What did it mean?

8    A    Yahoo reported Vladlover50@Yahoo.com, and then I

9    discovered Vladlover40@yahoo.com.  So it seems like they could

10   be related.

11   Q    Did you know what the word "Vlad" meant?

12   A    I've come to learn.

13   Q    How did you come to learn that?

14   A    So in my profession, a lot of investigators, we

15   corroborate information.  As legal processes change and

16   information such as -- for example, like social media is

17   constantly changing, like new platforms that now people are

18   chatting here, chatting there, and so we share information to

19   keep each other updated on the history.

20   Q    At some point did you learn information and do

21   independent research?

22   A    Yes.

23   Q    And what, if anything, did Vlad mean to you after that

24   research?

25   A    So Vlad was the author of a book, of a novel.  I would

DIRECT EXAMINATION OF JAMES KELLER, II

1  butcher his last name if I tried to say it, but it's like

2  Vlad, it starts with an N, and it was a book from 1955 with

3  the title "Lolita".

4  Q    Is Lolita a recurring theme in child pornography

5  investigations?

6  A    Yes.  There is a list of common child pornography terms.

7  And Loli, Lolita are what we consider big buzz words for child

8  pornography.

9  Q    And is that the term Loli we saw earlier in the Gateway

10  information?

11  A    Yes.

12  Q    And what is the Lolita book about?

13  A    So the Lolita book is about a character who is a

14  stepfather who falls in love and sexualizes his stepdaughter

15  throughout the novel.

16  Q    Do you see Greg Williamson in the courtroom today?

17  A    Yes.

18  Q    Could you please describe him by an article of clothing?

19  A    He is wearing a red tie and a blue shirt.

20        MS. FAVORIT:  Let the record reflect the witness has

21  identified the defendant.

22        THE COURT:  Yes.

23        MS. FAVORIT:  May I have a brief moment?

24        THE COURT:  Yes.

25  BY MS. FAVORIT:

CROSS-EXAMINATION OF JAMES KELLER, II

1  Q    In reference to the Vladlover40 email on the victim's

2  phone, did that mean it was her email?

3  A    No.  It was a blocked contact.

4  Q    Thank you.

5          MS. FAVORIT:  No further questions.

6          THE COURT:  All right.  Any cross, please, we will

7  have it now, Counsel.

8          MR. BRUNVAND:  Thank you.

9                          **CROSS-EXAMINATION**

10  BY MR. BRUNVAND:

11  Q    Good afternoon.

12  A    Good afternoon.

13  Q    You also learned during this investigation that Vlad was

14  also the name of a former boyfriend of Aliona Williamson; is

15  that correct?

16  A    That is correct.

17  Q    And did you locate on the cell phone, I think the

18  extraction is 9.2, right?  Do you have that in front of you?

19  A    I have 9.2 in front of me, yes.

20  Q    Is that an extraction report from a cell phone?

21  A    It's not an extraction report.  It's information from the

22  extraction.

23  Q    Okay.  And whose phone is that?

24  A    That's Deea Apostol's phone.

25  Q    And in reviewing that cell phone, did you find any of the

CROSS-EXAMINATION OF JAMES KELLER, II

1  emails that have been referenced in here today and purportedly

2  were emailed to Deea, find any of those on her cell phone?

3  A    I didn't find any emails like that on the cell phone.

4  Q    And did you do the same type of exam as you did on

5  Mr. Williamson's phone?

6  A    Yes.

7  Q    You examined the recycle bin?

8  A    I examined everything that the tool would allow me to

9  view.

10 Q    Okay.  All right.  And you indicated, I think to the

11 jury, that what you have and what you found is not an exact

12 copy of what was on her phone?

13 A    Correct.

14 Q    But nevertheless it's an exhaustive copy; would you say?

15 A    Yes.

16 Q    And it did not include any of those emails?

17 A    Correct.

18 Q    Do you happen to have 2, 2A, 3A, and 4A still?

19 A    I do not.

20 Q    So this is 2A.  The information that's on the top of

21 that, that says email on Thursday, January 16, 2020, where

22 does that information come from?

23 A    At the very, very top, top?

24 Q    Right, the expanded part.  It looks like it's a different

25 font, it's a larger font.  Is that something that you put in

CROSS-EXAMINATION OF JAMES KELLER, II

1  there?

2  A    Yes, to help the reader understand the translation from

3  the time.

4  Q    All right.  And where are you getting that information

5  from?

6  A    The Yahoo return was in UTC time.  So we had to calculate

7  it.

8  Q    Okay.  So that's your calculations from the UTC time

9  that's in the email below?

10  A    Correct.

11  Q    And does 2A, as far as you know, does that relate to

12  Count 5 of the indictment?

13  A    I believe it does.

14  Q    January 16, 2020, distribution count?

15  A    I believe so.

16  Q    And would it be fair to say that as far as you know, you

17  don't have any digital evidence that this ever reached Deea

18  Apostol, right?  Do you have evidence that it was emailed?

19  A    Yes.  We have evidence that it was emailed.

20  Q    You have evidence that it was intercepted by Yahoo?

21  A    Yes.  It was captured by Yahoo.

22  Q    But you don't have any evidence, any digital evidence

23  that it ever arrived in Deea Apostol's email?

24  A    Not that I have.

25  Q    Right.  Based on your analysis and everything that you

CROSS-EXAMINATION OF JAMES KELLER, II

1  looked at, you don't have that, right?

2  A    Correct.

3  Q    Okay.  If you can just go to that last page of the

4  exhibit.  And for each of these exhibits, 2, 2A, 3A, and 4A, I

5  believe you created this history user activity, right?

6  A    Correct.

7  Q    All right.  And is this strictly user activity on the

8  part of Vlad Vlad?

9  A    Yes.  This is just from the Yahoo return.

10  Q    Right.

11  A    So there is no other like information like what you see

12  on the cell phone surrounding this.

13  Q    It doesn't show you whether or not it was actually

14  distributed beyond Yahoo, right?  It doesn't show you if it

15  arrived in anyone's email?

16  A    They just show that it's "To," because Yahoo disables an

17  account when there's the incident that flags it.

18  Q    Sure.

19  A    Then from that point forward, things aren't delivered.

20  Q    Understood.  But what this shows you is activity on the

21  Vlad Vlad account.  It does not show you any activity on the

22  other side, on the other end?

23  A    Correct.

24  Q    On Deea Apostol's account?

25  A    This is just from Yahoo.

CROSS-EXAMINATION OF JAMES KELLER, II

1  Q    And that's true for each of these exhibits, correct?

2  A    Correct.

3  Q    2, 3, and 4?

4  A    Correct.

5  Q    And those exhibits, 2 relates to Count 5, 3 to Count 6,

6  and 4 to Count 7?

7  A    I have to take your word for the counts.

8  Q    Okay.  As it relates to the USB charger, we saw a charger

9  that you indicated had a slot for a microcard to be placed

10 into it, right?

11 A    Right.

12 Q    Did you locate a microcard with digital information on

13 it?

14 A    I never did locate a micro SD card.

15 Q    In looking at the report of when you refer to artifacts,

16 for example, coming from the Galaxy telephone, what does that

17 mean, an artifact?

18 A    An artifact as it pertains to digital forensics is an

19 information or a bit of information that's on a device that

20 represents something such as -- like earlier when I said

21 artifact of an application, that means that the extraction and

22 the forensic tool interacting with that extraction is showing

23 me, hey, there's a little bit of information for this.

24      And another example is Vladlover40.  That's what I

25 would call an artifact on the phone, so it's a bit of

CROSS-EXAMINATION OF JAMES KELLER, II

1   information.

2   Q    So an artifact can be anything from a portion of a word

3   to a complete email or phone number?

4   A    Yeah.  I'd say that's fair.

5   Q    When you look at the photos that are gathered from the

6   Galaxy 8, some of those have an entry on the bottom of the

7   email that we saw that says, "From Galaxy 8," right?

8   A    Correct.

9   Q    There are other emails that appeared that you were asked

10  questions about that did not have the, "From Galaxy 8."  How

11  do we explain that?

12  A    Because it depends on -- and you'll have to pull it up

13  and we'll have to compare the two.  Sometimes if it's a

14  certain email address, you have that default for -- like you

15  can change your signature.  So say for the sake of an example,

16  say you have a Yahoo email versus a Google email.  In your

17  Google account, you can have your signature preference to say,

18  like the default, I believe it's like a default is from

19  whatever phone you have, but then your Yahoo you changed to

20  the actual signature with your name and phone number.

21        So depending on where you send your email from, you

22  can technically send both from your phone, but it's dependent

23  upon that specific kind of provider that you are using to send

24  your emails.

25  Q    And the email signature?

CROSS-EXAMINATION OF JAMES KELLER, II

1  A    Right.

2  Q    So emails on the phone might have originated from the

3  phone and might have originated from a different device?

4  A    Well, yeah.  Another possibility too is that you can

5  always change at any time.  So like yesterday I could have my

6  signature say from my phone yesterday, but then I went and

7  changed it and I have it say something different today.

8  Q    So if someone wanted to make it appear that an email was

9  coming from a Galaxy phone, technically they could then put

10 into the email signature that it's coming from the Galaxy

11 phone even though it's not?

12 A    That's correct.

13 Q    Are you familiar with compromised emails?

14 A    Yes.

15 Q    And a compromised email could be an email that's

16 compromised where someone is actually using that email from

17 outside of the country, correct?

18 A    From anywhere.

19 Q    From anywhere.  Outside the country would be one

20 location?

21 A    Would be one example.

22 Q    Within the United States would be another one?

23 A    Correct.

24 Q    Within the City of North Port would be another one?

25 A    Correct.

CROSS-EXAMINATION OF JAMES KELLER, II

1   Q    And it may be someone who is using it for purposes of

2   spam, right?

3   A    It's possible.

4   Q    One scenario when someone is wanting to -- because spam

5   is frowned upon, right?

6   A    Correct.

7   Q    But it may also be used for other sinister purposes,

8   right?

9   A    Correct.

10  Q    And that could be done -- access to someone's email

11  account can also be done by people who might have access to

12  the devices, whether it's a cell phone or a computer, if they

13  are within the same parameters of where those items are

14  located?

15  A    It's hard to link the two because those are technically

16  two separate matters.  So compromised emails is different than

17  like someone just having access.  Someone having access to

18  someone's device who has their email logged in, I guess you

19  could say that's compromised, but it sounded like before you

20  were referring to compromised emails as like someone got my

21  password from the black market --

22  Q    Sure.

23  A    -- and is accessing my account.

24  Q    These are two different ways you can access someone's

25  email, right?

CROSS-EXAMINATION OF JAMES KELLER, II

1  A    Correct.

2  Q    And if someone does access the email or compromises an

3  email, they may change a password or they may not?

4  A    Yes.  It depends.

5  Q    It depends, right?  They may or they may not.

6  A    Correct.

7         MR. BRUNVAND:  One moment, Your Honor.

8         THE COURT:  Yes.

9         MR. BRUNVAND:  No other questions, Your Honor.

10        THE COURT:  All right.  Redirect, please?

11        MS. FAVORIT:  One moment, Your Honor.

12        THE COURT:  Yes.

13        MS. FAVORIT:  No questions, Your Honor.

14        THE COURT:  All right.  Thank you.  You may step

15  down.

16        Government, let's call your next witness, please.

17        MS. FAVORIT:  The government rests.

18        THE COURT:  All right.  Ladies and gentlemen, the

19  United States has rested its case.  Now, that doesn't mean

20  that the case is over, but their case in chief has concluded.

21        Let me see the lawyers at sidebar just for one

22  second.

23      (Bench conference on the record.)

24        THE COURT:  Are you putting on a case?

25        MR. BRUNVAND:  I need time to finalize that decision

CROSS-EXAMINATION OF JAMES KELLER, II

1   with him.

2          THE COURT:  Okay, good.  So we'll just send them home

3   and then tomorrow either you will put on a case or you'll

4   rest.

5          MR. BRUNVAND:  Right.  And my hope was that I would

6   have at least half an hour to talk to him about those issues,

7   whether we can do it in the back here.

8          THE COURT:  Well, we can take a little break right

9   now.  And then I'll come back out in 15 minutes and we can

10  talk about it.

11         MR. BRUNVAND:  All right.

12     (End of bench conference.)

13         THE COURT:  Ladies and gentlemen, so we are ahead of

14  schedule, so that's good.  You haven't heard the case yet.  So

15  please just keep an open mind.  Don't discuss the matter with

16  anybody.  Don't look on outside sources.  I'm betting -- don't

17  hold me to it -- that you all will have this case tomorrow to

18  deliberate and make your journey toward a unanimous verdict.

19  So right now we'll break and we'll see you at 9:00 tomorrow.

20  Thank you again for all your patience.  See you at 9:00 a.m.

21     (Juror escorted out of the courtroom.)

22         THE COURT:  Why don't we just -- y'all can be at

23  ease.  If we can just keep Mr. Williamson here for a few

24  minutes and go over these in a little bit.  Say, in 10 or 15

25  minutes we'll go over the jury instructions.

CROSS-EXAMINATION OF JAMES KELLER, II

1              So unless someone -- I mean, you can take a comfort

2    break, government.  I think that the defense needs to confer

3    about these jury instructions together.  So we'll come back in

4    about 15 minutes.  Is that okay, marshal, if we can keep

5    Mr. Williamson here, because they need to go over these jury

6    instructions?

7              We'll see you in 15.  Thank you.

8         (Recess taken.)

9              THE COURT:  Did you get a chance to talk to

10   Mr. Williamson?

11             MR. BRUNVAND:  Yes.

12             THE COURT:  Any feel for -- you still up in the air

13   on it?  That's fine.  You don't have to tell me if you're

14   still debating it.

15             MR. BRUNVAND:  Yeah, I mean --

16             THE COURT:  So tomorrow I'll call on you.  You can

17   either rest or call him.

18             MR. BRUNVAND:  Exactly.

19             THE COURT:  We probably ought to get him in here

20   before we talk any more.  Can they bring Mr. Williamson in?

21             When Mr. Williamson comes back, we will do the

22   Rule 29.

23             MR. BRUNVAND:  Yes, Your Honor.

24        (Brief recess taken.)

25             THE COURT:  Let's go back on the record here.

CROSS-EXAMINATION OF JAMES KELLER, II

1  Mr. Williamson is here.

2          I guess first things first.  Let's talk about the

3  Rule 29.

4          Counsel, have you a motion?  You can make it at this

5  time.

6          MR. BRUNVAND:  Yes, Your Honor.  At this time we

7  would move pursuant to Rule 29 for the Court to dismiss each

8  and every count, specifically Count 1, Count 2, Count 3, 4, 5,

9  6, 7, and 8.  And it is our position that the government has

10  failed to present sufficient facts to support this case going

11  to the jury looking at it in the light most favorable to the

12  government.

13          Specifically, Your Honor, as to the distribution

14  counts, which is Counts 5, 6, and 7, the government has failed

15  in producing evidence that in fact these images were

16  distributed.  They have presented evidence that they were

17  emailed, that they were then intercepted by Yahoo but that

18  they were not delivered.

19          THE COURT:  All right.  And government, why don't you

20  just touch on that last point that counsel made about the

21  distribution.  They did not -- he says they did not show up in

22  the forensic extraction of the young lady's phone.

23          MS. SCHMIDT:  Yes, Your Honor.

24          Well, first, the Yahoo witness testified that just

25  because an email is flagged, they don't stop distribution.

CROSS-EXAMINATION OF JAMES KELLER, II

1  Only once they get the tip do they shut the email down.  And

2  we heard testimony from the Yahoo witness about that.

3          There was also ample evidence from Deea about how she

4  was receiving all of these emails.  She recognized the email

5  addresses.  She testified to getting hundreds of them.  And so

6  they were distributed to Deea using those email addresses.

7          THE COURT:  All right.  Well, viewed in the light

8  most favorable to the government, I will deny the motion.

9          And let me ask you this.  So tomorrow I will just

10  call on the defense.  And if you are resting, rest.  And if

11  you are putting on a case, go ahead.

12          Do you know if that subpoenaed witness will be here?

13  I'm just curious.  If you don't know, that's fine.

14          MR. BRUNVAND:  The subpoenaed witness will be here

15  unless I excuse her this evening.

16          THE COURT:  We'll leave that to your good offices.

17          MR. BRUNVAND:  Thank you, Your Honor.

18          THE COURT:  Then let's just talk before we get into

19  the jury instructions.  So if per chance -- at some point,

20  obviously, the defense will rest, and then there may or may

21  not be any rebuttal.  Let's just talk about closings.  How

22  much time do you think you all want?  Very short trial, two

23  days, but go ahead.

24          MS. FAVORIT:  To just overestimate, 30 minutes for

25  the first and 15 for rebuttal.

CROSS-EXAMINATION OF JAMES KELLER, II

1          THE COURT:  I'll give 45 to both sides.

2          Now on these jury instructions, the one thing I did

3   catch -- or I didn't catch it, but my lawyer, one of my

4   lawyers caught it.  Obviously I will correct the issue

5   depending on -- if Mr. Williamson testifies, there will be one

6   instruction that's already in there.  And then if he doesn't,

7   then I will change that to the jury can't consider any silence

8   against him.  I'll make sure that's correct.  And then I will

9   give the floor to y'all to give me any issues you might have.

10          Page 10, the next to last, the last two paragraphs,

11  my lawyer said, and think they're correct, he's correct -- so

12  I'm looking at the last two paragraphs.  Counts 5, 6, and 7

13  charge the defendant did knowingly distribute a visible

14  depiction, and then it probably should say, in both of those

15  paragraphs, of a minor engaged in any sexually explicit

16  conduct.  So that clause probably should be in there.

17          Does anybody disagree with that?

18          MS. FAVORIT:  We agree with that, Your Honor.

19          MS. RAMOS WICKS:  I agree, Your Honor.

20          THE COURT:  So we'll make that change.

21          And then let me hear from Mr. Brunvand on the 404(b)

22  instruction.  My experience is that sometimes when you

23  highlight evidence, it makes it -- you know, it helps the

24  government.  But if you have -- if you want to -- anyway, do

25  you want that in there?  It's page 25.  Obviously it's not --

CROSS-EXAMINATION OF JAMES KELLER, II

1  the way it's written on page 25 is mid trial.  We are beyond

2  that.  I wasn't even sure when I would have read it, but is

3  there some 404(b) in here by your lights.  And if so, do you

4  want that instruction?

5          MR. BRUNVAND:  In an abundance of caution, I think we

6  should keep it in there.

7          THE COURT:  Let's just look at it then to edit it.

8  In the first line, I will delete the word "just."  And that's

9  the standard 404(b).

10          Any objection to that, government?

11          MS. FAVORIT:  No, Your Honor.

12          THE COURT:  Defense, does that sound good?

13          MS. RAMOS WICKS:  Yes, Your Honor.  No objection.

14          THE COURT:  Good.  So those are my two little hiccup

15  questions with the understanding that however the defense

16  shakes out, we will correct that one point.

17          Government, focusing on this, not to be flippant, but

18  what are your beefs?  It looks like we repeated pages 2 and 3,

19  so we'll delete one of those pages, I think.  Well, wait a

20  minute.

21          MS. FAVORIT:  They look a little bit different.

22          THE COURT:  Say again.

23          MS. FAVORIT:  I think the last paragraph is

24  different.

25          THE COURT:  It is, so let's just look at it.  So the

CROSS-EXAMINATION OF JAMES KELLER, II

1  last -- we will keep those right now.  And then I will adjust

2  it on the fly depending on what the defense presents in the

3  morning.  Okay?

4         What else?  Does the government have any other beefs?

5         MS. FAVORIT:  It's not a beef, but on page 18 there's

6  just a random "R."

7         THE COURT:  A random "R."  Hold on.  Yeah, that was

8  weird.  Delete the random "R."

9         MS. FAVORIT:  And then page 26, I think we could

10  remove or at least flag it for after the defendant's case.  We

11  didn't present any defendant statements after --

12         THE COURT:  All right.  So we will delete that.  You

13  agree.  You would not anticipate -- the only reason I'd leave

14  it is if you thought there was a very outside chance on a

15  rebuttal case there's some statement you would put on.

16         MS. FAVORIT:  There is a chance if he testifies.

17         THE COURT:  We will just leave it, but then don't

18  forget to remind me to take it out.  It's conditional.

19         Any other?

20         MS. FAVORIT:  Nothing else, Your Honor.

21         THE COURT:  Anything for the defense?

22         MS. RAMOS WICKS:  No, Your Honor.

23         THE COURT:  So we're good.  I'll make those little

24  changes.

25         MS. RAMOS WICKS:  Your Honor, I apologize.  I just

CROSS-EXAMINATION OF JAMES KELLER, II

 1  want to make our preference known between pages 2 and 3.  Upon

 2  consultation with Mr. Brunvand, we would like to keep page 3.

 3          THE COURT:  Page 3 as written unless he testifies and

 4  then --

 5          MR. BRUNVAND:  Right.  I think it's appropriate

 6  either way.

 7          THE COURT:  Well, if Mr. Williamson testifies, then

 8  it will be the defendant does not have to testify, but in this

 9  case he did, and you should adjudge his testimony as you would

10  any other witness.

11          MR. BRUNVAND:  Right.

12          THE COURT:  Okay.  We will make sure that that jibes

13  with whatever you all decide to do in the morning.

14          MR. BRUNVAND:  Okay.

15          THE COURT:  Anything else on these instructions?

16          MS. RAMOS WICKS:  No, Your Honor.

17          THE COURT:  We will see you all 9:00.  If it moves

18  quickly or not at all, we are going to jump right into

19  closings.

20          Thank you, Counsel.

21          MR. BRUNVAND:  Thank you.

22          MS. FAVORIT:  Thank you.

23      (Proceedings concluded at 5:05 p.m.)

24

25

CROSS-EXAMINATION OF JAMES KELLER, II

1 | UNITED STATES DISTRICT COURT    )
                                    )
2 | MIDDLE DISTRICT OF FLORIDA      )

3

### REPORTER TRANSCRIPT CERTIFICATE

4

5     I, Tracey Aurelio, Official Court Reporter for the United States District Court, Middle District of Florida, certify, pursuant to *Section 753, Title 28, United States Code*, that

6 the foregoing is a true and correct transcription of the stenographic notes taken by the undersigned in the

7 above-entitled matter (Pages 1 through 215 inclusive) and that the transcript page format is in conformance with the

8 regulations of the Judicial Conference of the United States of America.

9

10                             /s    *Tracey Aurelio*

11                             Tracey Aurelio, RMR, RDR, CRR
                                Official Court Reporter

12                             United States District Court
                                Middle District of Florida

13                             Tampa Division
                                Date:  September 16, 2024

14

15

16

17

18

19

20

21

22

23

24

25